

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



'09 CIV 00289

| | |
|---|---|
| REPEX VENTURES S. A, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF; BERNARD L. MADOFF INVESTMENT SECURITIES; BANK MEDICI S.A.;  SONJA KOHN; PETER SCHEITHAUER; HERALD USA FUND; HERALD LUXEMBURG FUND; BANK AUSTRIA CREDITANSTALT; UNICREDIT S.A.; PRIMEO SELECT FUNDS; PIONEER ALTERNATIVE INVESTMENTS; THEMA INTERNATIONAL FUND PLC; ERNST & YOUNG LLP, and HSBC HOLDINGS PLC, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## SUMMARY OF THE ACTION

Plaintiff, Repex Ventures S. A, (" Repex") by its attorneys, submits this Class Action Complaint (the "Complaint") against defendants Bernard L. Madoff ("Madoff"), Bernard L. Madoff Investment Securities ("BMIS"), Bank Medici, ("Medici"), Sonja Kohn ("Kohn"), Peter Scheithauer ("Scheithauer"), Herald USA Fund and Herald Luxemburg Fund (collectively, "Herald Funds"), Bank Austria Creditanstalt ("Bank Austria"), Unicredit S.A. ("Unicredit"), Primeo Select Funds ("Primeo Funds"), Pioneer Alternative Investments ("Pioneer"), Thema International Fund plc, ("Thema Fund") Ernst & Young LLP ("E&Y") and HSBC Holdings plc ("HSBC"). Plaintiff alleges the following based upon the investigation of plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This matter involves a massive and unprecedented Ponzi-scheme. Over the past several years, Madoff and BMIS amassed billions of dollars in private investments. On December 11, 2008, Madoff was arrested by federal authorities after confessing to his children that he was operating a $50 billion Ponzi scheme, in which Madoff used the investments of new clients to pay for fictitious "returns" to other clients. Madoff and BMIS were charged with securities fraud by the SEC. They both were also criminally charged with securities fraud by the U.S. Attorney's Office in the Southern District of New York.

2.      After Madoff was arrested, numerous investment funds disclosed that they were little more than feeder funds for Madoff and BMSI. Such funds included the Herald, Primeo, and Thema Funds. They each sought funds directly from investors, and delivered, or fed the

investments they received to Madoff. Medici controlled the Herald, Primeo, and Thema Funds, and caused these funds to be fed to Madoff.

3.     Medici, along with Kohn, Scheithauer, Bank Austria, Unicredit, and Pioneer (collectively, the "Fund Managers") each represented to investors that they would use their respective investors funds for investing in the securities market, and that the investors would share the profits from such investments. The Fund Managers promised steady returns, sometimes in excess of 10% of the investment profits.

4.     The Fund Managers did not inform their investors that they were acting as feeder funds for Madoff. Madoff forbade the Fund Managers from naming him as the actual manager in their performance summaries or marketing literature.

5.     The Fund Managers also represented and reported that existing investors were making profits on their investments, thereby encouraging further investments from new and existing investors.

6.     In truth, plaintiff and other members of the proposed Class were not sharing in true returns on their investments in the securities market. Instead, Madoff and BMSI systematically stole investor funds for their personal use and for making payments to other investors in order to create the false appearance of high returns on investments.

7.     E&Y were at all relevant times the accountants for both the Herald and Primeo Funds. E&Y audited the Herald and Primeo Funds and falsely represented to Plaintiff and the Class that their investments were secure and gaining value. E&Y ignored the many red flags which would have shown that these funds were not safe and growing, but were instead invested in a Ponzi scheme.

8.     The Herald, Primeo, and Thema Funds, along with the Fund Managers, ignored many red flags that should have caused them, as investment professionals, to conduct further due diligence and/or alter their investment decisions.  These red flags included, among others:

      a.     the lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

      b.     BMIS' returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

      c.     the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generated returns even remotely comparable to those generated by Madoff;

      d.     Madoff acted as his own prime broker, whole most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

      e.     unlike most hedge funds, which charge investment management fees based on the performance of the fund, BMIS only generated revenue through transaction-based commission fees;

      f.     monthly account statements sent to Madoff's investors did not support the returns they reported;

      g.     in 1999, one of Madoff's competitors, Harry Markopolous, sent a letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme";

      h.     BMIS' auditor, Freihling & Horowitz, consisted of one office in Rockland County, New York, with three employees, one of whom was 78 years old and lived in Florida, and one of whom was a secretary;

i.    regulatory filings of the feeder funds showed very small positions in equities, which the feeder funds explained was due to Madoff's strategy of converting all the assets to case equivalents at the end of every quarter, but there was no record of the estimated $13 billion in assets being moved all at one; and

j.    BMIS' comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers.

9.    Defendants' representations regarding their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management were false and misleading, because defendants either conducted no due diligence, or their due diligence was so reckless that they missed these and other obvious warning signs.

10.    Had defendants conducted proper due diligence investigations, Madoff and BMIS' improper conduct would have been revealed, and plaintiff and the other members of the Class would not have invested in the Herald, Primeo, and Thema Funds.

11.    As a result of defendants' wrongful conduct, including the failure to conduct due diligence into the legitimacy of BMIS, the Herald, Primeo, and Thema Fund's investments in BMIS have been wiped out, thereby damaging plaintiff and the other members of the Class.

12.    Plaintiff seeks to recover damages caused to the Class by defendants' violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934.

## PARTIES

13.    Plaintiff Repex is a corporation incorporated under the laws of the British Virgin Islands. Repex had invested in Herald (LUX) U.S. Absolute Return Fund controlled by Medici.

14.     Plaintiff's investment appears to have been taken by defendants and used as part of the Ponzi-scheme described herein. Plaintiff thereby has been damaged.

15.     Defendant Medici is based in Vienna, Austria with offices located in New York, Milan, Gibraltar and Zurich. Medici was incorporated in Austria on 9 March 1994 and was granted a full banking licence by the Austrian Financial Authority on 3 December 2003. Defendant Kohn at all relevant times controlled 75 percent of Medici. Bank Austria, which is owned by Defendant UniCredit, at all relevant times held the rest. Medici, at all relevant times, owned and marketed the Herald funds, which were feeder funds for Madoff. It was also, at all relevant times, the manager of the Thelma fund, which under Medici also became a feeder fund for Madoff. Through Unicredit's subsidiary Pioneer, at all relevant times Medici controlled the Primeo Funds and caused them to become feeder funds for Madoff.

16.     Defendant Madoff is a resident of New York, New York. He is a former chairman of the Board of Directors of the Nasdaq stock market. He controlled investment adviser services and finances at BMIS, and is the sole owner of BMIS, a company which he appears to have founded in the 1960s.

17.     Defendant BMIS is a broker-dealer and investment adviser registered with the SEC. BMIS formally engages in three operations, which include investment adviser services, market making services, and proprietary trading. According to the BMIS website, BMIS recently ranked among the top 1% of U.S. Securities firms.

18.     In January 2008, BMIS filed a Form ADV with the SEC, stating that BMIS had over $17 billion in assets under management. BMIS represented that its trading strategy for adviser accounts involved trading in baskets of equity securities and options thereon.

19.     Unicredit at all relevant times was a European bank holding company which owned 25% of Medici through its subsidiary Austria Bank. It also provided Medici with access to its subsidiary Pioneer's Primeo Funds. Unicredit acquired Pioneer in 2000 and grew assets to $72 bln as of the end of 2007. Pioneer's Dublin-based Alternative Investments division paid Medici commissions of €835k euros in 2007 for referring investors. Almost all of Pioneer's Primeo Select Fund was invested with Madoff. The fund's assets were reported as $280 million.

20.     Defendant Kohn is the founder of Medici, its chairperson, and a 75% owner. At all relevant times she was a control person of Medici

21.     Defendant Scheithauer was at all relevant times the CEO of Medici. He was also a control person of Medici.

22.     Defendant Herald Funds were at all relevant times were investment funds created and sold by Medici. Unknown to investors, 100% of the Herald Funds were transferred to Madoff. The Herald (LUX) U.S. Absolute Return Fund was started in March of 2008.

23.     Defendant Bank Austria at all relevant times owned 25% of Medici. It is a control person of Medici and also a subsidiary of Unicredit.

24.     Defendant Primeo Funds were at all relevant times owned by Pioneer. Primeo Funds at all relevant times were controlled by Medici and Unicredit and invested with Madoff.

25.     Defendant Pioneer was owned at all relevant times by Unicredit.

26.     E&Y at all relevant times was the accountant for the Primeo and Herald Funds.

27.     Defendant Thema Fund at all relevant times was controlled by Medici and invested with Madoff.

28.     Defendant HSBC was at all relevant times the custodian of, among other funds, the Herald (LUX) U.S. Absolute Return Fund.

29.     Each defendant had a duty to the putative Class members to use and manage their investment funds with due care, and to disseminate accurate and truthful information with respect to the use and management of such funds.

30.     Each defendant participated in the Ponzi-scheme complained of herein and/or was aware of, or recklessly disregarded, the misuse and mismanagement of investment fund belonging to plaintiff and the proposed Class, and/or was aware of, or recklessly disregarded, the material misstatements or omissions associated with the Ponzi-scheme alleged herein.

## GENERAL ALLEGATIONS

31.     Defendants have plundered the investments of plaintiff and the putative Class by using its invested capital in a giant Ponzi-scheme ultimately conducted by or through defendant BMIS.

32.     In the first week of December 2008, a senior BMIS employee apparently understood that the company's investment advisory business had between $48 billion and $50 billion in assets under management. On or about December 9, 2008, Madoff informed another senior employee that Madoff wanted to pay early bonuses to BMIS employees.

33.     On or about December 10, 2008, the two senior employees met with Madoff at his apartment in Manhattan. At that time, Madoff informed them that, in substance, his investment advisory business was a fraud. Madoff reported to have stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie" and that the business was "basically, a giant Ponzi-scheme."

34.     In substance, Madoff admitted that he had for years been paying returns to certain investors out of the principal received from other investors. Madoff also stated that BMIS was insolvent, and that it had been for years. Madoff also estimated the losses from this fraud to be approximately $50 billion dollars.

35.     Madoff further informed the two senior employees that he planned to surrender to authorities, but first, he still had about $200 million to $300 million dollars left, and he intended to distribute it to certain selected employees, family, and friends.

36.     In addition, defendants materially misled putative Class members by providing them with false and misleading statements about their investment returns and/or concealing the Ponzi-scheme from them. At all relevant times, the alleged misrepresentations and/or concealment of material facts induced the putative Class members to invest their capital with, and to maintain their investment with, defendants. As a result, the investment capital acquired from plaintiff and the other putative Class members is reported to be lost.

37.     All defendants knew that their representations about their investment activities were false and misleading, and knew that their concealment of the true nature and status of the investments would materially mislead putative Class members. Defendants also knowingly and substantially participated or acquiesced in the unlawful and fraudulent manipulation of investment capital placed with them for investment in the securities market.

38.     During the Class Period, Madoff operated a massive Ponzi scheme, in which he used the principal investments of his investors, including the Herald, Primeo, and Thema Funds, to pay the fictitious "returns" of other investors. According to a December 19, 2008 *Bloomberg*

article, U.S. government regulators investigating Madoff found evidence that the scheme began at least as early as the 1970s.

39.    For years since the inceptions of Madoff's scheme, there have been myriad warnings meaningful to investment professionals that Madoff and/or BMIS were perpetrating a fraud on investors.  Some the of the red flags are discussed in the paragraphs that follow.

40.    In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns fo 13.5 to 20 percent, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

41.    In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

42.    In May 2001, the article "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry.  In the article, author Michael Ocrant wrote:

    a.    "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feed fund known as Fairfield Sentry . . . .[The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.     "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executive, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

c.     These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

d.     "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

e.     "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel of the firm's professionals."

f.     "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds fir by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

g.     "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% vested.'"

h.     "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those

who believe there is something more to it and are seeking an answer beyond that are wasting their time."

43.     On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote:

a.     The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great deal.' Nor were the firms that market Madoff's fund forthcoming."

b.     "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. Three options strategists for major investment banks told *Barron's* they couldn't understand how Madoff churns out such numbers using this strategy."

c.     "Adding further mystery to Madoff's motives is the fact that he charges no fees for his money management services."

d.     "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - even though they don't understand how he does it. 'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told *Barron's*. 'People who have all the trade confirms and statements still can't define it very

well.' . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money."

      e.     "'What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here," says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

      44.     On November 7, 2005, Markopolous submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolous identified 29 red flags that were signs of highly suspicious activity in BMIS, including, among others:

      a.     *"why would B[ernie] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee = 20% of the profits?"* (Emphasis in original.)

      b.     "The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature . . . . ***Why the need for such secrecy?*** *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings."* (Emphasis in original.)

c. *"It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! ... However, BM's performance numbers show only 7 extremely small [monthly] losses during 14½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"* (Emphasis in original.)

d. *"Madoff does not allow outside performance audits."* (Emphasis in original.)

e. "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's." (Emphasis in original.)

f. *"Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge fund, fund of fund to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's [fund of funds] charge only 1% and 10%, yet BM allows them the extra 10%. Why? Any why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?"* (Emphasis in original.)

g. *"BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for 'cleaner financial statements' according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud."* (Emphasis in original.)

Page -14-

45.     In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.     Madoff's auditor, Friehling & Horowitz, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who live in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big 3 accounting firm. Friehling & Horowitz is now under investigation by the district attorney of Rockland County; and

c.     Aksia discovered the 2005 letter from Markopolous to the SEC described above.

46.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing. The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

47.     In addition to the foregoing, investment advisors, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying , "Our due diligence, which got into

both account statements of [Madoff's] customers and the audited statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

48.     Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vests hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets . . . There's clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

49.     Throughout the Class Period, the Herald, Primeo, and Thema Fund each would disseminate fund performance updates. As late as December 2008, the performance report showed consistent positive net returns for the first 11 months of 2008, even during the months of September, October, and November, when the stock market has been in a tailspin. In fact, the performance report showed positive year-to-date net returns for the years 1998 through the first eleven months of 2008. These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

50.     Had Herald, Primeo, and Thema Funds, or the Fund Managers conducted due diligence into Madoff and BMIS, they would have discovered at least some the dozens of red flags identified herein. At the very least, like Aksia, defendants should have been able to discover the existence of Markopolous' letter, which would put them on notice of the red flags identified therein.

## JURISDICTION AND VENUE

51. Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act")[15 U.S.C. § 78aa] and 28 U.S.C. §§1331, 1337.

52. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) and (c). Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.

53. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## CLASS ACTION ALLEGATIONS

54. This is a class action on behalf of those who purchased investments in funds that were controlled or managed by Medici and in turn provided to Madoff between January 12, 2004 and January 12, 2009, inclusive, (the "Class Period"). Excluded are defendants, directors and officers of the various defendants, and their families and affiliates (the "Class"). Class members are so numerous that joinder of them is impracticable

55. Common questions of law and fact predominate and include whether defendants (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) and knew or recklessly disregarded that their statements were false.

56. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the

interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Violation of § 10(b) of the 1934 Act Against all Defendants

57.     Plaintiff repeats the allegations set forth above.

58.     Defendants violated § 10(b) and Rule 10b-5 by:

    a.     Employing devices, schemes, and artifices to defraud;

    b.     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c.     Engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Class in connection with their purchase or acquisition of Medici controlled investment funds.

59.     Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for the Herald, Primeo, and Thema Funds that were provided to Madoff during the Class Period.

60.     The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

61.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Medici controlled funds that were provided to Madoff.  Plaintiff and the Class would not have purchased these investments at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### Violations of Section 20(a) of the 1934 Act Against Certain Defendants

62.     Plaintiff repeats the allegations set forth above.

63.     Medici was a control person  within the meaning of § 20(a) of the 1934 Act as alleged herein for the Herald, Primeo, and Thema Funds.  By virtue of its position in these funds, participation in and/or awareness of their operations and/or intimate knowledge of their internal financial condition and business practices, Medici had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Herald, Primeo, and Thema Funds, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

64.     Bank Austria was a control person of Medici.  By virtue of its ownership interest in Medici, participation in and/or awareness of its operations and/or intimate knowledge of its internal financial condition and business practices, Bank Austria had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Medici.

65.     Kohn and Scheithauer were also control persons of Medici.  Due to their high corporate positions, participation in and/or awareness of Medici's operations and/or intimate knowledge of its internal financial condition and business practices, Kohn and Scheithauer had

the power to influence and control and did influence and control, directly or indirectly, the decision-making of Medici.

66.     As set forth above, the defendants violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.

67.     As a direct and proximate result of the wrongful conduct of defendants, plaintiff and other members of the Class suffered damages in connection with their purchase of the Herald, Primeo, and Thema Funds.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding expenses, costs and attorneys' fees; and such equitable/injunctive or other relief as the Court may deem proper.

//

//

//

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 12, 2009

                                         **STULL, STULL & BRODY**

By: _____
                Jules Brody (JB-9151)
                Patrick K. Slyne (PS-1765)

                6 East 45th Street
                New York, New York 10017
                (212) 687-7230 (Tel)
                (212) 490-2022 (Fax)

                **STULL, STULL & BRODY**
                Timothy J. Burke
                10940 Wilshire Boulevard
                Suite 2300
                Los Angeles, California 90024
                (310) 209-2468 (Tel)
                (310) 209-2087 (Fax)
                Email: service@ssbla.com

                Plaintiff's Counsel

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Plaintiff REPEX VENTURES S.A. ("Plaintiff"), by a corporate officer, makes this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D(a)(2) of Title I of the Securities Exchange Act of 1934.

The corporate officer has reviewed a version of the complaint and authorize its filing on the corporation's behalf. Plaintiff retains Stull, Stull & Brody to pursue this litigation on a contingent fee basis.

Plaintiff did not purchase the security that is the subject of this action, at the direction of counsel or in order to participate in any action arising under Title I of the Securities Exchange Act of 1934.

Plaintiff is willing to serve as a Lead Plaintiff. A Lead Plaintiff is a representative party who acts on behalf of the class in directing the litigation, and whose duties include providing testimony at deposition and trial, if necessary.

The following are all of plaintiff's transactions in Herald (LUX) U.S. Absolute Return Fund securities during the last 5 years.

| Date | Purchase or Sale | Number of Shares | Price Per Share |
|------|------------------|------------------|-----------------|
| 2008-02-28 | Purchase | 700 | $1,000.00 |

During the (3) three year period preceding the date on which this certification is signed, plaintiff has not sought to serve as a representative party on behalf of a class under Title I of the Securities Exchange Act of 1934.

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The matters stated in this declaration are true to the best of plaintiff's current knowledge, information and belief.

Plaintiff hereby certifies, under penalty of perjury, that the foregoing is true and correct.

Executed this ___11___ day of January 2009.

/Elena Slipe/
(Signature)

For Repex Ventures, S.A.