## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



RECEIVED

FEB 1 1 2010

U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| In re HERALD, PRIMEO and THEMA FUNDS SECURITIES LITIGATION, ) <br> This Document Relates To: ) <br> *Repex Ventures, S.A., etc. v. Bernard L. Madoff, et al.* ) | Civil Action No. 09 CIV 289 (RMB) (HBP) <br> (Consolidated with 09 CIV 2032 and 09 CIV 2558) <br><br> **ECF Case** |

## AMENDED CLASS ACTION COMPLAINT

## <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff Repex Ventures, S.A. by it's attorneys, submits this Class Action Complaint for violation of federal securities laws (the "Complaint") against Defendants Herald Fund SPC-Herald USA Segregated Portfolio One ("Herald (USA)"), Herald (LUX), (collectively, "Herald Funds"), Herald Asset Management Limited ("HAML"), Paul de Sury, Gabriel Safdié, William A. Jones, Bank Medici, ("Medici"), Unicredit S.A. ("Unicredit"), Sonja Kohn ("Kohn"), Peter Scheithauer ("Scheithauer"), Helmuth E. Frey, Andreas Pirkner, Friedrich Pfeffer, Franco Mugnai, Richard Goddard, Hannes Saleta, Bank Austria Creditanstalt ("Bank Austria"), Ernst & Young S.A., Ernst & Young, Cayman Islands, and Ernst & Young Global Limited (collectively, the "E&Y Defendants"), HSBC Securities Services (Luxembourg) S.A., and HSBC Holdings plc (collectively, the "HSBC Defendants"), and Friehling & Horowitz ("F&H"). Due to their bankruptcy, neither Bernard Madoff ("Madoff") nor his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS") are defendants in this action. Lead Plaintiff alleges the following based upon the investigation of Lead Plaintiff's counsel. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be obtained after a reasonable opportunity for formal discovery.

## SUMMARY OF THE ACTION

1.      Lead Plaintiff's claims arise from the massive Ponzi scheme perpetrated by Madoff Madoff through his investment firm BMIS. As the public learned on December 11, 2008, Madoff stole hundreds of millions of dollars for personal enrichment and misappropriated billions more to perpetuate the scheme, which is, undoubtedly, the largest heist in financial history. As a result, Madoff has been sentenced to 150 years in prison. The Securities and Exchange Commission ("SEC") and numerous financial agencies are vigorously searching for

the stolen funds.  And, the tally to date indicates that approximately $65 billion have disappeared.

2.      Madoff, however, did not act alone.  Madoff deployed a web of sales teams throughout the world, but based in the United States in this instance, that captured tens of billions of dollars in investment vehicles, commonly referred to as feeder funds.  These feeder funds were established exclusively for the purpose of investing with Madoff, in what was effectively one integrated and coordinated operation.  For this reason, the feeder funds had no offices, employees, or existence, aside from the corporate form in an offshore jurisdiction.  A bank account that merely served as a pass through to wire monies to Madoff.  All investment operations were carried out by Madoff in New York.

3.      To lure investors, however, the feeder funds marketed themselves as sophisticated financial institutions that would safeguard investors' monies and conduct strict oversight of Madoff.  But the feeder funds were making hundreds of millions of dollars in fees, and these fees were being paid in real cash that was not fictitious.  Cash that they have kept to this day.  Not surprisingly, those enormous fees served as a sufficient incentive for the feeder funds to intentionally ignore the blatant signs of Madoff's wrongdoing, given that the real risk of loss was borne by the investors, not the funds.  Madoff had essentially paid off the feeder funds to stop asking questions.

4.      In this instance, Madoff used Sonja Kohn to funnel investors' money from Europe to his headquarters in New York.  Starting in the mid-1990's and continuing through 2008, Kohn organized and marketed a number of feeder funds, including the Herald Funds. Lead Plaintiff and other members of the Class invested in one of two feeder funds, Herald (USA)

and Herald (LUX).  Both funds were established by Kohn through Bank Medici to invest with Madoff.  Each was nothing more than a pass-through vehicle that gave one-hundred percent of its assets to Madoff.  Additionally, the fact that investors' money was being transferred to Madoff was rarely, if ever, disclosed.

5.      Also not disclosed to investors was the fact that Madoff made tens of millions of dollars in payments to Kohn.  According to Madoff's secretary, Kohn was paid *at least* $800,000 per quarter by Madoff for her part in funneling money to Madoff.  Kohn was also paid nearly $526,000 by Cohmad Securities, a Madoff-linked firm.  In exchange for these payments, Madoff and Bernard L. Madoff Investment Securities LLC ("BMIS") were able to amass billions of dollars in private investments funneled through Kohn.

6.      Medici, Kohn, and other defendants represented to investors that they would use their respective investors funds for diversified investing in the securities market, and that the investors would share the profits from such investments.  Defendants promised steady returns, sometimes in excess of 10% of the investment profits.

7.      Defendants also represented and reported that existing investors were making profits on their investments, thereby encouraging further investments from new and existing investors.

8.      In truth, Lead Plaintiff and other members of the proposed Class were not sharing in true returns on their investments in the securities market.  Instead, Madoff and BMIS systematically stole investor funds for their personal use and for making payments to other investors in order to create the false appearance of safe, steady, high returns on investments.

9.     The Herald Funds and other defendants ignored many red flags that obligated them, as investment professionals, to conduct further and proper due diligence and/or alter their investment decisions.  These red flags included, among others:

a.     the lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

b.     BMIS' returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

c.     the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generated returns even remotely comparable to those generated by Madoff;

d.     Madoff acted as his own prime broker, while most hedge funds use large well established banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

e.     unlike most hedge funds, which charge investment management fees based on the performance of the fund, BMIS only generated revenue through transaction-based commission fees;

f.     in 1999, one of Madoff's competitors, Harry Markopolous, sent a letter to the SEC claiming that "Madoff Securities is the world's largest Ponzi Scheme";

g.     BMIS' auditor, Friehling & Horowitz, consisted of one office located in a strip mall in New City, New York, which was no larger than a small coffee shop.  Defendants not only never contacted F&H to confirm or to inquire about the extent of the supposed audit, but they also never checked F&H's status with the American Institute of Certified Public Accountants ("AICPA").  Had they done so, they would have discovered that F&H filed a form

every year with the AICPA certifying that F&H did not conduct any audits.  David Friehling, the sole practitioner at F&H, has since been criminally convicted;

        h.        regulatory filings of the feeder funds showed very small positions in equities, which the feeder funds explained was due to Madoff's strategy of converting all the assets to cash equivalents at the end of every quarter, but there was no record of the estimated $65 billion in assets being moved all at once; and

        i.        while investment advisers almost universally have a third-party custodian that assures independence, Madoff was an extremely rare exception who demanded that he, through BMIS, be the custodian.  This unusual arrangement squarely raised the critical concern of how to verify the existence of assets as well as the integrity of the account statements issued by BMIS.  As renowned securities expert and Columbia Law School Professor John Coffee said, "[b]eing your own custodian violates the first rule of common sense, you can't be your own watchdog."[1] In addition, because BMIS was also a broker-dealer, BMIS generated its own trading confirmations for investors as well (via an outdated dot-matrix printer).  By combining the broker-dealer entity with an investment custodian, BMIS created an insulated, self-sustaining financial enterprise which generated all reporting to its investors – including the Herald Funds – without any third-party oversight.

        10.        Defendants' representations regarding their oversight, thorough manager research, careful due diligence, risk allocation, and portfolio management were false and

---

    [1]  Cristina McEachern Gibbs, "Proposed Bill: $100 Million to Crack Down on Wall Street Fraud," Advanced Trading, January 27, 2009; http://www.advancedtrading.com/regulations/showArticle.jhtml?articleID=212902968.

misleading, because Defendants either conducted no due diligence, or their due diligence was so reckless that they missed these and other obvious warning signs.

11. Had Defendants conducted proper due diligence investigations, Madoff and BMIS' improper conduct would have been revealed, and Lead Plaintiff and the other members of the Class would not have invested in the Herald Funds.

12. The Herald Funds and their Fund Managers, however, were not the only Defendants who ignored the obvious red flags surrounding Madoff, so did Ernst & Young S.A., who were at all relevant times the auditor for the Herald Funds

**The E&Y Defendants' Wrongful Conduct**

13. As set forth in detail below, the E&Y Defendants collaborated in providing the audit opinions issued by E&Y to Herald (USA) Fund investors. The E&Y Defendants were required to obtain independent confirmation that Madoff had custody of the Herald (USA) Fund assets. E&Y however, never confirmed that the assets existed – ignoring the most critical aspect of any audit. Instead, the E&Y Defendants simply accepted Madoff's assertion that he held all $3.2 billion worth of Herald Fund's monies, without ever obtaining any other confirmation. The failure to conduct this routine and most basic auditing procedure is sufficient to establish that the E&Y Defendants conducted no audit at all.

14. Madoff told feeder fund auditors that the U.S. Treasury Bills were traded through the Government Securities Clearing Corporation ("GSCC") and held at Bank of New York ("BONY"). While Madoff was a broker-dealer for stocks, he was not a broker-dealer for government securities and, therefore, could not take custody of U.S. Treasury Bills. None of the E&Y Defendants ever contacted GSCC or BONY to confirm the existence of the billions of

dollars in U.S. Treasury Bills reported in the Herald(USA) Funds' balance sheets at the end of each year. If they had, they would have discovered that the U.S. Treasury Bills did not exist.

15. The E&Y Defendants also never communicated with Madoff's auditors F&H, nor investigated F&H's credentials. One of the first procedures mandated by the auditing standards at issue here (discussed in detail below) required the E&Y Defendants to vet Madoff's auditor. This was due to the fact that both Herald Funds had one-hundred percent of their funds invested in Madoff and, in effect, the Herald Funds were nothing more than pass-through vehicles into Madoff. Accordingly, an audit opinion of Herald Funds required that the E&Y Defendants conduct certain procedures on the reliability of Madoff's financial statements. Those financial statements, however, were completely phony. Had the E&Y Defendants conducted even a minimal investigation of F&H, they would have discovered that F&H had never audited BMIS. E&Y, however, never communicated, directly or indirectly, nor sought to communicate with F&H. That, in and of itself, is also sufficient to establish that the audit by E&Y amounted to no audit at all.

16. Accordingly, Lead Plaintiff asserts common law claims for, *inter alia*, breach of fiduciary duty, gross negligence, negligence, and unjust enrichment, as well as, claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b5, promulgated thereunder by the SEC.

17. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of Herald Funds on December 10, 2008, or (ii) purchased shares of Herald Funds from January 14, 2004 to December 10, 2008 (the "Class Period"), and were damaged thereby

due to the wrongful conduct alleged in this Complaint (the "Class"). Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

## PARTIES

18.     Lead Plaintiff Repex Ventures, S.A. is a corporation incorporated under the laws of the British Virgin Islands. Repex invested in Herald (LUX) Fund. Lead Plaintiff's investment has been taken by Defendants and used as part of the Ponzi-scheme described herein. Lead Plaintiff thereby has been damaged.

19.     Plaintiff Dana Trezziova invested in Herald (USA) Fund. Plaintiff's investment has been taken by Defendants and used as part of the Ponzi-scheme described herein. Plaintiff thereby has been damaged.

20.     Defendant Herald (USA) also known as Herald Fund SPC, is an exempted segregated portfolio company (or investment fund) organized under the laws of the Cayman Islands, with a principal place of business at M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, South Church Street, Georgetown, Grand Cayman, Cayman Islands.

21.     Defendant HAML was at all relevant times the investment manager to Herald (USA). Its principle place of business is Whitehall House, 238 North Church Street, P.O. Box 31362 Seven Mile Beach, George Town, Grand Cayman, Cayman Islands, B.W.I.

22.     Defendant Paul de Sury was at all relevant times a director and control person of HAML.

23.     Defendant Gabriel Safdié was at all relevant times a director and control person of HAML.

24.     Defendant William A. Jones was at all relevant times a director and control person of HAML.

25.     Defendant Herald (LUX) is a Société d'Investissement à Capital Variable (or investment fund) organized under the laws of Luxembourg, with a principal place of business of 40, avenue Monterey, L-2163 Luxembourg.

26.     Defendant Medici is based in Vienna, Austria and claimed on its web-site to have offices located in New York, Milan, Gibraltar and Zurich.  Medici was incorporated in Austria on March 9, 1994 by Kohn under the name Medici Finanz Beratung GmbH and was granted a full banking licence by the Austrian Financial Authority on December 3, 2003, when Bank Austria acquired a 25% interest.  Defendant Kohn at all relevant times owned 75 percent of Medici.  Bank Austria, which is owned by Defendant UniCredit, at all relevant times held the rest.  Medici, at all relevant times, owned, marketed, and served as investment manager and global distributor of the Herald Funds.  Today, Medici's management is being overseen by the Austrian government following the government's launch of a probe, on January 15, 2009, into Medici's actions.

27.     Madoff was a resident of New York, New York prior to his sentencing.  He is a former chairman of the Board of Directors of the Nasdaq stock market.  He controlled investment adviser services and finances at BMIS, and is the sole owner of BMIS, a company which he appears to have founded in the 1960s.

28.     Defendant Unicredit at all relevant times was a European bank holding company which owned 25% of Medici through its subsidiary Austria Bank.

29.     Defendant Kohn is the founder of Medici, its chairperson, and a 75% owner.  At all relevant times she was a control person of Medici.  Kohn knew, but did not share with Lead Plaintiff or members of the proposed Class, that she received approximately $40 million dollars in kickbacks from Madoff for steering billions of dollars from investors to his multi-billion dollar fraud.

30.     Defendant Scheithauer was Medici's chief executive officer from August 2008 until 2009.  He was also a control person of Medici.

31.     Defendant Helmuth E. Frey was, at all relevant times, chairman and director of Herald (LUX).  He was also a director of Medici and served as Medici's chief executive officer from February 2006 to August 2008.  He was also a control person of Herald (LUX) and Medici.

32.     Defendant Andreas Pirkner was at all relevant times a delegate of the Herald (LUX) board of directors.  He was also a director and employee of Medici.  He was also a control person of Herald (LUX) and Medici.

33.     Defendant Friedrich Pfeffer was, at all relevant times, a director of Herald (LUX) and Herald (USA).  He was also a control person of both Herald (LUX) and Herald (USA).

34.     Defendant Franco Mugnai was, at all relevant times, a director of Herald (LUX) and Herald (USA).  He was also a control person of both Herald (LUX) & Herald (USA).

35.     Defendant Richard Goddard was at all relevant times a delegate of the Herald (LUX) board of directors.  He was also a control person of Herald (LUX).

36. Defendant Hannes Saleta was, at all relevant times, a director of Herald (USA). He was also at all relevant times a control person of Herald (USA).

37. Defendant Bank Austria at all relevant times owned 25% of Medici. It is a control person of Medici and also a subsidiary of Unicredit.

38. Defendant Ernst & Young S.A. was at all relevant times auditor for Herald (LUX) and the agent of Defendant Ernst & Young Global Limited. Ernst & Young S.A. is located in Munsbach, Luxembourg.

39. Defendant Ernst & Young, Cayman Islands was at all relevant times auditor for Herald (USA) and the agent of Defendant Ernst & Young Global Limited.

40. Defendant Ernst & Young Global Limited is the principle of Ernst & Young S.A. and Ernst & Young, Cayman Islands (collectively, the "E&Y Defendants") and located in London, England. The E&Y Defendants each had agency and/or *alter ego* relationships with each other. Thus, each is liable for its own acts, as well as the acts of the other E&Y entity.

41. Defendant HSBC Securities Services (Luxembourg) S.A. ("HSBC (Luxembourg)"), formerly known as Bank of Bermuda (Luxembourg) S.A., is a banking institution with an address at 40, Avenue Monterey, L-2163 Luxembourg. HSBC (Luxembourg) served as the custodian of the assets of Herald Funds.

42. Defendant HSBC Holdings plc was at all relevant times a public limited company incorporated in England.

43. Defendants HSBC Holdings plc and HSBC (Luxembourg)(collectively, the "HSBC Defendants") each had agency and/or *alter ego* relationships with each other. Thus, each is liable for its own acts, as well as the acts of the other HSBC Defendant.

44.     Defendant Friehling & Horowitz was auditor of BMIS and during the relevant time maintained an offices in the State of New York.

45.     Each defendant had a duty to the putative Class members to use and manage their investment funds with due care, and/or to disseminate accurate and truthful information with respect to the value of such funds.

46.     Each defendant participated in the fraud complained of herein and/or was aware of, or recklessly disregarded numerous red flags showing that their statements concerning the value and/or nature of Lead Plaintiff's and the Class' investment were false or misleading.

## FACTUAL ALLEGATIONS

47.     Defendants have plundered the investments of Lead Plaintiff and the putative Class by using its invested capital in a giant Ponzi-scheme ultimately conducted by or through defendant BMIS.

48.     BMIS, at all relevant times, was a broker-dealer and investment adviser registered with the SEC.  BMIS formally engages in three operations, which include investment adviser services, market making services, and proprietary trading.  According to the BMIS website, BMIS recently ranked among the top 1% of U.S. Securities firms.

49.     In January 2008, BMIS filed a Form ADV with the SEC, stating that BMIS had over $17 billion in assets under management.  BMIS represented that its trading strategy for adviser accounts involved trading in baskets of equity securities and options thereon.

50.     However, during the first week of December 2008, a senior BMIS employee apparently began to question the discrepancy between the purported $17 billion funds under

management reported to the SEC and $48 billion to $50 billion in assets purportedly under management at BMIS.

51.     On or about December 9, 2008, Madoff informed another senior employee that Madoff wanted to pay early bonuses to BMIS employees.

52.     On or about December 10, 2008, the two senior BMIS employees met with Madoff at his apartment in Manhattan.  At that time, Madoff informed them that, in substance, his investment advisory business was a fraud.  Madoff reported to have stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie" and that the business was "basically, a giant Ponzi-scheme."

53.     In substance, Madoff admitted that he had for years been paying returns to certain investors out of the principal received from other investors.  Madoff also stated that BMIS was insolvent, and that it had been for years.  Madoff also estimated the losses from this fraud to be approximately $50 billion dollars.

54.     Madoff further informed the two senior employees that he planned to surrender to authorities, but first, he still had about $200 million to $300 million dollars left, and he intended to distribute it to certain selected employees, family, and friends.

55.     It was recently discovered that Madoff had not purchased a single security in 13 years.  Irving Picard, court appointed trustee for BMIS  said Friday, February 20, 2009 during a meeting with investors at a lower Manhattan museum that "There is no evidence to indicate securities were purchased for customer accounts."  In so doing, Picard confirmed the massive Ponzi scheme Madoff confessed to at the time of his December 11, 2008 arrest.

56.     Bank Medici funneled the most money of any firm in Europe into Madoff's $50 billion scam.  Kohn, Medici's founder and 75% owner, and Madoff have a long history of working together.  Madoff and Kohn most likely met in New York, where Kohn began her investing career in the 1980s.

57.     In 1985, Kohn and her husband, Erwin, bought a house in Monsey, a New York suburb with an Orthodox Jewish community, property records show.  She kept this house until at least 2007, when records show it she transferred an interest in the property to her daughter.

58.     In 1987, Kohn set up a brokerage firm on 67 Wall Street called Windsor IBC.  According to New York state records, Kohn formed three New York corporations, Eurovaleur, Inc. in 1990, Valeur Securities, Inc. in 1992, and Infovaleur, Inc. in 1996.  Records show that Kohn controlled all three corporations.

59.     According to a February 19. 2009 article from Bloomberg, entitled "*Sonja Kohn Wooed Bernard Madoff Billions With Medici 'Fantasy'*" by Matthias Wabl, Eurovaleur, Inc. was marketed accounts for Madoff, according to a money manager who accompanied Kohn to a 1991 meeting with Madoff in New York.  The article states that Madoff greeted Kohn with a big hug and a kiss as they arrived, said the person who asked not to be identified.

60.     In 1994, Kohn founded Medici Finanz Beratung GmbH in Vienna.  According to the February 19 Article, that same year she helped create the first of three Bank Austria Primeo funds that invested with Madoff, according to the former Bank Austria employee.  She introduced executives of Bank Austria, now owned by Milan-based UniCredit SpA, to Madoff in New York at the time, the person said.  The Primeo funds face almost $1.1 billion of losses from the Madoff scam and Primeo investors are part of the present consolidated action.

61.     Kohn's company received a banking license and was renamed Bank Medici in 2003, when it posted a loss. Bank Medici boosted fee income to 9.72 million euros ($12.2 million) in 2007, from 1.38 million euros in 2003, by gaining new clients in Austria, Germany, Switzerland, Italy and the U.S., according to fee-payment tables in its income statement.

62.     Bank Medici, through Kohn and others met with Madoff in his offices in New York City numerous times to discuss the Herald Funds, among other funds, supposed investments. Specifically, according to Madoff's calendar, Kohn met with Madoff in his offices in New York City at least on the following dates, according to Madoff's appointment calender: August 23, 2005; March 27, 2006; October 31, 2006; November 26, 2007; and September 23, 2008.

63.     Kohn's meetings with Madoff in New York were part of Bank Medici's due diligence on Madoff, as manager and control person of the Herald Funds. According to a February 1, 2009 Bloomberg article, entitled, *"Madoff's Well-Treated Feeder Funds Suspected Shady Trades But Backed Off,"* the due diligence accomplished during these meetings was limited:

> The feeders were the gatekeepers, and they qualified for royal treatment. A money manager for a family office recalls accompanying Sonja Kohn, whose Vienna-based Bank Medici funneled $3.2 billion to Madoff, to a meeting with Madoff in New York in 1991.
>
> He says Madoff treated her as if she were the Queen of England. The money manager also says Madoff wouldn't answer any questions about his strategy.

64.     While supposedly performing due diligence on Madoff and looking out for investors' best interests, unknown to investors, Kohn was receiving tens of millions of dollars in kickbacks from Madoff in exchange for her steering billions into his fraud.

65.     On February 11, 2009, the Massachusetts Securities Division suspended Cohmad Securities Corp.'s ("Cohmad") state broker-dealer license.  Cohmad was one of the "feeder funds" to Madoff's investment business.  It was co-founded by Madoff and Maurice Jay (Sonny) Cohn in February 1985.  According to Massachusetts regulators, Cohmad and Bernard L. Madoff Investment Securities exhibited a "deeply intertwined relationship."  A complaint filed by Massachusetts regulators indicates that Cohmad paid $87,792 a year for six years, for a total a total of $526,000, to defendant Kohn, all the while Kohn was not associated with neither Cohmad nor employed by the firm.

66.     On July 3, 2009, the *Wall Street Journal* reported that U.S. and British prosecutors had alleged that Kohn was paid more than $40 million in kickbacks for funneling $3.5 billion in investments to Madoff from funds she controlled.  Specifically, U.S. investigators noticed a flow of payments totaling about $32 million over 10 years from Mr. Madoff's advisory firm, Bernard L. Madoff Investment Securities LLC, to Infovaleur Inc., a New York company that was "owned by Sonja Kohn personally," according to a U.S. affidavit filed on April 6.

67.     The same article states that Grant Thornton U.K. LLP, the accounting firm liquidating Mr. Madoff's London-based unit, Madoff Securities International Ltd., discovered a bank receipt that triggered a U.K. investigation, according to a March 24 affidavit filed with Austrian prosecutors by the Serious Fraud Office, a U.K. government agency responsible for prosecuting complex fraud cases.  The bank receipt referenced a check that Madoff International paid to a company called Erko Inc. (taken from the first two letters of **Er**win **Ko**hn's first and last names) and which was deposited in a Vienna bank account, according to the U.K. affidavit.  The affidavit said the Serious Fraud Office had determined that both Erko and the bank account

were controlled by Kohn. The fraud office also said in the affidavit it was unable to locate a registration for Erko. The U.K. affidavit alleges that Mr. Madoff's London subsidiary paid about GBP 7 million ($11.5 million) over five years to Erko. A British prosecutor alleges in the document that Mr. Madoff attempted to hide payments to Ms. Kohn by "falsely" declaring them in his company accounts as payment for research reports.

68. Finally, in an article entitled "*The Madoff Chronicles, Part II WHAT THE SECRETARY SAW"Hello, Madoff!*" published in the June 2009 edition of Vanity Fair, written by both Mark Seal and Madoff's secretary Eleanor Squillari, Ms. Squillari states that Kohn "was always thrilled to meet with Bernie, and always sent in staggering quarterly invoices—never less than $800,000—for her commissions."

69. After Madoff was exposed, Kohn amazingly filed a claim for alleged Madoff losses in the SIPA Liquidation case filed in the Southern District of New York Bankruptcy court entitled *In re: Bernard L. Madoff Investment Securities LLC*. She gave her address as Windsor, IBC, Inc. at 200 Liberty Square in New York City.

70. In addition, Defendants materially misled putative Class members by providing them with false and misleading statements about their investment returns and/or concealing the Ponzi-scheme from them. At all relevant times, the alleged misrepresentations and/or concealment of material facts induced the putative Class members to invest their capital with, and to maintain their investment with, Defendants. As a result, the investment capital acquired from Lead Plaintiff and the other putative Class members is reported to be lost.

71. All Defendants knew or were reckless for not knowing that their representations about their investment activities were false and misleading, and that their concealment of the true

nature and status of the investments would materially mislead putative Class members.

Defendants also knowingly and substantially participated or acquiesced in the unlawful and

fraudulent manipulation of investment capital placed with them for investment in the securities

market.

72.     During the Class Period, Defendants made false and misleading statements and

omissions to Lead Plaintiff and the Class in prospectuses (and associated supplements) and

offering memoranda for the Herald Funds (collectively, the "Offering Memoranda").

### Herald (LUX) Prospectuses

73.      The Herald (LUX) Prospectus was dated March, 2008.  An updated Prospectus

was published by Herald (LUX) during August 2008.

74.     Both Herald (LUX) Prospectuses omit any mention of the Herald Funds'

investment in Madoff and include false and misleading statements, including, but not limited to:

### The Fund's Investment Objective

The objective of the Fund is to achieve long-term appreciation through
diversification of investments.

*     *     *

### 1.    The Fund

In accordance with the requirements of the UCITS Directive and the
correspondent provisions of the 2002 Law, all Sub-Funds invest in accordance
with the principle of risk spreading in transferable securities and other permitted
assets which may comprise units of UCITS and UCIs, deposits with credit
institutions . . . .

*     *     *

### 3.    Risk Consideration

*     *     *

The Fund will implement strategies by using different types of securities which all carry inherent correlated and uncorrelated risks . . . .

The Fund is dependent upon the Investment Manager's evaluation of global financial markets. . . .

\*     \*     \*

The Investment Manager believes that its investment activities attempt to moderate risk through diversification.

\*     \*     \*

## Futures and Options

The Fund may invest in futures and option contracts.

\*     \*     \*

III.     a)     (i)     The Fund will invest no more than 10% of the net assets of any Sub-Fund in transferable securities and money market instruments issued by the same issuing body.

              (ii)     The Fund may not invest more than 20% of the net assets of any Sub-Fund in deposits made with the same body.

\*     \*     \*

b)     Moreover, where the Fund holds on behalf of a Sub-Fund, investments in transferable securities and money market instruments of issuing bodies which individually exceed 5% of the net assets of such Sub-Fund, the total of all such investments must not account for more than 40% of the total net assets of such Sub-Fund.

\*     \*     \*

Notwithstanding the individual limits laid down in paragraph a), the Fund may not combine for each Sub-Fund:

- investments in transferable securities or money market instruments issued by a single body.
- deposits made with a single body, and/or
- exposures arising from OTC derivative transactions undertaken with a single body

in excess of 20% of its net assets.

f)  Notwithstanding the above provisions, the Fund is authorised to invest up to 100% of the net assets of any Sub-Fund, in accordance with the principle of risk spreading, in transferable securities and money market instruments issued or guaranteed by a Member State of the EU, by its local authorities or agencies, or by another member State of the OECD, including the federal agencies of the United States of America, Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, or by public international bodies of which one or more Member States of the EU are members, provided that such Sub-Fund must hold securities from a least six different issues and securities from one issue do not account for more than 30% of the net assets of such Sub-Fund.

*   *   *

VI.  a)  The Fund may acquire units of the UCITS and/or other UCIs referred to in paragraph I) (1) c), provided that no more than 10% of a Sub-Fund's net assets be invested in aggregate in the units of such UCITS or other UCIs.

*   *   *

The Investment Manager, to whom the Board of Directors of the Fund has delegated under its responsibility such functions, employs a risk-management process which enables the monitoring and measurement at any time the risk of the positions and their contribution to the overall risk profile of each Sub-Fund.

75.  The above statements were false and misleading when made. Despite the considerable fees charged to investors and the repeated representations that Herald (LUX) would diversify its investments to limit risk, all of the Herald (LUX)'s assets were "invested" in a single entity, BMIS, where they were quickly stolen through the Madoff Ponzi scheme. Furthermore, Defendants Herald (LUX), Medici, Kohn, Pfeffer, Scheithauer, Frey, Pirkner, Mugnai, and Goddard (collectively, the "Herald (LUX) Defendants") each knew, or were reckless for not knowing, that Herald (LUX) was formed with the sole purpose of supplying investors' funds to Madoff. The Herald (LUX) Defendants knew that the only investment management performed by Medici was funneling investors' money to Madoff.

76.     Furthermore, defendant HSBC (Luxembourg), the custodian of Herald (LUX) knew or was reckless for not knowing that the above statements were false or misleading.  HSBC (Luxembourg) had been Herald (USA)'s custodian for years by this time, and had transferred over a billion dollars to Madoff from Herald (USA).  Additionally, by the time of the August 2008 Prospectus, HSBC (Luxembourg) had transferred millions of dollars from Herald (LUX) to Madoff.

77.     Despite the considerable fees charged to investors and the repeated representations of the Herald (LUX) Defendants and HSBC (Luxembourg), Lead Plaintiff and the Class' funds were stolen through the Madoff Ponzi scheme.  This could have been avoided if Defendants had fulfilled their duties to Lead Plaintiff and the Class, if Defendants had lived up to their own representations, and if Defendants had adequately and reasonably investigated, monitored, and conducted due diligence of Madoff and BMIS.  Had Defendants conducted due diligence, they would have discovered at least the multiple red flags identified herein.  At the very least, as described *infra*, like hedge fund investment advisors Aksia LLC, Defendants should have been able to discover the existence of facts which would put them on notice of the red flags identified therein.

78.     In failing to do so, Defendants breached their legal duties to Lead Plaintiff and the Class, resulting in the complete loss of Lead Plaintiff's and the Class' investments.  At the same time, Defendants paid themselves millions of dollars in fees, predicated on phony profits.

### Herald (LUX) Unaudited Semi-Annual Report and Financial Statement

Herald (LUX) only issued one Unaudited Semi-Annual Report and Financial Statement (the "Herald (LUX) Report") published by "HSBC" and the Herald (LUX) directors.  Only one

report was issued, due to the fact that Madoff's fraud was exposed less than a year after Herald (LUX) was incorporated. However the Herald (LUX) report contained numerous false or misleading statements in its statement of operations, statement of assets, change in assets, and schedule of investments. Each number concerning the fund was false or misleading because investors' assets had already been stolen via Madoff's fraudulent Ponzi scheme. Herald (LUX) Defendants and HSBC (Luxembourg) were reckless for not knowing of Madoff's fraud due to the many red flags they saw, as alleged throughout this complaint.

**Herald (USA) Offering Memorandum**

79.     All versions of Herald (USA)'s Offering Memorandum, from 2004 until 2008 stated the following:

### INVESTMENT OBJECTIVE AND STRATEGY

The Fund's objective is to provide investors with long-term capital growth while minimizing risks through the use of a very active trading style. The Fund will utilize a multi-strategy approach with respect to investment and management of the Fund's assets. The Fund, based upon the recommendation of the Investment Manager in consultation with the Investment Adviser(s), will appoint, on a continuous basis, investment managers ("Managers") managing collective investment schemes and/or discretionary portfolio management accounts ("accounts") with different backgrounds in terms of investment strategies, markets and financial instruments. The Investment Manager in consultation with the Investment Adviser(s) will consider a number of factors in supervising the selection of Managers, including, but not limited to, their experience and market performance, trading strategy and techniques, areas of expertise and judgment.

*     *     *

**Nature of Investments**

The Fund does not have any pre-determined philosophy with respect to the types of financial instruments that should be invested in and instead expects that through selection of various Managers and the allocation of assets to different accounts and/or collective investment schemes, there will be ultimate diversity of investment of the Fund's assets in financial instruments in different markets

capitalizing on investment opportunities present throughout the world, thus reducing risks through diversification.

\*   \*   \*

### INVESTMENT RISKS

The Fund is dependent upon the Investment Manager's evaluation of global financial markets.

\*   \*   \*

**Performance**

The Investment Manager believes that its investment activities attempt to moderate risk through diversification and the careful selection of Managers.

80.    The above statements were false and misleading when made. Despite the considerable fees charged to investors and the repeated representations that Herald (USA) would diversify its investments to limit risk, all of the Herald (USA)'s assets were "invested" in a single entity, BMIS, where they were quickly stolen through the Madoff Ponzi scheme. Furthermore, Defendants Herald (USA), HAML, de Sury, Safdié, Jones, Medici, Kohn, Scheithauer, Frey, Pfeffer, Mugnai, Saleta (collectively, the "Herald (USA) Defendants") each knew, or were reckless for not knowing, that Herald (USA) was formed with the sole purpose of supplying investors' funds to Madoff. Additionally, from the time Herald (USA) was formed in 2004 until Madoff's fraud was in 2008, the Herald (USA) Defendants each knew that the only investment performed by HAML was funneling investors' money to Madoff.

81.    Furthermore, defendant HSBC (Luxembourg), the custodian of Herald (USA) knew or was reckless for not knowing that the above statements were false or misleading. HSBC (Luxembourg) had been Herald (USA)'s custodian from 2004 to 2009, and had transferred over a billion dollars to Madoff from Herald (USA).

**Herald (USA)'s  Audited Annual and Unaudited Semi-Annual
Reports and Financial Statements**

82.     From its inception, a Herald (USA) Unaudited Semi-Annual Report and Financial
Statement and a Audited Annual Report were issued every year.  These reports were issued by
HSBC and the Herald (USA) directors.  Each of these reports contained numerous false or
misleading statements in its statement of operations, statement of assets, change in assets, and
schedule of investments.  Each number concerning the fund was false or misleading because
investors' assets had already been stolen via Madoff's fraudulent Ponzi scheme.  Herald (USA)
Defendants, HSBC (Luxembourg) were reckless for not knowing of Madoff's fraud due to the
many red flags they saw, as alleged throughout this complaint.

83.     Herald (USA) has stated that Ernst & Young, Cayman Islands was Herald
(USA)'s auditor.  However, the Independent Auditor's Report accompanying each of Herald
(USA)'s Annual Reports is on the letterhead of "Ernst & Young" and is signed by "Ernst &
Young."  Other than the letterhead providing an address for Ernst & Young in the Cayman
Islands, there is no indication that an entity calling itself "Ernst & Young, Cayman Islands" was
solely responsible for the opinion letter.

84.     Each Independent Auditor's Report states that "We have audited the
accompanying financial statements . . . which comprise the statement of net assets, including the
schedule of investments. . . And the statement of net income, and changes of net assets[.] They
also stated that "We conducted our audit in accordance with International Standards on
Auditing."  They also provided an Opinion, which stated "in our opinion, the financial
statements give a true and fair view of the financial position of Herald Fund SPC as of December

31 [of the year then ending] and of its financial performance for the year then ending in accordance with accounting principles generally accepted in Luxembourg."

85.     Ernst & Young's statements in its audit opinion were false and misleading when made.  Each of these reports contained numerous false or misleading statements in its statement of operations, statement of assets, change in assets, and schedule of investments.  Each number in the audited financial statements concerning the fund were false or misleading because investors' assets had already been stolen via Madoff's fraudulent Ponzi scheme.  Herald (USA) Defendants, HSBC, and Ernst & Young were reckless for not knowing of Madoff's fraud due to the many red flags they saw, but ignored, as alleged throughout this complaint.

86.     Despite the considerable fees charged to investors and the repeated representations of the Herald (LUX) Defendant, Herald (USA) Defendants, HSBC and E&Y that the Herald Funds were profitable and growing, Lead Plaintiff and the Class' funds were stolen through the Madoff Ponzi scheme.  This could have been avoided if the Defendants had fulfilled their duties to Lead Plaintiff and the Class, if these defendants had lived up to their own representations, and if Defendants had adequately and reasonably investigated, monitored, and conducted due diligence of Madoff and BMIS.  Had Defendants conducted due diligence, they would have discovered at least the multiple red flags identified herein.  At the very least, as described *infra*, like hedge fund investment advisors Aksia LLC, Defendants should have been able to discover the existence of facts which would put them on notice of the red flags identified therein.

87. In failing to do so, Defendants breached their legal duties to Lead Plaintiff and the Class, resulting in the complete loss of Lead Plaintiff's and the Class' investments. At the same time, Defendants paid themselves millions of dollars in fees, predicated on phony profits.

88. During the Class Period, Madoff operated a massive Ponzi scheme, in which he used the principal investments of his investors, including the Herald Funds, to pay the fictitious "returns" of other investors. According to a December 19, 2008 *Bloomberg* article, U.S. government regulators investigating Madoff found evidence that the scheme began at least as early as the 1970s.

**Red Flags Concerning Madoff**

89. For years since the inceptions of Madoff's scheme, there have been myriad warnings meaningful to investment professionals that Madoff and/or BMIS were perpetrating a fraud on investors. Some the of the red flags, which were ignored by all defendants, are discussed in the paragraphs that follow.

90. In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns fo 13.5 to 20 percent, and invested the money entirely with Madoff. As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients. No action was taken against Madoff.

91. In May 1999, Harry Markopolos, a derivatives expert with experience managing the "split-strike conversion" strategy used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

92.     In May 2001, the article "*Madoff Tops Charts; Skeptics Ask How*" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry.  In the article, author Michael Ocrant wrote:

a.      "Madoff has reported positive returns for the last 11-plus years in assets managed on behalf of the feed fund known as Fairfield Sentry . . . .[The] other [feeder] funds have demonstrated equally positive track records using the same strategy for much of that period."

b.      "Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executive, many of whom are familiar with the so-called split-strike conversion strategy used to manage the assets."

c.      These individuals "noted that others who use or have used the strategy . . . are known to have had nowhere near the same degree of success."

d.      "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

e.      "The strategy and trading, [Madoff] says, are done by signals from a proprietary 'black box' system that allows for human intervention to take into account the 'gut feel of the firm's professionals."

f.      "As for specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds by saying, 'I'm not

interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

       g.     "[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% vested.'"

       h.     "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.' He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

    93.    On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." In that article, author Erin E. Arvedlund wrote:

       a.     The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great deal.' Nor were the firms that market Madoff's fund forthcoming."

       b.     "Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. Three options strategists for major investment banks told *Barron's* they couldn't understand how Madoff churns out such numbers using this strategy."

c. "Adding further mystery to Madoff's motives is the fact that he charges no fees for his money management services."

d. "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - even though they don't understand how he does it. 'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told *Barron's*. 'People who have all the trade confirms and statements still can't define it very well.' . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money."

e. "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

94. On November 7, 2005, Markopolous submitted another letter to the SEC, titled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail, over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real. Markopolous identified 29 red flags that were signs of highly suspicious activity in BMIS, including, among others:

a. "*why would B*[ernie] *M*[adoff] *settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee = 20% of the profits?*" (Emphasis in original.)

b.	"The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature . . . . ***Why the need for such secrecy?***  *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings.*"  (Emphasis in original.)

c.	"*It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from.  This makes no sense!  . . . However, BM's performance numbers show only 7 extremely small* [monthly] *losses during 14½ years and these numbers are too good to be true.  The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent!  And BM never had more than a one month losing streak!*"  (Emphasis in original.)

d.	"*Madoff does not allow outside performance audits*."  (Emphasis in original.)

e.	"*Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's.*"  (Emphasis in original.)

f.	"*Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge fund, fund of fund to pocket their 1% and 20% fees bases* [sic] *upon Bernie Madoff's hard work and brains?  Does this make any sense at all?  Typically FOF's* [fund of funds] *charge only 1% and 10%, yet BM allows them the extra 10%.  Why?  Any why do these third parties fail to mention Bernie Madoff in their marketing*

*literature?  After all he's the manager, don't investors have a right to know who's managing their money?*"  (Emphasis in original.)

g.      "*BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM.  This allows for 'cleaner financial statements' according to this source.  Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud.*"  (Emphasis in original.)

95.     In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.      Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.      Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big 3 accounting firm.

c.      Aksia discovered the 2005 letter from Markopolous to the SEC described above.

96.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC.  Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.  The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

97.     In addition to the foregoing, investment advisors, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying , "Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity[.]"

98.     Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he managed. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which vets hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets . . . There's clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

99.     In her book entitled "*Too Good to Be True*" by Erin E. Arvedlund (author of the 2001 Barron's article on Madoff) the author noted that Madoff's leaving money on the table by not charging the customary 2% on assets and 20% of profits that other hedge funds charged their customers. As an example, Arvedlund estimated that Fairfield Sentry charged its investors $1.2 billion in fees for investing with Madoff. "Why would a savvy investor like Madoff leave that type of money on the table?"

100.    Arevedlund also noted that other potential Madoff investors quickly learned there was something wrong. 1n 1997, Rob Picard, of the Royal Bank of Canada, along with other

executives to meet Madoff because certain clients wanted to borrow money to invest with Madoff. Within 15 minutes, Picard realized he had stumbled onto a fraud. "Madoff stuttered when he tried to explain his options strategy and right away I realized he either didn't understand it, or he wasn't doing what he said he was doing." Picard also wondered why Madoff was never mentioned anywhere as one of the biggest hedge funds on Wall Street. As a result, Picard suspected that something wasn't right and after the meeting Royal Bank of Canada customers redeemed out of the Tremont fund (a Madoff feeder fund).

101.    Another red-flag was the fact that Madoff left no footprints, it was as if he didn't exist. As reported by Arvedlund, none of the big trades he supposedly executed in the dwindling S&P 100 index options trading pits could ever be found. Alex Johnson from the Chicago Board Options Exchange had heard that Madoff's option trading on that exchange has stopped in the early 1990s.

102.    Joe Gieger, a managing director at fund of hedge funds shop GAM told Arvedlund that representatives from the $39.2 billion asset management firm visited Madoff early on and decided against investing with him. Once in 1998 when David Smith, chief investment director of GAM's funds of hedge funds group visited Madoff, GAM could not triangulate the returns with what Madoff claimed to be his strategy. Then in 2001 GAM made another visit, and again rejected Madoff.

103.    As James Newman, vice president of due diligence at Ermitage, a fund of funds, wrote to clients "From the onset I was denied the opportunity to perform a detailed due diligence review. We take a dim view on any fund, regardless of size, industry status, or 'its good enough for them' type reasons that restricts our due diligence process." He declined to invest.

104. Société Générale ("SocGen") also concluded that Madoff was not legitimate after sending its own due diligence team to New York in 2003. As reported by The New York Times on December 17, 2008, in an article entitled, European Banks Tally Losses Linked To Fraud, SocGen's due diligence "was conducted by three people who visited Mr. Madoff's headquarters in the red-granite skyscraper on Third Avenue in Manhattan." The bankers concluded that "something wasn't right. … It's a strategy that can lose sometimes, but the monthly returns were almost all positive."

105. Jeffrey S. Thomas, chief investment officer at Atlantic Trust, which manages $13.5 billion, said that on several occasions over the years it had "reviewed and declined to invest with Madoff." In studying where to place its clients' funds, the firm said it spotted a number of "red flags" in Madoff's operation. Chief among those was a lack of an outside firm to handle trades and accounting for the funds, and the inability to document how Madoff made profits.

106. Throughout the Class Period, the Herald Funds would disseminate fund performance updates. As late as December 2008, the performance report showed consistent positive net returns for the first 11 months of 2008, even during the months of September, October, and November, when the stock market has been in a tailspin. In fact, the performance report showed positive year-to-date net returns for the years 1998 through the first eleven months of 2008. These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

107. As alleged in *Picard v. Herald Fund SPC*, Adv. Pro. No. 09-1359 (Bnkr. S.D.N.Y., 2009), on September 8, 2004, HSBC (Luxembourg), then known as the Bank of

Bermuda (Luxembourg) S.A., entered into a Sub-Custody Agreement with BMIS whereby BMIS would act as the sub-custodian for certain funds for which HSBC (Luxembourg), as the Bank of Bermuda (Luxembourg) S.A., was the custodian.

108.    On or about September 30, 2004, BMIS received a notice that the Bank of Bermuda (Luxembourg) S.A. was changing its name to HSBC Securities Services (Luxembourg) S.A. effective October 1, 2004.

109.    In January 2008, HSBC (Luxembourg), as HSBC Securities Services (Luxembourg) S.A., entered into a Sub-Custody Agreement with BMIS.  BMIS held these funds in New York, New York for the benefit of HSBC (Luxembourg).

110.    Both Herald Funds were clients of BMIS.  Picard states that according to BMIS' records, Herald USA maintained an account with BMIS through its custodian, HSBC (Luxembourg), that was designated account 1FR109 (the "Herald USA Account"). The Herald USA Account was opened on or about April 1, 2004, when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BMIS at BMIS' headquarters at 885 Third Avenue, New York, New York.

111.    The Customer Agreement signed by BMIS and Herald (USA) states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, and all laws of the United States. Herald (USA) voluntarily made transactions with BMIS subject to these laws.

112.     On information and belief, Herald (LUX) also signed the same agreements as Herald (USA).  It was BMIS's custom and practice to have all of its customers sign such Customer Agreements.

113.     Picard states that the Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Herald Funds' accounts were held in New York, New York, through BMIS.  HSBC and HSBC Securities Services (Luxembourg) S.A. consistently wired funds to BMIS's bank accounts in New York, New York for application to the Herald Funds' accounts and the conducting of trading activities.  All Defendants have intentionally taken advantage of the benefits of conducting transactions in the State of New York and, therefore, have submitted themselves to the jurisdiction of this Court for the purposes of this proceeding.

114.     Between April 1, 2004 and the filing date of this complaint, HSBC and HSBC (Luxembourg), for the benefit of Herald (USA), invested $1,533,741,975 with BMIS through 42 separate wire transfers directly into BMIS' account at JPMorgan Chase & Co. in New York, New York, Account #000000140081703 (the "BMIS Bank Account").  HSBC and HSBC (Luxembourg), for the supposed benefit of Herald (LUX), also transferred hundreds of millions of dollars to the same account.

115.     As disclosed in Herald (USA)'s investor application form, investors who wished to invest U.S. dollars in Herald (USA) were required to deposit their investments into banks located in this District.  In the beginning of the Class Period Herald (USA) dollar deposits were sent directly by investors to CitiBank N.A. account #66080020, located on Park Avenue, New York, which belonged to the Bank of Bermuda (Luxembourg) S.A. and later HSBC Securities

Services (Luxembourg) S.A. (after the name change).  Later Herald (USA) account was shifted

to HSBC Bank USA.  It was from these accounts that funds would be wired to the BMIS Bank

Account    On information and belief, Herald (LUX) funds were also first deposited in HSBC

Securities Services (Luxembourg) S.A.'s account at the HSBC Bank USA prior to being wired to

the BMIS Bank Account.

116.    Had any Defendant conducted due diligence into Madoff and BMIS, they would

have discovered at least some the dozens of red flags identified herein.  At the very least, like

Aksia, Defendants should have been able to discover the existence of Markopolous' letter, which

would put them on notice of the red flags identified therein.

## SUBSTANTIVE ALLEGATIONS CONCERNING THE E&Y DEFENDANTS

### E&Y Operated As a Unitary International Professional Organization

118.    E&Y Global serves as an umbrella organization which coordinates the assurance,

tax, transaction, and advisory services of its E&Y member firms worldwide.  E&Y Global's

literature and its global Web site refer to its constituent member firms, including E&Y Cayman,

as "Ernst & Young," or "E&Y."  For example, E&Y's 2009 Annual Report, entitled "Global

Annual Review," states that "Ernst & Young refers to the global organization of member firms

of Ernst & Young Global Limited."  (Global Annual Review, at 40).  E&Y's Global Code of

Conduct contains identical language.  (Code of Conduct, at 15).  Accordingly, Lead Plaintiff is

referring to all Ernst & Young entities when using the term "E&Y."

119.    The Global Annual Review leaves no doubt that E&Y functions as one integrated

entity with centralized control.  The section entitled "Shaping our business for the future," states:

Creating a global mindset

*At Ernst & Young we are creating both a global structure and a global mindset* that are unique in our profession and can best meet the demands of today's and tomorrow's business.

Most professional services organizations are simply collections of national practices. Each locally controlled firm has its own management and decision-making processes and its own board and governance oversight. This model served the partners of those practices well in the past. Today it is outdated and is not in keeping with what clients demand. The world has become too fast and too complex.

At Ernst & Young we understand that. *We have one strong global leadership team that sets one single global strategy and agenda*. To ensure we are efficient and effective, we have organized our legal entities into similarly sized business units in terms of both people and revenues. *These business units, almost all of which are purposely not single countries, are grouped into geographic Areas across the Americas, Europe and Asia-Pacific. Each business unit's leadership team works directly with their Area and global leaders to ensure flawless execution. This structure is streamlined — it allows us to make decisions quickly, and ensures that we execute our strategy and provide high-quality service wherever in the world our clients do business.*

*Creating our global mindset and structure are ongoing processes. We've been working with our partners to bring down the barriers to working together seamlessly across borders, and we have succeeded in realigning our previously country-focused organization into a more integrated global one*. This organization means our clients get faster response and more tailored services. They get broader, more experienced teams, with deeper industry knowledge. Our people get greater opportunity to pursue the global careers they desire. And our regulators see our structure as helping us deliver consistent, high-quality service across the globe.

(Global Annual Review, at 8, 10; emphasis added).

120.    As all hierarchical entities with centralized control, E&Y has one Chairman and CEO, James S. Turley, and member firms have obligations to E&Y.

121.    The Global Annual Review further confirms that the network is structured like a corporation.  According to the Global Annual Review, "Our *global organization and its management and governance structures* are vital elements to delivering on our promise to

stakeholders and clients and achieving our strategy of market leadership. We have centered these structures on two guiding principles: separating management and governance roles; and *operating Ernst & Young as a global business with one shared strategy, led and overseen by a single management team*." (Global Annual Review, at 35).

122.    The Global Annual Review describes four "global bodies":

a.      the Global Executive, effectively a Board of Directors, which is chaired by Mr. Turley and comprised of the COO; five Area Managing Partners; the Global Managing Partners of People, Markets, Quality & Risk Management, and Operations & Finance; and global Service Line Vice Chairs for Assurance, Advisory, Tax, and Transaction Advisory Services;

b.      the Global Executive Committees for People, Quality & Risk Management, Operations & Finance, Markets, Assurance, Advisory, Tax, and Transaction Advisory Services, which are responsible for making recommendations to the Global Executive and are chaired by members of the Global Executive and comprised of representatives from the five Areas;

c.      the Global Practice Group, which "seeks to ensure common understanding across member firms of Ernst & Young's strategic objectives and consistency of execution across the organization" and is comprised of members of the Global Executive, Global Executive Committees, and sub-Area leaders; and

d.      the Global Advisory Council, comprised of approximately forty partners, elected by their peers from member firms across the five Areas, which advises E&Y on policies and strategies. "The approval of the Global Advisory Council is required for a number of significant matters that could affect the organization."

(Global Annual Review, at 35).

123.     These four governance bodies (the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council) provide a global governance structure that is housed within E&Y Global.  In effect, the E&Y member firms (including E&Y Cayman) act as agents of E&Y Global.

124.     Indeed, throughout its Global Annual Review, E&Y stresses the importance of global consistency throughout the organization:

a.     "[O]ur regulators see our structure as helping us deliver consistent, high-quality service across the globe." (Global Annual Review at 10).

b.     "Ensuring International Financial Reporting Standards really mean the same thing across the globe is critical and a goal we work to support."  (Global Annual Review at 23).

c.     "Quality is at the heart of our objective to deliver seamless, consistent, high quality client service, worldwide."  (Global Annual Review at 32).

d.     "Globally consistent terms and conditions and statements of work means that our global clients contract with our member firms in a consistent manner throughout the world."  (Global Annual Review at 32).

e.     "[Global Financial Information System] provides client teams with timely, consistent information with respect to their engagement and account financial information, helping them to better plan work and serve their clients.  The system also enhances our ability to manage our own operations more effectively, using consistent key performance metrics and sharing best practices across our organization."  (Global Annual Review at 35).

In sum, E&Y states in its Global Annual Review that "[o]ver the past few years [it has] taken great strides towards globalizing the way we go to market."

125.    To complete the parallel between E&Y and any corporation, the Global Annual Review provides aggregate results for E&Y that are the hallmarks of the annual report of any Fortune 500 company.  For example, the Global Annual Review states that E&Y is composed of more than 144,000 people (at 37), and generated $21.4 billion in total worldwide revenues in 2009 (at 36).  It breaks down revenue by geographic area, service line, and client type (at 36).  And it describes the percentage of Global 500 and Global 2000 companies served by E&Y (at 36).  The Global Annual Review of E&Y is, thus, no different than the annual report of McDonald's, Exxon, or Microsoft.

**E&Y Cayman Issued Unqualified (Clean) Audit Opinions**

126.    E&Y Cayman audited Herald (USA) every year between at least 2004 and 2007.  The Herald Funds also listed Ernst & Young as the Funds' auditor in the Offering Memoranda and in the Subscription Agreement signed by new investors.  Each year E&Y issued an unqualified audit opinion – also commonly referred to as a "clean audit opinion" – stating that the financial statements at issue conformed with the requisite auditing standards.  *See*, *e.g.*, the Herald (USA)'s financial statements for the year ending December 31, 2007 ("2007 Financial Statements" or "2007 FS").

127.    The 2007 Financial Statements included E&Y unqualified audit opinion with respect to Herald (USA).  (2007 FS, at 3-4). The opinion is entitled "Independent Auditor' Reports" and states, in relevant part:  Herald (USA) has stated that Ernst & Young, Cayman Islands was Herald (USA)'s auditor.  However, the Independent Auditor's Report accompanying

each of Herald (USA)'s Annual Reports is on the letterhead of "Ernst & Young" and is signed by "Ernst & Young." Other than the letterhead providing an address for Ernst & Young in the Cayman Islands, there is no indication that an entity calling itself "Ernst & Young, Cayman Islands" was solely responsible for the opinion letter.

128. Each Independent Auditor's Report states that "We have audited the accompanying financial statements . . . which comprise the statement of net assets, including the schedule of investments. . . And the statement of net income, and changes of net assets[.] They also stated that "We conducted our audit in accordance with International Standards on Auditing." They also provided an Opinion, which stated "in our opinion, the financial statements give a true and fair view of the financial position of Herald Fund SPC as of December 31, 2007, and of its financial performance for the year then ending in accordance with accounting principles generally accepted in Luxembourg."

129. The audit opinion is signed, "Ernst & Young," and dated March 12, 2008. (2007 FS, at 4).

**The 2007 Financial Statements**

130. The 2007 Financial Statements included a Schedule of Investments as of December 31, 2007. (2007 FS, at 8). This schedule reflected how the assets of Herald (USA) were supposedly being held at the end of each respective year.

131. In 2007, Herald (USA) supposedly held (i) $16,715 in a Fidelity Spartan U.S. Treasury Money Market Fund, and $1,849,150,117 in U.S. Treasury Bills. Net of other unspecified assets and liabilities, the net asset value at the end of 2007 attributable to the putative Class were supposedly $1,833,977,065. (2007 FS, at 8).

132. The 2007 Financial Statements included a Statement of Net Assets as of December 31, 2007. (2007 FS, at 5). This Statement of Net Assets reflected the same amount of supposed net assets as the Schedule of Investments. *Id*.

133. The 2007 Financial Statements also included a Statement of Operations and Net Assets for 2007. (2007 FS, at 6). The Statement of Operations and Net Assets reflected a purported "net realized gain" of $142,982,900 for 2007. *Id*. The Statement of Operations and Changes in Net Assets also reflected the following expenses:

    a.   "Management and Advisory Fees," of $25,934,106 in 2007 to HAML;

    b.   "Performance fees," payable to HAML of $10,013,145 in 2007;

    c.   "Administration and custodial fees," payable to HSBC Luxembourg, of $1,182,956 in 2007; and

    d.   "Audit and professional fees," payable, in part, to E&Y Cayman, of $663,150 in 2007.

134. The Statement of Operations and Net Assets 2007 also reflected:

    a.   "Income" of $8,098,028 in 2007; and

    b.   Net Realized Gain of $142,982,900 2007

**E&Y Cayman's Audits Failed to Meet Luxembourg and International Standards, or Even E&Y's Own Standards**

135. In 2002, an European Commission (EC) Regulation No. 1606/2002 was passed by the European Parliament and the European Council of Ministers, which requires all European Union (EU) member states to adopt International Financial Reporting Standards (IFRSs), formerly known as IAS, issued by the International Accounting Standards Board as adopted by the EU. As a result, all EU-listed companies are required to prepare their consolidated financial

statements following IFRSs, beginning on January 1, 2005. Listed companies in Luxembourg therefore follow IFRSs in preparation of their consolidated accounts. According to a 2006 self-assessment prepared by the Institute of Companies' Auditors (IRE) as a part of the International Federation of Accountants' (IFAC) Member Body Compliance Program, audit of financial statements in Luxembourg is conducted in accordance with International Standards on Auditing (ISAs) issued by the Auditing and Assurance Standards Board (IAASB).

136.    Through its Auditing Standards Board, the AICPA has in its Statements of Accounting Standards codified a detailed interpretation of GAAS, which is cited as "AU" in this complaint. ISAs are consistent with U.S. GAAS in all material respects. Accordingly, references herein to GAAS and ISA are intended to be synonymous and references to GAAS are intended to include references to ISA.

137.    Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the uniform rules, conventions, and procedures necessary to define generally accepted accounting principles in the United States. AU § 411. The International Financial Reporting Standards ("IFRS") govern the framework for the preparation of financial statements adopted by the International Accounting Standards Board. The IFRS mirror GAAP with respect to the form and content of the Funds' financial statements. References herein to GAAP and IFRS are intended to be synonymous and, accordingly, references to GAAP shall include references to IFRS.

138.    The AICPA and the IAASB prohibit members from expressing an opinion or stating affirmatively that financial statements or other financial data "present fairly … in

conformity with generally accepted accounting principles," if such information departs from applicable accounting principles.

139. There are ten Generally Accepted Auditing Standards established by the AICPA which E&Y had a duty to follow in the audits of the Funds: General Standards, Standards of Field Work, and Standards of Reporting:

*General Standards*

1. The auditor must have adequate technical training and proficiency to perform the audit.

2. The auditor must maintain independence in mental attitude in all matters relating to the audit.

3. The auditor must exercise due professional care in the performance of the audit and the preparation of the report.

*Standards of Field Work*

1. The auditor must adequately plan the work and must properly supervise any assistants.

2. The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

3. The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

1. The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2. The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.     When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

4.     The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefor in the auditor's report. In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree o£ responsibility the auditor is taking, in the auditor's report.

(AU § 150.02.)  The International Standards on Auditing are effectively the same as GAAS insofar as material to E&Y's audits of the Funds' financial statements.  *See* ISA 200 "Objective and General Principles Governing an Audit of Financial Statements."

140.    E&Y was thus required to exercise due professional care "to plan and perform the audit to obtain *reasonable assurance* about whether the financial statements are free of material misstatement, *whether caused by error or fraud*."  AU § 110.02 (emphasis added); *see also* AU § 230.03 (concerning the auditors' responsibility to conduct their work exercising due professional care); ISA 240 ("The Auditor's Responsibility to Consider Fraud and Error in an Audit of Financial Statements"); ISA 300 ("Planning").

141.    In order to state an opinion with regard to an audited entity's financial statements, GAAS states that "the auditor must obtain a sufficient understanding of the entity and its environment, including its internal controls, as to assess the risk of material misstatement of the financial statements, whether due to error or fraud."  AU § 314.01; *see also* ISA 310 ("Knowledge of Business").

142.    Audit risk and materiality must be considered by the auditor in designing the nature, tuning, and extent of audit procedures and in evaluating the results of those procedures.

AU § 312.01.  GAAS requires the auditor to use professional judgment and, in particular, professional skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud.  AU §§, 230.07-09, 316.12, 316; *see also* ISA 400 ("Risk Assessments and Internal Controls").

143.     In particular, the auditor is required to consider the competency and sufficiency of the audit evidence.  Since audit evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.  AU § 230.08; *see also* ISA 200.

144.     Moreover, GAAS recognizes that the audit of an entity with securities investments requires special procedures:  "The inherent risk for an assertion about a derivative or security is its susceptibility to a material misstatement, assuming there are no related controls."  AU § 332.08.

145.     Thus, when auditing the existence of a security, auditors must perform substantive procedures, such as confirmations with the security's issuer or physical inspections of the security.

> Existence assertions address whether the derivatives and securities reported in the financial statements through recognition or disclosure exist at the date of the statement of financial position.  Occurrence assertions address whether derivatives and securities transactions reported in the financial statements, as a part of earnings, other comprehensive income, or cash flows or through disclosure, occurred.  Paragraph 19 provides guidance on the auditor's determination of the nature, timing, and extent of substantive procedures to be performed.  Examples of substantive procedures for existence or occurrence assertions about derivatives and securities include—
>
> •       Confirmation *with the issuer of the security*.

- *Confirmation* with the holder of the security, including securities in electronic form, or with the counterparty to the derivative.

- *Confirmation of settled transactions with the broker-dealer or counterparty.*

- *Confirmation* of unsettled transactions with the broker-dealer or counterparty.

- *Physical inspection of the security or derivative contract.*

- Reading *executed* partnership or similar agreements.

- *Inspecting* underlying agreements and other forms of supporting documentation, in paper or electronic form, for the following:

  — Amounts reported
  — Evidence that would preclude the sales treatment of a transfer
  — Unrecorded repurchase agreements

- *Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period.*

- *Performing analytical procedures.* For example, the absence of a material difference from an expectation that interest income will be a fixed percentage of a debt security based on the effective interest rate determined when the entity purchased the security provides evidence about existence of the security.

(AU § 332.21; emphasis added).

146.     Specifically for audits of large funds, the AICPA *Audit & Accounting Guide, Investment Companies* (the "Guide") directs auditors of investment funds to gain an understanding of the attitude of the fund's management concerning internal control and its importance in reliable financial reporting.  Guide § 5.64. Auditors must consider testing the fund's control and monitoring procedures.  Guide § 5.64.  The Guide further directs auditors to consider whether the fund's investment in an underlying fund is so significant as to require modification of financial statements.  Guide § 5.48.

147.    As a member firm of E&Y Global, E&Y Cayman was bound by the foregoing standards and guidelines.

148.    Indeed, because E&Y knew that Herald (USA) was a conduit for investments that were controlled by Madoff, E&Y was required to plan and conduct audits that verified the existence of Herald (USA)'s investments.  In order to do so, E&Y was required to understand the Herald (USA)'s "information systems for derivatives and securities," including its investments held by BMIS.  AU § 332.05.  An understanding of Herald (USA)'s  internal controls was particularly important to a properly planned audit because, absent effective internal controls, Herald (USA) was not in a position to accurately and reliably validate the existence, or value, of the investments through BMIS.

149.    Moreover, in addition to the requirements imposed by the foregoing standards, E&Y should have treated BMIS as a service organization because its services were part of Herald (USA)'s information system for derivatives and securities that affected (1) how Herald (USA)'s derivatives and securities transactions were purportedly initiated and (2) the accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of Herald (USA)'s derivatives and securities transactions.  AU §§ 332.11, 332.20, and 324; *see also* ISA 402 ("Audit Considerations Relating to Entities Using Service Organization").

150.    E&Y was thus required to consider the controls put in place by BMIS:

Following the guidance in Section 324, Service Organizations, a service organization's services are part of an entity's information system for derivatives and securities if they affect any of the following:

      a.     How the entity's derivatives and securities transactions are initiated.

b.     The accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of the entity's derivatives and securities transactions.

(AU § 332.11.)

151.     E&Y was also required to perform additional procedures required in situations where, as here, there is a lack of segregation of duties at a service organization.  With respect to Herald (USA), BMIS initiated the securities transactions held and serviced the securities as custodian and prepared trading and account information.  This heightened risk required E&Y to perform additional procedures to opine on the financial statements of the Funds.  AU § 332.16 specifically directs that confirmations from service organizations are not sufficient audit evidence.

152.     Moreover, where, as here, the service organization (BMIS) both initiated the transactions and held and serviced the securities, the greater risk of fraud requires the auditor to perform additional procedures, including site visits to inspect documentation, and identification of controls by the service organization:

> *If one service organization initiates transactions as an investment adviser and also holds and services the securities, all of the information available to the auditor is based on the service organization's information.  The auditor may be unable to sufficiently limit audit risk without obtaining audit evidence about the operating effectiveness of one or more of the service organization's controls.*  An example of such controls is establishing independent departments that provide the investment advisory services and the holding and servicing of securities, then reconciling the information about the securities that is provided by each department.

(AU § 332.20; emphasis added).

153.     In light of the nature of Herald (USA) and of the circumstances surrounding it, E&Y also had an obligation to discuss with BMIS' independent auditor, F&H, the result of

F&H's most recent audit of BMIS. Guide § 5.59; AU § 332.11. In this regard, E&Y was required to examine the control environment at BMIS and should have either requested or performed additional tests of controls. Guide §§ 5.66-67.

154. Because F&H's "audits" of BMIS were unsatisfactory, E&Y had the additional obligation to apply appropriate auditing procedures:

> If the investee's financial statements are not audited, or if the investee auditor's report is not satisfactory to the investor's auditor for this purpose, the investor's auditor should apply, or should request that the investor arrange with the investee to have another auditor apply, appropriate auditing procedures to such financial statements, considering the materiality of the investment in relation to the financial statements of the investor.

(AU § 332.30).

**E&Y Failed to Verify the Existence of the Funds' Madoff Investments**

155. E&Y failed in its obligation to obtain reasonable assurance that the assets included in Herald (USA)'s Schedule of Investments in fact existed and were appropriately valued.

156. Contrary to the applicable accounting standards, E&Y failed to gather sufficient, competent evidential matter to support its opinions that the Funds' financial statements were free of material misstatements with respect to the claimed assets, instead inappropriately relying on the Funds' management's representations. AU § 333; *see also* ISA 580 ("Management Representations"). As a result, although E&Y opined that the billion plus dollar valuations of Herald (USA)'s investments were fairly presented in the financial statements, E&Y failed to determine whether the assets, which constituted nearly 100% of the Funds' value, even existed.

157. E&Y also did not perform the necessary procedures to audit the existence of the transactions which constituted the split-strike conversion strategy. E&Y was aware that Herald

(USA) was purportedly using that strategy, a nontraditional options trading strategy. Due to the strategy's heavy use of options trading, E&Y should have performed substantive procedures or testing.

158.     Had E&Y undertaken the proper analysis and testing of the strategy purportedly employed by Madoff, it would have determined that the strategy, including the claimed liquidation of all positions at the middle and end of each year to acquire U.S. Treasury bonds, could not have functioned as described within market parameters. Moreover, E&Y would have determined that BMIS' claimed consistent, positive returns were not achievable.

159.     In addition, despite its knowledge of the interconnection between Herald (USA) and and BMIS, and of Herald (USA)'s reliance on the supposed integrity of BMIS' operations, E&Y did not review the data required by the auditing standards with respect to an auditor's obligation to examine the "controls over derivatives and securities transactions from their initiation to their inclusion in the financial statements." E&Y did not test the trades supposedly made by BMIS or confirm the actual existence of securities in BMIS' accounts. If E&Y had made any such efforts, it would have discovered the securities did not exist.

160.     E&Y also improperly relied on the financial information provided by BMIS without inquiring into F&H, BMIS' auditor, even though F&H had represented to the AICPA that it did not perform audits and was, therefore, not subject to the annual peer review process. E&Y should have, but did not, perform additional procedures such as visiting the offices of F&H to discuss the audit procedures. Had E&Y taken this necessary step, it would have discovered that there was no effective audit of BMIS.

**E&Y Violated Its Duties to Herald (USA) Investors**

161. As the independent party charged with certifying that it had reasonable assurance that Herald (USA)s financial statements were free of material misstatements, E&Y failed to meet its obligation to Herald (USA)'s investors when it issued its audit opinions – opinions upon which it knew those parties would rely.

162. Had E&Y performed appropriate audits (as it represented it had), it would have learned that the securities transactions purportedly conducted by Madoff did not occur and the assets of Herald (USA) did not exist.

163. In addition, even the limited audit work that E&Y must have conducted would have given it actual knowledge or information that it willfully ignored, that:

- BMIS was not audited pursuant to GAAS by a "qualified and reputable independent audit firm";

- Herald (USA) and the other Defendants, performed no meaningful due diligence on BMIS;

- Herald (USA) did not test the validity of Madoff's performance or strategy;

- Herald (USA) had no process in place to verify the fair value of the investments purportedly made by BMIS;

- Herald (USA) did not verify the supposed trades made by Madoff with counterparties or other third parties and, thus, did not verify the existence of the securities and other assets.

164. E&Y breached its duties as the independent auditor of Herald (USA) at least as follows:

- E&Y failed to exercise due professional care and professional skepticism in its audit of Herald (USA). Specifically, E&Y failed to use professional skepticism "when considering the risk of material misstatement due to fraud";

- E&Y failed to obtain a sufficient understanding of Herald (USA) and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud;

- E&Y failed to obtain sufficient competent audit evidence with respect to existence of Herald (USA)'s investments through BMIS and E&Y did not perform the necessary procedures to audit the existence of the Funds' securities;

- E&Y failed to obtain an understanding of the internal controls (or lack thereof) of BMIS and did not perform the necessary procedures to audit the occurrence of the transactions which constituted the purported split-strike conversion strategy, such as confirmation with counterparties, confirmation of settled transactions, physical inspection of the securities, or performance of analytical procedures;

- E&Y failed to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization. Numerous red flags, discussed above, indicating that Madoff was a fraud existed and required E&Y to investigate further and perform additional audit procedures prior to opining on the presentation of Herald (USA)'s financial positions.

- Any reliance by E&Y on the financial statements of BMIS was improper because F&H was not qualified or able to audit BMIS in accordance with GAAP.

**E&Y Cayman's Audit Violated E&Y's Own Standards**

165.    E&Y's Web site contains a guide to its audits of hedge funds, entitled "Serving the Hedge Fund Industry: Seasoned Professionals for a Time of Change" (the "Audit Guide"). In it, E&Y boasts that it is "a leader in serving the hedge fund industry" and notes that it "[s]erves approximately 40% of the global hedge fund industry." (Audit Guide, at 2.)

166.    In particular, E&Y boasts that its audits of hedge funds pay "attention to risk." The Audit Guide states that E&Y "collaborate[s] with clients to … reduce risk," through, *inter alia*, "[a] global audit methodology, consistently applied." The Audit Guide continues:

Attention to risk

Our longstanding experience in the industry provides us with uncommon insights into the spectrum of potential risks and the necessary internal controls. Valuation has increasingly become one of the most challenging areas that funds and their boards of directors face. In uncertain market conditions, coupled with the proliferation of ever more complex and innovative financial instruments and product designs, hedge fund managers demand an experienced and broad team of professionals to serve them. Our audit teams leverage the knowledge and skills of our entire asset management practice, including those of internal valuation professionals in the areas of derivatives, structured products and private company valuations.

(Audit Guide, at 5).

167. Noting the increased use of "early warning systems" to detect risk at asset

management firms, E&Y represents that it has tools to assist in detecting risk:

Risk Management Advisory Services

In this environment of heightened stakeholder expectations, firms are formalizing their risk functions to establish and put into operation early warning systems. ***We have proven methodologies, tools and experience to assist asset management firms in identifying, monitoring and managing risk effectively and efficiently***.

(Audit Guide, at 8; emphasis added).

168. E&Y further represents that it is able to "investigate unusual financial activity"

and "perform electronic evidence discovery":

Fraud Investigation and Dispute Services

The financial services landscape continues to be redefined, as internal controls, risk management and regulatory compliance have risen to unprecedented levels. In addition to the demand for greater accountability, our clients must manage heightened scrutiny from the media and public. When conflicts arise, firms must respond with speed and efficiency to investigate the underlying facts and then remedy the issue. ***Our professionals investigate unusual financial activity, perform electronic evidence discovery and review financial reports – all with the sensitivity and urgency you require. Our knowledge comes from our experience dealing with matters of accounting malpractice, anti-corruption and regulatory compliance***.

(Audit Guide, at 9; emphasis added).

169.     E&Y even represents that it is able to assess risk throughout the "entire transaction lifecycle," and, specifically, that its auditors "perform thorough buy-side and sell-side due diligence":

> Strategic transaction support
>
> Our professionals address the entire transaction lifecycle. We can help you determine the true value of an asset, set up the right business and tax structure and execute the deal. And we will support your operational due diligence process. Whether it's a domestic or cross-border investment, our teams work proactively to offer structuring advice related to the acquisition of assets that can drive value in the form of greater after-tax return.
>
> We combine proven practices and consistent methodologies with fresh thinking, giving you the advice you need to make informed decisions, mitigate risk and achieve a successful outcome. And there are many other ways we can assist in transactions:
>
> 1.     ***Perform thorough buy-side and sell-side due diligence***
>
> 2.     Assess and quantify risk

(Audit Guide, at 9; emphasis added).

170.     Finally, to do all this, E&Y represents that it draws on its "worldwide industry resources, knowledge and experience." "Using our far-flung network of global resources, we can mobilize our team anywhere in the world." (Audit Guide, at 12).

171.     Given its leadership in the hedge fund audit business, it is not surprising that Herald (USA) was not the only Madoff feeder fund audited by E&Y. Lead Plaintiff is aware of at least eight additional feeder funds audited by E&Y. E&Y's audits of Madoff's feeder funds provided E&Y with a unique ability and opportunity to verify information about BMIS. That information, particularly in the aggregate, should have raised significant suspicions about

Madoff. These suspicions also should have been obvious because E&Y coordinated the audits of the feeder funds on a global basis.

## JURISDICTION AND VENUE

172. This Court has jurisdiction over the Exchange Act claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

173. This Court has jurisdiction over the state law claims pursuant to

      a.     the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a); and

      b.     the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA").

With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount of $5,000,000, and (ii) the Class consists of hundreds, and perhaps thousands of individuals, and (iii) at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of New York.

174. The exercise of personal jurisdiction over the Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants sued under New York law had sufficient minimum contacts with New York.

175. Venue in this judicial District is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District. Additionally, Defendants maintain offices and conduct substantial business in this District.

176. In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails,

interstate telephone communications and the facilities of the national securities exchanges and markets.

### THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EXCHANGE ACT

177.    Defendants knew that the sole purpose of the Herald Funds was to funnel money directly to Madoff and BMIS.  They were always intended to be feeder funds for Madoff.  All significant conduct (including trading and due diligence on Madoff) was to take place in New York.  To invest dollars in the Herald Funds, investors needed to send their money directly to New York banks.

178.    Further, in creating a fund whose sole objective was to provide money to Madoff, Defendants took advantage of the exemplary reputation of the laws and securities markets of the United States as being the best regulated and most efficient markets in the world.  Having benefitted from the advantages of the United States, they cannot now seek to disavow the concomitant obligations which include being subject to the laws of the United States.

179.    Accordingly, all Defendants availed themselves of the benefits and privileges of investing in the United States, pursuant to its laws and regulations.  It was foreseeable that, having chosen to operate an investment fund that was invested "primarily" in the United States, Defendants would be hauled into court in the United States.

### The Conduct and Effects Tests Are Both Met

180.    Bank Medici stated in on its website that it had offices located in New York City.  Bank Austria had offices located at 150 E. 42nd Street in New York City.  E&Y has offices in New York city.  HSBC has offices located in New York City.

181.    Bank Medici, through its founder, chairperson, and 75% owner, Sonja Kohn, met with Madoff in his offices in New York City numerous times to discuss providing him with investor's money.  Specifically, according to Madoff's calendar, Kohn met with Madoff in his offices in New York City on the following dates, among others: August 23, 2005; March 27, 2006; October 31, 2006; November 26, 2007; and September 23, 2008.  He also met with Dr. Ursula Rand from Medici in New York on December 6, 2005, May 9, 2006, October 23, 2006, March 19, 2007, October 30, 2007, May 20, 2008, and September 29, 2008.

182.    Kohn's meetings with Madoff in New York were part of Bank Medici's due diligence on Madoff.  According to a February 1, 2009 Bloomberg article, entitled, "Madoff's Well-Treated Feeder Funds Suspected Shady Trades But Backed Off," the due diligence accomplished during these meetings was limited:

> The feeders were the gatekeepers, and they qualified for royal treatment. A money manager for a family office recalls accompanying Sonja Kohn, whose Vienna-based Bank Medici funneled $3.2 billion to Madoff, to a meeting with Madoff in New York in 1991.
>
> He says Madoff treated her as if she were the Queen of England. The money manager also says Madoff wouldn't answer any questions about his strategy.

183.    On July 3, 2009, the Wall Street Journal reported that U.S. and British prosecutors had alleged that Kohn was paid more than $40 million in kickbacks for funneling $3.5 billion in investments to Madoff from funds she controlled.  Specifically, prosecutors alleged that two companies controlled by Kohn, Infovaleur and Erko, Inc., had received $32 million and £7, respectively.  Infovaleur was located at 767 Fifth Avenue, in New York City.

184.    Finally, in an article entitled "*The Madoff Chronicles, Part II WHAT THE SECRETARY SAW"Hello, Madoff!*" published in the June 2009 edition of Vanity Fair, written

by both Mark Seal and Madoff's secretary Eleanor Squillari, Ms. Squillari states that Kohn "was always thrilled to meet with Bernie, and always sent in staggering quarterly invoices—never less than $800,000—for her commissions."

185.    Accordingly, Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.  As set forth in detail herein, the due diligence conducted in New York did not meet the adequate standard of care, and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Lead Plaintiff's losses.

186.    At all relevant times, the Herald Funds maintained an account with BMIS in New York, through their custodian.  Additionally, the Herald Funds accounts were opened when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BMIS at BMIS' headquarters at 885 Third Avenue, New York, New York.  The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.

187.    The Customer Agreement signed by BMIS and the Herald Funds states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, and all laws of the United States.  The Herald Funds voluntarily made transactions with BMIS subject to these laws.

188.    Accordingly, the Herald Funds and the Defendants conducted activities in New York which (i) constituted conduct that was more than merely preparatory to the wrongdoing;

and (ii) directly caused Lead Plaintiff's losses.  In particular, the Herald Funds and Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.

### The E&Y Defendants

189.     The E&Y Defendants' conduct in the United States represented the centerpiece and fundamental aspect of the wrongful conduct at the heart of the claims against the E&Y Defendants.  Ernst & Young (Cayman Islands) knew that all of the Herald Fund assets were located with Madoff in New York.  Ernst & Young (Cayman Islands) needed to communicate with Madoff to complete ant type of audit.  At year end, at a minimum, it would have needed a confirmation and most likely would need to visit Madoff to confirm the location of fund assets.

### The HSBC Defendants

190.     HSBC and HSBC Luxembourg consistently wired funds, for the benefit of the Herald Funds, directly into BMIS' account at JPMorgan Chase & Co. in New York, New York, Account No. 000000140081703 (the "BMIS Bank Account").

191.     According to the Herald Funds' customer agreements, investments in the Herald Funds which were made in U.S. currency were required to be wired to New York.  HSBC Bank USA also became an entry point for all Herald (USA) U.S. dollar investments, regardless of the origin of the investment, and even though banks across the world accept dollar deposits, including foreign HSBC affiliates.  HSBC Luxembourg was the beneficiary of an account for these purposes both with HSBC Bank USA, Inc and Citibank.

192.     The principal executive offices of HSBC Bank USA are located at 452 Fifth Avenue, New York, New York.  HSBC Bank USA operates over three hundred branches in New

York.  HSBC Bank acted in New York for the benefit of, on behalf of, and with the knowledge and consent of, HSBC Luxembourg.

193.    Further, representatives of HSBC Holdings plc met with Madoff, repeatedly, in New York in 2008.  Specifically, Brian Pettitt, Head of HSBC Securities Services Network Management, met with Madoff in his office in New York City on February 21, 2008 and November 19, 2008, according to Madoff's calendar.  HSBC Securities Services is a division of HSBC.  HSBC's Web site explains that HSBC Securities Services "provides custody and administration services to institutional fund managers."  The HSBC Defendants are being sued in this action in connection with precisely these same administrative and custodial functions.  The Web site further states that HSBC Securities Services provides services in over fifty countries, indicating that the HSBC Defendants here are legal entities that form part of the HSBC Securities Services division.

194.    A January 2007 article in a publication called Financial Services Research, which mentions both Mr. Pettitt and HSBC Securities Services, places the type of due diligence which HSBC would have conducted on the Herald Funds squarely within his division's responsibility:

> Since the HSBC Group's acquisition of the Bank of Bermuda in February 2004, [HSBC Securities Services] has encountered *the new challenge of conducting risk assessments on prime brokers* whose hedge fund clients use [HSBC Securities Services'] Alternative Fund Services as their hedge fund administrator. "Given that the prime broker [*i.e.*, Madoff] is typically appointed by the hedge fund [*i.e.*, the Herald Funds], many prime brokers struggle to understand why they should be subject to due diligence by a global custodian," notes Mick Underwood [Head of Custody Network Management at HSBC].

(Emphasis added.)

195.    Thus, HSBC (through Mr. Pettitt) met with Madoff, in New York, to perform precisely the due diligence that is at issue in this action.

196. Accordingly, the HSBC Defendants conducted activities in New York which (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Lead Plaintiff's losses. In particular, the HSBC Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.

**Defendants' Conduct Had a Substantial Effect In the United States**

197. According to the SIPC Trustee, Madoff's Ponzi scheme caused investors to believe they had approximately $65 billion in assets when in reality those assets did not exist. Billions of dollars of these fictitious assets caused substantial harm to thousands of United States citizens whose supposed wealth evaporated overnight. This wealth had served to collateralize investments and assets of thousands of United States citizens who had to liquidate these assets and suffered real losses.

198. Defendants' wrongful conduct permitted Madoff to perpetuate his Ponzi scheme. The nature of a Ponzi scheme required that Madoff use the funds from new investors to pay old ones. The Herald Funds provided Madoff with billions of dollars to continue his Ponzi scheme. But for the billion plus dollars that the Herald Funds gave to Madoff, the scheme would have unraveled substantially earlier and not damaged thousands of United States citizens. Similarly, but for the withdrawal of hundreds of millions of dollars from Madoff in the later years of his Ponzi scheme which were effectively taken from United States citizens, substantially fewer United States citizens would have been harmed by Madoff's Ponzi scheme. Herald Funds would not have invested with Madoff but for Defendants' wrongful conduct.

199. The effect of the feeder funds in perpetuating Madoff's Ponzi scheme has been widely reported in the press. According to the Wall Street Journal's article, "Mad Men,"

published on January 7, 2009, "[f]eeder funds appear to explain [] the longevity of money manager Bernie Madoff."  Other news agencies issued similar reports:

a.  *Time Magazine* published an article entitled, "How Madoff's Feeder Funds Stole My Retirement," which noted, "Bernard Madoff built his $65 billion Ponzi empire at least half on the backs of his feeder funds."   The feeder funds allowed Madoff "to keep his house of cards standing much longer than he otherwise could have with his ragtag band of family members, small time accountants," according to the same article.

b.  *The New York Times* published an article entitled, "In Fraud Case, Middlemen in Spotlight," which reported that the feeder funds "were essentially pouring billions of dollars each into Bernard L. Madoff Investment Securities."

200.  Madoff's Ponzi scheme had additional substantial and direct effects on U.S. citizens:

a.  It is estimated that the Internal Revenue Service ("IRS") will lose up to $17 billion in lost tax revenue.  In some instances, the IRS may have to refund filers who paid taxes on fictitious gains from Madoff.  Individual states may also lose substantial tax revenue due to Madoff.

b.  The effect of Madoff on U.S. charities and their respective beneficiaries is substantial and well-documented.  The collateral effect of Madoff's Ponzi scheme has sent "shock waves throughout the medical and scientific communities - with far-reaching implications for everything from diabetes research to palliative care.  Philanthropy experts say that the negative effect of the Madoff scandal on health care could ultimately affect millions of people."   As a result, "hospitals, food banks, schools and community outreach programs

throughout the world are being forced to cut life-giving services as they watch millions of dollars in grants from large Jewish charities dry up in the wake of Bernard Madoff's alleged $50 billion Ponzi scheme.

c. The insurance industry has reported that it will be affected by Madoff's scheme in the "range of direct insured losses … between $760 million and $3.8 billion … with the maximum potential exposed insurance limits at more than $6 billion."

d. United States banks have also been affected by Madoff, including lending institutions, like Wells Fargo, who recently recorded losses of $294 million related to customers who were unable to pay their mortgages because they were wiped out by Madoff.   Similarly, hedge funds have seen substantial redemptions:  "The Madoff scandal has contributed to redemptions that could shrink the hedge fund industry by half, to $1 trillion, by the end of the year."  and

e. Investors who suffered enormous losses at the hands of Madoff included, "pensioners, municipal workers, students on scholarship, and middle class Americans, not just wealthy investors."

201. Accordingly, Defendants' wrongful conduct had a substantial effect in the United States and upon United States citizens.

## CLASS ACTION ALLEGATIONS

202. Plaintiffs brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of the Herald Funds on December 10, 2008, or (ii) purchased shares of the Herald Funds from January 12, 2004 to December 10, 2008 (the "Class Period"), and were damaged thereby due to

the wrongful conduct alleged in this Complaint (the "Class").  Excluded from the Class are the

Defendants; any entity in which Defendants have a controlling interest; and the officers,

directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate

family members of any such individual or entity.

203.    The Class is so numerous that joinder of all members is impracticable.  Although

the exact number of Class members is unknown to Plaintiffs at this time, and can only be

ascertained through appropriate discovery, Plaintiffs believe that Class members number at least

in the hundreds and perhaps thousands.

204.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class.  Plaintiffs are members of the Class, his claims are typical of the claims of all Class

members, and he does not have interests antagonistic to, or in conflict with, those of the Class.

In addition, Plaintiffs have retained competent counsel experienced in class action litigation.

205.    Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal and common law.

206.    There are numerous questions of law and fact which are common to the Class and

which predominate over any questions affecting individual members, including:

a.    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

b.    whether the common law was violated by Defendants' acts as alleged

herein;

c.      whether Defendants' conduct alleged herein was intentional, reckless, grossly negligent, or negligent in violation of duties owed to Plaintiffs and the Class and, therefore, in violation of the common law;

d.      whether the Court has personal and subject matter jurisdiction over Defendants; and

e.      whether, and to what extent, Plaintiffs and the Class were damaged.

207.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## COUNT 1

## BREACH OF FIDUCIARY DUTY AGAINST THE HERALD (USA) AND HERALD (LUX) DEFENDANTS

208.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald (LUX) and Herald (USA) Defendants for breach of fiduciary duty pursuant to New York law.

209.    Lead Plaintiff and the Class entrusted their assets to the Defendants named in this Count by investing in the Herald Funds and reposed confidence in them with respect to the management of those assets.  The Defendants named in this Count were in a superior position as to the management and control of those assets, in their capacities as advisers, their parent and

selling agent, the directors of the Funds, and the Funds themselves, and in a superior position to manage, control, and oversee Madoff. As a result, Lead Plaintiff and the Class placed their trust and confidence in the Defendants named in this Count.

210. The Defendants named in this Count accepted that repose of trust and confidence and held themselves out as providing superior client investment services and as having policies and procedures in place to ensure that:

    a.    the Herald Funds would follow their policies and investment guidelines;

    b.    sufficient operational controls were in place to safeguard Lead Plaintiff's and the Class' assets; and

    c.    transactions would be properly conducted.

211. Lead Plaintiff and the Class reasonably and forseeably trusted the purported expertise and skill of the Defendants named in this Count.

212. The Defendants named in this Count therefore owed a fiduciary duty to Lead Plaintiff and the Class with respect to the management, oversight, and protection of Lead Plaintiff's and the Class' assets invested in the Herald Funds.

213. In accordance with their fiduciary duties to Lead Plaintiff and the Class, the Defendants named in this Count were obligated to:

    a.    deal fairly and honestly with Lead Plaintiff and the Class;

    b.    act with loyalty and good faith towards Lead Plaintiff and the Class;

    c.    manage and operate the investments of Lead Plaintiff and the Class exclusively for the best interest of Lead Plaintiff and the Class;

d.      make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk and instruction of Lead Plaintiff and the Class; and

e.      oversee the investment of Lead Plaintiff's and the Class' assets to confirm they were maintained in a prudent and professional manner.

214.    The Defendants named in this Count breached their fiduciary duties to Lead Plaintiff and the Class by:

a.      failing to act with reasonable care to ensure that the investment opportunity presented to Lead Plaintiff and the Class was suitable and in accordance with their investment goals and intentions;

b.      failing to perform adequate due diligence before investing with Madoff;

c.      failing to invest Lead Plaintiff's and the Class' assets with adequate diligence or monitoring;

d.      failing to monitor Madoff on an ongoing basis to any reasonable degree;

e.      failing to take adequate steps to confirm BMIS's purported account statements, transactions, and holdings of the Herald Funds' assets;

f.      failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds;

g.      profiting and allowing their affiliates to unlawfully profit at the expense of Lead Plaintiff and the Class; and

h.      engaging in transactions that were designed to and did result in a profit to Defendants named in this Count at the expense of Lead Plaintiff and the Class.

215. As a result of the Defendants named in this Count's breaches of their fiduciary duties, Lead Plaintiff and the Class have lost all, or substantially all, of their respective investments in the Herald Funds.

216. As a result of the Defendants named in this Count's breaches of their fiduciary duties, Lead Plaintiff and the Class have been forced to pay excessive investment, performance, and management fees in exchange for investment services that were never provided.

217. The damages suffered by Lead Plaintiff and the Class were a direct and foreseeable result, proximately caused by the Defendants named in this Count's breaches of their fiduciary duties.

218. By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Lead Plaintiff and the Class.

219. As a result of the Defendants named in this Count's breaches of their fiduciary duties, Lead Plaintiff and the Class have suffered damages with respect to their investments in the Herald Funds in an amount to be determined at trial.

## COUNT 2

### GROSS NEGLIGENCE AGAINST THE HERALD (LUX) AND HERALD (USA) DEFENDANTS

220. Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count. This Count is asserted against the Herald (Lux) Defendants and the Herald (USA) Defendants for gross negligence pursuant to New York law.

221. The Defendants named in this Count had a special relationship with Lead Plaintiff and the Class that gave rise to a duty to exercise due care in the management of Lead Plaintiff's

and the Class' assets invested in the Herald Funds and in the selection and monitoring of Madoff and BMIS.

222.    This special relationship arose from, among other things, the following:

        a.      the managers were responsible for executing trading activities on behalf of the Herald Funds; and

        b.      the Defendants named in this Count agreed that they would exercise the requisite level of care in selecting and monitoring investments of the Herald Funds.

223.    The Defendants named in this Count grossly failed to exercise due care, and acted in disregard of their duties, and thereby injured Lead Plaintiff and the Class.

224.    The Defendants named in this Count grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

225.    The Defendants named in this Count grossly failed to:

        a.      perform necessary and adequate due diligence before investing in Madoff;

        b.      monitor Madoff on an ongoing basis to any reasonable degree;

        c.      take adequate steps to confirm Madoff's purported account statements, transactions and holdings of Herald Fund assets;

        d.      take reasonable steps to ensure that the investments of the assets of Lead Plaintiff and the Class were made and maintained in a prudent and professional manner;

        e.      take reasonable steps to preserve the value of Lead Plaintiff's and the Class' investments; and

f.    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

226.    If the Defendants named in this Count had not been grossly negligent with respect to Lead Plaintiff's and the Class' assets invested in the Herald Funds, the Defendants named in this Count would not have entrusted Lead Plaintiff's and the Class' assets invested in the Herald Funds to Madoff.

227.    As a direct and proximate result of the Defendants named in this Count's gross negligence with respect to Lead Plaintiff's and the Class' assets invested in the Herald Funds, Lead Plaintiff and the members of the Class have lost all, or substantially all, of their investment in the Herald Funds.

228.    By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Lead Plaintiff and the Class in an amount to be determined at trial.

## COUNT 3

## NEGLIGENCE AGAINST THE HERALD (LUX) AND HERALD (USA) DEFENDANTS

229.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts ( paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald (LUX) Defendant and the Herald (USA) Defendants for negligence pursuant to New York law.

230.    The Defendants named in this Count had a special relationship with Lead Plaintiff and the Class that gave rise to a duty to exercise due care in the management of Lead Plaintiff's and the Class' assets invested in the Herald Funds and in the selection and monitoring of Madoff for the Herald  Funds.

231. This special relationship arose from, among other things, the following:

a. Madoff was responsible for executing trading activities on behalf of the Herald Funds under the direction of the Funds' Advisers; and

b. the Defendants named in this Count agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom they entrusted the investment assets of the Herald Funds.

232. The Defendants named in this Count failed to exercise reasonable due care, and acted in disregard of their duties, and thereby injured Lead Plaintiff and the Class.

233. The Defendants named in this Count failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

234. The Defendants named in this Count failed to:

a. perform necessary and adequate due diligence, before investing all of the Herald Funds assets with Madoff;

b. monitor Madoff on an ongoing basis to any reasonable degree;

c. take adequate steps to confirm Madoff's purported account statements, transactions, and holdings of the Herald Funds' assets;

d. take reasonable steps to ensure that the investments of the assets of Lead Plaintiff and the Class were made and maintained in a prudent and professional manner;

e. take reasonable steps to preserve the value of Lead Plaintiff's and the Class' investments; and

f.    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

235.    If the Defendants named in this Count had not been negligent with respect to Lead Plaintiff's and the Class' assets invested in the Herald Funds, the Defendants named in this Count would not have entrusted Lead Plaintiff's and the Class' assets invested in the Herald Funds to Madoff.

236.    As a direct and proximate result of the Defendants named in this Count's negligence with respect to Lead Plaintiff's and the Class' assets invested in the Herald Funds, Lead Plaintiff and other members of the Class have lost all, or substantially all, of their investment in the Herald Funds.

237.    By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Lead Plaintiff and the Class in an amount to be determined at trial.

## COUNT 4

### UNJUST ENRICHMENT AGAINST THE HERALD (LUX) AND HERALD (USA) DEFENDANTS

238.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald (LUX) Defendants and the Herald (USA) Defendants for unjust enrichment pursuant to New York law.

239.    Lead Plaintiff and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that the Defendants named in this Count obtained at the expense of Lead Plaintiff and the Class, and to which they were not entitled, including, but not limited to, management and advisory fees.

240.    Lead Plaintiff and the Class further base their unjust enrichment claim on the receipt or retention of commissions and other monies that the Defendants named in this Count charged Lead Plaintiff and the Class at the time of investment in, switches between, or redemptions of shares in the Herald Funds, and to which they were not entitled.

241.    The Defendants were unjustly enriched because they received unfair compensation for the performance of their duties.

242.    The Defendants named in this Count were enriched at the expense of Lead Plaintiff and the Class, including by taking Lead Plaintiff's and the Class' monies in the form of commissions and other fees for their purported management of Lead Plaintiff's and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

243.    Lead Plaintiff and the Class involuntarily conferred a benefit upon the Defendants named in this Count without Lead Plaintiff and the Class receiving adequate benefit or compensation in return.  The Defendants named in this Count appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

244.    Equity and good conscience require the Defendants named in this Count to refund all fees and other monies they received at Lead Plaintiff's and the Class' expense.

## COUNT 5

## IMPOSITION OF CONSTRUCTIVE TRUST AGAINST HERALD (LUX) AND HERALD (USA) DEFENDANTS

245.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts ( paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald (LUX) Defendants and the Herald (USA) Defendants for imposition of constructive trust pursuant to New York law.

246.     The Defendants named in this Count had a fiduciary or confidential relationship with Lead Plaintiff and the Class.

247.     The Defendants named in this Count agreed to manage Lead Plaintiff's and the Class' investment capital in the Herald Funds in accordance with that fiduciary relationship.

248.     The Defendants named in this Count were compensated by Lead Plaintiff and the Class, including by the receipt or retention of improperly calculated fees and other monies.

249.     The Defendants named in this Count were unjustly enriched by the receipt or retention of monies, including management and performance fees that were predicated on fictitious profits, and other compensation.

250.     Lead Plaintiff and the Class are entitled to have a constructive trust imposed on the amount of all monies and other compensation in the possession of the Defendants named in this Count, which relate to their fees or any other monies from Lead Plaintiff and the Class, the amount of which is yet to be determined.

## COUNT 6

## BREACH OF CONTRACT AGAINST THE HERALD FUNDS AND THEIR RESPECTIVE DIRECTORS

251.     Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald Funds and their respective directors for breach of contract pursuant to New York law.

252.     Plaintiff and the Class had a contractual relationship with the Herald Funds and their directors, as evidenced by the Subscription Agreement, executed in connection with their investment in the Herald Funds.

253. By virtue of the contractual relationship between the parties, these defendants agreed that (i) Lead Plaintiff's and the Class' monies would be invested in legitimate enterprises with a potential for capital appreciation, and (ii) that the investments would be diversified.

254. These obligations were material terms of the agreement.

255. These obligations were also fundamental assumptions of the agreement embraced by both Lead Plaintiff and the Class on the one hand, and these defendants on the other.

256. Lead Plaintiff and the Class fully performed their contractual obligations to these defendants.

257. These defendants breached their contract with Lead Plaintiff and the Class.

258. By reason of the foregoing, these defendants are jointly and severally liable to Lead Plaintiff and the Class in an amount to be determined at trial.

## COUNT 7

## GROSS NEGLIGENCE AGAINST E&Y CAYMAN

259. Lead Plaintiff repeats and realleges certain allegations in this Complaint that are not part of the Counts (paragraphs 13-46, 89-94, 106, and 118-207) as if fully set forth in this Count. This Count is asserted against E&Y Cayman for gross negligence pursuant to New York law.

260. E&Y Cayman had a special relationship with Lead Plaintiff and the Class that gave rise to a duty of care. E&Y Cayman issued audit opinions directly to Lead Plaintiff and the Class as investors and shareholders in the Herald (USA) Fund. E&Y Cayman knew that the audit opinions about the Herald (USA) Fund would be relied upon by Lead Plaintiff and the Class in deciding to make or retain their investments in the Herald (USA) Fund in that, among

other things, E&Y Cayman knew that defendants advised Lead Plaintiff and other members of the Class that it audited the Herald Funds' financial statements and had given the Herald (USA) Fund unqualified audit opinions.

261.     Lead Plaintiff and the Class foreseeably and reasonably relied, directly or indirectly, on E&Y Cayman to exercise such care as ordinarily exercised by auditors generally and as required by GAAS, ISA and other applicable auditing and accounting standards in conducting the audits of the Herald Funds.

262.     E&Y Cayman was grossly negligent in knowingly failing to properly audit the Herald (USA) Fund in accordance with GAAS, ISA and other applicable auditing and accounting standards.  E&Y Cayman nevertheless was grossly negligent in issuing unqualified audit opinions that the Herald (USA) Funds' financial statements fairly represented the financial condition of the fund.

263.     E&Y Cayman acted with gross negligence by failing to conduct the requisite procedures concerning BMIS.  Among other things, E&Y Cayman failed to perform any procedures to gain an understanding of BMIS's business pursuant to GAAS and ISA.

264.     E&Y Cayman ignored numerous red flags surrounding Madoff.  E&Y Cayman acted with gross negligence as to the consequences of the Herald Funds' incorrect financial statements.

265.     Had E&Y Cayman not acted with gross negligence, it would not have issued the unqualified audit opinions.

266.     As a result of the gross negligence of E&Y Cayman, Lead Plaintiff and the Class have lost all, or substantially all, of their investment in the Herald Funds.

## COUNT 9

## NEGLIGENCE AGAINST E&Y CAYMAN

267. Lead Plaintiff repeats and realleges certain allegations in this Complaint that are not part of the Counts (paragraphs 13-46, 89-94, 106, and 118-207) as if fully set forth in this Count. This Count is asserted against E&Y Cayman for negligence pursuant to New York law.

268. E&Y Cayman had a special relationship with Lead Plaintiff and the Class that gave rise to a duty of care. E&Y Cayman issued audit opinions directly to Lead Plaintiff and the Class as investors and shareholders in the Herald (USA) Fund. E&Y Cayman knew that the audit opinions about the Herald (USA) Fund would be relied upon by Lead Plaintiff and the Class in deciding to make or retain their investments in the Herald Funds in that, among other things, E&Y Cayman knew that defendants advised Lead Plaintiff and other members of the Class that it audited the Herald (USA) Funds' financial statements and had given the Herald (USA) Fund unqualified audit opinions.

269. Lead Plaintiff and the Class foreseeably and reasonably relied, directly or indirectly, on E&Y Cayman to exercise such care as ordinarily exercised by auditors generally and as required by GAAS, ISA and other applicable auditing and accounting standards in conducting the audits of the Herald (USA) Fund.

270. E&Y Cayman was negligent in failing to properly audit the Herald (USA) Fund in accordance with GAAS, ISA and other applicable auditing and accounting standards. E&Y Cayman nevertheless negligently issued unqualified audit opinions that the Herald (USA) Fund's financial statements fairly represented the financial condition of the fund.

271.     E&Y Cayman acted negligently by failing to conduct the requisite procedures concerning BMIS.  Among other things, E&Y Cayman failed to perform any procedures to gain an understanding of BMIS's business pursuant to GAAS and ISA.

272.     E&Y Cayman ignored numerous red flags surrounding Madoff.  E&Y Cayman acted with negligence as to the consequences of the Herald Funds' incorrect financial statements.

273.     Had E&Y Cayman not acted negligently, it would not have issued the unqualified audit opinions.

274.     As a result of the negligence of E&Y Cayman, Lead Plaintiff and the Class have lost all, or substantially all, of their investment in the Herald Funds.

## COUNT 10

### GROSS NEGLIGENCE AND NEGLIGENCE AGAINST E&Y GLOBAL

275.     Lead Plaintiff repeats and realleges certain allegations in this Complaint that are not part of the Counts (paragraphs 13-46, 89-94, 106, and 118-207) as if fully set forth in this Count.  This Count is asserted against E&Y Global for gross negligence and negligence pursuant to New York law.

276.     E&Y Cayman, in the conduct of its audits of the Herald Funds' financial statements, was performing the duties expected and provided for by E&Y to its audit clients.

277.     E&Y's 2009 Annual Report, entitled "Global Annual Review," states that "Ernst & Young refers to the global organization of member firms of Ernst & Young Global Limited." (Global Annual Review, at 40).

278.     As all hierarchical entities with centralized control, E&Y has one Chairman and CEO, James S. Turley, and member firms have obligations to E&Y.

279. The Global Annual Review further confirms that the network is structured like a corporation. According to the Global Annual Review, "Our global organization and its management and governance structures are vital elements to delivering on our promise to stakeholders and clients and achieving our strategy of market leadership. We have centered these structures on two guiding principles: separating management and governance roles; and operating Ernst & Young as a global business with one shared strategy, led and overseen by a single management team." (Global Annual Review, at 35).

280. Four governance bodies (the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council) provide a global governance structure that is housed within E&Y Global. In effect, the E&Y member firms (including E&Y Cayman) act as agents of E&Y Global.

281. By virtue of E&Y Global's control, directly or indirectly through the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council, over its member firms (including E&Y Cayman), E&Y Global is liable for the gross negligence or negligence of E&Y Cayman.

## COUNT 11

### BREACH OF FIDUCIARY DUTY AGAINST HSBC (LUXEMBOURG)

282. Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts ( paragraphs 1 through 207) as if fully set forth in this Count. This Count is asserted against the "HSBC (Luxembourg) for breach of fiduciary duty pursuant to New York law.

283.     In providing administrative services to the Herald Funds, HSBC (Luxembourg) was responsible for Custodial, accounting, registrar, and transfer services, including reporting the Herald Funds' NAV.  HSBC (Luxembourg) occupied a superior position over Lead Plaintiff and the Class because it had superior access to confidential information about Madoff's purported investments, including the purported location, security, and value of the purported assets.

284.     In providing custodial services to the Herald Funds, HSBC (Luxembourg) was responsible for acting with reasonable skill, care, and diligence in the appointment and monitoring of BMIS, and were responsible for the periodic oversight of BMIS in connection with the custody of the assets of the Herald Funds.

285.     HSBC (Luxembourg) held themselves out as providing superior custodial services to financial firms.  Specifically, HSBC (Luxembourg) held themselves out, in their role as custodians, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to monitor and oversee the custody of assets held by entities other than HSBC (Luxembourg).

286.     HSBC (Luxembourg) charged a premium for their custodial and administrative services to the Herald Funds.

287.     HSBC (Luxembourg) held itself out as providing superior administrative services to financial firms.  Specifically, HSBC (Luxembourg) held itself out, in its role as custodian and administrator, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to calculate the NAV reported to investors on a monthly basis.

288.     HSBC (Luxembourg)'s superior position necessitated that Lead Plaintiff and the Class repose their trust and confidence in HSBC (Luxembourg) to fulfill its duties, and Lead Plaintiff and the Class did so by investing and continuing to invest in the Herald Funds.

289.     HSBC (Luxembourg) accepted Lead Plaintiff's and the Class' repose of trust and confidence.

290.     Lead Plaintiff and the Class reasonably and foreseeably trusted HSBC (Luxembourg)'s purported expertise and skill, and HSBC (Luxembourg) recognized that Lead Plaintiff and the Class would rely on and repose their trust in HSBC (Luxembourg) when deciding to invest and retain their investments in the Herald Funds.

291.     HSBC (Luxembourg)'s superior position over Lead Plaintiff and the Class gave rise to a fiduciary duty and duty of care on the part of the Administrator to Lead Plaintiff and the Class, who invested in the Herald Funds.

292.     HSBC (Luxembourg) breached its fiduciary duties to Lead Plaintiff and the Class by, *inter alia*, failing to discharge properly its responsibilities as custodian and administrator, including the calculation of the NAVs and review of information provided by Madoff.

293.     Lead Plaintiff and the Class have been damaged as a proximate result of the HSBC (Luxembourg)'s breach of fiduciary duties.

## COUNT 12

### GROSS NEGLIGENCE AGAINST HSBC (LUXEMBOURG)

294.     Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against HSBC (Luxembourg) for gross negligence pursuant to New York law.

295.    In providing administrative services to the Herald Funds, HSBC (Luxembourg) was responsible for custodial, accounting, registrar, and transfer services, including reporting the Herald Funds' NAV.  HSBC (Luxembourg) occupied a superior position over Lead Plaintiff and the Class because it had superior access to confidential information about Madoff's purported investments, including the purported location, security, and value of the purported assets.

296.    In providing custodial services to the Herald Funds, HSBC (Luxembourg) was responsible for acting with reasonable skill, care, and diligence in the appointment and monitoring of BMIS, and were responsible for the periodic oversight of BMIS in connection with the custody of the assets of the Herald Funds.

297.    HSBC (Luxembourg) held themselves out as providing superior custodial services to financial firms.  Specifically, HSBC (Luxembourg) held themselves out, in their role as custodians, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to monitor and oversee the custody of assets held by entities other than HSBC (Luxembourg).

298.    In providing custodial and administrative services to the Herald Funds,  HSBC (Luxembourg) had a special relationship with Lead Plaintiff and the Class that gave rise to a duty to exercise due care in the performance of its duties.

299.    HSBC (Luxembourg)'s duty of care to Lead Plaintiff and the Class was based on and arose from, among other things, its duty to calculate the Herald Funds' NAV reported to investors on a monthly basis.

300.    HSBC (Luxembourg) knew or was reckless in not knowing that Lead Plaintiff and the Class were relying on it to exercise reasonable care in providing its services to the

Herald Funds, and Lead Plaintiff and the Class did reasonably and foreseeably rely on HSBC (Luxembourg) to exercise such care by investing and continuing to invest in the Herald Funds.

301.    HSBC (Luxembourg) was grossly negligent in its duties as custodian and administrator.  HSBC (Luxembourg) relied, with gross negligence, on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Lead Plaintiff and the Class without scrutiny, verification, confirmation, or review of the information.  HSBC (Luxembourg) was obligated to scrutinize, verify, confirm or review independently the information it was providing in calculating the NAV, but grossly failed to do so.  HSBC (Luxembourg) grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

302.    HSBC (Luxembourg) was not entitled to rely on the information provided by Madoff because of the red fags surrounding Madoff; the consolidation of the role of investment manager, custodian and execution agent in Madoff; and because the information was manifestly incorrect.

303.    Lead Plaintiff's and the Class' investment in the Herald Funds has been completely, or substantially, lost, and, thus, Lead Plaintiff and the Class have been damaged as a proximate result HSBC (Luxembourg)'s gross negligence.

## COUNT 13

## NEGLIGENCE AGAINST HSBC (LUXEMBOURG)

304.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts ( paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against HSBC (Luxembourg) for negligence pursuant to New York law.

305. In providing administrative and custodial services to the Herald Funds, HSBC (Luxembourg) had a special relationship with Lead Plaintiff and the Class that gave rise to a duty to exercise due care in the performance of its duties.

306. In providing administrative services to the Herald Funds, HSBC (Luxembourg) was responsible for custodial, accounting, registrar, and transfer services, including reporting the Herald Funds' NAV. HSBC (Luxembourg) occupied a superior position over Lead Plaintiff and the Class because it had superior access to confidential information about Madoff's purported investments, including the purported location, security, and value of the purported assets.

307. In providing custodial services to the Herald Funds, HSBC (Luxembourg) was responsible for acting with reasonable skill, care, and diligence in the appointment and monitoring of BMIS, and were responsible for the periodic oversight of BMIS in connection with the custody of the assets of the Herald Funds.

308. HSBC (Luxembourg) held themselves out as providing superior custodial services to financial firms. Specifically, HSBC (Luxembourg) held themselves out, in their role as custodians, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to monitor and oversee the custody of assets held by entities other than HSBC (Luxembourg).

309. HSBC (Luxembourg)'s duty of care to Lead Plaintiff and the Class was based on and arose from, among other things, its duty to calculate the NAV reported to investors on a monthly basis.

310. HSBC (Luxembourg) knew or was reckless in not knowing that Lead Plaintiff and the Class were relying on it to exercise reasonable care in providing its services to the

Herald Funds, and Lead Plaintiff and the Class did reasonably and foreseeably rely on HSBC (Luxembourg) to exercise such care by investing and continuing to invest in the Herald Funds.

311. HSBC (Luxembourg) was negligent in its disregard for its duties as administrator and custodian of the Herald Funds. HSBC (Luxembourg) relied on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Lead Plaintiff and the Class without scrutiny, verification, confirmation, or review of the information. HSBC (Luxembourg) failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

312. HSBC (Luxembourg) was not entitled to rely on the information provided by Madoff because of the red flags surrounding Madoff; the consolidation of the role of investment manager, custodian and execution agent in Madoff; and because the information was manifestly incorrect.

313. Lead Plaintiff's and the Class' investment in the Herald Funds has been completely, or substantially, lost, and, thus, Lead Plaintiff and the Class have been damaged as a proximate result of HSBC (Luxembourg)'s negligence.

## COUNT 14

### UNJUST ENRICHMENT AGAINST HSBC (LUXEMBOURG)

314. Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count. This Count is asserted against HSBC (Luxembourg) for unjust enrichment pursuant to New York law.

315. Lead Plaintiff and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that HSBC (Luxembourg) obtained at the expense of Lead

Plaintiff and the Class, and to which they were not entitled, including, but not limited to, those specified in the Offering Memoranda.

316.    HSBC (Luxembourg) was enriched at the expense of Lead Plaintiff and the Class, including by taking Lead Plaintiff's and the Class' monies in the form of fees for their purported custody or oversight of the custody of Lead Plaintiff's and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

317.    Lead Plaintiff and the Class involuntarily conferred a benefit upon HSBC (Luxembourg) without Lead Plaintiff and the Class receiving adequate benefit or compensation in return.  HSBC (Luxembourg) appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

318.    Equity and good conscience require HSBC (Luxembourg) to refund all fees and other monies they received at Lead Plaintiff's and the Class' expense.

## COUNT 15

## FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE HERALD (LUX) AND HERALD (USA) DEFENDANTS

319.    Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207) as if fully set forth in this Count.  This Count is asserted against the Herald (LUX) Defendants and the Herald (USA) Defendants and is based upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

320.    Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading to Lead Plaintiff and the Class. The purpose and effect of said false and misleading statements was, among other things, to induce Lead Plaintiff and the Class to purchase shares in the Herald Funds.

321. During the Class Period, Defendants subject to this Count sold the Herald Funds based on false and misleading statements and omissions. Investors in the Herald Funds or their nominees were provided copies of the Offering Memoranda. These documents, however, contained uniform misrepresentations and material omissions and induced Lead Plaintiff and the Class to invest in the Herald Funds.

322. The Offering Memoranda specifically stated that only the representations in the Offering Memoranda were to be relied upon by investors.

323. The Defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, adviser, administrator and custodian, and their obligation to perform these functions. Nevertheless, the Defendants subject to this Count recklessly or knowingly failed to perform due diligence that they recognized was essential and required by standard industry practice. Defendants subject to this Count also recklessly or knowingly disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

324. As set forth below in this Count, the Defendants subject to this Count recklessly or knowingly misrepresented to Lead Plaintiff and other members of the Class that their assets were being invested in a diversified manner. The Defendants subject to this Count failed to disclose to Lead Plaintiff and other members of the Class the material facts that in reality no one

had conducted any meaningful due diligence on Madoff prior to establishing the Herald Funds' investments with Madoff; no one was meaningfully monitoring, verifying, or confirming Madoff's trade activity; effectively there was no transparency into Madoff's operations; and no one had an independent, factual basis for stating that Lead Plaintiff and the Class' investments would ne diversified. Furthermore, no defendant mentioned that the investments would be going solely to Madoff.

325.    The statements concerning how investments would be diverse were false and misleading. In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme and no other securities transactions were ever conducted. Further, the Offering Memoranda failed to disclose to Lead Plaintiff and other members of the Class the material fact that the Defendants subject to this Count had no factual basis for their representations about the Herald Funds' investment strategy because they knew all monies would be invested with Madoff.

326.    By reason of the foregoing, Defendants subject to this Count directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

327.    Lead Plaintiff and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by Defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in the Herald Funds. Lead Plaintiff and the Class have suffered substantial damages with respect to their

investments in the Herald Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

**COUNT 16**

**FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE E&Y DEFENDANTS**

328.    Lead Plaintiff repeats and realleges certain allegations in this Complaint that are not part of the Counts (paragraphs 13-46, 89-94, 106, and 118-207) as if fully set forth in this Count.  This Count is asserted against the E&Y Defendants and is based upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

329.    E&Y Cayman issued audit opinions that constituted the presentation of false and misleading information as to the assets of the Herald (USA) Fund.  Instead of more than a billion, as represented, virtually no assets actually existed.  These statements were made recklessly or knowingly and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  These statements induced Lead Plaintiff and the Class to invest in the Herald Funds.

330.    E&Y Cayman made the following false and misleading statements.  E&Y Cayman issued audit opinions for every calendar year between at least 2003 and 2007 with respect to the Herald (USA) Funds' financial statements.   In each of these opinions, E&Y Cayman (i) stated that it conducted the audits in accordance with auditing standards generally accepted in the Luxembourg and (ii) Each Independent Auditor's Report states that "We have audited the accompanying financial statements . . . which comprise the statement of net assets, including the schedule of investments. . .  And the statement of net income, and changes of net

assets[.] They also stated that "We conducted our audit in accordance with International Standards on Auditing." They also provided an Opinion, which stated "in our opinion, the financial statements give a true and fair view of the financial position of Herald Fund SPC as of December 31, 200[4-7], and of its financial performance for the year then ending in accordance with accounting principles generally accepted in Luxembourg."

331.     Each of those statements was false.  The statements were false for the following reasons:

a.     E&Y Cayman knew, or was reckless in not knowing that, the Herald Funds' financial statements did not reflect the financial position of the Herald (USA) Fund as of December 31, 200[4-7];

b.     E&Y Cayman knew, or was reckless in not knowing, that its audits of the Herald [USA] Fund did not meet, were in violation of, and were not in accordance with GAAS;

c.     E&Y Cayman did not confirm the existence of the Herald (USA) Fund's supposed assets.  While purporting to conduct an audit pursuant to GAAS, E&Y Cayman did not take the most fundamental and obvious steps in confirming the existence of the Herald (USA) Fund's assets, and did not do so despite the requirements pursuant to GAAS, as set forth above;

d.     E&Y Cayman acted recklessly in making the false statements alleged in this Count and its conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

e.     E&Y Cayman knew facts or had access to information suggesting that its audit opinions were not accurate or failed to check information that it had a duty to monitor and which would have demonstrated the falsity of its statements when made; and

f.     E&Y Cayman knew that substantially all of the Herald (USA) Fund's assets were funneled to Madoff.  Yet, E&Y Cayman failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of the Herald (USA) Fund's assets, so that the Herald (USA) Fund's audits failed to uncover the fact that the assets did not exist.

332.    To issue unqualified audit opinions that the Herald (USA) Fund had over a billion dollars of assets without any independent confirmation that any of the assets actually existed is a textbook definition of a reckless audit because it failed to comply with GAAS and the requisite accounting standards and constitutes, essentially, no audit at all. Issuing clean audit opinions in the circumstances here, with the multiple red flags set forth above, is even more reckless yet. The failure of E&Y Cayman to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit - to confirm that reported assets in fact exist.

333.    The E&Y Defendants had agency and/or alter ego relationships with each other, as set forth above.  E&Y Global is the principal of E&Y Cayman.  Accordingly, E&Y Global is liable for the acts of E&Y Cayman.

334.    In ignorance of the false and misleading statements described in this Count, Lead Plaintiff and the Class relied, to their detriment, on such misleading statements and omissions contained in E&Y Cayman's unqualified audit opinions by investing in the Herald Funds.  Lead

Plaintiff and the Class have suffered substantial damages with respect to their investments in the Herald Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 17

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST E&Y GLOBAL

335.     Lead Plaintiff repeats and realleges certain allegations in this Complaint that are not part of the Counts (paragraphs 13-46, 89-94, 106, and 118-207) as if fully set forth in this Count.  This Count is asserted against E&Y Global pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

336.     E&Y Global is a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

337.     E&Y Global had the power to influence and control and did influence and control, directly or indirectly, the decision making of E&Y Cayman, including the content and dissemination of the audit opinions of the Herald (USA) Fund that were false and misleading, by virtue of E&Y Global's participation in, and control and awareness of, the operations, audit procedures, audit work, and audit standards of E&Y Cayman.

338.     E&Y Global had direct and supervisory involvement and control in the day-to-day operations, audit procedures, audit work, and audit standards of E&Y Cayman and, therefore, is presumed to have had the power to control or influence the audit statements, audit procedures, and conduct giving rise to the primary securities violations alleged in this Complaint.

339.     As a direct and proximate result of the wrongful conduct alleged in this Count, Lead Plaintiff and the Class suffered damages in connection with their purchases of shares in the Herald Funds in an amount to be proven at trial.

## COUNT 18

### FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST HSBC (LUXEMBOURG)

340.     Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (1 through 207) as if fully set forth in this Count.  This Count is asserted against the HSBC (Luxembourg) pursuant to Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

341.     HSBC (Luxembourg) issued false statements containing inflated NAV calculations and account balance information.  HSBC (Luxembourg) issued these statements, at a minimum, on a monthly basis throughout the Class Period.  In issuing these statements, HSBC (Luxembourg) acted recklessly or knowingly because the Administrator knew or had access to information indicating that its statements were not accurate.  HSBC (Luxembourg) acted recklessly by failing to check or verify the information received from BMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances. HSBC (Luxembourg) failure to check or verify the information was also reckless because it was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

342.     Lead Plaintiff and the Class justifiably relied on the information contained in the HSBC (Luxembourg)'s statements.  Further, HSBC (Luxembourg) as paid substantial fees for performing administrative services.

343.     As a direct and proximate result of the wrongful conduct alleged in this Count, Lead Plaintiff and the Class suffered damages in connection with their purchases of shares in the Herald Funds in an amount to be proven at trial.

## COUNT 19

## FOR VIOLATIONS OF RULES 10b-5(a) AND 10b-5(c) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS EXCEPT THE E&Y DEFENDANTS

344.     Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (1 through 207) as if fully set forth in this Count. This Count is asserted against all Defendants and is based upon Rules 10b-5(a) and 10b-5(c) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

345.     Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of shares in the Herald Funds, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c). In furtherance of this unlawful plan, scheme and course of conduct, Defendants took the actions set forth herein.

346.     Defendants, individually and collectively, were responsible for safeguarding Lead Plaintiff's and Class members' investments. In this role, Defendants were obligated to perform, and represented that they had performed, due diligence on Madoff. Through such due diligence, Defendants had knowledge of, or were extremely reckless in not knowing of, Madoff's Ponzi scheme, described herein.

347.     In ignorance of the fact that the Herald Funds were feeder funds for Madoff's Ponzi scheme, Lead Plaintiff and the Class, relying on Defendants' due diligence, purchased shares in the Funds during the Class Period.

348.     Defendants benefitted financially from Lead Plaintiff's and Class members' purchases of shares in the Herald Funds.  In particular, Defendants received compensation, fees, commissions, kickbacks, and other payments based on (i) the Herald Funds' net asset value; and (ii) Lead Plaintiff's and Class members' subscriptions to the Herald Funds.

349.     Defendants engaged in the fraudulent activity described above knowingly and intentionally, or in such an extremely reckless manner, as to constitute willful deceit and fraud upon Lead Plaintiff and the Class.

350.     But for Defendants' fraud, none of the securities that were sold to Lead Plaintiff and the Class could have been sold.

351.     Upon public disclosure of the true facts which had been misrepresented or concealed by Defendants, as alleged herein, Lead Plaintiff's and Class members' investments lost all of their value.

352.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases of shares of the Herald Funds, for which the Defendants named in this Count are jointly and severally liable.

## COUNT 20

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS EXCEPT THE E&Y DEFENDANTS

353.     Lead Plaintiff repeats and realleges all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 207 ) as if fully set forth in this Count.  This Count is asserted against all defendants, except the E&Y Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

354.    Each defendant acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

355.    Medici controlled the Herald Funds and caused them to become feeder funds for Madoff's Ponzi scheme.  It had the power to control, and did control, the general business affairs of Herald Funds and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Pioneer and the Funds which resulted in primary liability.  Medici knew, or was reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

356.    Kohn controlled the Herald Funds and Medici, through her 75% ownership stake in Medici, and caused the Herald Funds become feeder funds for Madoff's Ponzi scheme.  She had the power to control, and did control, the general business affairs of Medici and the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Medici and the Herald Funds which resulted in primary liability.  Kohn knew, or was reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

357.    UniCredit controlled Medici through Bank Austria, its wholly-owned subsidiary. Through its 25% ownership of Medici, UniCredit had the power to control, and did control, the general business affairs of Medici and the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Medici and the Funds which resulted in primary liability.  UniCredit knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

358.     Bank Austria was a control person of Medici.    Through Medici, Bank Austria was also a control person of the Herald Funds.  Thus, Bank Austria had the power to control, and did control, the general business affairs of Medici and the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Medici and the Herald Funds which resulted in primary liability.  Bank Austria knew, or was reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

359.     Certain defendants were, for portions of the Class Period, directors and/or delegates of directors of the Herald Funds.  These defendants had the power to control, and did control, the general business affairs of the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Herald Funds which resulted in primary liability.  These director defendants knew, or were reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

360.     The invest managers, Medici and Herald Asset Management Limited, were control persons of the Herald Funds.  They had the power to control, and did control, the general business affairs of the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Herald Funds which resulted in primary liability.  The invest managers knew, or were reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

361.     HSBC (Luxembourg) was a control person of the Herald Funds.  It had the power to control, and did control, the general business affairs of the Herald Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct

due diligence) of the Herald Funds which resulted in primary liability. HSBC (Luxembourg) knew, or was reckless in not knowing, that the Herald Funds' investments were non-existent, as alleged herein.

362. HSBC was a control person of HSBC (Luxembourg). It had the power to control, and did control, the general business affairs of the Herald Fund's administrator and the custodian, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the administrator and custodians which resulted in primary liability. HSBC knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

363. As a direct and proximate result of the wrongful conduct alleged in this Count, Lead Plaintiff and the Class suffered an economic loss and damages in connection with their purchases of shares in the Herald Funds in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of himself and other members of the Class, demands judgment against Defendants as follows:

(a) declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring Lead Plaintiff a proper Class representative;

(b) awarding damages suffered by Lead Plaintiff and the Class as a result of the wrongs complained of herein, together with appropriate interest;

(c) awarding Lead Plaintiff and the Class punitive damages, where appropriate, suffered as a result of the wrongs complained of herein;

(d)    declaring that Defendants have been unjustly enriched and imposing a constructive trust to recoup Defendants' fees, unjust benefits, and other assets for the benefits of Lead Plaintiff and the Class;

(e)    enjoining Defendants from using the Herald Funds' assets to defend this action or to otherwise seek indemnification from the Funds for their wrongful, deceitful, reckless, or negligent conduct as alleged herein;

(f)    awarding Lead Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Lead Plaintiff's and Class' counsel and experts, and reimbursement of expenses; and

(g)    granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2010

STULL, STULL & BRODY

Jules Brody (JB-9151)
Patrick Slyne (PS-1765)
6 East 45th Street
New York, New York 10017
(212) 687-7230 (Tel)
(212) 490-2022 (Fax)

//

//

**STULL, STULL & BRODY**
Timothy J. Burke (Admitted *pro hac vice*)
10940 Wilshire Boulevard
Suite 2300
Los Angeles, California 90024
(310) 209-2468 (Tel)
(310) 209-2087 (Fax)
Email: [service@ssbla.com](mailto:service@ssbla.com)

**Lead Counsel for Lead Plaintiff Repex
Ventures and the Class
(*Repex* action only)**

## CERTIFICATE OF SERVICE

I hereby certify, this 11th day of February, 2010, that I caused a true and correct copy[ies] of the **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** to be served via First Class Mail and First Class International Mail on all parties listed on the attached service list.

Dated: February 11, 2010

_____
Jules Brody



RECEIVED
FEB 11 2010
U.S.D.C. S.D. N.Y.
CASHIERS

<u>**SERVICE LIST**</u>

William P. Hammer
ERNST & YOUNG LLP
5 Times Square
36th Floor
New York, NY 10036-6530
Tel:     (212) 773-3865
Fax:     (212) 773-3928

Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel:               (212) 351-2625
Direct Fax:     (212) 351-6225

William J. O'Brien
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY  10036-6522
Tel:     (212) 735-3000
Fax:     (917) 777-4128

Steven J. Toll
Daniel S. Sommers
Joshua S. Devore
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington,  DC  20005
Tel:     (202) 408-4600
Fax:     (202) 408-4699

Catherine A. Torell
COHEN MILSTEIN SELLERS & TOLL PLLC
150 East 52nd Street
30th Floor
New York, NY  10022
Tel:     (212) 838 7797
Fax:     (212) 838-7745

Samuel H. Rudman
David A. Rosenfeld
COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
58 South Service Road
Suite 200
Melville, NY 11747
Tel:    (631) 367-7100
Fax:    (631) 367-1173

Sabrina E. Tirabassi
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
DOUGLAS WILENS
120 E. Palmetto Park Road
Suite 500
Boca Raton, FL 33432-4809
Tel:    (561) 750-3000
Fax:    (561) 750-3364

Frank A. Bottini
Albert Y. Chang
JOHNSON BOTTINI, LLP
501 W. Broadway
Suite 1720
San Diego, CA 92101
Tel:    (619) 230-0063
Fax:    (619) 238-0622

Brian P. Murray
Gregory B. Linkh
MURRAY, FRANK & SAILER LLP
275 Madison Avenue
Suite 801
New York, NY 10016
Tel:    (212) 682-1818
Fax:    (212) 682-1892

Robert S. Schachter
ZWERLING, SCHACHTER & ZWERLING
41 Madison Avenue
New York, NY 10010
Tel:    (212) 223-3900
Fax:    (212) 371-5969

Jacob Sabo, Esq.
The Tower
# 3 Daniel Frisch St.
Tel Aviv Israel
Tel: (972) 36078888
Fax: (972) 36078889

Herald Fund SPC-Herald USA Segregated Portfolio One
M&C Corporate Services Limited
P.O. Box 309 GT
Ugland House, South Church Street
Georgetown, Grand Cayman
Cayman Islands

Herald (LUX)
40 Avenue Monterey
B.P. 413, L-2014
Luxembourg

Herald Asset Management Limited
Whitehall House, 238 North Church Street
Seven Mile Beach
George Town, Grand Cayman
Cayman Islands, B.W.I.

Paul de Sury
(Agent/Address unknown at this time)

Gabriel Safdié
(Agent/Address unknown at this time)

William A. Jones
(Agent/Address unknown at this time)

Bank Medici S.A.
Operngasse 6/4
Vienna, 1010
Austria

Unicredit S.A.
Piazza Cordusio
20123 Milan
Italy

Sonja Kohn
(Agent/Address unknown at this time)

Peter Scheithauer
Operngasse 6/4
Vienna, 1010
Austria

Helmuth E. Frey
Operngasse 6/4
Vienna, 1010
Austria

Andreas Pirkner
(Agent/Address unknown at this time)

Friedrich Pfeffer
WFE-Consulting
Fuhrenweg 27
D-31515 Wunstorf
Germany

Franco Mugnai
Via Leone XIII° n.27
I-20145 Milan
Italy

Hannes Saleta
(Agent/Address unknown at this time)

Bank Austria Creditanstalt
1010 Wien, Schottengasse 6-8
A-1010 Vienna
Austria

Ernst & Young S.A.
7 Parc d'Activite Syrdall
Munsbach
L5365
Luxembourg

Ernst & Young, Cayman Islands
62 Forum Lane, Suite 6401
Camana Bay
Grand Cayman, KY1-1106
Cayman Islands
Tel:     1 345 949 8444
Fax:    1 345 949 8529

Ernst & Young Global Limited
Becket House, 1 Lambeth Palace Rd.
London SE1 7EU
United Kingdom

HSBC Holdings plc
8 Canada Square
London ENG E14 5HQ
United Kingdom
Tel:     +44 (207) 991-8888
Fax:    +44 (207) 992-4880

HSBC Securities Services (Luxembourg) S.A.
16, boulevard d'Avranches
L-1160 Luxembourg
Tel:     352 40 46 461
Fax:    352 27 025 774

Friehling & Horowitz
(Agent/Address unknown at this time)