**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | File No: |
| ) | |
| IN RE HERALD, PRIMEO AND THEMA ) | 09 Civ. 289 (RMB) (HBP) |
| FUNDS SECURITIES LITIGATION ) | |
| ) | |
| This document relates to: 09 Civ. 2032 (RMB) (HBP) ) | |
| _____ ) | |

Dockets.Justia.com

## CONSOLIDATED AMENDED COMPLAINT



**COHEN MILSTEIN SELLERS & TOLL PLLC**
150 East 52nd Street, 30th Floor
New York, New York 10022
Tel.: (212) 838-7797
Fax: (212) 838-7745

*Lead Counsel for the Class*

Jacob Sabo, Esq.
The Tower
# 3 Daniel Frisch St.
Tel Aviv, Israel
Tel.: (972) 36078888
Fax: (972) 36078889

*Of Counsel*

# TABLE OF CONTENTS

Page

I.  NATURE OF ACTION ...................................................................................1
    Defendants' Wrongful Conduct ...............................................................2

II. THE PARTIES..........................................................................................5

    A.  LEAD PLAINTIFF ........................................................................5

    B.  DEFENDANTS ...............................................................................6

III. BACKGROUND FACTS ..........................................................................13

    A.  MADOFF'S PONZI SCHEME .....................................................13

    B.  MADOFF'S ARREST AND GUILTY PLEA ...............................14

IV. SUBSTANTIVE ALLEGATIONS .............................................................15

    A.  THE OFFERING MEMORANDA .................................................15

    B.  SUBSTANTIVE ALLEGATIONS CONCERNING THE E&Y
        DEFENDANTS ...............................................................................24
        1.  E&Y Operated As a Unitary International Professional Organization......24
        2.  E&Y Cayman Issued Unqualified (Clean) Audit Opinions.......................28
        3.  The 2007 Financial Statements..................................................30
        4.  E&Y Cayman's Audits Failed to Meet U.S. and International
            Standards, or Even E&Y's Own Standards .............................................32
            (a)  E&Y Recklessly Performed Its Audits and Made Mis-
                 Representations Regarding the Funds............................................32
                 (i)    E&Y Was Required, at a Minimum, to Obtain
                        Independent Verification that the Funds' Assets Existed ..32
                 (ii)   E&Y Failed to Verify the Existence of the Funds'
                        Madoff Investments ...........................................................39
                 (iii)  E&Y Violated Its Duties to the Funds' Investors .............40
            (b)  E&Y Cayman's Audit Violated E&Y's Own Standards .............42

    C.  SUBSTANTIVE ALLEGATIONS CONCERNING THE HSBC
        DEFENDANTS ...............................................................................45
        1.  The HSBC Defendants Violated Their Obligations As Administrator
            To Plaintiffs and the Class ........................................................45
        2.  The HSBC Defendants Violated Their Obligations As Custodians to
            Plaintiffs and the Class.............................................................46

D. SUBSTANTIVE ALLEGATIONS CONCERNING OBVIOUS RED FLAGS
THAT ALL DEFENDANTS IGNORED.......................................................48

 1. Red Flags ...............................................................................48
  (a) Madoff's Custody of Equity Securities.............................48
  (b) Madoff's Non-Existent Counterparties............................48
  (c) Defendants Failed To Confirm the Existence of Government
   Securities at the End of Each Year ...................................48
  (d) Madoff's Unknown Auditing Firm..................................49
  (e) Madoff's Secretive Operation.........................................49
  (f) Madoff's Paper Trading Records.....................................49
  (g) Madoff's Consistent Returns ..........................................50
  (h) Madoff's Impossible Trades ...........................................50
  (i) Madoff's Impossible Trade Volumes ..............................51
  (j) Madoff's Impossible Trade Dates...................................52
  (k) Madoff's Fee Structure ..................................................52
 2. Other Financial Institutions Did Not Ignore the Red Flags and Refused
  To Deal With Madoff...............................................................53

V. JURISDICTION AND VENUE ....................................................................54

A. THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO
THE EXCHANGE ACT..............................................................................55
 1. Defendants Purposefully Availed Themselves of the Benefits of
  Having Plaintiffs and the Class Invest in the United States; It Was
  Foreseeable That Defendants Would Be Haled Into Court In The
  United States ..........................................................................55
 2. The Conduct and Effects Tests Are Both Met .............................57
  (a) Defendants' Conduct in the United States Was "More Than
   Merely Preparatory," and the "Culpable Failures to Act
   Within the United States Directly Caused the Losses".................57
   (i) The Medici Defendants Had Substantial Conduct in
    The United States That Was More Than Merely
    Preparatory and Directly Caused the Losses ...................57
   (ii) The Fund, Its Directors, and Pioneer Had Substantial
    Conduct in the United States That Was More Than
    Merely Preparatory and Directly Caused the Losses.........59
   (iii) The HSBC Defendants Had Substantial Conduct in the
    United States That Was More Than Merely
    Preparatory and Directly Caused the Losses ...................61
  (b) Effects Test:  Defendants' Conduct Had a Substantial Effect
   In the United States.......................................................63
B. THE COURT HAS SUPPLEMENTAL JURISDICTION PURSUANT TO
28 U.S.C. § 1367(a) ...............................................................................66

VI. CLASS ACTION ALLEGATIONS ............................................................66

COUNT 1       BREACH OF FIDUCIARY DUTY AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS .................................................................................68

COUNT 2       GROSS NEGLIGENCE AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS .................................................................................71

COUNT 3       NEGLIGENCE AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS ...............73

COUNT 4       UNJUST ENRICHMENT AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS .................................................................................75

COUNT 5       IMPOSITION OF CONSTRUCTIVE TRUST AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS.............................................................................77

COUNT 6       BREACH OF CONTRACT AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS ...................................................................77

COUNT 7       THIRD PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT AGAINST THE ADVISERS..................................................................79

COUNT 8       GROSS NEGLIGENCE AGAINST E&Y CAYMAN........................................80

COUNT 9       NEGLIGENCE AGAINST E&Y CAYMAN .....................................................81

COUNT 10     AIDING AND ABETTING BREACH OF FIDUCAIRY DUTY AGAINST E&Y CAYMAN ...................................................................................83

COUNT 11     GROSS NEGLIGENCE, NEGLIGENCE, AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST E&Y GLOBAL .........................84

COUNT 12     BREACH OF FIDUCIARY DUTY AGAINST THE ADMINISTRATOR.........85

COUNT 13     GROSS NEGLIGENCE AGAINST THE ADMINISTRATOR...........................87

COUNT 14     NEGLIGENCE AGAINST THE ADMINISTRATOR........................................88

COUNT 15     BREACH OF FIDUCIARY DUTY AGAINST THE CUSTODIANS................89

COUNT 16     GROSS NEGLIGENCE AGAINST THE CUSTODIANS...................................91

COUNT 17     NEGLIGENCE AGAINST THE CUSTODIANS.................................................92

COUNT 18    UNJUST ENRICHMENT AGAINST THE CUSTODIANS ............................... 93

COUNT 19    FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS .................................................................. 94

COUNT 20    FOR FRAUD AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS .................................................................. 101

COUNT 21    FOR NEGLIGENT MISREPRESENTATION AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS .............................................. 108

COUNT 22    FOR VIOLATIONS OF RULES 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE E&Y DEFENDANTS ............................... 114

COUNT 23    FOR FRAUD AGAINST THE E&Y DEFENDANTS ...................................... 117

COUNT 24    FOR NEGLIGENT MISREPRESENTATION AGAINST THE E&Y DEFENDANTS ................................................................................ 120

COUNT 25    FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST E&Y GLOBAL ................................................................... 123

COUNT 26    FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE ADMINISTRATOR ................................ 124

COUNT 27    FOR FRAUD AGAINST THE ADMINISTRATOR .......................................... 125

COUNT 28    FOR NEGLIGENT MISREPRESENTATION AGAINST THE ADMINISTRATOR .......................................................................... 126

COUNT 29    FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE CUSTODIANS ........................................ 127

COUNT 30    FOR FRAUD AGAINST THE CUSTODIANS ................................................. 128

COUNT 31    FOR NEGLIGENT MISREPRESENTATION AGAINST THE CUSTODIANS ............................................................................... 129

COUNT 32    FOR VIOLATIONS OF RULES 10b-5(a) AND 10b-5(c) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS .............. 130

COUNT 33    FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE MEDICI DEFENDANTS, PIONEER, THE DIRECTOR DEFENDANTS, THE ADVISERS, THE ADMINISTRATOR, THE

CUSTODIANS, AND HSBC ...............................................................................132

PRAYER FOR RELIEF .......................................................................................135

JURY DEMAND ................................................................................................136

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| 2001 OM | The May 2001 Primeo Select Fund Offering Memorandum |
| 2007 OM | The April 25, 2007 Primeo Select and Primeo Executive Fund Offering Memorandum |
| 2007 Financial Statements | Primeo Funds' financial statements for the year ending December 31, 2007 |
| 2007 FS | Primeo Funds' financial statements for the year ending December 31, 2007 |
| Account Agreements | Customer Agreement, Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options relating to the "Primeo Account" |
| Acorn | Acorn Partners |
| Administrator | Defendant Bank of Bermuda (Cayman) Limited |
| Advisers | Defendant BA Worldwide Fund Management, Ltd and Defendant Pioneer Alternative Investment Management Ltd. |
| AICPA | American Institute of Certified Public Accountants |
| Aksia | Aksia LLC |
| Audit Guide | E&Y's publication, "Serving the Hedge Fund Industry: Seasoned Professionals for a Time of Change" |
| Bank of Bermuda | Defendant Bank of Bermuda Limited |
| Bank of Bermuda Cayman | Defendant Bank of Bermuda (Cayman) Limited |
| Bank of Bermuda Luxembourg | Defendant Bank of Bermuda (Luxembourg) S.A. |
| BLMIS | Bernard L. Madoff Investment Securities LLC |
| BLMIS Bank Account | BLMIS' account at JPMorgan Chase & Co. |
| CAFA | Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) |

| | |
|---|---|
| CBOE | Chicago Board Options Exchange |
| Custodians | Defendant Bank of Bermuda (Luxembourg) S.A. and Defendant HSBC Securities Services (Luxembourg) S.A |
| Dr. Cabilly | Lead Plaintiff, Dr. Shmuel Cabilly |
| DTC | Depository Trust & Clearing Corporation |
| E&Y | The Ernst & Young entities |
| E&Y Cayman | Defendant Ernst & Young (Cayman) |
| E&Y Global | Defendant Ernst & Young Global Limited |
| F&H | Friehling & Horowitz |
| Fielding | Defendant Nigel H. Fielding |
| Funds | Defendants Primeo Select Fund and Primeo Executive Fund |
| Guide | AICPA *Audit & Accounting Guide, Investment Companies* |
| HSBC | Defendant HSBC Holdings plc |
| HSBC Luxembourg | Defendant HSBC Securities Services (Luxembourg) S.A. |
| IAASB | The International Auditing and Assurance Standards Board |
| IFRS | International Financial Reporting Standards |
| Investment Advisory | BLMIS business unit, investment advisory |
| ISA | International Standards on Auditing |
| Kaniak | Defendant Karl E. Kaniak |
| Kohn | Defendant Sonja Kohn |
| Korea Exchange Bank | Plaintiff Korea Exchange Bank, as Trustee of the Korea Global All Asset Trust I-1 |
| La Rocca | Defendant Alberto La Rocca |
| Lead Plaintiff | Lead Plaintiff, Dr. Shmuel Cabilly |

| | |
|---|---|
| Madoff | Bernard L. Madoff |
| Medici | Defendant Bank Medici |
| Mr. Picard | Irving H. Picard, Trustee to liquidate BLMIS |
| Murray | Defendant Declan Murray |
| NAV | Net Asset Value |
| OEX | S&P 100 index |
| Offering Memoranda | Collective offering memoranda for the Primeo Funds |
| O'Neill | Defendant James E. O'Neill |
| PIM | Defendant Pioneer Alternative Investment Management Ltd. |
| Pioneer | Defendant Pioneer Global Asset Management S.p.A. |
| Primeo Account | Primeo Funds' account maintained with BLMIS |
| Primeo Funds | Defendants Primeo Select Fund and Primeo Executive Fund |
| Primeo Supplements | July 22, 2008 and October 20, 2008 Supplements to the April 25, 2007 Offering Memorandum |
| Radel-Leszczynski | Defendant Ursula Radel-Leszczynski |
| S&P | Standard & Poor's |
| Saleta | Defendant Hannes Saleta |
| Simon | Defendant Alfred Simon |
| SIPA | Securities Investor Protection Act |
| SIPC | Securities Investor Protection Corporation |
| SIPC Trustee | Irving H. Picard, Trustee to liquidate BLMIS |
| SocGen | Société Générale |

| | |
|---|---|
| Spalek | Defendant Johannes P. Spalek |
| Tiefenbacher | Defendant Dr. Hans-Peter Tiefenbacher |
| Wheaton | Defendant Michael Wheaton |
| WWF | Defendant BA Worldwide Fund Management Ltd. |

Plaintiffs, individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following based upon personal knowledge and counsels' investigation.

## I.  NATURE OF THE ACTION

1.     This case arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and his investment firm, Bernard L. Madoff Investment Securities LLC ("BLMIS").  On December 11, 2008, the public learned that Madoff had stolen hundreds of millions of dollars for his own personal enrichment and misappropriated billions more to perpetrate what would ultimately become the largest Ponzi scheme in history.  As a result of his actions, Madoff has been sentenced to 150 years in prison.  The Securities and Exchange Commission ("SEC") and numerous other agencies are vigorously searching for the stolen funds. To date, nearly $65 billion has vanished.

2.     Madoff, however, did not act alone.  He deployed a web of sales teams who captured tens of billions of dollars of investors' money in so-called "feeder funds" which funneled the money to Madoff.  These feeder funds were established exclusively for the purpose of investing in Madoff, in New York, in what was effectively one integrated and coordinated operation.

3.     To lure investors, the feeder funds marketed themselves as sophisticated financial institutions that would safeguard investors' money and conduct strict oversight of Madoff.  But the feeder funds were making hundreds of millions of dollars in fees, and these fees were being paid in real cash that was not fictitious – cash that they have kept to this day.  Not surprisingly, those enormous fees served as an incentive for the feeder funds to intentionally ignore the blatant signs of Madoff's wrongdoing, given that the real risk of loss was borne by the investors, not the

funds.

4.      Here the evidence shows that this is precisely what occurred.  Defendants had committed themselves to, among other things, "continuously monitor[ing]" Madoff as the sub-manager and sub-custodian of Plaintiffs' investment.  They did not.  If they had, they would have known that Madoff's investment company was a Ponzi scheme. What limited due diligence defendants did do, moreover, was effectively no due diligence at all, since it missed bright red flags that should have caused them to withdraw investors' money.

### Defendants' Wrongful Conduct

5.      Plaintiffs and other members of the Class invested in feeder funds called Primeo Select Fund and Primeo Executive Fund (collectively, the "Primeo Funds" or the "Funds").  As of December 11, 2008, the Funds were entirely invested with Madoff, primarily through another feeder fund, Herald USA.

6.      Pioneer Global Asset Management S.p.A. ("Pioneer") owned the Funds and marketed them to investors.  Bank Medici ("Medici"), and, specifically, Sonja Kohn ("Kohn"), Bank Medici's founder, chairperson, and 75% owner, referred clients to the Funds, and received substantial fees for doing so.  Bank Medici had access to Pioneer through Bank Austria, Medici's 25% owner, which was a subsidiary of the Italian bank UniCredit, Pioneer's parent company.

7.      In the Offering Memoranda disseminated to investors, Pioneer, the Funds, and the Funds' directors represented, *inter alia*, that the investment objective of the Funds was long-term capital appreciation, that the Funds' assets would be invested in Standard & Poor's ("S&P") 100 stocks and options, that investments would be made in a way that diversified risk, and that defendants would carefully select and monitor those whom they appointed to safeguard the Funds' assets.  None of this occurred.  Instead, the Funds' assets were stolen.

8.      In particular, the Funds appointed BA Worldwide Fund Management Ltd. ("WWF") and Pioneer Alternative Investment Management Ltd. ("PIM") to be the Funds' Advisers with the responsibility for, *inter alia*, supervising the selection and monitoring of the Funds' managers.  The Funds also appointed Bank of Bermuda (Cayman) Limited ("Bank of Bermuda Cayman") to act as the Funds' Administrator.  In that capacity, Bank of Bermuda Cayman was responsible for, *inter alia*, calculating the Funds' net asset value ("NAV") on a monthly basis.  Finally, the Funds appointed HSBC Luxembourg and its predecessor, Bank of Bermuda Luxembourg, to act as Custodians of the Funds.  In this capacity, HSBC Securities Services (Luxembourg) S.A. ("HSBC Luxembourg") and Bank of Bermuda (Luxembourg) S.A. ("Bank of Bermuda Luxembourg") were responsible for, *inter alia*, appointing and supervising sub-custodians of the Funds.  The Funds' Administrator and Custodians all represented that they would have the assistance of HSBC Holdings plc ("HSBC") – one of the largest banks in the world – in carrying out their responsibilities.  Each of these entities, however, failed to perform its duties as it said it would in Offering Memoranda.

9.      Even these defendants, however, did not act alone.  In making their investments, the Funds' investors also relied on the unqualified audit opinions of Ernst & Young (Cayman) ("E&Y Cayman"), which represented that the Funds' financial statements were compliant with generally accepted accounting principles.  As set forth in detail below, E&Y Cayman was required to obtain independent confirmation that Madoff had custody of the Primeo Funds' assets.  E&Y Cayman, however, never confirmed that the assets existed – ignoring the most critical aspect of any audit.  Instead, E&Y Cayman simply accepted Madoff's assertion that he held all of the Primeo Funds' assets, which, collectively, exceeded half a billion dollars, without ever obtaining independent confirmation.  The failure to conduct this routine and most basic

auditing procedure is sufficient to establish that E&Y Cayman conducted no audit at all.

10. Plaintiffs have also sued Ernst & Young Global Limited ("E&Y Global"). As set forth below in detail, the Ernst & Young entities operated as a unitary international professional organization. E&Y Global had the power to control, and did control, through its "single management team," the audit procedures employed by E&Y Cayman, including those employed in E&Y Cayman's audits of Madoff. E&Y Global is the principal of E&Y Cayman, and is liable for E&Y Cayman's acts and omissions.

11. Remarkably, none of the defendants – not even Ernst & Young – caught the bright red flags which should have alerted them to Madoff's Ponzi sheme. Those red flags included: (a) Madoff's dual roles of manager and custodian of the Primeo Funds' assets; (b) the absence of any confirmation of trades from counterparties; (c) Madoff's concentration, at the end of each calendar year, of all of the assets under his control exclusively in U.S. Treasury bonds; (d) Madoff's use of an unknown auditing firm with three employees; (e) Madoff's insistence that his trading strategy remain secret; (f) Madoff's paper trading records, including transaction slips that did not state the price and time at which a trade had been executed; (g) Madoff's uniformly consistent returns; (h) Madoff's trades outside price ranges on particular days; (i) Madoff's trades in excess of market volume on given days; (j) Madoff's settlement of trades on weekends and/or holidays, when the market was closed; and (k) Madoff's incredibly generous fee structure. Defendants' failure to see these red flags ultimately caused Plaintiffs' and Class members' loss. Indeed, other financial institutions *did* see these red flags and heeded them, refusing to deal with Madoff.

12. In sum, the crux of the allegations in this Complaint is that defendants (i) were obligated to perform due diligence on Madoff and safeguard Plaintiffs' and Class members'

investments, but (ii) failed to fulfill those duties.

13.     Accordingly, Plaintiffs assert common law claims for, *inter alia*, breach of fiduciary duty, gross negligence, negligence, unjust enrichment, as well as claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), and Rules 10b-5(a), (b), and (c), 17 C.F.R. § 240.10b5, promulgated thereunder by the SEC.

14.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who (i) owned shares of the Primeo Funds on December 10, 2008, or (ii) purchased shares of the Primeo Funds from January 12, 2004 to December 10, 2008 (the "Class Period"), and were damaged thereby due to the wrongful conduct alleged in this Complaint (the "Class"). Excluded from the Class are the defendants; any entity in which defendants have a controlling interest; and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

## II.     THE PARTIES

### A.     LEAD PLAINTIFF

15.     Court-appointed Lead Plaintiff, **Dr. Shmuel Cabilly** ("Dr. Cabilly" or "Lead Plaintiff"), is, and was at all times relevant hereto, a citizen of Israel. As indicated in the attached certification, Dr. Cabilly purchased shares in the Primeo Funds during the Class Period. Due to the activities alleged herein, Dr. Cabilly has lost all, or substantially all, of his investments in the Primeo Funds, and has paid fees for illusory services. Dr. Cabilly invested in the Primeo Funds in U.S. dollars.

16.     Plaintiff **Korea Exchange Bank**, as Trustee of the Korea Global All Asset Trust

I-1 ("Korea Exchange Bank"), is a bank incorporated under the laws of the Republic of Korea. The Korea Exchange Bank purchased shares in the Primeo Funds during the Class Period. Due to the activities alleged herein, the Korea Exchange Bank has lost all, or substantially all, of its investments in the Primeo Funds, and has paid fees for illusory services. The Korea Exchange Bank invested in the Primeo Funds in U.S. dollars.

17. The plaintiffs named in ¶¶ 15-16 are collectively referred to herein as "Plaintiffs."

### B. DEFENDANTS

18. Defendant **Bank Medici** is a closely-held merchant bank based in Vienna, Austria with offices located in New York, Milan, Gibraltar, and Zurich. Medici was incorporated in Austria on March 9, 1994, and was granted a full banking license by the Austrian Financial Authority on December 3, 2003. Sonja Kohn, at all relevant times, owned 75% of Medici. Bank Austria, which is owned by UniCredit, at all relevant times held the remaining 25%. Medici, at all relevant times, controlled the Primeo Funds, through UniCredit's subsidiary Pioneer, and caused them to become feeder funds for Madoff's Ponzi scheme. Medici's funds have lost approximately $3.5 billion in Madoff's Ponzi scheme. Today, Medici's management is being overseen by the Austrian government following the government's launch of a probe, on January 15, 2009, into Medici's actions.

19. Defendant **Sonja Kohn** is the founder of Medici, its chairperson, and a 75% owner. At all relevant times Kohn was aware, but did not share with Plaintiffs or members of the Class, that defendants were purchasing shares in feeder funds for Madoff's Ponzi scheme. Kohn was a control person of the Primeo Funds.

20. Defendant **UniCredit**, at all relevant times, was an Italian bank which owned

25% of Medici through its subsidiary Bank Austria. UniCredit's stake in Medici had a book value of €1.5 million in December 2008. UniCredit provided Medici with access to its subsidiary Pioneer's Primeo Funds. UniCredit acquired Pioneer in 2000 and grew assets to $72 billion by the end of 2007. At all relevant times, UniCredit was a control person of Pioneer and the Primeo Funds.

21.  Defendant **Bank Austria**, at all relevant times, owned 25% of Medici. Bank Austria is Austria's largest bank and was, at all relevant times, a subsidiary of UniCredit. At least until April 25, 2007, Bank Austria was the sponsor of the Primeo Funds and provided investment advisory services to the Funds. Bank Austria was a control person of the Primeo Funds and of BA Worldwide Fund Management Ltd., one of the Funds' advisers.

22.  The defendants named in ¶¶ 18-21 are collectively referred to herein as the "Medici Defendants."

23.  Defendant **Pioneer Global Asset Management S.p.A.** was owned at all relevant times by UniCredit. Pioneer at all relevant times owned and was a control person of the Primeo Funds. In 2007, Pioneer paid Medici commissions of €835,000 for referring investors to the Primeo Funds. Pioneer is part of the Asset Management division of UniCredit, and its investment history dates to 1928. As of January 31, 2008, Pioneer managed over €207 billion in assets. On January 12, 2009, a spokesman for Pioneer said Pioneer's total Madoff exposure, mainly through the Primeo Funds, was $1.1 billion.

24.  Defendants **Primeo Select Fund** and **Primeo Executive Fund** were at all relevant times owned by Pioneer. The Primeo Funds were, at all relevant times, controlled by the Medici Defendants and Pioneer and invested with Madoff. The Primeo Funds are open-ended investment funds organized under the laws of the Cayman Islands on November 17,

1993.  The registered office of the Funds is located c/o Bank of Bermuda (Cayman) Limited, P.O. Box 513, GT, HSBC House, 68 West Bay Road, Grand Cayman, Cayman Islands.  The Primeo Funds commenced operations on January 1, 1994.  As of June 30, 2008, the entirety of the Funds' assets – more than $786 million – were invested in funds controlled by Madoff.  The Primeo Funds were not marketed or sold in New York.

25.     Defendant **Alfred Simon** ("Simon") was President and CEO of the Primeo Funds for a portion of the Class Period.  Additionally, from 1999 until at least 2001, Simon was General Manager of the Financial Products Department of Bank Austria in Vienna.

26.     Defendant **Karl E. Kaniak** ("Kaniak") was a director of the Primeo Funds for a portion of the Class Period.  Kaniak was also affiliated with Bank Austria in various capacities from 1991 until at least 1998.

27.     Defendant **Dr. Hans-Peter Tiefenbacher** ("Tiefenbacher") was a director of the Primeo Funds for a portion of the Class Period.  From 1978 until at least 2001, Tiefenbacher was Chief Representative of Bank Austria for Italy and Greece.

28.     Defendant **Johannes P. Spalek** ("Spalek") was a director of the Primeo Funds for a portion of the Class Period.  From 1996 until at least 2001, Spalek was Representative of Bank Austria for Spain and Portugal.

29.     Defendant **Nigel H. Fielding** ("Fielding") was a director of the Primeo Funds for a portion of the Class Period.  From 1999 until at least 2004, Fielding was also General Manager of Global Fund Services for Bank of Bermuda (Luxembourg) S.A., one of the Funds' custodians.

30.     Defendant **James E. O'Neill** ("O'Neill") was a director of the Primeo Funds for a portion of the Class Period and a director of one of its advisers, BA Worldwide Fund

Management Ltd. O'Neill was also a Managing Director of Bank Austria Cayman Islands Limited, Grand Cayman, Cayman Islands from 1998 until at least 2004. O'Neill is a citizen of New York.

31. Defendant **Alberto La Rocca** ("La Rocca") was a director of the Primeo Funds for a portion of the Class Period. La Rocca was also a Managing Director of Pioneer Alternative Investment Management (Bermuda) Limited from December 2002 until at least April 2007; a director of Pioneer Global Asset Management Limited, S.p.A. from November 2003 until at least April 2007; and Chief Executive Officer of Pioneer Alternative Investment Management Ltd. from 1998 until at least April 2007.

32. Defendant **Declan Murray** ("Murray") was a director of the Primeo Funds for a portion of the Class Period. Murray was also Chief Operating Officer of Pioneer Alternative Investment Management Ltd. from 1999 until at least April 2007 and employed by Ernst & Young from 1987 to 1991.

33. Defendant **Ursula Radel-Leszczynski** ("Radel-Leszczynski") was a director of the Primeo Funds for a portion of the Class Period. Radel-Leszczynski was also President of BA Worldwide Fund Management Ltd., one of the Funds' advisers, from February 2000 until at least April 2007, and joined Bank Austria in 1995.

34. Defendant **Hannes Saleta** ("Saleta") was a director of the Primeo Funds for a portion of the Class Period. Saleta was also a Director of BA Worldwide Fund Management Ltd., one of the Funds' advisers. Saleta was affiliated with Bank Austria in various capacities from 1999 until at least 2005.

35. Defendant **Michael Wheaton** ("Wheaton") was a director of the Primeo Funds for a portion of the Class Period. Wheaton resigned from the board on June 30, 2008.

36.     The defendants named in ¶¶ 25-35 are collectively referred to herein as the "Director Defendants."  The Director Defendants were control persons of the Primeo Funds.

37.     Defendant **BA Worldwide Fund Management, Ltd.** was the investment adviser for the Primeo Funds prior to April 25, 2007.   WWF was  a 75%-owned subsidiary of Bank Austria, and was located at c/o HWR Services, P.O. Box 71, Road Town, Tortola, B.V.I.  WWF was charged with supervising the selection of investment companies and managers with the help of Bank Austria and then monitoring the underlying portfolios of the investment companies and managers.  WWF was a control person of the Primeo Funds.

38.     Defendant **Pioneer Alternative Investment Management Ltd.** was an investment adviser based in Dublin, Ireland, appointed by the Primeo Funds beginning on April 25, 2007 to assist the Primeo Funds in choosing, on behalf of the Funds, which managers or their funds to invest in.  PIM was a control person of the Primeo Funds.

39.     The defendants named in ¶¶ 37 and 38 are collectively referred to herein as the "Advisers."

40.     Defendant **Bank of Bermuda (Cayman) Limited** ("Bank of Bermuda Cayman," or the "Administrator") was, at all relevant times, the administrator and registrar of the Primeo Funds.   The Administrator was located at P.O. Box 513 2nd Floor, Strathvale House, North Church Street, Grand Cayman, Cayman Islands.   The Administrator had responsibility for (i) maintaining corporate and financial books and records of the Primeo Funds; (ii) providing the Primeo Funds with periodic reports regarding its account and preparing annual financial statements for the Primeo Funds; (iii) computing NAV on a monthly basis; (iv) providing registrar and transfer agent services; (v) attending to certain non-discretionary details in connection with the sale, purchase, transfer and other dealings with the securities, debt

instruments and other property of the Primeo Funds held by it; (vi) performing certain accounting and clerical services necessary in connection with the administration of the Primeo Funds; and (vii) serving as corporate secretary. The Administrator is a wholly-owned subsidiary of Bank of Bermuda Limited. The Administrator was a control person of the Primeo Funds.

41. Defendant **Bank of Bermuda (Luxembourg) S.A.** was the custodian of the Primeo Funds for a portion of the Class Period, and purportedly sought to provide safe custody for, and control of, the Primeo Funds' assets it held. Bank of Bermuda Luxembourg was located at 13, rue Goethe, P.O. Box 413, L-2014 Luxembourg. Bank of Bermuda Luxembourg was a wholly-owned subsidiary of Bank of Bermuda Limited. Bank of Bermuda Luxembourg was a control person of the Primeo Funds.

42. Defendant **Bank of Bermuda Limited** ("Bank of Bermuda") was, at all relevant times, the parent company and a control person of its wholly-owned subsidiaries, the Bank of Bermuda Cayman and Bank of Bermuda Luxembourg. During the Class Period, Bank of Bermuda had offices in Bermuda, Bahrain, Cayman Islands, Cook Islands, Dublin, Guernsey, Hong Kong, Isle of Man, Jersey, London, Luxembourg, New York, New Zealand, and Singapore. Bank of Bermuda was a control person of the Primeo Funds. On February 18, 2004, Bank of Bermuda became an indirect wholly-owned subsidiary of HSBC Holdings plc.

43. Defendant **HSBC Securities Services (Luxembourg) S.A.** was the custodian of the Primeo Funds for a portion of the Class Period. HSBC Luxembourg was located at 40 avenue Monterey, P.O. Box 413, L-2014 Luxemburg. HSBC Luxembourg is a wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England and traded on the New York Stock Exchange. HSBC Luxembourg was a control person of the Primeo Funds.

44. The defendants named in ¶¶ 41 and 43 are collectively referred to herein as the

"Custodians."

45.     Defendant **HSBC Holdings plc** was, at all relevant times, the parent company and a control person of its wholly-owned subsidiaries, Bank of Bermuda and HSBC Luxembourg.  HSBC was a control person of the Primeo Funds.

46.     The defendants in ¶¶ 40-43 and 45 are collectively referred to herein as the "HSBC Defendants."

47.     Defendant **Ernst & Young (Cayman)** at all relevant times was the auditor of the Primeo Funds.  E&Y Cayman failed to perform its annual audits of the financial statements and financial condition of the Primeo Funds in accordance with professional standards applicable to those audits.  E&Y Cayman was located at Suite 6401, 62 Forum Lane, Camana Bay, P.O. Box 510, Grand Cayman, Cayman Islands.

48.     Defendant **Ernst & Young Global Limited** is the principal of E&Y Cayman (collectively, Ernst & Young), and is located in London, England.  The Ernst & Young entities had agency and/or *alter ego* relationships with each other.  Thus, each E&Y entity is liable for its own acts as well as for the acts of the other.  E&Y Global is also a control person of E&Y Cayman.

49.     The defendants in ¶¶ 47-48 are collectively referred to herein as the "E&Y Defendants."

50.     Each defendant had a duty to the Class members to use and manage the Primeo Funds with due care, and to disseminate accurate and truthful information with respect to the use and management of the Funds.  Each defendant participated in the Ponzi scheme complained of herein and/or was aware of, and/or recklessly and/or negligently disregarded, the misuse and mismanagement of investment funds belonging to Plaintiffs and the Class, and/or was aware

of, and/or recklessly and/or negligently disregarded, the material misstatements or omissions associated with the Ponzi scheme alleged herein.

## III. BACKGROUND FACTS

### A. MADOFF'S PONZI SCHEME

51.     Madoff founded BLMIS in 1959 as a New York limited liability company and was its chairman and chief executive officer. Madoff ran BLMIS mainly through his family, including his brother Peter, and sons Andrew and Marc. BLMIS had three business units: market making, proprietary trading, and investment advisory ("Investment Advisory").

52.     The Investment Advisory business purportedly invested using a "split-strike conversion" strategy. The strategy involved the purchase and sale of equity securities, options, and government securities. Although investors in the Investment Advisory business received monthly or quarterly statements purportedly showing the equity securities, options, and government securities that the investor owned, as well as the growth of and profit from those accounts over time, these statements were a complete fabrication. There is no record of BLMIS or Madoff having cleared a single purchase or sale of securities at the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

53.     Additionally, there is no evidence that Madoff or BLMIS ever purchased or sold any of the options claimed to have been purchased or sold and reported to BLMIS's Investment Advisory investors. Options related to the S&P 100 companies are typically traded on the Chicago Board Options Exchange ("CBOE"). There are no records of Madoff or BLMIS ever having purchased or sold any options on the CBOE.

## B. MADOFF'S ARREST AND GUILTY PLEA

54.     On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws after Madoff admitted that his money management operation was "a giant Ponzi scheme."  Madoff further admitted that "there [was] no innocent explanation" and estimated that investors' losses reached $50 billion.  That same day, the SEC filed an emergency action to halt all ongoing activities by Madoff and BLMIS.  The action is styled, *SEC v. Bernard L. Madoff,* 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008).

55.     On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application in the United States District Court for the Southern District of New York alleging that BLMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA").  The Court granted the SIPC application and appointed Irving H. Picard as the Trustee to liquidate BLMIS (the "SIPC Trustee" or "Mr. Picard").

56.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff,* Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]," and that "I knew what I was doing was wrong, indeed criminal."

## IV. SUBSTANTIVE ALLEGATIONS

## A. THE OFFERING MEMORANDA

57.     During the Class Period, defendants made false and misleading statements and omissions to Plaintiffs and the Class in prospectuses (and associated supplements) and offering memoranda for the Primeo Funds (collectively, the "Offering Memoranda").  The Offering

Memoranda were issued in the following months, among others: May 2001, September 2002, November 2005, and April 2007.

58. The May 2001 Offering Memorandum ("2001 OM") omits any mention of the Primeo Funds' investment in Madoff and includes false and misleading statements including but not limited to:

(a) "The Directors of the Fund whose names appear under 'Directors and Officers,' accept responsibility for the information contained in this Offering Memorandum. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information." (2001 OM, at iv).

(b) "The investment objective of the Fund (defined below) is long-term capital appreciation through diversification of investments. … The investment objective for Primeo Select Fund is to invest in liquid U.S. equity securities and index options seeking long-term capital appreciation." *Id.* at vi.

(c) "For the Primeo Select Fund Shareholders, the Fund intends to achieve the objective of long-term capital appreciation by investing primarily in United States listed equity securities that are liquid, including those listed in the Standard & Poor's 500 Index and in index options." *Id.* at 3.

(d) "The Select Fund based upon the recommendation of BA Worldwide Fund Management Ltd., the Adviser, and other professional advisors (as described below), will select, on a continuous basis, one or more Investment Companies and Managers. … The Adviser will consider, in supervising the selection of Investment

Companies and Managers, experience and market performance, trading strategy and techniques, areas of expertise and judgment." *Id.* at 3.

(e)　"Fund assets that are allocated to Primeo Select Fund Shares will be invested in a large number (approx. 20 - 40) of U.S. equity securities and index options. … In structuring the portfolio for Primeo Select Fund Shares, the Manager(s) or Investment Companies will attempt to minimize risk by choosing investments from a broad range of liquid securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility." *Id.* at 3.

(f)　"The Adviser will continually monitor, directly or indirectly, the performance of the Manager(s) and Investment Companies in which the Select Fund's assets are invested and make recommendations to the Fund's Directors as to appropriate changes in, or reallocation of assets among, existing or new Managers or Investment Companies. Such monitoring will be direct, by the Adviser, or indirect, through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market." *Id.* at 3.

(g)　"The Adviser will monitor the underlying portfolio of Investment Companies and Managers to ensure that, in the aggregate, no such group of Investment Companies or Managers invests more than 20% of the Fund's assets with single issuers. … Moreover the Adviser will monitor the underlying portfolio of Investment Companies and Managers to ensure that the Fund will not expose more that [*sic*] 20% of its gross assets to the solvency of any single counterparty." *Id.* at 4.

(h)    "Managed Accounts.    The Fund may allocate certain money to investment managers running managed accounts.    In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every security transaction only."  *Id.* at 4.

(i)    "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers."  *Id.* at 5.

(j)    "[T]he Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's Board of Directors."  *Id.* at 7.

59.    The September 2002 Offering Memorandum and November 2005 Offering Memorandum omit any mention of the Primeo Funds' investment in Madoff and substantially repeat the false and misleading statements contained in the May 2001 Offering Memorandum.

60.    The April 25, 2007 Offering Memorandum ("2007 OM") omits any mention of the Primeo Fund's investment in Madoff and includes false and misleading statements including but not limited to:

(a)    "The Directors of the Fund (with the exception of the non-executive Directors), whose names appear under the section headed 'Directors and Other Parties,' accept responsibility for the information contained in this Offering Memorandum.    To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in

accordance with the facts and does not omit anything likely to affect the import of such information."  (2007 OM, at 2).

(b)     "The Select Fund aims to achieve the goal of long term capital growth. For Select Fund Shareholders, the Fund intends to achieve the objective of a long-term capital growth . . ." *Id.* at 6.

(c)     "The Executive Fund aims to achieve the goal of long term capital growth.  For Executive Fund Shareholders, the Fund intends to achieve the objective of long-term capital growth . . ." *Id.* at 6.

(d)     "The Adviser will consider, in supervising the selection of the Manager, its experience and market performance, trading strategy and techniques, areas of expertise and judgment." *Id.* at 8.

(e)     "The Sub-Manager invests primarily in the United States and utilizes a non-traditional strategy that is a variation of the traditional 'option conversion' strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares).  The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:

(i)     purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;

(ii)     selling out-of-the-money S&P 100 Index call options representing

- 18 -

a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and

(iii) purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount." *Id.* at 8.

(f) "In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility." *Id.* at 8.

(g) "The Adviser will continually monitor, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to the appropriate changes in, or reallocation of assets. The Manager is responsible for all the investment decisions, including asset allocations. Such monitoring will be direct, by the Adviser, or indirect through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market." *Id.* at 8.

(h) "The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer . . . . Moreover the Adviser will monitor the underlying portfolio of Managers to seek to ensure that the Fund will not permit more than 30% of the assets of the Select Fund to be subject to the counterparty risk of a single counterparty, other than the United States government." *Id.* at 9.

(i)     "Managed Accounts.   The Fund may allocate certain money to investment managers running managed accounts.  In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every securities transaction only."  *Id.* at 10.

(j)     "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers."  *Id.* at 10.

(k)     "[T]he Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's Board of Directors."  *Id.* at 11.

61.     The Primeo Fund issued two subsequent supplements, on July 22, 2008 and October 20, 2008, to the Offering Memoranda (the "Primeo Supplements").   The Primeo Supplements omit any mention of the Primeo Fund's investment in Madoff and do not correct the false and misleading statements of the Offering Memoranda.

62.     Throughout the Class Period, Pioneer would disseminate fund performance updates to the Primeo Funds' investors.  As late as September 2008, a performance report showed consistent positive net returns for eight of the first nine months of 2008,[1] even during the months when the stock market had taken a significant downturn.  In fact, the performance reports showed positive year-to-date net returns for years.  These returns were not real, as they were the result of Madoff's Ponzi scheme and, therefore, were materially false and misleading.

63.     Indeed, an October 2008 "Fund Summary" sent by Pioneer to investors

---

[1]     For the ninth month, the performance report showed no change.  Thus, not a

contained a section entitled "Consistency of Returns." In that section, Pioneer stated, "Since it's [*sic*] inception, the Primeo Select Fund has consistently achieved steady, long-term returns across all market environments and has never incurred a negative year. As at 30 September 2008, the Fund boasts an annualised return of 10.84%." On the following page, Pioneer stated that one of its "defining characteristics" was "risk control": "Our consistent investment process utilises an intensive full circle approach that helps uncover sources of risk, determine how these risks will impact the portfolio and how they can be mitigated through strategy diversification."

64.     Another document issued by Pioneer to investors in October 2008 likewise noted the Funds' consistent returns. Under the heading "Positive Returns Despite Volatile Markets," Pioneer stated:

> Without a doubt, 2008 has been a challenging year for global markets, with September proving to be the most extraordinary month and one that will be noted forever in stock market history.
>
> Primeo Select Fund ("Primeo Select") has withstood these turbulent markets extremely well and has continued to produce strong returns for investors. It successfully defied the market mayhem in September, posting a gain of 0.72% in a month that saw the broad hedge fund industry incur a monthly loss of 4.7%. Year-to-date, Primeo Select has returned a remarkable 5.37%, with positive returns across all three quarters.
>
> ***Primeo Select's positive returns in these challenging markets reflect its strong focus on capital preservation in times of heightened market volatility. The key driver behind Primeo Select's robust resilience in times of markets stress is the underlying manager's proven asset allocation strategy: when the manager believes market conditions are unfavorable for the split-strike conversion strategy, the manager shifts its allocation to a portfolio of short-dated U.S. Treasury Bills. As soon as the manager believe that favorable market conditions have returned, the allocation is shifted back into the split-strike conversion***

single month showed a negative return.

*strategy to capture opportunities once again.*

Launched in March 1996, Primeo Select boasts an impressive 12 year track record of positive absolute returns with over 94% positive months since inception. Since inception Primeo Select has also generated a solid annualised return of 10.84% with a volatility level of just 2.67%.

(Emphasis added).

65.     Even more remarkably, a document issued by Pioneer to investors on November 28, 2009 – a mere thirteen days before Madoff's arrest – contained answers to frequently asked questions, including the following:

**Please explain any major factors affecting performance and drawdowns (i.e. a manager change, a change in strategy, etc.):**

There have been no major changes affecting performance. The Sub-Manager and strategy have remained constant.

\*\*\*

**Over the past 12 months, how many drawdowns greater than 5% have occurred, when did they occur and what was the length of recovery?**

There have been no drawdowns greater than 5% since the inception of the Primeo Select Fund.

\*\*\*

**How often does the investment team review the portfolio?**

Substantially all of the Primeo Select Fund's assets are managed by one Manager, i.e., a Cayman Islands domiciled company, who appoints on a continuous basis, a sub-manager/sub-managers (each, a "Sub-Manager"), managing collective investment schemes and/or discretionary portfolio management accounts ("Accounts") with different backgrounds in terms of strategies, markets and financial instruments. The Manager employs an investment strategy that is consistent with the objective of the Primeo Select Fund.

*The Manager reviews the Sub-Manager on a continuous basis*

*and has a service level agreement with a distributor to perform the controlling functions, including risk management. The Manager monitors the Account on a mark-to-market basis, which is automatically updated whenever a trade is actioned in the Account.*

\*\*\*

**Manager Experience**

Substantially all of the Primeo Select Fund's assets are managed by one Manager, i.e., a Cayman Islands domiciled company, who appoints on a continuous basis, a sub-manager/sub-managers (each, a "Sub-Manager"), managing collective investment schemes and/or discretionary portfolio management accounts ("Accounts") with different backgrounds in terms of strategies, markets and financial instruments.

The Sub-Manager has been managing a split-strike conversion strategy since the inception of the firm in 1960. It is a family office, with over $700 million in firm capital. All the investment professionals within the firm have PhD qualifications and the firm is focused on recruiting the highest quality of investment staff.

The Manager was founded in 1994 and has extensive financial experience in broker accounts and innovative product development.

**Any stop-loss limit control?**

There is no official stop loss limit applied but risk is monitored on a daily basis.

**What has been the turnover rate among the investment team?**

The Sub-Manager that manages the underlying strategy has seen extremely low turnover for the industry, with many employees being at the firm for at least 15-20 years.

(Emphasis added).

66. Despite the considerable fees charged to investors and the repeated representations that defendants would carefully select and monitor advisers, managers, and sub-

managers, Plaintiffs' and the Class' funds were stolen through the Madoff Ponzi scheme.[2]  This

could have been avoided if defendants had fulfilled their duties to Plaintiffs and the Class, if

defendants had lived up to their own representations, and if defendants had adequately and

reasonably investigated, monitored, and conducted due diligence of Madoff and BLMIS.  Had

defendants conducted due diligence, they would have discovered at least the multiple red flags

identified herein.  At the very least, as described *infra*, like hedge fund investment advisors

Aksia LLC, defendants should have been able to discover the existence of Markopolous' letter,

which would put them on notice of the red flags identified therein.

67.    In failing to do so, defendants breached their legal duties to Plaintiffs and the

Class, resulting in the complete loss of Plaintiffs' and the Class' investments.  At the same time,

defendants paid themselves millions of dollars in fees, predicated on phony profits.

### B.    SUBSTANTIVE ALLEGATIONS CONCERNING THE E&Y DEFENDANTS

#### 1.    E&Y Operated As a Unitary International Professional Organization

68.    E&Y Global serves as an umbrella organization which coordinates the assurance,

tax, transaction, and advisory services of its E&Y member firms worldwide.  E&Y Global's

literature and its global Web site refer to its constituent member firms, including E&Y Cayman,

as "Ernst & Young," or "E&Y."  For example, E&Y's 2009 Annual Report, entitled "Global

---

[2]    It is noteworthy that, on January 7, 2009, Ireland's Financial Regulator stated, "All authorised funds must appoint a trustee with responsibility for custody of the assets. Trustees may appoint sub-custodians.  However, this does ***not*** absolve the trustee of responsibility for the custody of the funds' assets."  To the same end, on January 2, 2009, Luxembourg's Commission de Surveillance du Secteur Financier stated that "when a fund's assets are deposited by the depositary bank with a third party, these deposits are under the monitoring and supervisory responsibility of the depositary bank, implying that the latter must know at all times in which manner the assets are invested and where and how these assets are available.  This responsibility is ***not*** affected by the fact that the depositary has entrusted to a third party all or part of the assets in its safe-keeping."

Annual Review," states that "Ernst & Young refers to the global organization of member firms of Ernst & Young Global Limited." (Global Annual Review, at 40). E&Y's Global Code of Conduct contains identical language. (Code of Conduct, at 15). Accordingly, Plaintiffs are referring to all Ernst & Young entities when using the term "E&Y."

69. The Global Annual Review leaves no doubt that E&Y functions as one integrated entity with centralized control. The section entitled "Shaping our business for the future," states:

Creating a global mindset

*At Ernst & Young we are creating both a global structure and a global mindset* that are unique in our profession and can best meet the demands of today's and tomorrow's business.

Most professional services organizations are simply collections of national practices. Each locally controlled firm has its own management and decision-making processes and its own board and governance oversight. This model served the partners of those practices well in the past. Today it is outdated and is not in keeping with what clients demand. The world has become too fast and too complex.

At Ernst & Young we understand that. *We have one strong global leadership team that sets one single global strategy and agenda.* To ensure we are efficient and effective, we have organized our legal entities into similarly sized business units in terms of both people and revenues. *These business units, almost all of which are purposely not single countries, are grouped into geographic Areas across the Americas, Europe and Asia-Pacific. Each business unit's leadership team works directly with their Area and global leaders to ensure flawless execution. This structure is streamlined — it allows us to make decisions quickly, and ensures that we execute our strategy and provide high-quality service wherever in the world our clients do business.*

*Creating our global mindset and structure are ongoing processes. We've been working with our partners to bring down the barriers to working together seamlessly across borders, and we have succeeded in realigning our previously country-focused organization into a more integrated global one.* This organization means our clients get faster response and more tailored services. They get broader, more experienced teams, with deeper industry knowledge. Our people get greater opportunity to pursue the global careers they desire. And our regulators see our structure as helping us deliver consistent, high-quality service across the globe.

(Global Annual Review, at 8, 10; emphasis added).

70.     As all hierarchical entities with centralized control, E&Y has one Chairman and CEO, James S. Turley, and member firms have obligations to E&Y.

71.     The Global Annual Review further confirms that the network is structured like a corporation.   According to the Global Annual Review, "Our ***global organization and its management and governance structures*** are vital elements to delivering on our promise to stakeholders and clients and achieving our strategy of market leadership. We have centered these structures on two guiding principles: separating management and governance roles; and ***operating Ernst & Young as a global business with one shared strategy, led and overseen by a single management team.***"  (Global Annual Review, at 35).

72.     The Global Annual Review describes four "global bodies":

(a)     the Global Executive, effectively a Board of Directors, which is chaired by Mr. Turley and comprised of the COO; five Area Managing Partners; the Global Managing Partners of People, Markets, Quality & Risk Management, and Operations & Finance; and global Service Line Vice Chairs for Assurance, Advisory, Tax, and Transaction Advisory Services;

(b)     the Global Executive Committees for People, Quality & Risk Management, Operations & Finance, Markets, Assurance, Advisory, Tax, and Transaction Advisory Services, which are responsible for making recommendations to the Global Executive and are chaired by members of the Global Executive and comprised of representatives from the five Areas;

(c)     the Global Practice Group, which "seeks to ensure common understanding across member firms of Ernst & Young's strategic objectives and consistency of

execution across the organization" and is comprised of members of the Global Executive, Global Executive Committees, and sub-Area leaders; and

(d)     the Global Advisory Council, comprised of approximately forty partners, elected by their peers from member firms across the five Areas, which advises E&Y on policies and strategies. "The approval of the Global Advisory Council is required for a number of significant matters that could affect the organization."

(Global Annual Review, at 35).

73.     These four governance bodies (the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council) provide a global governance structure that is housed within E&Y Global. In effect, the E&Y member firms (including E&Y Cayman) act as agents of E&Y Global.

74.     Indeed, throughout its Global Annual Review, E&Y stresses the importance of global consistency throughout the organization:

(a)     "[O]ur regulators see our structure as helping us deliver consistent, high-quality service across the globe." (Global Annual Review at 10).

(b)     "Ensuring International Financial Reporting Standards really mean the same thing across the globe is critical and a goal we work to support." (Global Annual Review at 23).

(c)     "Quality is at the heart of our objective to deliver seamless, consistent, high quality client service, worldwide." (Global Annual Review at 32).

(d)     "Globally consistent terms and conditions and statements of work means that our global clients contract with our member firms in a consistent manner throughout the world." (Global Annual Review at 32).

(e)    "[Global Financial Information System] provides client teams with timely, consistent information with respect to their engagement and account financial information, helping them to better plan work and serve their clients.  The system also enhances our ability to manage our own operations more effectively, using consistent key performance metrics and sharing best practices across our organization."  (Global Annual Review at 35).

In sum, E&Y states in its Global Annual Review that "[o]ver the past few years [it has] taken great strides towards globalizing the way we go to market."

75.    To complete the parallel between E&Y and any corporation, the Global Annual Review provides aggregate results for E&Y that are the hallmarks of the annual report of any Fortune 500 company.  For example, the Global Annual Review states that E&Y is composed of more than 144,000 people (at 37), and generated $21.4 billion in total worldwide revenues in 2009 (at 36).  It breaks down revenue by geographic area, service line, and client type (at 36).  And it describes the percentage of Global 500 and Global 2000 companies served by E&Y (at 36).  The Global Annual Review of E&Y is, thus, no different than the annual report of McDonalds, Exxon, or Microsoft.

**2.    E&Y Cayman Issued Unqualified (Clean) Audit Opinions**

76.    E&Y Cayman audited the Primeo Funds every year between at least 2003 and 2007.  The Funds listed Ernst & Young as the Funds' auditor in the Offering Memoranda and in the Subscription Agreement signed by new investors.  Each year it issued an unqualified audit opinion – also commonly referred to as a "clean audit opinion" – stating that the financial statements at issue conformed with the requisite auditing standards.  *See, e.g.*, the Primeo Funds' financial statements for the year ending December 31, 2007 ("2007 Financial Statements" or

"2007 FS").

77. The 2007 Financial Statements included E&Y Cayman's unqualified audit opinion with respect to the Primeo Funds. (2007 FS, at 18). The opinion is entitled "Report of Independent Auditors" and states, in relevant part:

> We have audited the accompanying statement of net assets of Primeo Fund (comprising the Primeo Select Fund and Primeo Executive Fund), including the schedule of investments, as of December 31, 2007 and 2006, and the related statements of operations, changes in net assets, cash flows and financial highlights for the years then ended.
>
> ***
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.
>
> ***
>
> An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> ***
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Primeo Fund at December 31, 2007 and 2006, and the results of its operations, the changes in its net assets, its cash flows, and its financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America.

(2007 FS, at 18; emphasis added).

78. The audit opinion is signed, "Ernst & Young," and dated April 28, 2008. (2007

FS, at 18).

### 3. The 2007 Financial Statements

79. The 2007 Financial Statements included a Schedule of Investments as of December 31, 2006, and 2007. (2007 FS, at 12-13). This schedule reflected how the assets of the Primeo Funds were supposedly being held at the end of each respective year.

(a) In 2006, the Primeo Select Fund supposedly held (i) $642,778 in a cash fund; and (ii) $453,824,964 in a "segregated portfolio at broker,"[3] including $43,734 in a Fidelity Spartan U.S. Treasury Money Market Fund, and $453,781,230 in U.S. Treasury Bills. In 2006, the Primeo Executive Fund supposedly held (i) $1,248,803 in cash funds; (ii) $25,608,457 in Alpha Prime Equity Hedge Funds; and (iii) $25,543,752 in Herald USA Funds. Net of other unspecified assets and liabilities, total net assets at the end of 2006 attributable to the putative Class were supposedly $506,044,600. (2007 FS, at 13).

(b) In 2007, the Primeo Select Fund supposedly held (i) $616,316 in a cash fund; and (ii) $632,296,767 in Herald USA Funds. In 2007, the Primeo Executive Fund supposedly held $253,681 in cash funds; $33,468,169 in Alpha Prime Equity Hedge Funds; and $33,438,046 in Herald USA Funds. Net of other unspecified assets and liabilities, total net assets at the end of 2007 attributable to the putative Class were supposedly $709,511,903. (2007 FS, at 12).

80. The 2007 Financial Statements included a Statement of Net Assets as of December 31, 2006, and 2007. (2007 FS, at 7). This Statement of Net Assets reflected the same

---

[3] Note 15 of the Notes to the Financial Statements for the Year Ended 31 December 2007, 2007 FS, at 17, states, "Separate Managed Account. Until April 2007, the Investment Advisor invested certain assets of the Primeo Select Fund through a separate managed account. This separate managed account was managed by a broker/dealer investment firm." The Notes to

amount of supposed net assets as the Schedule of Investments. *Id.*

81.     The 2007 Financial Statements also included a Statement of Operations for 2006 and 2007.  (2007 FS, at 8).  The Statement of Operations reflected a purported "net gain on investments" of $44,688,490 for both Funds in 2006 and $39,971,321 for both Funds in 2007. *Id.* The Statement of Operations also reflected the following expenses:

(a)     "Advisory fees," payable to WWF and, after April 25, 2007, to PIM, of $9,319,339 for both funds in 2006 and $11,394,619 for both Funds in 2007;

(b)     "Performance fees," payable to WWF and, after April 25, 2007, to PIM, of $284,039 for both Funds in 2006 and $169,430 for both Funds in 2007;

(c)     "Custodian and administration expenses," payable to HSBC Luxembourg,[4] of $483,371 for both Funds in 2006 and $536,746 for both Funds in 2007; and

(d)     "Audit and legal fees," payable, in part, to E&Y Cayman, of $113,168 for both Funds in 2006 and $75,279 for both Funds in 2007.

82.     The 2007 Financial Statements also included a Statement of Cash Flows for 2006 and 2007.  (2007 FS, at 11).  The Statement of Cash Flows reflected:

(a)     "Interest received" of $83,363 for both Funds in 2006, and $159,060 for both Funds in 2007;

(b)     Payments for "purchases of investments" of $4,468,932,213 for both Funds in 2006 and $2,866,287,972 for both Funds in 2007; and

(c)     Proceeds from "sales of investments" of $4,419,975,075 for both Funds in

---

the 2007 Financial Statements are part of the 2007 Financial Statements, and are encompassed within E&Y Cayman's audit opinion.  (ISA 200.34).

2006 and $2,295,845, 218 for both Funds in 2007.

### 4. E&Y Cayman's Audits Failed to Meet U.S. and International Standards, or Even E&Y's Own Standards

#### (a) E&Y Recklessly Performed Its Audits and Made Misrepresentations Regarding the Funds

##### (i) E&Y Was Required, at a Minimum, to Obtain Independent Verification that the Funds' Assets Existed

83. The American Institute of Certified Public Accountants ("AICPA"), the professional organization that promulgates the national auditing standards known as Generally Accepted Auditing Standards ("GAAS"), develops the objectives for audits conducted in accordance with GAAS. GAAS set the minimum level of performance and quality that auditors are expected to meet. Through its Auditing Standards Board, the AICPA has in its Statements of Accounting Standards codified a detailed interpretation of GAAS, which is cited as "AU" in this complaint. The International Auditing and Assurance Standards Board ("IAASB") of the International Federation o£ Accountants promulgates the International Standards on Auditing ("ISA"). Those pronouncements are consistent with U.S. GAAP in all material respects. Accordingly, references herein to GAAS and ISA are intended to be synonymous and references to GAAS are intended to include references to ISA.

84. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the uniform rules, conventions, and procedures necessary to define generally accepted accounting principles in the United States. AU § 411. The International Financial Reporting Standards ("IFRS") govern the framework for the preparation of financial statements adopted by the International Accounting Standards Board. The IFRS mirror GAAP with respect to the form and content of the Funds' financial statements. References herein

---

[4]     The Notes to the 2007 Financial Statements represent that HSBC Luxembourg

to GAAP and IFRS are intended to be synonymous and, accordingly, references to GAAP shall include references to IFRS.

85.     The AICPA and the IAASB prohibit members from expressing an opinion or stating affirmatively that financial statements or other financial data "present fairly … in conformity with generally accepted accounting principles," if such information departs from applicable accounting principles.

86.     There are ten Generally Accepted Auditing Standards established by the AICPA which E&Y had a duty to follow in the audits of the Funds:  General Standards, Standards of Field Work, and Standards of Reporting.

*General Standards*

1. The auditor must have adequate technical training and proficiency to perform the audit.

2. The auditor must maintain independence in mental attitude in all matters relating to the audit.

3. The auditor must exercise due professional care in the performance of the audit and the preparation of the report.

*Standards of Field Work*

1. The auditor must adequately plan the work and must properly supervise any assistants.

2. The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

3. The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.

---

acted as the Funds' administrator and received the administration fee.

*Standards* of *Reporting*

1. The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2. The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3. When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

4. The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefor in the auditor's report. In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree o£ responsibility the auditor is taking, in the auditor's report.

(AU § 150.02.) The International Standards on Auditing are effectively the same as GAAS insofar as material to E&Y's audits of the Funds' financial statements. *See* ISA 200 "Objective and General Principles Governing an Audit of Financial Statements."

87. E&Y was thus required to exercise due professional care "to plan and perform the audit to obtain *reasonable assurance* about whether the financial statements are free of material misstatement, *whether caused by error or fraud."* AU § 110.02 (emphasis added); *see also* AU § 230.03 (concerning the auditors' responsibility to conduct their work exercising due professional care); ISA 240 ("The Auditor's Responsibility to Consider Fraud and Error in an Audit of Financial Statements"); ISA 300 ("Planning").

88. In order to state an opinion with regard to an audited entity's financial statements, GAAS states that "the auditor must obtain a sufficient understanding of the entity and its environment, including its internal controls, as to assess the risk of material misstatement of the

financial statements, whether due to error or fraud." AU § 314.01; *see also* ISA 310 ("Knowledge of Business").

89.     Audit risk and materiality must be considered by the auditor in designing the nature, tuning, and extent of audit procedures and in evaluating the results of those procedures. AU § 312.01.   GAAS requires the auditor to use professional judgment and, in particular, professional skepticism in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud.  AU §§, 230.07-09, 316.12, 316; *see* also ISA 400 ("Risk Assessments and Internal Controls").

90.     In particular, the auditor is required to consider the competency and sufficiency of the audit evidence.   Since audit evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.  AU § 230.08; *see also* ISA 200.

91.     Moreover, GAAS recognizes that the audit of an entity with securities investments requires special procedures:  "The inherent risk for an assertion about a derivative or security is its susceptibility to a material misstatement, assuming there are no related controls."  AU § 332.08.

92.     Thus, when auditing the existence of a security, auditors must perform substantive procedures, such as confirmations with the security's issuer or physical inspections of the security.

> Existence assertions address whether the derivatives and securities reported in the financial statements through recognition or disclosure exist at the date of the statement of financial position.  Occurrence assertions address whether derivatives and securities transactions reported in the financial statements, as a part of earnings, other comprehensive income, or cash flows or through disclosure, occurred. Paragraph 19 provides guidance on the auditor's determination of the nature, timing, and extent of substantive procedures to be performed.   Examples of substantive procedures for existence or occurrence assertions about derivatives and securities include—
>
> • Confirmation *with the issuer of the security.*

• *Confirmation* with the holder of the security, including securities in electronic form, or with the counterparty to the derivative.

• *Confirmation of settled transactions with the broker-dealer or counterparty.*

• *Confirmation* of unsettled transactions with the broker-dealer or counterparty.

• *Physical inspection of the security or derivative contract.*

• Reading *executed* partnership or similar agreements.

• *Inspecting* underlying agreements and other forms of supporting documentation, in paper or electronic form, for the following:

    — Amounts reported
    — Evidence that would preclude the sales treatment of a transfer
    — Unrecorded repurchase agreements

• *Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period.*

• *Performing analytical procedures.* For example, the absence of a material difference from an expectation that interest income will be a fixed percentage of a debt security based on the effective interest rate determined when the entity purchased the security provides evidence about existence of the security.

(AU § 332.21; emphasis added).

93. Specifically for audits of large funds, the AICPA *Audit & Accounting Guide, Investment Companies* (the "Guide") directs auditors of investment funds to gain an understanding of the attitude of the fund's management concerning internal control and its importance in reliable financial reporting. Guide § 5.64. Auditors must consider testing the fund's control and monitoring procedures. Guide § 5.64. The Guide further directs auditors to consider whether the fund's investment in an underlying fund is so significant as to require modification of financial statements. Guide § 5.48.

94.     As a member firm of E&Y Global, E&Y Cayman was bound by the foregoing standards and guidelines.

95.     Indeed, because E&Y knew that the Funds constituted conduits for investments that were controlled by Madoff, E&Y was required to plan and conduct audits that verified the existence of the Funds' investments.  In order to do so, E&Y was required to understand the Funds' "information systems for derivatives and securities," including its investments held by BLMIS.  AU § 332.05.  An understanding of the Funds' internal controls was particularly important to a properly planned audit because, absent effective internal controls, the Funds were not in a position to accurately and reliably validate the existence, or value, of the investments through BLMIS.

96.     Moreover, in addition to the requirements imposed by the foregoing standards, E&Y should have treated BLMIS as a service organization because its services were part of the Funds' information system for derivatives and securities that affected (1) how the Funds' derivatives and securities transactions were purportedly initiated and (2) the accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of the Funds' derivatives and securities transactions.  AU §§ 332.11, 332.20, and 324; *see also* ISA 402 ("Audit Considerations Relating to Entities Using Service Organization").

97.     E&Y was thus required to consider the controls put in place by BLMIS:

> Following the guidance in Section 324, Service Organizations, a service organization's services are part of an entity's information system for derivatives and securities if they affect any of the following:
>
>> a.      How the entity's derivatives and securities transactions are initiated.

b.    The accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of the entity's derivatives and securities transactions.

(AU § 332.11.)

98.    E&Y was also required to perform additional procedures required in situations where, as here, there is a lack of segregation of duties at a service organization. With respect to the Funds, BLMIS initiated the securities transactions held and serviced the securities as custodian and prepared trading and account information. This heightened risk required E&Y to perform additional procedures to opine on the financial statements of the Funds. AU § 332.16 specifically directs that confirmations from service organizations are not sufficient audit evidence.

99.    Moreover, where, as here, the service organization (BLMIS) both initiated the transactions and held and serviced the securities, the greater risk of fraud requires the auditor to perform additional procedures, including site visits to inspect documentation, and identification of controls by the service organization:

> *If one service organization initiates transactions as an investment adviser and also holds and services the securities, all of the information available to the auditor is based on the service organization's information. The auditor may be unable to sufficiently limit audit risk without obtaining audit evidence about the operating effectiveness of one or more of the service organization's controls.* An example of such controls is establishing independent departments that provide the investment advisory services and the holding and servicing of securities, then reconciling the information about the securities that is provided by each department.

(AU § 332.20; emphasis added).

100.    In light of the nature of the Funds and of the circumstances surrounding them, E&Y also had an obligation to discuss with BLMIS' independent auditor, Friehling & Horowitz ("F&H"), the result of F&H's most recent audit of BLMIS. Guide § 5.59; AU § 332.11. In this regard, E&Y was required to examine the control environment at BLMIS and should have either

requested or performed additional tests of controls. Guide §§ 5.66-67.

101. Because F&H's "audits" of BLMIS were unsatisfactory, E&Y had the additional obligation to apply appropriate auditing procedures:

> If the investee's financial statements are not audited, or if the investee auditor's report is not satisfactory to the investor's auditor for this purpose, the investor's auditor should apply, or should request that the investor arrange with the investee to have another auditor apply, appropriate auditing procedures to such financial statements, considering the materiality of the investment in relation to the financial statements of the investor.

(AU § 332.30).

**(ii)    E&Y Failed to Verify the Existence of the Funds' Madoff Investments**

102. E&Y failed in its obligation to obtain reasonable assurance that the assets included in the Funds' Schedule of Investments in fact existed and were appropriately valued.

103. Contrary to the applicable accounting standards, E&Y failed to gather sufficient, competent evidential matter to support its opinions that the Funds' financial statements were free of material misstatements with respect to the claimed assets, instead inappropriately relying on the Funds' management's representations. AU § 333; *see also* ISA 580 ("Management Representations"). As a result, although E&Y opined that the multi-million dollar valuations of the Funds' investments were fairly presented in the financial statements, E&Y failed to determine whether the assets, which constituted nearly 100% of the Funds' value, even existed.

104. E&Y also did not perform the necessary procedures to audit the existence of the transactions which constituted the split-strike conversion strategy. E&Y was aware that the Funds were purportedly using that strategy, a nontraditional options trading strategy. Due to the strategy's heavy use of options trading, E&Y should have performed substantive procedures or testing.

105. Had E&Y undertaken the proper analysis and testing of the strategy purportedly

employed by Madoff, it would have determined that the strategy, including the claimed liquidation of all positions at the end of each year to acquire U.S. Treasury bonds, could not have functioned as described within market parameters. Moreover, E&Y would have determined that BLMIS' claimed consistent, positive returns were not achievable.

106.    In addition, despite its knowledge of the interconnection between the Funds and BLMIS, and of the Funds' reliance on the supposed integrity of BLMIS' operations, E&Y did not review the data required by the auditing standards with respect to an auditor's obligation to examine the "controls over derivatives and securities transactions from their initiation to their inclusion in the financial statements." E&Y did not test the trades supposedly made by BLMIS or confirm the actual existence of securities in BLMIS' accounts. If E&Y had made any such efforts, it would have discovered the securities did not exist.

107.    E&Y also improperly relied on the financial information provided by BLMIS without inquiring into F&H, BLMIS' auditor, even though F&H had represented to the AICPA that it did not perform audits and was, therefore, not subject to the annual peer review process. E&Y should have, but did not, perform additional procedures such as visiting the offices of F&H to discuss the audit procedures. Had E&Y taken this necessary step, it would have discovered that there was no effective audit of BLMIS.

### (iii)    E&Y Violated Its Duties to the Funds' Investors

108.    As the independent party charged with certifying that it had reasonable assurance that the Funds' financial statements were free of material misstatements, E&Y failed to meet its obligation to the Funds' investors when it issued its audit opinions – opinions upon which it knew those parties would rely.

109.    Had E&Y performed appropriate audits (as it represented it had), it would have

learned that the securities transactions purportedly conducted by Madoff did not occur and the assets of the Funds did not exist.

110.     In addition, even the limited audit work that E&Y must have conducted would have given it actual knowledge or information that it willfully ignored, that:

- BLMIS was not audited pursuant to GAAS by a "qualified and reputable independent audit firm";

- The Funds, and the other defendants, performed no meaningful due diligence on BLMIS;

- The Funds did not test the validity of Madoff's performance or strategy;

- The Funds had no process in place to verify the fair value of the investments purportedly made by BLMIS;

- The Funds did not verify the supposed trades made by Madoff with counterparties or other third parties and, thus, did not verify the existence of the securities and other assets.

111.     E&Y breached its duties as the independent auditor of the Funds at least as follows:

- E&Y failed to exercise due professional care and professional skepticism in its audit of the Funds. Specifically, E&Y failed to use professional skepticism "when considering the risk of material misstatement due to fraud";

- E&Y failed to obtain a sufficient understanding of the Funds and their environment, including their internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud;

- E&Y failed to obtain sufficient competent audit evidence with respect to existence of the Funds' investments through BLMIS and E&Y did not perform the necessary procedures to audit the existence of the Funds' securities;

- E&Y failed to obtain an understanding of the internal controls (or lack thereof) of BLMIS and did not perform the necessary procedures to audit the occurrence of the transactions which constituted the purported split-strike conversion strategy, such as

confirmation with counterparties, confirmation of settled transactions, physical inspection of the securities, or performance of analytical procedures;

- E&Y failed to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization. Numerous red flags, discussed above, indicating that Madoff was a fraud existed and required E&Y to investigate further and perform additional audit procedures prior to opining on the presentation of the Funds' financial positions.

- Any reliance by E&Y on the financial statements of BLMIS was improper because F&H was not qualified or able to audit BLMIS in accordance with GAAP.

**(b)    E&Y Cayman's Audit Violated E&Y's Own Standards**

112.    E&Y's Web site contains a guide to its audits of hedge funds, entitled "Serving the Hedge Fund Industry: Seasoned Professionals for a Time of Change" (the "Audit Guide"). In it, E&Y boasts that it is "a leader in serving the hedge fund industry" and notes that it "[s]erves approximately 40% of the global hedge fund industry." (Audit Guide, at 2.)

113.    In particular, E&Y boasts that its audits of hedge funds pay "attention to risk." The Audit Guide states that E&Y "collaborate[s] with clients to … reduce risk," through, *inter alia*, "[a] global audit methodology, consistently applied." The Audit Guide continues:

Attention to risk

Our longstanding experience in the industry provides us with uncommon insights into the spectrum of potential risks and the necessary internal controls. Valuation has increasingly become one of the most challenging areas that funds and their boards of directors face. In uncertain market conditions, coupled with the proliferation of ever more complex and innovative financial instruments and product designs, hedge fund managers demand an experienced and broad team of professionals to serve them. Our audit teams leverage the knowledge and skills of our entire asset management practice, including those of internal valuation professionals in the areas of derivatives, structured products and private company valuations.

(Audit Guide, at 5).

114.     Noting the increased use of "early warning systems" to detect risk at asset

management firms, E&Y represents that it has tools to assist in detecting risk:

> Risk Management Advisory Services
>
> In this environment of heightened stakeholder expectations, firms
> are formalizing their risk functions to establish and put into
> operation early warning systems.  ***We have proven methodologies,
> tools and experience to assist asset management firms in
> identifying, monitoring and managing risk effectively and
> efficiently.***

(Audit Guide, at 8; emphasis added).

115.     E&Y further represents that it is able to "investigate unusual financial activity"

and "perform electronic evidence discovery":

> Fraud Investigation and Dispute Services
>
> The financial services landscape continues to be redefined, as
> internal controls, risk management and regulatory compliance have
> risen to unprecedented levels.  In addition to the demand for
> greater accountability, our clients must manage heightened
> scrutiny from the media and public.  When conflicts arise, firms
> must respond with speed and efficiency to investigate the
> underlying facts and then remedy the issue.  ***Our professionals
> investigate unusual financial activity, perform electronic
> evidence discovery and review financial reports – all with the
> sensitivity and urgency you require.  Our knowledge comes from
> our experience dealing with matters of accounting malpractice,
> anti-corruption and regulatory compliance.***

(Audit Guide, at 9; emphasis added).

116.     E&Y even represents that it is able to assess risk throughout the "entire

transaction lifecycle," and, specifically, that its auditors "perform thorough buy-side and sell-side

due diligence":

Strategic transaction support

Our professionals address the entire transaction lifecycle. We can help you determine the true value of an asset, set up the right business and tax structure and execute the deal. And we will support your operational due diligence process. Whether it's a domestic or cross-border investment, our teams work proactively to offer structuring advice related to the acquisition of assets that can drive value in the form of greater after-tax return.

We combine proven practices and consistent methodologies with fresh thinking, giving you the advice you need to make informed decisions, mitigate risk and achieve a successful outcome. And there are many other ways we can assist in transactions:

► ***Perform thorough buy-side and sell-side due diligence***

► Assess and quantify risk

(Audit Guide, at 9; emphasis added).

117.    Finally, to do all this, E&Y represents that it draws on its "worldwide industry resources, knowledge and experience." "Using our far-flung network of global resources, we can mobilize our team anywhere in the world." (Audit Guide, at 12).

118.    Given its leadership in the hedge fund audit business, it is not surprising that the Primeo Funds were not the only Madoff feeder funds audited by E&Y. Plaintiffs are aware of at least eight additional feeder funds audited by E&Y. E&Y's audits of Madoff's feeder funds provided E&Y with a unique ability and opportunity to verify information about BLMIS. That information, particularly in the aggregate, should have raised significant suspicions about Madoff. These suspicions also should have been obvious because E&Y coordinated the audits of the feeder funds on a global basis.

## C. SUBSTANTIVE ALLEGATIONS CONCERNING THE HSBC DEFENDANTS

### 1. The HSBC Defendants Violated Their Obligations As Administrator to Plaintiffs and the Class

119. According to the Funds' Offering Memoranda, Bank of Bermuda Cayman served as the Administrator of the Primeo Funds since at least May 2001, and was responsible for, *inter alia*, "computing Net Asset Value on a monthly basis." (2007 OM, at 13). Bank of Bermuda Cayman carried out these obligations pursuant to an Administration Agreement with the Primeo Funds. *Id.* at 13.

120. In the Offering Memoranda, Bank of Bermuda Cayman touted its expertise in administrative services by highlighting that, through its parent, Bank of Bermuda, it had become part of HSBC on February 18, 2004. HSBC is one of the largest financial institutions in the world. According to the 2007 OM, Bank of Bermuda was "an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England. As at 31 December 2005, HSBC Holdings plc had consolidated gross assets of approximately US $1,502 billion." *Id.* at 12.

121. The Funds' financial statements further indicate that, in essence, HSBC acted as administrator. According to Note 6 of the 2007 Financial Statements, "[a]dministration and custodian fees amounting to USD 458,780 and USD 77,966 for Primeo Select Fund and Primeo Executive Fund respectively (2006: USD 430,579 for Select and USD 52,792 for Executive) and [*sic*] have been paid to the HSBC Securities Services (Luxembourg) S.A., which acts as the Fund's Administrator and Custodian." (2007 FS, at 15).

122. One of the critical functions performed by HSBC and Bank of Bermuda Cayman consisted of calculating the NAV that was then reported to investors on a monthly basis. A

central component of the NAV calculation included the value of the securities held by Madoff. Upon reviewing account statements listing the securities held by Madoff, HSBC and Bank of Bermuda Cayman would have seen that, as further described below, trades were allegedly executed at prices outside the daily range of prices for such securities on the days in question; certain securities were allegedly settled on weekends and/or holidays; and option trading volumes for certain days exceeded option trading volume for the entire market. Thus, HSBC and Bank of Bermuda Cayman knew or were reckless in not knowing that Madoff could not have executed hundreds of trades at the listed prices.

2.      **The HSBC Defendants Violated Their Obligations As Custodians to Plaintiffs and the Class**

123. HSBC Luxembourg, and, for a portion of the Class Period, Bank of Bermuda Luxembourg (which later became part of HSBC through HSBC's acquisition of Bank of Bermuda), served as custodians of the Primeo Funds and were "responsible for all assets of the Fund." (2007 OM, at 13). In the Funds' Offering Memoranda, HSBC Luxembourg represented that it was "an ultimately wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England. … As at 31 December 2005, HSBC Holdings plc had consolidated gross assets of approximately US $1,502 billion."

124. For the Funds' assets they did not hold, the Custodians' responsibilities included the following:

> The Custodian may appoint sub-custodians, agents or delegates ("Correspondents") to hold the assets of the Fund. The Custodian will retain responsibility for the acts and omissions of the majority of its Correspondents, but will not be liable for any loss directly or indirectly arising as a result of the acts or omissions of its Correspondents in certain emerging markets provided that the Custodian uses reasonable skill, care and diligence in the selection of a suitable Correspondent. In addition, the Custodian shall not be liable for any losses arising as a result of the

liquidation, bankruptcy or insolvency of its Correspondents in any market. The Custodian will be responsible to the Fund for the duration of any sub-custody agreement and for satisfying itself as to the ongoing suitability of the Correspondent to provide custodial services to the Fund. ***The Custodian will also maintain an appropriate level of supervision over the Correspondents and will make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged.***

(2007 OM, at 13; emphasis added).

125.   On August 7, 2002, Bank of Bermuda Luxembourg entered into a sub-custody agreement with BLMIS whereby BLMIS would act as the sub-custodian of certain funds for which Bank of Bermuda Luxembourg was the custodian. On or about September 30, 2004, BLMIS received a notice that Bank of Bermuda Luxembourg was changing its name to HSBC Luxembourg effective October 1, 2004. BLMIS held these funds in New York, New York for the benefit of the Primeo Funds.

126.   As noted above, the 2007 Financial Statements indicate that HSBC Luxembourg collected "[a]dministration and custodian fees amounting to USD 458,780 and USD 77,966 for Primeo Select Fund and Primeo Executive Fund respectively (2006: USD 430,579 for Select and USD 52,792 for Executive)." Since the Custodians did not hold the Funds' assets, they could not have charged a fee for doing so. Thus, the Custodians' only role, and the reason they charged a fee, was to act with "reasonable skill, care and diligence in the selection of a suitable Correspondent." The Custodians were further obligated to "maintain an appropriate level of supervision over the Correspondents and [] make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged."

127.   The Custodians and HSBC failed to discharge their duties and to conduct the necessary procedures to adequately appoint and monitor BLMIS, and to ensure the safeguard of

assets entrusted by Plaintiffs and the Class. Had the Custodians and HSBC not breached their duties, Plaintiffs and the Class would not have been damaged.

### D. SUBSTANTIVE ALLEGATIONS CONCERNING OBVIOUS RED FLAGS THAT ALL DEFENDANTS IGNORED

#### 1. Red Flags

##### (a) Madoff's Custody of Equity Securities

128. Madoff failed to trade through an independent broker and, instead, self-cleared all trading activities through his wholly-owned company, BLMIS. In addition, Madoff served as his own custodian for the Funds' assets, even though this greatly increased the risk of self-dealing and of Madoff perpetrating a Ponzi scheme. As renowned securities expert and Columbia Law School Professor John Coffee has said, "[b]eing your own custodian violates the first rule of common sense, you can't be your own watchdog."[5] At a minimum, this arrangement should have alerted defendants to the need for heightened scrutiny, monitoring, and verification of transactions, yet defendants ignored this risk.

##### (b) Madoff's Non-Existent Counterparties

129. Madoff refused to identify the counterparties with whom he traded equity securities and options when executing the split-strike conversion strategy. Alternatively, if Madoff did identify them, defendants failed to learn that Madoff had never traded with any of them.

##### (c) Defendants Failed To Confirm the Existence of Government Securities at the End of Each Year

130. Another warning sign was the fact that Madoff supposedly held ***all assets, one-hundred percent, in government securities at the end of every year***. While a possible

coincidence, it is extremely suspicious. Not one single year-end coincided with an opportune time to be invested in the split-strike conversion strategy? In light of this recurring pattern the obvious concern should have been that Madoff was hiding from the auditors so that at year-end the auditors would only audit government securities. At a minimum, this should have caused defendants to confirm the existence of the government securities.

### (d) Madoff's Unknown Auditing Firm

131. Madoff supposedly used F&H, an unknown accounting firm that was plainly unequipped to audit a company of BLMIS's purported size. F&H had only three employees – a retired partner living in Florida, a secretary, and one active certified public accountant. Although F&H was a member of the AICPA, it had not been the subject of a peer review since 1993 – which is a membership requirement – because F&H represented to the AICPA, in writing, that it did not conduct any audits.

### (e) Madoff's Secretive Operation

132. Madoff refused to answer even basic questions about BLMIS. Madoff thus refused to provide the minimum level of transparency necessary to conduct reasonable due diligence.

133. Madoff's secrecy was exacerbated by the fact that Madoff family members controlled key positions at BLMIS, thus limiting third-party involvement. Defendants knew about this arrangement, yet ignored the risk it clearly represented.

### (f) Madoff's Paper Trading Records

134. Madoff claimed that BLMIS was technologically advanced. Yet, Madoff reported his trades to defendants using only paper transaction slips which did not include the

---

[5]     Cristina McEachern Gibbs, "Proposed Bill: $100 Million to Crack Down on Wall

exact time of the trade nor the exact price of each trade. Instead, the transaction slips only provided average prices for the transactions that had supposedly been executed each day. Based on standard industry practice, the lack of access to real-time electronic reporting should have raised significant concerns about Madoff. The use of delayed paper confirmations, which are patently susceptible to manipulation, was yet another red flag ignored by defendants.

### (g)    Madoff's Consistent Returns

135.    The impossible consistency of Madoff's reported results using the split-strike conversion strategy and the resulting investment returns was another warning sign. BLMIS produced returns that were too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amount, that was simply not credible. The Primeo Funds received annual rates of return on investments with BLMIS ranging, on average, from approximately 10% to 19% for the years 1997 through 2006. The Primeo Funds incurred a negative return in a particular month in only four months of purported trading during the period from March 1996 through May 2007, equal to 3.0% of the 135 months during that period. In contrast, for the same period, the S&P 500 had a total of 48 months which generated negative returns, equal to 35.6% of the 135 months during that period. BLMIS' returns could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed to even approximate its results.

### (h)    Madoff's Impossible Trades

136.    At times, the Primeo Funds' monthly account statements reflected trades on behalf of the Funds in certain securities that were allegedly executed at prices outside the

---

Street Fraud," Advanced Trading, Jan. 27, 2009.

daily range of prices for such securities on the days in question. For example, the Primeo Funds' monthly account statement for October 2003 reported a purchase of 191,037 shares of Intel Corporation (INTC) with a settlement date of October 7, 2003. BLMIS records reflect a trade date for these transactions of October 2, 2003, at a price of $27.63. However, the daily price range for Intel Corporation shares on October 2, 2003 was a low of $28.41 to a high of $28.95. In an example of a purported sale, the Primeo Funds' monthly account statement for December 2006 reported a sale of 45,050 shares of Merck & Co., Inc. (MRK) with a settlement date of December 28, 2006. BLMIS records reflect a trade date for these transactions of December 22, 2006, at a price of $44.61. However, the daily price range for Merck stock on December 22, 2006 was a low of $42.78 to a high of $43.42.

### (i)    Madoff's Impossible Trade Volumes

137.    BLMIS would have had to execute massive numbers of options trades to implement its purported split-strike conversion strategy. In order to implement this strategy, BLMIS purportedly purchased options on the S&P 100 index ("OEX") – which are traded on the Chicago Board Options Exchange ("CBOE") – in combination with purchases of select underlying stocks that are components of that index. At times, the traded option volume BLMIS reported to its customers was simply impossible if those options had been exchange-traded because BLMIS reported a traded option volume that exceeded the total market traded option volume for that contract on that day.

138.    For example, on April 20, 2007, with a settlement date of April 25, 2007, BLMIS purportedly bought a total of 6,899 OEX put options (with May expiration and a strike price of 670) in two lots of 4,542 and 2,357, when the total volume traded on the CBOE for all such contracts that day was 2,032. Similarly, on that same day, BLMIS

purportedly sold a total 6,899 OEX call options (with May expiration and a strike price of 680) in two lots of 4,542 and 2,357, when the total volume traded on the CBOE for all such contracts that day was 4,027.

139. BLMIS' daily traded volume also represents the amount of outstanding contracts (also known as open interest) held by BLMIS. A comparison of BLMIS' volume (share of total market open interest) with the total market open interest for the same contracts yields the same impossible conclusion. For example, again on April 20, 2007, the CBOE market's reported total outstanding contracts for OEX put options (with May expiration and a strike price of 670) was only 3,142, which is lower than BLMIS' reported outstanding contracts or volume of 6,899. Therefore, it would have been impossible for both BLMIS' open interest and volume to exceed that of the market, respectively, for the identical contract on the same day. In each of these instances, defendants knew or should have known that the option trading volumes reported by BLMIS were impossible if exchange-traded.

### (j)    Madoff's Impossible Trade Dates

140. Certain of the Primeo Funds' monthly account statements reflected trades on behalf of the Funds in certain securities that were allegedly settled on weekends and/or holidays. For example, the Funds' monthly account statement for the month of January 2000 reported alleged purchases of 434 S&P 100 Index put option contracts and equal numbers of S&P 100 Index call option contracts, which purportedly settled on January 8, 2000 – a Saturday.

### (k)    Madoff's Fee Structure

141. Equally suspicious was Madoff's fee structure, which was extremely unusual and perhaps unique. A typical investment firm like BLMIS charged two percent of assets

annually, plus twenty percent of profits. "Two-twenty," as this arrangement is commonly referred to in the hedge fund world, is the industry standard. Madoff did not charge any such fees and effectively relinquished tens of millions of dollars every year. There was no explanation for this apparent generosity. Indeed, the Primeo Funds received higher purported annual rates of return on investments with BLMIS than the interest rates BLMIS could have paid to commercial lenders during the same time periods. Upon information and belief, defendants never questioned why Madoff accepted the Primeo Funds' investment capital in lieu of other available alternatives that would have been more lucrative for BLMIS.

### 2. Other Financial Institutions Did Not Ignore the Red Flags and Refused to Deal With Madoff

142. Multiple other financial market participants reviewed Madoff's operations and refused to invest in light of the high number of red flags. In 2007, hedge fund investment adviser Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff. Aksia identified the following concerns:

(a) Madoff's auditor, F&H, was a three-person accounting firm located in a 13-by-18 foot office in New City, New York. A financial institution of the size of BLMIS is typically audited by a big-four accounting firm, or other larger and more reputable auditor. In addition, while F&H purportedly audited BLMIS, F&H filed annual forms with the AICPA attesting that it had not performed audits for the past fifteen years;

(b) The comptroller of BLMIS was based in Bermuda. Most mainstream hedge fund investment advisers have their comptroller in-house; and

(c) BLMIS had no outside clearing agent that could confirm its trading activity.

143.    Société Générale ("SocGen") also concluded that Madoff was not legitimate after sending its own due diligence team to New York in 2003.  As reported by *The New York Times* on December 17, 2008, in an article entitled, *European Banks Tally Losses Linked To Fraud*, SocGen's due diligence "was conducted by three people who visited Mr. Madoff's headquarters in the red-granite skyscraper on Third Avenue in Manhattan."  The bankers concluded that "something wasn't right. … It's a strategy that can lose sometimes, but the monthly returns were almost all positive."

144.    Acorn Partners ("Acorn"), an investment advisory firm, also concluded that the steadiness of the returns that Madoff reported did not make sense, and that the size of Madoff's auditor raised serious concerns. According to Robert Rosenkranz, a principal at Acorn, "[o]ur due diligence, which got into both account statements of his customers and the audited statements of Madoff Securities which he filed with the SEC, made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."[6]

145.    Jeffrey S. Thomas, chief investment officer at Atlantic Trust, which manages $13.5 billion, said that on several occasions over the years it had "reviewed and declined to invest with Madoff."  In studying where to place its clients' funds, the firm said it spotted a number of "red flags" in Madoff's operation.  Chief among those was a lack of an outside firm to handle trades and accounting for the funds, and the inability to document how Madoff made profits.

## V.    JURISDICTION AND VENUE

146.    This Court has jurisdiction over the Exchange Act claims asserted herein pursuant

---

[6]    *Look at Wall St. Wizard Finds Magic Had Skeptics*, N.Y. Times, Dec. 12, 2008.

to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

147.    This Court has jurisdiction over the state law claims pursuant to

(a)    the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"). With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount of $5,000,000, and (ii) the Class consists of hundreds, and perhaps thousands of individuals, and (iii) at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of New York.; and

(b)    the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a).

148.    The exercise of personal jurisdiction over the defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the defendants sued under New York law had sufficient minimum contacts with New York.

149.    Venue in this judicial District is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District.    Additionally, defendants maintain offices and conduct substantial business in this District.

### A.    THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EXCHANGE ACT

#### 1.    Defendants Purposefully Availed Themselves of the Benefits of Having Plaintiffs and the Class Invest in the United States; It Was Forseeable That Defendants Would Be Haled Into Court In The United States

150.    The Offering Memoranda explained that the Primeo Funds were to be invested "primarily in the United States."   The sole purpose of investing in the Primeo Funds was to invest in the United States and in United States equities that are part of the S&P 100 index.

Indeed, as of December 31, 2007, 97.5% of the Primeo Select Fund and 54.76% of the Primeo Executive Fund were invested in the Herald USA Funds, another Madoff feeder fund – the name of which, itself, denotes a U.S.-based investment. The remainder of the Primeo Executive Fund was invested in the Alpha Prime Equity Hedge Fund, also a Madoff feeder fund. Thus, the Funds were 100% invested with Madoff in New York, supposedly in U.S. securities. The 2007 OM, and every other offering memorandum, in sum or substance, said:

> The Sub-Manager invests **primarily in the United States** and utilizes a non-traditional strategy that is a variation of the traditional 'option conversion' strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares). The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:
>
> (a) **purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks**, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;
>
> (b) **selling out-of-the-money S&P 100 Index call options** representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and
>
> (c) **purchasing out-of-the-money or at-the-money S&P Index put options** in the same dollar amount.

(2007 OM, at 8, 9; emphasis added).

151.    Defendants, as well as Plaintiffs and the Class, thus understood that the Primeo Funds were to be invested in the United States, because that is precisely what the Offering Memoranda said. All significant conduct (including trading and due diligence on Madoff) was to take place in New York. Although the Offering Memoranda said that the adviser had the "discretion to select different Managers" (*see, e.g.*, 2007 OM, at  8, 9), and thus different

investment strategies, the managers had agreed to use one sub-manager – Madoff – who used exclusively a "split-strike conversion" strategy involving U.S. securities.

152.     Further, in creating a fund whose sole objective was to invest in the United States, defendants took advantage of the exemplary reputation of the laws and securities markets of the United States as being the best regulated and most efficient markets in the world.   Indeed, the Offering Memoranda represented that investments were subject to United States tax laws. Having benefited from the advantages of the United States, they cannot now seek to disavow the concomitant obligations which include being subject to the laws of the United States.

153.     Accordingly, all defendants availed themselves of the benefits and privileges of investing in the United States, pursuant to its laws and regulations.   It was foreseeable that, having chosen to operate an investment fund that was invested "primarily" in the United States, defendants would be haled into court in the United States.

> **2.     The Conduct and Effects Tests Are Both Met**
>
> > **(a)     Defendants' Conduct in the United States Was "More Than Merely Preparatory," and the "Culpable Failures to Act Within the United States Directly Caused the Losses"[7]**
> >
> > > **(i)     The Medici Defendants Had Substantial Conduct in the United States That Was More Than Merely Preparatory and Directly Caused the Losses**

154.     Bank Medici and  Bank Austria had offices located in New York City.

155.     Bank Medici, through its founder, chairperson, and 75% owner, Sonja Kohn, met with Madoff in his offices in New York City numerous times to discuss the Primeo Funds' investments.   Indeed, according to a February 19, 2009 article on Bloomberg, entitled "Sonja Kohn Wooed Bernard Madoff Billions With Medici 'Fantasy,'" Kohn introduced executives

---

[7]     *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 171 (2d Cir. 2008).

from Bank Austria to Madoff in 1994, the year the Primeo Funds were created. More recently, according to Madoff's calendar, Kohn met with Madoff in his offices in New York City on the following dates, among others: August 23, 2005; March 27, 2006; October 31, 2006; November 26, 2007; and September 23, 2008.

156. Kohn's meetings with Madoff in New York were part of Bank Medici's due diligence on Madoff, as sub-manager and sub-custodian of the Primeo Funds. According to a February 1, 2009 Bloomberg article, entitled, "Madoff's Well-Treated Feeder Funds Suspected Shady Trades But Backed Off," the due diligence accomplished during these meetings was limited:

> The feeders were the gatekeepers, and they qualified for royal treatment. A money manager for a family office recalls accompanying Sonja Kohn, whose Vienna-based Bank Medici funneled $3.2 billion to Madoff, to a meeting with Madoff in New York in 1991.
>
> He says Madoff treated her as if she were the Queen of England. The money manager also says Madoff wouldn't answer any questions about his strategy.

157. On July 3, 2009, the *Wall Street Journal* reported that U.S. and British prosecutors had alleged that Kohn was paid more than $40 million in kickbacks for funneling $3.5 billion in investments to Madoff from funds she controlled. Specifically, prosecutors alleged that two companies "owned by Sonja Kohn personally," Infovaleur and Erko, Inc., had received $32 million and £7, respectively. Infovaleur is a New York corporation and, at all relevant times, was located at 767 Fifth Avenue, in New York City. Similarly, in a June 2009 article entitled "The Madoff Chronicles, Part II: What the Secretary Saw," written by both Mark Seal and Madoff's secretary, Eleanor Squillari, Ms. Squillari states that Kohn "was always thrilled to meet with Bernie, and always sent in staggering quarterly invoices – never less than

"$800,000 – for her commissions."

158.    Defendant BA Worldwide Fund Management Ltd., the adviser of the Primeo Funds until April 25, 2007, also met with Madoff in New York.  Defendant Radel-Leszczynski, who was President and CEO of WWF, met with Madoff in his offices in New York City on the following dates, among others, according to Madoff's calendar: December 6, 2005; May 9, 2006; October 23, 2006; March 19, 2007; October 30, 2007; May 20, 2008; and September 29, 2008. Additionally, according to a June 17, 2009 article in *der Standard*, entitled, "FMA Shows at Bank Austria," a former manager of WWF visited Madoff twice a year since at least 2000, sometimes alone and sometimes with others from WWF, including Werner Kretschmer, Stefan Zapotocky, and Wilhelm Hemetsberger.  "The latter," according to the former manager, "had once interviewed Madoff extensively.  Every question had been answered fully and satisfactorily."

159.    Accordingly, the Medici Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.  As set forth in detail herein, the due diligence conducted in New York did not meet the adequate standard of care, and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Plaintiffs' losses.

> **(ii)    The Fund, Its Directors, and Pioneer Had Substantial Conduct in the United States That Was More Than Merely Preparatory and Directly Caused the Losses**

160.    Pioneer has offices located at 535 Fifth Avenue, 24th Floor in New York City. Pioneer at all times owned the Primeo Funds, and managed the Primeo Funds through its wholly-owned subsidiary, PIM, which became adviser of the Primeo Funds on April 25, 2007.  Upon information and belief, Pioneer conducted due diligence on Madoff from its offices in New York

City. According to the Primeo Funds' marketing materials, Pioneer Funds Distributor, Inc., located at 60 State Street, Boston, Massachusetts, was "a U.S.-registered broker-dealer" which "provide[d] marketing services in connection with the distribution of Pioneer Alternative Investments products," including the Primeo Funds.

161. The Primeo Funds, through one of its directors, Defendant Radel-Leszczynski, met with Madoff in his offices in New York City numerous times to discuss the Primeo Funds' investments. Specifically, according to Madoff's calendar, Radel-Leszczynski met with Madoff in his offices in New York City on the following dates, among others: April 22, 2005; December 6, 2005; May 9, 2006; October 23, 2006; March 19, 2007; October 30, 2007; May 20, 2008; and September 29, 2008. Dr. Radel-Leszczynski's meetings with Madoff in New York were part of the Primeo Funds' due diligence on Madoff, as sub-manager and sub-custodian of the Funds.

162. Additionally, at all relevant times, the Primeo Funds maintained an account with BLMIS in New York, through the Funds' Custodians, which was designated account 1FN092 (the "Primeo Account"). The Primeo Account was opened on or about March 1, 1996 when a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") were executed and delivered to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York. The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.

163. The Customer Agreement signed by BLMIS and the Primeo Funds states that all transactions are subject to the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System and the Commodities Futures Trading Commission, and all laws of the United States. The Primeo

Funds voluntarily made transactions with BMLIS subject to these laws.

164. Accordingly, the Funds, its Directors, and Pioneer conducted activities in New York which (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused Plaintiffs' losses. In particular, the Funds, its Directors, and Pioneer conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.

**(iii)    The HSBC Defendants Had Substantial Conduct in the United States That Was More Than Merely Preparatory and Directly Caused the Losses**

165. HSBC and HSBC Luxembourg consistently wired funds, for the benefit of the Primeo Funds, directly into BLMIS' account at JPMorgan Chase & Co. in New York, New York, Account No. 000000140081703 (the "BLMIS Bank Account"). Specifically, between April 1, 2004 and the date of Madoff's arrest, HSBC and HSBC Luxembourg invested $370,483,000 with BLMIS through 86 separate wire transfers to the BLMIS Bank Account.

166. According to the Primeo Funds' Subscription Agreement, investments in the Funds which were made in U.S. currency were required to be wired to HSBC at "HSBC BANK USA, New York, United States of America." HSBC Bank USA was the entry point for all U.S. dollar investments, regardless of the origin of the investment, and even though banks across the world accept dollar deposits, including foreign HSBC affiliates. HSBC Luxembourg was the beneficiary of an account for these purposes with HSBC Bank USA, Inc.

167. The principal executive offices of HSBC Bank USA are located at 452 Fifth Avenue, New York, New York. HSBC Bank USA operates over three hundred branches in New York. HSBC Bank acted in New York for the benefit of, on behalf of, and with the knowledge and consent of, HSBC Luxembourg.

168. Further, representatives of HSBC Holdings plc met with Madoff, repeatedly, in New York in 2008. Specifically, Brian Pettitt, Head of HSBC Securities Services Network Management, met with Madoff in his office in New York City on February 21, 2008 and November 19, 2008, according to Madoff's calendar. HSBC Securities Services is a division of HSBC. HSBC's Web site explains that HSBC Securities Services "provides custody and administration services to institutional fund managers." The HSBC Defendants are being sued in this action in connection with precisely these same administrative and custodial functions. The Web site further states that HSBC Securities Services provides services in over fifty countries, indicating that the HSBC Defendants here are legal entities that form part of the HSBC Securities Services division.

169. A January 2007 article in a publication called Financial Services Research, which mentions both Mr. Pettitt and HSBC Securities Services, places the type of due diligence which HSBC would have conducted on the Primeo Funds squarely within his division's responsibility:

> Since the HSBC Group's acquisition of the Bank of Bermuda in February 2004, [HSBC Securities Services] has encountered the ***new challenge of conducting risk assessments on prime brokers*** whose hedge fund clients use [HSBC Securities Services'] Alternative Fund Services as their hedge fund administrator. "Given that the prime broker [*i.e.*, Madoff] is typically appointed by the hedge fund [*i.e.*, the Primeo Funds], many prime brokers struggle to understand why they should be subject to due diligence by a global custodian," notes Mick Underwood [Head of Custody Network Management at HSBC].

(Emphasis added.)

170. Thus, HSBC (through Mr. Pettitt) met with Madoff, in New York, to perform precisely the due diligence that is at issue in this action.

171. Accordingly, the HSBC Defendants conducted activities in New York which (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly

caused Plaintiffs' losses. In particular, the HSBC Defendants conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.

(b)    <strong>Effects Test: Defendants' Conduct Had a Substantial Effect In the United States</strong>

172. According to the SIPC Trustee, Madoff's Ponzi scheme caused investors to believe they had approximately $65 billion in assets when in reality those assets did not exist. Billions of dollars of these fictitious assets caused substantial harm to thousands of United States citizens whose supposed wealth evaporated overnight. This wealth had served to collateralize investments and assets of thousands of United States citizens who had to liquidate these assets and suffered real losses.

173. Defendants' wrongful conduct permitted Madoff to perpetuate his Ponzi scheme. The nature of a Ponzi scheme required that Madoff use the funds from new investors to pay old ones. The Primeo Funds provided Madoff with billions of dollars to continue his Ponzi scheme. But for the billions of dollars that the Primeo Funds gave to Madoff, the scheme would have unraveled substantially earlier and not damaged thousands of United States citizens. Similarly, but for the withdrawal of hundreds of millions of dollars from Madoff in the later years of his Ponzi scheme which were effectively taken from United States citizens, substantially fewer United States citizens would have been harmed by Madoff's Ponzi scheme. The Primeo Funds would not have invested with Madoff but for Defendants' wrongful conduct.

174. The effect of the feeder funds in perpetuating Madoff's Ponzi scheme has been widely reported in the press. According to the *Wall Street Journal*'s article, "Mad Men," published on January 7, 2009, "[f]eeder funds appear to explain [] the longevity of money manager Bernie Madoff." Other news agencies issued similar reports:

(a)     *Time Magazine* published an article entitled, "How Madoff's Feeder Funds Stole My Retirement," which noted, "Bernard Madoff built his $65 billion Ponzi empire at least half on the backs of his feeder funds."[8]  The feeder funds allowed Madoff "to keep his house of cards standing much longer than he otherwise could have with his ragtag band of family members, small time accountants," according to the same article.

(b)     *The New York Times* published an article entitled, "In Fraud Case, Middlemen in Spotlight," which reported that the feeder funds "were essentially pouring billions of dollars each into Bernard L. Madoff Investment Securities."[9]

175.    Madoff's Ponzi scheme had additional substantial and direct effects on U.S. citizens:

(a)     It is estimated that the Internal Revenue Service ("IRS") will lose up to $17 billion in lost tax revenue.  In some instances, the IRS may have to refund filers who paid taxes on fictitious gains from Madoff.  Individual states may also lose substantial tax revenue due to Madoff.[10]

(b)     The effect of Madoff on U.S. charities and their respective beneficiaries is substantial and well-documented.  The collateral effect of Madoff's Ponzi scheme has sent "shock waves throughout the medical and scientific communities – with far-reaching implications for everything from diabetes research to palliative care.  Philanthropy experts say that ***the negative effect of the Madoff***

---

[8]     *How Madoff's Feeder Funds Stole My Retirement*, Time, Apr. 5, 2009.
[9]     *In Fraud Case, Middlemen in Spotlight*, N.Y. Times, Dec. 17, 2008.
[10]    *Madoff's Ponzi Scheme Could Cost IRS $17 Billion In Tax Revenue*, Huffington Post, Dec. 18, 2008.

*scandal on health care could ultimately affect millions of people*."[11]  As a result, "hospitals, food banks, schools and community outreach programs throughout the world are being forced to cut life-giving services as they watch millions of dollars in grants from large Jewish charities dry up in the wake of Bernard Madoff's alleged $50 billion Ponzi scheme.[12]

(c)     The insurance industry has reported that it will be affected by Madoff's scheme in the "range of direct insured losses … between $760 million and $3.8 billion … with the maximum potential exposed insurance limits at more than $6 billion."[13]

(d)     United States banks have also been affected by Madoff, including lending institutions, like Wells Fargo, who recently recorded losses of $294 million related to customers who were unable to pay their mortgages because they were wiped out by Madoff.[14]  Similarly, hedge funds have seen substantial redemptions: "The Madoff scandal has contributed to redemptions that could shrink the hedge fund industry by half, to $1 trillion, by the end of the year."[15] and

(e)     Investors who suffered enormous losses at the hands of Madoff included, "pensioners, municipal workers, students on scholarship, and middle class

---

[11]     *Madoff Scandal's Deep Impact on Funding For Health, Science*, Wall St. J., Feb. 12, 2009 (emphasis added).
[12]     *Long Tentacle of Madoff's Scheme Impacting Life-Giving* Programs, Fox News, Dec. 18, 2008.
[13]     *Aon Estimates Madoff's Alleged Ponzi Scheme Could Cost Insurers Billions,* Medill Reports, Jan. 15, 2009.
[14]     *Wells Fargo Says Madoff Scheme Cost It $294 Million*, N.Y. Times, Jan. 28, 2009.
[15]     *Hedge Fund Industry Still Feeling Madoff* Effect, Reuters, Mar. 27, 2008.

Americans, not just wealthy investors."[16]

176.    Accordingly, defendants' wrongful conduct had a substantial effect in the United States and upon United States citizens.

**B.    THE COURT HAS SUPPLEMENTAL JURISDICTION PURSUANT TO 28 U.S.C. § 1367(a)**

177.    As alleged herein, this Court has primary jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d)(2).  Should the Court find that it lacks primary jurisdiction over any claim, it may exercise supplemental jurisdiction over that claim pursuant to 28 U.S.C. § 1367(a), as such a claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."

## VI.    CLASS ACTION ALLEGATIONS

178.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of the Primeo Funds on December 10, 2008, or (ii) purchased shares of the Primeo Funds from January 12, 2004 to December 12, 2008[17] (the "Class Period"), and were damaged thereby due to the wrongful conduct alleged in this Complaint (the "Class").  Excluded from the Class are the defendants; any entity in which defendants have a controlling interest; and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

179.    The Class is so numerous that joinder of all members is impracticable.

---

[16]    *Did Bernie Madoff Steal Your Money?* Newsweek, Dec. 17, 2008.

[17]    According to a letter issued by the Primeo Funds to investors on December 17, 2008, the Funds "suspend[ed] … the issue and redemption of shares in the Primeo Select Fund and the Primeo Executive Fund from 17.00 (GMT) on 12 December 2008."

Although the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds and perhaps thousands.

180.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are a member of the Class, his claims are typical of the claims of all Class members, and he does not have interests antagonistic to, or in conflict with, those of the Class.  In addition, Plaintiffs have retained competent counsel experienced in class action litigation.

181.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal and common law.

182.    There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the common law was violated by defendants' acts as alleged herein;

(c)    whether defendants' conduct alleged herein was intentional, reckless, grossly negligent, or negligent in violation of duties owed to Plaintiffs and the Class and, therefore, in violation of the common law;

(d)    whether the Court has personal and subject matter jurisdiction over defendants; and

(e)    whether, and to what extent, Plaintiffs and the Class were damaged.

183.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

## COUNT 1

### BREACH OF FIDUCIARY DUTY AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS

184. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Medici Defendants, Pioneer, the Funds, the Director Defendants, and the Advisers for breach of fiduciary duty pursuant to New York law.

185. Plaintiffs and the Class entrusted their assets to the defendants named in this Count by investing in the Primeo Funds and reposed confidence in them with respect to the management of those assets. The defendants named in this Count were in a superior position as to the management and control of those assets, in their capacities as advisers, their parent and selling agent, the directors of the Funds, and the Funds themselves, and in a superior position to manage, control, and oversee Madoff. As a result, Plaintiffs and the Class placed their trust and confidence in the defendants named in this Count.

186. The defendants named in this Count accepted that repose of trust and confidence and held themselves out as providing superior client investment services and as having policies and procedures in place to ensure that:

(a) the sub-manager for the Primeo Funds (*i.e.*, Madoff) would follow the Primeo Funds' policies and investment guidelines;

(b)     sufficient operational controls were in place to safeguard Plaintiffs' and the Class' assets; and

(c)     transactions would be properly conducted.

187.    Plaintiffs and the Class reasonably and forseeably trusted the purported expertise and skill of the defendants named in this Count.

188.    The defendants named in this Count therefore owed a fiduciary duty to Plaintiffs and the Class with respect to the management, oversight, and protection of Plaintiffs' and the Class' assets invested in the Primeo Funds.

189.    In accordance with their fiduciary duties to Plaintiffs and the Class, the defendants named in this Count were obligated to:

(a)     deal fairly and honestly with Plaintiffs and the Class;

(b)     act with loyalty and good faith towards Plaintiffs and the Class;

(c)     manage and operate the investments of Plaintiffs and the Class exclusively for the best interest of Plaintiffs and the Class;

(d)     make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk and instruction of Plaintiffs and the Class; and

(e)     oversee the investment of Plaintiffs' and the Class' assets to confirm they were maintained in a prudent and professional manner.

190.    The defendants named in this Count breached their fiduciary duties to Plaintiffs and the Class by:

(a)     failing to act with reasonable care to ensure that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with

their investment goals and intentions;

(b)     failing to perform adequate due diligence before allowing Madoff to serve as the sub-manager for the Primeo Funds;

(c)     failing to invest Plaintiffs' and the Class' assets with adequate diligence or monitoring;

(d)     failing to monitor Madoff on an ongoing basis to any reasonable degree;

(e)     failing to take adequate steps to confirm BLMIS's purported account statements, transactions, and holdings of the Primeo Funds' assets;

(f)     failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds;

(g)     profiting and allowing their affiliates to unlawfully profit at the expense of Plaintiffs and the Class; and

(h)     engaging in transactions that were designed to and did result in a profit to defendants named in this Count at the expense of Plaintiffs and the Class.

191.     As a result of the defendants named in this Count's breaches of their fiduciary duties, Plaintiffs and the Class have lost all, or substantially all, of their respective investments in the Primeo Funds.

192.     As a result of the defendants named in this Count's breaches of their fiduciary duties, Plaintiffs and the Class have been forced to pay excessive investment, performance, and management fees in exchange for investment services that were never provided.

193.     The damages suffered by Plaintiffs and the Class were a direct and foreseeable result, proximately caused by the defendants named in this Count's breaches of their fiduciary duties.

194. By reason of the foregoing, the defendants named in this Count are jointly and severally liable to Plaintiffs and the Class.

195. As a result of the defendants named in this Count's breaches of their fiduciary duties, Plaintiffs and the Class have suffered damages with respect to their investments in the Primeo Funds in an amount to be determined at trial.

## COUNT 2

### GROSS NEGLIGENCE AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS

196. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Medici Defendants, Pioneer, the Funds, the Director Defendants, and the Advisers for gross negligence pursuant to New York law.

197. The defendants named in this Count had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets invested in the Primeo Funds and in the selection and monitoring of the sub-manager (*i.e.*, Madoff) for the Primeo Funds.

198. This special relationship arose from, among other things, the following:

(a) the sub-manager was responsible for executing trading activities on behalf of the Primeo Funds under the direction of Pioneer and the Advisers; and

(b) the defendants named in this Count agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom they entrusted the investment assets of the Primeo Funds.

199. The defendants named in this Count grossly failed to exercise due care, and acted in disregard of their duties, and thereby injured Plaintiffs and the Class.

200.    The defendants named in this Count grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

201.    The defendants named in this Count grossly failed to:

(a)    perform necessary and adequate due diligence before allowing Madoff to serve as the sub-manager for the Primeo Funds;

(b)    monitor Madoff on an ongoing basis to any reasonable degree;

(c)    take adequate steps to confirm Madoff's purported account statements, transactions and holdings of the Primeo Funds' assets;

(d)    take reasonable steps to ensure that the investments of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(e)    take reasonable steps to preserve the value of Plaintiffs' and the Class' investments; and

(f)    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

202.    If the defendants named in this Count had not been grossly negligent with respect to Plaintiffs' and the Class' assets invested in the Primeo Funds, the defendants named in this Count would not have entrusted Plaintiffs' and the Class' assets invested in the Primeo Funds to Madoff.

203.    As a direct and proximate result of the defendants named in this Count's gross negligence with respect to Plaintiffs' and the Class' assets invested in the Primeo Funds, Plaintiffs and the members of the Class have lost all, or substantially all, of their investment in

the Primeo Funds.

204.    By reason of the foregoing, the defendants named in this Count are jointly and severally liable to Plaintiffs and the Class in an amount to be determined at trial.

**COUNT 3**

**NEGLIGENCE AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS**

205.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Medici Defendants, Pioneer, the Funds, the Director Defendants, and the Advisers for negligence pursuant to New York law.

206.    The defendants named in this Count had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets invested in the Primeo Funds and in the selection and monitoring of the sub-manager (*i.e.*, Madoff) for the Primeo Funds.

207.    This special relationship arose from, among other things, the following:

(a)    the sub-manager was responsible for executing trading activities on behalf of the Primeo Funds under the direction of Pioneer and the Advisers; and

(b)    the defendants named in this Count agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom they entrusted the investment assets of the Primeo Funds.

208.    The defendants named in this Count failed to exercise reasonable due care, and acted in disregard of their duties, and thereby injured Plaintiffs and the Class.

209.    The defendants named in this Count failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment

professional.

210.    The defendants named in this Count failed to:

(a)    perform necessary and adequate due diligence, before allowing Madoff to serve as the sub-manager for the Primeo Funds;

(b)    monitor Madoff on an ongoing basis to any reasonable degree;

(c)    take adequate steps to confirm Madoff's purported account statements, transactions, and holdings of the Primeo Funds' assets;

(d)    take reasonable steps to ensure that the investments of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(e)    take reasonable steps to preserve the value of Plaintiffs' and the Class' investments; and

(f)    exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

211.    If the defendants named in this Count had not been negligent with respect to Plaintiffs' and the Class' assets invested in the Primeo Funds, the defendants named in this Count would not have entrusted Plaintiffs' and the Class' assets invested in the Primeo Funds to Madoff.

212.    As a direct and proximate result of the defendants named in this Count's negligence with respect to Plaintiffs' and the Class' assets invested in the Primeo Funds, Plaintiffs and other members of the Class have lost all, or substantially all, of their investment in the Primeo Funds.

213.    By reason of the foregoing, the defendants named in this Count are jointly and

severally liable to Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 4

### UNJUST ENRICHMENT AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS

214.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Medici Defendants, Pioneer, the Funds, the Director Defendants, and the Advisers for unjust enrichment pursuant to New York law.

215.     Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that the defendants named in this Count obtained at the expense of Plaintiffs and the Class, and to which they were not entitled, including, but not limited to, those specified in the Offering Memoranda.  By way of example, the 2007 Financial Statements indicate that the following fees were received in 2006 and 2007:

> The adviser will receive a 2% asset based management fee expense with respect to the Primeo Select Fund.  The advisory fees amounted to USD 10,494,364 for Primeo Select Fund (2006: USD 8,953,352). The advisory agreement is automatically renewed and extended for successive one year periods.  From Primeo Select Fund the Adviser is also entitled to a performance fee of 20% calculated on any increase in the NAV per share in the current year which is greater than the current year target NAV (the highest prior year end NAV per share (inclusive of all fees) of the Sub-fund plus 10%).

> There were no performances fees payable by Primeo Select Fund for the year ended 31 December 2007 (2006: USD 143,600).

> Primeo Executive Fund will pay an advisory fee monthly equal to 1/12th of 1.50% of the month-end net asset value of the Fund (0.5% up to and including July 2006).  The advisory fees amounted to USD 900,255 for Primeo Executive Fund (2006: USD 365,987). Primeo Executive Fund shall also pay an annual performance fee of 5% of the annual appreciation in Net Asset Value.  The performance fee for Executive amounted to USD 169,430 as at 31 December 2007 (2006: USD 140,439).

(2007 FS, at 15).

216. Plaintiffs and the Class further base their unjust enrichment claim on the receipt or retention of commissions and other monies that the defendants named in this Count charged Plaintiffs and the Class at the time of investment in, switches between, or redemptions of shares in the Primeo Funds, and to which they were not entitled, including, but not limited to, the commissions authorized in, for example, the 2007 Offering Memorandum, as follows: "There is, except in special circumstances, a fee of three percent (3%) of the Net Asset Value per Participating Share to be paid for each subscription. Such commission is payable by the investor as an amount in addition to the price of the Participating Shares being subscribed for by such investor." (2007 OM, at 15).

217. The Director Defendants were unjustly enriched because they received unfair compensation for the performance of their duties as directors.

218. The defendants named in this Count were enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of commissions and other fees for their purported management of Plaintiffs' and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

219. Plaintiffs and the Class involuntarily conferred a benefit upon the defendants named in this Count without Plaintiffs and the Class receiving adequate benefit or compensation in return. The defendants named in this Count appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

220. Equity and good conscience require the defendants named in this Count to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

## COUNT 5

### IMPOSITION OF CONSTRUCTIVE TRUST AGAINST THE MEDICI DEFENDANTS, PIONEER, THE FUNDS, THE DIRECTOR DEFENDANTS, AND THE ADVISERS

221.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Medici Defendants, Pioneer, the Funds, the Director Defendants, and the Advisers for imposition of constructive trust pursuant to New York law.

222.    The defendants named in this Count had a fiduciary or confidential relationship with Plaintiffs and the Class.

223.    The defendants named in this Count agreed to manage Plaintiffs' and the Class' investment capital in the Primeo Funds in accordance with that fiduciary relationship.

224.    The defendants named in this Count were compensated by Plaintiffs and the Class, including by the receipt or retention of improperly calculated fees and other monies.

225.    The defendants named in this Count were unjustly enriched by the receipt or retention of monies, including management and performance fees that were predicated on fictitious profits, and other compensation.

226.    Plaintiffs and the Class are entitled to have a constructive trust imposed on the amount of all monies and other compensation in the possession of the defendants named in this Count, which relate to their fees or any other monies from Plaintiffs and the Class, the amount of which is yet to be determined.

## COUNT 6

### BREACH OF CONTRACT AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS

227.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not

part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against Pioneer, the Funds, and the Director Defendants for breach of contract pursuant to New York law.

228.    Plaintiffs and the Class had a contractual relationship with Pioneer, the Funds, and the Director Defendants, as evidenced by the Subscription Agreement, executed in connection with their investment in the Primeo Funds, which stated:  "I/we the undersigned hereby apply to subscribe for shares ("Shares") … as set out below at the applicable subscription price and in accordance with the terms and conditions of the most recent prospectus (the "Prospectus") relating to the offering of Shares in the Fund, copies of which documents the undersigned has/have received, duly read and understood."

229.    By virtue of the contractual relationship between the parties, Pioneer, the Funds, and the Director Defendants agreed that (i) Plaintiffs' and the Class' monies would be invested in legitimate enterprises with a potential for capital appreciation, and (ii) that the selection of investment managers such as Madoff was based on "careful" analysis which considered his "areas of expertise and judgment."

230.    These obligations were material terms of the agreement.

231.    These obligations were also fundamental assumptions of the agreement embraced by both Plaintiffs and the Class on the one hand, and Pioneer, the Funds, and the Director Defendants on the other.

232.    Plaintiffs and the Class fully performed their contractual obligations to Pioneer, the Funds, and the Director Defendants.

233.    Pioneer, the Funds, and the Director Defendants breached their contract with Plaintiffs and the Class.

234.    By reason of the foregoing, Pioneer, the Funds, and the Director Defendants are jointly and severally liable to Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 7

### THIRD PARTY BENEFICIARY CLAIM
### FOR BREACH OF CONTRACT AGAINST THE ADVISERS

235.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted on behalf of Plaintiffs and the Class as third-party beneficiaries to the contractual relationship existing between the Funds and the Advisers pursuant to New York law.

236.    The Primeo Funds entered into an Advisory Agreement with the Advisers.  For example, the April 25, 2007 Offering Memorandum stated that, "[p]ursuant to the Advisory Agreement, the Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund."  (2007 OM, at 11).

237.    Pursuant to the Advisory Agreement, the Advisers assumed the responsibility to fulfill certain contractual obligations as to the Primeo Funds for the intended immediate benefit of Plaintiffs and the Class.

238.    The Advisers breached the Advisory Agreement by committing the above-alleged misconduct, specifically including failing to:

(a)    ensure adherence to the Funds' investment policies and objectives;

(b)    monitor the Funds' investments;

(c)    conduct meaningful due diligence of Madoff;

(d)    meaningfully monitor and oversee Madoff, and

(e)    confirm with the counterparties and third-party custodians of U.S. Treasury Bills the existence of the assets.

239.     These contractual breaches resulted in significant losses to Plaintiffs and the Class, as described in this Complaint.

240.     The Advisers' breach of the Advisory Agreement injured Plaintiffs and the Class as third-party beneficiaries to that contract in an amount to be determined at trial.

## COUNT 8

## GROSS NEGLIGENCE AGAINST E&Y CAYMAN

241.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against E&Y Cayman for gross negligence pursuant to New York law.

242.     E&Y Cayman had a special relationship with Plaintiffs and the Class that gave rise to a duty of care.  E&Y Cayman issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in the Primeo Funds.  E&Y Cayman knew that the audit opinions about the Primeo Funds would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in the Primeo Funds in that, among other things, E&Y Cayman knew that Pioneer, the Funds, and the Director Defendants advised Plaintiffs and other members of the Class that it audited the Primeo Funds' financial statements and had given the Primeo Funds unqualified audit opinions.

243.     Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on E&Y Cayman to exercise such care as ordinarily exercised by auditors generally and as required by GAAS, ISA and other applicable auditing and accounting standards in conducting the audits of the Primeo Funds.

244.     E&Y Cayman was grossly negligent in knowingly failing to properly audit the Primeo Funds in accordance with GAAS, ISA and other applicable auditing and accounting

standards. E&Y Cayman nevertheless was grossly negligent in issuing unqualified audit opinions that the Primeo Funds' financial statements fairly represented the financial condition of the Funds.

245. E&Y Cayman acted with gross negligence by failing to conduct the requisite procedures concerning BLMIS. Among other things, E&Y Cayman failed to perform any procedures to gain an understanding of BLMIS's business pursuant to GAAS and ISA.

246. E&Y Cayman ignored numerous red flags surrounding Madoff. E&Y Cayman acted with gross negligence as to the consequences of the Primeo Funds' incorrect financial statements.

247. Had E&Y Cayman not acted with gross negligence, it would not have issued the unqualified audit opinions.

248. As a result of the gross negligence of E&Y Cayman, Plaintiffs and the Class have lost all, or substantially all, of their investment in the Primeo Funds.

## COUNT 9

## NEGLIGENCE AGAINST E&Y CAYMAN

249. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against E&Y Cayman for negligence pursuant to New York law.

250. E&Y Cayman had a special relationship with Plaintiffs and the Class that gave rise to a duty of care. E&Y Cayman issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in the Primeo Funds. E&Y Cayman knew that the audit opinions about the Primeo Funds would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in the Primeo Funds in that, among other

things, E&Y Cayman knew that Pioneer, the Funds, and the Director Defendants advised Plaintiffs and other members of the Class that it audited the Primeo Funds' financial statements and had given the Primeo Funds unqualified audit opinions.

251. Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on E&Y Cayman to exercise such care as ordinarily exercised by auditors generally and as required by GAAS, ISA and other applicable auditing and accounting standards in conducting the audits of the Primeo Funds.

252. E&Y Cayman was negligent in failing to properly audit the Primeo Funds in accordance with GAAS, ISA and other applicable auditing and accounting standards. E&Y Cayman nevertheless negligently issued unqualified audit opinions that the Primeo Funds' financial statements fairly represented the financial condition of the Funds.

253. E&Y Cayman acted negligently by failing to conduct the requisite procedures concerning BLMIS. Among other things, E&Y Cayman failed to perform any procedures to gain an understanding of BLMIS's business pursuant to GAAS and ISA.

254. E&Y Cayman ignored numerous red flags surrounding Madoff. E&Y Cayman acted with negligence as to the consequences of the Primeo Funds' incorrect financial statements.

255. Had E&Y Cayman not acted negligently, it would not have issued the unqualified audit opinions.

256. As a result of the negligence of E&Y Cayman, Plaintiffs and the Class have lost all, or substantially all, of their investment in the Primeo Funds.

# COUNT 10

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## AGAINST E&Y CAYMAN

257.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against E&Y Cayman for aiding and abetting breach of fiduciary duty pursuant to New York law.

258.    As the auditor of the Funds, E&Y Cayman was aware of the fiduciary duties owed by Pioneer, the Funds, and the Director Defendants to Plaintiffs and the Class as alleged above.  E&Y Cayman acted with willful blindness or recklessness in conducting its audits and is thus charged with constructive knowledge that:

a.  Pioneer, the Funds, and the Director Defendants had the discretion and control giving rise to a fiduciary duty of care to Plaintiffs and the Class;

b.  Pioneer, the Funds, and the Director Defendants occupied a superior position over Plaintiffs and the Class with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff and BMLIS;

c.  Pioneer's, the Funds', and the Director Defendants' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in them to fulfill their duties, and Plaintiffs and the Class did so by investing in the Funds;

d.  Pioneer, the Funds, and the Director Defendants held themselves out as providing superior client investment services, and evinced an understanding that they were the fiduciaries of the investors.  E&Y Cayman was further aware that Plaintiffs and the Class reasonably relied on such representations, and trusted in

Pioneer's, the Funds', and the Director Defendants' purported expertise and skill.

259. E&Y Cayman substantially assisted Pioneer, the Funds, and the Director Defendants by issuing "clean" audit reports on the Funds and failing to conduct proper independent audits of the Funds, including E&Y Cayman's failure to disclose that the representations made in the financial statements could not be relied upon.

260. As a direct result of (i) Pioneer's, the Funds', and the Director Defendants' breaches of their fiduciary duties and (ii) E&Y Cayman's aiding and abetting those breaches, Plaintiffs and the Class have suffered substantial damages.

## COUNT 11

## GROSS NEGLIGENCE, NEGLIGENCE, AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST E&Y GLOBAL

261. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against E&Y Global for gross negligence, negligence, and aiding and abetting breach of fiduciary duty pursuant to New York law.

262. E&Y Cayman, in the conduct of its audits of the Primeo Funds' financial statements, was performing the duties expected and provided for by E&Y to its audit clients.

263. E&Y's 2009 Annual Report, entitled "Global Annual Review," states that "Ernst & Young refers to the global organization of member firms of Ernst & Young Global Limited." (Global Annual Review, at 40).

264. As all hierarchical entities with centralized control, E&Y has one Chairman and CEO, James S. Turley, and member firms have obligations to E&Y.

265. The Global Annual Review further confirms that the network is structured like a

corporation. According to the Global Annual Review, "Our **global organization and its management and governance structures** are vital elements to delivering on our promise to stakeholders and clients and achieving our strategy of market leadership. We have centered these structures on two guiding principles: separating management and governance roles; and **operating Ernst & Young as a global business with one shared strategy, led and overseen by a single management team.**" (Global Annual Review, at 35).

266. Four governance bodies (the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council) provide a global governance structure that is housed within E&Y Global. In effect, the E&Y member firms (including E&Y Cayman) act as agents of E&Y Global.

267. By virtue of E&Y Global's control, directly or indirectly through the Global Executive, Global Executive Committees, Global Practice Group, and Global Advisory Council, over its member firms (including E&Y Cayman), E&Y Global is liable for the gross negligence or negligence, and aiding and abetting breach of fiduciary duty, of E&Y Cayman.

## COUNT 12

## BREACH OF FIDUCIARY DUTY AGAINST THE ADMINISTRATOR

268. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Administrator for breach of fiduciary duty pursuant to New York law.

269. In providing administrative services to the Primeo Funds, the Administrator was responsible for accounting, registrar, and transfer services, including reporting the Primeo Funds' NAV. The Administrator occupied a superior position over Plaintiffs and the Class because it had superior access to confidential information about Madoff's

purported investments, including the purported location, security, and value of the purported assets.

270.    The Administrator held itself out as providing superior administrative services to financial firms.  Specifically, the Administrator held itself out, in its role as administrator, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to calculate the NAV reported to investors on a monthly basis.

271.    The Administrator charged a premium for its administration of the Primeo Funds.

272.    The Administrator's superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Administrator to fulfill its duties, and Plaintiffs and the Class did so by investing and continuing to invest in the Primeo Funds.

273.    The Administrator accepted Plaintiffs' and the Class' repose of trust and confidence.

274.    Plaintiffs and the Class reasonably and foreseeably trusted the Administrator's purported expertise and skill, and the Administrator recognized that Plaintiffs and the Class would rely on and repose their trust in the Administrator when deciding to invest and retain their investments in the Primeo Funds.

275.    The Administrator's superior position over Plaintiffs and the Class gave rise to a fiduciary duty and duty of care on the part of the Administrator to Plaintiffs and the Class, who invested in the Primeo Funds.

276.    The Administrator breached its fiduciary duties to Plaintiffs and the Class by, *inter alia*, failing to discharge properly its responsibilities as administrator, including the

calculation of the NAVs and review of information provided by Madoff.

277. Plaintiffs and the Class have been damaged as a proximate result of the Administrator's breach of fiduciary duties.

**COUNT 13**

**<u>GROSS NEGLIGENCE AGAINST THE ADMINISTRATOR</u>**

278. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Administrator for gross negligence pursuant to New York law.

279. In providing administrative services to the Primeo Funds, the Administrator had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

280. The Administrator's duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to calculate the Primeo Funds' NAV reported to investors on a monthly basis.

281. The Administrator knew or was reckless in not knowing that Plaintiffs and the Class were relying on it to exercise reasonable care in providing its services to the Primeo Funds, and Plaintiffs and the Class did reasonably and foreseeably rely on the Administrator to exercise such care by investing and continuing to invest in the Primeo Funds.

282. The Administrator was grossly negligent in its duties as administrator. The Administrator relied, with gross negligence, on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Plaintiffs and the Class without scrutiny, verification, confirmation, or review of the information. The Administrator was obligated to scrutinize, verify, confirm or review independently the information it was providing in

calculating the NAV, but grossly failed to do so. The Administrator grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

283.    The Administrator was not entitled to rely on the information provided by Madoff because of the red fags surrounding Madoff; the consolidation of the role of investment manager, custodian and execution agent in Madoff; and because the information was manifestly incorrect.

284.    Plaintiffs' and the Class' investment in the Primeo Funds has been completely, or substantially, lost, and, thus, Plaintiffs and the Class have been damaged as a proximate result of the Administrator's gross negligence.

## COUNT 14

## <u>NEGLIGENCE AGAINST THE ADMINISTRATOR</u>

285.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Administrator for negligence pursuant to New York law.

286.    In providing administrative services to the Primeo Funds, the Administrator had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

287.    The Administrator's duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to calculate the NAV reported to investors on a monthly basis.

288.    The Administrator knew or was reckless in not knowing that Plaintiffs and the Class were relying on it to exercise reasonable care in providing its services to the Primeo

Funds, and Plaintiffs and the Class did reasonably and foreseeably rely on the Administrator to exercise such care by investing and continuing to invest in the Primeo Funds.

289.    The Administrator was negligent in its disregard for its duties as administrator of the Primeo Funds.  The Administrator negligently relied on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Plaintiffs and the Class without scrutiny, verification, confirmation, or review of the information.  The Administrator failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

290.    The Administrator was not entitled to rely on the information provided by Madoff because of the red flags surrounding Madoff; the consolidation of the role of investment manager, custodian and execution agent in Madoff; and because the information was manifestly incorrect.

291.    Plaintiffs' and the Class' investment in the Primeo Funds has been completely, or substantially, lost, and, thus, Plaintiffs and the Class have been damaged as a proximate result of the Administrator's negligence.

## COUNT 15

## BREACH OF FIDUCIARY DUTY AGAINST THE CUSTODIANS

292.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians for breach of fiduciary duty pursuant to New York law.

293.    In providing custodial services to the Primeo Funds, the Custodians were responsible for acting with reasonable skill, care, and diligence in the appointment and monitoring of BLMIS, and were responsible for the periodic oversight of BLMIS in connection

with the custody of the assets of the Primeo Funds.

294.    The Custodians held themselves out as providing superior custodial services to financial firms.  Specifically, the Custodians held themselves out, in their role as custodians, as part of HSBC, one of the world's largest financial institutions, with an obligation, among other things, to monitor and oversee the custody of assets held by entities other than the Custodians.

295.    The Custodians charged a premium for their custodial services to the Primeo Funds.

296.    The Custodians' superior position necessitated that Plaintiffs and the Class repose their trust and confidence in the Custodians to fulfill their duties, and Plaintiffs and the Class did so by investing and continuing to invest in the Primeo Funds.

297.    The Custodians accepted Plaintiffs' and the Class' repose of trust and confidence.

298.    Plaintiffs and the Class reasonably and foreseeably trusted the Custodians' purported expertise and skill, and the Custodians recognized that Plaintiffs and the Class would rely on and repose their trust in the Custodians when deciding to invest and retain their investments in the Primeo Funds.

299.    The Custodians' superior position over Plaintiffs and the Class gave rise to a fiduciary duty and duty of care on the part of the Custodians to Plaintiffs and the Class, who invested in the Primeo Funds.

300.    The Custodians breached their fiduciary duties to Plaintiffs and the Class by, *inter alia*, failing to discharge properly their responsibilities as custodians, including the oversight and supervision of BLMIS in holding the assets of the Primeo Funds.

301.    Plaintiffs and the Class have been damaged as a proximate result of the

Custodians' breach of fiduciary duties.

## COUNT 16

## <u>GROSS NEGLIGENCE AGAINST THE CUSTODIANS</u>

302.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians for gross negligence pursuant to New York law.

303.    In providing custodial services to the Primeo Funds, the Custodians had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of their duties.

304.    The Custodians' duty of care to Plaintiffs and the Class was based on and arose from, among other things, their duty to oversee and monitor BLMIS's custody of the assets of the Primeo Funds.

305.    The Custodians knew or were reckless in not knowing that Plaintiffs and the Class were relying on them to exercise reasonable care in providing their services to the Primeo Funds, and Plaintiffs and the Class did reasonably and foreseeably rely on the Custodians to exercise such care by investing and continuing to invest in the Primeo Funds.

306.    The Custodians were grossly negligent in their duties as custodians.  The Custodians were grossly negligent in failing to oversee and monitor whether BLMIS held the assets of the Primeo Funds.  The Custodians were obligated to act with reasonable skill, care, and diligence in their oversight and supervision of BLMIS, but grossly failed to do so.  The Custodians grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

307.    Plaintiffs' and the Class' investment in the Primeo Funds has been completely,

or substantially, lost and, thus, Plaintiffs and the Class have been damaged as a proximate result of the Custodians' gross negligence.

## COUNT 17

## NEGLIGENCE AGAINST THE CUSTODIANS

308.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians for negligence pursuant to New York law.

309.    In providing custodial services to the Primeo Funds, the Custodians had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of their duties.

310.    The Custodians' duty of care to Plaintiffs and the Class was based on and arose from, among other things, their duty to oversee and monitor BLMIS's custody of the assets of the Primeo Funds.

311.    The Custodians knew or were reckless in not knowing that Plaintiffs and the Class were relying on the Custodians to exercise reasonable care in providing their services to the Primeo Funds, and Plaintiffs and the Class did reasonably and foreseeably rely on the Custodians to exercise such care by investing and continuing to invest in the Primeo Funds.

312.    The Custodians were negligent in their duties as custodians.  The Custodians were negligent in failing to oversee and monitor whether BLMIS held the assets of the Primeo Funds.  The Custodians were obligated to act with reasonable skill, care, and diligence in their oversight and supervision of BLMIS, but negligently failed to do so.  The Custodians negligently failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

313.    Plaintiffs' and the Class' investment in the Primeo Funds has been completely, or substantially, lost, and, thus, Plaintiffs and the Class have been damaged as a proximate result of the Custodians' negligence.

## COUNT 18

### UNJUST ENRICHMENT AGAINST THE CUSTODIANS

314.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians for unjust enrichment pursuant to New York law.

315.    Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that the Custodians obtained at the expense of Plaintiffs and the Class, and to which they were not entitled, including, but not limited to, those specified in the Offering Memoranda.  By way of example, the 2007 Financial Statements indicate that the following fees were received in 2006 and 2007:

> Administration and custodian fees amounting to USD 458,780 and USD 77,966 for Primeo Select Fund and Primeo Executive Fund respectively (2006: USD 430,579 for Select and USD 52,792 for Executive) and [sic] have been paid to the HSBC Securities Services (Luxembourg) S.A., which acts as the Fund's Administrator and Custodian.  An amount of USD 91,986 for Select, USD 9,019 for Primeo Executive Fund (2006: USD 69,484 for Select and USD 9,831 for Executive) is included in accrued expenses payable to HSBC Securities Services (Luxembourg) S.A. as at 31 December 2007.

(2007 FS, at 15).

316.    The Custodians were enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of fees for their purported custody or oversight of the custody of Plaintiffs' and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

317.     Plaintiffs and the Class involuntarily conferred a benefit upon the Custodians without Plaintiffs and the Class receiving adequate benefit or compensation in return.  The Custodians appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

318.     Equity and good conscience require the Custodians to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

## COUNT 19

### FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS

319.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against Pioneer, the Funds, and the Director Defendants and is based upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

320.     Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the Class.  The purpose and effect of said false and misleading statements was, among other things, to induce Plaintiffs and the Class to purchase shares in the Primeo Funds.

321.     During the Class Period, defendants subject to this Count sold the Primeo Funds based on false and misleading statements and omissions.  Investors in the Primeo Funds or their nominees were provided copies of the Offering Memoranda.  These documents, however, contained uniform misrepresentations and material omissions and induced Plaintiffs and the Class to invest in the Primeo Funds.

322. The Offering Memoranda specifically stated that only the representations in the Offering Memoranda were to be relied upon by investors: "Any information given or representation made by any dealer, salesman or other person and (in either case) not contained herein should be regarded as un-authorised and, accordingly, should not be relied upon." (2007 OM, at 2).

323. Similarly, the Subscription Agreement signed by every investor required investors to agree that, "I/we the undersigned hereby apply to subscribe for shares ("Shares") … in accordance with the terms and conditions of the most recent prospectus (the "Prospectus") relating to the offering of Shares in the Fund, copies of which documents the undersigned has/have received, duly read and understood."

324. The defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, adviser, administrator and custodian, and their obligation to perform these functions. Nevertheless, the defendants subject to this Count recklessly or knowingly failed to perform due diligence that they recognized was essential and required by standard industry practice. Defendants subject to this Count also recklessly or knowingly disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

325. As set forth below in this Count, the defendants subject to this Count recklessly or knowingly misrepresented to Plaintiffs and other members of the Class that their assets were being invested using a split-strike conversion strategy. Defendants subject to this Count further misrepresented that they and their financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations, which served as

the Primeo Funds' manager, execution agent, and custodian, and that they had full transparency with respect to all Madoff's operations. The defendants subject to this Count failed to disclose to Plaintiffs and other members of the Class the material facts that in reality no one had conducted any meaningful due diligence on Madoff prior to establishing the Primeo Funds' investments with Madoff; no one was meaningfully monitoring, verifying, or confirming Madoff's trade activity; effectively there was no transparency into Madoff's operations; and no one had an independent, factual basis for stating that Madoff was executing a split-strike conversion strategy. Indeed, the defendants subject to this Count, despite referring to Madoff variously as the "Sub-Manager" or "Correspondent" of the Funds, failed to disclose his identity.

### 1. False and Misleading Statements and Omissions About the Split-Strike Conversion Strategy Used By the Primeo Funds

326.  The Offering Memoranda consistently described the investment strategy utilized by the Primeo Funds as seeking to obtain "capital appreciation" through the split-strike conversion strategy. For example, the April 25, 2007 Offering Memorandum stated:

> The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:
>
> (a)  purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;
>
> (b)  selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and
>
> (c)  purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount."

(2007 OM, at 8).

327. These statements were false and misleading. In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted. Further, the Offering Memoranda failed to disclose to Plaintiffs and other members of the Class the material fact that the defendants subject to this Count had no independent factual basis for their representations about the Primeo Funds' investment strategy because they had never undertaken any meaningful steps to confirm that the split-strike conversion strategy was actually being implemented by Madoff.

### 2. False and Misleading Statements and Omissions About Due Diligence for the Primeo Funds

328. The Offering Memoranda falsely and misleadingly reassured investors about the care that Pioneer, the Funds, and the Director Defendants would purportedly take in selecting and monitoring the managers to whom it entrusted the Primeo Funds' assets, including the so-called "Sub-Manager." For example, the April 25, 2007 Offering Memorandum stated:

(a) "The Adviser will consider, in supervising the selection of the Manager, its experience and market performance, trading strategy and techniques, areas of expertise and judgment." (2007 OM, at 8).

(b) "The Adviser will continually monitor, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to the appropriate changes in, or reallocation of assets. The Manager is responsible for all the investment decisions, including asset allocations. Such monitoring will be direct, by the Adviser, or indirect through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market." *Id.* at 8.

(c)     "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers." *Id.* at 10.

(d)     "[T]he Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's Board of Directors." *Id.* at 11.

329.    These statements were false and misleading.  Defendants subject to this Count did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold the Primeo Funds' assets.  Further, the Offering Memoranda did not disclose that Defendants subject to this Count failed to conduct any meaningful due diligence of Madoff and had never independently verified with a third party that any of the trade confirmations provided by Madoff were true and correct, or that the assets reported by Madoff existed.

### 3.    False and Misleading Statements and Omissions About Portfolio Monitoring for the Primeo Funds

330.    The Offering Memoranda likewise falsely and misleadingly reassured investors about the care Pioneer, the Funds, and the Director Defendants would take in monitoring the "underlying portfolios" of the Funds' managers.  For example, the April 25, 2007 Offering Memorandum stated:

> The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer . . . .  Moreover the Adviser will monitor the underlying portfolio of Managers to seek to ensure that the Fund will not permit more than 30% of the assets of the Select Fund to be subject to the

counterparty risk of a single counterparty, other than the United
States government.

(2007 OM, at 9).

331.    These statements were false and misleading.  Defendants subject to this Count did not monitor the Funds' "underlying portfolio" – not to ensure that the managers did not invest more than 30% of the Funds' assets in a single issuer, and not to ensure that more than 30% of the Funds' assets were subject to the risk of a single counterparty.   Indeed, the defendants subject to this Count did not monitor the Funds' "underlying portfolio" at all.  If they had, they would have discovered that there were no issuers, there were no counterparties, and there was no portfolio.

### 4.    False and Misleading Statements and Omissions About the Sub-Manager's Investment Strategy

332.    The Offering Memoranda falsely represented that the  "Sub-Manager," *i.e.*, Madoff, attempted to "minimize risk" in his investment strategy.  For example, the April 25, 2007 Offering Memorandum stated:

> In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

(2007 OM, at 8).

333.    These statements were false and misleading.  Madoff's investment strategy was the epitome of risk.  The defendants subject to this Count had no reasonable basis for stating that he would, or ever had, attempted "to minimize risk."  Nor did they have any reasonable basis for stating that he would consider such factors as "the issuer, its performance, and [its] industry."  In fact, the sub-manager never considered any such factors, because there had never

been any investments.

**5. False and Misleading Statements and Omissions About Transaction Slips**

334. The Offering Memoranda falsely and misleadingly represented that the Funds' administrator and custodian would receive "statements of [] managed account[s], as well as transaction slips for every securities transaction." For example, the April 25, 2007 Offering Memorandum stated:

> Managed Accounts. The Fund may allocate certain money to investment managers running managed accounts. In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every securities transaction only.

(2007 OM, at 10).

335. These statements were false and misleading. They omitted the fact that the account statements and transaction slips were (i) on paper, rather than electronic; (ii) were not time-stamped; (iii) did not include the exact price at which securities were purchased; and (iv) were thus useless for the purpose of confirming whether the transaction occurred at the price the manager claimed. Indeed, they omitted the fact that such "managed accounts" were a huge risk to the Funds, since with only paper statements and transaction slips – which were useless – and in the absence of any other mechanism for confirming transactions, there was absolutely no supervision of trading in such managed accounts.

336. By reason of the foregoing, defendants subject to this Count directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

337. Plaintiffs and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in the Primeo Funds. Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

**COUNT 20**

**FOR FRAUD AGAINST PIONEER, THE FUNDS,
AND THE DIRECTOR DEFENDANTS**

338. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against Pioneer, the Funds, and the Director Defendants for fraud pursuant to New York law.

339. Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the Class. The purpose and effect of said false and misleading statements was, among other things, to induce Plaintiffs and the Class to purchase shares in the Primeo Funds.

340. During the Class Period, defendants subject to this Count sold the Primeo Funds based on false and misleading statements and omissions. Investors in the Primeo Funds or their nominees were provided copies of the Offering Memoranda. These documents, however, contained uniform misrepresentations and material omissions and induced Plaintiffs and the Class to invest in the Primeo Funds.

341. The Offering Memoranda specifically stated that only the representations in the

Offering Memoranda were to be relied upon by investors: "Any information given or representation made by any dealer, salesman or other person and (in either case) not contained herein should be regarded as un-authorised and, accordingly, should not be relied upon." (2007 OM, at 2).

342. Similarly, the Subscription Agreement signed by every investor required investors to agree that, "I/we the undersigned hereby apply to subscribe for shares ("Shares") … in accordance with the terms and conditions of the most recent prospectus (the "Prospectus") relating to the offering of Shares in the Fund, copies of which documents the undersigned has/have received, duly read and understood."

343. The defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, adviser, administrator and custodian, and their obligation to perform these functions. Nevertheless, the defendants subject to this Count recklessly or knowingly failed to perform due diligence that they recognized was essential and required by standard industry practice. Defendants subject to this Count also recklessly or knowingly disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

344. As set forth below in this Count, the defendants subject to this Count recklessly or knowingly misrepresented to Plaintiffs and other members of the Class that their assets were being invested using a split-strike conversion strategy. Defendants subject to this Count further misrepresented that they and their financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations, which served as the Primeo Funds' manager, execution agent, and custodian, and that they had full

transparency with respect to all Madoff's operations. The defendants subject to this Count failed to disclose to Plaintiffs and other members of the Class the material facts that in reality no one had conducted any meaningful due diligence on Madoff prior to establishing the Primeo Funds' investments with Madoff; no one was meaningfully monitoring, verifying, or confirming Madoff's trade activity; effectively there was no transparency into Madoff's operations; and no one had an independent, factual basis for stating that Madoff was executing a split-strike conversion strategy.

### 1. False and Misleading Statements and Omissions About the Split-Strike Conversion Strategy Used By the Primeo Funds

345. The Offering Memoranda consistently described the investment strategy utilized by the Primeo Funds as seeking to obtain "capital appreciation" through the split-strike conversion strategy. For example, the April 25, 2007 Offering Memorandum stated:

> The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:
>
> (a) purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;
>
> (b) selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and
>
> (c) purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount."

(2007 OM, at 8).

346. These statements were false and misleading. In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted. Further, the Offering

Memoranda failed to disclose to Plaintiffs and other members of the Class the material fact that the defendants subject to this Count had no independent factual basis for their representations about the Primeo Funds' investment strategy because they had never undertaken any meaningful steps to confirm that the split-strike conversion strategy was actually being implemented by Madoff.

## 2. False and Misleading Statements and Omissions About Due Diligence for the Primeo Funds

347. The Offering Memoranda falsely and misleadingly reassured investors about the care that Pioneer, the Funds, and the Director Defendants would purportedly take in selecting and monitoring the managers to whom it entrusted the Primeo Funds' assets, including the so-called "Sub-Manager." For example, the April 25, 2007 Offering Memorandum stated:

(a) "The Adviser will consider, in supervising the selection of the Manager, its experience and market performance, trading strategy and techniques, areas of expertise and judgment." (2007 OM, at 8).

(b) "The Adviser will continually monitor, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to the appropriate changes in, or reallocation of assets. The Manager is responsible for all the investment decisions, including asset allocations. Such monitoring will be direct, by the Adviser, or indirect through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market." *Id.* at 8.

(c) "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers." *Id.* at 10.

(d) "[T]he Adviser will provide investment advice and management

decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's Board of Directors." *Id.* at 11.

348. These statements were false and misleading. Defendants subject to this Count did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold the Primeo Funds' assets. Further, the Offering Memoranda did not disclose that Defendants subject to this Count failed to conduct any meaningful due diligence of Madoff and had never independently verified with a third party that any of the trade confirmations provided by Madoff were true and correct, or that the assets reported by Madoff existed.

### 3. False and Misleading Statements and Omissions About Portfolio Monitoring for the Primeo Funds

349. The Offering Memoranda likewise falsely and misleadingly reassured investors about the care Pioneer, the Funds, and the Director Defendants would take in monitoring the "underlying portfolios" of the Funds' managers. For example, the April 25, 2007 Offering Memorandum stated:

> The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer . . . . Moreover the Adviser will monitor the underlying portfolio of Managers to seek to ensure that the Fund will not permit more than 30% of the assets of the Select Fund to be subject to the counterparty risk of a single counterparty, other than the United States government.

(2007 OM, at 9).

350. These statements were false and misleading. Defendants subject to this Count

did not monitor the Funds' "underlying portfolio" – not to ensure that the managers did not invest more than 30% of the Funds' assets in a single issuer, and not to ensure that more than 30% of the Funds' assets were subject to the risk of a single counterparty. Indeed, the defendants subject to this Count did not monitor the Funds' "underlying portfolio" at all. If they had, they would have discovered that there were no issuers, there were no counterparties, and there was no portfolio.

### 4. False and Misleading Statements and Omissions About the Sub-Manager's Investment Strategy

351.     The Offering Memoranda falsely represented that the "Sub-Manager," *i.e.*, Madoff, attempted to "minimize risk" in his investment strategy. For example, the April 25, 2007 Offering Memorandum stated:

> In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

(2007 OM, at 8).

352.     These statements were false and misleading. Madoff's investment strategy was the epitome of risk. The defendants subject to this Count had no reasonable basis for stating that he would, or ever had, attempted "to minimize risk." Nor did they have any reasonable basis for stating that he would consider such factors as "the issuer, its performance, and [its] industry." In fact, the sub-manager never considered any such factors, because there had never been any investments.

### 5. False and Misleading Statements and Omissions About Transaction Slips

353.     The Offering Memoranda falsely and misleadingly represented that the Funds'

administrator and custodian would receive "statements of [] managed account[s], as well as transaction slips for every securities transaction." For example, the April 25, 2007 Offering Memorandum stated:

> Managed Accounts. The Fund may allocate certain money to investment managers running managed accounts. In such a case, the Administrator and the Custodian receive statements of the managed account as well as transaction slips for every securities transaction only.

(2007 OM, at 10).

354. These statements were false and misleading. They omitted the fact that the account statements and transaction slips were (i) on paper, rather than electronic; (ii) were not time-stamped; (iii) did not include the exact price at which securities were purchased; and (iv) were thus useless for the purpose of confirming whether the transaction occurred at the price the manager claimed. Indeed, they omitted the fact that such "managed accounts" were a huge risk to the Funds, since with only paper statements and transaction slips – which were useless – and in the absence of any other mechanism for confirming transactions, there was absolutely no supervision of trading in such managed accounts.

355. Plaintiffs and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in the Primeo Funds. Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 21

## FOR NEGLIGENT MISREPRESENTATION AGAINST PIONEER, THE FUNDS, AND THE DIRECTOR DEFENDANTS

356. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against Pioneer, the Funds, and the Director Defendants for negligent misrepresentation pursuant to New York law.

357. Defendants subject to this Count negligently made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the Class. The purpose and effect of said false and misleading statements was, among other things, to induce Plaintiffs and the Class to purchase shares in the Primeo Funds.

358. During the Class Period, defendants subject to this Count sold the Primeo Funds based on false and misleading statements and omissions. Investors in the Primeo Funds or their nominees were provided copies of the Offering Memoranda. These documents, however, contained uniform misrepresentations and material omissions and induced Plaintiffs and the Class to invest in the Primeo Funds.

359. The Offering Memoranda specifically stated that only the representations in the Offering Memoranda were to be relied upon by investors: "Any information given or representations made by any dealer, salesman or other person and (in either case) not contained herein should be regarded as un-authorised and, accordingly, should not be relied upon." (2007 OM, at 2).

360. Similarly, the Subscription Agreement signed by every investor required investors to agree that, "I/we the undersigned hereby apply to subscribe for shares ("Shares")

… in accordance with the terms and conditions of the most recent prospectus (the "Prospectus") relating to the offering of Shares in the Fund, copies of which documents the undersigned has/have received, duly read and understood."

361. The defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, adviser, administrator and custodian, and their obligation to perform these functions. Nevertheless, the defendants subject to this Count negligently failed to perform due diligence that they recognized was essential and required by standard industry practice. Defendants subject to this Count also negligently disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

362. As set forth below in this Count, the defendants subject to this Count negligently misrepresented to Plaintiffs and other members of the Class that their assets were being invested using a split-strike conversion strategy. Defendants subject to this Count further misrepresented that they and their financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations, which served as the Primeo Funds' manager, execution agent, and custodian, and that they had full transparency with respect to all Madoff's operations. The defendants subject to this Count failed to disclose to Plaintiffs and other members of the Class the material facts that in reality no one had conducted any meaningful due diligence on Madoff prior to establishing the Primeo Funds' investments with Madoff; no one was meaningfully monitoring, verifying, or confirming Madoff's trade activity; effectively there was no transparency into Madoff's operations; and no one had an independent, factual basis for stating that Madoff was executing

a split-strike conversion strategy.

        **1.**      **False and Misleading Statements and Omissions About the Split-Strike Conversion Strategy Used By the Primeo Funds**

363.    The Offering Memoranda consistently described the investment strategy utilized by the Primeo Funds as seeking to obtain "capital appreciation" through the split-strike conversion strategy.  For example, the April 25, 2007 Offering Memorandum stated:

> The strategy utilized by the Sub-Manager is called 'split-strike conversion' and entails:
>
> (a)   purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;
>
> (b)   selling out-of-the-money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and
>
> (c)   purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount."

(2007 OM, at 8).

364.    These statements were false and misleading.  In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted.  Further, the Offering Memoranda failed to disclose to Plaintiffs and other members of the Class the material fact that the defendants subject to this Count had no independent factual basis for their representations about the Primeo Funds' investment strategy because they had never undertaken any meaningful steps to confirm that the split-strike conversion strategy was actually being implemented by Madoff.

### 2. False and Misleading Statements and Omissions About Due Diligence for the Primeo Funds

365.     The Offering Memoranda falsely and misleadingly reassured investors about the care that Pioneer, the Funds, and the Director Defendants would purportedly take in selecting and monitoring the managers to whom it entrusted the Primeo Funds' assets, including the so-called "Sub-Manager."  For example, the April 25, 2007 Offering Memorandum stated:

(a)     "The Adviser will consider, in supervising the selection of the Manager, its experience and market performance, trading strategy and techniques, areas of expertise and judgment."  (2007 OM, at 8).

(b)     "The Adviser will continually monitor, directly or indirectly, the performance of the Manager in which such assets are invested and advise the Fund's Directors as to the appropriate changes in, or reallocation of assets.  The Manager is responsible for all the investment decisions, including asset allocations.  Such monitoring will be direct, by the Adviser, or indirect through the assistance of third parties, and include, as appropriate, personal visits and periodic review of performance in comparison to other investment managers in such market." *Id.* at 8.

(c)     "The Adviser believes that its investment activities attempt to moderate risk through diversification and careful selection of Managers." *Id.* at 10.

(d)     "[T]he Adviser will provide investment advice and management decisions and supervise the selection and monitoring of Managers for the Fund and the allocation of assets covering such, all in accordance with the Fund's investment objectives and policies and under the direction and control of the Fund's Board of Directors." *Id.* at 11.

366.     These statements were false and misleading.  Defendants subject to this Count

did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold the Primeo Funds' assets. Further, the Offering Memoranda did not disclose that Defendants subject to this Count failed to conduct any meaningful due diligence of Madoff and had never independently verified with a third party that any of the trade confirmations provided by Madoff were true and correct, or that the assets reported by Madoff existed.

### 3. False and Misleading Statements and Omissions About Portfolio Monitoring for the Primeo Funds

367. The Offering Memoranda likewise falsely and misleadingly reassured investors about the care Pioneer, the Funds, and the Director Defendants would take in monitoring the "underlying portfolios" of the Funds' managers. For example, the April 25, 2007 Offering Memorandum stated:

> The Adviser will review on an ongoing basis the investment objective, restrictions and performance of Managers of the Fund to seek to ensure that a Manager does not invest more than 30% of the assets of the Select Fund with a single issuer . . . . Moreover the Adviser will monitor the underlying portfolio of Managers to seek to ensure that the Fund will not permit more than 30% of the assets of the Select Fund to be subject to the counterparty risk of a single counterparty, other than the United States government.

(2007 OM, at 9).

368. These statements were false and misleading. Defendants subject to this Count did not monitor the Funds' "underlying portfolio" – not to ensure that the managers did not invest more than 30% of the Funds' assets in a single issuer, and not to ensure that more than 30% of the Funds' assets were subject to the risk of a single counterparty. Indeed, the defendants subject to this Count did not monitor the Funds' "underlying portfolio" at all. If they had, they would have discovered that there were no issuers, there were no counterparties,

and there was no portfolio.

### 4. False and Misleading Statements and Omissions About the Sub-Manager's Investment Strategy

369. The Offering Memoranda falsely represented that the "Sub-Manager," *i.e.*, Madoff, attempted to "minimize risk" in his investment strategy. For example, the April 25, 2007 Offering Memorandum stated:

> In structuring the portfolio for the Select Fund, the Sub-Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration, various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

(2007 OM, at 8).

370. These statements were false and misleading. Madoff's investment strategy was the epitome of risk. The defendants subject to this Count had no reasonable basis for stating that he would, or ever had, attempted "to minimize risk." Nor did they have any reasonable basis for stating that he would consider such factors as "the issuer, its performance, and [its] industry." In fact, the sub-manager never considered any such factors, because there had never been any investments.

### 5. False and Misleading Statements and Omissions About Transaction Slips

371. The Offering Memoranda falsely and misleadingly represented that the Funds' administrator and custodian would receive "statements of [] managed account[s], as well as transaction slips for every securities transaction." For example, the April 25, 2007 Offering Memorandum stated:

> Managed Accounts. The Fund may allocate certain money to investment managers running managed accounts. In such a case, the Administrator and the Custodian receive statements of

the managed account as well as transaction slips for every securities transaction only.

(2007 OM, at 10).

372.     These statements were false and misleading.  They omitted the fact that the account statements and transaction slips were (i) on paper, rather than electronic; (ii) were not time-stamped; (iii) did not include the exact price at which securities were purchased; and (iv) were thus useless for the purpose of confirming whether the transaction occurred at the price the manager claimed.  Indeed, they omitted the fact that such "managed accounts" were a huge risk to the Funds, since with only paper statements and transaction slips – which were useless – and in the absence of any other mechanism for confirming transactions, there was absolutely no supervision of trading in such managed accounts.

373.     Plaintiffs and the Class, in ignorance of the false and misleading statements and omissions made negligently by defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in the Primeo Funds.  Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 22

### FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE E&Y DEFENDANTS

374.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the E&Y Defendants and is based upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

375.     E&Y Cayman issued audit opinions that constituted the presentation of false and

misleading information as to the assets of the Primeo Funds. Instead of millions of dollars, as represented, virtually no assets actually existed. These statements were made recklessly or knowingly and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These statements induced Plaintiffs and the Class to invest in the Primeo Funds.

376. E&Y Cayman made the following false and misleading statements. E&Y Cayman issued audit opinions for every calendar year between at least 2003 and 2007 with respect to the Primeo Funds' financial statements.[18] In each of these opinions, E&Y Cayman (i) stated that it conducted the audits in accordance with auditing standards generally accepted in the United States, and (ii) expressed an unqualified opinion that the Primeo Funds' "financial statements … present fairly, in all material respects, the financial position of Primeo Fund as of December 31, 200[1-7], and the results of its operations, the changes in its net assets, its cash flows, and its financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America."

377. Each of those statements was false. The statements were false for the following reasons:

(a) E&Y Cayman knew, or was reckless in not knowing that, the Primeo Funds' financial statements did not reflect the financial position of the Primeo Funds as of December 31, 200[1-7];

---

[18] Plaintiffs are only suing the E&Y Defendants for audit opinions issued within the last five years prior to the filing of this lawsuit on January 12, 2009, in light of the five-year statute of repose under the Exchange Act. Audit opinions for any calendar year prior to 2003 would have been issued in 2003, or before, and would fall outside the five-year statute of repose.

(b)     E&Y Cayman knew, or was reckless in not knowing, that its audits of the Primeo Funds did not meet, were in violation of, and were not in accordance with GAAS;

(c)     E&Y Cayman did not confirm the existence of the Primeo Funds' supposed assets.  While purporting to conduct an audit pursuant to GAAS, E&Y Cayman did not take the most fundamental and obvious steps in confirming the existence of the Primeo Funds' assets, and did not do so despite the requirements pursuant to GAAS, as set forth above;

(d)     E&Y Cayman acted recklessly in making the false statements alleged in this Count and its conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

(e)     E&Y Cayman knew facts or had access to information suggesting that its audit opinions were not accurate or failed to check information that it had a duty to monitor and which would have demonstrated the falsity of its statements when made; and

(f)     E&Y Cayman knew that substantially all of the Primeo Funds' assets were managed by Madoff, who as the investment advisor, the sub-manager, and custodian of the assets held highly unusual multiple roles that facilitated Madoff's fraud.  Yet, E&Y Cayman failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of the Primeo Funds' assets, so that the Primeo Funds' audits failed to uncover the fact that the assets did not exist.

378.    To issue unqualified audit opinions that the Primeo Funds had hundreds of millions of dollars of assets without any independent confirmation that any of the assets

actually existed is a textbook definition of a reckless audit because it failed to comply with GAAS and the requisite accounting standards and constitutes, essentially, no audit at all. Issuing clean audit opinions in the circumstances here, with the multiple red flags set forth above, is even more reckless yet. The failure of E&Y Cayman to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BLMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

379.   The E&Y entities had agency and/or *alter ego* relationships with each other, as set forth above. E&Y Global is the principal of E&Y Cayman.  Accordingly, E&Y Global is liable for the acts of E&Y Cayman.

380.   In ignorance of the false and misleading statements described in this Count, Plaintiffs and the Class relied, to their detriment, on such misleading statements and omissions contained in E&Y Cayman's unqualified audit opinions by investing in the Primeo Funds.  Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

### COUNT 23

### <u>FOR FRAUD AGAINST THE E&Y DEFENDANTS</u>

381.   Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the E&Y Defendants for fraud pursuant to New York law.

382.    E&Y Cayman issued audit opinions that constituted the presentation of false and misleading information as to the assets of the Primeo Funds.  Instead of millions of dollars, as represented, virtually no assets actually existed.  These statements were made recklessly or knowingly and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  These statements induced Plaintiffs and the Class to invest in the Primeo Funds.

383.    E&Y Cayman made the following false and misleading statements.  E&Y Cayman issued audit opinions for every calendar year between at least 2003 and 2007 with respect to the Primeo Funds' financial statements.  In each of these opinions, E&Y Cayman (i) stated that it conducted the audits in accordance with auditing standards generally accepted in the United States, and (ii) expressed an unqualified opinion that the Primeo Funds' "financial statements … present fairly, in all material respects, the financial position of Primeo Fund as of December 31, 200[1-7], and the results of its operations, the changes in its net assets, its cash flows, and its financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America."

384.    Each of those statements was false.  The statements were false for the following reasons:

(a)     E&Y Cayman knew, or was reckless in not knowing that, the Primeo Funds' financial statements did not reflect the financial position of the Primeo Funds as of December 31, 200[1-7];

(b)     E&Y Cayman knew, or was reckless in not knowing, that its audits of the Primeo Funds did not meet, were in violation of, and were not in accordance with

GAAS;

(c)     E&Y Cayman did not confirm the existence of the Primeo Funds' supposed assets. While purporting to conduct an audit pursuant to GAAS, E&Y Cayman did not take the most fundamental and obvious steps in confirming the existence of the Primeo Funds' assets, and did not do so despite the requirements pursuant to GAAS, as set forth above;

(d)     E&Y Cayman acted recklessly in making the false statements alleged in this Count and its conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

(e)     E&Y Cayman knew facts or had access to information suggesting that its audit opinions were not accurate or failed to check information that it had a duty to monitor and which would have demonstrated the falsity of its statements when made; and

(f)     E&Y Cayman knew that substantially all of the Primeo Funds' assets were managed by Madoff, who as the investment advisor, the sub-manager, and custodian of the assets held highly unusual multiple roles that facilitated Madoff's fraud. Yet, E&Y Cayman failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of the Primeo Funds' assets, so that the Primeo Funds' audits failed to uncover the fact that the assets did not exist.

385.    To issue unqualified audit opinions that the Primeo Funds had hundreds of millions of dollars of assets without any independent confirmation that any of the assets actually existed is a textbook definition of a reckless audit because it failed to comply with GAAS and the requisite accounting standards and constitutes, essentially, no audit at all.

Issuing clean audit opinions in the circumstances here, with the multiple red flags set forth above, is even more reckless yet. The failure of E&Y Cayman to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BLMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

386. The E&Y entities had agency and/or *alter ego* relationships with each other, as set forth above. E&Y Global is the principal of E&Y Cayman. Accordingly, E&Y Global is liable for the acts of E&Y Cayman.

387. In ignorance of the false and misleading statements described in this Count, Plaintiffs and the Class relied, to their detriment, on such misleading statements and omissions contained in E&Y Cayman's unqualified audit opinions by investing in the Primeo Funds. Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 24

## FOR NEGLIGENT MISREPRESENTATION AGAINST THE E&Y DEFENDANTS

388. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the E&Y Defendants for negligent misrepresentation pursuant to New York law.

389. E&Y Cayman issued audit opinions that constituted the presentation of false and misleading information as to the assets of the Primeo Funds. Instead of millions of dollars, as

represented, virtually no assets actually existed. These statements were made negligently and constitute untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These statements induced Plaintiffs and the Class to invest in the Primeo Funds.

390. E&Y Cayman made the following false and misleading statements. E&Y Cayman issued audit opinions for every calendar year between at least 2003 and 2007 with respect to the Primeo Funds' financial statements. In each of these opinions, E&Y Cayman (i) stated that it conducted the audits in accordance with auditing standards generally accepted in the United States, and (ii) expressed an unqualified opinion that the Primeo Funds' "financial statements … present fairly, in all material respects, the financial position of Primeo Fund as of December 31, 200[1-7], and the results of its operations, the changes in its net assets, its cash flows, and its financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America."

391. Each of those statements was false. The statements were false for the following reasons:

(a) the Primeo Funds' financial statements did not reflect the financial position of the Primeo Funds as of December 31, 200[1-7];

(b) E&Y Cayman's audits of the Primeo Funds did not meet, were in violation of, and were not in accordance with GAAS;

(c) E&Y Cayman did not confirm the existence of the Primeo Funds' supposed assets. While purporting to conduct an audit pursuant to GAAS, E&Y Cayman did not take the most fundamental and obvious steps in confirming the existence of the Primeo Funds' assets, and did not do so despite the requirements

pursuant to GAAS, as set forth above;

(d)     E&Y Cayman acted negligently in making the false statements alleged in this Count;

(e)     E&Y Cayman knew facts or had access to information suggesting that its audit opinions were not accurate or failed to check information that it had a duty to monitor and which would have demonstrated the falsity of its statements when made; and

(f)     E&Y Cayman knew that substantially all of the Primeo Funds' assets were managed by Madoff, who as the investment advisor, the sub-manager, and custodian of the assets held highly unusual multiple roles that facilitated Madoff's fraud. Yet, E&Y Cayman failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of the Primeo Funds' assets, so that the Primeo Funds' audits failed to uncover the fact that the assets did not exist.

392.    To issue unqualified audit opinions that the Primeo Funds had hundreds of millions of dollars of assets without any independent confirmation that any of the assets actually existed failed to comply with GAAS and the requisite accounting standards and constitutes, essentially, no audit at all. The failure of E&Y Cayman to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BLMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

393.    The E&Y entities had agency and/or *alter ego* relationships with each other,

as set forth above. E&Y Global is the principal of E&Y Cayman. Accordingly, E&Y Global is liable for the acts of E&Y Cayman.

394. In ignorance of the false and misleading statements described in this Count, Plaintiffs and the Class relied, to their detriment, on such misleading statements and omissions contained in E&Y Cayman's unqualified audit opinions by investing in the Primeo Funds. Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Primeo Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 25

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST E&Y GLOBAL

395. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against E&Y Global pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

396. E&Y Global is a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

397. E&Y Global had the power to influence and control and did influence and control, directly or indirectly, the decision making of E&Y Cayman, including the content and dissemination of the audit opinions of the Primeo Funds that were false and misleading, by virtue of E&Y Global's participation in, and control and awareness of, the operations, audit procedures, audit work, and audit standards of E&Y Cayman.

398. E&Y Global had direct and supervisory involvement and control in the day-to-day operations, audit procedures, audit work, and audit standards of E&Y Cayman and, therefore, is presumed to have had the power to control or influence the audit statements, audit

procedures, and conduct giving rise to the primary securities violations alleged in this Complaint.

399.    As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 26

### FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE ADMINISTRATOR

400.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Administrator pursuant to Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

401.    The Administrator issued false statements containing inflated NAV calculations and account balance information.  The Administrator issued these statements, at a minimum, on a monthly basis throughout the Class Period.  In issuing these statements, the Administrator acted recklessly or knowingly because the Administrator knew or had access to information indicating that its statements were not accurate.  The Administrator acted recklessly by failing to check or verify the information received from BLMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances.  The Administrator's failure to check or verify the information was also reckless because it was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

402.    Plaintiffs and the Class justifiably relied on the information contained in the Administrator's statements.    Further, the Administrator was paid substantial fees for

performing administrative services.

403.   As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 27

## FOR FRAUD AGAINST THE ADMINISTRATOR

404.   Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Administrator for fraud pursuant to New York law.

405.   The Administrator issued false statements containing inflated NAV calculations and account balance information.  The Administrator issued these statements, at a minimum, on a monthly basis throughout the Class Period.  In issuing these statements, the Administrator acted recklessly or knowingly because the Administrator knew or had access to information indicating that its statements were not accurate.  The Administrator acted recklessly by failing to check or verify the information received from BLMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances.  The Administrator's failure to check or verify the information was also reckless because it was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

406.   Plaintiffs and the Class justifiably relied on the information contained in the Administrator's statements.   Further, the Administrator was paid substantial fees for performing administrative services.

407.   As a direct and proximate result of the wrongful conduct alleged in this Count,

Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 28

## FOR NEGLIGENT MISREPRESENTATION AGAINST THE ADMINISTRATOR

408. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Administrator for negligent misrepresentation pursuant to New York law.

409. The Administrator issued false statements containing inflated NAV calculations and account balance information. The Administrator issued these statements, at a minimum, on a monthly basis throughout the Class Period. In issuing these statements, the Administrator acted negligently because the Administrator knew or had access to information indicating that its statements were not accurate. The Administrator acted negligently by failing to check or verify the information received from BLMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances. The Administrator's failure to check or verify the information was also negligent because it was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

410. Plaintiffs and the Class justifiably relied on the information contained in the Administrator's statements. Further, the Administrator was paid substantial fees for performing administrative services.

411. As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 29

## FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE CUSTODIANS

412.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians pursuant to Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, 15 U.S.C § 78j(b).

413.    The Custodians made the following false and misleading statements in the Offering Memoranda:

> The Custodian will be responsible to the Fund for the duration of any sub-custody agreement and for satisfying itself as to the ongoing suitability of the Correspondent to provide custodial services to the Fund.  The Custodian will also maintain an appropriate level of supervision over the Correspondents and will make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged.

(2007 OM, at 13).

414.    This statement is false because the Custodians did not satisfy themselves periodically that BLMIS was a suitable custodian.  In issuing these statements, the Custodians acted recklessly or knowingly because the Custodians knew, or were reckless in not knowing, that the statements were not accurate.

415.    The Custodians acted recklessly by failing to act with reasonable skill, care, and diligence in the appointment and monitoring of BLMIS as holder of the Primeo Funds' assets. The Custodians were also reckless, and did not act in good faith, because the Custodians were aware of the red flags surrounding Madoff including the consolidation of the roles of investment manager, custodian, and execution agent.

416. Plaintiffs and the Class justifiably relied on the Custodians' statements. Further, the Custodians were paid substantial fees for performing, monitoring, and overseeing BLMIS's custody of the assets.

417. As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 30

## FOR FRAUD AGAINST THE CUSTODIANS

418. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against the Custodians for fraud pursuant to New York law.

419. The Custodians made the following false and misleading statements in the Offering Memoranda:

> The Custodian will be responsible to the Fund for the duration of any sub-custody agreement and for satisfying itself as to the ongoing suitability of the Correspondent to provide custodial services to the Fund. The Custodian will also maintain an appropriate level of supervision over the Correspondents and will make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged.

(2007 OM, at 13).

420. This statement is false because the Custodians did not satisfy themselves periodically that BLMIS was a suitable custodian. In issuing these statements, the Custodians acted recklessly or knowingly because the Custodians knew, or were reckless in not knowing, that the statements were not accurate.

421. The Custodians acted recklessly by failing to act with reasonable skill, care, and

diligence in the appointment and monitoring of BLMIS as holder of the Primeo Funds' assets. The Custodians were also reckless, and did not act in good faith, because the Custodians were aware of the red flags surrounding Madoff including the consolidation of the roles of investment manager, custodian, and execution agent.

422.    Plaintiffs and the Class justifiably relied on the Custodians' statements. Further, the Custodians were paid substantial fees for performing, monitoring, and overseeing BLMIS's custody of the assets.

423.    As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 31

## FOR NEGLIGENT MISREPRESENTATION AGAINST THE CUSTODIANS

424.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Custodians for negligent misrepresentation pursuant to New York law.

425.    The Custodians made the following false and misleading statements in the Offering Memoranda:

> The Custodian will be responsible to the Fund for the duration of any sub-custody agreement and for satisfying itself as to the ongoing suitability of the Correspondent to provide custodial services to the Fund.  The Custodian will also maintain an appropriate level of supervision over the Correspondents and will make appropriate enquiries periodically to confirm that the obligations of the Correspondents continue to be competently discharged.

(2007 OM, at 13).

426.    This statement is false because the Custodians did not satisfy themselves

periodically that BLMIS was a suitable custodian. The Custodians acted negligently in representing that they did.

427. The Custodians acted negligently by failing to act with reasonable skill, care, and diligence in the appointment and monitoring of BLMIS as holder of the Primeo Funds' assets. The Custodians also acted negligently because they were aware of the red flags surrounding Madoff including the consolidation of the roles of investment manager, custodian, and execution agent.

428. Plaintiffs and the Class justifiably relied on the Custodians' statements. Further, the Custodians were paid substantial fees for performing, monitoring, and overseeing BLMIS's custody of the assets.

429. As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## COUNT 32
### FOR VIOLATIONS OF RULES 10b-5(a) AND 10b-5(c) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS

430. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count. This Count is asserted against all defendants and is based upon Rules 10b-5(a) and 10b-5(c) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

431. Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of shares in the Primeo Funds, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c). In furtherance of this unlawful plan, scheme and course of conduct,

defendants took the actions set forth herein.

432.    Defendants, individually and collectively, were responsible for safeguarding Plaintiffs' and Class members' investments.  In this role, defendants were obligated to perform, and represented that they had performed, due diligence on Madoff, as sub-manager and sub-custodian of the Funds.  Through such due diligence, defendants had knowledge of, or were extremely reckless in not knowing of, Madoff's Ponzi scheme, described herein.

433.    In ignorance of the fact that the Primeo Funds were feeder funds for Madoff's Ponzi scheme, Plaintiffs and the Class, relying on defendants' due diligence, purchased shares in the Funds during the Class Period.

434.    Defendants benefited financially from Plaintiffs' and Class members' purchases of shares in the Funds.  In particular, defendants received compensation, fees, commissions, kickbacks, and other payments based on (i) the Funds' net asset value; and (ii) Plaintiffs' and Class members' subscriptions to the Funds.

435.    Defendants engaged in the fraudulent activity described above knowingly and intentionally, or in such an extremely reckless manner, as to constitute willful deceit and fraud upon Plaintiffs and the Class.

436.    But for defendants' fraud, none of the securities that were sold to Plaintiffs and the Class could have been sold.

437.    Upon public disclosure of the true facts which had been misrepresented or concealed by defendants, as alleged herein, Plaintiffs' and Class members' investments lost all of their value.

438.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases of shares of the Primeo

Funds, for which the defendants named in this Count are jointly and severally liable.

## COUNT 33

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE MEDICI DEFENDANTS, PIONEER, THE DIRECTOR DEFENDANTS, THE ADVISERS, THE ADMINISTRATOR, <u>THE CUSTODIANS, AND HSBC</u>

439.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (¶¶ 1-183) as if fully set forth in this Count.  This Count is asserted against the Medici Defendants, Pioneer, the Director Defendants, the Advisers, the Administrator, the Custodians, and HSBC pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

440.    The Medici Defendants, Pioneer, the Director Defendants, the Advisers, the Administrator, the Custodians, and HSBC acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

441.    Medici controlled the Primeo Funds, through UniCredit's subsidiary Pioneer, and caused them to become feeder funds for Madoff's Ponzi scheme.  It had the power to control, and did control, the general business affairs of Pioneer and the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Pioneer and the Funds which resulted in primary liability.  Medici knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

442.    Kohn controlled the Primeo Funds, through her 75% ownership stake in Medici, and caused them to become feeder funds for Madoff's Ponzi scheme.  She had the power to control, and did control, the general business affairs of Pioneer and the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Pioneer and the Funds which resulted in primary liability.  Kohn

knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

443. UniCredit controlled Pioneer, its wholly-owned subsidiary. Through its 25% ownership of Medici, it provided Medici with access to its subsidiary Pioneer's Primeo Funds. UniCredit had the power to control, and did control, the general business affairs of Pioneer and the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of Pioneer and the Funds which resulted in primary liability. UniCredit knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

444. Bank Austria was a control person of WWF, one of the Funds' custodians, in which it had a 75% ownership stake. Through WWF, Bank Austria was also a control person of the Funds. According to the Funds' Offering Memoranda, Bank Austria was the sponsor of the Primeo Funds and provided investment advisory services to the Funds. Thus, Bank Austria had the power to control, and did control, the general business affairs of WWF and the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of WWF and the Funds which resulted in primary liability. Bank Austria knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

445. Pioneer controlled the Primeo Funds through its ownership of those Funds and through its wholly-owned subsidiary, PIM, one of the advisers of the Funds. Pioneer had the power to control, and did control, the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Funds which resulted in primary liability. Pioneer knew, or was

reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

446.    The Director Defendants were, for portions of the Class Period, directors and/or officers of the Primeo Funds.  The Director Defendants had the power to control, and did control, the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Funds which resulted in primary liability.  The Director Defendants knew, or were reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

447.    The Advisers were control persons of the Primeo Funds.  They had the power to control, and did control, the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Funds which resulted in primary liability.  The Advisers knew, or were reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

448.    The Administrator was a control person of the Primeo Funds.  It had the power to control, and did control, the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Funds which resulted in primary liability.  The Administrator knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

449.    The Custodians were control persons of the Primeo Funds.  They had the power to control, and did control, the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Funds which resulted in primary liability.  The Custodians knew, or were reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

450.    HSBC was a control person of the Administrator and the Custodians.  It had the

power to control, and did control, the general business affairs of the Administrator and the Custodians, and the power to directly or indirectly control or influence the specific corporate policy (*i.e.*, the failure to conduct due diligence) of the Administrator and Custodians which resulted in primary liability. HSBC knew, or was reckless in not knowing, that the Funds' investments were non-existent, as alleged herein.

451. As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiffs and the Class suffered an economic loss and damages in connection with their purchases of shares in the Primeo Funds in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and other members of the Class, demand judgment against defendants as follows:

(a) declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs proper Class representatives;

(b) awarding damages suffered by Plaintiffs and the Class as a result of the wrongs complained of herein, together with appropriate interest;

(c) awarding Plaintiffs and the Class punitive damages, where appropriate, suffered as a result of the wrongs complained of herein;

(d) declaring that defendants have been unjustly enriched and imposing a constructive trust to recoup defendants' fees, unjust benefits, and other assets for the benefits of Plaintiffs and the Class;

(e) enjoining defendants from using the Primeo Funds' assets to defend this action or to otherwise seek indemnification from the Funds for their wrongful,

deceitful, reckless, or negligent conduct as alleged herein;

     (f)   awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and Class' counsel and experts, and reimbursement of expenses; and

     (g)   granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York
       February 11, 2010

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: *S. Douglas Bunch*
   Catherine A. Torell (CAT-0905)
   150 East 52nd Street, 30th Floor
   New York, New York 10022
   Tel.: (212) 838 7797
   Fax: (212) 838-7745

   *-and-*

   Steven J. Toll
   Daniel S. Sommers
   Joshua S. Devore
   S. Douglas Bunch (SB-3028)
   1100 New York Avenue, N.W.
   Suite 500, West Tower
   Washington, D.C. 20005
   Tel.: (202) 408-4600
   Fax: (202) 408-4699

   *Counsel for Lead Plaintiff Dr. Shmuel Cabilly and Plaintiff Korea Exchange Bank and Lead Counsel for the Class*

***Of Counsel*:**

Jacob Sabo, Esq.
The Tower
# 3 Daniel Frisch St.
Tel Aviv Israel
Tel.:  (972) 36078888
Fax:  (972) 36078889

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _____ Shmuel Cabilly _____, ("Plaintiff") declare, as to the claims asserted under th
securities laws, that:

1. I have reviewed a class action complaint asserting securities claims involving the
Funds and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll, PLLC as my coun:

2. Plaintiff did not purchase the security that is the subject of this action at the direc
plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, includ
providing testimony at deposition and trial, if necessary.

4. My transactions in the Primeo Funds during the Class Period were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER ! |
|------|------------------------|---------------|-------------|
| 24-May-08 | buy | | |
| 30 Jan 08 | buy | | |
| 30 Jan 08 | buy | | |
| Total | | 103,100 | $ 35.55 |

5. During the three years prior to the date of this Certificate, Plaintiff has not sough
or served as a representative party for a class in any action under the federal securities laws exce
follows:

6. Plaintiff will not accept any payment for serving as a representative party on beh.
class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expense
(including lost wages) directly relating to the representation of the class as ordered or approved
court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this __9__ Day of __May__, 2009.