

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE HERALD, PRIMEO, AND THEMA FUNDS SECURITIES LITIGATION | ECF Case<br><br>Case No. 09 Civ. 0289 (RMB) |
| THIS DOCUMENT RELATES TO:<br><br>NEVILLE SEYMOUR DAVIS,<br><br>                     Plaintiff,<br><br>        vs.<br><br>ALBERTO BENBASSAT, STÉPHANE BENBASSAT, GENEVALOR, BENBASSAT & CIE, GERALD J.P. BRADY, JOHN HOLLIWELL, SONJA KOHN, DANIEL MORRISSEY, PETER SCHEITHAUER, DAVID T. SMITH, WERNER TRIPOLT, BANK MEDICI AG, UNICREDIT SPA, HSBC INSTITUTIONAL TRUST SERVICES (IRELAND) LTD., HSBC SECURITIES SERVICES (IRELAND) LTD., HSBC HOLDINGS PLC, PRICEWATERHOUSECOOPERS INTERNATIONAL LTD., PRICEWATERHOUSECOOPERS (DUBLIN), PRICEWATERHOUSECOOPERS LLP, PRICEWATERHOUSECOOPERS BERMUDA, THEMA ASSET MANAGEMENT LIMITED, THEMA INTERNATIONAL FUND PLC, BA WORLDWIDE FUND MANAGEMENT LIMITED, PETER MADOFF, ANDREW MADOFF, MARK MADOFF, WILLIAM FRY, JP MORGAN CHASE & CO., and THE BANK OF NEW YORK MELLON,<br><br>                  Defendants. | Case No. 09 Civ. 2558 (RMB)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Dockets.Justia.com

# TABLE OF CONTENTS

I   INTRODUCTION ..................................................................................................1

II   THE PARTIES ...................................................................................................7

  A.   Plaintiff.............................................................................................................7

  B.   Defendants........................................................................................................7

    (1)   The Medici Defendants ...............................................................................7

    (2)   UniCredit SpA .............................................................................................9

    (3)   Thema ........................................................................................................10

    (4)   The Director Defendants ...........................................................................11

    (5)   The HSBC Defendants ..............................................................................14

    (6)   The PwC Defendants.................................................................................15

    (7)   William Fry................................................................................................16

    (8)   The Advisor Defendants............................................................................16

    (9)   The BMIS Defendants...............................................................................17

    (10)   The Financial Institution Defendants .....................................................18

III   AGENCY, AIDING AND ABETTING, AND CONSPIRACY ........................................20

IV   JURISDICTION AND VENUE ..........................................................................21

  A.   Subject Matter Jurisdiction Over the Federal Securities Law Claims .............21

    (1)   Conduct Test..............................................................................................22

    (2)   Effects Test ................................................................................................33

  B.   Subject Matter Jurisdiction Over State Law Claims........................................35

  C.   Personal Jurisdiction.......................................................................................35

    (1)   Defendants' Purposeful Availment ...........................................................35

    (2)   New York Resident Defendants ................................................................38

    (3)   Non-Resident Defendants Under New York's Long-Arm Statute..............38

D.   Venue ...................................................................................................... 38

V   BACKGROUND FACTS ...................................................................................... 39

A.   Madoff's Ponzi Scheme ....................................................................... 39

B.   Madoff's Guilty Plea and Sentence ..................................................... 40

C.   Thema's Role in Madoff's Ponzi Scheme ........................................... 40

VI   DEFENDANTS' WRONGFUL CONDUCT .......................................................... 42

A.   Mismanagement of Thema By the Director Defendants, the Medici Defendants, the HSBC Defendants, the Advisor Defendants, William Fry, and the PwC Defendants .................. 42

(1)   The Director Defendants ............................................................. 42

(2)   The Medici Defendants ............................................................... 46

(3)   The HSBC Defendants ................................................................ 47

(4)   The Advisor Defendants .............................................................. 52

(5)   William Fry .................................................................................. 54

(6)   The PwC Defendants ................................................................... 56

(7)   Significant Fees Collected By Defendants ................................. 79

B.   The Role and Knowledge of the BMIS Defendants ............................ 80

C.   The Role and Knowledge of the Financial Institution Defendants .................. 82

(1)   JP Morgan .................................................................................... 82

(2)   BONY ........................................................................................... 93

VII   RED FLAGS DEFENDANTS KNEW OR CONSCIOUSLY DISREGARDED .............. 96

VIII   FACTS GIVING RISE TO THE FEDERAL SECURITIES LAW CLAIMS ................ 103

A.   Misleading Statements and Material Omissions Attributable to the Medici Defendants, Thema, the Director Defendants, Thema Management, HSBC Securities, HSBC Trust, and PwC Ireland ................................................................................. 104

(1)   Annual Reports Between 2001 and 2006 ................................... 104

(2)   The December 31, 2006 Prospectuses ....................................... 108

(3)   The Supplement to the December 31, 2006 Prospectus ............................................. 110

(4)   Newsletters and Brochures ...................................................................................... 111

B.  Additional Specific Allegations of Misrepresentations and Omissions ......................... 114

(1)   By the Medici Defendants ....................................................................................... 114

(2)   By Thema and the Director Defendants ................................................................... 120

(3)   By the HSBC Defendants ........................................................................................ 123

(4)   By the PwC Defendants .......................................................................................... 129

C.  Reliance ........................................................................................................................... 135

D.  Proximate Loss Causation ............................................................................................... 136

IX   DEFENDANTS' DUTY TO DISCLOSE ........................................................................ 137

X   THE TRUTH IS REVEALED ........................................................................................... 139

XI   FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ................................ 140

XII   CLASS ACTION ALLEGATIONS ................................................................................. 141

A.  Class Definition .............................................................................................................. 141

B.  Numerosity ...................................................................................................................... 141

C.  Typicality ........................................................................................................................ 142

D.  Common Questions ......................................................................................................... 142

E.  Adequate Representation ................................................................................................ 143

F.  Superiority ...................................................................................................................... 143

XIII   CLAIMS FOR RELIEF .................................................................................................. 143

COUNT 1 Violations of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against the
Medici Defendants ................................................................................................................. 143

COUNT 2 Violations of Section 20(a) of the Exchange Act Against Kohn, Scheithauser, Tripolt,
Holliwell, and UniCredit ........................................................................................................ 146

COUNT 3 Violation of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against Thema
and the Director Defendants ................................................................................................... 147

COUNT 4 Violation of Section 20(a) of the Exchange Act  Against Alberto Benbassat, Stephane Benbasst, Brady, Morrissey, Smith, HSBC Trust, HSBC Securities, PwC Ireland, Medici, and Kohn ................................................................................................................................149

COUNT 5 Violations of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against Thema Management .................................................................................................................151

COUNT 6 Violations of Section 20(a) of the Exchange Act  Against Alberto Benbassat, Stéphane Benbassat, and Smith ..............................................................................................154

COUNT 7 Violations of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against HSBC Securities and HSBC Trust..............................................................................................154

COUNT 8 Violations of Section 20(a) of the Exchange Act  Against HSBC ..........................157

COUNT 9 Violations of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against PwC Ireland................................................................................................................................157

COUNT 10 Violations of Section 20(a) of the Exchange Act  Against PwC International .......160

COUNT 11 Violations of Rule 10b-5(b) and Section 10(b) of the Exchange Act Against William Fry ......................................................................................................................................161

COUNT 12 Gross Negligence and Negligence Against PwC Ireland, PwC U.S., and PwC Bermuda ............................................................................................................................164

COUNT 13 Gross Negligence and Negligence Against PwC International ..............................166

COUNT 14 Gross Negligence against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants..............................................168

COUNT 15 Negligence Against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants .........................................................170

COUNT 16 Imposition of Constructive Trust Against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, AND the Advisory Defendants ...........................171

COUNT 17 Breach of Fiduciary Duty Against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants .....................................172

COUNT 18 Aiding and Abetting Breach of Fiduciary Duty Against William Fry, the BMIS Defendants, and the PwC Defendants ........................................................................................174

COUNT 19 Aiding and Abetting Gross Negligence and Negligence Against the BMIS Defendants................................................................................................................................175

COUNT 20 Unjust Enrichment Against All Defendants ..........................................................176

iv

COUNT 21 Aiding and Abetting Breach of Fiduciary Duty Against the Financial Institution Defendants ................................................................................................................................. 177

COUNT 22 Aiding and Abetting Gross Negligence and Negligence ........................................ 178

Against the Financial Institution Defendants, the PwC Defendants, and the BMIS Defendants 178

COUNT 23 Third Party Beneficiary Claim for Breach of Contract Against the Medici Defendants, the Advisor Defendants HSBC Trust, and HSBC Securities ................................... 179

COUNT 24 Professional Negligence Against the HSBC Defendants, the PwC Defendants, and the Advisor Defendants .......................................................................................................... 180

XIV   PRAYER ........................................................................................................................ 181

JURY TRIAL DEMAND ........................................................................................................... 182

# I    INTRODUCTION

1.      This is a class action pursuant to Federal Rule of Civil Procedure 23(a) and

23(b)(3) on behalf of all persons and entities who either owned shares of Thema International

Fund plc (collectively referred to, together with its sub-fund, the Thema Fund, as "Thema") on

December 10, 2008, or purchased shares of Thema between January 12, 2004 and December 14,

2008 inclusive (the "Class Period"), and suffered damages thereby due to the wrongful conduct

alleged in this Amended Complaint (the "Class").  Excluded from the Class are defendants, any

entity in which defendants have a controlling interest, and the officers, directors, affiliates, legal

representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any

such individual or entity.

2.      Plaintiff's Amended Complaint is based on his personal knowledge and his

counsel's investigation, which included, among other things:

(a)     multiple interviews with Eleanor Squillari, who spent 25 years working as a
        secretary for Bernard L. Madoff ("Madoff"), who perpetrated a multi-billion
        dollar Ponzi scheme with the help of others, including defendants in this action;

(b)     Madoff's appointment book/calendar and personal phone book;

(c)     information obtained from the numerous governmental investigations across the
        United States and Europe into the Madoff Ponzi scheme, the feeder funds, and the
        professionals who participated in and facilitated the Ponzi scheme; and

(d)     review of facts gathered by others who interviewed Madoff in prison after his
        guilty plea, the exhibits and other documents produced in the investigation of
        Madoff by the United States Securities and Exchange Commission ("SEC"), SEC
        filings, news articles, and other documents.

3.      Lead Plaintiff Neville Seymour Davis, who lost over $1.1 million of his life

savings as a result of defendants' wrongdoing, alleges two separate categories of claims in this

class action:

(a)     federal securities law claims under §§ 10(b) and 20(a) of the Securities and
        Exchange Act of 1934 (the "Exchange Act"); and

(b)　　state law claims, including breach of contract, gross negligence, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment.

4.　　The federal securities law claims arise from defendants' wrongful conduct in connection with issuing false and misleading statements and omitting to disclose material facts in prospectuses, annual reports, and financial statements which were sent to Plaintiff and the Class in connection with their purchases of shares in Thema. Unbeknownst to Plaintiff and the Class, Thema was a "feeder fund" for the Ponzi scheme perpetrated by Madoff through Bernard L. Madoff Investment Securities LLC ("BMIS").

5.　　Plaintiff's state law claims are pled separately because they do not rely on or incorporate any of the facts or circumstances giving rise to the federal securities claims and because they are based on defendants' breaches of contract, breaches of fiduciary duty, negligence, and failure to adequately perform their duties as directors, administrators, custodians, investment managers, auditors, advisors, lawyers, and financial intermediaries for Thema.

6.　　Plaintiff discovered defendants' wrongdoing only after Thema revealed for the first time on or about December 17, 2008 through a press release that Thema's assets had been held by Madoff and that Thema's custodian could not confirm safe custody of the assets. Madoff had been arrested by federal authorities on December 11, 2008. According to federal authorities, Madoff and BMIS had fraudulently reported steady, positive returns on billions of dollars in investments they controlled when, in fact, they had never invested any of their clients' money and instead were operating the largest Ponzi scheme in United States history. After his arrest, Madoff pled guilty to criminal charges in connection with the Ponzi scheme and is currently serving a 150-year prison sentence.

7.　　Following these revelations, Thema was identified as one of the leading feeder funds for Madoff because, for years, Thema recruited investors and delivered their investments

2

directly to Madoff and BMIS. Madoff never invested the money, but instead created false account statements and sent them to Thema and Thema's custodian and administrator, who in turn created account statements and performance updates for Thema's investors that falsely represented Thema's net asset value ("NAV") and investment returns. Thema was not marketed as a risky investment. Quite to the contrary, defendants represented that: "This Fund is particularly well suited to replace the fixed income portion of portfolios" and that investors could expect steady (but not spectacular) returns of 5% above the London Interbank Offered Rates ("LIBOR"). (*See* Thema November 2008 Brochure, Ex. 1, at 1.)

8.      With neither offices nor employees, Thema was operated entirely by the professionals named as defendants herein.[1] Defendants represented that Thema would implement a sophisticated yet conservative investment strategy to deliver safe annual returns in the 5-10% range. In reality, defendants did not devise or implement any investment strategy, but instead simply transferred all the investors' money to Madoff and BMIS in New York City and failed to conduct any reasonable due diligence or supervision over Madoff and BMIS.

9.      Defendants include: (i) the Medici Defendants, including Bank Medici AG ("Medici") and the individuals controlling Medici; (ii) UniCredit SpA; (iii) Thema; (iv) the Director Defendants, who controlled and managed Thema; (v) the BMIS Defendants, Madoff's brother and sons, who conspired with others in perpetrating the Ponzi scheme; (vi) the HSBC Defendants, which served as Thema's administrator and custodian; (vii) the PwC Defendants, which audited Thema; (viii) William Fry, which served as Thema's legal counsel; (ix) the Advisor Defendants, which promoted and distributed Thema; and (x) the Financial Institution

---

[1] As admitted by Thema in its Prospectus dated December 31, 2006, "The Company does not have, nor has it has since its incorporation, any employees." (*See* Thema December 31, 2006 Prospectus, Ex. 2, at 45.)

Defendants, whose services to Madoff and BMIS contributed to the losses suffered by the members of the Class.

10.     Defendants represented to investors that their money would be invested in the securities market.  Defendants also touted profits made by current investors, thereby encouraging investment by new and existing investors.  Defendants, however, did *not* disclose to investors the most basic and material information concerning Thema, including the fact that Madoff, not Medici, was Thema's investment manager, and Madoff, not the HSBC Defendants, had custody of all Thema's assets.  Defendants' misconduct also included:

(a)     the Medici Defendants, the Director Defendants, the HSBC Defendants, the PwC Defendants, and the Advisor Defendants frequently met with Madoff in New York City in furtherance of the scheme to funnel Thema investments to Madoff and BMIS;

(b)     the Medici Defendants, the Director Defendants, the HSBC Defendants, William Fry, and the PwC Defendants jointly drafted, reviewed, and/or approved and issued prospectuses, annual reports, and financial statements that (i) misled Thema investors about the value of their investments; and (ii) failed to inform them that Madoff had been appointed as the custodian and investment manager and that Thema was nothing but a feeder fund to Madoff's Ponzi scheme;

(c)     the PwC Defendants violated the most basic auditing standards by:  (i) accepting Madoff's assertion that he held over $1 billion of Thema's assets without ever obtaining independent verification; and (ii) in an effort to minimize costs, centralizing the auditing work of numerous PwC affiliates over nine Madoff feeder funds totaling $17 billion in value, without complying with each affiliate's own auditing procedures; and

(d)     the Financial Institution Defendants aided and abetted other Defendants' wrongful conduct by facilitating the Ponzi scheme despite knowing about or recklessly disregarding Madoff's fraud.

11.     Moreover, Defendants ignored many red flags that should have caused them, as professionals, to discover Madoff's fraud or conduct further due diligence and/or alter their investment decisions.  These red flags included:

(a)     Madoff purported to provide investment advice, but ***did not charge any fees*** for his investment advisory services.  A typical firm like BMIS charges a fee of two

4

percent of assets managed plus twenty percent of profits. "Two-twenty," as this arrangement is known, is industry standard. On Thema's $1.441 billion invested with Madoff as of December 31, 2007, a "two-twenty" arrangement would have entitled Madoff to a fee of over $53 million in 2008 had Thema returned the same 8.4 per cent return in 2008 which Thema reported for 2007. Defendants were aware of this but never investigated why Madoff refused to charge the hundreds of millions of dollars of investment advisory fees that he could have charged and collected from Thema during the Class Period;

(b)     In 2006, after conducting an informal investigation of Madoff, SEC ordered Madoff to register as an investment advisor. Thereafter, BMIS was forced to file Form ADVs with the SEC which listed its assets under Madoff's management. The amounts listed in such forms were far less than the amounts that Madoff's feeder funds were reporting as assets, and the defendants named herein had unique access to such knowledge because of their roles with multiple Madoff feeder funds. For example, PwC audited at least nine Madoff feeder funds whose reported assets as of 2007 were collectively in excess of $16.5 billion. However, on January 7, 2008, BMIS filed a Form ADV with the SEC representing that BMIS's assets under management were only $17 billion. Since PwC knew that Madoff managed money for many more feeder funds than the nine that PwC audited, it knew or should have known that BMIS's Form ADV should have reported much higher assets under management. Indeed, at the time, BMIS was sending out statements to more than 4,900 active customer accounts with a purported value of *$64.8 billion* under management. Moreover, while being ***too low*** to match the reported assets of his hedge fund clients, Madoff's Form ADV reported assets were ***too high*** for Madoff to have been able to execute his split strike conversion strategy since, as explained by industry experts, Madoff's trades would have had to have constituted over 100% of the total S&P 100 put option contract open interest in order to hedge his stock holdings in such a manner as to fulfill his split-strike conversion strategy as depicted in Thema's marketing literature;

(c)     Madoff refused to use an outside custodian, whereas most legitimate brokers and investment advisors use an outside and independent custodian, as Professor John C. Coffee of Columbia Law School has stated, "[b]eing your own custodian violates the first rule of common sense, your can't be your own watchdog";

(d)     the lack of transparency into BMIS, including (i) Madoff's refusal to disclose his investment strategy; (ii) Madoff's refusal to identify the counterparties to his trades; (iii) the fact that BMIS's investment advisory business was located on a separate floor (the 17th floor in BMIS's building) and Madoff severely restricted access to that floor; and (iv) Madoff's insistence that BMIS was technologically advanced, yet he used paper confirmations and did not provide time-stamps for his trade executions. Based on standard industry practice, the lack of access to real-time electronic reporting was a huge red flag;

(e)      BMIS's returns lacked the usual level of volatility, including only five months of negative returns in the 12 years prior to his arrest;

(f)      the inability of other funds using a "split-strike conversion" strategy (which Madoff purportedly used) to generate returns comparable to those generated by Madoff;

(g)      account statements sent to Madoff's investors did not support the returns they reported;

(h)      one of Madoff's competitors, Harry Markopolos, sent two letters to the SEC in 1999 and 2005 stating that "[BMIS was] the world's largest Ponzi Scheme";

(i)      BMIS's auditor, Friehling & Horowitz, consisted of one office in New York with three employees, one of whom was 78 years old and lived in Florida and one of whom was a secretary;

(j)      BMIS's comptroller was based in Bermuda, while most mainstream hedge funds have in-house comptrollers; and

(k)      BMIS was "very much a family-run business," as the SEC acknowledged in one of its informal investigations of Madoff years before Madoff's arrest.

12.      While failing to perform adequate due diligence or supervision, Defendants pocketed millions of dollars in fees for serving as Thema's directors, auditors, advisors, lawyers, custodians, administrators, and investment managers.

13.      The scheme alleged herein was as enormous and egregious as it was simple. As Thema's *de facto* (and undisclosed) investment manager, Madoff and BMIS conducted all investment operations in New York but took no advisory fees and only extremely low commissions for non-existing stock trades and allowed Thema – and, in turn, the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants – to keep all the advisor and management fees. The fact that Madoff did not charge any advisory fees provided significant financial incentives for Defendants, especially the Medici Defendants, the HSBC Defendants, the Advisor Defendants, and the Director Defendants (through their

ownership of Thema Asset Management Ltd. and Genevalor, Benbassat & Cie), to commit fraud or to consciously disregard any red flags.

14.     Defendants never once, in 13 years, contacted a single counterparty to confirm Madoff's alleged trades.  Moreover, despite their actual knowledge that Madoff held all of Thema's assets, Defendants never contacted Madoff's three-person auditing firm, Friehling & Horowitz, which was located in a strip mall in New City, New York and had an office the size of a small coffee shop.  In addition to never contacting Madoff's auditor, the supposedly sophisticated professionals named herein never checked in 13 years the status of Madoff's auditor with the American Institute of Certified Public Accountants ("AICPA").  Had Defendants done so, they would have discovered that Friehling & Horowitz filed a form every year with the AICPA certifying that it did not conduct any audits.

15.     As a result of Defendants' wrongdoing, Plaintiff and other members of the Class unknowingly invested in a Ponzi scheme indirectly through Thema and have lost over $1 billion.

## II     THE PARTIES

### A.     Plaintiff

16.     **Plaintiff Neville Seymour Davis** is, and was at all relevant times, a resident of the United Kingdom.  As indicated in the attached certification, Plaintiff purchased shares of Thema during the Class Period.  Due to the activities alleged herein, Plaintiff has lost all, or substantially all, of his investment in Thema, and has paid fees for inadequate or non-existent services.  Plaintiff invested in Thema in United States Dollars.

### B.     Defendants

#### (1)     The Medici Defendants

17.     **Defendant Bank Medici AG** is a closely held merchant bank incorporated in 1994 under the laws of Austria with its headquarters at Operngasse 6/4, 1010 Vienna, Austria.

Medici obtained a full banking license from the Austrian Financial Authority in December 2003. Since December 31, 2006, Medici has been serving as Thema's investment manager. In 2007 alone, Medici collected $6,350,821 investment management fees from Thema.

18.     Defendant Sonja Kohn at all relevant times owned 75% of Medici. Bank Austria Creditanstalt, a subsidiary of Defendant UniCredit SpA, at all relevant times held the remaining 25%. Bank Austria Creditanstalt was one of the broker-dealers Madoff used to execute trades for his institutional trading accounts, including Thema.

19.     In addition to Thema, Medici funneled the following funds to Madoff's Ponzi scheme: Primeo Select Fund, Primeo Executive Fund (sub-funds of the Primeo Fund), Herald USA Fund and/or Herald Luxemburg Fund (together, the "Herald Funds") (collectively, together with Thema, the "Medici Funds"). Medici and Kohn caused each of the Medici Funds to become a feeder fund for Madoff's Ponzi scheme. Over $3 billion in the Medici Funds have been lost in the Madoff Ponzi scheme.

20.     Medici is currently under government supervision following Austria's launch of a probe, on January 15, 2009, into Medici's operations. Upon information and belief, Medici transacted business in the United States related to the claims alleged herein.

21.     **Defendant Sonja Kohn ("Kohn")** is Medici's founder, chairperson, and a 75% owner. Kohn was a control person of Medici because she had the power to direct or cause the direction of Medici's management and policy. Similarly, Kohn was also a control person of Thema because, for example, she caused Thema to appoint Medici as investment manager, a position that allowed Medici to receive $6,350,821 in 2007.

22.     Kohn transacted business in the United States related to the claims alleged herein. In addition, Kohn maintained a residence at 9 Dolson Road, Monsey, New York 10952 for years

until 2006.  Kohn's last-known address is at Medici's offices at Operngasse 6/4, 1010 Vienna, Austria.

23.    **Defendant Peter Scheithauer ("Scheithauer")** was the Chief Executive Officer ("CEO") of Medici.  Scheithauer resigned as CEO of Medici on January 2, 2009.  Scheithauer was a control person of Medici because he had the power to direct or cause the direction of Medici's management and policy.  Scheithauer's last-known address is at Medici's offices at Operngasse 6/4, 1010 Vienna, Austria.  Upon information and belief, Scheithauer transacted business in the United States related to the claims alleged herein.

24.    **Defendant Werner Tripolt ("Tripolt")** was a director of Medici.  Tripolt resigned from the board on January 2, 2009.  Tripolt was a control person of Medici because he had the power to direct or cause the direction of Medici's management and policy.  Tripolt's last-known address is at Medici's offices at Operngasse 6/4, 1010 Vienna, Austria.  Upon information and belief, Tripolt transacted business in the United States related to the claims alleged herein.

25.    **Defendant John Holliwell ("Holliwell")** was a director of Medici.  Holliwell was a control person of Medici because he had the power to direct or cause the direction of Medici's management and policy.  Holliwell's last-known address is at Medici's offices at Operngasse 6/4, 1010 Vienna, Austria.  Upon information and belief, Holliwell transacted business in the United States related to the claims alleged herein.

26.    Medici, Kohn, Scheithauer, Tripolt, and Holliwell are collectively referred to as the "Medici Defendants."

### (2)    UniCredit SpA

27.    **Defendant UniCredit SpA ("UniCredit")**, an international banking organization based in Italy, owned 25% of Medici through its subsidiary, Bank Austria Creditanstalt.  Since

its acquisition of Bank Austria Creditanstalt in 2006, UniCredit has been a control person of Medici because it had the power to direct or cause the direction of Medici's management and policy. Upon information and belief, UniCredit transacted business in the United States related to the claims alleged herein.

### (3) Thema

28. **Defendant Thema International Fund plc (sometimes referred to as the "Company")**, located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland, is an umbrella type open-ended investment company with variable capital. Thema was incorporated in Ireland on May 9, 1996 (registration number 248741) as a public limited company, and qualifies as a UCITS.[2] The sub-fund had two share Classes, one in United States Dollars and the other in Euros. The shares of the United States Dollar Class were admitted to Official Listing on the Irish Stock Exchange on July 2, 1996 and shares in the Euro Class were admitted on October 3, 2001. Significantly, ***Thema had no employees***. As of November 28, 2008, Thema was said to have assets of over $1 billion, all of which were invested with Madoff. At all relevant times, Thema was controlled by the Medici Defendants. Upon information and belief, Thema transacted business in the United States related to the claims alleged herein.

29. As stated in the Company's 2007 Annual Report: "The objective of the Fund is to achieve long-term capital appreciation by investing on a non-leveraged basis in a large number of United States equity securities traded on Regulated Markets that are highly liquid. Investments will only be made in equity securities that are included in the Standard & Poor's 100 Index." The 2007 Annual Report also emphasized that the United States Dollar "reflects the Company's primary activity of investing in US securities and derivatives." The Prospectus of

---

[2] UCITS refers to the Undertaking for Collective Investment in Transferable Securities.

Thema also represented that it employed "careful selection of investment advisors, which are, in the opinion of the Investment Manager, of the highest quality with a proven track record."

### (4)    The Director Defendants

30.    **Defendant Alberto Benbassat**, whose last-known address is 9, Chemin De Passy, Eres, Switzerland, is a director of Thema, a director of Defendant Thema Asset Management Ltd. ("Thema Management"), and a partner of Defendant Genevalor, Benbassat & Cie ("GB&C"), which owned 55% of Thema Management. Alberto Benbassat was a control person of Thema because he had the power to direct or cause the direction of Thema's management and policy. For example, Alberto Benbassat caused Thema to appoint GB&C and Thema Management to positions that generated multi-million dollar fees. Alberto Benbassat received an MBA from New York University. Upon information and belief, Alberto Benbassat transacted business in the United States related to the claims alleged herein.

31.    **Defendant Stéphane Benbassat**, whose last-known address is Chemin Du Petit, Bel-Air 18B NEX, Switzerland, is a director of Thema, a director of Thema Management, and a partner of GB&C, which owned 55% of Thema Management. Stéphane Benbassat was a control person of Thema because he had the power to direct or cause the direction of Thema's management and policy. For example, Stéphane Benbassat caused Thema to appoint GB&C and Thema Management to positions that generated multi-million dollar fees. Stéphane Benbassat previously worked as a lawyer in the New York office of Morgan, Lewis & Bockius LLP. He transacted business in the United States related to the claims alleged herein.

32.    **Defendant David T. Smith ("Smith")**, whose last-known addresses include: 1 Pokick Farm, South Shore Road, Smith's Parish, Ireland and c/o Equus Asset Management Partner, Bermudiana Arcade, 27 Queen Street, Hamilton HM 11, Bermuda, is a director of Thema, a director of Defendant Thema Management, and a partner of GB&C, which owned 55%

of Thema Management. Smith was a control person of Thema because he had the power to direct or cause the direction of Thema's management and policy. For example, Smith caused Thema to appoint GB&C and Thema Management to positions that generated multi-million dollar fees. Upon information and belief, Smith transacted business in the United States related to the claims alleged herein.

33.     Smith was appointed a Partner of Equus Asset Management Partners, Hamilton, Bermuda, in March 2003. Equus specialized in wealth management services for high net worth individuals. Prior to Equus, Smith was employed by Bank of Bermuda from 1982 to 2003, where he specialized in structuring and servicing of global investment funds. He was a member of the bank's global senior management team in Hong Kong responsible for global sales and distribution for the Global Funds Services Division.

34.     **Defendant Gerald J.P. Brady ("Brady")**, whose last-known address is Birch Hollow, Upper Kilmacud Road, Dundrum, Dublin 14, Ireland, is a director of Thema. Brady was a control person of Thema because he had the power to direct or cause the direction of Thema's management and policy. Upon information and belief, Brady transacted business in the United States related to the claims alleged herein.

35.     Brady is an experienced accountant and Fellow of the Institute of Chartered Accountants in Ireland, a Chartered Financial Analyst, and a member of the Institute of Directors. Brady is currently CEO of the Ireland office of Northern Trust, a U.S. financial institution. Previously, Brady served as Managing Director for the Capital Financial Group in Ireland, and before that was Country Head of Bank of Bermuda in Ireland from 1995 through May 2004, following the acquisition of Bank of Bermuda by HSBC. Prior to that, Brady worked for Bank of Bermuda in its Bermuda office from 1986 (when he served as Global Head of

12

Internal Audit) through 1990, at which time he became the bank's Country Head of Cayman operations and served in such capacity until 1995, when he returned to Dublin. Prior to joining Bank of Bermuda in 1986, Brady had worked for KPMG for eight years in Dublin. Brady has substantial experience in issues involving risks and due diligence process of custodians for investment funds. In fact, he was a speaker at a seminar on this topic held at University College Dublin in October 1997.

36. **Defendant Daniel Morrissey ("Morrissey")**, whose last-known address is William Fry, Fitzwilton House, Wilton Place, Dublin 2, Ireland, is a director of Thema. Morrissey was a control person of Thema because he had the power to direct or cause the direction of Thema's management and policy. For example, Morrissey caused Thema to retain William Fry, a law firm in which he is and has been a partner since 1981, as legal counsel. Upon information and belief, Morrissey transacted business in the United States related to the claims alleged herein.

37. At William Fry, Morrissey is the head of the firm's Asset Management and Investment Funds practice. Since the establishment of Dublin's International Financial Services Centre in 1987, Morrissey has represented the full range of financial services organizations setting up operations there including custodians/trustees, administration and fund management companies and investment funds. Morrissey was a Chairman of the Irish Funds Industry Association, was a member of its Council from 2000 to 2006 and is a member of the Advisory Council of the Institutional Money Market Fund Association.

38. Alberto Benbassat, Stéphane Benbassat, Smith, Brady, and Morrissey are collectively referred to as the "Director Defendants."

### (5)  The HSBC Defendants

39.  **Defendant HSBC Securities Services (Ireland) Ltd. ("HSBC Securities")**, located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland, was the administrator, registrar, transfer agent, and secretary of Thema.  It was incorporated in Ireland as a limited liability company on November 29, 1991.  HSBC Securities had, subject to the Director Defendants' supervision, responsibility for the day-to-day administration of Thema, including the calculation of the NAV, preparation of the accounts, the issue and redemption of shares, the payment of dividends, and the valuation of the fund's assets.  HSBC Securities was an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.  HSBC Securities was a control person of Thema.  Upon information and belief, HSBC Securities transacted business in the United States related to the claims alleged herein.

40.  **Defendant HSBC Institutional Trust Services (Ireland) Ltd. ("HSBC Trust")** (f/k/a Bermuda Trust (Dublin) Limited), located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland, was the custodian of Thema and was responsible for providing safe custody for, and control of, Thema's assets.  HSBC Trust was incorporated in Ireland on November 29, 1991 as a limited liability company and is an indirect wholly-owned subsidiary of HSBC Holdings plc.  HSBC Trust was a control person of Thema.  Upon information and belief, HSBC Trust transacted business in the United States related to the claims alleged herein.

41.  **Defendant HSBC Holdings plc ("HSBC")**, located at 8 Canada Square, London E14 5HQ, United Kingdom, was at all relevant times parent company to its wholly-owned subsidiaries, HSBC Securities, HSBC Trust, and Bank of Bermuda Limited.  HSBC was a control person of HSBC Securities and HSBC Trust because it had the power to direct or cause the direction of the management and policy of HSBC Trust and HSBC Securities.  For example, HSBC advertises itself as an institution with "a uniform, international brand name."  And HSBC

14

subsidiaries also pride themselves as being "backed by [HSBC, which has] one of the strongest balance sheets in the industry, and is known for its strong control and compliance culture." Upon information and belief, HSBC transacted business in the United States related to the claims alleged herein.

42.     HSBC, HSBC Securities, and HSBC Trust are collectively referred to as the "HSBC Defendants."

### (6)     The PwC Defendants

43.     **Defendant PricewaterhouseCoopers (Dublin) ("PwC Ireland")**, located at One Spencer Dock, North Wall Quay, Dublin 1, Ireland, served as the auditor for Thema.  PwC Ireland is the largest professional services firm in Ireland and one of the "Big Four" auditing firms.  Upon information and belief, PwC transacted business in the United States related to the claims alleged herein.

44.     **Defendant PricewaterhouseCoopers LLP ("PwC U.S.")** participated in the audit of Thema and conducted critical procedures relating to Madoff in New York City.  PwC U.S. is headquartered at 300 Madison Avenue, New York, New York.

45.     **Defendant PricewaterhouseCoopers Bermuda ("PwC Bermuda")** participated in the audit of Thema and conducted critical procedures relating to Madoff in New York City. PwC Bermuda maintains offices at Dorchester House, 7 Church Street, Hamilton HM 11, Bermuda.

46.     **Defendant PricewaterhouseCoopers International Ltd. ("PwC International" or "PwC")** is a United Kingdom membership-based company.  PwC International controls constituent PricewaterhouseCoopers offices, self-described as member firms, which "comprise a vigorous global network," according to the global PwC Website.  PwC International is a control person of PwC U.S., PwC Bermuda, and PwC Ireland because it has the power to direct or cause

the direction of their management and policy. PwC International's chairman maintains his offices at 300 Madison Avenue, 24th Floor, New York, New York. PwC International's headquarters is located at 1 Embankment Place, London WC2N 6RH, United Kingdom.

47.     PwC Ireland, PwC U.S., PwC Bermuda, and PwC International are collectively referred to as the "PwC Defendants."

### (7)     William Fry

48.     **Defendant William Fry** is law firm headquartered in Dublin, Ireland and maintains an office in the United States located at 300 Park Avenue, Suite 1700, New York, New York. According to its Website, William Fry is one of Ireland's largest law firms and "operates a large international practice and regularly acts in cases involving other jurisdictions, including . . . the United States." At all relevant times, William Fry served as Thema's legal counsel.

### (8)     The Advisor Defendants

49.     **Defendant Genevalor, Benbassat & Cie**, located at 6, Place Camoletti, CH-1207 Geneva, Switzerland, is an investment advisor offering portfolio management services. GB&C acted as a sub-distributor and representative of Thema Fund. Defendants Alberto Benbassat, Stéphane Benbassat, and Smith "have a controlling stake in Genevalor, Benbassat & Cie which owns 55% of Thema Asset Management Ltd." Upon information and belief, GB&C transacted business in the United States related to the claims alleged herein.

50.     **Defendant Thema Asset Management Limited**, located at Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands, served as the investment manager for Thema from inception until December 31, 2006, and was appointed distributor to Thema on December 31, 2006. In 2006 alone, Thema Management collected $14,759,932 in investment management fees from Thema. And in 2007, Thema Management collected $15,877,052 in distributor's fees from Thema.

51.     Alberto Benbassat, Stéphane Benbassat, and Smith are the directors and the control persons of Thema Management because they are majority owners and have the power to direct or cause the direction of its management and policies.  Thema Management was incorporated in the British Virgin Islands on February 8, 1991.  Upon information and belief, Thema Management transacted business in the United States related to the claims alleged herein.

52.     **Defendant BA Worldwide Fund Management Limited ("BA Worldwide")**, which maintains a post office box at P.O. Box 71, Road Town, Tortola, British Virgin Islands, is an offshore subsidiary of Bank Austria Creditanstalt.  BA Worldwide was the investment advisor to Thema until December 31, 2006, for which it received a fee of 0.5% per year of the net asset value of the Fund.  In 2006, BA Worldwide collected investment advisor fees of $2,434,734 from Thema.  From 2000 through at least 2007, Ursula Radel-Leszczynski (previously named Fano-Leszczynski) was the President of BA Worldwide.  Radel-Leszczynski joined Pioneer Alternative Investments, a member of Pioneer Global Asset Management (UniCredit Group) in approximately 2006 or 2007, after the merger of Bank Austria Creditanstalt and UniCredit Group.  Radel-Leszczynski studied at Harvard University.  She also frequently met with Madoff in New York and was frequently referred to by Madoff as "Dr. Fano."

53.     GB&C, Thema Management, and BA Worldwide are collectively referred to as the "Advisor Defendants."

**(9)     The BMIS Defendants**

54.     **Peter Madoff**, Madoff's younger brother, is a resident of New York.  For almost 40 years, Peter Madoff held senior positions at BMIS, including Senior Managing Director, Director of Trading, Chief Compliance officer, and General Counsel.  Peter Madoff was directly responsible for:  (i) establishing and maintaining an internal control system to protect BMIS investors against fraud; and (ii) ensuring that BMIS's operations comply with all laws.  Instead,

Peter Madoff not only failed to develop any control system, but also actively participated in his brother's Ponzi scheme to defraud investors.

55.    **Andrew Madoff**, one of Madoff's sons, is a resident of New York.  At all relevant times, Andrew Madoff was a senior employee at BMIS, holding the titles of, for example, Director of Proprietary Trading and Co-Head of Trading.  Andrew Madoff was also a director of Madoff Securities International, Ltd. ("MSIL").  During his decades of employment at BMIS, Andrew Madoff gained intimate knowledge of BMIS's operation and trading practices.  Andrew Madoff knew of his father's Ponzi scheme.

56.    **Mark Madoff**, another of Madoff's sons, is a resident of New York.  At all relevant times, Mark Madoff was a senior employee at BMIS, holding the title of Co-Director of Trading.  Like his brother, Mark Madoff has been employed at BMIS for about 20 years and was a director of MSIL.  During his decades of employment at BMIS, Andrew Madoff gained intimate knowledge of BMIS's operation and trading practices.  In fact, Andrew Madoff had publicly acknowledged the intimate family setting at BMIS when he told Wall Street and Technology magazine:  "What makes it fun for all of us is to walk into the office in the morning and see the rest of your family sitting there. . . . To Bernie and Peter, that's what it's all about."  Also like his brother, Andrew Madoff knew of his father's Ponzi scheme.

57.    Peter Madoff, Andrew Madoff, and Mark Madoff are collectively referred to as the "BMIS Defendants."

### (10)    The Financial Institution Defendants

58.    **JP Morgan Chase & Co. ("JP Morgan")**, formerly Chase Manhattan Bank, is the third largest financial institution in the United States and one of the largest asset managers and hedge fund managers in the world.  JP Morgan is organized under the laws of Delaware with offices in New York.  Joanne DiPascali, the sister of Madoff's lieutenant, Frank DiPascali, was

an employee of JP Morgan Chase National Association, the private banking arm of JP Morgan Chase.

59.     JP Morgan played a key role in Madoff's Ponzi scheme. Madoff and BMIS maintained account number 140081703 (the "703 Account") at JP Morgan, in which the vast majority of the investors' monies obtained in the Ponzi scheme was held. Despite the fact that billions of dollars flowed through that account, none of which was used for securities transactions, it does not appear that this multibillion-dollar bank account at JP Morgan came under suspicion by internal bank compliance systems or managers in charge of Madoff's account. In addition, as BMIS's banker for over two decades, JP Morgan funneled hundreds of millions of dollars to Madoff and BMIS by using ***structured derivative notes*** based on the performance of two funds managed by Madoff feeder fund Fairfield Greenwich Advisors. During its acquisition of Bear Stearns, JP Morgan discovered information at Bear Stearns that led it to withdraw approximately $250 million of its own money from Fairfield Greenwich. As a result of its involvement with Madoff and BMIS, JP Morgan Chase either knew or was willfully blind to the fact that BMIS was not purchasing securities on behalf of investors and was misusing investor funds. Finally, JP Morgan also violated the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, the Money Laundering Control Act of 1986 and the Bank Secrecy Act of 1970 for failing to file Suspicious Activity Reports ("SAR") regarding the 703 Account and suspicious money transfers between Madoff's New York and the London offices.

60.     **The Bank of New York Mellon ("BONY")**, formerly The Bank of New York Company, Inc., is a global financial services company providing asset and wealth management, asset servicing, issuer services, clearing services and treasury services, and is headquartered in

New York.  According to its Website, BONY is a leading provider of financial services for institutions, corporations, and high net-worth individuals.  BMIS maintained its operating account number 8661126621 (the "621 Account") with BONY for its brokerage business.  In response to an SEC investigation, Madoff identified BMIS's account at BONY was one of only four bank accounts used to illegally transfer monies, often using MSIL's London accounts as an intermediary for money laundering purposes (the only other three bank accounts were held at BMIS, Depository Trust Clearing Corp. in New York, and Barclay's Capital in London).  BONY violated the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, the Money Laundering Control Act of 1986 and the Bank Secrecy Act of 1970 for failing to file Suspicious Activity Reports ("SAR") regarding the 621 Account and suspicious money transfers between New York and London.  In the course of handling BMIS's account, BONY gained actual knowledge that BMIS was violating its fiduciary duties and committing fraud.

61.     JP Morgan and BONY are collectively referred to as the "Financial Institution Defendants."

### III     AGENCY, AIDING AND ABETTING, AND CONSPIRACY

62.     At all relevant times, each Defendant was an agent, servant, employee, partner, and joint venturer of the other Defendants.  At all such times, each Defendant was acting within the course and scope of his or her relationship as agent, servant, employee, partner, or joint venturer of the other Defendants.  Each Defendant had actual and/or constructive knowledge of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each other Defendant, and/or retained the benefits of other Defendants' wrongful acts.

63.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff and the

Class.  In taking action to aid and abet and substantially assist the commissions of these wrongful

acts and other wrongdoing complained of, each Defendant had actual knowledge of the fraud and

realized that its conduct would substantially assist the accomplishment of the wrongdoing

alleged herein.

64.     Defendants reached an agreement to perform the acts complained of herein; all

were direct, necessary, and substantial participants in the conspiracy, common enterprise, and

common course of conduct complained of herein; and all Defendants were aware of their overall

contribution to and furtherance of the conspiracy, common enterprise, and common course of

conduct.  Defendants' acts of conspiracy include, among other things, all of the acts each

Defendant is alleged to have committed in furtherance of the wrongful scheme alleged herein,

except those relating to the reaching of agreements or understandings sufficient to characterize

their conduct as conspiratorial.

## IV     JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction Over the Federal Securities Law Claims

65.     This Court has jurisdiction over the Exchange Act claims pursuant to Section 27

of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 because (i) the activities of the

Medici Defendants, Thema, the Director Defendants, the HSBC Defendants, Thema Asset

Management Ltd., the PwC Defendants, and UniCredit in the United States were "more than

merely preparatory" and their culpable failures to act in the United States directly caused the

losses of Plaintiff and the Class; and (ii) Defendants' wrongful conduct had a substantial effect in

the United States or upon United States citizens.

          **(1)**       **Conduct Test**

                **(a)**      **The Medici Defendants' Substantial Presence and Conduct in New York**

66.      Defendant Kohn, Medici's founder, chairperson, and 75% owner, has had continuous and systematic contacts with New York since the 1980s. Known as "Austria's woman on Wall Street," Kohn founded and headed a small brokerage firm in New York in the 1980s. Kohn maintained a residence at 9 Dolson Road, Monsey, New York at all relevant times.

67.      Since meeting Madoff in New York City in the 1980s, Kohn maintained a decades-long relationship with him. Kohn's telephone numbers appeared in Madoff's personal telephone book.

68.      Kohn met frequently with Madoff in New York City in connection with Thema since its inception in the 1990s and with other Medici Funds. For example, according to Madoff's appointment book, Kohn met with him in New York City on August 23, 2005, March 27, 2006, October 31, 2006, and September 23, 2008. During these meetings, Kohn either (i) actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS; or (ii) failed to perform due diligence as the founder, chairperson, and majority shareholder of Medici – Thema's investment manager – to detect Madoff's Ponzi scheme.

69.      Kohn caused Thema's assets to be funneled to Madoff and BMIS in New York City. Kohn caused more than $3 billion of Medici Funds' assets to be funneled to Madoff and BMIS.

70.      In furtherance of the wrongdoing giving rise to the federal securities law claims, Kohn incorporated Eurovaleur Inc. and Infovaleur, Inc. under the laws of the State of New York in the 1990s. Both Eurovaleur and Infovaleur maintained their principal place of business in

New York City and served as Kohn's alter ego in connection with her wrongdoing alleged herein.

71. Unbeknownst to Plaintiff and the Class, through Eurovaleur and/or Infovaleur, Kohn received secret quarterly payments from Madoff or his affiliates. According to Eleanor Squillari, who was Madoff's secretary for 25 years, typically Madoff would leave an envelope with the payments at BMIS's New York headquarters for Kohn, which her assistant, Robert Reuss ("Reuss"), or another employee would pick up. In addition, Kohn or Reuss would schedule the meetings between Kohn and Madoff in the name of Kohn's company, Eurovelour, 230 Park Avenue, New York, New York.

72. This is presumably an attempt to disguise the nature of the meetings. Moreover, according to an investigation conducted by the U.S. Department of Justice, these payments, purportedly to reimburse Kohn for research, amounted to over $32 million over the years. All these payments originated from Madoff's offices in New York City and were funneled through Kohn's offices in New York City. All Medici Defendants were aware of these payments, which amply demonstrate that the Medici Defendants breached their fiduciary duties to Plaintiff and the Class by appointing Madoff to be Thema's undisclosed investment advisor in exchange for these payments and without performing adequate due diligence.

73. Accordingly, Kohn's activities in New York City constituted conduct that was more than merely preparatory to the wrongdoing and directly caused the losses.

74. Medici also conducted business in New York City through Kohn and Eurovaleur in connection with Thema because, as Medici's agent, Kohn promoted Medici in New York City and because Eurovaleur owned a number of domain names relating to Medici, including:

MEDICI-FINANCE.COM, MEDICI-FINANZ.COM, MEDICIFINANCE.COM, and MEDICIFINANZ.COM.

75. Kohn, together with Eurovaleur and Infovaleur, served as an agent of the remaining Medici Defendants – Medici, Scheithauer, Tripolt, and Holliwell – and transacted business in the State of New York for the benefits of all Medici Defendants in connection with Thema.

76. According to a February 23, 2006 letter in response to a Securities and Exchange Commission ("SEC") inquiry, Madoff identified Medici's 25% owner, Bank Austria Creditanstalt, as one of the broker/dealers through which he executed trades for institutional clients such as Thema.

77. Medici, as Thema's investment manager, not only appointed Madoff and BMIS in New York City to serve as a *de facto* investment manager, but also funneled Thema's assets to Madoff and BMIS in New York City. Because all Medici Defendants had actual knowledge of the fact that Madoff and BMIS in New York City held all of Thema's assets, they purposefully interjected themselves to New York City by (i) visiting with Madoff; and/or (ii) directing communications to, and receiving communications from, Madoff and BMIS in New York City. The Medici Defendants' activities in New York were integral to their roles in the wrongdoing.

78. Accordingly, the Medici Defendants' activities in, and directed to, New York constitute conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

### (b) UniCredit's Substantial Presence and Conduct in the United States

79. Because UniCredit owned and controlled Bank Austria Creditanstalt and is a control person of Medici, Medici's activities in New York were attributable to UniCredit.

80.     UniCredit exerted its authority to control Medici and the operation of the Medici Funds in multiple ways.  For example, in addition to ownership, UniCredit provided Medici with access to its subsidiary, Pioneer Alternative Investment Management Limited ("Pioneer Management"), which served as an investment advisor for the Primeo Funds.  UniCredit also caused the appointment of BA Worldwide as Thema's investment advisor.  UniCredit controlled both Pioneer Management and BA Worldwide through Bank Austria Creditanstalt.  And Radel-Leszczynski, who had close ties to Madoff, served as an officer for both Pioneer Management and BA Worldwide.

81.     As an agent of UniCredit, Radel-Leszczynski met with Madoff frequently in New York City in connection with the Medici Funds, including Thema.  For example, Madoff's appointment book reflects that Radel-Leszczynski met with Madoff in New York City on April 22, 2005, December 6, 2005, May 9, 2006, October 23, 2006, March 19, 2007, October 30, 2007, May 20, 2008, and September 29, 2008.

82.     Moreover, UniCredit sent at least one member of its management (as identified in the UniCredit Group Employee Share Ownership Plan 2009), Dario Frigerio ("Frigerio"), for assignment in the United States.  Frigerio, the CEO of Pioneer Global Asset Management, was stationed in Boston, Massachusetts between 2001 and 2010.  Upon information and belief, Frigerio was involved in UniCredit's handling of the Medici Funds.

83.     Accordingly, the UniCredit's activities in, and directed to, the United States constitute conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

84.    Like Kohn, Alberto Benbassat and his family have had close ties to Madoff for years.  The telephone numbers of both Alberto Benbassat and Stéphane Benbassat appeared in Madoff's personal telephone book.

85.    Alberto Benbassat and Stéphane Benbassat were both Thema Fund directors and frequently met with Madoff in New York City to conduct business on behalf of Thema. Madoff's appointment book reflects that Alberto Benbassat made an appointment with Madoff for September 13, 2007, which was later cancelled.  Upon rescheduling, Alberto Benbassat and Madoff met on October 22, 2007 in New York City to conduct business on behalf of Thema. Madoff's appointment book also reflects that Stéphane Benbassat met with Madoff on October 2, 2007 and October 6, 2008 in New York City in connection with Thema.   During these meetings, Alberto Benbassat and Stéphane Benbassat either (i) actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS; or (ii) failed to perform due diligence as directors of Thema to detect Madoff's Ponzi scheme.

86.    Alberto Benbassat and Stéphane Benbassat also directed communications to and received communications from Madoff in New York City in connection with Thema.

87.    Alberto Benbassat and Stéphane Benbassat not only appointed Madoff and BMIS in New York City to serve as Thema's *de facto* investment manager, but also funneled Thema's assets to Madoff and BMIS in New York City.

88.    Furthermore, Alberto Benbassat and Stéphane Benbassat appointed Madoff and BMIS in New York City to serve as Thema's sub-custodian.

89.    Because Thema had neither employees nor offices and can only act through the Director Defendants and the Company's professional advisors, Alberto Benbassat and Stéphane

Benbassat participated in the foregoing activities as agents of Thema Fund and the remaining Director Defendants, Smith, Brady, and Morrissey.

90.     Moreover, Brady and Morrissey both regularly transact business in the United States. Both Brady and Morrissey have regularly attended business meetings and conferences in New York City. For example, Brady and Morrissey were both featured speakers at a conference at the New York Athletic Club on March 19, 2009 dealing with the investment funds industry. Morrissey spoke on international distribution of UCITS funds such as Thema. Brady is CEO of the Irish office of Northern Trust and has frequent business trips to and meetings in New York.

91.     Accordingly, the activities of Thema and Director Defendants in, and directed to, New York constitute conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

### (d)     Thema Management's Substantial Presence and Conduct in New York

92.     As discussed above, Alberto Benbassat and Stéphane Benbassat (i) frequently met with Madoff in New York City; and (ii) directed communications to and received communications from Madoff in New York City in connection with Thema.

93.     Alberto Benbassat and Stéphane Benbassat carried out these activities not only as agents of Thema and of its directors (including Smith, who was a director of Thema Management and partner of GB&C), but also for the benefit of Thema Management, which served Thema as an investment manager before 2006 and a distributor beginning in 2007.

94.     Accordingly, Alberto Benbassat's and Stéphane Benbassat's activities were attributable to Thema Management, which was under their control. And Thema Management's activities in, and directed to, New York constitute conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

**(e)**      **HSBC Defendants' Substantial Presence and Conduct in New York**

95.      The HSBC Defendants – HSBC, HSBC Trust, and HSBC Securities – served the roles of custodian and administrator at Thema. Specifically, as custodian, the HSBC Defendants were obligated to: (a) safe-keep securities; and (b) open and maintain accounts with brokers according to the regulations of each market in which the securities were traded. (*See* May 30, 1996 Custodian Agreement at 5-6.) And as administrator, the HSBC Defendants were responsible for calculating the NAV and administering the accounts, all of which were related to securities and treasury bills purportedly purchased on United States markets. Because all securities purportedly purchased by the Company originated from the United States markets, the HSBC Defendants conducted substantial activities in the United States to perform their functions.

96.      More fundamentally, as the undisclosed sub-custodian for Thema, Madoff performed in New York most of the job duties that the HSBC Defendants was allegedly performing. HSBC securities' calculation of Thema's NAV was entirely dependent on the account statements Madoff prepared in New York. And HSBC Trust did not safeguard Thema's assets – Madoff did. Thus, the wrongdoing that occurred in New York was central, and not merely preparatory, to the HSBC Defendants' wrongful conduct. Whatever wrongful conduct the HSBC Defendants performed in Ireland was entirely secondary to their primary wrongful conduct of meeting with Madoff in New York to check in on whether he was performing the duties they claimed to be performing.

97.      The HSBC Defendants' failure to properly perform their custodial and administrative functions with respect to the purported trades made by Madoff and BMIS in New York City directly caused the losses of Plaintiff and the Class.

98.     The HSBC Defendants not only participated in funneling Thema's assets to Madoff and BMIS in New York City, but also appointed Madoff and BMIS in New York City to serve as Thema's sub-custodian. Because HSBC Trust and HSBC Securities had actual knowledge of the fact that Madoff and BMIS in New York City held all of Thema's assets, they purposefully interjected themselves to New York City by, upon information and belief, visiting with and directing communications to Madoff and BMIS.

99.     In fact, HSBC's officers have frequently met with Madoff in New York City in connection with HSBC Trust's role as custodian of Thema.

100.     According to a January 2007 article in the Financial Services Research, the HSBC division that provided administrative and custodial services to investment funds (the precise services HSBC Trust performed for Thema) was tasked with assessing the risk that Madoff posed to Thema:

> Since the HSBC Group's acquisition of the Bank of Bermuda was completed in February 2004, [HSBC Securities Services] **has encountered the new challenge of conducting risk assessments on prime brokers** whose hedge fund clients use [HSBC Securities Services'] Alternative Fund Services as their hedge fund administrator. "Given that the prime broker [*i.e.*, Madoff] is typically appointed by the hedge fund [*i.e.*, the Company], many prime brokers struggle to understand why they should be subject to due diligence by a global custodian," notes Mick Underwood[, head of HSBC's Custody Network Management division.].

(*See* January 2007 Financial Services Research, Ex. 5, at 5 (emphasis supplied).)[3]

101.     Madoff's appointment book reflects that the head of HSBC Securities Services, Brian Pettitt ("Pettitt"), met with Madoff on at least two occasions – February 21, 2008 and November 19, 2008 – at BMIS's New York office, in connection with HSBC's custodial

---

[3] All emphases are supplied unless otherwise noted.

services. Madoff's appointment book also reflects a July 16, 2008 meeting with an HSBC representative at BMIS's New York office. During these meetings, the HSBC Defendants either (i) actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS; or (ii) failed to perform due diligence as directors of Thema to detect Madoff's Ponzi scheme.

102. The HSBC Defendants, through HSBC Securities Services, transacted business in New York City in connection with their custodial and administrative functions for Thema. In the January 2007 article, Pettitt admitted that "Irish Regulator insist[ed] that the prime broker [i.e., Madoff and BMIS] must also be sub-custodian of the assets" and that it was "vital that [the HSBC Defendants] work with the prime broker as their agent." (Id. at 50.) Moreover, HSBC's regulatory reporting team approved of the process through which Pettitt purportedly attempted to perform due diligence on Madoff and BMIS.

103. Accordingly, the HSBC Defendants' activities in, and directed to, New York constituted conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

### (f) The PwC Defendants' Substantial Presence and Conduct in New York

104. The coordinated conduct of the PwC Defendants – PwC International, PwC Ireland, PwC U.S., and PwC Bermuda – in the United States reveals a fundamental aspect of their wrongdoing.

105. PwC Ireland knew that Madoff and BMIS in New York City (i) served as Thema's investment advisor and sub-custodian; and (ii) held all of Thema's assets. Such knowledge required PwC Ireland to examine and visit Madoff and BMIS in New York as an integral part of its audit of Thema. Accordingly, PwC Ireland purposefully interjected itself to

New York City by visiting with and/or directing communications to, and receiving communications from, Madoff and BMIS in New York.

106.     PwC U.S. and PwC Bermuda held numerous meetings with Madoff and routinely exchanged information necessary for PwC Ireland to issue audit opinions:

(a)     Partners from the PwC U.S. and PwC Bermuda met with Madoff at his offices in New York City in December 2004 and December 2006;

(b)     PwC Bermuda held telephonic conversations with PwC Ireland in connection with the 2005 and 2007 audits;

(c)     Each year between 2003 and 2007, PwC Ireland received a written confirmation letter enclosing year-end brokerage account statements for Thema from BMIS;

(d)     PwC Ireland had a number of e-mail communications with partners of PwC U.S. in New York in connection with Madoff and Thema;

(e)     PwC Ireland reimbursed PwC U.S. and PwC Bermuda for their expenses incurred in interviewing Madoff in New York City and, in return, received copies of reports about the interviews;

(f)     PwC U.S. and PwC Bermuda tailored their interviews with Madoff to directly address matters germane to PwC Ireland's audits of Thema; and

(g)     PwC U.S. and/or PwC Bermuda obtained critical documents in the United States necessary for PwC Ireland to issue an audit opinion, including, (i) the PwC Madoff Report for 2004, (ii) a report in 2006 which was similar to the PwC Madoff Report; (iii) a copy of Friehling & Horowitz's Independent Auditor's Report on Internal Control for Madoff pursuant to SEC Rule 17a-5(g)(1), received in connection with the 2004, 2006, and 2007 audits; (iv) a copy of Madoff's Statement of Financial Condition, with an Independent Auditors Report on Internal Control for Madoff from Friehling & Horowitz, received in connection with the 2006 and 2007 audits; and (v) a FINRA BrokerCheck report for the 2004 and 2006 audits.

107.     Thus, the activity that occurred in New York and the documents Madoff and BMIS sent to PwC Ireland were central to, and not merely preparatory to, PwC Ireland's audit of Thema, all the fraudulent documents, account statements and other information that PwC Ireland received from Madoff and blindly relied upon emanated from New York, not Ireland. PwC

Ireland did not perform a single act in Ireland to confirm that Madoff had actually bought securities on behalf of Thema.

108.     PwC U.S. interviewed Madoff and assisted PwC Ireland's issuance of annual audit opinions for Thema.  Linda McGowan, a PwC U.S. partner, was present at least two key meetings with Madoff in 2004 and 2006 at Madoff's offices in New York City.  At least two other PwC U.S. partners, Anthony Artaban ("Artaban") and Barry Knee ("Knee"), communicated with PwC Ireland concerning Madoff.

109.     PwC Ireland also has had substantial contacts with the United States:

(a)     PwC Ireland has clients and provides professional services in the United States;

(b)     PwC Ireland has received payments from clients in the United States and New York;

(c)     PwC Ireland regularly visited the office of PwC U.S. in the United States;

(d)     PwC Ireland regularly seconded staff to PwC U.S. in the United States;

(e)     PwC U.S. staff regularly visited the offices of PwC Ireland;

(f)     PwC U.S. regularly seconded staff to PwC Ireland; and

(g)     PwC Ireland communicated with Madoff in New York in the form of written trade confirmations from Madoff.

110.     PwC U.S. and PwC Bermuda failed to verify the statements made by Madoff during the interviews in December 2004 and December 2006, and they also shared with PwC Ireland the reports containing Madoff's unsubstantiated statements.  PwC Ireland in turn relied almost exclusively on these cursory reports and the documents it received from Madoff himself to issue unqualified audit opinions on Thema.  The PwC Defendants therefore conducted the critical, and fatally defective, part of their audit of Thema in New York City.

111.    Accordingly, the PwC Defendants' activities in, and directed to, New York constituted conduct that was not merely preparatory to the wrongdoing and directly caused the losses of Plaintiff and the Class.

### (2)    Effects Test

112.    According to the Securities Investor Protection Corporation ("SIPC") Trustee, Madoff's Ponzi scheme caused investors to believe they had approximately $65 billion in assets when in reality those assets did not exist.  Billions of dollars of these fictitious assets caused substantial harm to thousands of United States citizens whose supposed wealth evaporated overnight.  This wealth had served to collateralize investments and assets of thousands of United States citizens who had to liquidate these assets and suffered real losses.

113.    Defendants' wrongful conduct permitted Madoff to perpetuate the Ponzi scheme. The nature of a Ponzi scheme required that Madoff use the funds from new investors to pay old ones.  Thema provided Madoff with billions of dollars to continue the Ponzi scheme.  But for the billions of dollars that Thema gave to Madoff, the scheme would have unraveled substantially earlier and not damaged thousands of United States citizens.  Similarly, but for the withdrawal of hundreds of millions of dollars from Madoff in the later years of the Ponzi scheme which were effectively taken from United States citizens, substantially fewer United States citizens would have been harmed by Madoff's Ponzi scheme.  Thema would not have invested with Madoff but for Defendants' wrongful conduct.

114.    The effect of the feeder funds in perpetuating Madoff's Ponzi scheme has been widely reported in the press. According to The Wall Street Journal's article, "Mad Men," published on January 7, 2009, "[f]eeder funds appear to explain [ ] the longevity of money manager Bernie Madoff."  Other news agencies issued similar reports:

33

(a)     Time Magazine published an article entitled, "*How Madoff's Feeder Funds Stole My Retirement*," which said that, "Bernard Madoff built his $65 billion Ponzi empire at least half on the backs of his feeder funds."[4] The feeder funds allowed Madoff "to keep his house of cards standing much longer than he otherwise could have with his ragtag band of family members, small time accountants," according to the same article; and

(b)     The New York Times published an article entitled, "*In Fraud Case, Middlemen in Spotlight*," which reported that the feeder funds "were essentially pouring billions of dollars each into Bernard L. Madoff Investment Securities."[5]

115.    Madoff's Ponzi scheme had a substantial effect on U.S. citizens:

(a)     investors who suffered enormous losses at the hands of Madoff included "pensioners, municipal workers, students on scholarship, and middle class Americans, not just wealthy investors";[6]

(b)     the effect of Madoff on U.S. charities and their respective beneficiaries is substantial and well-documented.   The collateral effect of Madoff's Ponzi scheme has sent "shock waves throughout the medical and scientific communities – with far-reaching implications for everything from diabetes research to palliative care.   Philanthropy experts say that *the negative effect of the Madoff scandal on health care could ultimately affect millions of people*."[7] As a result, "hospitals, food banks, schools and community outreach programs throughout the world are being forced to cut life-giving services as they watch millions of dollars in grants from large Jewish charities dry up in the wake of Bernard Madoff's alleged $50 billion Ponzi scheme."[8]

(c)     it is estimated that the Internal Revenue Service ("IRS") will lose up to $17 billion in lost tax revenue.   In some instances, the IRS may have to refund filers who paid taxes on fictitious gains from Madoff.   Individual states may also lose substantial tax revenue due to Madoff;[9]

---

[4] Time, April 5, 2009, *How Madoff's Feeder Funds Stole My Retirement*.

[5] The New York Times, December 17, 2008, *In Fraud Case, Middlemen in Spotlight*.

[6] Newsweek, December, 17, 2008, *Did Bernie Madoff Steal Your Money?*

[7] The Wall Street Journal, February 12, 2009, *Madoff Scandal's Deep Impact on Funding For Health, Science*.

[8] Fox News online report, December 18, 2008, *Long Tentacle of Madoff's Scheme Impacting Life-Giving Programs*.

[9] Huffington Post, December 18, 2008, *Madoff's Ponzi Scheme Could Cost IRS $17 Billion In Lost Tax Revenue*.

(d)      the insurance industry has reported that it will be affected by Madoff's scheme in the "range of direct insured losses . . . between $760 million and $3.8 billion . . . with the maximum potential exposed insurance limits at more than $6 billion";[10] and

(e)      United States banks have also been affected by Madoff, including lending institutions, like Wells Fargo, who recently recorded losses of $294 million related to customers who were unable to pay their mortgages because they were wiped out by Madoff.[11] Similarly, hedge funds have seen substantial redemptions: "The Madoff scandal has contributed to redemptions that could shrink the hedge fund industry by half, to $1 trillion, by the end of the year."[12]

116.      Accordingly, Defendants' wrongful conduct had a substantial effect in the United States and upon United States citizens.

## B.      Subject Matter Jurisdiction Over State Law Claims

117.      This Court has jurisdiction over the state law claims pursuant to:

(a)      the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a); and

(b)      the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because (i) the amount in controversy exceeds the jurisdictional amount of $5,000,000; (ii) the Class consist of hundreds, and perhaps thousands, of individuals; and (iii) Plaintiff is a citizen of a foreign state and at least one Defendant is a citizen of New York.

## C.      Personal Jurisdiction

### (1)      Defendants' Purposeful Availment

118.      According to the prospectuses and annual reports to Thema Fund investors, Thema was designed and established to invest in the U.S. stock market.

119.      A prospectus dated December 31, 2006 states that "investment in securities will be restricted to those traded on stock exchanges and markets listed below in this Prospectus":

---

[10] Medill Reports, January 15, 2009, *Aon Estimates Madoff's Alleged Ponzi Scheme Could Cost Insurers Billions*.

[11] New York Times, January 28, 2009, *Wells Fargo Says Madoff Scheme Cost It $294 Million*.

[12] Reuters, March 27, 2008, *Hedge Fund Industry Still Feeling Madoff Effect*.

(a)     the markets organized by the International Securities Market Association;

* * *

(e)     NASDAQ in the United States;

(f)     the market in US government securities conducted by primary dealers regulated by the Federal Reserve Bank of New York;

(g)     the over-the-counter market in the United States regulated by the National Association of Securities Dealers Inc.;

* * *

(*See* Thema December 31, 2006 Prospectus, Ex. 2, at 47.)

120.     That prospectus also refers to federal statutes, including the Securities Act of 1933 and the Investment Company Act of 1940, in its definition section.

121.     Annexed to the prospectus is a supplement regarding Thema – the only sub-fund of the Company.  The supplement states that the fund's investment objective was to invest in the United States equity securities markets:

> The objective of Thema is to achieve long-term capital appreciation by investing on a non-leveraged basis in a large number of United States equity securities traded on Regulated Markets that are highly liquid.  Investments will principally be made in equity securities that are included in the Standard & Poors 100 Index (the "Index").

(*See id.* at 4.)

122.     Similarly, the annual report for the year ending December 31, 2007 explains that Thema was to be invested "in a large number of United States equity securities" and that Thema's "portfolio will typically have approximately 50 highly liquid positions in US equities quoted on Regulated Markets located in the United States."  (*See id.* at 24.)

123.     As an investment strategy, "the Company held equities, treasury bills, put and call options, forward foreign currency contracts and cash.  Of the twenty four valuation points during 2007, on twelve of these the Fund was fully invested in US treasury bills and on five of these the Fund was fully or almost fully invested in equities.  Of the remaining seven valuation points the Fund was partially invested in US treasury bills and partially invested in equities." (*See id.* at 25.)

124.     Consistent with this description of investment strategy, the 2007 annual report stated that Thema's portfolio consisted of (i) the stock of over 100 corporations, including AT&T Inc., American Express Co., and Wal-Mart Stores, all of which are listed on the New York Stock Exchange or NASDAQ; (ii) purchase put options of S&P 100 Index; and (iii) U.S. treasury bills.

125.     Defendants took advantage of the exemplary reputation of the laws and securities markets of the United States as being the best regulated and most efficient markets in the world by:

   (a)     creating, advising, managing, and/or auditing a fund whose sole objective was to invest in the United States;

   (b)     directly dealing with Madoff and BMIS in New York City; and

   (c)     funneling, or participating in funneling, Thema's assets to bank accounts in New York City.

126.      Having benefited from the advantages of the United States, they cannot seek now to disavow the concomitant obligations, which include being subject to the laws of the United States.

127.     Accordingly, all Defendants availed themselves of the benefits and privileges of investing in the United States, pursuant to its laws and regulations.  It was foreseeable that,

having chosen to operate an investment fund that was 100% invested in the United States, all Defendants would be subject to being sued in the United States.

### (2)  New York Resident Defendants

128.    This Court has personal jurisdiction over (i) the BMIS Defendants, Peter Madoff, Mark Madoff, and Andrew Madoff; (ii) the Financial Institution Defendants, JP Morgan and BONY; and (iii) William Fry, because they reside within this District.

### (3)  Non-Resident Defendants Under New York's Long-Arm Statute

129.    As discussed above, the Medici Defendants, Thema, the Director Defendants, the HSBC Defendants, the PwC Defendants, and the Advisor Defendants, by themselves or through their agent(s), transacted business or committed tortious acts in the State of New York in furtherance of the scheme alleged herein by:

(a)     meeting with Madoff on numerous occasions in New York City;

(b)     directing communications to and receiving communications from New York City;

(c)     funneling, or participating in funneling, investments to and from New York City;

(d)     receiving payments from New York City in connection with the Thema Fund;

(e)     appointing, or participating in the appointment of, Madoff and BMIS in New York City to serve as Thema's investment manager and sub-custodian; and/or

(f)     using, owning, or possessing real estate in the State of New York

130.    Accordingly, the Medici Defendants, Thema, the Director Defendants, the HSBC Defendants, the PwC Defendants, the Advisor Defendants, and William Fry are subject to New York's long-arm statute, N.Y.C.P.L.R. § 302.

### D.  Venue

131.    Venue in this District is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged

wrongdoing and/or its effects have occurred within this District. Additionally, certain Defendants maintain offices and conduct substantial business in this District.

## V      BACKGROUND FACTS

### A.      Madoff's Ponzi Scheme

132.    Madoff founded BMIS in 1959 as a New York limited liability company and was its chairman and chief executive officer. Madoff ran BMIS mainly through his family, including the BMIS Defendants – his brother Peter, and sons Andrew and Mark. BMIS had three business units:  market making, proprietary trading, and investment advisory services ("Investment Advisory").

133.    The Investment Advisory business purportedly invested using a split strike conversion strategy. The strategy involved the purchase and sale of equity securities, options, and government securities. Although investors in the Investment Advisory business received monthly or quarterly statements purportedly showing the equity securities, options, and government securities that the investor owned, as well as the growth of and profit from those accounts over time, these statements were a complete fabrication. There is no record of BMIS or Madoff having cleared a single purchase or sale of securities for its Investment Advisory clients at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BMIS could have reasonably traded securities.

134.    Additionally, there is no evidence that Madoff or BMIS ever purchased or sold any of the options claimed to have been purchased or sold and reported to BMIS's Investment Advisory investors. Options related to the Standard & Poor's 100 ("S&P 100") companies are typically traded on the Chicago Board Options Exchange ("CBOE"). There are no records of Madoff or BMIS ever having purchased or sold any options for its Investment Advisory clients on the CBOE.

**B.    Madoff's Guilty Plea and Sentence**

135.    On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws after Madoff admitted that his money management operation was "a giant Ponzi scheme." Madoff further admitted that "there [was] no innocent explanation." And estimated that investors' losses reached $50 billion. That same day, the SEC filed an emergency action, *SEC v. Madoff*, No. 08 Civ. 10791 (S.D.N.Y.), to halt all ongoing activities by Madoff and BMIS.

136.    On December 15, 2008, the SIPC filed an application in the United States District Court for the Southern District of New York alleging that BMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA"). The Court granted the SIPC's application and appointed Irving H. Picard as the Trustee to liquidate BMIS (the "SIPC Trustee").

137.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09 CR 0213 (S.D.N.Y.), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]" and that he "knew what [he] was doing was wrong, indeed criminal." On June 29, 2009, Madoff was sentenced to 150 years of imprisonment. Madoff is currently serving this sentence.

**C.    Thema's Role in Madoff's Ponzi Scheme**

138.    For years, Madoff and BMIS created false documents for thousands of individual accounts. To avoid detection, however, Madoff began utilizing feeder funds in the 1990s to

develop his Ponzi scheme because, in appearance, the feeder funds were issued, managed, and audited by professional companies and thus provided investors with a sense of confidence and security. To recruit financial professionals to develop feeder funds, Madoff did not charge any investment advisor fees and instead charged only extraordinarily low commissions for stock trades – usually 4 cents per trade and $1 per option (as opposed to the typical 1-2% of assets under management) – thus allowing the feeder funds to keep all the management fees.

139. For Thema, its connection with Madoff allowed Defendants to collect over $100 million in fees during the Class Period. The Fairfield Greenwich Advisors, a major feeder fund, is estimated to have earned about $135 million in fees from BMIS investments. The purported rationale for the feeder funds was to provide investors with sophisticated management and investment of their money. But Thema Management and Medici failed to perform any investment selection or management and instead simply funneled its clients' investments to Madoff in exchange for lucrative fees.

140. Thema was one of the four largest feeder funds for Madoff. The other three largest feeder funds were: Fairfield Greenwich Advisors (approximately $7,500,000,000 in exposure), Tremont-Broad Market Fund (approximately $3,300,000,000 in exposure), and Banco Santander (approximately $2,870,000,000 in exposure).

141. According to a February 3, 2004 SEC memorandum, which was only publicly disclosed in 2009, "the commission revenues generated from these four institutional clients account for the overwhelming majority of commission revenues generated for [Madoff/BMIS] since 2001. Obviously, this trading strategy has yielded Madoff unbelievable profits." The SEC memorandum indicates that Madoff earned $9,410,218 from Thema in 2003 alone just from the

split-strike conversion trades (the memorandum indicates that Madoff earned additional, but by comparison minor, commissions from Thema for broker-dealer market making trades).

142.    The Ponzi scheme could not have occurred without the knowledge and substantial assistance of feeder funds like Thema.  Unbeknownst to Plaintiff and the Class, Thema became a portal through which money from investors was secretly sent to Madoff even though Thema Management and Medici were represented to be the investment managers.

## VI    DEFENDANTS' WRONGFUL CONDUCT

### A.    Mismanagement of Thema By the Director Defendants, the Medici Defendants, the HSBC Defendants, the Advisor Defendants, William Fry, and the PwC Defendants

#### (1)    The Director Defendants

143.    Thema was founded as an "umbrella type open-ended investment company with variable capital and having segregated liability between its [f]unds incorporated in Ireland as a public limited company qualifying as a UCITS." (*See* Thema December 31, 2006 Prospectus, Ex. 2, at 11.)  "The Company [was] designed for investors . . . who desire[d] professional management of their liquid assets." (*Id.*)  The Company's primary investment objective was "to achieve long term capital appreciation while attempting to limit investment risk." (*Id.* at 12.)

144.    Because Thema had neither employees nor offices, the Director Defendants were among the control persons of Thema, and acted on its behalf and by appointing agents. According to a December 31, 2006 prospectus, the Director Defendants "control[led] the affairs of the Company and [were] responsible for the overall investment policy." (*Id.* at 15.)  And the Director Defendants were supposed to "seek to achieve [the Company's] objective . . . through the careful selection of investment advisors, which are, in the opinion of the Investment Manager, of the highest quality with a proven track record." (*Id.* at 12.)

145.    Accordingly, the Director Defendants were responsible for overseeing Thema and accomplishing its investment objectives.  To that end, the Director Defendants appointed:  (i) Medici as the investment manager; (ii) HSBC Securities as administrator; (iii) HSBC Trust as custodian; (iv) PwC Ireland as auditor; and (v) the Advisor Defendants – GB&C, Thema Management, and BA Worldwide – as promoter, distributor, and advisor, respectively.

146.    The appointments of Medici and the Advisor Defendants were improper for two reasons.  First, at least two of the Director Defendants – Alberto Benbassat and Stéphane Benbassat – knew that Kohn, Medici's founder, owner, and chair person, had close ties with Madoff and that their relationship and financial interests in appointing BMIS as a *de facto* investment manager might compromise Medici's ability to act in the best interest of Plaintiff and the Class.  Moreover, Alberto Benbassat, Stéphane Benbassat, and Smith themselves suffered from conflicts of interest in appointing GB&C and Thema Management to positions that would allow them to personally profit from the appointments.

147.    In addition to failing to appoint proper agents for Thema, the Director Defendants failed to properly oversee their appointees to ensure that they performed their respective functions.  As discussed in detail below, each of these appointees failed to fulfill their responsibilities.

148.    Moreover, the Director Defendants failed to perform due diligence to safeguard Thema's assets because, although they were each uniquely situated to detect the numerous red flags indicating that Madoff and BMIS were operating a Ponzi scheme, the Director Defendants turned a blind eye to the red flags.

149.    Alberto Benbassat and Stéphane Benbassat had close ties with Madoff and met with him frequently in New York City.  But the Director Defendants either (i) actively

participated in devising a plan to funnel Thema's assets to Madoff and BMIS; or (ii) failed to perform due diligence to detect Madoff's Ponzi scheme, despite the numerous red flags identified herein.

150. Smith, Brady, and Morrissey pride themselves on being experts in managing investment funds like Thema:

(a) Smith has decades of experience in providing wealth management services and performing due diligence on global investment funds for both Equus and the Bank of Bermuda;

(b) Brady held senior positions at Bank of Bermuda and Northern Trust specializing in asset management and had substantial experience in issues involving risks and due diligence process of custodians for investment funds; and

(c) Morrissey was the head of William Fry's asset management and investment funds practice, specializing in the administration of funds like Thema.

Because of their specialized expertise, these Director Defendants should have utilized their expertise to establish procedures to safeguard Thema's assets. They failed to do so. And because of their expertise, these Director Defendants knew or consciously disregarded the many red flags concerning Madoff that surrounded them for years.

151. The Director Defendants appointed, or consented to Medici's appointment of, Madoff and BMIS in New York City as Thema's *de facto* investment manager. The Director Defendants thus violated Thema's own policy of "careful selection of investment advisors" who were "of the highest quality with a proven track record."

152. The Director Defendants appointed, or consented to HSBC Trust's appointment of, Madoff and BMIS in New York City as Thema's sub-custodian. The Director Defendants thus increased the risk of the loss of Thema's assets by allowing Madoff and BMIS to simultaneously fulfill the roles of an investment advisor, broker, and custodian.

153. To that end, the Director Defendants caused Thema to enter into at least four agreements with Madoff/BMIS:

(a) The Opening Account Document, in which Thema established a brokerage account for the Thema at BMIS;

(b) The Customer or Custodial Agreement, which governed the opening and maintenance of Thema's accounts with Madoff. This agreement gave Madoff custody of the assets of Thema;

(c) The Trading Authorization Agreement,[13] in which Thema gave Madoff discretionary authority to trade on Thema's behalf and authorized "Bernard L. Madoff (whose signature appears below) (and not Bernard L. Madoff Investment Securities) as his agent, and attorney in fact to buy, sell and trade in stocks, bonds and any other securities in accordance with [Madoff's] terms and conditions"; and

(d) The Option Agreement, which authorized Madoff/BMIS to purchase and sell options on behalf of Thema and stated the terms and conditions and risks of transactions in options.

154. Not only did the Director Defendant fail to conduct adequate due diligence before causing Thema to enter into these contracts, the Director Defendants also failed to instruct the Medici Defendants or the HSBC Defendants to conduct proper due diligence on its behalf.

155. Moreover, the Director Defendants had actual knowledge that Madoff and BMIS were not investment advisors registered with the SEC and thus lacked the requisite qualifications and regulatory oversight to provide Thema with the services contemplated in these agreements.

156. The Director Defendants also breached their fiduciary duties, and acted in a grossly reckless and negligent manner, because they did nothing to supervise and monitor Madoff after they appointed him to be the investment advisor and sub-custodian for Thema. They also completely abdicated their duties as directors because they failed to properly supervise

---

[13] As identified in the 2002 Courvoisier Memorandum issued in connection with Optimal SUS, another Madoff feeder fund, the trading authorization contract "is a standard document [Madoff] usually has with his customers." (*See* Courvoisier Memorandum Regarding September 18-19, 2002 Meeting, Ex. 3, at 2.)

or provide oversight over Thema's other advisors, including the HSBC Defendants, the Advisor Defendants, the PwC Defendants, and Medici. They also failed to adopt and implement proper internal controls at Thema for the detection and prevention of fraud.

157. Because of their lack of adequate due diligence and their motivation to enrich themselves, the Director Defendants breached their duties of care, diligence, loyalty, and good faith to Plaintiff and the Class.

### (2) The Medici Defendants

158. Medici entered into an Investment Advisor Agreement with Thema. As a result, Medici was a fiduciary of and had a confidential relationship with Plaintiff and the Class.

159. Under the Investment Advisor Agreement, the Director Defendants appointed Medici as the Company's investment manager. (*See* Thema December 31, 2006 Prospectus, Ex. 2, at 16.) Medici had the authority to appoint investment advisors. (*Id.*) Medici was obligated to advance the Company's investment objective. (*See id.*)

160. The Medici Defendants, however, provided Thema with highly inadequate or non-existent investment advice.

161. With regard to the selection of investment advisors, Medici was obligated to conduct the selection process with care and select only those "of the highest quality with a proven track record."

162. In violation of their obligations, the Medici Defendants delegated their responsibilities to Madoff and BMIS in New York City and allowed Madoff to serve as Thema's *de facto* investment manager. The Medici Defendants did so despite all the red flags of fraud that had emerged about Madoff and BMIS.

163. The Medici Defendants performed inadequate due diligence to assess the risks of appointing Madoff and BMIS in New York City as an investment manager.

164.     Kohn, who frequently met with Madoff in New York City in connection with Thema, had actual knowledge of the Ponzi scheme and received millions of dollars of secret kickbacks for helping steal the Class's money.  Accordingly, Kohn actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS in her role as director, chairperson, and 75% owner of Thema's investment manager, Medici.

165.     The other Medici Defendants – Scheithauer, Tripolt, and Holliwell – either had actual knowledge of Madoff's Ponzi scheme or failed to perform adequate due diligence in carrying out their responsibilities as directors and control persons of Thema's investment manager, Medici.  At a minimum, Scheithauer, Tripolt, and Holliwell consciously disregarded known red flags, such as their knowledge that Madoff was not registered with the SEC as an investment advisor.

166.     As a result, the Medici Defendants funneled Thema's assets to Madoff and BMIS and collected millions of dollars for services they never performed or performed in a grossly negligent manner.  Moreover, after they appointed Madoff to be the undisclosed investment advisor for Thema (i.e., to do Medici's job), the Medici Defendants did nothing to supervise Madoff or ensure his duties,  They also failed to adopt and implement proper internal controls at Medici for the detection and prevention of fraud.

### (3)     The HSBC Defendants

167.     HSBC Securities entered into an Administration Agreement with Thema.  As a result, HSBC Securities was a fiduciary of and had a confidential relationship with Plaintiff and the Class.

168.     Under the Administration Agreement, the Director Defendants appointed HSBC Securities as the Company's administrator.  HSBC Securities was responsible for "the day to day administration of the Company," including: (i) calculating daily and periodic portfolio valuations

using independent pricing sources; (ii) reconciling cash and portfolio positions; (iii) providing electronic interface with prime brokers and custodians; (iv) processing corporate actions, (v) providing portfolio reporting; (vi) maintaining books and records; (vii) calculating all fund fees (performance and asset based); (viii) reconciling general ledger accounts; and (ix) calculating and disseminating daily or periodic net asset values. (*Id.* at 16).

169. As the professional administrator for Thema, HSBC Securities was in a position such that it should have independently monitored and valued Thema's holdings and reconciled Thema's accounts, trading activities, and financial statements. Had HSBC Securities performed its duties in a reasonable manner, it would have identified critical discrepancies in Thema's accounts, activities, and financial statements (for example, the fact that the account statements BMIS sent to HSBC Securities reflected many trades at prices that fell outside the daily trading range for the stock).

170. The HSBC Defendants were aware of or recklessly disregarded numerous red flags indicating that the monies invested in Thema were never invested in U.S. securities after being transferred to BMIS.

171. HSBC Trust entered into an Custodian Agreement with Thema. As a result, HSBC Securities was a fiduciary of and had a confidential relationship with Plaintiff and the Class.

172. HSBC Trust was responsible for "provid[ing] custodial and trustee services in respect of the assets of the Company." (*Id.*) As custodian, HSBC Trust was obligated to: (a) safe-keep securities; and (b) open and maintain accounts with brokers according to the regulations of each market in which the securities were traded. (*See* May 30, 1996 Custodian Agreement, Ex. 4, at 5-6.)

173.     Instead of performing these functions, HSBC Trust and the Director Defendants appointed Madoff and BMIS in New York City to serve as Thema's sub-custodian.  In fact, the HSBC Defendants admitted, in a statement by Pettitt, that Madoff and BMIS were HSBC's agents in their role as Thema's sub-custodian and that *HSBC could be held liable for the wrongdoing of Madoff and BMIS*:

> [T]he Irish Regulator has specified that the fund [*i.e.*, Thema] must appoint a custodian/trustee to handle the assets that are maintained with the prime broker [*i.e.*, Madoff and BMIS] as sub-custodian. Thus, we are the owner of the assets and ***the investor would have recourse to [HSBC Securities Services] rather than the prime broker directly***.

(*See* January 2007 Financial Services Research Article, Ex. 5, at 50.)

174.     Furthermore, the HSBC Defendants knew that they were obligated to "conduct risk assessment on the prime broker [*i.e.*, Madoff and BMIS] to ensure clients' assets [were] fully protected." (*Id.*)

175.     To that end, HSBC Holdings plc's regulatory reporting team designed methodologies "in keeping with regulatory guidelines for collecting risk data, computing operational risk assessments, and, where appropriate, reporting to the financial authorities." (*Id.* at 49.)  HSBC Holdings plc issued an edict for all HSBC entities to develop a more comprehensive risk assessment procedures.  Such procedures were then to be developed by HSBC Securities Services at HSBC Holdings' direction and were aimed at preventing fraud by a prime broker, such as Madoff, who had been appointed sub-custodian by a hedge fund, such as Thema.

176.     But the HSBC Defendants faced resistance from Madoff in response to their effort to implement these methodologies.  According to Pettitt, the HSBC Defendants only sent Madoff and BMIS, as well as other prime brokers, questionnaires that were designed to be used to assess

their risks.  And Pettitt admitted that some brokers' responses to those questionnaires were

inadequate:

> Brian Pettitt is candid about the fact that the depth and quality of information that some agents [*i.e.*, Madoff and BMIS] have delivered to the Basel II Operational Risk questionnaire will need to rise in some cases.  "Although agents may have robust risk mitigation procedures in place, ***some have not been as full and thorough as we might expect in detailing this information in their responses[.]***"

(*Id.*)  Moreover, other HSBC employees concurred with Pettitt that HSBC's risks assessment

efforts faced resistance from brokers like Madoff:

> Since the HSBC Group's acquisition of the Bank of Bermuda was completed in February 2004, [HSBC Securities Services] ***has encountered the new challenge of conducting risk assessments on prime brokers*** whose hedge fund clients use [HSBC Securities Services'] Alternative Fund Services as their hedge fund administrator.  "Given that the prime broker [*i.e.*, Madoff] is typically appointed by the hedge fund [*i.e.*, Thema], many prime brokers struggle to understand why they should be subject to due diligence by a global custodian," notes Mick Underwood[, head of HSBC's Custody Network Management division.].

(*Id.* at 50.)  Thus, although the HSBC Defendants had actual knowledge of (i) the increased risks

posed by prime brokers such as Madoff; and (ii) the resistance by Madoff to providing complete

responses to HSBC's risk-assessment questionnaires, the HSBC Defendants failed to remedy the

inadequacy of Madoff's and BMIS's responses to their inquiries.  Thus, the HSBC Defendants

consciously disregarded the very red flags about Madoff they had identified.

177.    The HSBC Defendants also failed to detect Madoff's Ponzi scheme or

consciously disregarded Madoff's scheme and/or red flags about Madoff, despite having frequent

meetings with him in New York City.  Madoff's appointment book reflects that the head of

HSBC Securities Services, Brian Pettitt, met with Madoff on at least two occasions – February

21, 2008 and November 19, 2008 – at BMIS's New York office, in connection with HSBC's

custodial services. Madoff's appointment book also reflects a July 16, 2008 meeting with an HSBC representative at BMIS's New York office.

178. During these meetings, the HSBC Defendants failed to perform adequate due diligence of Madoff as Thema's custodian and administrator.

179. The HSBC Defendants received periodic account statements from BMIS. These statements contained fictitious trades of stock BMIS made on Thema's behalf. The statements identified only the trading dates, number of shares, share price, amount of trade proceeds, and a trade number. Absent from these statements were crucial information, such as the identity of the counterparties. Nor did the HSBC Defendants receive electronic confirmation of the trades, nor any time stamps reflecting when the trades were executed. The HSBC Defendants never attempted to verify these fictitious trades nor requested BMIS to substantiate them. Had they done so, the HSBC Defendants would have discovered that many of the reported trades were represented by BMIS to have been made at prices that fell outside the trading range of the stock for the day. Thus, even the most basic efforts by the HSBC Defendants would have uncovered the fraud. Instead of performing their jobs as custodian and administrator, for over ten years, the HSBC Defendants simply let Madoff perform all the duties they claimed to be performing. Instead of doing anything, the HSBC Defendants simply took the account statements they received from Madoff or BMIS, stuck them in a drawer (again, never once verifying the trade date and price), and collected the fees. Thus, the HSBC Defendants acted in a grossly negligent and reckless manner.

180. The HSBC Defendants knew, from their experiences serving as custodian for other feeder funds, that Madoff and BMIS served as the sub-custodian and *de facto* investment manager for multiple funds. Had the HSBC Defendants exercised reasonable and customary due

diligences, they would have noticed and investigated a pattern of suspicious activities in the operations of these funds.

### (4) The Advisor Defendants

#### (a) Thema Management

181. Thema Management entered into an Investment Advisor Agreement with Thema. As a result, Thema Management was a fiduciary of and had a confidential relationship with Plaintiff and the Class.

182. Thema Management served as Thema's investment manager from 1996 until December 31, 2006, when Medici took over as investment manager. Since December 31, 2006, Thema Management served as Thema's distributor.

183. Thema Management was fundamentally conflicted because it was 55% owned by GB&C, which in turn was owned by Alberto Benbassat, Stéphane Benbassat, and Smith. The Benbassats and Smith thus breached their fiduciary duties to Thema's shareholders by choosing an investment manager and a distributor whose fees would line their own pockets.

184. Like the Medici Defendants, Thema Management did not provide Thema with any investment advice (or, if any advice was given, it constituted no advice at all since Thema Management chose Madoff solely on the basis that Madoff allowed Thema to keep all the investment advisory fees). Instead, Thema Management simply funneled Thema's assets to Madoff and BMIS, and therefore failed to supervise Madoff on even the most basic level.

185. Thema Management also ignored its obligation to carefully select investment advisors by selecting only those "of the highest quality with a proven track record" for Thema.

186. In violation of its obligations, Thema Management delegated its responsibilities to Madoff and BMIS in New York City and allowed them to serve as Thema's *de facto* investment manager.

187. Thema Management failed to perform any due diligence to assess the risks of appointing Madoff and BMIS in New York City as an investment manager.

188. Alberto Benbassat and Stéphane Benbassat, who frequently met with Madoff in New York City in connection with Thema, knew about or consciously disregarded the Ponzi scheme. Accordingly, Alberto Benbassat and Stéphane Benbassat either actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS, or failed to perform adequate due diligence as Thema's directors and as control persons of Thema's investment manager and distributor.

189. As a result, Thema Management, as investment manager and distributor, funneled Thema's assets to Madoff and BMIS and collected millions of dollars for services it never performed.

190. For its role as an investment manager and distributor, Thema Management collected millions of dollars of unearned fees from Thema.

### (b)    GB&C and BA Worldwide

191. The Director Defendants appointed GB&C as the Company's promoter and BA Worldwide as an investment advisor. (*See* Thema December 31, 2006 Prospectus, Ex. 2, at 17.) As a result, GB&C and BA Worldwide were fiduciaries of and had confidential relationships with Plaintiff and the Class.

192. GB&C and BA Worldwide were thus obligated to perform advisory functions to Thema and its investors by promoting Thema and advising it regarding proper investments.

193. GB&C was fundamentally conflicted, however, since the Benbassats and Smith owned GB&C. GB&C breached its duties to Plaintiff and the Class since it promoted Thema notwithstanding its knowledge that Thema's investment advisors were not carefully chosen for their experience and tract record, but instead based on the fact that they agreed to cooperate in

Defendants' scheme, pursuant to which Medici, and Thema Management let their names be used, provided no investment advice, and kept all the fees after turning all responsibilities to provide any oversight over Madoff.

194. GB&C and BA Worldwide, however, allowed Thema's assets to be funneled to Madoff and BMIS without performing any due diligence, even though they knew that Madoff and BMIS served as Thema's *de facto* investment manager and sub-custodian.

195. Moreover, the control persons of GB&C and BA Worldwide – Alberto Benbassat, Stéphane Benbassat, and Ursula Radel-Leszczynski – had long-term relationships with and enjoyed exclusive access to Madoff. Each of them frequently met with Madoff in New York City. BA Worldwide breached its duties because it provided no investment advisor service. Like Thema Management and Medici, it turned the keys over to Madoff and then turned off the light.

196. Thus, GB&C and BA Worldwide either (i) actively participated in devising a plan to funnel Thema's assets to Madoff and BMIS; or (ii) failed to perform their job responsibilities and adequate due diligence to detect Madoff's Ponzi scheme.

### (5) William Fry

197. William Fry acted as Thema's legal counsel at all relevant times. William Fry provided substantial assistance to Thema and the Director Defendants because William Fry drafted, reviewed, and/or approved: (i) all contracts entered into by Thema; and (ii) disclosure materials issued by Thema, including prospectuses, prospectus supplements, annual reports and financial statements, and updates. All these documents prominently identified William Fry as counsel.

198. Specifically, William Fry drafted, reviewed, approved and/or was provided with a copy of:

(a)     the agreements between Thema and Madoff/BMIS, including the Opening Account Document, the Customer or Custodial Agreement, the Trading Authorization Agreement, and the Option Agreement; and

(b)     the agreements between Thema and the Advisor Defendants, which appointed the Advisor Defendants to positions that allowed them to collect millions of dollars in fees from Thema; William Fry materially assisted the Director Defendants by approving their agreements with the Advisor Defendants, notwithstanding the fact that William Fry knew such agreements posed irreconcilable and unacceptable conflicts of interests due to the Director Defendants' ownership stakes in the Advisor Defendants.

In addition, William Fry participated in the inadequate due diligence Thema conducted of Madoff and BMIS.

199.    William Fry had actual knowledge due to its negotiations, review, approval, and/or receipt of Thema's agreements with Madoff/BMIS, pursuant to through which Madoff did not allow his name to be mentioned in Thema's prospectuses, annual reports, or any other documents. Notwithstanding such knowledge, and the fact that non-disclosure of the agreements with Madoff was material to Thema's investors, William Fry assisted in the drafting, review, and/or approval of Thema's prospectuses and annual reports, all of which failed to disclose Madoff's identity and Madoff's agreements with Thema. Moreover, William Fry's approval of Thema's prospectuses and annual reports was critical to the Director Defendants, the HSBC Defendants, Medici, and the Advisor Defendants because William Fry's approval substantially assisted these Defendants' breaches by allowing them to continue to engage in their dealings with Madoff. If William Fry had refused to approve the prospectuses and annual reports, these Defendants would have likely had to terminate using Madoff because he would not agree to be Thema's investment manager and custodian if his name was disclosed.

200.    William Fry thus had actual knowledge that the Director Defendants, HSBC Defendants, Medici, and the Advisor Defendants breached their fiduciary duties to Plaintiff and the Class because William Fry knew, among other things, that:

(a)     Madoff and BMIS were Thema's investment advisor and sub-custodian;

(b)     Madoff instructed Defendants not to identify him or BMIS as an investment advisor;

(c)     the Director Defendants, the HSBC Defendants, Medici, and the Advisor Defendants failed to conduct adequate due diligence of Madoff;

(d)     Madoff and BMIS lacked the qualifications to serve as Thema's investment advisor and custodian because he was not registered with the SEC; and

(e)     the Director Defendants breached their duty of loyalty to Plaintiff and the Class by appointing the Advisor Defendants, entities in which the Director Defendants had substantial economic stakes.

201.    Despite its actual knowledge of these facts, William Fry provided substantial assistance to the Director Defendants, the HSBC Defendants, the Advisor Defendants, and Medici in furtherance of their wrongdoing, which caused significant damages to Plaintiff and the Class.

### (6)     The PwC Defendants

#### (a)     The PwC Defendants Functioned as a Unified Organization

202.    The Director Defendants appointed PwC Ireland as auditor.  (*Id.* at 18.)  PwC Ireland collaborated with the other PwC Defendants – PwC International, PwC U.S., and PwC Bermuda – to fulfill its responsibilities as Thema's auditor.  All PwC Defendants knew that (i) Madoff and BMIS served as Thema's *de facto* investment manager and sub-custodian; and (ii) all of Thema's assets were invested with Madoff and BMIS.

203.    PwC International serves as an umbrella organization coordinating the accounting and auditing activities of the various PwC accounting firms.  PwC International's literature and its global Website refer to the constituent members, including PwC Ireland, PwC Bermuda, and PwC U.S., as PricewaterhouseCoopers or PwC.  For example, PwC's 2008 Annual Report, entitled "Global Annual Review," states that "the terms PricewaterhouseCoopers, PwC, *our* and

*we* are used to refer to the network of member firms." (*See* PwC 2008 Global Annual Review, Ex. 6, at ii.).

204.     The Global Annual Review leaves no doubt that PwC functions as one integrated entity with centralized control. The section entitled "Making structural changes," states:

> After a comprehensive review of the future needs of PwC and our clients, our firms around the world recently approved a new internal structure. This has created three major clusters of PwC firms – East, Central, and West – led by the senior partner of the leading national firm in each cluster, namely, China, the United Kingdom and the United States.

> At the same time, we have made changes to the leadership of the PwC global network. The **network is now led by a new leadership team comprising myself (Samuel A. DiPiazza Jr., former chairman of PwC US) as Chairman and CEO**; Silas Yang, senior partner of PwC China; Ian Powell, senior partner of PwC UK; Dennis Nally, senior partner of PwC US, and Hans Wagener, senior partner of PwC Germany. Additionally, the standards **each PwC member firm is obliged to follow** have been updated and expanded to reflect the increasingly global nature of our services and the need for worldwide consistency across an ever-widening range of areas.

> \* \* \*

> Our new structure will improve the integrated services we offer and more closely align our strategy around the world.

> \* \* \*

> We are making these changes for the most fundamental of reasons: to ensure that our organization is positioned to provide clients with the distinctive, premier service they expect from our brand.

(*Id.* at 4.)

205.     As all hierarchical entities with centralized control, PwC has one Chairman and CEO, Mr. DiPiazza, and member firms have obligations to PwC.

206.    The Global Annual Review further confirms that the network is structured like a corporation.  (*See* PwC 2008 Global Annual Review, Ex. 6, at 34, 50-51.)  The Network Leadership Team is effectively the Board of Directors and comprised of five members – the five members set forth above.  Mr. DiPiazza is, as stated in the Global Annual Review, Chairman and CEO.  The Network Leadership Team "sets the strategy and standards that the PwC network **will** follow." (*Id.* at 34.)

207.    Directly reporting to the Network Leadership Team is, effectively, management, the "Network Executive Team."  This Network Executive Team includes the heads of eleven key areas, the equivalent of key divisions in a corporation:  (i) Clients and Markets; (ii) Operations; (iii) Risk and Quality; (iv) Tax; (v) People and Culture, Brand and Communications; (vi) Strategy and Network Transformation; (vii) Assurance; (viii) Strategic Sourcing; (ix) Advisory; (x) General Counsel; and (xi) Public Policy and Regulatory Matters.  (*Id.* at 50.)

208.    Two other bodies further control the actions of the various PwC member firms throughout the world, the Global Board and the Strategy Council.  (*Id.* at 34.)  The Global Board's role is "to ensure accountability, protect the PricewaterhouseCoopers International Limited network, and ensure effective **governance**." (*Id.* at 34.)  The Strategy Council includes the "senior partners of some of the largest PwC firms" and "agrees strategic direction and ensures alignment in the execution of strategy."  (*Id.* at 34.)

209.    These four governance bodies (the Network Leadership Team, Network Executive Team, Global Board, and Strategy Council) provide a global governance structure that is housed within PwC International.  In effect, the PwC member firms (including PwC Ireland, PwC Bermuda, and PwC U.S.) act as agents of PwC International.  PwC International controls

its agents through a series of agreements that govern and enforce standards across PwC member firms.  The enforcement of standards is clear from the Global Annual Review.

> Quality procedures.  PwC has a number of globally developed methodologies and work programs for many of its services.  These are designed to assist partners and staff in delivering work of the expected quality. . . .
>
> Managing risk and quality.  A firm's membership of the PwC network depends on its ability to comply with common risk and quality standards. . . . Territory Senior Partners **sign** an annual compliance confirmation with a set of risk management standards covering a range of risk areas. . . . These confirmations follow an assessment of compliance supported by local testing and quality review.

(*Id.* at 35.)

210.    To complete the parallel between PwC and any corporation, the Global Annual Review provides aggregate results for PwC that are the hallmarks of the annual report of any Fortune 500 company.  For example, the Global Annual Review states that PwC is composed of more than 155,000 people in 153 countries (*id.* at 2, 46), and generated $28.2 billion in total worldwide revenues in 2008 (*id.* at 5, 41).  It breaks down the revenue by geographic area, service line, and industry group.  (*Id.* at 41.)  And it provides all kind of statistics about PwC's clients, including size, industry groups, and geographic location.  (*Id.* at 44-47.)  The Global Annual Review of PwC is, thus, no different than the annual report of McDonalds, Exxon, or Microsoft.

211.    Thema's financial statements show that PwC Ireland was paid a mere $18,010 in 2006 and $28,050 in 2007.  These paltry sums reflect the very limited work conducted, and that it was not profitable for PwC Ireland to dedicate substantial resources to the audit.  Travel expenses alone would have amounted to a substantial portion of the entire audit fee.

212. Upon information and belief, in some years PwC Ireland traveled to New York to meet with Madoff in order to gather information to use in completing Thema's audit. Plaintiff's information and belief is based on the fact that PwC's audit procedures and practice required PwC Ireland to visit the physical location where the audit client's principal or key operations were conducted. For Thema, that was Madoff's office in New York (indeed, Thema had no employees and its "office" was no more than a mail drop with the same mailing address as its administrator, HSBC Securities). Thus, PwC Ireland could not have conducted a competent audit without visiting Madoff and BMIS in New York since Madoff made all the investment decisions for Thema and had custody of all Thema's assets.

213. In other years, in order to curtail costs, PwC Ireland worked with PwC U.S. and PwC Bermuda to provide what was effectively an illusory audit of Thema. PwC U.S. and PwC Bermuda visited BMIS, in New York City, on at least two separate occasions and conducted cursory audit procedures of another feeder fund – Optimal SUS – being managed by Madoff. In December 2004 and December 2006, PwC partners Linda McGowan (PwC U.S.) and Scott Watson-Brown (PwC Bermuda) visited Madoff at BMIS's offices in New York City. The purpose of the visits was to review the investment procedures employed by Madoff. Although the reports ("PwC Madoff Report"), printed on generic PwC letterhead, purport to "document" BMIS's management "procedures" for Madoff feeder funds like Optimal SUS and Thema, the conclusions contained therein are based exclusively on PwC's interviews with Madoff himself and his own self-serving representations. (*See* PwC Madoff Report, Ex. 7.)

214. Before each meeting with Madoff, PwC U.S. contacted PwC Ireland to inquire whether PwC Ireland was interested in obtaining a copy of the reports in exchange for a portion of the costs of the interviews. On both occasions, PwC Ireland agreed to share the costs of and

the reports from the interviews. As a result of PwC Ireland's agreement, PwC U.S. and PwC Bermuda tailored part of their interviews with Madoff to directly address matters germane to PwC Ireland's audits for Thema.

215. Neither McGowan (PwC U.S.) nor Watson-Brown (PwC Bermuda) made any attempt to verify Madoff's statements, and instead simply transcribed his unsubstantiated assertions into the Report and turned it over to PwC Ireland. PwC Ireland then, notwithstanding the cursory nature of the review, relied almost exclusively on PwC U.S. and PwC Bermuda's visits to BMIS, and the resulting Report, to sign-off on its purportedly comprehensive audits of Thema for 2004 and 2006.

216. The PwC Defendants knew that Plaintiff and the Class would rely on their audit opinions to make investment decisions. Again, PwC U.S. and PwC Bermuda were told by PwC Ireland when it indicated that it wanted to purchase the Madoff Report that it would use the Report to prepare its audit opinions of Thema. And PwC U.S. and PwC Bermuda specifically tailored part of their interviews of Madoff to cover topics PwC Ireland needed to examine as part of its audits of Thema.

217. The PwC Defendants, however, violated their own internal procedures, as well as basic accounting principles, in conducting audits for Thema. The PwC Defendants failed to verify unsubstantiated statements made by Madoff during their in-person interviews with him in 2004 and 2006 and failed to substantiate any of the hundreds of millions of dollars of trades Madoff purportedly made for Thema. And these unverified statements and the account statements that Madoff sent to PwC Ireland became the basis of the PwC Defendants' unqualified clean audit opinions for Thema.

### (b)  PwC IRELAND'S AUDIT FAILED TO CONFORM TO INTERNATIONAL STANDARDS ON AUDITING

218.    A fundamental premise of every accounting audit is that the auditors have to verify the assertion that the assets actually exist.  (ISA 500.16) ("The auditor uses assertions in assessing risks by considering the different types of potential misstatements that may occur, and thereby designing audit procedures that are responsive to the assessed risks").  Assertions include:  "existence – assets, liabilities, and equity interests exist."  (ISA 500.17(b)(i).)

219.    The International Federation of Accountants, through the International Auditing and Assurances Standards Board ("IAASB"), promulgates the International Standards on Auditing ("ISA").  The IAASB is the equivalent of The American Institute of Certified Public Accountants.  ISAs are the equivalent of the generally accepted auditing standards in the U.S., commonly known as GAAS.  These are the rules the auditor must follow in conducting an audit. (ISA 200.06.)

220.    When following ISA, the auditor must also consider the International Auditing Practice Statements ("IAPS").  IAPSs provide "interpretive guidance and practical assistance to auditors in implementing ISAs."  (ISA 200.08.)

221.    ISA 200 sets forth the "objective and general principles governing an audit of financial statements."  (ISA 200.01.)  The critical objective of an audit is to express an opinion regarding whether the financial statements were prepared in accordance with the applicable financial reporting framework in all material respects.  (ISA 200.02.)

222.    ISA 200.14 prohibits auditors from expressing an affirmative opinion that the financial statements comply with ISA "unless the auditor has complied fully with all of the International Standards on Auditing relevant to the audit."

223.     One of the fundamental principles in every audit is that the auditor must exercise

"**professional skepticism,** recognizing that circumstances may exist that cause the financial

statements to be materially misstated."  (ISA 200.15.)

> An attitude of professional skepticism means [that] . . . . [w]hen
> making inquiries and performing other audit procedures, the
> auditors is not satisfied with less-than persuasive audit evidence
> based on a belief that management and those charged with
> governance are honest and have integrity. Accordingly,
> representations from management are not a substitute for obtaining
> **sufficient appropriate audit evidence** to be able to draw
> reasonable conclusions on which to base the auditor's opinion.

(ISA 200.16.)  Accordingly, the ISAs prohibit PwC Ireland from accepting Madoff's

representations absent "sufficient appropriate audit evidence."

224.     ISAs go even further and require that every audit consider the possibility of fraud.

*See* ISA 240, "[t]he Auditors Responsibility To Consider Fraud In An Audit of Financial

Statements."  ISA 240.57 explicitly identifies the risk of fraud concerning account balances:

"When identifying and assessing the risks of material misstatement at the financial statement

level, and at the assertion level for Class of transactions, account balances and disclosures, the

auditor should identify and assess the risks of material misstatements due to fraud."  (ISA

240.57.)

225.     The first paragraph of ISA 240 concerns, "the auditor's responsibility to consider

fraud in an audit of financial statements and expand on how the standards and guidance in ISA

315, 'Understanding the Entity and its Environment and Assessing the Risks of Material

Misstatement' . . . are to be applied in relation to the risks of material misstatement due to fraud."

(ISA 240.1.)

226.     Pursuant to ISA 315, "the auditor should obtain an understanding of the entity and

its environment, including its internal controls, sufficient to identify and assess the risks of

material misstatement of the financial statements whether due to fraud or error, and sufficient to design and perform further audit procedures."  As part of the auditor's understanding of the entity and its environment, the auditor must assess the risks of material misstatement specifically with respect to account balances.  ISA 315.100 states, "the auditor should identify and assess the risks of material misstatement at the financial statement level, and at the assertion level for Class of transactions, account balances, and disclosures.  For this purpose, the auditor: Identifies risks . . . . [and] relates the identified risks to what can go wrong at the assertion level."

227.    Further, ISA 315 requires that the auditor identify significant risks.  "As part of the risk assessment as described in [315.100], the auditor should determine which of the risks identified are, in the auditor's judgment, risks that require special audit consideration (such risks are defined as 'significant risks')."  (ISA 315.108.)

228.    In sum, the overall auditing framework set forth by ISAs 200, 240, and 315 is extremely clear.  The auditor must be skeptical, obtain a global understanding of the entity (Madoff) and the environment, remain vigilant for fraud, and **refuse to accept assertions without verification**.

229.    ISA 402 concerns "Audit Considerations Relating to Entities Using Service Organizations."  ISA 402 effectively requires auditors (PwC Ireland) to determine the importance of a service organization (such as Madoff) to the financial statements of the entity audited (Thema).  "Service organization" is therefore the auditing term-of-art for Madoff with respect to Thema.

230.    Pursuant to ISA 402, the auditor must first "consider how an entity's use of a service organization affects the entity's internal control so as to identify and assess the risk of

material misstatement and to design and perform further audit procedures." (ISA 402.02.) This consideration required that PwC Ireland assess Madoff's significance:

> In obtaining an understanding of the entity and its environment, the auditor should determine the significance of service organization activities to the entity and the relevance to the audit. In doing so, the auditor obtains an understanding of the following, as appropriate:
>
> • Nature of the services provided by the service organization.
>
> • Terms of contract and relationship between the entity and the service organization.
>
> • Extent to which the entity's internal control interact with the systems at the service organization.
>
> • The entity's internal control relevant to the service organization activities such as:
>
>   ° Those that are applied to the transactions processed by the service organization.
>
>   ° How the entity identifies and manages risks related to use of the service organization.
>
> • **Service organization's capability and financial strength, including the possible effect of the failure of the service organization on the entity.**

(ISA 402.05.)

231. "If the auditor concludes that the activities of the service organization are significant to the entity and relevant to the audit, the auditor should obtain a sufficient understanding of the service organization and its environment, including its internal control, to identify and assess the risks of material misstatement and design further audit procedures in response to the assessed risk." (ISA 402.07.) The risk of material misstatement here was total and absolute given that Madoff controlled, operated, and held **all** of Thema Fund's assets.

232.     PwC Ireland knew that Madoff held all Thema's assets and made all investment decisions for Thema and thus knew that Madoff's activities were significant to Thema.  Thus, PwC Ireland should have executed appropriate procedures.

### (c)     PwC Ireland Failed to Assess the Qualifications and Audit Conducted by Madoff's Purported Auditors

233.     One of the additional audit procedures that PwC Ireland was supposed to implement involved Madoff's own auditors, Friehling & Horowitz.  As set forth in ISA 402.06, "[t]he auditor would also consider the existence of third-party reports from the service organization auditors, internal auditors, or regulatory agencies as a means of obtaining information about the internal control of the service organization and about its operation and effectiveness."

234.     PwC Ireland, however, had to review Madoff's auditor and audit critically, and could not simply accept the audit without review and analysis:

> If the auditor [PwC Ireland] uses the report of a service organization auditor [Friehling & Horowitz], the auditor should consider making inquiries concerning that auditor's professional competence in the context of the specific assignment undertaken by the service organization auditor.  (ISA 402.09.)

> When using a service organization auditor's report [Friehling & Horowitz's], the auditor [PwC Ireland] should consider the nature of and content of that report.  (ISA 402.11.)

> The auditor [PwC Ireland] should consider the scope of work performed by the service organization auditor [FREHLING & HOROWITZ] and should evaluate the usefulness and appropriateness of reports issued by the service organization auditor.  (ISA 402.13.)

### (d)     PwC Failed to Independently Verify That Thema's Assets Existed

235.     There were two additional auditing pronouncements that required PwC to obtain independent confirmation of the existence of Thema's assets.

236.     The first, IAPS 1012, concerned "Auditing Derivative Financial Instruments," such as the puts and calls used by Madoff to supposedly implement the split strike conversion strategy.  IAPS 1012 specifically flagged the importance for the auditor of verifying the existence of the asset when based on management's assertions.  Under the sub-heading "Assertions to Address," IAPS 1012.22 stated:

> Financial statement assertions are assertions by management, explicit or otherwise, embodied in the financial statements prepared in accordance with the applicable financial reporting framework.  They can be categorized as follows:
>
> • Existence: An asset or liability exists at a given date.  For example, the derivatives reported in the financial statements through measurement or disclosure exist at the date of the balance sheet.

237.     Under the sub-heading, "Substantive Procedures Related to Assertions – Existence and Occurrence," IAPS 1012.77 stated:

> Substantive tests for existence and occurrence assertions about derivatives may include:
>
> • **Confirmation with the holder of or the counterparty to the derivative**.
>
> • Inspecting the underlying agreements and other forms of supporting documentation, including confirmations received by an entity, in paper or electronic form, for amounts reported
>
> • Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period; and
>
> • Inquiry and observation.

(IAPS 1012.77.)

238.    Similarly, IAPS 1012.79 required the auditor to confirm that the assertions by Madoff were complete and that, for example, Madoff had not failed to disclose to the auditor liabilities that would have changed the value of the asserted assets:

> Substantive tests for completeness assertions about derivatives may include:
>
> •    Asking the holder of or counterparty to the derivative to provide details of all derivatives and transactions with the entity.  In sending confirmation requests, the auditor determines which part of the counterparty's organization is responding, and whether the respondent is responding on behalf of all aspects of its operations;
>
> •    Sending zero-balance confirmations to potential holders or counterparties to derivatives to test the completeness of derivatives recorded in the financial records;
>
> •    Reviewing brokers' statements for the existence of derivative transactions and positions held; [and]
>
> •    Reviewing counterparty confirmations received but not matched to transaction records.

(IAPS 1012.79.)

239.    The second additional auditing pronouncement required PwC Ireland to confirm the existence of Thema's assets.  ISA 505, "External Confirmations," states:  "The auditor should determine whether the use of external confirmations is necessary to obtain sufficient appropriate audit evidence at the assertion level.  In making this determination, the auditor should consider the assessed risk of material misstatement at the assertion level and how the audit evidence from other planned audit procedures will reduce the risk of material misstatement at the assertion level to an acceptably low level."  (ISA 505.02.)

240.    ISA 500.03 emphasized that external confirmations were more reliable than internal ones:  "audit evidence is more reliable when it is obtained from independent sources

outside the entity," and, "audit evidence obtained directly by the auditor is more reliable than audit evidence obtained indirectly or by inference." (ISA 500.03.)

241. ISA 500 even specifically addresses the usefulness of external confirmations in the precise situation at issue with Madoff – bank balances. "Other examples of situations where external confirmations may be used include the following: Bank balances and other information from bankers." (ISA 500.05.) As set forth on the PwC Madoff Report, Madoff supposedly held U.S. Treasuries at BONY. PwC Ireland should have followed ISA 500 and performed procedures to obtain confirmations from BONY. Had PwC Ireland done so, it would have discovered the inaccuracy of Thema's financial statements it purported to audit.

242. In April 2007, PwC issued a fifty-page audit guide for auditing hedge funds, called "Auditing Alternative Investments – A Practical Guide For Investor Entities, Investee Fund Managers and Auditors." (*See* PwC April 2007 Guide, Ex. 8.). One of the central purposes of the Guide was to provide guidance for auditors of hedge funds (such as Thema) about their auditing obligations with respect to the underlying hedge funds (such as Madoff) in which the fund-of-funds had invested.

243. The PwC Guide's first concern was the existence of assets at the underlying hedge fund. "The main focus of the new guidance is as follows:

> With respect to existence, the question is: **Do the investor entity's alternative investments exist at the financial statement date, and have the related transactions occurred during the period?** While confirming the existence of assets that are held by third parties generally provides adequate audit evidence, the Interpretation and AICPA Practice Aid say that, by itself, a confirmation in the aggregate does not constitute adequate audit evidence.

(*See* PwC April 2007 PwC Guide, "Our perspective," Ex. 8, at iii.).

244.     Because "confirming investment in the aggregate" was no longer sufficient, PwC Ireland's obligation was to "confirm [Madoff's] holdings on a security-by-security basis." (*Id.* at 1.)  And even then, the PwC Guide warned that was not always enough, and additional procedures were necessary in certain circumstances.  "Even if the auditor obtains a detailed confirmation of [Madoff's] holdings, the AICPA Practice Aid states that the auditor may need to perform additional procedures, depending on the significance of the [Madoff] investments to [Thema's] financial statements.  Considerable auditor judgment is required to determine whether the auditor has sufficient evidence to satisfy the existence assertion." (*Id.* at 24.)

245.     One of the "illustrative alternative or additional procedures" consisted in checking with the banks that the assets actually existed.  "Comparing cash activity reflected in the records of the investor entity with the corresponding cash movements reflected in bank or brokerage statements generally provides the auditor with valuable audit evidence." (*Id.* at 26.)  Madoff never provided trade tickets or statements from third parties – only statements from "Madoff Securities."  Yet, the PwC Guide clearly said, "**simply receiving a confirmation from [Madoff]** of its underlying investments, either in the aggregate or on a security-by-security basis, **does not, in and of itself, constitute adequate audit evidence** with respect to the valuation assertion." (*Id*. at 27.)

246.     PwC further failed to conduct an additional basic confirmation procedure listed in the PwC Guide concerning Madoff's auditors.  The guide said that, if PwC was going to rely on Madoff's financial statements audited by Friehling & Horowitz, PwC had to conduct some basic due diligence on Friehling & Horowitz and its supposed audit of Madoff.  The first critical factor was the "professional reputation and standing of [Friehling & Horowitz]." (*Id.* at 30.)  For auditors whose reputation was not sufficient (such as Friehling & Horowitz) the PwC Guide

listed "illustrative additional procedures," any of which would have uncovered the fact that

Thema's financial statements were incorrect if PwC had carried them out:

- Investigate the professional reputation and standing of [Friehling & Horowitz].

- Request that [Thema] apply, or have [Friehling & Horowitz] apply, appropriate procedures to [Madoff's] financial statements and/or the underlying records.

- Request that [Thema] call or visit [Friehling & Horowitz] to discuss audit procedures followed and the results thereof. Review the audit program and/or working papers of [Friehling & Horowitz], to the extent permissible.

(*Id.* at 30.)

### (e) Internal PwC Documents Show That PwC's Audit Violated ISA

247. The Thema Fund was not the only Madoff feeder fund audited by PwC.

Plaintiffs are aware of at least eight additional feeder funds audited by PwC with more than $16

billion invested in Madoff in 2007.

| Madoff Feeder Funds Audited By PwC | Assets Under Management - 2007 |
|---|---|
| Fairfield Sentry (includes Fairfield Lambda & Sigma) | $ 7,277,386,000 |
| Greenwich Sentry, LP | $ 262,531,000 |
| Kingate Global, Ltd | $ 2,754,291,825 |
| Kingate Euro Fund, Ltd | $ 766,322,771 |
| Optimal Strategic US Equity, Ltd. | $ 2,770,250,674 |
| Thema International Fund, PLC | $ 1,447,688,803 |
| Zeus Partners, Ltd | $ 300,000,000 |
| Defender Fund Ltd | $ 312,282,024 |
| Plaza Investments International Ltd. | $ 657,241,006 |
| **Total** | **$16,547,994,103** |

248.    According to Madoff's Form ADV publicly filed with the SEC on January 7, 2008, BMIS represented that its assets under management totaled $17,091,640,696.  PwC audited feeder funds with assets under management at the end of 2007 of $16.547 billion, which represented more than 96% of BMIS's supposed entire investment advisory business.  PwC's audits of Madoff's feeder funds provided PwC with a unique ability and opportunity to verify information about BMIS.  That information, particularly in the aggregate, should have raised significant suspicions about Madoff.  These suspicions also should have been obvious because PwC coordinated the audits of the feeder funds and visits to Madoff's offices on a global basis.

249.    Starting at least as early as 2004, PwC Bermuda and PwC U.S. conducted procedures on Madoff which were then communicated in written form to the various PwC

member firms that actually issued the audit opinions for the Madoff feeder funds, such as PwC Ireland for Thema and Optimal SUS. These procedures on Madoff were conducted at least twice, in December 2004 and again in December 2006.

250. In addition, in a letter dated March 15, 2005 to another feeder fund (Fairfield Greenwich Advisors, LLC ("Fairfield Greenwich")), PwC Rotterdam ("PwC Netherlands") recounted the audit procedures conducted on Madoff in December 2004. (*See* PwC March 15, 2005 Netherlands Letter, Ex. 9.). The letter discloses PwC Bermuda's involvement in meeting with Madoff, but does not mention PwC U.S. In relevant part, the letter states as follows:

> In our previous conference calls, we have informed you about the fact that PwC Bermuda had a meeting in December 2004 with Bernard L. Madoff Investments Securities LLC (hereinafter 'BLM') in order to obtain and/or update PwC's understanding of the procedures in place at BLM. PwC Bermuda has shared with PwC Rotterdam their procedures program, notes of meeting and conclusions for the purpose of our audit of Fairfield Sentry Limited.
>
> The procedures performed by PwC Bermuda were only directed towards obtaining an understanding of certain procedures and organization aspects of BLM for **the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM.**

(*See* PwC March 15, 2005 Netherlands Letter, Ex. 9, at 1.)

251. The letter also includes an appendix entitled, "Summary of procedures performed at BLM." (*Id.* at 3.) The appendix states that "[b]y means of an interview with [Madoff], the following controls and procedures were discussed":

(a) Segregation of the advisory/front office function from the broker, accounting and custodial departments;

(b) Trading process strategy;

(c) Controls in place to ensure that trading levels are maintained within those prescribed in the brokerage agreement (*i.e.*, the controls to ensure cash accounts are not margined);

(d)      Reporting to clients (copies of trade confirmations and blotters and what level of reports summarizing investment transactions, receipts and disbursements, asset holdings, and income are provided on regular basis to the client);

(e)      Require about grouping or bunching of orders and the procedures for the Advisor authorizing the order size for our clients, the Advisor's procedures for monitoring the allocation of bunched trades, and the monitoring in place at the trading department for ensuring accurate allocation of bunched orders;

(f)      Monitoring of Advisory of the results of the Fund against expectations (roles and responsibilities);

(g)      Procedures in respect of review by the Advisor if own trading records matches with the broker-generated listing of daily trades (P&S), and monthly activity statements.

(*Id.*)

252.    Under ISA, discussions alone do not suffice to provide appropriate audit evidence.

253.    PwC also discussed with Madoff his "Custodian function," which was described in the PwC Netherlands Letter as follows:

(a)      An entity acts as custodian within Madoff's group of companies;

(b)      Are there any other sub-custodial or clearing arrangements;

(c)      Segregation of the custodian function from the Advisory and Brokerage functions (both physically and through access);

(d)      Frequency of reconciliations (daily, weekly) performed with the sub-custodian, taking inventory of securities and subsequent reconciliation to stock and treasury holdings and reconciliation of activity reports to records maintained by depositories and sub-custodians . . . .

(*Id.* at 4.)

254.    PwC blindly accepted, and never confirmed, verified, or independently ascertained, any of the information provided by Madoff.  Particularly with respect to sub-custodians, the PwC Netherlands Letter further explained that according to Madoff "there [were]

agreements with other US custodians." (*Id.* at 5.) PwC never confirmed who the "other US custodians" were, and accepted all of Madoff's representations at his word.

255.     PwC Ireland received an even more detailed report concerning Optimal SUS from PwC Bermuda and PwC U.S. about the same meeting with Madoff in December 2004. (*See* PwC Madoff Report, Ex. 7.) The report is on "PricewaterhouseCoopers" letterhead and labeled "Strictly Private And Confidential." (*Id.*) PwC Ireland paid a fee to obtain the PwC Madoff Report and used it to prepare its audits of both Optimal SUS and Thema. PwC Ireland obtained a similar report for the 2006 audit, but Plaintiffs have not been able to locate a copy.

256.     The report concerning the 2004 audit followed a similar structure to the appendix included in the PwC Netherlands letter, but provided additional information. For example, the attendees to the meeting with Madoff are disclosed as Linda McGowan and Scott-Watson Brown. McGowan is a partner at PwC U.S., and based in PwC's office in New York City at 300 Madison Avenue -- about ten blocks from Madoff's offices in the Lipstick Building. Brown was a partner at PwC Bermuda, based in Hamilton, Bermuda.

257.     The PwC Madoff Report states that "99% of all trades [were] electronic, therefore records are updated daily and all reconciliations [were] performed daily (automated process)." (*See* PwC Madoff Report, Ex. 7, at 1.) Yet, both OIS and Thema received all trade confirmations in paper format with a considerable time lag that allowed Madoff to fabricate the trades. Indeed, the paper records did not include time stamps for each trade nor individualized prices. Instead, the paper confirmation tickets only reflected average prices for the day. This inconsistency between the fact that virtually all Madoff's purported trades were electronic and the fact that all trade information from Madoff was sent in paper format was irreconcilable. Accordingly, PwC's inability to obtain electronic confirmations and having access only to the

paper confirmations received by Thema should have raised a red flag regarding the claimed assets on the Funds' financial statements.

258. The PwC Madoff Report further explained how the fictitious trading process supposedly functioned:

> **Trades are initiated by the system without trader intervention** and routed in accordance with the firms routing priority. Trades are bunch but the system maintains detail by account, which upon electronic confirmation of execution is automatically posted to each individual account in accordance with the original trade break out. Bunched trades are allocated on a prorate basis. Performance is the same across all funds/accounts for which this strategy is employed. Madoff received 4 cents a share mark up on all trades. The system chooses the trades by generally using 35 of the &P 100 stocks and hedges the positions with S&P options . . . . The parameters of the strategy require the correlation to be in the 90's. Based on the **models** matrix, positions are adjusted as correlative factors dictate. If the **model** determines that there is not a current factor conducive to positioning, the cash will be invested in US Treasury securities. The **model** runs on a dynamic basis and is adjusted periodically as market conditions dictate.

(*See* PwC Madoff Report, Ex. 7, at 2.)

259. Because PwC could have only reviewed paper copies of the trades purportedly executed for and sent to Thema, PwC never confirmed that the electronic trading for Thema's assets in fact occurred.

260. According to the PwC Madoff Report, "all securities are segregated in accordance with US brokerage rules (primarily at DTC for equities and BONY for governments; **GSCC clears governments**)." (*See id.* at 4.) The statement "BONY for governments, GSCC clears governments" meant that BONY (the Bank of New York) held the government securities, or U.S. Treasury bills, and that GSCC (Government Securities Clearing Corporation) was the clearing agent for the purchase and sales of U.S. Treasuries. The U.S. Treasuries were purportedly held at BONY and cleared through GSCC because Madoff was not an authorized

broker-dealer for government securities, only for equity securities. FINRA's 2008 report on BMIS specifically stated that BMIS was a broker dealer, but **not** a "government securities broker or dealer."

261. PwC Ireland's audit opinion concerning Thema represented that $1,438,964,541, which was 99.84% of Thema's total assets, was held in U.S. Treasuries as of December 31, 2007. In fact, every year-end financial statement audited by PwC reflected that virtually all the assets were being supposedly held in U.S. Treasuries, and the rest in cash. Yet, PwC never confirmed, for example, that the Treasury bills that were reflected on Thema's financial statements – in which Thema's assets were invested when not investing in the split-strike conversion strategy – in fact existed.

262. PwC Ireland audited Thema during the Class Period. Every single year Madoff told PwC that billions of dollars were held in U.S. Treasuries. And every single year PwC failed to check to make sure that these assets – the U.S. Treasuries – existed. A critical part of PwC Ireland's audit was to verify that the assets existed and that Thema's monies were safe. But PwC Ireland failed to perform this task.

263. The PwC Madoff Report also indicated that "all securities [were] segregated in accordance with US brokerage rules (primarily at DTC for equities)." (*See* PwC Madoff Report, Ex. 7, at 4.) PwC never confirmed that there existed a "segregated" account at DTC for the benefit of either the Optimal Funds or Thema.

264. In purporting to obtain an understanding of Thema's business (as required by ISA) and of the internal control framework at BMIS where Thema entrusted the monies of Plaintiff and the Class, PwC failed to obtain confirmations from yet another critical set of third parties: Madoff's supposed-trading counterparties.

265.    PwC knew that the put counterparties were critical and questioned Madoff on this point during the December 2004 meeting. The PwC Madoff Report states that according to Madoff, **"all options [were] traded [over-the-counter], but use same expiration date as listed index options; Madoff uses various, numerous counterparties"** (*See* PwC Madoff Report, Ex. 7, at 7.)

266.    Over-the-counter traded options meant that Madoff entered into private contracts with other market players and that Madoff did not purchase exchange-traded options. Exchange-traded options carry no credit risk because the exchange ensures that all exchange participants are credit worthy. In the event they are not, the exchange suffers the loss. Accordingly, PwC knew that Madoff supposedly did not purchase any puts in an exchange and that all its puts consisted of direct, private transactions.

267.    As a result of the foregoing, the PwC Defendants, as well as the Medici Defendants, Thema, the Director Defendants, the HSBC Defendants, and the Advisor Defendants, failed to perform proper due diligence on Madoff. These Defendants should have been, but failed to be, guided by ten major principles, according to common industry practice:

(a)    committing appropriate resources to due diligence;

(b)    performing intense due diligence;

(c)    appropriate documentation of the due diligence process;

(d)    determining an appropriate scope for due diligence;

(e)    utilizing qualified individuals to conduct due diligence;

(f)    conducting due diligence using individuals with a diverse skill set;

(g)    performing on-going monitoring of the investment manager;

(h)    determining whether or not to conduct due diligence in-house or outsource it;

(i)    conducting due diligence on not just the hedge fund but on the hedge fund's service providers; and

(j)     willingness not to do business with an investment manager who fails the due diligence process.

268.    Ignoring these principles, the Medici Defendants, Thema, the Director Defendants, the HSBC Defendants, the Advisor Defendants, and the PwC Defendants performed inadequate due diligence and failed to competently perform their jobs.

### (7)     Significant Fees Collected By Defendants

269.    Since Thema's inception, the Medici Defendants, the HSBC Defendants, the Director Defendants, and the Advisor Defendants collected enormous fees for their purported services – over $100 million during the Class Period.

270.    The Income Statement contained in the 2007 annual report stated that the following Defendants received the indicated fees in 2006 and 2007:

(a)     as investment managers, Thema Management received approximately $14,759,932 in 2006, and Medici received $6,350,821 in 2007;

(b)     as investment advisor, BA Worldwide received approximately $2,434,734 in 2006;

(c)     as distributor, Thema Management received approximately $15,877,052 in 2007;

(d)     as administrator, HSBC Securities received approximately $1,032,991 in 2006 and $783,129 in 2007;

(e)     as custodian, HSBC Trust received approximately $964,875 in 2006 and $784,752 in 2007;

(f)     the Director Defendants received $149,138 in 2006 and $173,481 in 2007 for director fees, but millions more due to their ownership interests in Thema Management and GB&C.

(Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 12.)

271.     In addition to the foregoing fees for 2006 and 2007,[14] Kohn received approximately $32 million from Madoff and BMIS for purported research fees.

272.     These Defendants' wrongdoing was motivated by greed.  They did little if any work to "earn" their fees, which, for the most part, were calculated as a percentage of Thema's annual NAV.  Since Madoff did not charge any advisory fees (which was unusual if not unheard of for an investment advisor), Defendants were paid much higher fees by using Madoff as an undisclosed investment advisor and custodian than if they had chosen someone legitimate to perform the investment advisory and custodial functions for Thema.  The fact that Madoff charged no fees for his purported investment advice was one of the most conspicuous red flags giving rise to suspicions of fraud.  Motivated by the lucrative fees, however, Defendants consciously ignored this red flag.

## B.     The Role and Knowledge of the BMIS Defendants

273.     All BMIS Defendants – Peter Madoff, Mark Madoff, and Andrew Madoff – had actual knowledge of the Ponzi scheme and Thema's role as a feeder fund because:  (i) they held senior positions at BMIS for decades, were close to Madoff, and were control persons of BMIS; and (ii) they were surrounded by red flags on a daily basis, including the secrecy of BMIS's operation and the lack of audits.

274.     Because of their unique positions, all BMIS Defendants had actual knowledge that (i) Madoff's investment advisory business was a fraud; (ii) Thema was a feeder fund; (iii) Kohn received quarterly secret kickbacks for her role in the Ponzi scheme; and (iv) they and

---

[14] Plaintiff has not alleged the fees Defendants earned for other years in the Class Period because he has not been able to locate such information.

other Maodff/BMIS employees prepared account statements for its institutional investment advisory clients.

275. Specifically, Peter Madoff created the technology that permitted customers to perform trade transactions via computer. He was responsible for the day-to-day management of the trading desk at BMIS. His other duties included:

(a)     directing the management and policies of BMIS;

(b)     regularly verifying and accurately reporting the financial condition of BMIS;

(c)     establishing, implementing, controlling, monitoring, and enforcing a compliance program of internal controls designed to ensure BMIS's compliance with all laws; and

(d)     the detection, prevention, and reporting of all violations of any laws or regulations by BMIS or its employees.

276. In fact, the BMIS Defendants actively participated in perpetrating the Ponzi scheme by managing BMIS's operation, which included creating fictitious stock trading records. The BMIS Defendants also failed to develop and implement effective internal controls that, had they been implemented, would have prevented Plaintiff's losses. Moreover, the BMIS Defendants were uniquely situated because they were presented with and ignored red flags every day. In addition to the other red flags identified herein, the BMIS Defendants had unique knowledge regarding the fact that (i) Madoff's investment advisory services business was separated from the rest of BMIS; it was located on a separate floor, known as the "cage," and was off-limits to all but a few select employees; (ii) the reported returns of the investment advisory business were abnormally profitable; they were consistently profitable over 144 months of reported operation; (iii) feeder funds such as Thema did not have electronic real-time access to their accounts; and (iv) BMIS did not use its own trading desk or outside brokers when buying or selling the securities it purported to manage and sell for its important advisory clients.

277.    Accordingly, the BMIS Defendants substantially assisted the other Defendants'
mismanagement and wrongful conduct of Thema, causing enormous losses to Plaintiff and the
Class.

C.    **The Role and Knowledge of the Financial Institution Defendants**

(1)    **JP Morgan**

278.    JP Morgan is a banking conglomerate and the third largest U.S. financial
institution.  JP Morgan promotes itself as providing "institutional, high-net-worth and individual
investor clients with high quality global investment management in equities, fixed income, real
assets, hedge funds, private equity and cash liquidity.  By building a reputation for investment
excellence and superior service, JP Morgan Asset Management has become one of the largest
asset managers in the world."  JP Morgan further promotes itself as "a premier securities
provider that helps institutional investors, alternative asset managers, broker dealers and equity
issuers optimize efficiency, mitigate risk and enhance revenue.  JP Morgan leverages the firm's
unparalleled scale, leading technology and deep industry expertise to service investments around
the world."  It also ranks as one of the top three commercial banks in the nation.  Joanne
DiPascali, sister to Madoff's right hand man in the Ponzi scheme, was an employee of JP
Morgan Chase National Association, JP Morgan's private banking arm.

(a)    **JP Morgan Managed BMIS's Primary Account Which Was
Used to Illegally Launder Monies Obtained from Investors**

279.    JP Morgan played a key role in the Madoff fraud.  For two decades, JP Morgan
was BMIS's banker.  BMIS's account was one of the largest cash accounts at JP Morgan and
contributed substantially to JP Morgan's revenues and its capital holding requirements.
According to analysts, due to the sheer size of the 703 Account, which at one time blossomed to
$5.5 billion, JP Morgan made nearly $483 million just for managing the 703 Account.  The fact

that BMIS maintained a huge cash account at JP Morgan that engaged in suspicious money transfers to London but did not engage in any securities transactions did or should have raised alarms at JP Morgan. Not satisfied with serving solely as BMIS's banker, JP Morgan substantially assisted the fraud and also profited from Madoff and BMIS through the issuance of structured notes that paid out three times the returns of the Fairfield Sentry Fund and the Fairfield Sigma Fund, the primary Madoff feeder funds under the management of the Fairfield Group. JP Morgan invested about $250 million of customers' monies in the Fairfield Sentry Fund and the Fairfield Sigma Fund.

280. JP Morgan purchased Bear Stearns on March 16, 2008 and gained additional inside knowledge about the Madoff scandal, specifically that Madoff could not have traded the volume of stock and options Madoff claimed. As a result of its connections with Madoff and BMIS, it had actual knowledge that BMIS was violating its fiduciary duties and committing fraud because JP Morgan knew that BMIS was not purchasing securities on behalf of investors and was misusing investor funds.

281. BMIS was a substantial client of JP Morgan and, according to a well-known bank analyst, JP Morgan made close to half a billion dollars from the BMIS account, making BMIS an important profit center for the bank.

282. One of JP Morgan Chase's roles for Madoff was as a depository for the investors who invested through BMIS. Since at least the early 1990s, all the investor monies obtained by BMIS were deposited in the JP Morgan 703 Account.

283. Madoff had other checking accounts with JP Morgan, too, including at least one, a business account for Bernard L. Madoff Investment Securities LLC, that paid monthly American Express bills for Madoff's family and BMIS employees. It was through monitoring of these

accounts that JP Morgan obtained the knowledge that Madoff was not trading the securities as represented. Despite this knowledge, JP Morgan substantially assisted the fraud by obtaining investors for Madoff and BMIS through Thema.

### (b) JP Morgan's Internal Control System Raised No Alarms Regarding Madoff

284. JP Morgan is a bank of substantial size, resources, and sophistication, with an active investment brokerage and advisory business. JP Morgan is also an expert in investment technique and business practices. By that time, Madoff's fame on Wall Street and the remarkable success of his investment strategy were well known. JP Morgan also knew that it managed the 703 Account which Madoff used for his investment advisory business. JP Morgan had a long relationship with Madoff and BMIS and had direct knowledge of the cash activity and balance of Madoff's 703 Account. With the significant press surrounding Madoff, and the fact that the 703 Account was one of JP Morgan's single largest cash accounts, JP Morgan knew that no funds were being utilized for any actual securities transactions.

285. Because of JP Morgan's relationship with Madoff in managing the 703 Account since the early 1990s and Madoff's reputation, JP Morgan's internal controls were or should have been alerted when Madoff purported to generate returns of over 10% by hedging and trading S&P 100 index stocks that had been literally devastated by the economic downturn. These remarkable gains, and the fact that Madoff reported only seven months of minor losses out of 89, were highly improbable given the financial climate of the domestic and international economies during that time. Because of the size and importance of BMIS as a client, JP Morgan consciously disregarded any questions it may have had regarding the 703 Account. JP Morgan

was uniquely positioned to monitor and oversee BMIS's investment advisory accounts and it used that knowledge to assist the fraud by managing the 703 Account.

286. Madoff's account at JP Morgan held demand-based deposits. As such, JP Morgan had full use of the funds until the funds were needed or requested by the account holder. For a bank with the size and sophistication of JP Morgan, it was common protocol to monitor the activity and transactions of such a large cash account. For decades, JP Morgan profited from the available use of the funds in the account. From 2006 to 2008, the account held billions in cash, at one point topping $6 billion. This balance evaporated in late 2008 during the economic downturn when huge cash withdrawals were demanded by Madoff's investment advisory clients to cover shortages in other areas of investment.

287. JP Morgan had long overseen the account used by Madoff to develop and grow his Ponzi scheme. JP Morgan witnessed serious irregularities in the handling of the 703 Account, which was purportedly used to invest in securities. These irregularities warranted extra scrutiny from JP Morgan. JP Morgan watched and monitored a supposed powerful and successful brokerage house that operated on unregistered (until 2006) investment advisory business while outwardly advertising that it could achieve excessively high, consistent gains. JP Morgan's exclusive ability to monitor the irregular large cash deposits and withdrawals provided JP Morgan with the ability to detect and uncover the Madoff fraud before it devastated tens of thousands of innocent investors. Instead, it continued to transact business on behalf of Madoff and BMIS.

288. Madoff used the 703 Account to pay money out to himself, his family, or other investors who requested withdrawals, or he put it in short term investments, or he laundered it through other accounts to himself, his family or his broker dealer business. **Rarely, if at all, did**

**BMIS use the monies from the account to purchase stocks or options for its investors, as it claimed to do.** In fact, it was nothing more than a slush fund, according to the SEC's latest report.

289.    Sometimes the account had little money and sometimes huge sums just sat for extended periods in the account, as in 2008 when it held almost $6 billion. This massive fluctuation in the 703 Account should have triggered an internal probe or triggered alarms with JP Morgan's internal control system.

### (c)    JP Morgan Assists in Money Laundering Between New York and London

290.    In 2000, money began to flow from the 703 Account in New York to a London bank account and back to the 621 Account at BONY, which was the operating account for BMIS's broker-dealer arm. According to government authorities, these transfers of money constitute money laundering. JP Morgan actively participated in these transactions. For example, between 2001 and 2008, Madoff wired $500 million from the investors' 703 Account in New York through MSIL accounts in London to the 621 Account in New York. More than half of the money ended up with BMIS market making and proprietary trading businesses, prosecutors said. During that time, Madoff regularly withdrew cash from the 621 Account, sometimes as much as $2 million a day. Some of the transfers were much larger. On April 1, 2007, for example, Madoff sent $54.5 million from the 703 Account in New York to one of the BMIS accounts in London. Not all of the money is currently accounted for.

### (d)    International Money Laundering Abatement Act

291.    JP Morgan knew that many Madoff's transfers were fraudulent. Under the Bank Secrecy Act, banks are trained to spot, and required to report, cash transactions exceeding $10,000 and suspicious activity that might be a sign of money laundering, especially after

September 11, 2001, when the passage of the USA Patriot Act required stepped up scrutiny. The International Money Laundering Abatement Act and Financial Anti-Terrorism Act of 2001 imposed added due diligence requirements on financial institutions that required them to provide Suspicious Activity Reports ("SAR") if they detected account activity that was suggestive of money laundering activities. The transfers in the BMIS accounts had many of the features of money laundering, such as frequent large transfers among accounts, and large deposits but few cash withdrawals for daily operations.

292. The primary regulator of national banks, the Office of the Comptroller of the Currency ("OCC"), described the goals of the Bank Secrecy Act in its 2000 handbook:

> Money laundering is the criminal practice of filtering ill-gotten gains or "dirty" money through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities.

293. Congress enacted the Bank Secrecy Act to prevent banks and other financial service providers from being used as intermediaries for, or to hide the transfer or deposit of money derived from, criminal activity. In particular, the Department of the Treasury warned that hedge funds, such as BMIS, was one of the prime candidates for money laundering. JP Morgan never filed any SAR relating to the 703 Account.

294. A financial institution must educate its employees, understand its customers and their businesses, and have systems and procedures in place to distinguish routine transactions from ones that rise to the level of suspicious activity.

295. Among the criminal activities money laundering is designed to combat is fraud, according to the OCC, which mentions "brokers/dealers as an example of the kinds of businesses that could be a potential source of money laundering.

296. The OCC specifically identifies several "examples of potentially suspicious activities that should raise red flags for further investigation to determine whether the

transactions or activities reflect illicit activities rather than legitimate business activities and whether a Suspicious Activity Report should be filed." Many of the following applied to BMIS and Madoff:

(a)    A customer opens several accounts for the type of business he or she purportedly is conducting and/or frequently transfer among those accounts.

(b)    A customer frequently makes large dollar transactions (such as deposits, withdrawals, or purchases of monetary instruments) without an explanation as to how they will be used in the business.

(c)    A business account history that shows little or no regular, periodic activity; the account appears to be used primarily as a temporary repository for funds that are transferred abroad. For example, numerous deposits of cash followed by lump-sum wire transfers.

(d)    The currency transaction patterns of a business experience a sudden and inconsistent change from normal activities.

(e)    Unusual transfer of funds among related accounts or accounts that involve the same principal or related principals.

(f)    Funds transferred in and out of an account on the same day or within a relatively short period of time.

(g)    A professional service provider, such as a lawyer, account, or broker, who makes substantial deposits of cash into client accounts or in-house company accounts, such as trust accounts and escrow accounts.

297.    The transfers into and out of these accounts exhibited these qualities, but JP Morgan continued to substantially assist the fraud. In violation of U.S. law, JP Morgan did not raise any suspicions with the federal government. Based upon the transfers of money and the fact that no stocks were ever purchased with the money from the accounts, JP Morgan knew that BMIS and Madoff were engaging in a massive fraud and had breached their fiduciary duties to their investors, either direct investors or those who invested through feeder funds.

298.    Around 2006, JP Morgan began selling derivative investments that had the effect of tripling an investor's investment in BMIS.  When an investor buys a structured note from a bank, typically the bank is promising to pay interest based on the performance of some other investment.  In this case, the other investment was the Fairfield Sentry Fund and Fairfield Sigma Fund, which JP Morgan knew was completely invested in Madoff and BMIS.  The structured notes sold by JP Morgan promised to pay investors based on the performance of the Fairfield Sentry Find and the Fairfield Sigma Fund, two of Madoff's primary feeder funds.  In order to hedge its bets, JP Morgan invested a substantial amount of money into the Fairfield Sentry Fund and Fairfield Sigma Fund.  JP Morgan expected to profit by taking advantage of the margin between what it needed to pay investors in the structured notes and what it obtained from its investments in the Fairfield funds.  By selling these structured notes, JP Morgan was substantially assisting the fraud being perpetrated by Madoff, BMIS, and Madoff's feeder funds, such as Thema, while indirectly bringing in new investor money for Madoff's Ponzi scheme.

299.    JP Morgan has long been a world leader in derivative innovations, which in turn have driven record-setting revenues and profits.  In 2006, the year it began issuing its Fairfield structured notes, JP Morgan was ranked #1 in Investment Banking fees worldwide with record investment banking fees of $5.5 billion, up 35% from the prior year.

300.    To cover the promise it made to investors, JP Morgan put three times the face amount of the notes, or $250 million, into the Fairfield Sentry Fund and the Fairfield Sigma Fund.  In doing so, JP Morgan used derivatives to substantially assist the Madoff fraud.  For investors enamored of Fairfield's – and therefore Madoff's – consistent returns, this was a way to make more money than if they had invested directly in any of the Madoff feeder funds.  For JP

Morgan, it was a way to attract high-net-worth investors and earn an estimated $1.5 million in fees. By selling the structured notes and then hedging its bets by investing in the Fairfield funds, if those funds did well, the bank's returns would offset its obligation on the notes. In other words, these notes became a valuable source of funds for Madoff, triple what an investor alone would have committed. For the Fairfield Group, which based its fees on how much money it was managing for an investor, it was essentially tripling its fees through JP Morgan's sale of these structured notes.

301.    As JP Morgan describes in its online explanation of structured notes:

Q.      Would an issuer want the index underlying a structured investment to go up or down?

A.      Those who construct structured investments typically seek to design investments that enable investors to realize the maximum possible return given their market view. As such, they often do not take an active view on the structured investments they sell. Instead, an issuer typically hedges its exposure to the equity underlying as completely as possible and is therefore indifferent to the appreciation or depreciation of a structured investment underlying.

302.    In 2006, JP Morgan was so eager to sell its Fairfield structured notes that it did not evaluate the safety of its investors' bets on Fairfield. The bank itself was protected by its hedges. In developing the Fairfield structured notes, JP Morgan ignored the many warning bells surrounding Madoff's operations. It completely failed to investigate Fairfield's claims that it was monitoring Madoff's strategy and performing due diligence to make sure Madoff was a safe investment.

303.    Though JP Morgan has publicly stated that it only learned of the problems with BMIS in the fall of 2008, this is not true. JP Morgan was BMIS's banker for decades. After its acquisition of Bear Stearns, JP Morgan gained additional inside knowledge about the Madoff scandal. Bear Stearns was a major institution in the hedge fund industry and did extensive

business with Cohmad, the brokerage house founded by Madoff himself and his close friend, Maurice Cohn.  BMIS's trading desk executed a large number of trades with Cohmad that were cleared by Bear Stearns.  Based on this inside information, JP Morgan had actual knowledge that BMIS was violating its fiduciary duties and committing fraud because JP Morgan knew that BMIS was not purchasing securities on behalf of investors and was misusing investor funds.

304.    Investors were not told of JP Morgan's concerns.  A JP Morgan spokesperson, Kristen Lemkau, said that under the sales agreements "we did not have the right to disclose our concerns" because the issues did not rise to the threshold of letting the bank restructure the notes. However, nothing in the sales agreements would have prevented JP Morgan from reporting its concerns to the SEC.  Even though JP Morgan knew these were investors' funds pouring into a company that JP Morgan knew was engaged in fraud, the bank continued to accept deposits into the 703 Account and others.

305.    In developing these structured notes and making these investment decisions, JP Morgan knew that BMIS was not purchasing securities for investors based on its knowledge that BMIS was not purchasing securities from the 703 Account and its knowledge that the market would have moved differently if Madoff was making the trades he claimed to be making using his "split strike conversion" strategy.

306.    Specifically, in an investigation of Madoff in the summer of 2008, JP Morgan representatives met with Madoff and sought information regarding his cash flows and his counterparties for option contracts, because the options market was too small to handle the size and capacity Madoff was claiming to manage his supposed options strategy.  After Madoff refused to provide information, JP Morgan obtain key information from, Aldo Parcesepe, a former employee of Bear Stearns – Madoff's largest counter party – that Madoff's trades could

not possibly sustain a portfolio returning 10% to 20% a year on what JP Morgan knew from the deposit side had to exceed at least $7 billion.

307.     Upon concluding that Madoff was a fraud, JP Morgan quietly liquidated its entire $250 million position in the Fairfield Sentry Fund, even though the Fairfield Sentry investment notes were showing a 5% gain for the year.  As an excuse for the liquidation, Lemkau stated that the liquidation was a result of "a wide-ranging review of [JP Morgan's] hedge-fund exposure." But she conceded that JP Morgan "became concerned about the lack of transparency to some questions [JP Morgan] posed [upon Madoff]" as part of the review.

308.     By 2008, JP Morgan knew and recklessly disregarded that Madoff and BMIS perpetrated fraud.

        **(f)**        **Knowing the End Was Near, JP Morgan Withdraws from the Madoff-Related Structured Notes Due to Knowledge of Serious Problems at BMIS**

309.     As BMIS's banker, JP Morgan knew that the Madoff fraud would soon collapse. If stocks had actually been purchased, BMIS would have been depositing monies from the stock sales when investors sought to redeem the monies.  Since no stocks had ever been purchased, the only money coming into the accounts was money from investors.  In the <u>fall of 2008</u>, knowing that the end of the fraud was near, JP Morgan withdrew its $250 million from BMIS through the Fairfield feeder funds.  The fact that JP Morgan was still otherwise active in hedge fund investments and withdrew its funds from only one hedge fund, the Fairfield feeder funds for BMIS, is evidence that it knew about problems at BMIS.  JP Morgan had full knowledge about the lack of transparency in 2006 when it first invested the monies.  According to *Pensions & Investments*, JP Morgan Asset Management decided not to invest in Madoff or BMIS.

310.     JP Morgan failed to tell those who invested in the structured notes and its depositors who had placed money in the 703 Account that it had withdrawn due to its knowledge

that the Madoff fraud was about to collapse.  After withdrawing, JP Morgan continued to accept deposits into the 703 Account, even though it knew these investors' funds were not being used to purchase securities for the investors, as Madoff and BMIS claimed, further substantially assisting the fraud.

311.    In the summer of 2008, with the global economy already on shaky ground, Madoff still maintained almost $6 billion in the JP Morgan 703 Account which contributed substantially to JP Morgan's capital and helped stabilize its balance sheet.

312.    In September 2008, market conditions worsened rapidly.  The S&P 100 fell  28% from mid September to mid October, and investor redemptions spiked dramatically.  Over the next three months, Madoff's investors would demand the return of more than $6 billion.  This meant the balance in the 703 Account was in freefall.

### (2)    BONY

313.    BMIS had its operating account for its broker-dealer business with the Bank of New York (the "621 Account").  As a result, BONY knew that it was providing substantial assistance to the fraud by providing fund administrative services to Tremont, another Madoff feeder fund, giving both Tremont and Madoff an added layer of legitimacy.

314.    In violation of money laundering laws, BONY allowed Madoff to transfer monies back and forth to London.  The cash into MSIL was monies laundered through JP Morgan (which also sold structured investments directly tied to the largest Madoff feeder fund) and BONY.  The fund transfers to London were subsequently funneled to Madoff, his family, and to the 621 Account.

315.    BONY also provided fund administration, valuation, and custodial services to Tremont Partners, including monthly calculation of the NAV for certain Rye Select funds.  BONY's hedge fund administration services included:  independent portfolio monitoring and

valuation, accounting and account reconciliation, coordination of audits, asset management, reconciliation of trading activities, and fulfillment of reporting requirements. This required BONY to conduct <u>independent determinations</u> of the funds' assets and liabilities. One of the primary objectives of selecting BONY to administer the funds was because BONY would purportedly be able to provide quality accounting and tailored administrative services.

316. BONY was uniquely situated to discover Madoff's Ponzi scheme. BONY was responsible for performing certain day-to-day administration tasks on behalf of the Rye Select funds, including: (1) calculating daily and periodic portfolio valuations using independent pricing sources, (2) reconciling cash and portfolio positions, (3) providing electronic interface with prime brokers and custodians, (4) processing corporate actions, (5) providing portfolio reporting, (6) maintaining books and records, (7) calculating all fund fees (performance and asset based), (8) reconciling general ledger accounts, (9) calculating and disseminating daily or periodic net asset values, (10) preparing periodic financial statements, (11) coordinating annual audits, (12) communicating with limited partners, (13) communicating with others relating to the Broad Market Funds, (14) processing subscriptions of new limited partners, (15) maintaining the registers of limited partners, (16) disbursing distributions with respect to the interests, legal fees, accounting fees, and officers' fees, and (17) conducting meetings of limited partners and the General Partner. In addition, BONY was responsible for providing certain custodial services to the Rye Select funds.

317. As the professional administrator for the Rye Select funds, BONY was in a position such that it should have independently monitored and valued the Rye Select funds' holdings, reconciled the Rye Select funds' accounts, trading activities, and financial statements.

318.     Had BONY performed its duty in a reasonable manner, it would have identified critical discrepancies in the Rye Select funds' accounts, activities, and financial statements. BONY was aware of or recklessly disregarded numerous red flags that the monies invested in the Rye Select funds either ceased to exist or were substantially diminished in value once transferred to BMIS.

319.     In fact, BONY's own Investment Management Division investigated Madoff and recommended that its own clients not invest with Madoff or in BMIS.  However, BONY was collecting such large fees as the administrator of the Rye Select funds that it ignored the evidence of fraud and failed to disclose the fraud and the crucial fact that virtually all of the capital invested in the Rye Select funds and other feeder funds, such as Thema, were being used in a massive Ponzi scheme.

320.     In addition, through its role as the administrator for another feeder fund, the Rye Select Board Market Prime Fund, BONY obtained inside knowledge of the suspicious operation of BMIS and was thus uniquely situated to detect Madoff's fraud.

321.     Moreover, in a letter to BONY dated May 9, 2006, the SEC requested documents relating to Madoff and BMIS, showing the government's concerns over Madoff's accounting.

322.     BONY therefore knew and recklessly disregarded numerous red flags about Madoff's Ponzi scheme.

323.     In violation of money laundering laws, BONY allowed Madoff to transfer monies back and forth to London.  The cash into MSIL was monies laundered through JP Morgan (which also sold structured investments directly tied to the largest Madoff feeder fund) and BONY.  The fund transfers to London were subsequently funneled to Madoff, his family, and to the 621 Account.

## VII   RED FLAGS DEFENDANTS KNEW OR CONSCIOUSLY DISREGARDED

324.    According to a December 19, 2008 *Bloomberg* article, U.S. government regulators investigating Madoff found evidence that the scheme began at least as early as the 1970s.  For years since the scheme's inception, there have been a myriad of warnings that would have been meaningful to Defendants, had they been conducting proper due diligence, but unavailable to Plaintiff and the Class, as they were unaware their investments in the Medici Funds were being sent to Madoff's Ponzi scheme.  Some of the red flags are discussed in the paragraphs that follow.

325.    In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5% to 20%, and invested the money entirely with Madoff.  As a result of the Securities and Exchange Commission ("SEC") investigation, Avellino and Bienes agreed to shut down their business and reimburse their clients.  PwC served as a special master in the investigation.

326.    In May 1999, Harry Markopolos ("Markopolos"), a derivatives expert with experience managing split-strike conversion strategies, sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.

327.    By May 2001, Defendants knew or were reckless in not knowing that significant questions had surfaced about Madoff's so-called split-strike conversion strategy.  The hedge fund world was baffled by the way Madoff had obtained such consistent, nonvolatile returns month after month and year after year.  Many questioned the consistency of the returns, including current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives.  Others who had used the ***split-strike conversion*** strategy were

known to have had nowhere near the same degree of success.  The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period.

328.     In addition, experts were asking why no one had been able to duplicate similar returns using the strategy and why other firms on Wall Street hadn't become aware of the fund and its strategy and traded against it, as had happened so often in other cases.  When pressed at the time to truly explain the basis of the split-strike conversion strategy, Madoff stated, "'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

329.     Also, by May 2001, Defendants knew or were reckless in not knowing that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results they claimed with their purported investment strategy.  Madoff responded by stating, "'It's a proprietary strategy.  I can't go into great detail.'"

330.     Markopolos again provided an analysis to the SEC on November 7, 2005, warning that Madoff was running a Ponzi scheme.  In his over 17 page single spaced letter entitled "The World's Largest Hedge Fund is a Fraud," Markopolos asserted that the consistency of Madoff's positive returns was mathematically impossible, stating that it was "highly likely" that "Madoff Securities is the world's largest Ponzi Scheme."

331.     Markopolos's analysis further stated as follows:

>    At my best guess level of BM's assets under management of $30
>    billion, or even at my low end estimate of $20 billion in assets
>    under management, BM would have to be over 100% of the total
>    [S&P 100] put option contract open interest in order to hedge his
>    stock holdings as depicted in the third party hedge funds marketing
>    literature [*e.g.*, the Optimal Memorandum].  In other words, there
>    are not enough index option put contracts to hedge the way BM
>    says he is hedging[.]  And there is no way the OTC market is

bigger than the exchange listed market for plain vanilla S&P 100 index put options.

One hedge fund . . . has told that BM uses Over-the-Counter options and trades exclusively thru [sic] UBS and Merrill Lynch. . . .

The counter-party credit exposures for UBS and Merrill Lynch would be too large for these firms [sic] credit departments to approve. The SEC should ask BM for trade tickets showing he has traded OTC options thru [sic] these two firms. Then the SEC should visit the firms' OTC derivatives desk, talk to the heads of trading and ask to see BM's trade tickets.

\*       \*       \*

It is mathematically impossible for a strategy using index call options and index put options [as described by Madoff] to have such a low correlation to the market where its returns are supposedly generated from. . . . BM's [Bernard Madoff's] performance numbers show only 7 extremely small [monthly] losses during 14.5 years . . . .

\*       \*       \*

[S]ince Madoff owns a broker-dealer, he can generate whatever trade tickets he wants. . . . [H]ave the [feeder funds] matched [the trade tickets] to the time and sales of the exchanges? For example, if BM says he bot [sic] 1 million shares of GM, sold $1 million worth of OTC OEX calls and bot [sic] $1 million worth of OTC OEX puts . . . the GM share prints would show on either the NYSE or some other exchange while the broker-dealers he traded OTC options thru [sic] would show prints of the hedges they traded to be able to provide BM with the OTC options at the prices listed on BM's trade tickets.

Madoff does not allow outside performance audits. One London based hedge fund . . . asked to send in a team of Big 4 accountants to conduct a performance audit during their planned due diligence. They were told "No, only Madoff's brother-in-law who owns his accounting firm is allowed to audit performance for reasons of secrecy in order to keep Madoff's proprietary trading strategy secret so that nobody can copy it."

\*       \*       \*

Madoff is suspected of being a fraud by some of the world's largest and most sophisticated financial services firms. Without naming names, here's an abbreviated tally:

A.      A managing director at Goldman, Sachs prime brokerage operation told me that his firm doubts Bernie Madoff is legitimate so they don't deal with him.

*     *     *

[Royal Bank of Canada] and [Societe Generale] have removed Madoff some time ago from approved lists of individual managers . . . .

Madoff was turned down . . . for a borrowing line from a Euro bank. . . . Now why would Madoff need to borrow more funds? . . . Looks like he is stepping down the payout.

*     *     *

BM tells the third party FOF's [fund of funds] that he has so much money under management that he's going to close his strategy to new investments. However, I have met several FOF's who brag about their "special access" to BM's capacity. This would be humorous except that too many European FOF's have told me this same seductive story about their being so close to BM that he'll waive the fact that he's closed his funds to other investors but let them in because they're special. It seems like every single one of these third party FOF's has a "special relationship" with BM.

332.     Had Defendants conducted reasonable and adequate due diligence, they would have detected the fraud based on the red flags and glaring inconsistencies identified by Markopolos. In fact, given that the Medici Funds had provided Madoff with billions of dollars in assets, Defendants had considerably more access than Markopolos to Madoff's operations to detect these red flags. For example, one of Markopolos's critical tests was the confirmation with the supposed counterparties of the trades Madoff claimed to have executed. But, as reported by the *Associated Press* on January 16, 2009, in an article entitled "Madoff fund may have made no trades," "[T]he securities and brokerage industry self-policing organization, the Financial

Industry Regulatory Authority, confirmed that there was no evidence of Madoff's secretive investment fund executing trades through its brokerage operation. And Fidelity Investments, which had a money-market fund listed among the many trades included in statements Madoff's fund sent to customers, says Madoff was not a client." Defendants' minimal and reasonable inquiries with Fidelity, or other similar counterparties, would have alerted Defendants to the fraud.

333. Markopolos's obvious questions about the legitimacy of Madoff's enterprise were echoed by other finance professionals. In 2007, hedge fund investment advisor Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff. Aksia identified the following red flags:

(a) Aksia discovered the 2005 letter from Markopolos to the SEC set forth above.

(b) Madoff's auditor, Friehling & Horowitz, was a three-person accounting firm located in a 13-by-18 foot office in New City, New York. A financial institution of the size of BMIS is typically audited by a big-four accounting firm, or one of the other larger and more reputable auditors. In addition, while Friehling & Horowitz purportedly audited BMIS, Friehling & Horowitz had filed annual forms with AICPA attesting that it had not performed audits for the past fifteen years. The AICPA has begun an ethics investigation into Friehling & Horowitz. Federal investigators have issued a subpoena to Friehling & Horowitz and have requested documents going back to 2000.

(c) The comptroller of BMIS was based in Bermuda. Most mainstream hedge fund investment advisors have their comptroller in house.

(d) BMIS had no outside clearing agent that could confirm its trading activity.

334. In addition, other peculiar practices at BMIS gave rise to suspicion:

(a) Madoff demanded that some feeder funds tell clients and regulators that it was the feeder fund, not him, that made investment decisions. The funds that complied with this demand knew it was a lie.

(b) Large amounts of cash deposited by investors would sit in the JP Morgan 703 Account for Period of time – not invested. BMIS also sent large amounts of cash to London and back to New York. These banking patterns can be signs of money

laundering, and banks are required by law to report this type of behavior, but JP Morgan failed to do so.

(c)     Madoff operated the Ponzi scheme from the 17th Floor of the building that housed BMIS and access to that floor was strictly limited to select employees.

(d)     Proxy materials from Madoff for the stocks he supposedly held were never received by the feeder funds.

335.     Societe Generale ("SocGen") sent a due diligence team to New York in 2003 to investigate Madoff.  As reported by *The New York Times* on December 17, 2008, in an article entitled "European Banks Tally Losses Linked to Fraud," SocGen concluded that something was not right.  "'It's a strategy that can lose sometimes, but the monthly returns were almost all positive' . . . ."

336.     On December 12, 2008 Robert Rosenkranz, a principal at Acorn Partners, an investment advisory firm, stated: "'Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity' . . . ."

337.     Jeffrey S. Thomas, Chief Investment Officer at Atlantic Trust, which manages $13.5 billion, said that it had "reviewed and declined to invest with Madoff."  The firm said it spotted a number of "red flags" in Madoff's operation, including a lack of an outside firm to handle trades and accounting for the funds and the inability to document how Madoff made profits.

338.     In contrast to the above-quoted experts, Defendants here entrusted Madoff with over $1 billion of the Class's assets without conducting any reasonable due diligence.

339.     In addition, Defendants recklessly disregarded red flags from Madoff's filings with the SEC:

(a)    In 2006, after conducting an informal investigation of Madoff, the SEC forced Madoff to register as an investment advisor. Thereafter, BMIS was forced to file Form ADVs with the SEC, which listed its assets under Madoff's management. The amounts listed in such forms were far less than the amounts that Madoff's feeder funds were reporting as assets, and the defendants named herein had unique access to such knowledge because of their roles with multiple Madoff feeder funds. For example, PwC audited at least nine Madoff feeder funds whose reported assets as of 2007 were collectively in excess of $16.5 billion. However, on January 7, 2008, BMIS filed a Form ADV with the SEC representing that BMIS's assets under management were only $17 billion. Since PwC knew that Madoff managed money for many more feeder funds than the nine that PwC audited, it knew or should have known that BMIS's Form ADV should have reported much higher assets under management. Indeed, at the time, BMIS was sending out statements to more than 4,900 active customer accounts with a purported value of *$64.8 billion* under management.

(b)    A review of BMIS's Form 13 F regularly showed that the feeder funds held only a scattering of small positions in small, non-S&P 100 equities. Madoff told clients that his strategy was to be 100% in cash or U.S. Treasuries at every quarter end, to avoid making information about the securities he was trading public. This was inconsistent with his split strike strategy. The real reason was to keep secret the magnitude of the investments being placed with Madoff and to explain why he had no trading positions for an auditor to inspect at year-end. Since U.S. Treasury Bills exist in book entry form only, this also explained why he had no physical securities on hand for an auditor to inspect. An auditor could have corroborated the existence of the U.S. Treasury Bills by asking to see independent confirmation of the book entries.

340.    Finally, the monthly account statements BMIS delivered to Thema's custodian, HSBC Trust (or its predecessor, Bermuda Trust (Dublin) Ltd.) contained grossly inaccurate information. These account statements documented several purported purchases and sales of securities on Thema's behalf, but many documented trades occurred at prices outside of the possible range for each security's daily trading ranges. For example, the December 2001 monthly account statement lists a December 13, 2001 purchase of 22,640 shares of The Proctor & Gamble Company (NYSE:PG) at $76.35 per share. Proctor & Gamble's trading range on December 13, 2001, however, was a low of $79.00 to a high of $81.10 per share-a full $2.65 per share away from the lowest possible purchase price of Proctor & Gamble stock that day. Many other purchases and sales in the December 2001 statement were represented to have been

executed at similarly impossible prices.  Upon information and belief, other account statements sent by Madoff during the Class Period to HSBC Trust contained inaccurate information, which would have led to the discovery of Madoff's fraud, had HSBC Trust checked the information.

## VIII    FACTS GIVING RISE TO THE FEDERAL SECURITIES LAW CLAIMS

341.    During the Class Period, Defendants issued to Plaintiff and the Class (i) prospectuses and prospectus supplements; (ii) reports and audited financial statements each year; and (iii) monthly and quarterly performance update newsletters and brochures.

342.    The prospectuses and prospectus supplements were prepared, reviewed, and approved by (i) Thema and the Director Defendants; (ii) HSBC Securities, as administrator; (iii) Bermuda Trust (Dublin) Limited up until 2004 and HSBC Trust thereafter, as custodian; (iv) Thema Management up until December 31, 2006 and the Medici Defendants thereafter, as investment manager; (v) PwC Ireland, as auditor; and (vi) other professionals who were listed as advisors to Thema, including Thema Management, as distributor; and GB&C, as promoter.

343.    The annual reports and financial statements were prepared, reviewed, approved and/or signed by (i) Thema and the Director Defendants; (ii) Bermuda Trust (Dublin) Limited up until 2004 and HSBC Trust thereafter, as custodian; (iv) Thema Management to until December 31, 2006 and the Medici Defendants therefore, as investment manager; (v) PwC Ireland, as auditor; and (vi) other professionals who were listed as advisors to Thema, including Thema Management, as distributor; GB&C, as promoter; and William Fry, as legal counsel.

344.    The Medici Defendants, Thema, the Director Defendants, Thema Management, HSBC Securities, HSBC Trust, and PwC Ireland supplied the contents of Thema's monthly and quarterly performance update newsletters and brochures, which were sent to both current shareholders and to prospective investors in Thema.

345. The Medici Defendants, Thema, the Director Defendants, Thema Management, HSBC Securities, HSBC Trust, William Fry, and PwC Ireland have *each* made or materially assisted in the making of misleading statements and material omissions in the prospectuses, the prospectus supplements, annual reports and audited financial statements, and the monthly and quarterly performance update newsletters and brochures. William Fry substantially participated in the drafting and review of such documents in its role as Thema's counsel responsible for ensuring that other Defendants complied with their obligations to make full disclosure of all material facts in such documents.

A. **Misleading Statements and Material Omissions Attributable to the Medici Defendants, Thema, the Director Defendants, Thema Management, HSBC Securities, HSBC Trust, and PwC Ireland**

(1) **Annual Reports Between 2001 and 2006**

346. In 2001, Thema issued an Annual Report for 2000 (the "2000 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $166.89 at the end of 1999 to $184.86 as of December 31, 2000 – a 10.76% increase.

347. In 2002, Thema issued an Annual Report for 2001 (the "2001 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $184.86 as of December 31, 2000 to $206.08 as of December 31, 2001– a 11.48% increase, and that the NAV of the Euro Class of Thema had increased by 2.98% to €102.98.

348.     In 2003, Thema issued an Annual Report for 2002 (the "2002 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $206.08 as of December 31, 2001 to $226.05 as of December 31, 2002 – a 9.69% increase, and that the NAV of the Euro Class of Thema had increased by 11.11% to €114.42.

349.     In 2004, Thema Fund issued an Annual Report for 2003 (the "2003 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $226.05 as of December 31, 2002 to $244.60 as of December 31, 2003– a 8.21% increase, and that the NAV of the Euro Class of Thema had increased by 9.33% to €125.09.

350.     In 2005, Thema issued an Annual Report for 2004 (the "2004 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $244.60 as of December 31, 2003 to $262.94 as of December 31, 2004 – a 7.50% increase, and that the NAV of the Euro Class of Thema had increased by 8.03% to €135.14.

351.     In 2006, Thema Fund issued an Annual Report for 2005 (the "2005 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and

Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $262.94 as of December 31, 2004 to $283.58 as of December 31, 2005– a 7.85% increase, and that the NAV of the Euro Class had increased by 6.63% to €144.10.

352.     In 2007, Thema issued an Annual Report for 2006 (the "2006 Thema Annual Report") which falsely represented that the Fund had invested in U.S. securities and Treasuries during the year, that Thema Asset Management Ltd. was the Investment Manager, that BA Worldwide was the Investment Advisor, that Bermuda Trust/HSBC Trust was the Custodian, and that the NAV of the US$ Class of Thema had increased from $283.58 as of December 31, 2005 to $313.51 as of December 31, 2006– a 10.55% increase, and that the NAV of the Euro Class of Thema had increased by 7.93% to €155.53.

353.     The 2000 through 2006 Thema Annual Reports were prepared, reviewed, approved and/or signed by (i) Thema and the Director Defendants; (ii) Bermuda Trust (Dublin) Limited up until 2004 and HSBC Trust thereafter, as custodian; (iv) Thema Management, as investment manager; (v) PwC Ireland, as auditor.

354.     The 2000 through 2006 Annual Reports were false and misleading because they all falsely misrepresented that:

(a)     the NAV of Thema was positive and was increasing each year (the NAV was really zero, since Madoff had stolen all the money and it had never been invested);

(b)     positive returns were steady each year (this was false because Plaintiff's and the Class's monies was were never invested and thus yielded no return);

(c)     Thema Management was the investment manager and BA Worldwide was the Investment Advisor and were making all the investment decisions (when in fact Madoff/BMIS was the investment manager and advisor);

106

(d)     Bermuda Trust (Dublin) Limited or HSBC Trust was the custodian (in reality it was Madoff), and falsely represented that Thema had engaged in multiple securities transactions each year on the NYSE and/or NASDAQ (in reality, no securities were purchased).

355.    Thema, the Director Defendants, HSBC Trust (or Bermuda Trust (Dublin) Limited), Thema Management, PwC Ireland, and William Fry knew these statements were false because each of them knew that all Thema's assets were funneled to Madoff and BMIS and that Madoff and BMIS were Thema's sub-custodian and *de facto* investment manager.

356.    Madoff's status as undisclosed investment manager for Thema had come to the attention of the SEC in January 2006 in connection with a non-public investigation of Madoff by the SEC in response to reports that Madoff was running a Ponzi scheme.  In a January 23, 2006 email, Simona Suh of the SEC indicated to other SEC staff that:

> The staff received a **complaint alleging that Bernard L. Madoff Investment Securities LLC**, a registered broker-dealer in New York ("BLM"), operates an undisclosed multi-billion dollar investment advisory business, and that BLM **operates this business as a Ponzi scheme** . . . [B]ecause of the substantial amounts at issue, the staff, in an abundance of caution, requested voluntary production of certain documents from BLM and two of its hedge fund customers, Fairfield Sentry Limited and Greenwich Sentry, L.P., affiliates of the New York-based Fairfield Greenwich Group ("FGG")

The staff also conducted a voluntary interview of an FGG officer.  The staff found:

> [First,] . . . **neither BLM nor the Sentry Funds disclose to investors that the investment decisions for the Sentry Funds are made by BLM rather than by FGG, and that, in substance, BLM acts as an undisclosed investment advisor to the Sentry Funds**. . . Third, the evidence obtained so far suggests that **BLM also acts as an undisclosed investment advisor to several additional hedge funds**. **The staff is now seeking additional evidence, in the form of documents and witness testimony from BLM and its hedge fund customers**, on the issues of [Madoff's] role in those hedge funds' investment activities and the adequacy of related disclosures.

357. Thus, in 2006, the SEC had identified the fact that BMIS was serving as an undisclosed investment advisor to the Sentry Funds and other hedge funds, including Thema. Because the SEC found this lack of disclosure to the hedge funds' clients to be material, the SEC contacted Thema (Madoff's fourth largest feeder fund) and requested additional information concerning why Thema's prospectuses and annual reports did not disclose that Madoff was the real investment manager and custodian. Nonetheless, Thema, the Director Defendants, HSBC Trust, HSBC Securities, Thema Management, and PwC Ireland never publicly disclosed BMIS's role as undisclosed investment manager and sub-custodian for Thema.

### (2) The December 31, 2006 Prospectuses

358. On December 31, 2006, Thema issued a prospectus for the purpose of inducing Plaintiff and the Class to invest in Thema.

359. The December 31, 2006 prospectus was prepared, reviewed, and authorized by the Director Defendants – Alberto Benbassat, Stéphane Benbassat, Brady, Morrissey, and Smith – who they represented that they were "the persons responsible for the information contained in this prospectus and accept responsibility accordingly." The prospectus was also prepared, reviewed, and approved by, among others, the Medici Defendants, HSBC Trust, HSBC Securities, PwC Ireland, Thema Management, William Fry and GB&C, all of whom were listed as experts and professional advisors to Thema in the prospectus.

360. The prospectus included the following false statements:

(a) The cover of the Thema Prospectus states: "The Directors of the Company . . . are the persons responsible for the information contained in this Prospectus and accept responsibility accordingly. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information." (Thema December 31, 2006 Prospectus, Ex. 2, at 1.)

This statement was false because the Director Defendants failed to perform adequate due diligences and to collect sufficient information to prepare the prospectus.

(b)     "The primary investment objective of the Company is to achieve long term capital appreciation while attempting to limit investment risk.  The Company will seek to achieve this objective on behalf of each Fund through the careful selection of investment advisors, which are, in the opinion of the Investment Manager, of the highest quality with a proven track record."  (*Id.* at 12.)

This statement was false because Thema, the Director Defendants, HSBC Ireland, and Thema Management failed to perform due diligence before selecting Madoff and BMIS as *de facto* investment manager.

(c)     "Investments may only be made in accordance with the UCITS Regulations."  (*Id.* at 13.)

This statement was false because all Thema's assets were funneled to Madoff and BMIS in New York.

(d)     "The Company has appointed Bank Medici AG as its investment manager."  (*Id.* at 16.)

This statement was knowingly false when made because the Medici Defendants, HSBC Trust, HSBC Securities, PwC Ireland, William Fry, and Thema Management each knew, but failed to disclose to Plaintiff and the Class, that Madoff and BMIS were serving as Thema's *de facto* investment manager.

(e)     The Prospectus stated that the Directors and Custodian must calculate the value of the assets held by Thema.  With respect to any investment which is not quoted, listed or normally dealt with on a market, the Prospectus *required the Directors and Custodian to calculate the value* of such investment, and to calculate it as "the probable realizable value thereof which must be estimated with care and in good faith ascertained as hereinafter provided as determined by the Directors with the concurrence of the Custodian."  In determining such value, the Directors and Custodian were required to take "into account interest on interest bearing investments."  (*Id.* at 44.)

This statement was false because the Medici Defendants, HSBC Trust, HSBC Securities, PwC Ireland, William Fry, and Thema Management each knew that Thema's assets were funneled to Madoff and BMIS and that the Director Defendants and HSBC Defendants did not make any effort to calculate the value of Thema's investments but instead blindly accepted Madoff's valuations.

(f)     "Neither the Company nor the Investment Manager has entered into any soft commission arrangements with respect to the Company.  In the event that any such arrangements are made, the Company or Investment Manager, as applicable, will ensure that . . . such arrangements are adequately disclosed in the relevant

109

Prospectuses as updated or amended, and the periodic reports issued by the Company." (*Id*.)

This statement was knowingly false when made because the Medici Defendants, HSBC Trust, HSBC Securities, PwC Ireland, William Fry, and Thema Management each knew or recklessly disregarded that Medici and Sonja Kohn had entered into agreements with Madoff pursuant to which Madoff made substantial payments to Kohn and companies controlled by her in exchange for Kohn and Bank Medici sending the Class's money in Thema to Madoff. Such arrangements between Madoff and Kohn/Bank Medici were never disclosed in the Prospectuses or any periodic reports issued to the Class at any point.

(i)     "Save as disclosed on page 26, no amount or benefit has been paid or given to any promoter and none is intended to be given." (*Id.* at 45.)

This statement was knowingly false when made. While the Prospectus disclosed that GB&C was acting as the promoter, and that Alberto Benbassat and Stéphane Benbassat were both directors of Thema and general partners of GB&C, it did not disclose that Medici and Kohn were serving as Thema's promoters and that they had an agreement with Madoff pursuant to which Madoff had been making and would continue to make substantial undisclosed quarterly payments to companies controlled by Kohn, Medici's 75% owner.

### (3)     The Supplement to the December 31, 2006 Prospectus

361.    The Director Defendants, the Medici Defendants, the HSBC Defendants, PwC

Ireland, and William Fry also prepared, reviewed, approved, and/or disseminated a

"Supplement" to the Prospectus.

362.    The Supplement contained the following statements:

(a)     "**Investment Objective and Policy**. The objective of Thema is to achieve long-term capital appreciation by investing on a non-leveraged basis in a large number of United States equity securities traded on Regulated Markets that are highly liquid. Investments will principally be made in equity securities that are included in the Standard & Poor's 100 Index (the "Index"). In constructing the portfolio for Thema, the Investment Manager will attempt to minimize risk by choosing investments from a broad range of liquid securities and by taking into consideration various factors including the issuer, its performance and the industry in which it principally engages in business. The portfolio will typically have approximately 30 to 50 highly liquid positions in US equities quoted on Regulated Markets located in the United States. Thema will have positions in related put options, in accordance with the restrictions set out in the UCITS Regulations for the purposes of efficient portfolio management, in an attempt to protect Thema from downward movements in the Index."

110

(b)      "Thema may purchase 'out of the money' put options on the Standard & Poors 100 Index. . . The Company, on behalf of Thema, will finance the purchase of these put options by selling 'out of the money' call options on either the underlying equity securities held by Thema or the Standard & Poors 100 Index."

(c)      "**Dividend Policy**. The share Class of Thema are accumulating share Class and, therefore, it is not intended to distribute dividends to the Shareholders in Thema. *The income and other profits will be accumulated and reinvested on behalf of Shareholders*."

(Thema December 31, 2006 Prospectus Supplement, Ex. 2, at 4-5.)

363.      The Thema Prospectus also stressed that delegation of the duties by Thema's advisors does not exempt the advisors from their responsibilities. For example, "the Custodian has full power to delegate the whole or part of its custodial functions provided that the Custodian's liability ***shall not*** be affected by the fact it has entrusted to a third party some or all of the assets in its safekeeping."

364.      Each of the foregoing statements was knowingly false when made because the Director Defendants, the Medici Defendants, the HSBC Defendants, William Fry, and PwC Ireland knew or reckless disregarded the fact that Madoff and BMIS (i) were acting as undisclosed investment advisor and custodian for Thema; and (ii) never invested any of Thema's assets in any legitimate investment.

### (4)      Newsletters and Brochures

365.      As late as November 2008, Prodis Advisors disseminated a performance update brochure for both "Thema Fund USD & EUR" classes of the Thema Fund (*See* Thema November 2008 Update, Ex. 10.). This brochure indicated that its contents were "based solely on information and data supplied by managers and fund administrators," namely the Director Defendants, HSBC Trust, HSBC Securities, the Medici Defendants, and PwC Ireland.

366.      The brochure falsely stated that:

(a) the NAV of the US$ Class was $367.02 and the NAV of the Euro Class was €181;

(b) Thema achieved gains every year from 1996 to 2008 – without a single year with a negative return during this almost thirteen-year period; and

(c) Thema achieved a total return of 1023.2% compared to just 328.2% for the S&P 500 (and an average annual return for Thema of 13.23% compared to 7.8% for the S&P 500 index).

367. The November 2008 performance update also misrepresented that: "The investment objective of the Fund is to achieve long term capital appreciation by investing in US equities on a completely non-leveraged basis. Investments will be made in securities included in the S&P 100 index. The fund will attempt to mirror the performance of the index while protecting against downside movement. In order to do so, the fund purchases slightly out of the money put options on the S&P 100 index, which it finances by selling call options on the index."

368. The Director Defendants, HSBC Trust, HSBC Securities, the Medici Defendants, and PwC Ireland knew that these statements were false when made for the same reasons identified in section VIII(A)(1)-(3) above.

369. The brochure also stated that: "The Investment Manager of the Fund is Bank Medici AG. The Investment Manager's institutional minority shareholder is Bank Austria Creditanstalt, Austria's largest bank and a member of the UniCredit Group." (*Id.* at 1.) But the brochure failed to disclose that Madoff and BMIS were performing investment advisory and custodial services for Thema. Thus, up to the very end of the Class Period, the Director Defendants, HSBC Trust, HSBC Securities, the Medici Defendants, and PwC Ireland were continuing to fail to disclose Madoff's central role in Thema and instead emphasizing the prestige and safety of Medici, Bank Austria, and UniCredit as key selling points to Thema's current and potential shareholders. These Defendants continued to allow their names to be used

even though they were not really performing the investment management and custodial functions. They did so because they were earning large fees for doing little to no work.

370. The Director Defendants, HSBC Trust, HSBC Securities, the Medici Defendants, and PwC Ireland also prepared, reviewed, and approved two other performance updates for the Euro Class shares and the US$ Class shares dated November 30, 2008 (*See* Thema November 2008 Update, Ex. 10, at 2.). Again, to emphasize the fact that the Thema Fund was managed by large, well-known professional entities, the November 30, 2008 performance updates for the US$ Class and Euro Class did not mention Madoff or BMIS anyway and instead prominently identified: (i) Medici as the investment manager; (ii) HSBC Securities as the administrator; (iii) HSBC Trust as the custodian; and (iv) PwC as the auditor (without identifying the particular PwC entity and instead just listing "PricewaterhouseCoopers").

371. The update for the Euro Class shares falsely stated that the NAV was €181 and the update for the US$ Class shares stated that the NAV was $367.02. In addition, these updates contained the following false statements:

(a) "The purpose of the fund is to obtain consistent performance with low volatility. ***This fund is particularly well suited to replace the fixed income portion of portfolios. The annual return is expected to be LIBOR +5% hedged in EUR, with a worst case targeted return equal to the US Treasury bill rate.*** The advisor invests in approximately 45 to 50 blue chips closely correlated to the S&P 100. Downside protection is provided by buying puts on the S&O 100. These puts are financed by selling calls on S&P 100. When the strategy is not in place the portfolio is invested in Treasury bills." (Thema November 2008 Brochure, Ex. 1, at 1.)

(b) Thema Euro Class achieved a return (net of all fees) during 2008 of 9% and that such return compared favorably to the lower 4.3% for the benchmark (which it identified as the Euribor, which is the rate at which euro interbank deposits within the Euro zone are offered by one prime bank to another).

(c) Thema EUR Class achieved an annual compound return since September 2001 of 8.62% compared to 3.13% for the Euribor benchmark index, and a cumulative return over such period of 81% compared to 24.72% for Euribor.

(d)     Thema US$ Class achieved an 8% return for 2008 compared to 1.4% for the benchmark, which was the USD T-bill 3-month rate (and an annual compound return of 11.03% since June 1996 compared to 3.60% for the benchmark).

372.     The Director Defendants, HSBC Trust, HSBC Securities, the Medici Defendants, and PwC Ireland knew or recklessly disregarded the fact that the statements in these performance updates were false for the same reasons identified in section VIII(A)(1)-(3) above.

**B.     Additional Specific Allegations of Misrepresentations and Omissions**

**(1)     By the Medici Defendants**

373.     The Medici Defendants – Medici, Kohn, Scheithauer, Tripolt, and Holliwell – prepared the "Investment Manager's Report" which was included as an integral part of the 2007 Annual Report.  The false statements in this Investment Manager's report were attributable to the Medici Defendants because (i) Medici was identified as the investment manager in the annual report; and (ii) the signature block on the Investment Manager's Report reads:

> Bank Medici
> Investment Manger
> 31 January 2008

(*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 2, 10).

374.     The Investment Manager's Report misrepresented that Thema had assets under management of $1.441 billion, that the NAV as of December 31, 2007 was $339.91 for the US$ Class and €166.05 for the Euro Class shares.

375.     The Investment Manager's Report was materially false because it represented that Medici was the investment manager and performed all the investment activities.  It was also materially false because it failed to disclose that Medici and Thema (and the Director Defendants) had appointed Madoff and MBIS as *de facto* investment manager and sub-custodian.

376.     The Medici Defendants also had actual knowledge regarding the materiality of the lack of disclosure of the fact that Madoff was the real investment manager, demonstrated by the fact that Medici did partially disclose late in the Class Period this fact in the prospectuses of other Medici Funds for which it served as investment manager.  This was the case for the Herald Fund.

377.     First, in the Herald Fund March 2008 Prospectus, Medici misrepresented that it was the investment manager but acknowledged the materiality of its identification and role as investment manager by admitting that if the Herald Fund decided at any point to "sub-deleg[ate] [the investment advisory functions], the present Prospectus will be updated accordingly." (Herald Fund March 2008 Prospectus at 35-36.)  Thus, while acknowledging its duty to disclose this critical information, Medici failed to do so in that prospectus.

378.     By July 2008, however, Medici began to make partial (but incomplete and inadequate) disclosures in Herald Fund's financial documents about Madoff being the investment manager.  On July 17, 2008, Herald filed its semi-annual report, which was drafted in part and reviewed and approved by Medici.  The report stated that Herald Fund's assets were managed by an unnamed "broker/dealer investment firm" and that the HSBC Defendants have "appointed this broker/dealer investment firm as its sub-custodian to hold and maintain the assets of the Herald (Lux) US Absolute Return Fund."  (Herald Fund 2008 Semi-Annual Report at 11.)

379.     Having partially (though inadequately) disclosed these highly material facts in Herald Fund documents in 2008, the Medici Defendants had an obligation to do so in Thema documents and also had actual knowledge of the need for such disclosure in order to prevent Thema prospectuses and annual reports from being materially misleading.  But the Medici Defendants failed to do so.

380.     The Investment Manager's Report also misrepresented that:

(a)     "***The Fund has either been invested in a basket of blue chips, US Treasury Bills or a mixture of both***."  (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 10.)

This statement by Kohn and the other Medici Defendants was false since it falsely represented to Plaintiff and the Class that their money with Thema had been invested at all times during 2007 in "blue chip" (*i.e.*, safe and liquid) US stocks or US Treasury bonds (universally regarded as among the safest and most liquid investments in the world).  In reality, the money of Plaintiff and the Class had never been invested in US blue chip stocks or US Treasuries, or any other investment.  Instead, Defendants had simply sent the money of Plaintiff and the Class to Madoff, who stole it.  As alleged herein, Kohn knew this since she visited Madoff frequently in New York and was receiving millions of dollars in secret kickback from Madoff for her role in the fraud.  And since she was the alter ego of Medici and its directors, her knowledge is attributed to Bank Medici, which signed the Investment Manager's Report.

(b)     "***The Investment Manager has applied the agreed investment policy to the full extent***."  (*See id.* at 10.)

The investment policy was set forth in the Prospectus, and was also set forth in Note 13 to the 2007 Annual Report.  That investment policy was to "have approximately 50 highly liquid positions in US equities quoted on Regulated Markets located in the United States" and then to also "have positions in related put options . . . in an attempt to protect Thema from downward movements in the index."  (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at  24.)  The statement of Kohn and the other Medici Defendants that they had "applied the agreed investment policy to the full extent" was a complete lie since (i) they failed to disclose that they did not apply any investment policy at all, but simply wire transferred the money of Plaintiff and the Class to Madoff; (ii) they failed to disclose that it was another individual whose identity was never disclosed that was allegedly implementing the investment policy (*i.e.*, Madoff/BMIS); (iii) the investment policy was not applied "to the full extent" or even at all since none of the money of Plaintiff and the Class was ever invested (and thus was not invested in a basket of 50 highly liquid US securities with related put positions to hedge the positions).  Kohn and the other Medici Defendants knew these statements were false at the time the statements were made because they knew they were not performing any investment management functions at all.  Instead, they simply wire transferred the money to Madoff, who, undisclosed and unbeknownst to the Class, was allegedly the person performing the investment management duties.  Kohn and the other Medici Defendants, on the other hand, knew this (but did not disclose it to the Class) since they were the ones who entered into the secret agreements with Madoff, and since Kohn had frequent telephonic and in-person meetings with Madoff in New York.  The identity of the person or company which was performing the investment

management function was the key factor affecting the decision of the Class to invest in Thema, since the acumen, integrity, and track record of the investment manager determines the safety and returns of the Fund. Kohn and the other Medici Defendants knew this, and falsely sought to assure Plaintiff and the Class of the safety, respectability, and favorable returns of Thema by representing that it was Bank Medici which was performing this function (for which Medici received a fee of 0.5% of the NAV of the fund; in 2007 alone, Medici was paid $6,350,821 in investment manager fees). As all Medici Defendants well knew, however, in reality it was Madoff, whose identify was never disclosed to the Class. Thus, this lie "struck the roots" as to the decision of Plaintiff and the Class to invest in Thema.

(c) *"Consequently, the portfolio remained in Treasury Bills in January despite the market rise and was invested in February only to be penalized by the end of month sharp market correction. On the other hand, the strategy proved again adequate during the summer months when it was able to provide positive returns during major market disruptions caused by the defaulting subprime market. This again proves to be a source of comfort for investors, especially at a time at which the entire scope of this financial turmoil has not yet been fully assessed yet. . . Ultimately and basically these recent developments have not changed our opinion on the capacity of the strategy to continue to deliver adequate risk adjusted returns."* (*See id.* at 10.)

These statements are again false since the Class's money was never invested in either U.S. Treasuries or U.S. stocks, and since Medici had not implemented any of these actions and instead had simply transferred the Class's money to Madoff in New York, who stole the money. The Medici Defendants' statements to the Class concerning the fact that the market volatility of 2007 had not "changed our opinion on the capacity of the strategy to deliver adequate risk adjusted returns" was knowingly false or reckless; since Medici had done ***nothing*** to assess or evaluate Madoff's alleged investment strategy, it was obviously knowingly false for the Medici Defendants to represent to the Class that they were performing a careful assessment on the ability of the alleged strategy to continue to deliver safe returns even in the face of the 2007 market turmoil.

(d) "*The Investment Manager monitors the risk in the Fund on an ongoing basis* in accordance with the Fund's Risk Management Process. *This involves calculating and monitoring the global exposure and counterparty exposure* in accordance with the provisions of the UCITS investment limits. *The Investment Manager also continuously monitors the Fund for compliance with applicable investment policies and limits.*"

These statements were blatant lies since Bank Medici did not actually do any of these activities. Instead, the Medici Defendants simply turned all the Class's money over to Madoff and failed to properly monitor Madoff's compliance with Thema's stated investment policy. As just one example, Medici never once monitored the "counterparty exposure" of any of Madoff's alleged investments on

117

behalf of Thema. The counterparty exposure for Madoff's "split strike conversion strategy" involved other parties who were writing the put options which allegedly protected the downside risk of Madoff's investments in a basket of 50 US blue chip stocks. If Medici was really monitoring the counterparty exposure of these put options, the "monitoring" function would simply have required Bank Medici, as a minimum first step, to identify the counterparty (*i.e.*, the party writing or selling the put option). Since Madoff never actually invested any money, he never bought or sold any puts or calls. Thus, there were no counterparties. Thus, if Bank Medici had ever performed any "monitoring" of counterparty risk it would have discovered this. Thus, the Medici Defendants knowingly lied when they stated that it was monitoring counterparty risk. And the Medici Defendants also obviously had to either have actual knowledge of Madoff's Ponzi scheme or recklessly disregarded it since it never performed any of the "monitoring" functions which they represented they were performing. The Medici Defendants' scienter is further demonstrated by the secret payments Kohn was receiving from Madoff. If Medici was not aware of Madoff's Ponzi scheme, and it was really performing legitimate "investment manager" functions for Thema instead of just assisting Madoff in stealing money, then there would be no reason for Bank Medici/Kohn to be accepting secret quarterly payments in excess of $32 million from Madoff (*i.e.*, these payments were above and beyond the 0.5% investment manager fee Bank Medici received). The fact that such payments were being received by Kohn and were never disclosed to the Class is highly suggestive of the scienter of the Medici Defendants.

(e) ***"The Company's policy is for the Investment Manager and the Board of Directors to evaluate the information about these financial assets on a fair value basis together with other related financial information."*** (*See id.* at 18.)

This statement was false because neither Medici nor the Board of Directors performed any analysis of the financial assets allegedly owned by Thema. Instead, they simply turned the money over to Madoff and exercised no supervision over Madoff whatsoever, nor any analysis of the investments allegedly made by Madoff on behalf of Thema.

(f) ***<ins>"In constructing the portfolio for the Fund, the Investment Manager attempts to minimize risk by choosing investments</ins> from a broad range of liquid securities and by taking into consideration various factors including the issuer, its performance and the industry in which it principally engages in business."*** (*See id.* at 24.)

This statement was a blatant lie since Medici did not (and the Medici Defendants obviously knew that it did not) "construct the portfolio" nor "choose investments" since it had absolutely no involvement in portfolio construction nor choosing investments. Instead, it simply funneled the Class's money to Madoff/BMIS, which in turn stole the money and never invested one penny. Since Medici never performed any of this activity, the Medici Defendants had actual knowledge of the falsity of this statement at the time it was made. And the Director Defendants

had actual knowledge of the falsity of these statements when they signed the 2007 Annual Report since the 2007 Annual Report represented that both the Investment Manager and the directors together and in consultation with each other made decisions regarding the investments and investment policy.

(g) *"The fair value of futures and option contracts which are quoted on a market is calculated with reference to the price appearing to the Directors to be the settlement price as determined by the market in question. Where such a settlement price is not available, the value shall be determined by the Directors with the agreement of the Custodian. The Directors, with the approval of the Custodian, may adjust the fair value of any investment if they consider that such adjustment is required to reflect the fair value of that investment."* (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 19.)

This statement was knowingly false when made by Medici and the Director Defendants because they knew at the time the statement was made that they did not make any determination of the fair value of Thema's futures and option contracts, and instead that they just blindly accepted whatever FMV Madoff put down on paper for such investments. The determination of FMV was particularly critical for the futures and option contracts, since such financial instruments were supposedly providing the "downside risk" for Thema's investments. Moreover, if the futures or option contracts were not traded on an exchange, as explicitly contemplated by the Defendants, then the Defendants warranted and represented that they would make an actual assessment of the FMV in consultation with the Custodian. Again, this was a knowing lie at the time made since neither Medici, the Director Defendants, nor HSBC ever made any such assessment of FMV for futures and options contracts which were not traded on an exchange.

(h) *"During the year the Company held equities, treasury bills, put and call options, forward foreign currency contracts and cash. Of the twenty-four valuation points during 2007, on twelve of these the Fund was fully invested in US treasury bills and on five of these the Fund was fully or almost fully invested in equities. . . When invested in equities . . . the Fund had equal and opposite positions in purchased S&P 100 put options and written S&P 100 call options. The weighted average cash balance during the 2007 was 0.4% of Net Asset Value."* (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 25.)

(i) *"The Company is exposed to a credit risk on the counterparties with whom it trades, that these counterparties may not perform their obligations and that settlement of transactions may not occur. . . Exposures to individual counterparties are limited to 10%/5% of Net Asset Value in the case of (I)/(II) above.* <u>*Exposures are monitored under the responsibility of the Investment Manager in this respect. The Directors review the activity of the Investment Manager on a quarterly basis and more frequently as required*</u> *on an exceptional basis."* (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 26.)

119

These statements were knowingly false when issued for the same reasons noted above in (d) – (g).

(j)   ***"The Fund's assets comprise mainly readily realizable securities, which can be readily sold. . . The Investment Manager is experienced in the use of these instruments and given the nature of the derivatives used in the Fund, the level of liquidity risk is considered to be low."*** (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 26.)

This statement was knowingly or recklessly false when made and since Thema did not own any securities, since the Class's money had simply been sent to Madoff, who did not purchase any securities.

(k)   ***"There were no soft commission agreements entered into with any brokers during the year on behalf of Thema Fund."*** (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 27.)

This statement was knowingly false when made because Defendant Kohn was receiving quarterly commission checks from Madoff in excess of $32 million. The scienter of Kohn and Medici is further demonstrated by the fact that Kohn (i) failed to disclose the commissions to Thema's shareholders and (ii) went to great lengths to disguise and hide the commissions by picking up the checks for the commissions in person from Madoff's New York office (or having her assistant Robert Reuss pick them up) and having the checks made payable to separate, controlled companies owned by Kohn such as Eurovaleur. This false statement was further highly material since the existence of commissions would have raised red flags suggesting that Medici and Kohn had a potential conflict of interest in recommending Thema and/or a reason to not diligently and competently perform Medici's duty as investment manager.

### (2)   By Thema and the Director Defendants

381.   Thema and the Director Defendants – Alberto Benbassat, Stéphane Benbassat, Smith, Brady, and Morrissey – prepared, reviewed, and approved the prospectuses, prospectuses supplements, annual reports, and newsletters and brochures identified above. All of the statements in these prospectuses and annual reports relating to investment strategy and account values are untrue.

382.   In addition, the Director Defendants knew that:

(a)   Madoff and BMIS did not allow Thema or other third parties to conduct audits of BMIS despite Thema's representations that it conducted due diligence;

120

(b)     Madoff instructed Thema and other Madoff feeder funds not to identify BMIS to the investors of the feeder funds; rather than complying with their duties to Thema's investors to disclose such information, the Director Defendants followed Madoff's instructions and knowingly failed to disclose Madoff's identity;

(c)     Thema and the Director Defendants followed Madoff's orders and did not identify BMIS to Thema's investors; and

(d)     Thema did not monitor BMIS despite Thema's representations.

383.    Specifically, the Director Defendants prepared and signed a Directors' Report, which was included in the 2007 Annual Report.  (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 5.)  This Directors' Report contained numerous false statements, including:

(a)     Under "Results," the Director Defendants stated "[t]he results for the year are shown in the Income Statement on page 12." (*Id.* at 3.)

This statement is false because the Income Statement falsely stated that Thema held $1,166,743,573 in 2006 and $1,447,688,803 in financial assets.

(b)     Under "Risk Management Objectives and Policies," the Director Defendants identified only the following risks:  interest rate risk, foreign currency risk, market price risk, market price risk, credit risk, and liquidity risk.  (*Id.* at 3, 24-26.)

These statements are false and incomplete because nowhere did the Director Defendants identify the risk of a feeder fund to a Ponzi scheme.

(c)     "[T]he Company has delegated custody of the Company's assets to [HSBC Trust]." (*Id.* at 4.)

This statement was knowingly false when made and incomplete because the Director Defendants knew, but failed to disclose, that Madoff and BMIS served as Thema's sub-custodian.

384.    Moreover, the Director Defendants knew, but failed to disclose to Plaintiff and the Class, that Madoff and BMIS, not Medici, were serving as Thema's *de facto* investment manager.  The Director Defendants made a knowing and intentional choice not to disclose Madoff's identity as Thema's investment advisor.  They did so not only because Madoff instructed them to omit his name, but also because they had actual knowledge that Madoff was

121

not registered as an independent advisor with the SEC. Moreover, they knew that Madoff's purported excuse for not registering as investment advisor (i.e., that the hedge fund, rather than Madoff, devised the trading strategy and Madoff executed or implemented it) was completely false and unsupportable, and that therefore Madoff had an obligation to register with the SEC. Despite such knowledge, the Director Defendants agreed not to disclose Madoff's identity.

385.    This fact that the Director Defendants made a conscious choice is highlighted by the fact that other feeder funds engaged in the same active participation in Madoff's cover-up. For example, the Courvoisier Memorandum indicates that, with respect to Optimal SUS, its directors and lawyers identified as early as 2002 that they recognized that "under U.S. law, we need to disclose all facts that are material to investors, such as who is making the decision of buying and selling" and that "our primary main concern was that Madoff did not permit any customer, including us to disclose his/MIS's name in the prospectus, financial statements, both as broker-dealer and custodian of the assets." The Optimal directors nonetheless consciously decided "that it is not necessary to disclose his name in the fund documentation." The Director Defendants made the same conscious choice here.

386.    The Director Defendants signed two charts they jointly prepared with the HSBC Defendants, the PwC Defendants, and other Defendants. First is a chart labeled "Thema Fund Income Statement for the Year Ended 31 December 2007" dated April 3, 2008. (*Id.* at 12.) Every item on the Income Statement was completely false because Thema invested none of the Class's money and thus derived zero income. For example, the Income Statement listed:

(a)    Dividend Income in 2007 of $9,685,562;

(b)    net realized gain on forward foreign exchange contracts of $56,752,431;

(c)    realized gains on equities of $65,170,358;

(d)    net realized gains on United States Treasury Bills of $35,835,006;

(e)     net realized gains on written call options of $10,800,339;

(f)     net realized gains on purchased put options of $5,615,641; and

(g)     total investment income of $183,564,217.

(*Id.*)  In reality, the above figures were zero.

387.    Total expenses were listed on the Income Statement as $24,709,563.  Of such expenses, the largest by far were the fees paid to Defendants:  (1) $15,877,052 paid to Defendants Thema Asset Management Ltd. and GB&C for "Distributor's Fees"; and (2) $6,350,821 paid to Bank Medici for "Investment Management Fees."  (*Id.*)  These fees, while actually paid, were unearned because Thema Asset Management, GB&C, and Bank Medici did absolutely nothing to earn the fees other than wire transfer money to Madoff, while failing to disclose to Plaintiff and the Class that they were doing so.

388.    The second chart was "Thema Fund Statement of Net Assets as at 31 December 2007" dated April 3, 2008, also signed by the Director Defendants.  (Id. at 11.)  Among other things, the chart stated that Thema's net asset was $1,166,743,573 in 2006 and $1,447,688,803 in 2007.  (*Id.* at 11.)  Every statement of assets was false because all of Thema's Assets were funneled to Madoff's Ponzi scheme.  And the Director Defendants knew of, or recklessly disregarded, these statements falsity when they signed and dated these charts.

### (3)     By the HSBC Defendants

389.    The HSBC Defendants were heavily involved in preparing, reviewing, and approving the 2007 Annual Report, which included a "Report of the Custodian to the Shareholders."  One of the main duties of the custodian was to safeguard the assets of Thema and calculate the NAV.  In the 2007 Annual Report, the HSBC Defendants falsely reported that the NAV of Thema as of December 31, 2007 was US $339.91 for the US Dollar Class shares and €166.05 for the Euro Class shares (compared to December 31, 2006 values of $313.51 and

€155.53, respectively). This falsely assured investors that the NAV of Thema was increasing year-to-year and that Thema had significant financial assets. Indeed, the Report listed total assets of $1,447,688,803 (of which $1,438,964,541 were listed as "Financial Assets at Fair Value"), liabilities of only $6,418,045, and thus Net Assets of $1,441,270,758. These statements were completely false since Thema had financial assets of zero and thus the NAV of both the US Dollar Class and Euro Class was zero. These false statements were contained in a chart labeled "Thema Fund Statement of Net Assets" which was signed by the Director Defendants and prepared by them along with the HSBC Defendants and the PwC Defendants.

390. In Note 16, "Forward Foreign Exchange Contracts," the 2007 Annual Report noted that ***"All forward exchange contracts held at year end are with HSBC Bank Plc."*** Note 16 also stated that "The assets and cash balances held by the Custodian, HSBC Institutional Trust Services (Ireland) Limited, are held as collateral for the forward foreign exchange contracts held with HSBC Bank plc." (Thema 2007 Annual Report and Financial Statements, Ex. 11, at 28.) Thus, HSBC affiliates not only served as administrator and custodian, but it represented that HSBC Bank plc allegedly held valuable assets of Thema.

391. Both HSBC and PwC prepared a chart for inclusion in the 2007 Annual Report entitled "Unaudited Portfolio Changes for the Year Ended 31 December 2007." The chart summarized the securities allegedly purchased and sold by Thema on US stock markets in 2007. The chart misrepresented that the following securities were purchased and sold on the U.S. stock markets (*i.e.*, the NYSE and NASDAQ):

| Equities | No. of Shares Purchased | No. of Shares Sold |
|----------|------------------------|--------------------|
| 3M Co. | 675,856 | 675,856 |
| Abbott Labs | 1,391,448 | 1,391,448 |
| Altria Group | 1,905,932 | 1,905,932 |

124

| American Express Co. | 1,088,415 | 1,088,415 |
| AIG | 2,348,497 | 2,348,497 |
| Amgen | 1,016,305 | 1,016,305 |

* * *

| Wal-Mart Stores | 2,196,541 | 2,196,541 |
| Walt Disney Co | 1,804,759 | 1,804,759 |
| Wells Fargo & Co | 3,036,391 | 3,036,391 |
| Tyco International | 752,271 | 752,271 |

(*See id.* at 31-32.)

392.     Throughout the Class Period, HSBC Trust and HSBC Securities, as the Custodian and Administrator, respectively, worked together to disseminate account statements to Plaintiff and the Class.  The account statements misrepresented the NAV of Thema to Plaintiff and the Class, and HSBC knew that Plaintiff and the Class would rely on such misrepresentations. HSBC Institutional Trust Services utterly failed in its obligation to "enquire into the conduct of the Company, in each annual accounting period and report thereon to the shareholders."  HSBC Securities Services completely abdicated its duty to calculate the NAV of Thema and instead simply parroted the NAV which BMIS sent it.   HSBC Securities Services never made any independent calculation of Thema's NAV and never audited BMIS.

393.     The HSBC Defendants also never disclosed the highly material fact that Madoff, not HSBC, was the actual custodian of Thema's assets.  Thema and Madoff/BMIS had entered into four separate agreements:

(a)     The Opening Account Document, in which Thema established a brokerage account for the Fund at BMIS;

(b)     The Customer or Custodial Agreement, which governed the opening and maintenance of Thema's accounts with Madoff.  This agreement gave Madoff custody of the assets of Thema;

125

(c)     The Trading Authorization Agreement, in which Thema authorized Madoff as its agent and attorney in fact to buy, sell, and trade in stocks, bonds, and other securities for its account; and

(d)     The Option Agreement, which authorized Madoff/BMIS to purchase and sell options on behalf of Thema and stated the terms and conditions and risks of transactions in options.

394.    The Custodial Agreement between Madoff and Thema was never disclosed to Plaintiff and the Class.  This was a highly material omission since Madoff and BMIS maintained custody of the assets of Thema, and since the identity of the Custodian was very important to investors' belief about the security of their investment.  Investors believed that the custodian was HSBC Trust, an affiliate of a multi-national corporation which was represented to be safe and to have an impeccable reputation.

395.    HSBC Trust and its predecessor, Bank of Bermuda (Dublin) Ltd., made a conscious choice to not disclose Madoff's identity.  Bank of Bermuda (Dublin) Ltd. and HSBC Trust both agreed to let their names be used as Thema's custodian with full knowledge that Madoff would do all the work.  Thus, they knowingly accepted "free money" in exchange for accepting potential liability down the line if anything happened to Thema's assets.

396.    Bank of Bermuda (Dublin) Ltd. and HSBC Trust made the same exact deal with regard to several other feeder funds.  For example, with respect to Optimal SUS, in 2002 Optimal stated:

> It has to be noted that the custody of Optimal Multiadvisors Ltd. (including the Funds) is in the process of being changed to Bermuda Trust (Dublin) Ltd (from the Bank of Bermuda Group). This entity has agreed to appear in the Prospectus as the official custodian of the fund above mentioned.  This entity will then delegate its duties to MIS and appoint it as sub-custodian.  The new custodian will keep all the exposure/responsibility in case of liquidation of the fund as neither Madoff nor any of the Santander entities will be disclosed in the Prospectus as custodian.

(*See* Courvoisier Memorandum Regarding September 18-19, 2002 Meeting, Ex. 3, at 4.)

397.     By 2004, however, HSBC was starting to retreat from its policy of not making

any reference to Madoff in the Optimal SUS prospectuses.  For Optimal SUS, HSBC Trust

served as the custodian, HSBC Securities served as administrator, and  PwC Ireland served as

auditor.   Beginning with the 2004 Explanatory Memorandum for the Optimal SUS Fund, HSBC

Trust and PwC Ireland disclosed the fact that the custodian could appoint sub-custodians and

agents.  Moreover, a risk disclosure section entitled "Possibility of Fraud or Misappropriation"

stated that:  "Neither the Fund, Optimal SUS nor the Custodian has actual custody of the assets.

Such actual custody rests with the Broker-Dealer and/or its affiliated broker-dealer.  Therefore,

there is the risk that the Broker-Dealer could abscond with those assets."  (See June 2004

Explanatory Memorandum, Optimal Multiadvisors, Ltd. at 35.)[15]

398.     The Explanatory Memorandum also described the U.S. broker-dealer (*i.e.*,

Madoff), stating that "the Fund and Optimal SUS have established a discretionary account with a

US broker-dealer (the "Broker-Dealer") registered with the U.S. Securities and Exchange

Commission (the "SEC") and the National Association of Securities Dealers, Inc. (the

"NASD")."  (*Id.* at 30.)

399.     Similarly, the October 2006 Explanatory Memorandum for the Optimal SUS

Fund stated that "The Fund has appointed HSBC Institutional Trust Services (Ireland) Limited

[as] (the "Custodian")" but also disclosed that "The Custodian has no responsibility for assets of

---

[15] Plaintiff does not concede that such disclosures were adequate with respect to Optimal.
Indeed, they were far from complete, as they did not, among other things, identify Madoff by
name.  However, the fact that some disclosures were belatedly made by HSBC Trust and PwC
Ireland in Optimal's prospectuses serves to highlight the fact that HSBC Securities, HSBC Trust,
and PwC Ireland:  (i) had actual knowledge of the need to make disclosures regarding Madoff
because of the materiality of such information; (ii) intentionally choose not to disclose such
information initially at Optimal, then switched to making only partial and incomplete disclosures
in an effort to comply with Madoff's directives yet still attempt to limit their liability; and (iii)
never made any disclosures about Madoff in Thema's prospectuses and annual reports.

the Fund or any Trading Company, which are held by [a] US registered broker dealer." (*See* October 2006 Explanatory Memorandum, Optimal Multiadvisors, Ltd., at 13.) Like the 2004 Memorandum, the 2006 Memorandum went on to describe the U.S. Broker-Dealer and to disclose that the U.S. Broker-Dealer not only was the one with actual custody of the fund's assets, but that "The Broker-Dealer is responsible for the execution of the fund's trading strategy." (*Id.* at 31.)

400. The January 2008 Explanatory Memorandum for Optimal SUS contained identical disclosures. Thus, for at least a five-year period, the same exact defendants as in this case serving in the same exact roles for Optimal SUS (HSBC Trust as custodian, HSBC Securities as administrator, and PwC Ireland as auditor) disclosed the fact that they had "delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer," that the U.S. Broker-Dealer, not HSBC Trust, was the real custodian and held the assets of the fund, and that "there is the risk that the Broker-Dealer could abscond with those assets."

401. Having disclosed these highly material facts for at least five straight years in the Optimal SUS Memoranda from 2004 to 2008, HSBC Trust, HSBC Securities, and PwC Ireland undeniably had actual knowledge of the materiality of the non-disclosure of these facts in the prospectuses and annual reports for Thema during the same time period.[16]

---

[16] It is noteworthy that, on January 7, 2009, Ireland's Financial Regulator stated "All authorized funds must appoint a trustee with responsibility for custody of the assets. Trustees may appoint sub-custodians. However, this does ***not*** absolve the trustee of responsibility for the custody of the funds' assets." To the same end, on January 2, 2009, Luxembourg's Commission de Surveillance du Secteur Financier stated "when a fund's assets are deposited by the depositary bank with a third party, these deposits are under the monitoring and supervisory responsibility of the depositary bank, implying that the latter must know at all times in which manner the assets are invested and where and how these assets are available. This responsibility is ***not*** affected by

(a)     **PwC Ireland Issued Unqualified (Clean) Audit Opinions Knowing That Plaintiff and the Class Would Rely on Them**

(i)     **Auditors' Report**

402.    PwC Ireland audited Thema every year between 2003 and 2007.  Each year it issued an unqualified auditors' report – also commonly referred to as a "clean audit opinion" – stating that the financial statements at issue conformed with the requisite auditing standards. *See*, *e.g.*, Thema's financial statements for the year ending December 31, 2007, which are attached hereto.  (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11.).

403.    The 2007 Financial Statements included PwC's Ireland unqualified auditors' report with respect to Thema.  (*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 8.)  The opinion is entitled:  "Independent Auditors' Report to the Members of Thema International Fund plc."

404.    The opinion is addressed to "the Members of Thema International Fund plc" – that is, to Plaintiffs and the Class here.  Evident in the title of the opinion is PwC's admission that PwC expected Plaintiff and the Class to rely on the opinion.

405.    The opinion states, in relevant part:

> We have audited the Company's financial statements for the year ended 31 December 2007 which comprise the Statement of Net Assets, the Income Statement, the Statement of Changes in Net Assets Attributable to Holders of Redeemable Participating Shares, the Schedule of Investments and the related notes.  These financial statements have been prepared under the accounting policies set out therein.

**Respective Responsibilities of Directors and Auditors**

---

the fact that the depositary has entrusted to a third party all or part of the assets in its safe-keeping."

* * *

Our responsibility is to audit the financial statements *in accordance with relevant legal and regulatory requirements and International Standards on Auditing (UK and Ireland)*.

* * *

**Opinion**

**In our opinion the financial statements**

(a)    give a true and fair view in accordance with [International Financial Reporting Standards ("IFRS")] as adopted by the EU, of the state of the Company's affairs at 31 December 2007 and of its results for the year then ended; and

(b)    have been properly prepared in accordance with the requirements of the Companies Acts, 1963 to 2006 and the European Communities (Undertakings for Collective Investment in Transferable Securities) Regulations, 2003 (as amended).

***We have obtained all the information and explanations we consider necessary for the purpose of our audit. In our opinion proper books of account have been kept by the Company. The Company's Statement of Net Assets is in agreement with the books of account.***

***In our opinion the information given in the Directors' Report is consistent with the financial statements.***

(*See* Thema 2007 Annual Report and Audited Financial Statements, Ex. 11, at 8-9.)

406.    The audit opinion is signed, "PricewaterhouseCoopers, Chartered Accountants and Registered Auditors, Dublin," and dated April 3, 2008. (*See id.* at 9.)

> **(ii)    Statement of Net Assets, Income Statement, Statement of Changes in Net Assets Attributable to Holders of Redeemable Participating Shares**

407.    The 2007 Financial Statements included a Thema Fund Schedule of Investments. (*See id.* at 15-16.) This schedule reflects how Thema's assets were supposedly being held at the end of 2006 and 2007. The report misrepresented that:

130

(a)     In 2006, Thema held: (i) $1,093,721,747 in U.S. Treasury Bills; (ii) $3,341,786 in unrealized gains on forward exchange contracts; and (iii) $42,029,998 in other assets that were not specified. Total net assets at the end of 2006 attributable to the putative Class were supposedly $1,132,409,959. (*See id.* at 16.)

(b)     In 2007, Thema held: (i) $1,438,964,541 in U.S. Treasury Bills; (ii) $3,259,939 in unrealized gains on forward exchange contracts; and (iii) $5,566,156 in other assets that were not specified. Total net assets at the end of 2007 attributable to the putative Class were supposedly $1,441,270,758. (*See id.* at 15.)

408.    The 2007 Financial Statements also included a Statement of Net Assets as of December 31, 2007, which was signed by the Director Defendants. (*See id.* at 11.) This Statement of Net Assets reflected the same amount of supposed net assets as the Schedule of Investments, $1,132,409,959 for 2006, and $1,441,270,758 for 2007. (*Id.*)

409.    The 2007 Financial Statements also included a Thema Fund Income Statement for 2007, which was also signed by the Director Defendants. (*See id.* at 12.) The Income Statement reflected a purported "total investment income" of $149,325,946 in 2006 and $183,564,217 in 2007. The Income Statement also reflected total expenses of $19,788,588 in 2006 and $24,709,563 in 2007 itemized as follows:

(a)     "Investment management fees" of $14,759,932 in 2006 and $6,350,821 in 2007;

(b)     "Investment advisory fees" of $2,434,734 in 2006;

(c)     "Distributor's fees" of $15,877,052 in 2007;

(d)     "Currency advice fees" of $133,568 in 2006 and $151,803 in 2007;

(e)     "Administration fees" of $1,032,991 in 2006 and $783,129 in 2007;

(f)     "Custodian fees" of $964,875 in 2006 and $784,752 in 2007;

(g)     "Legal fees" of $75,000 in 2006 and $173,588 in 2007;

(h)     "Directors' fees" of $149,138 in 2006 and $173,481 in 2007;

(i)     "Audit fees" of $18,010 in 2006 and $28,050 in 2007; and

(j)     "Other expenses" of $220,340 in 2006 and $386,887 in 2007.

410. The 2007 Financial Statements also included a Consolidated Statement of Cash Flows for 2006 and 2007. (*See id.* at 14.) The Cash Flow Statement reflected:

(a) "Realized gain on financial assets" of supposedly $10,101,187,170 in 2006 and $14,859,046,891 in 2007; and

(b) "Proceeds from redeemable participating shares issued" of supposedly $277,136,792 in 2006 and $344,419,063 in 2007.

### (iii) The Notes to the 2007 Financial Statements

411. The Notes to the 2007 Financial Statements included Note 13: "Derivatives and other financial instruments." (*See id.* at 26.)[17] As set forth below, PwC Ireland understood that there were significant risks concerning Madoff holding one-hundred percent of the monies as well as the counterparty risk involved in executing the split strike conversion strategy. PwC Ireland, however, identified as the "main risks arising from the Company's financial instruments" only:

(a) Interest rate risk

(b) Foreign currency risk

(c) Market price risk

(d) Credit risk [and]

(e) Liquidity risk

(*See id.* at 16.)

412. The Credit Risk disclosure stated:

The Company is exposed to a credit risk on the counterparties with whom it trades, that these counterparties may not perform their obligations and that settlement of transactions may not occur. All over the counter ("OTC") counterparties must meet the following criteria as set out in the UCITS regulations namely:

---

[17] The Notes to the financial statements are part of the financial statements and encompassed within the auditor's opinion. (ISA 200.34).

(a)     A credit institution in accordance with sub- paragraphs 7(i), (ii) or (iii) of UCITS Notice 9, or

(b)     Have a minimum credit rating of A2 or equivalent, or in the opinion of the Investment Manager, an implied credit minimum rating of A2 or equivalent.

Exposures to individual counterparties are limited to 10% / 5% of Net Asset Value in the case of (I) / (II) above.  Exposures are monitored under the responsibility of the Investment Manager in this respect.  The Directors review the activity of the Investment Manager on a quarterly basis and more frequently as required on an exceptions basis.

The Company invests in listed equities securities which form part of the S&P 100 index.  When not invested in listed equities, the Company is normally invested in US treasury bills.  ***Credit risk in respect of these instruments is considered to be very low.***

(*See id.* at 26.)

413.     All these statements in Note 13 of the 2007 Financial Statements showed that PwC Ireland understood the risk that one of the parties that held assets on behalf of Thema, or that had obligations to Thema, would not perform.  Yet, contrary to the statements in Note 13 to the 2007 Financial Statements and the 2007 PwC Ireland audit opinion, neither Thema nor PwC Ireland ever confirmed any of Madoff's purported trades with counterparties.  Had they done so, they would have discovered the counterparties never existed.

### (b)     PwC Knowingly Failed to Disclose the Madoff's and BMIS's Roles as De Facto Investment Manager and Sub-Custodian

414.     The PwC Defendants' scienter regarding the lack of disclosure of the fact that Madoff was the real investment manager, and the materiality of such omission, is also demonstrated by the fact that at least three Defendants – HSBC Services, HSBC Trust, and PwC Ireland – did disclose this critical fact in the prospectuses of other Madoff feeder funds for which they served in identical positions.  This was the case for the Optimal SUS Fund (a sub-fund of Optimal MultiAdvisors Ltd.), for whom HSBC Trust was the custodian, HSBC Securities was

133

the Administrator, and PwC Ireland was the auditor.   For example, as early as 2002 the Optimal SUS Explanatory Memorandum disclosed the fact that Optimal's Investment Manager delegated the actual investment advisor functions to a single external manager:  "Optimal Strategic US Equity Series (hereinafter "Optimal SUS") invests with a single fund manager.  The manager invests primarily in a basket of S&P 100 stocks.  The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital." (*See* 2002 Optimal SUS Explanatory Memorandum at  25.)   It also disclosed as a risk factor under the heading "Sole Proprietor Risk" that "the independent fund manager will make all decisions with respect to the investments of the Series."

415.    By 2004, the disclosures in the Optimal SUS Explanatory Memorandum regarding the fact that Madoff was the real investment manager had become much more detailed. The Explanatory Memorandum described the fact that "In attempting to achieve its investment objective, the Fund and Optimal SUS "have established a discretionary account with a US broker-dealer (the "Broker-Dealer") registered with the U.S. Securities and Exchange Commission (the "SEC") and the National Association of Securities Dealers, Inc. (the "NASD"). The Broker-Dealer is responsible for the execution of the fund's trading strategy. . . The strategy utilized by the Broker-Dealer is described as 'split-strike conversion.'"  (*See* 2004 Optimal SUS Explanatory Memorandum at 30.)  It also disclosed under a "risk factors" section entitled "Dependence on the Broker-Dealer" that:  "The Fund and Optimal SUS have delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer.  As a result, the success of the fund for the foreseeable future will depend on the ability of the Broker-Dealer to achieve the fund's investment objective."   (Id. at 32.)

416. The October 2006 Explanatory Memorandum for the Optimal SUS Fund had the same disclosures about Madoff being the investment manager, but went even further and additionally disclosed the fact that:

> Trading Strategies of the Investment Manager. The Investment Manager has delegated the execution of the trading strategy of the fund to the Broker-Dealer and the overall success of the fund depends upon the ability of the Broker-Dealer to be successful in the fund's strategy.

(*See* 2006 Optimal SUS Explanatory Memorandum at 34.) Thus, by 2006 HSBC Trust, HSBC Securities, and PwC Ireland had all disclosed the fact that the U.S. broker-dealer (*i.e.*, Madoff) was the Investment Manager for Optimal SUS.

417. The January 2008 Explanatory Memorandum for Optimal SUS contained identical disclosures. Thus, for at least a seven-year period, the same defendants as in this case serving in the same exact roles for Optimal SUS (HSBC Trust as Custodian, HSBC Securities as administrator, and PwC Ireland as auditor) disclosed the fact that they had "delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer," and that the U.S. broker-dealer, not Optimal, was the real investment manager.

418. Having disclosed these highly material facts for at least seven straight years in the Optimal SUS Memorandums from 2002 to 2008, PwC Ireland undeniably had actual knowledge of the materiality of the non-disclosure of these facts in the prospectuses and annual reports for Thema during the same time period.

## C. Reliance

419. Defendants mailed Plaintiff and the Class copies of all the prospectuses, prospectus supplements, annual reports and financial statements, and performance updates.

420. Thema required that, before purchasing shares, all persons and entities had to be provided with and read the following documents:

135

> Applications for Participating Shares in a Fund will only be considered on the basis of this Prospectus and a copy of the latest annual report and if published after such report, a copy of the latest unaudited semi-annual report. Distribution of this Prospectus is not authorized unless it is accompanied by a copy of the latest semi-annual report and/or annual report (as the case may be).

(*See* Thema December 31, 2006 Prospectus, Ex. 2, at 2.)

421.    As a result, Plaintiff and members of the Class received and reviewed Defendants' prospectuses, prospectus supplements, annual reports and financial statements, and performance updates before deciding to purchase and/or to retain shares of Thema.

422.    Plaintiff and members of the Class relied, to their detriment, on the misstatements and omissions contained in the foregoing documents.

**D.    Proximate Loss Causation**

423.    During the Class Period, Defendants engaged in (i) a scheme to deceive Plaintiff and the Class; and (ii) a course of conduct that artificially inflated the value of investments in Thema.

424.    Defendants perpetrated their scheme by misrepresenting and omitting material information about, among other things, (i) the true operation and value of Thema and its financial results, business, and prospects; (ii) the fact that Madoff and BMIS were acting as Thema's *de facto* investment manager and sub-custodian; and (iii) the fact that Madoff and BMIS held all Thema's assets.

425.    Defendants' fraudulent and reckless misstatements and omission caused Plaintiff and the other members of the Class to invest in Thema.

426.    Following the revelation of the truth beginning on December 15, 2008, when Thema issued a notice of suspension of its shares due entirely to Thema's exposure to Madoff, the shares became valueless.

136

427. But for Defendants' false statements and material omissions, Plaintiff and the Class would not have invested in Thema. As a proximate result of Defendants' conduct, Plaintiff and the Class have suffered economic loss, *i.e.*, damages, under the federal securities laws. The fact that Thema's shares are now worthless was directly and entirely caused by Defendants' fraud.

## IX    DEFENDANTS' DUTY TO DISCLOSE

428. The Medici Defendants, the Director Defendants, the HSBC Defendants, and the PwC Defendants had a duty to disclose the material information omitted from Thema's prospectuses, prospectus supplements, and annual reports.

429. The Medici Defendants – Medici, Kohn, Scheithauer, Tripolt, and Holliwell – owed a duty to disclose because they made false statements in each annual report and in each prospectus and prospectus supplement, and thus had a duty to correct misstatements and omissions in subsequent annual reports and prospectuses. Medici also owed a fiduciary duty to Plaintiff and the Class due to its role as investment manager.

430. The Director Defendants – Albert Benbassat, Stéphane Benbassat, Smith, Brady, and Morrissey – owed fiduciary duties to Plaintiff and the Class due to their status as directors. They also explicitly stated in the prospectuses that they "are the persons responsible for the information contained in this Prospectus and accept responsibility accordingly." Moreover, the false information contained in earlier prospectuses and annual reports gave rise to a duty to disclose in subsequent prospectuses, supplements, and annual reports.

431. The HSBC Defendants – HSBC, HSBC Trust, and HSBC Securities – owed a fiduciary duty to Plaintiff and the Class due to HSBC Trust's status as Thema's custodian, HSBC Securities' status as administrator, and because they explicitly assumed such duties. In the annual reports, the HSBC Defendants conceded that: "The Custodian must enquire into the

137

conduct of the Company, in each annual accounting period and report thereon to the shareholders.  The Custodian's report shall state whether in its opinion the Company has been managed, in all material respects, in that period, in accordance with its constitutional documentation and the appropriate regulations.  If the Company has not complied, in all material respects, with its constitutional documentation or the appropriate regulations, the Custodian must state why this is the case and outline steps which it has taken to rectify the situation."  In addition, the HSBC Defendants clearly had a duty to disclose because a director of HSBC Trust signed each annual report and since its specific statements in each annual report were false. Ronnie Griffin, a director of HSBC Institutional Trust Services (Ireland) Ltd., signed the annual reports on behalf of HSBC.

432.    The PwC Defendants – PwC International, PwC U.S., PwC Ireland, and PwC Bermuda – had a duty to disclose because PwC Ireland actually made false statements in each annual report, and signed each annual report, thus giving rise to a duty to correct false statements and omissions in future annual reports.  Furthermore, PwC Ireland owed a fiduciary duty to Plaintiff and the Class due to its role as auditor of Thema, and because it explicitly assumed and acknowledged its fiduciary duty.  Each Thema Fund annual report signed by PwC Ireland stated that "This report, including the opinion [of PwC], has been prepared for and only for the Company's members as a body. . ."  In each annual report, PwC stated that "***We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error***.  In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements."   Thus, the PwC Defendants

acknowledged that their job was to obtain all necessary information and evidence to support the opinion that PwC provided to Plaintiff and the Class that Thema's financial statements were true and accurate and to ensure that they did not omit any material information. This duty of the PwC Defendants extended to situations where any false statement or omission in the annual reports was caused by "fraud or other irregularity or error."

## X    THE TRUTH IS REVEALED

433. Madoff was arrested on December 11, 2008 and charged with criminal securities fraud after admitting that his money management operations were "all just one big lie," and "a giant Ponzi scheme." Madoff also admitted that "there [was] no innocent explanation" and estimated investors' losses at $50 billion.

434. The same day, the SEC filed an emergency action in this Court to halt all ongoing fraudulent activities by Madoff and BMIS. That action is *SEC v. Bernard L. Madoff*, 08 Civ. 10791-LLS (S.D.N.Y. Dec. 11, 2008).

435. Thema issued a notice of suspension on December 15, 2008, and subsequent press release regarding the same on December 17, 2008. The notice of suspension stated:

> Following the recent events surrounding the investigation of
> Bernard L Madoff Investment Securities LLC ("Madoff"), the
> Company's custodian has not been able to obtain confirmation
> regarding the safe custody of the Company's assets. All assets as
> were held by Madoff on 13 December 2008 have now been frozen
> by court order in the U.S. In this position, the Company had no
> alternative, in the interests of shareholders, but to suspend dealings
> and the calculation of its net asset value in Thema and did so with
> effect from 14 December 2008 in accordance with the terms of the
> Company's memorandum and articles of association and
> prospectus. The Company is working with its advisors and service
> providers to clarify the situation and to take such measures to
> protect the assets of Thema as it deems appropriate, including the
> suspension of all foreign exchange positions.

436. On January 2, 2009, Austria's financial regulatory authority, known as the Financial Market Authority, took control of Medici. That same day, Medici's board resigned.

## XI    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

437. Defendants have affirmatively and fraudulently concealed their unlawful scheme and course of conduct from Plaintiff and the Class through an elaborate scheme of affirmative acts including concealing the fact that Defendants were feeding money belonging to Plaintiff and the Class into a massive Ponzi scheme.

438. More fundamentally, Defendants actively concealed their wrongful conduct because they knew but never advised Plaintiff and the Class that Thema was using Madoff/BMIS as the *de facto* investment manager and sub-custodian. Instead, Defendants knowingly misrepresented in prospectuses and annual reports that Medici was the investment manager and that HSBC Trust was the custodian. Thus, as opposed to many investors who invested *directly* with Madoff/BMIS, Plaintiff and the Class never knew that Madoff/BMIS was managing their money and thus any red flags that existed with respect to Madoff/BMIS would not have put Plaintiff and the Class on inquiry notice of the fraud.

439. Despite exercising reasonable diligence, Plaintiff and the Class could not discover and were prevented from discovering Defendants' illegal conduct. As fiduciaries to Plaintiff and the Class, Defendants owed them an affirmative duty to full and fair disclosure but failed to honor and discharge that duty. Rather than ensure truthful disclosure of all material facts, Defendants concealed such material facts relating to the deceptive and unlawful conduct alleged herein.

440. The running of the statute of limitations has been suspended and did not accrue until Plaintiff and the Class discovered Defendants' deception, or was equitably tolled with respect to any claims Plaintiff and the Class have brought or could bring as a result of

Defendants' fraudulent concealment. Defendants, through various devices of misrepresentation and secrecy, affirmatively and fraudulently concealed the truth about where Plaintiff's and the Class's money was going. Plaintiff and the Class had no knowledge of Defendants' illicit activities, schemes and unlawful conduct, or of any of the facts that might have led to earlier discovery of the wrongdoing, and could not reasonably have obtained such an advanced level of expert knowledge even through diligent effort, before filing suit.

441. Nor could Plaintiff and the Class have discovered that Defendants' representations were false or that Defendants had concealed information and materials until shortly before the filing of this action.

442. Accordingly, any applicable statute of limitations has been tolled with respect to any claims Plaintiff and the Class have brought as a result of the unlawful and fraudulent conduct alleged herein.

## XII   CLASS ACTION ALLEGATIONS

### A.   Class Definition

443. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who either owned shares of Thema International Fund plc (collectively referred to, together with its sub-fund the Thema Fund, as "Thema") on December 10, 2008, or purchased shares of Thema between January 12, 2004 and December 14, 2008 inclusive (the "Class Period"), and suffered damages thereby due to the wrongful conduct alleged in this Amended Complaint (the "Class"). Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

### B.   Numerosity

444.     The Class are so numerous that joinder of all members is impracticable.  While

the exact number of the members of the Class is unknown to Plaintiff at this time, and can only

be ascertained through appropriate discovery, Plaintiff believes that there are thousands of Class

members.

### C.     Typicality

445.     Plaintiff will fairly and adequately protect the interests of the members of the

Class.  Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of all Class

members, and Plaintiff does not have interests antagonistic to, or in conflict with, those of the

Class.  In addition, Plaintiff has retained competent counsel experienced in class action securities

litigation.

446.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct.

### D.     Common Questions

447.     There are numerous questions of law and fact which are common to the Class and

which predominate over any questions affecting individual members, including:

(a)     Whether Defendants violated the federal securities laws;

(b)     For the federal securities law claims, whether statements made by Defendants to
        Plaintiff and the Class were false and misleading and misrepresented or omitted
        material facts about Thema;

(c)     For the federal securities law claims, whether Defendants acted with scienter in
        making materially false and misleading statements and omissions during the Class
        Period;

(d)     For the state law claims, whether Defendants were negligent and/or reckless in
        failing to adequately investigate Madoff and BMIS;

(e)     For the state law claims, whether Defendants' conduct alleged herein was
        intentional, reckless, grossly negligent, or negligent in violation of fiduciary
        duties owed to Plaintiff and the Class and, therefore, in violation of the common
        law;

(f)     For the state law claims, whether Defendants aided and abetted other Defendants' breaches of fiduciary duty and common law; and

(g)     Whether Plaintiff and the Class have been damaged, and if so, the proper measure of damages.

**E.     Adequate Representation**

448.    Plaintiff has been appointed lead plaintiff by the Court and will fairly and adequately protect the interest of the Class.

449.    Plaintiff has retained experienced counsel who (i) have been approved by the Court to serve as lead counsel; and (ii) are experienced in securities class action litigators and are competent to advance the interests of the Class.

**F.     Superiority**

450.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

**XIII    CLAIMS FOR RELIEF**

**COUNT 1**
**VIOLATIONS OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT**
**AGAINST THE MEDICI DEFENDANTS**

451.    Plaintiff repeats and realleges each and every allegation in the Amended Complaint that is not part of the other counts as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against the Medici Defendants and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C §78j(b).

452.     The false and misleading statements and omissions incorporated by reference in this Count apply to this Count only and do not apply to any other Counts or to any other part of this Complaint.

453.      The Medici Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the Class to purchase shares in Thema.

454.     During the Class Period, the Medici Defendants sold Thema based on false and misleading statements and omissions. Investors in Thema or their nominees were provided copies of prospectuses, annual reports, and financial statements. These documents, however, contained uniform misrepresentations and material omissions and induced Plaintiff and the Class to invest in Thema.

455.     The prospectuses, annual reports, and financial statements specifically stated that only the representations in the prospectuses, annual reports, and financial statements for Thema were to be relied upon by investors.

456.     When the Medici Defendants made the false statements and omitted to disclose material facts, they had actual knowledge or recklessly disregarded information demonstrating that their statements were false, or they recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements and the materiality of their omissions and failure to correct previous false statements they had made.

457. The Medici Defendants were motivated to commit fraud because of the large fees they were earning. The Medici Defendants did little if any work in exchange for the large fees they earned from Thema, which were calculated as a percentage of Thema's annual NAV. Since Madoff did not charge any advisory fees (which was highly unusual for an investment advisor), defendants were paid much higher fees by using Madoff as an undisclosed investment advisor and custodian than if they had chosen someone else than Madoff. The fact that Madoff did not charge any fees for his alleged investment advice was one of the largest and most conspicuous red flags indicating Madoff was a fraud, and also created a strong incentive and motive for defendants to commit fraud and consciously disregard red flags about Madoff.

458. By reason of the foregoing, the Medici Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of shares in Thema.

459. Plaintiff and the Class, in ignorance of the false and misleading statements and omissions made by the Medici Defendants, relied, to their detriment, on such misleading statements and omissions in purchasing shares in Thema. Plaintiff and the Class have suffered substantial damages with respect to their investments in Thema as a result of the wrongs alleged herein in, an amount to be proven at trial.

## COUNT 2

### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
### AGAINST KOHN, SCHEITHAUSER, TRIPOLT, HOLLIWELL, AND UNICREDIT

460.     Plaintiff repeats and realleges each and every allegation in the Amended

Complaint as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to

this Amended Complaint.  This Count is asserted against Defendants Kohn, Scheithauser,

Tripolt, Holliwell, and UniCredit pursuant to Section 20(a) of the Exchange Act, 15 U.S.C

§78j(b).

461.     Defendants Kohn, Scheithauser, Tripolt, Holliwell, and UniCredit SpA acted as

controlling persons of Medici within the meaning of Section 20(a) of the Exchange Act, as

alleged herein.

462.     Defendants Kohn, Scheithauser, Tripolt, Holliwell, and UniCredit were control

persons of Medici.  Such defendants had day-to-day control and exercised day-to-day control of

Medici.  Moreover, UniCredit had control over Medici through its ownership of Bank Austria,

the 25% owner of Medici. Kohn controlled Medici because she owned 75% of the bank and

because she controlled its activities and dealings with Thema.  Kohn was a central figure in

causing Thema to invest with Madoff and in getting Bank Medici appointed as Thema's

investment manager.  Accordingly, Defendants named in this Count had the power to control the

general business affairs of Medici and the power to directly or indirectly control or influence the

specific corporate policy at Medici (*e.g.*, the failure to ensure that Medici did not make any false

statements or omissions in Thema prospectuses and annual reports) which resulted in the primary

liability of Medici under the federal securities laws.

463.    As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiff and the Class suffered an economic loss and damages in connection with their purchases of shares in Thema in an amount to be proven at trial.

## COUNT 3
## VIOLATION OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT AGAINST THEMA AND THE DIRECTOR DEFENDANTS

464.    Plaintiff repeats and realleges each and every allegation in the Amended Complaint except for the counts as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against Thema and the Director Defendants and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C §78j(b).

465.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts or to any other part of this Complaint.

466.    The Defendants named in this Count directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the Class to purchase shares in Thema.

467.    During the Class Period, Defendants named in this Count made false and misleading statements and omissions regarding Thema.  Investors in Thema or their nominees were provided copies of prospectuses, annual reports, and financial statements for Thema.  These

documents, however, contained uniform misrepresentations and material omissions that induced Plaintiff and the Class to invest in Thema.

468. The prospectuses, annual reports, and financial statements specifically stated that only the representations in the prospectuses, annual reports, and financial statements for Thema were to be relied upon by investors.

469. When they made the false statements and omitted to disclose material facts, Defendants named in this Count had actual knowledge or recklessly disregarded information demonstrating that their statements were false, or they failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements and the materiality of their omissions and failure to correct previous false statements they had made.

470. Defendants named in this Count were motivated to commit fraud because of the large fees they were earning. In addition to earning large fees for serving as Thema's directors, the Director Defendants earned very large fees from other entities that they owned, which entities earned large percentage fees based on Thema's NAV and assets under management. For example, Defendants Alberto Benbassat, Stéphane Benbassat, and David Smith were all partners of, and held controlling stakes in, GB&C, which was a distributor for Thema and earned a percentage fee for its services. GB&C also owned 55% of Thema Management, which itself earned large percentage fees from Thema for serving in various capacities, as alleged above. Defendant Gerald J.P. Brady was a long-time employee of Bank of Bermuda, which was acquired by HSBC, Thema's custodian and auditor. Finally, Defendant Daniel Morrissey has been a partner since 1981 of Thema Fund's outside counsel, William Fry. Morrissey directly financially benefitted from the significant fees that William Fry earned from Thema. Thus, all Director Defendants earned substantial fees from companies they owned or were associated with

that dwarfed the fees they earned from serving as Thema's directors. They thus had significant economic incentives to consciously disregard any known facts that they had a duty to disclose as directors of Thema.

471. By reason of the foregoing, Defendants named in this Count directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of shares in Thema.

472. Plaintiff and the Class, in ignorance of the false and misleading statements and omissions made by Defendants named in this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in Thema. Plaintiff and the Class have suffered substantial damages with respect to their investments in Thema as a result of the wrongs alleged herein, in an amount to be proven at trial.

## COUNT 4
### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
### AGAINST ALBERTO BENBASSAT, STEPHANE BENBASST, BRADY, MORRISSEY, SMITH, HSBC TRUST, HSBC SECURITIES, PWC IRELAND, MEDICI, AND KOHN

473. Plaintiff repeats and realleges each allegation in the body of the Amended Complaint and in the immediately preceding count (but no other counts) as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C §78j(b).

474.     Defendants Alberto Benbassat, Stéphane Benbassat, Gerald J.P. Brady, Daniel Morrissey, David T. Smith, HSBC Trust, HSBC Services, PwC Ireland, Bank Medici, and Sonja Kohn acted as control persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

475.     Defendants were control persons of Thema.  Thema, as indicated above, had no employees.  Thus, 100% of Thema's operations were carried out by Defendants.  The Thema Prospectus stated that HSBC Services was responsible for the day-to-day administrative activities of Thema.  HSBC Trust had control of Thema's assets.  PwC Ireland was the only auditor for Thema – it had no in-house auditor.  Bank Medici was the Investment Manager and was responsible for devising and implementing the investment objectives and polices of Thema.  Bank Medici, in turn, was controlled by Sonja Kohn and Bank Austria/UniCredit.  Kohn was an important force in causing the other defendants to choose Madoff to be Thema's undisclosed investment manager and custodian.  Kohn met frequently with Madoff in New York and was instrumental in getting many other feeder funds, including Primeo and Herald, to invest with Madoff.  Madoff recognized Kohn's influence and control by making secret payments of millions of dollars to Kohn in exchange for her ability to influence Thema to invest all its assets with Madoff.  The Director Defendants had and exercised control over the policies of Thema and interacted and gave direction to HSBC Trust, HSBC Services, Bank Medici, and PwC Ireland.  Since Thema had no employees, the Director Defendants, together with PwC Ireland, Bank Medici, Kohn, HSBC Services, and HSBC Trust, exercised day-to-day control of Thema.  Critically, all Defendants named in this Count were ***directly responsible*** for drafting, reviewing, and approving all Thema's prospectuses, annual reports, and financial information (*i.e.,* unlike a corporation which has employees, Thema did not have a CFO who prepared the financial

statements, to in turn be reviewed by outside auditors; for Thema, PwC Ireland, the HSBC

Defendants, Medici, and the Director Defendants directly prepared, reviewed and authorized the

financial statements contained in Thema's annual reports.  Similarly, HSBC Trust, not some non-

existent Thema employee, directly prepared the Custodian Reports).  Thus, the defendants

named in this Count caused Thema to file all the false and misleading statements alleged in this

Complaint.  Accordingly, Defendants had the power to control the general business affairs of

Thema and the power to directly or indirectly control or influence the specific corporate policy at

Thema which resulted in Thema's primary liability under the federal securities laws.

476.    As a direct and proximate result of the wrongful conduct alleged in this Count,

Plaintiff and the Class suffered an economic loss and damages in connection with their purchases

of shares in Thema in an amount to be proven at trial.


**COUNT 5**
**VIOLATIONS OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT**
**AGAINST THEMA MANAGEMENT**

477.    Plaintiff repeats and realleges each allegation contained in the body of the

Amended Complaint (but not the Counts) as if fully set forth in this Count.  Plaintiff also

incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against

Thema Management and is based only upon Rule 10b-5(b) promulgated pursuant to Section

10(b) of the Exchange Act, 15 U.S.C §78j(b).

478.    The false and misleading statements and omissions alleged in this Count apply to

this Count only and do not apply to any other Counts or to any other part of this Complaint.

479.    Thema Management directly engaged in a common plan, scheme, and unlawful

course of conduct, pursuant to which it recklessly or knowingly made various deceptive and

untrue statements of material facts and omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct, pursuant to which Thema Management recklessly or knowingly made false and misleading statements, was, among other things, to induce Plaintiff and the Class to purchase shares in Thema.

480. During the Class Period, Thema Management made false and misleading statements and omissions in prospectuses, annual reports, and financial statements, which induced Plaintiff and the Class to invest in Thema.

481. When Thema Management made the false statements and omitted to disclose material facts, Thema Management had actual knowledge or recklessly disregarded information demonstrating that its statements were false or recklessly failed to check information it had a duty to monitor and which would have demonstrated the falsity of its statements and the materiality of its omissions and failure to correct previous false statements it had made.

482. Thema Management was motivated to commit fraud because of the large fees it was earning. Thema Management did little if any work in exchange for the large fees it earned from Thema, which were calculated as a percentage of Thema's annual NAV. Since Madoff did not charge any advisory fees (which was highly unusual for an investment advisor), Thema Management paid much higher fees by using Madoff as an undisclosed investment advisor and custodian than if they had chosen someone other than Madoff. Moreover, for Thema Management, its large fees were almost free money since Madoff was performing most if not all of the investment advisory functions and yet Thema Management was being paid a percentage fee for work it was not doing. The fact that Madoff did not charge any fees for his alleged investment advice and custodial services was one of the largest and most conspicuous red flags

indicating Madoff was a fraud, and also created a strong incentive and motive for Thema Management to commit fraud and consciously disregard red flags about Madoff since it got paid percentage fees based on fraudulent NAV values for doing little to no work.

483.    By making false and misleading statements, as alleged herein, Thema Management directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that it recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

484.    By reason of the foregoing, Thema Management directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of shares in Thema.

485.    Plaintiff and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by Thema Management, relied, to their detriment, on such misleading statements and omissions in purchasing shares in Thema.  Plaintiff and the Class have suffered substantial damages with respect to their investments in Thema as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 6
## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
## AGAINST ALBERTO BENBASSAT, STÉPHANE BENBASSAT, AND SMITH

486.     Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint and in the immediately preceding Count (but no other counts). This Count is asserted against Alberto Benbassat, Stéphane Benbassat, and Smith pursuant to Section 20(a) of the Exchange Act, 15 U.S.C §78j(b).

487.     Alberto Benbassat, Stéphane Benbassat, and Smith acted as control persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

488.     Alberto Benbassat, Stéphane Benbassat, and Smith had day-to-day control and exercised day-to-day control of Thema Management.  Accordingly, Alberto Benbassat, Stéphane Benbassat, and Smith had the power to control the general business affairs of Thema Management and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the preparation of Thema prospectuses and annual reports by Thema Management) at Thema Management which resulted in primary liability.

489.     As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiff and the Class suffered an economic loss and damages in connection with their purchases of shares in Thema in an amount to be proven at trial.

## COUNT 7
## VIOLATIONS OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT
## AGAINST HSBC SECURITIES AND HSBC TRUST

490.     Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint (but not the counts) as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against

HSBC Securities and HSBC Trust and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C §78j(b).

491.	The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts or to any other part of this Complaint.

492.	The Defendants named in this Count directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the Class to purchase shares in Thema.

493.	During the Class Period, Defendants named in this Count made false and misleading statements and omissions in Thema's prospectuses, annual reports, and financial statements.  These documents induced Plaintiff and the Class to invest in Thema.

494.	The prospectuses, annual reports, and financial statements specifically stated that only the representations in the prospectuses, annual reports, and financial statements for Thema were to be relied upon by investors.

495.	When they made the false statements and omitted to disclose material facts, Defendants named in this Count had actual knowledge of or recklessly disregarded information demonstrating that their statements were false or recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements and the materiality of their omissions and failure to correct previous false statements they had made.

496. Defendants were motivated to commit fraud because of the large fees they were earning. Defendants did little if any work in exchange for the large fees they earned from Thema, which were calculated as a percentage of Thema's annual NAV. Since Madoff did not charge any advisory fees (which was highly unusual for an investment advisor), defendants were paid much higher fees by using Madoff as an undisclosed investment advisor and custodian than if they had chosen someone other than Madoff. Moreover, for the HSBC Defendants, their large fees were almost free money since Madoff was performing most if not all of the administrative and custodial functions and yet HSBC Trust and HSBC Securities were being paid a percentage fee for work they were not doing. The fact that Madoff did not charge any fees for his alleged investment advice and custodial services was one of the largest and most conspicuous red flags indicating Madoff was a fraud, and also created a strong incentive and motive for defendants to commit fraud and consciously disregard red flags about Madoff since they got paid percentage fees based on fraudulent NAV values for doing little to no work.

497. By reason of the foregoing, Defendants named in this Count directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of shares in Thema.

498. Plaintiff and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by Defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in Thema. Plaintiff

and the Class have suffered substantial damages with respect to their investments in Thema as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 8
### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
### AGAINST HSBC

499.   Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint and in the immediately preceding Count (but no other counts).  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against Defendant HSBC pursuant to Section 20(a) of the Exchange Act, 15 U.S.C §78j(b).

500.   Defendant HSBC acted as a controlling person of HSBC Trust and HSBC Securities within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

501.   HSBC had day-to-day control and exercised day-to-day control of HSBC Trust and HSBC Securities.  Accordingly, Defendant HSBC had the power to control the general business affairs of HSBC Trust and HSBC Securities and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the preparation of Thema prospectuses and annual reports) that resulted in primary liability.

502.   As a direct and proximate result of the wrongful conduct alleged in this Count, Plaintiff and the Class suffered an economic loss and damages in connection with their purchases of shares in Thema in an amount to be proven at trial.

## COUNT 9

### VIOLATIONS OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT
### AGAINST PWC IRELAND

503.   Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint (but not the counts) as if fully set forth in this Count.  Plaintiff also

incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against PwC Ireland and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C §78j(b).

504.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts or to any other part of this Complaint.

505.    PwC Ireland directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by engaging in a common plan, scheme, and unlawful course of conduct, pursuant to which it recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the Class to purchase shares in Thema.

506.    PwC Ireland made the following false and misleading statements:  PwC Ireland issued audit opinions for every calendar year between 2003 and 2007 with respect to Thema's financial statements.[18]  PwC also directly prepared and made false statements in prospectuses and annual reports issued by Thema during this time.  In each of the audit opinions, PwC Ireland (i) stated that it conducted the audits in accordance with ISA, and (ii) expressed an unqualified opinion that Thema's "financial statements present fairly, in all material respects, the financial position of [Thema] . . . , its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards."

---

[18]    Plaintiff is only suing PwC Ireland for audit opinions and prospectuses issued within the last five years prior to the filing of this lawsuit in light of the five year statute of repose under the Exchange Act.  Audit opinions for any calendar year prior to 2003 would have been issued in 2003, or before, and would fall outside the five year statute of repose.

507.     Each of those statements was false for the following reasons:

(a)     PwC Ireland did not confirm the existence of Thema's assets.  While purporting to conduct an audit pursuant to ISA, PwC Ireland did not take the most fundamental and obvious step of confirming the existence of Thema's assets, and did not do so despite the requirements pursuant to ISA, as set forth above;

(b)     PwC Ireland acted knowingly or recklessly in making the false statements alleged in this Count and its conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

(c)     PwC Ireland knew facts or recklessly disregarded information suggesting that its audit opinions were not accurate, or failed to check information that PwC Ireland had a duty to monitor and which would have demonstrated the falsity of its statements when made;

(d)     PwC Ireland knew that substantially all Thema's assets were managed by Madoff, who as the investment advisor, the broker-dealer, and custodian of the assets held highly-unusual multiple roles that facilitated Madoff's fraud.  Yet PwC Ireland failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of Thema's assets, so that PwC Ireland's audits failed to uncover the fact that the assets did not exist.

508.     To issue unqualified audit opinions that Thema had billions of dollars of assets without any independent confirmation that any of the assets existed is a textbook definition of a reckless audit because it failed to comply with ISA and the requisite accounting standards and constitutes, essentially, no audit at all.  Issuing clean audit opinions in the circumstances here, with the multiple red flags set forth above, is more reckless yet.  The failure of PwC Ireland to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

509.     By reason of the foregoing, PwC Ireland directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it:  (a) employed devices, schemes,

and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of shares in Thema.

510.     In ignorance of the false and misleading statements described in this Count, Plaintiff and the Class relied, to their detriment, on the misleading statements and omissions contained in PwC Ireland's unqualified audit opinions and the statements PwC Ireland made in Thema's prospectuses and annual reports by investing in Thema.  Plaintiff and the Class have suffered substantial damages with respect to their investment in Thema as a result of the wrongs alleged herein, in an amount to be proven at trial.

## COUNT 10
## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
## AGAINST PWC INTERNATIONAL

511.     Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint as well as the paragraphs of the immediately preceding Count (but no other counts).  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against Defendant PwC International pursuant to Section 20(a) of the Exchange Act, 15 U.S.C §78j(b).

512.     Defendant PwC International is a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

513.     Defendant PwC International had the power to influence and control and did influence and control, directly or indirectly, the decision making of PwC Ireland, PwC U.S., and PwC Bermuda, including the content and dissemination of audit opinions of Thema that were

false and misleading, by virtue of PwC International's participation in, and control and awareness of, the operations, audit procedures, audit work, and audit standards of PwC Ireland, PwC U.S., and PwC Bermuda.

514.    PwC International had direct and supervisory involvement and control in the day-to-day operations, audit procedures, audit work, and audit standards of PwC Ireland, PwC U.S., and PwC Bermuda and, therefore, is presumed to have had the power to control or influence the audit statements, audit procedures, and conduct giving rise to PwC Ireland's primary securities violations.

515.    By reasons of such conduct, PwC International is liable pursuant to Section 20(a) of the Exchange Act.

## COUNT 11
## VIOLATIONS OF RULE 10B-5(B) AND SECTION 10(B) OF THE EXCHANGE ACT AGAINST WILLIAM FRY

516.    Plaintiff repeats and realleges each allegation contained in the body of the Amended Complaint (but not the counts) as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against William Fry and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C §78j(b).

517.    William Fry directly engaged in a common plan, scheme, and unlawful course of conduct to induce Plaintiff and the Class to purchase shares in Thema.

518.    William Fry committed deceptive or manipulative acts. William Fry reviewed, negotiated, approved, and/or received copies of the agreements between Thema and Madoff/BMIS. Having either participated in the negotiation these agreements or having received copies of the agreements, and/or discussing the agreements with the Director Defendants and

others, William Fry had actual knowledge that Madoff instructed Thema and the Director Defendants not to identify him or BMIS as Thema's investment advisor and/or sub-custodian in any of Thema's prospectuses, annual reports, or any other public disclosures. Subsequent to negotiating, reviewing, approving, and/or receiving copies of these agreements between Thema and Madoff, and/or discussing the agreements with the Director Defendants and others, William Fry drafted, reviewed, and/or approved Thema's prospectuses, prospectus supplements, and annual reports during the Class Period, none of which mentioned Madoff or BMIS or disclosed the fact that Madoff and BMIS were serving as Thema's investment advisor and sub-custodian. William Fry knew that the non-disclosure of this highly material information was a material omission. William Fry also knew that Thema would not issue the prospectuses or annual reports without its approval and that, if it refused to approve the prospectuses or annual reports unless Madoff's identity was disclosed, Thema and the other Defendants would have to stop engaging Madoff/BMIS (since Madoff would not agree to continue working for Thema or serve as Thema's investment advisor if his name was disclosed). William Fry also had actual knowledge that, notwithstanding the fact that Madoff was making all investment decisions for Thema, he was not registered with the SEC as an investment advisor. Thus, William Fry knew that Madoff's investment advisory business was not subject to regulatory oversight.

519. In order to conceal Madoff's identify in Thema's prospectuses and annual reports, William Fry met with the Director Defendants, Thema Management, and/or Medici to device a scheme to justify the concealment. William Fry and/or the other Defendants discussed with Madoff why he refused to allow his name to be disclosed. William Fry and the other Defendants relied on Madoff's concocted excuse that disclosure was unnecessary because Madoff was merely executing an investment strategy, rather than making investment decisions. Madoff also

stated that he had avoided registering with the SEC as an investment advisor based on the fact that his investment advisory services were allegedly merely incidental to his broker-dealer business and that he did not accept any payment for his investment advisory services. William Fry knew that Madoff's explanation was absurd, since Madoff was making all investment decisions for Thema, not merely providing "incidental" investment advice. William Fry agreed with the other Defendants to rely on Madoff's excuse in order for William Fry to approve the annual reports and prospectuses, notwithstanding the other Defendants' knowing and intentional concealment of Madoff's identity in Thema's prospectuses and annual reports.

520. For all practical purposes, William Fry "made" the false statements and omissions in Thema's prospectuses and annual reports, which misrepresented the fact that Thema Management, Medici, and BA Worldwide were Thema's investment advisors and which concealed Madoff's identity and role as Thema's real investment manager. William Fry was sufficiently responsible for the statements and caused the statements to be made. Thema had no employees and thus relied extensively on William Fry to draft, review, and/or approve the prospectuses and annual reports, which William Fry knew would be disseminated to Thema's investors.

521. William Fry's deceptive and manipulative acts were in furtherance of the scheme to defraud.

522. William Fry acted with scienter because, as noted above, it had actual knowledge of Madoff's involvement with Thema and actively conspired with the other Defendants to conceal Madoff's identity in Thema's prospectuses and annual reports, notwithstanding the fact that William Fry knew that this was an material omission and that the other Defendants had a duty to disclose the information to Thema's shareholders.

523. William Fry's conduct occurred in connection with the purchase or sale of shares of Thema.

524. Plaintiff and the Class, to their detriment, relied on William Fry's acts, practices, devices, schemes, and artifices to defraud in connection with their purchase of shares in Thema.

525. By reason of the foregoing, William Fry directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it employed devices, schemes, and artifices to defraud.

526. By reason of the foregoing, William Fry also directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of shares in Thema.

527. As a result of William Fry's wrongful conduct, Plaintiff and the Class suffered damages.

## COUNT 12
## GROSS NEGLIGENCE AND NEGLIGENCE
## AGAINST PWC IRELAND, PWC U.S., AND PWC BERMUDA

528. Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against PwC Ireland, PwC U.S., and PwC Bermuda for gross negligence, negligence, or both pursuant to New York common law.

529. PwC Ireland, PwC U.S., and PwC Bermuda had a special relationship with Plaintiff and the Class that gave rise to a duty of care. PwC Ireland issued audit opinions directly to Plaintiff and the Class as investors and shareholders in Thema. PwC U.S. and PwC Bermuda

164

conducted procedures that PwC U.S. and PwC Bermuda knew would form the basis for the audit opinions provided by PwC Ireland for Thema, and knew that the audit opinions for Thema would be relied upon by Plaintiff and the Class in deciding to make or retain their investments in Thema in that, among other things, PwC Ireland addressed its audit opinions to shareholders in Thema.

530.    Plaintiff and the Class foreseeably and reasonably relied, directly or indirectly, on PwC Ireland, PwC U.S., and PwC Bermuda to exercise such care as ordinarily exercised by auditors generally and as required by ISA and other applicable auditing and accounting standards in conducting the audits of Thema.

531.    PwC Ireland was grossly negligent, negligent, or both in knowingly or recklessly failing to properly audit Thema in accordance with ISA and other applicable auditing and accounting standards.  PwC Ireland nevertheless was grossly negligent in issuing unqualified audit opinions that Thema's financial statements fairly represented the financial condition of Thema.

532.    PwC U.S. and PwC Bermuda acted with gross negligence, negligence, or both by failing to conduct the requisite procedures concerning Madoff or BMIS.  Among other things, PwC U.S. and PwC Bermuda failed to perform any procedures to gain an understanding of Madoff/BMIS's business – other than speaking with Madoff – for purposes of providing the information obtained from their cursory interview of Madoff to PwC Ireland.

533.    PwC Ireland, PwC U.S., and PwC Bermuda also ignored numerous red flags surrounding Madoff.

534.    Had PwC Ireland, PwC U.S., and PwC Bermuda not acted with gross negligence, negligence, or both, PwC Ireland would not have issued the unqualified audit opinions.

535.    PwC Ireland, PwC U.S., and PwC Bermuda are jointly and severally liable.

536.    As a result of the gross negligence, negligence, or both of PwC Ireland, PwC U.S., and PwC Bermuda, Plaintiff and the Class have lost all, or substantially all, of their investment in Thema.

**COUNT 13**
**GROSS NEGLIGENCE AND NEGLIGENCE**
**AGAINST PWC INTERNATIONAL**

537.    Plaintiff repeats and realleges each allegation contained in: (i) the immediately preceding counts for gross negligence and negligence against PwC Ireland, PwC Bermuda, and PwC U.S., and (ii) sections II through VII, except section IV(A), and sections X through XII above, as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against PwC International for gross negligence or negligence, or both, pursuant to New York common law.

538.    PwC Ireland, in the conduct of its audits of Thema's financial statements, and PwC U.S. and PwC Bermuda, in the conduct of procedures "directed towards obtaining an understanding of certain procedures and organization aspects of BLM for the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM . . . ," were performing the duties expected and provided for by PwC to its audit clients.

539.    The PwC Code of Conduct acknowledges:

> The PricewaterhouseCoopers network includes any entity which is authorised to carry on business under a name which includes all or part of the  PricewaterhouseCoopers name, is a direct or indirect affiliate or subsidiary of a PricewaterhouseCoopers entity or is otherwise within (or associated or connected with an entity within) or is a correspondent firm of the worldwide network of PricewaterhouseCoopers firms, where "entities" or an "entity"

166

includes partnerships, firms, corporations or other entities wherever located.

540.     PwC Ireland, PwC U.S., and PwC Bermuda are member firms of PwC International and use its trade name, "PwC."

541.     PwC presents itself to the public as a unified entity.

542.     PwC's website (www.pwc.com) discusses "Upholding the PricewaterhouseCoopers name," and states:

> •     Our clients and colleagues trust PricewaterhouseCoopers based on our professional competence and integrit[y]—qualities that underpin our reputation. We uphold that reputation.
>
> * * *
>
> •     When speaking in a forum in which audiences would reasonably expect that we are speaking as a representative of PricewaterhouseCoopers, we generally state only PricewaterhouseCoopers' view and not our own.

543.     The PwC website (www.pwc.com) in referring to its locations, states: "No matter where you're located, chances are there's a PwC office near you," and lists nations worldwide where PwC maintains its offices.

544.     The PwC website (www.pwc.com) provides access to PwC's Code of Conduct which states in part: "we also have a **Code of Conduct** for all PwC people and firms."  (Bold in original.)

545.     PwC has established a Global Assurance Leader which heads the Audit and Assurance Services that PwC provides to its clients. The Global Assurance Leader, Donald McGovern, is located in New York.

546.     PwC International does not provide services to clients. Instead, "[i]ts primary activities are to: identify broad market opportunities and develop associated strategies; strengthen PwC's internal product, skill, and knowledge networks; promote the PwC brand; and

167

develop and work for the consistent application of common risk and quality standards by member firms, including compliance with independence processes."

547. PwC is governed by a Global Board, Network Leadership Team, Strategy Council, and Network Executive Team.

548. The Global Board's role is "to ensure accountability, protect the PricewaterhouseCoopers International Limited network, and ensure effective governance."

549. PwC's Network Leadership Team "sets the strategy and standards that the PwC network will follow," and is comprised of five members, including the Global CEO Sam DiPiazza and Dennis Nally, the Chairman and Senior Partner of PwC U.S., both of whom who maintain offices in New York.

550. PwC's Strategy Council is comprised of "the senior partners of some of the largest PwC firms, [and] agrees on strategic direction and ensures alignment in the execution of strategy." Dennis Nally, the Chairman and Senior Partner of PwC U.S. is the Chairman of PwC's Strategy Council.

551. By virtue of PwC International's control, directly or indirectly through the Global Board, Network Leadership Team and/or Strategy Council, and/or the imposition of the Code of Conduct, over its member firms (including PwC Ireland, PwC U.S., and PwC Bermuda), PwC International is liable for the gross negligence or negligence, or both, of PwC Ireland, PwC, and PwC Bermuda.

**COUNT 14**
**GROSS NEGLIGENCE**
**AGAINST THE MEDICI DEFENDANTS, THE DIRECTOR DEFENDANTS, HSBC TRUST, HSBC SECURITIES, AND THE ADVISOR DEFENDANTS**

552. Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count.

Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants for gross negligence pursuant to New York common law.

553. The Defendants named in this Count had special relationships with Plaintiff and the Class because of their appointment as Thema's investment manager/advisor, administrator, custodian, distributor, promoter, and/or representative.

554. Such relationships gave rise to a duty to exercise due care in, among other things:

(a) managing Plaintiff's and the Class's assets invested in Thema;

(b) selecting and monitoring Madoff and BMIS as investment advisor and custodian for Thema;

(d) performing administrative functions for Thema;

(e) verifying pricing information and calculating the NAV of Thema's assets;

(f) safeguarding Thema's assets; and/or

(g) appointing persons and entities to act as investment managers and distributors based on merit and not because Defendants owned an equity interest in the investment managers and distributors.

555. The Defendants named in this Count (i) grossly failed to exercise due care and the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional; (ii) acted in disregard of their duties; and (iii) engaged in self-dealing.

556. As a direct and proximate result of the gross negligence of the Defendants named in this Count, Plaintiff and the members of the Class have lost all, or substantially all, their investment in Thema.

557. By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff and the Class in an amount to be determined at trial.

## COUNT 15
## NEGLIGENCE
## AGAINST THE MEDICI DEFENDANTS, THE DIRECTOR DEFENDANTS, HSBC TRUST, HSBC SECURITIES, AND THE ADVISOR DEFENDANTS

558.     Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants for negligence pursuant to New York common law.

559.     The Defendants named in this Count had special relationships with Plaintiff and the Class because of their appointment as Thema's investment manager/advisor, administrator, custodian, distributor, promoter, and/or representative.

560.     Such relationships gave rise to a duty to exercise due care in, among other things:

(a)     managing Plaintiff's and the Class's assets invested in Thema;

(b)     selecting and monitoring Madoff and BMIS as investment advisor and custodian for Thema;

(d)     performing administrative functions for Thema;

(e)     verifying pricing information and calculating the NAV of Thema's assets;

(f)     safeguarding Thema's assets; and/or

(g)     appointing persons and entities to act as investment managers and distributors based on merit and not because Defendants owned an equity interest in the investment managers and distributors.

561.     The Defendants named in this Count failed to exercise reasonable due care, and acted in disregard of their duties.

562.     As a direct and proximate result of the negligence of the Defendants named in this Count, Plaintiff and the members of the Class have lost all, or substantially all, their investment in Thema.

563.     By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff and the Class in an amount to be determined at trial.

## COUNT 16
## IMPOSITION OF CONSTRUCTIVE TRUST
## AGAINST THE MEDICI DEFENDANTS, THE DIRECTOR DEFENDANTS, HSBC TRUST, HSBC SECURITIES, AND THE ADVISORY DEFENDANTS

564.     Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted against the Medici Defendants, the Director Defendants, HSBC Trust, and HSBC Securities, the Advisory Defendants for imposition of a constructive trust pursuant to New York common law.

565.     The Defendants named in this Count had a fiduciary and/or confidential relationship with Plaintiff and the Class because, under their respective agreements with Thema, they were obligated to perform duties as Thema's investment manager/advisor, administrator, custodian, distributor, promoter, and/or representative.

566.     The Defendants named in this Count were compensated by Plaintiff and the Class, including by the receipt and/or retention of improperly calculated fees and other monies.

567.     The Defendants named in this Count were unjustly enriched by the receipt and/or retention of monies, including management and performance fees that were predicated on fictitious profits, and other compensation.

568.     Plaintiff and the Class are entitled to have a constructive trust imposed on the amount of all monies and other compensation in the possession of the Defendants named in this Count, to the extent that their possession relates to the fees or any other monies from Plaintiff and the Class, the amount of which is yet to be determined.

171

## COUNT 17
## BREACH OF FIDUCIARY DUTY
## AGAINST THE MEDICI DEFENDANTS, THE DIRECTOR DEFENDANTS, HSBC TRUST, HSBC SECURITIES, AND THE ADVISOR DEFENDANTS

569.     Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count asserts claims against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants for breach of fiduciary duty pursuant to New York common law.

570.     The Defendants named in this Count, under their respective agreements with Thema, were obligated to faithfully perform duties as Thema's investment manager/advisor, administrator, custodian, distributor, promoter, and/or representative.  Defendants named in this Count owed a duty of loyalty, care, and good faith to Plaintiff and the Class.  Plaintiff and the Class entrusted their assets to Defendants named in this Count.  Thus, the Defendants named in this Count occupied a superior position over Plaintiff and the Class with respect to (i) management and control of those assets; (ii) overseeing Thema and its other fiduciaries and agents; (iii) access to confidential information about Madoff and BMIS.

571.     Plaintiff and the Class placed their trust and confidence in Defendants.  And Defendants accepted Plaintiff's and the Class's repose of trust and confidence.

572.     Plaintiff and the Class reasonably and foreseeably trusted the purported expertise and skill of the Defendants named in this Count and, in turn, the Defendants named in this Count recognized that Plaintiff and the Class would rely on and repose their trust in Defendants when deciding to invest and retain their investments in Thema.

573.     The Defendants named in this Count breached their fiduciary duty of (i) due care; (ii) loyalty; and (iii) good faith to Plaintiff and the Class by failing to properly discharge their

responsibilities as Thema's investment manager/advisor, administrator, custodian, distributor, promoter, and/or representative, including:

(a) failing to act with reasonable care to ensure that the investment opportunity presented to Plaintiff and the Class was suitable and in accordance with their investment goals and intentions;

(b) failing to perform adequate due diligence, including following their own internal due diligence protocols, before allowing Thema Asset Management Ltd. and Bank Medici to serve as investment managers for Thema;

(c) breaching their duty of loyalty by appointing Thema Management and GB&C, to serve as Thema's investment manager and distributor;

(d) failing to perform adequate due diligence, including following their own internal due diligence protocols, before allowing Madoff to serve as the investment manager and custodian for Thema;

(e) failing to invest Plaintiff's and the Class's assets with adequate diligence or monitoring;

(f) failing to monitor Madoff on an ongoing basis to any reasonable degree, or to comply with their own internal protocols for monitoring Thema's assets entrusted to Madoff;

(g) failing to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of Thema's assets;

(h) failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds;

(i) profiting and allowing their affiliates to profit at the expense of Plaintiff and the Class; and

(j) engaging in transactions that were designed to and did result in a profit to Director Defendants at the expense of Plaintiff and the Class.

574. As a proximate result of the breach of fiduciary duties by the Defendants named in this Count, Plaintiff and the Class have (i) been forced to pay excessive investment, performance, and management fees in exchange for inadequate or non-existent services; and (ii) suffered significant losses of their investment in Thema.

575. The damages suffered by Plaintiff and the Class were a direct and foreseeable result, proximately caused by the breach of fiduciary duties by Defendants named in this Count.

576. By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff and the Class.

## COUNT 18
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### AGAINST WILLIAM FRY, THE BMIS DEFENDANTS, AND THE PWC DEFENDANTS

577. Plaintiff repeats and realleges each allegation contained in: (i) all breach of fiduciary duty counts against the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants; and (ii) sections II through VII, except section IV(A), and sections X through XII above, as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is brought under New York common law and is asserted against (i) William Fry for aiding and abetting breaches of fiduciary duty by the Director Defendants, the HSBC Defendants, the Advisor Defendants, and Medici; (ii) the BMIS Defendants for aiding and abetting breaches of fiduciary duty by the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants; and (iii) the PwC Defendants for aiding and abetting breaches of fiduciary duty by the Director Defendants, the Medici Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants.

578. The Defendants named in this Count had actual knowledge of the breaches of fiduciary duty committed by the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and the Advisor Defendants. The Defendants named in this Count were in a superior position as to the management and control of the assets entrusted to Thema by Plaintiff and the Class, and knowingly induced or participated, or both, in the wrongful conduct described

herein. The BMIS Defendants and the PwC Defendants materially assisted the breaches of fiduciary duty committed by the Medici Defendants, the Director Defendants, HSBC Trust, HSBC Securities, and/or the Advisor Defendants. William Fry materially assisted the breach of fiduciary duty committed by the Director Defendants, the HSBC Defendants, the Advisor Defendants, and Medici.

579. As a result of the breaches of fiduciary duties the Defendants named in this Count aided and abetted, Plaintiff and the Class have been damaged.

580. By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff and the Class.

## COUNT 19
## AIDING AND ABETTING GROSS NEGLIGENCE AND NEGLIGENCE
## AGAINST THE BMIS DEFENDANTS

581. Plaintiff repeats and realleges each allegation contained in: (i) all negligence and gross negligence counts against the Medici Defendants, the Director Defendants, the HSBC Defendants, the Advisor Defendants and the PwC Defendants, and (ii) sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against the BMIS Defendants for aiding and abetting gross negligence or negligence, or both, pursuant to New York common law.

582. The BMIS Defendants had actual knowledge of the gross negligence or negligence, or both, committed by multiple defendants, including the Medici Defendants, the Director Defendants, the HSBC Defendants, the Advisor Defendants, and the PwC Defendants. The BMIS Defendants were in a superior position as to the management and control of the assets entrusted to Thema by Plaintiff and the Class, as well as the protections and checks undertaken by the Medici Defendants, the Director Defendants, the HSBC Defendants, the Advisor

Defendants, and the PwC Defendants, which were practically nonexistent. Through the BMIS Defendants actions and inactions, they knowingly induced or participated, or both, in the wrongful conduct described herein. The BMIS Defendants materially assisted the negligent and/or grossly negligent conduct of the Director Defendants, the Medici Defendants, the HSBC Defendants, the Advisor Defendants, and the PwC Defendants.

583. As a result of the BMIS Defendants' aiding and abetting gross negligence or negligence, or both, Plaintiff and the Class have suffered damages with respect to their investments in Thema in an amount to be determined at trial.

584. By reason of the foregoing, the BMIS Defendants are jointly and severally liable to Plaintiff and the Class.


**COUNT 20**
**UNJUST ENRICHMENT**
**AGAINST ALL DEFENDANTS**

585. Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is asserted against all Defendants for unjust enrichment pursuant to New York common law.

586. Plaintiff and the Class base their unjust enrichment claim on the receipt or retention of salaries, bonuses and other monies that all Defendants obtained at the expense of Plaintiff's and the Class's unwitting participation in the Madoff Ponzi scheme, and to which all Defendants were not entitled.

587. All Defendants were unjustly enriched at the expense of Plaintiff and the Class, including for example, by taking Plaintiff's and the Class's monies and earning fees and benefits

from such monies – purportedly to invest and manage the assets—but in fact used these monies to execute a Ponzi scheme.

588.     Plaintiff and the Class involuntarily conferred a benefit upon all Defendants without Plaintiff and the Class receiving adequate benefit or compensation in return.  All Defendants appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

589.     Equity and good conscience require all Defendants to refund all fees and other monies they received at Plaintiff's and the Class's expense.

**COUNT 21**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST THE FINANCIAL INSTITUTION DEFENDANTS**

590.     Plaintiff repeats and realleges each allegation contained in:  (i) the breach of fiduciary duty counts against the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants; and (ii) sections II through VII, except section IV(A), and sections X through XII above, as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is brought under New York common law and asserted against the Financial Institution Defendants for aiding and abetting the breaches of fiduciary duty by the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants.

591.     The Financial Institution Defendants had actual knowledge of the breaches of fiduciary duty committed by multiple defendants, including the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants.  The Financial Institution Defendants knowingly facilitated and provided services to Madoff in furtherance of the Ponzi

scheme, and materially assisted the breaches of fiduciary duty by the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants.

592.    As a result of the breaches of fiduciary duties the Financial Institution Defendants aided and abetted, Plaintiff and the Class have been damaged.

593.    By reason of the foregoing, the Financial Institution Defendants are jointly and severally liable to Plaintiff and the Class.

## COUNT 22
### AIDING AND ABETTING GROSS NEGLIGENCE AND NEGLIGENCE AGAINST THE FINANCIAL INSTITUTION DEFENDANTS, THE PWC DEFENDANTS, AND THE BMIS DEFENDANTS

594.    Plaintiff repeats and realleges each allegation contained in:  (i) gross negligence and negligence counts against the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants; and (ii) sections II through VII, except section IV(A), and sections X through XII above, as if fully set forth in this Count.  Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is brought under New York common law and asserted against the Financial Institution Defendants, the PwC Defendants, and the BMIS Defendants for aiding and abetting gross negligence, negligence, or both committed by the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants.

595.    The Defendants named in this Count had actual knowledge of the gross negligence, negligence, or both committed by the Medici Defendants, the Director Defendants, the HSBC Defendants, and the Advisor Defendants.  The Defendants named in this Count knowingly facilitated and provided services to Madoff in furtherance of the Ponzi scheme, and substantially assisted, encouraged, and aided and abetted the other Defendants' negligence, gross negligence, or both.

596. As a result of the Defendants' aiding and abetting gross negligence, negligence, or both, Plaintiff and the Class have suffered damages with respect to their investments in Thema in an amount to be determined at trial.

597. By reason of the foregoing, the Defendants named in this Count are jointly and severally liable to Plaintiff and the Class.

## COUNT 23
### THIRD PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT AGAINST THE MEDICI DEFENDANTS, THE ADVISOR DEFENDANTS HSBC TRUST, AND HSBC SECURITIES

598. Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint. This Count is brought under New York common law and asserted on behalf of Plaintiff and the Class as third-party beneficiaries to the contractual relationships existing between Thema and HSBC Trust, HSBC Securities, the Medici Defendants, and the Advisor Defendants.

599. Thema entered into contractual agreements with each Defendant named in this Count, as alleged in the Amended Complaint.

600. Pursuant to the contractual agreements, the Defendants named in this Count assumed the responsibility to fulfill certain obligations to Thema for the intended immediate benefit of Plaintiff and the Class.

601. The Defendants named in this Count breached the contractual agreements by committing the misconduct alleged herein, including failing to: (i) safe-keep securities; and (ii) open and maintain accounts with brokers according to the regulations of each market in which the securities were traded; (iii) perform due diligence; (iv) invest the monies of Plaintiff and the Class in U.S. securities; and (v) perform the job duties they claimed to be performing.

179

602.     These contractual breaches resulted in significant losses to Plaintiff and the Class, as described herein.

603.     The breaches of the agreements by Defendants named in this Count injured Plaintiff and the Class as third-party beneficiaries to those agreements in an amount to be determined at trial.

## COUNT 24
## PROFESSIONAL NEGLIGENCE
### AGAINST THE HSBC DEFENDANTS, THE PWC DEFENDANTS, AND THE ADVISOR DEFENDANTS

604.     Plaintiff repeats and realleges each allegation contained in sections II through VII, except section IV(A), and sections X through XII above as if fully set forth in this Count. Plaintiff also incorporates all exhibits attached to this Amended Complaint.  This Count is asserted on behalf of Plaintiff and the Class against the HSBC Defendants, the PwC Defendants, and the Advisor Defendants for professional negligence pursuant to New York common law.

605.     The Defendants named in this count owed duties of due care and professional competence to Plaintiff and the Class.

606.     As detailed herein, the Defendants in this count failed to perform their professional responsibilities.  The Defendants in this count committed multiple breaches of their duties of care and professional competence, for example:

(a)      failing to provide Plaintiff and the Class with the services they were entitled;

(b)      wrongfully assigning professional duties to Madoff and BMIS;

(c)      investing Plaintiff's and the Class's monies in an unsuitable manner;

(d)      failing to perform due diligence;

(e)      intentionally ignoring serious indications of fraud; and

(f)      failing to properly value the investments and assets of Thema.

180

607. By failing to properly discharge their professional responsibilities, the Defendants in this count caused significant damage to Plaintiff and the Class.

## XIV    PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class, demands judgment against Defendants as follows:

(a)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff a proper Class representative;

(b)    Awarding damages suffered by Plaintiff and the Class as a result of the wrongs complained of herein, together with appropriate interest.  Plaintiff and the Class specifically seek the recovery not only of all the principal initially invested in Thema, but also all interest and profits which Plaintiff and the Class would have earned had their money been prudently invested;

(c)    Awarding Plaintiff and the Class punitive damages, where appropriate;

(d)    Enjoining defendants from using Thema's assets to defend this action or to otherwise seek indemnification from the funds for their wrongful, deceitful, reckless, and negligent conduct as alleged herein;

(f)    Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

# JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2009

MURRAY, FRANK & SAILER LLP
Brian P. Murray (BM 9954)
Gregory B. Linkh (GL 0477)

_[signature]_

Gregory B. Linkh (GL 0477)
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 681-1818
Facsimile: (212) 682-189

*Counsel for Plaintiff and the Class*

JOHNSON BOTTINI, LLP
Francis A. Bottini, Jr. (*pro hac vice*)
Albert Y. Chang (AC 5415)
501 West Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622

*Lead Counsel for Plaintiff and the Class*

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
Samuel H. Rudman
David A. Rosenfeld
52 Duane Street, 7th Floor
New York, NY 10007
Telephone: (212) 693-1058
Facsimile: (212) 693-7423

– and –

Jack Reise
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

*Counsel for Plaintiff and the Class*

182

# CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Neville Seymour Davis, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint on file in this case – *Perrone v. Benbassat et al.*, Case No. 09-cv-2558 (S.D.N.Y.), with my counsel.

2.    I did not acquire the securities that are the subject of this action at the direction of my counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a lead plaintiff in these cases. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial, if necessary.

4.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses - such as lost wages and travel expenses - directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.    I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.    My purchases and sales during the Class Period of the securities which are the subject of this case are listed below:

## THEMA INTERNATIONAL FUND

| | DATE | SHARES | Share Price | US $ VALUE |
|---|---|---|---|---|
| BOUGHT | 24MAY2006 | 4466 | $ 296.686 | 1,325,000. 00 |
| SOLD | 29DEC2006 | -75 | | 22,251. 75 |
| SOLD | 31JAN2007 | -95.4472 | | 28,318. 23 |
| SOLD | 28FEB2007 | -178.5430 | | 52,971. 92 |
| SOLD | 31MAR2007 | -125.0469 | | 37,100. 16 |
| SOLD | 13APR2007 | -93.6650 | | 27,789. 47 |
| SOLD | 02JAN2007 | -35.3035 | | 10,474. 20 |
| SOLD | 18MAR2007 | -49.3885 | | 14,653. 07 |
| SOLD | TOTAL | | | 193,558. 80 |

TOTAL LOSS:             U.S. DOLLARS:   $1,131,441. 20

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __03__ day of May, 2009.

NEVILLE SEYMOUR DAVIS