**Exhibit 2**

Dockets.Justia.com

If you are in any doubt about the contents of this prospectus (the "Prospectus"), you should consult your stockbroker, bank manager, solicitor, accountant or other financial advisor.

The Directors of the Company, whose names appear on page 10 are the persons responsible for the information contained in this Prospectus and accept responsibility accordingly. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

# THEMA INTERNATIONAL FUND plc

*(An umbrella type open-ended investment company with variable capital
and having segregated liability between its Funds
incorporated with limited liability in Ireland
under registration number 248741)*

## PROSPECTUS

### Investment Manager

### BANK MEDICI AG

The Directors do not anticipate that an active secondary market will develop in such Participating Shares of the Company.

This document should be read in conjunction with any Supplement hereto.

The date of this Prospectus is 31 December 2006.

# THEMA INTERNATIONAL FUND PLC

## PRELIMINARY

This Prospectus comprises information relating to Thema International Fund plc, an open-ended investment company with variable capital and having segregated liability between its Funds organised under the laws of Ireland. It qualifies and is authorised in Ireland by the Financial Regulator as a UCITS for the purposes of the UCITS Regulations. This document together with any Supplement or addendum constitutes a prospectus for the purposes of the UCITS Regulations and comprises listing particulars for the purpose of any application for listing of any such class of Shares in respect of which that Supplement is issued.

**The Financial Regulator shall not be liable by virtue of its authorisation of the Company or by reason of its exercise of the functions conferred on it by legislation in relation to the Company for any default of the Company. Authorisation of the Company does not constitute a warranty by the Financial Regulator as to the credit worthiness or financial standing of the various service providers to the Company. The authorisation of the Company is not an endorsement or guarantee of the Company by the Financial Regulator and the Financial Regulator is not responsible for the contents of this Prospectus.**

Neither the admission of the Shares of the Company to the official list nor the approval of this document pursuant to the listing requirements of The Irish Stock Exchange Limited shall constitute a warranty or representation by the Irish Stock Exchange as to the competence of service providers to or any other party connected with the Company, the adequacy of information contained in the document or the suitability of the Company for investment purposes.

Applications for Participating Shares in a Fund will only be considered on the basis of this Prospectus and a copy of the latest annual report and if published after such report, a copy of the latest unaudited semi-annual report. Distribution of this Prospectus is not authorised unless it is accompanied by a copy of the latest semi-annual report and/or annual report (as the case may be).

A separate Supplement relating to any new Fund of the Company approved by the Financial Regulator will be issued at the time of the establishment of that Fund. If there are different classes representing a Fund, details relating to the separate classes may be dealt with in the same Supplement or in separate Supplements for each Class. Each Supplement shall form part of, and should be read in conjunction with, this Prospectus.

Statements made in this Prospectus are, except where otherwise stated, based on the law and practice currently in force in Ireland and are subject to change.

No person has been authorised to give any information or to make any representation in connection with the offering or placing of Shares other than those contained in this Prospectus and the reports referred to below and, if given or made, such information or representation must not be relied upon as having been authorised by the Company. The delivery of this Prospectus (whether or not accompanied by the reports) or any issue of Shares shall not, under any circumstances, create any implication that the affairs of the Company have not changed since the date of this Prospectus.

The Company may make application to register and distribute its Shares in jurisdictions outside Ireland. In the event that such registrations take place, the Company may appoint or be required to appoint paying agents, representatives, distributors or other agents in the relevant jurisdictions. The fees and expenses in connection with the registration and distribution of shares in such jurisdictions,

which will be at normal commercial rates, may be borne by the Company and/or the Funds. Details of the local representatives will be set out in the local relevant country information document.

The distribution of this Prospectus and the offering and placing of Shares in certain jurisdictions may be restricted and, accordingly, persons into whose possession this Prospectus comes are required by the Company to inform themselves about and to observe such restrictions.

This Prospectus does not constitute an offer or solicitation to anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation.

As the Company is neither authorised nor recognised by the Financial Services Authority ("FSA") it is not categorised as a regulated collective investment scheme in the United Kingdom for the purposes of the Financial Services and Markets Act 2000 (the "Act") and subordinate legislation made under that Act, including the FSMA 2000 (Financial Promotion) Order 2001 ("FPO"), the FSMA 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 ("SPO"), and the Conduct of Business ("COB") Sourcebook of rules and guidance made by the FSA under the Act. This means that there are strict rules on the promotion of the Company. This document and its contents are confidential and its distribution (which term shall include any form of communication) is restricted pursuant to Section 21 (restrictions on financial promotion) of the Act. To the extent that this document is capable of having effect in the United Kingdom, it is only directed at, and may only be distributed to, persons who are "investment professionals" (being persons having professional expertise in matters relating to investments) within the meaning of Article 19(5) of the FPO or article 14 of the SPO, or who are persons to whom any of paragraphs (2)(a) to (d) of Article 49 (high net worth companies, unincorporated associations etc.) of the FPO or article 22(2)(a) to (d) of the SPO apply, and certified sophisticated investors within the meaning of article 50 of the FPO or article 23 of the SPO, or who are persons to whom distribution may otherwise lawfully be made under the legislation described above. Any investment, and investment activity or controlled activity, to which this document relates is available only to such persons and will be engaged in only with such persons. Persons that do not have professional experience should not rely or act upon this document unless they are persons to whom it may lawfully be directed under the legislation described above.

Where this document is communicated or approved by an authorised person, the relevant classes of investor also include market counterparties or intermediate customers within the meaning of COB 3, certain exempt persons (other than appointed representatives), and certain established or newly accepted customers within the meaning of COB 3 Ann 5 for whom investment is suitable. Shares in the Company are available only to such investors; other persons should not rely or act upon this document, and there are in place proper administrative and other systems and procedures to prevent such persons from acquiring Shares in the Company. The rules made by the FSA under the Act for the protection of private customers (including those conferring rights of cancellation or withdrawal) do not apply, and the Financial Services Compensation Scheme will not be available, in relation to an investment in the Company.

With limited exceptions, the direct or indirect offer, sale, transfer or delivery of Shares to US Persons is prohibited and the Shares may not be offered or sold within the United States. The Shares have not been registered under the US Securities Act of 1933 (the "1933 Act") or the securities laws of any state within the United States, nor is such registration contemplated. This document has not been filed with or reviewed by the US Securities and Exchange Commission and neither that Commission nor any state securities administrator has passed upon or endorsed the merits of an investment in the Company or a Fund, or the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offence. For these purposes, "United States" and "US Persons" have the meanings given to them by Regulation S under the 1933 Act, as amended, under the US Internal Revenue Code of 1986, as amended, and under the regulations of the US Commodity Futures Trading Commission (the "CFTC"). The Company and any Fund will not be registered under the US Investment Company Act of 1940, as amended. Neither the Company nor the Investment

Manager will be registered under the US Investment Advisers Act of 1940, as amended, or under any state laws. Pursuant to CFTC Rule 4.13(a)(4), neither the Company nor the Investment Manager will be registered under the US Commodity Exchange Act, as amended. Consequently, certain of the protections afforded by those statutes will not be available. Unlike a registered commodity pool, the Company is not required to deliver to you a disclosure document, as defined in CFTC rules or a certified annual report. Each prospective investor is required at the time of acquiring the Shares to represent that they are not acquiring the Shares with the assets of an ERISA Plan, as defined in the subscription documents.

Before investing in the Company, potential investors should consider the risks involved in such investment. Please see "Risk Factors" on page 14 below. In addition, potential investors should inform themselves as to:

    (a)    the legal requirements within the countries of their nationality, residence, ordinary residence or domicile for such acquisition;

    (b)    any foreign exchange restrictions or exchange control requirements which they might encounter on the acquisition or sale of Shares; and

    (c)    the income tax and other taxation consequences which might be relevant to the acquisition, holding or disposal of Shares.

This Prospectus may also be translated into other languages. Any such translation shall only contain the same information and have the same meaning as this English language Prospectus. To the extent that there is any inconsistency between the English language Prospectus and the Prospectus in another language, this English language Prospectus will prevail, except, to the extent (but only to the extent) required by law of any jurisdiction where the Shares are sold, that in an action based upon disclosure in a prospectus in a language other than English, the language of the Prospectus on which such action is based shall prevail.

# TABLE OF CONTENTS

THEMA INTERNATIONAL FUND PLC .................................................................................................... 2

PRELIMINARY .................................................................................................................................... 2

DEFINITIONS ...................................................................................................................................... 7

DIRECTORS, INVESTMENT MANAGER AND OTHER ADVISERS ............................................... 10

SUMMARY INFORMATION ............................................................................................................. 11

THEMA INTERNATIONAL FUND PLC .......................................................................................... 12

    INTRODUCTION ................................................................................................................................ 12
    INVESTMENT OBJECTIVES AND POLICIES ......................................................................................... 12
    EFFICIENT PORTFOLIO MANAGEMENT .............................................................................................. 13
    INVESTMENT RESTRICTIONS ............................................................................................................ 13
    BORROWING RESTRICTIONS ............................................................................................................. 13
    DISTRIBUTION POLICY ..................................................................................................................... 14
    RISK FACTORS ................................................................................................................................. 14
    GENERAL ......................................................................................................................................... 14
    EXCHANGE CONTROL ...................................................................................................................... 14

MANAGEMENT AND ADMINISTRATION ...................................................................................... 15

    DIRECTORS ...................................................................................................................................... 15
    INVESTMENT MANAGER ................................................................................................................... 16
    THE ADMINISTRATOR, REGISTRAR, TRANSFER AGENT AND SECRETARY .......................................... 16
    CUSTODIAN ...................................................................................................................................... 16
    DISTRIBUTOR ................................................................................................................................... 17
    PROMOTER ....................................................................................................................................... 17
    LEGAL ADVISERS ............................................................................................................................ 18
    AUDITORS ........................................................................................................................................ 18
    CONFLICTS OF INTEREST .................................................................................................................. 18
    MEETINGS ........................................................................................................................................ 19
    REPORTING ...................................................................................................................................... 19

SUBSCRIPTIONS AND REDEMPTIONS ......................................................................................... 20

    SUBSCRIPTION FOR SHARES ............................................................................................................ 20
    MONEY LAUNDERING ...................................................................................................................... 20
    EUROPEAN UNION TAXATION OF SAVINGS INCOME DIRECTIVE ........................................................ 21
    REDEMPTION OF SHARES ................................................................................................................. 22
    TOTAL REDEMPTION ....................................................................................................................... 22
    TRANSFERS ...................................................................................................................................... 22
    TEMPORARY SUSPENSIONS .............................................................................................................. 22
    CONVERSION ................................................................................................................................... 23

FEES AND EXPENSES ..................................................................................................................... 25

    GENERAL ......................................................................................................................................... 25

TAXATION ....................................................................................................................................... 28

    GENERAL ......................................................................................................................................... 28
    IRISH TAXATION .............................................................................................................................. 28
    SHAREHOLDERS ............................................................................................................................... 31
    STAMP DUTY ................................................................................................................................... 33
    CAPITAL ACQUISITIONS TAX ........................................................................................................... 33

STATUTORY AND GENERAL INFORMATION ............................................................................... 34

    APPENDIX I ..................................................................................................................................... 47
    THE REGULATED MARKETS .............................................................................................................. 47

**APPENDIX II**..................................................................................................................49

   INVESTMENT TECHNIQUES AND INSTRUMENTS FOR EFFICIENT PORTFOLIO MANAGEMENT/DIRECT
INVESTMENT PURPOSES..................................................................................................49

**APPENDIX III** ...............................................................................................................52

   INVESTMENT RESTRICTIONS ...........................................................................................52

# DEFINITIONS

As used in this Prospectus, the following words and phrases shall have the meanings set forth below.

"*1933 Act*", the United States Securities Act of 1933 (as amended).

"*1940 Act*", the United States Investment Company Act of 1940 (as amended).

"*Administrator*", HSBC Securities Services (Ireland) Limited, a limited liability company incorporated in Ireland.

"*Administration Agreement*", the Agreement dated 30 May 1996 made between the Company and the Administrator and subsequently amended by a supplemental administration agreement dated 21 August 2006.

"*Articles*", the Articles of Association of the Company as amended from time to time.

"*Auditors*", PricewaterhouseCoopers, Chartered Accountants.

"*Base Currency*", in respect of any class of shares, means the currency in which the Shares are issued.

"*Business Day*", in relation to any Fund, any day on which the banks in both Dublin and Geneva are open for business, or any additional day as the Directors may from time to time determine (see the relevant Supplement).

"*Company*", Thema International Fund plc.

"*Custodian*", HSBC Institutional Trust Services (Ireland) Limited.

"*Custodian Agreement*", the Agreement dated 30 May 1996 made between the Company and the Custodian as amended by a supplemental custodian agreement dated 21 August 2006.

"*Dealing Day*", in relation to any Fund, such day or days as the Directors may from time to time determine, provided that:-

(i)     there shall be at least two Dealing Days in every month; and

(ii)    the assets of the Company shall be valued for each Dealing Day.

"*Distribution Agreement*", the Agreement dated 31 December 2006 between the Company and the Distributor.

"*Distributor*", Thema Asset Management Limited, a company incorporated under the laws of the British Virgin Islands.

"*Directors*", the directors of the Company or any duly authorised committee thereof.

"*Duties and Charges*", in relation to any Fund, all stamp and other duties, taxes, governmental charges, brokerage, bank charges, transfer fees, registration fees and other duties and charges whether in connection with the original acquisition or increase of the assets of the relevant Fund or the creation, issue, sale, conversion or repurchase of Shares or purchase of Investments or in respect of certificates or otherwise which may have become or may be payable in respect of or prior to or in connection with or arising out of or upon the occasion of the transaction or dealing in respect of which such duties and charges are payable but shall not include any commission payable to agents on sales

and purchases of Shares or any commission, taxes, charges or costs which may have been taken into account in ascertaining the Net Asset Value of Shares in the relevant Fund.

"*EURO or €*", the currency unit referred to in the second sentence of the Council Regulation (EC) no.974/98 of 3 May 1998 on the introduction of the Euro.

"*Financial Regulator*", the Irish Financial Services Regulatory Authority or any successor thereof.

"*Fund*", a fund of assets established (in accordance with the requirements of the Notices) for one or more classes of Shares which is invested in accordance with the investment objectives applicable to such fund.

"*Investment Manager*", Bank Medici AG, a company incorporated under the laws of Austria.

"*Investment*", any investment authorised by the Memorandum of Association of the Company and which is permitted by the UCITS Regulations and the Articles.

"*Investment Management Agreement*", the Agreement dated 31 December 2006 between the Company and the Investment Manager.

"*Irish Stock Exchange*", means The Irish Stock Exchange Limited.

"*Minimum Holding*", a holding of Participating Shares in any Fund or across a number of funds having an aggregate value of such minimum amount as determined by the Directors.

"*Net Asset Value*", in respect of any Fund, the net asset value of Participating Shares thereof determined in accordance with the Articles for each Dealing Day. For fuller details see pages 40 to 43.

"*Notices*", the notices issued by the Financial Regulator in exercise of its powers under the UCITS Regulations.

"*Qualified Holder*", any person, corporation or entity other than (i) a United States Person which is not a Qualified US Person; (ii) any person, corporation or entity which cannot acquire or hold Participating Shares without violating laws or regulations applicable to it; or (iii) a custodian, nominee, or trustee for any person, corporation or entity described in (i) or (ii) above.

"*Qualified US Person*", a United States person who has acquired Shares with the consent of the Directors provided that the number of Qualified US Persons shall not exceed such number as the Directors shall determine from time to time with a view to precluding the Company from being required to register as an investment company under the 1940 Act, or, in the absence of such determination, 75.

"*Redemption Price*", in respect of any Fund, the price at which Participating Shares can be redeemed as calculated in the manner set forth in the Prospectus.

"*Regulated Market*", in relation to any Investment, any stock exchange or other regulated market as referred to in the UCITS Regulations or as listed in Appendix I, it being noted that the Financial Regulator does not issue a list of authorised exchanges or markets.

"*Share*", or "*Participating Share*", a share of no par value in the Company designated as a Participating Share in a Fund of the company.

"*Shareholder*", the registered holder of a Share and does not include any individual or entity for whose account the registered holder purchases Shares.

"*Subscriber Shares*", shares of US$1.00 each in the capital of the Company designated as "*Subscriber Shares*" in the Articles and subscribed by or on behalf of the Distributor for the purposes of incorporating the Company.

"*Subscription Price*", the price at which Participating Shares in a Fund can be subscribed as set forth in the Prospectus.

"*Supplement*", any document issued by the Company expressed to be a supplement to this Prospectus.

"*UCITS*", Undertaking for Collective Investment in Transferable Securities established pursuant to the UCITS Directive as amended.

"*UCITS Directive*", Council Directive of 20 December 1985 (85/611/EEC) on the co-ordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities as amended by Council Directive of 22 March 1988 (88/220/EEC), Directive No. (95/26/EC) of the Council and of the European Parliament of 29 June 1995 and Directive No. 2001/108/EC of the Council and of the European Parliament of 21 January 2002, Directive No. 2001/107/EC of the Council and of the European Parliament of 21 January 2002 as applicable and any amendment thereto.

"*UCITS Regulations*", the European Communities (Undertakings for Collective Investment in Transferable Securities) Regulations 2003 (SI No. 211 of 2003) as amended by the European Communities (Undertakings for Collective Investment in Transferable Securities) (Amendment) Regulations 2003 (SI No. 212 of 2003), as same may be amended.

"*United States*" and "*US*", the United States of America or any of its territories, possessions or other areas subject to its jurisdiction including the Commonwealth of Puerto Rico.

"*United States Dollars*", "*US Dollars*" and "*US$*", the lawful currency of the United States of America.

"*United States Person*" and "*US Person*", any person defined as a US Person (1) by Regulation S under the 1933 Act, (2) under the US Internal Revenue Code of 1986, as amended, or (3) under the regulations of the CFTC. Directors may amend the definition of "*United States Person*" for purposes of this Prospectus without notice to Shareholders as may become necessary to best reflect then current applicable law and regulation. "*United States Persons*" must be "*accredited investors*" under Regulation D under the 1933 Act, and "" under Section 3(c)(7) of the US Investment Company Act of 1940, as amended.

"*Valuation Point*", such point in time by reference to which the Net Asset Value of a Fund is calculated as the Directors may from time to time determine, and as set out in the relevant Supplement.

## DIRECTORS, INVESTMENT MANAGER AND OTHER ADVISERS

**The Company and Registered Office**

Thema International Fund plc
HSBC House
Harcourt Centre
Harcourt Street
Dublin 2
Ireland

**Investment Manager**

Bank Medici AG
Operngasse 6/4
1010 Vienna
Austria

**Custodian**

HSBC Institutional Trust
Services (Ireland) Limited
HSBC House
Harcourt Centre
Harcourt Street
Dublin 2
Ireland

**Sponsoring Brokers**

NCB Stockbrokers Limited
3 George's Dock
International Financial Services Centre
Dublin 1
Ireland

**Auditors**

PricewaterhouseCoopers
Chartered Accountants
George's Quay
Dublin 2
Ireland

**The Directors**

The Directors of the Company,
whose business address is at
the registered office of
the Company as follows:

Stéphane Benbassat
Alberto Benbassat
David T. Smith
Gerald J. P. Brady
Daniel Morrissey

**Administrator, Registrar, Transfer Agent and
Secretary**

HSBC Securities Services (Ireland) Limited
HSBC House
Harcourt Centre
Harcourt Street
Dublin 2
Ireland

**Legal Advisers to the Company**

William Fry
Solicitors
Fitzwilton House
Wilton Place
Dublin 2
Ireland

**Distributor**

Thema Asset Management Limited
Citco Building
Wickhams Cay
Road Town
Tortola
British Virgin Islands

# SUMMARY INFORMATION

The following is a summary only and is qualified in its entirety by the more detailed information appearing elsewhere in this Prospectus, the Articles, and any relevant Supplement which should be read by prospective investors prior to making any decision to invest.

| | |
|---|---|
| **THE COMPANY** | The Company is an umbrella type open-ended investment company with variable capital and having segregated liability between its Funds incorporated in Ireland as a public limited company qualifying as a UCITS. |
| | The assets of each Fund will be invested in accordance with the investment objectives and policies of that Fund. Each Fund will constitute a separate fund of the Company. Particulars in relation to any Fund are set out in the relevant Supplement for that Fund. |
| **INVESTMENT OPPORTUNITY** | The Company is designed for investors (who are Qualified Holders, as defined under the heading "Definitions") who desire professional management of their liquid assets. |
| **MANAGEMENT OF THE COMPANY** | The Directors are responsible for the management of the Company's affairs and have appointed Bank Medici AG as Investment Manager of the Company. |
| **THE OFFERING** | Details in relation to the subscription and settlement procedures for any Fund are set out in the relevant Supplement. |
| **NET ASSET VALUE/VALUATION POINT** | The Net Asset Value of each Fund will be calculated as at each Valuation Point in the Base Currency for each Fund (unless the Valuation Point has, for any reason been postponed or suspended) as set out in the relevant Supplement. |
| **INVESTOR RESTRICTIONS** | The Shares may not be purchased or held by or for the account of US Persons (other than Qualified US Persons). |
| **CONVERSION BETWEEN FUNDS** | Where there is more than one class in any Fund established by the Company, Shareholders may convert specified minimum amounts of their holdings to the corresponding Share class of any other Fund of the Company in order to maximise the potential of different market conditions relating to different Funds. |

# THEMA INTERNATIONAL FUND PLC

## Introduction

The Company is organised under the laws of Ireland as an open-ended investment company with variable capital and having segregated liability between its Funds pursuant to the Companies Acts, 1963 to 2005.

The Company is qualified as a UCITS within the meaning of the UCITS Regulations and, pursuant to the UCITS Regulations, is authorised by the Financial Regulator.

The Company is structured as an umbrella fund in that different classes of Shares (one or more allocated to a separate Fund) may be issued from time to time by the Directors. On the introduction of any new Fund, which is subject to the consent of the Financial Regulator, documentation will be prepared setting out the relevant details of each such Fund. The Funds will (subject to the comments under the heading "Risk Factors" below) be separate from one another and will be invested in accordance with the investment objectives applicable to such Fund. There is currently only one sub-fund of the Company, the Thema Fund. Particulars relating to US$ Class and Euro Class of the Thema Fund are set out in the relevant Supplement.

The Company intends to enter into transactions for the purpose of hedging the currency exposure of any class which is denominated in a currency other than the Base Currency of the Fund. The extent to which the Company to hedge against such currency fluctuations shall not exceed 100% of the Net Asset Value of the relevant class so that a class will not be leveraged as a result of these transactions. All such transactions will be clearly attributable to a specific class and currency exposures of different class will not be combined or offset. The currency exposure of Investments will not be allocated to separate classes.

The share capital of each Fund shall at all times equal its Net Asset Value. The currency of designation of each class of Participating Shares will be determined by the Directors. Ownership will be evidenced by the entry on the Company's register of Shareholders, and completion notices will be sent to the Shareholder once the register has been written up. Share certificates will only be issued if specifically requested.

## Investment Objectives and Policies

General

The specific investment objectives and policies for each Fund will be formulated by the Directors at the time of the creation of the Fund and set out in the relevant Supplement.

The primary investment objective of the Company is to achieve long term capital appreciation while attempting to limit investment risk. The Company will seek to achieve this objective on behalf of each Fund through the careful selection of investment advisers, which are, in the opinion of the Investment Manager, of the highest quality with a proven track record. The choice of advisers will be based on their knowledge of the local market conditions, their investment methodology and their experience.

Any alteration to the investment objectives or any material alteration to the investment policies of any Fund will be subject to the prior approval on the basis of a majority of votes cast at a general meeting of Shareholders of the relevant Fund. The Company will give Shareholders reasonable prior written notice of any change in the investment objectives or material changes to the investment policies to enable shareholders to redeem their Shares prior to the implementation of such changes.

In accordance with the requirements of the Financial Regulator and the Irish Stock Exchange, the Investment Manager may appoint and replace investment advisers to a Fund from time to time. Shareholders will be notified of any change in the next annual/semi-annual report or other periodic documentation sent to Shareholders.

## Efficient Portfolio Management

The Company may, on behalf of each Fund and subject to the conditions and within the limits laid down by the Financial Regulator, employ techniques and instruments relating to transferable securities for efficient portfolio management purposes. Transactions for the purposes of efficient portfolio management may be undertaken with a view to achieving a reduction in risk, a reduction in costs or an increase in capital or income returns to a Fund and may not be speculative in nature. These techniques and instruments may include investments in financial derivative instruments such as futures (which may be used to manage interest rate risk), options (which may be used to achieve cost efficiencies, for example where the acquisition of the option is more cost effective than purchasing of the underlying asset), swaps and forward currency exchange contracts (both of which may be used to manage currency risk against the Base Currency and/or any functional currency of a Fund). Such techniques and instruments will be utilised in accordance with the requirements of the Financial Regulator. New techniques and instruments may be developed which may be suitable for use by the Company and the Company (subject as aforesaid) may employ such techniques and instruments. A Fund may enter into stock lending, repurchase and/or reverse repurchase agreements for the purposes of efficient portfolio management in accordance with the provisions of the Notices.

## Investment Restrictions

Investments may only be made in accordance with the UCITS Regulations. Details of the investment restrictions applicable to each Fund are contained in Appendix III.

If the investment limitations (other than those relating to borrowings) set out in the UCITS Regulations (specifically paragraphs 10 to 22 (inclusive) of the Financial Regulator UCITS Notice 9) are exceeded for reasons beyond the control of the Company or as a result of the exercise of subscription rights, the Directors must adopt as a priority objective the remedying of that situation taking due account of the interest of the Shareholders.

The Directors may, in relation to any Fund from time to time impose such further investment restrictions as may be compatible with or be in the interest of the Shareholders in order to comply with the laws and regulations of the countries where Shareholders of the Company are located or the Shares are marketed.

It is intended that the Company should, subject to compliance with any applicable restrictions which are imposed by the Irish Stock Exchange, have power to avail itself of any change in the investment restrictions laid down in the UCITS Regulations which would permit investment by the Company in securities, derivative instruments or in any other forms of investment which, as at the date of this Prospectus, is restricted or prohibited under the UCITS Regulations. The Company will give Shareholders at least four weeks prior written notice of its intention to avail itself of any such change which is material in nature. The Prospectus will be updated in any such event.

## Borrowing Restrictions

The Company may, at the discretion of the Directors, borrow up to 10% of the net assets of each Fund for temporary (non-leveraging) purposes and the Company may give a pledge (where the delivery of assets is not required) or charge over the assets of a Fund in order to secure such borrowings.

## Distribution Policy

The Directors are empowered to declare and pay dividends on any class of Shares in the Company. The dividend policy in respect of each Share class shall be set out in the relevant Supplement.

## Risk Factors

Potential investors should consider the following risk factors before investing in the Company. Additional risk factors, if any, for various Funds will be set out in the relevant Supplement.

## General

1. Prospective investors should be aware that the price of Shares and the income derived therefrom can, in common with other investments, go down as well as up. There is no assurance that the investment objective of a Fund will be actually achieved.

2. The Company is structured as an umbrella fund with segregated liability between its Funds. As a matter of Irish law, the assets of one Fund will not be available to meet the liabilities of another. However, the Company is a single legal entity that may operate or have assets held on its behalf or be subject to claims in other jurisdictions that may not necessarily recognise such segregation.

3. A listing on The Irish Stock Exchange will not necessarily provide liquidity to investors.

4. Given the difference in the Subscription and Redemption Prices (due to the initial charge), investment in the Company should be viewed as a medium to long term investment.

5. The Company may employ various investment techniques, such as futures contracts, options, swaps and financial currency exchange contracts (together "derivatives") for the purposes of efficient portfolio management of a Fund or for investment purposes (where such intention is disclosed in the Fund's investment policy). Such instruments involve certain special risks and may expose investors to a high risk of loss. The low initial margin deposits normally required to establish a position permit a high degree of leverage. As a result, a relatively small movement in the price of the underlying securities may result in a profit or a loss which is high in proportion to the amount of funds actually placed as initial margin and may result in a further loss exceeding any margin deposited. These derivative positions may be executed either on exchange or over the counter. Investment in derivatives involves exposure to normal market fluctuations and the other risks inherent in investment in securities. In addition, certain other risks arise; these include lack of liquidity or lack of correlation between the change in the value of the underlying asset and that of the value of the Company's derivatives. These techniques may not always be possible or effective in enhancing returns or mitigating risk. The Company's investment in over the counter derivatives is subject to the risk of counterparty default. In addition, the Company may have to transact with counterparties on standard terms, which it may not be able to negotiate. To the extent that the Company invests in derivatives, the Company may take a credit risk with regard to parties with whom it trades and may bear the risk of settlement default. The use of derivatives will also expose the Company to the risk that the legal documentation of the contract may not accurately reflect the intention of the parties.

## Exchange Control

Under current legislation in Ireland, there are no exchange control laws or regulations in effect which would affect either the Company or Shareholders.

## MANAGEMENT AND ADMINISTRATION

The Directors control the affairs of the Company and are responsible for the overall investment policy, which will be determined by them in accordance with UCITS Regulations, this Prospectus and the Articles.

### Directors

The Company shall be managed and its affairs supervised by the Directors whose details are set out below. The Directors are all non-executive directors of the Company.

*Alberto Benbassat.* Mr Benbassat is a general partner of Genevalor Benbassat & Cie since 1989. From 1983 until 1989, Mr Benbassat was portfolio manager and became vice-president of J. P. Morgan (Suisse) S.A. with responsibility for portfolios of mixed global investments with a value in excess of US$200 million, having been credit manager at Paribas (Suisse) S.A. from 1981 to 1983. Mr Benbassat holds a degree in industrial and economic sciences from the University of Geneva, together with an MBA with honours from the New York University.

*Stéphane Benbassat.* Mr Stéphane Benbassat joined Genevalor Benbassat & Cie in 1998 and has been a general partner since October 1999. From 1996 to 1998, Mr Benbassat was an attorney in the Legal and Banking Department of the law firm Lalive & Partners in Geneva. Prior to that Mr Benbassat worked as a foreign lawyer in the Business and Finance Department of the law firm Morgan, Lewis & Bockius LLP in New York. Mr Benbassat holds a law degree from the University of Geneva and a diploma in International Money Management from the Institut Supérieur de Formation Bancaire in Geneva. He also holds a Swiss Attorney's Licence.

*Mr Gerald J.P. Brady.* Mr Brady was Country Head of Bank of Bermuda in Ireland, from commencement of operations in 1995 until his departure in May, 2004, following the acquisition of the Bank by HSBC. Mr. Brady joined Bank of Bermuda in Bermuda in 1986 as Global Head of Internal Audit and subsequently served as Country Head of the Bank's Cayman operations from 1990 until his return to Dublin in 1995. Before joining Bank of Bermuda, Mr Brady served in several capacities for KPMG Dublin. He is a Fellow of the Institute of Chartered Accountants in Ireland (FCA), a Chartered Financial Analyst (CFA), a member of the Institute of Directors and holds a first class honours degree in Economics from Queens University in Belfast, having graduated first in his faculty. He also serves as director of a number of companies, several of which are listed on international stock exchanges.

*Daniel Morrissey.* Mr Morrissey is a partner in the law firm, William Fry, Dublin. He was educated at University College Dublin graduating with a Bachelor of Civil Law degree in 1976. He was subsequently awarded a Diploma in European Law by University College Dublin and qualified as a solicitor in 1977. He has been a partner in William Fry since 1981 specialising in corporate law initially with an emphasis on cross-border mergers/acquisitions and joint ventures and since 1992 he has been concentrating on financial services related activities. Mr Morrissey is a non-executive director of a number of Irish companies, a former chairman of the Dublin Funds Industry Association and a member of its Council from 2000 to 2006.

*David T. Smith.* David Smith was appointed a Partner of Equus Asset Management Partners, Hamilton, Bermuda in March, 2003. Equus specialises in wealth management services for high net worth individuals and eligible investors. Prior to that he was employed by Bank of Bermuda from 1982 – 2003, where he specialized in structuring and servicing of global investment funds. He was a member of the Bank's global senior management team and his final position was based in Hong Kong where he was responsible for global sales and distribution for the Global Funds Services Division. He is a chartered secretary "ACIS" and a member of Bermuda International Business Association "BIBA'.

## Investment Manager

The Company has appointed Bank Medici AG as its investment manager pursuant to the provisions of the Investment Management Agreement. The Investment Manager in accordance with the requirements of the Financial Regulator may appoint and will have the discretion to replace investment advisers to the different Funds from time to time and may delegate the investment decision making to such investment advisers provided such investments are made in accordance with the investment objectives and policies described in this Prospectus and the relevant Supplement.

The Investment Management Agreement contains indemnities in favour of the Investment Manager excluding matters arising by reason of its fraud, bad faith, wilful default or negligence in the performance of its duties and obligations and provisions regarding the Investment Manager's legal responsibilities.

The Investment Management Agreement provides that the appointment of the Investment Manager will continue in force unless and until terminated by either party giving to the other not less than six months written notice, although in certain circumstances (e.g. the insolvency of either party, unremedied breach after notice etc), the Agreement may be terminated without notice.

Bank Medici AG was incorporated in Austria on 9 March 1994 and was granted a full banking licence by the Austrian Financial Authority on 3 December 2003. The Investment Manager's institutional minority shareholder is Bank Austria Creditanstalt, Austria's largest bank and a member of the Unicredit Group.

## The Administrator, Registrar, Transfer Agent and Secretary

The Directors have appointed HSBC Securities Services (Ireland) Limited as Administrator of the Company. The Administrator will, subject to the overall supervision of the Directors, be responsible for the day to day administration of the Company including the issue and redemption of Shares, the payment of dividends and the valuation of the Company's assets. The Administrator was incorporated in Ireland as a limited liability company on 29 November 1991 and is an indirect wholly owned subsidiary of HSBC Holdings plc, a public limited company incorporated in England. As at 30 June 2006 HSBC Holdings plc has consolidated gross assets of approximately US$1,738 billion. The Administrator acts as the Secretary to the Company.

The Articles of Association and the Administration Agreement provide that, with the consent of the Company, the Administrator may delegate some or all of its duties to other parties.

The Administration Agreement contains indemnities in favour of the Administrator excluding matters arising by reason of its fraud, wilful default and negligence in the performance of its duties and obligations and provisions regarding the Administrator's legal responsibilities.

The Administration Agreement provides that the appointment of the Administrator will continue in force unless and until terminated by either party giving to the other not less than ninety days written notice, although in certain circumstances (e.g. the insolvency of either party, unremedied breach after notice etc.) the Agreement may be terminated without notice.

## Custodian

The Directors have appointed HSBC Institutional Trust Services (Ireland) Limited to act as Custodian for the Company pursuant to the Custodian Agreement, under which it will provide custodial and trustee services in respect of the assets of the Company.

The Custodian Agreement contains indemnities in favour of the Custodian excluding matters arising by reason of its fraud, wilful default and negligence in the performance of its duties and obligations and provisions regarding the Custodian's legal responsibilities.

The Custodian Agreement provides that the appointment of the Custodian will continue in force unless and until terminated by either party giving to the other not less than ninety days prior written notice. In certain circumstances (e.g. the insolvency of either party, unremedied breach after notice, etc), the Agreement may be terminated immediately by notice in writing by either party to the other provided, however, that the Custodian may not cease to act until such time as a new custodian has been appointed with the prior approval of the Financial Regulator. Pursuant to the Articles, all the Shares of the Company shall be redeemed if the Custodian has served notice of its intention to retire under the terms of the Custodian Agreement (and has not revoked such notice) and no new custodian has been formally approved and appointed within three months of the date of service of such notice.

The Custodian was incorporated in Ireland on 29 November 1991 as a limited liability company and its registered office is at HSBC House, Harcourt Centre, Dublin 2. The Custodian is ultimately an indirect subsidiary of HSBC Holdings plc. The Company has been approved by the Financial Regulator to act as Custodian for the Company.

The main activity of the Custodian is to act as custodian of the assets of collective investment schemes. Under the terms of the Custodian Agreement, the Custodian has full power to delegate the whole or part of its custodial functions provided that the Custodian's liability shall not be affected by the fact it has entrusted to a third party some or all of the assets in its safekeeping.

## Distributor

The Directors have appointed Thema Asset Management Limited, to act as global distributor for the Company pursuant to the Distribution Agreement, under which it will act as Distributor for the Shares of the Company.

Thema Asset Management Limited was incorporated in the British Virgin Islands on 8 February 1991 and is authorised and regulated in the conduct of its business by the Registrar of Mutual Funds in the British Virgin Islands. Thema Asset Management Limited has an issued share capital of US$50,000 and net shareholders funds as at 30 June 2000 of approximately US $307m.

The Distribution Agreement provides that the Distributor shall have full authority to delegate the whole or any part of its distribution functions to sub-distributors. The Distribution Agreement also provides that the appointment of the Distributor will continue in force unless or until terminated by either party giving to the other not less than 180 days notice, although in certain circumstances, (e.g. a serious breach, violation of regulatory obligations) the Distribution Agreement may be terminated immediately by notice in writing by either party to the other.

## Promoter

Genevalor, Benbassat & Cie currently acts as promoter of the Company. Genevalor, Benbassat & Cie is an international organisation, headquartered in Geneva specialising in investment in the United States, European and Japanese equity markets and fixed income securities, foreign exchange management and corporate administration. Genevalor, Benbassat & Cie is a Swiss incorporated limited partnership in which Mr Alberto Benbassat and Mr Stéphane Benbassat are general partners. Genevalor, Benbassat & Cie is a member of the Swiss Money Managers Association (Membre Association Suisse des Gerants De Fortune (ASG)) which is a self-regulatory body.

## Legal Advisers

The Company is advised as to matters of Irish law by William Fry, Solicitors, Fitzwilton House, Wilton Place, Dublin 2, Ireland.

## Auditors

The Company has appointed PricewaterhouseCoopers, Chartered Accountants of Georges Quay, Dublin 2, Ireland, as its auditors.

## Conflicts of Interest

The selection by the Investment Manager of any investment adviser and the determination of such investment adviser's remuneration will be as a result of arm's length negotiation and will be the best the Investment Manager is able to negotiate with the investment advisers, any rebates or refunds being applied for the exclusive benefit of the relevant Fund and its Shareholders.

Due to the widespread operations undertaken or which in the future may be undertaken by the Investment Manager, the Administrator, the Custodian, the Distributor and any investment adviser and their respective holding companies, subsidiaries and affiliates (each an "interested party") conflicts of interest may arise. The Investment Manager, the Administrator, the Custodian, the Distributor and any investment adviser may provide similar services to others, provided that the services they provide to the Company are not impaired thereby. Each will at all times have regard in such event to its obligations to act in the best interest of the Company, so far as practicable, having regard to its obligations to other clients, when undertaking any investments where conflicts of interest may arise and they will resolve such conflicts fairly having regard to all the circumstances. An interested party may acquire or dispose of any investment notwithstanding that the same or similar investments may be owned by or for the account of or otherwise connected with the Company. Furthermore, an interested party may acquire, hold or dispose of investments notwithstanding that such investments had been acquired or disposed of by or on behalf of the Company by virtue of a transaction effected by the Company in which the interested party was concerned provided that the acquisition or disposal by an interested party of such investments is effected on normal commercial terms as if negotiated on an arm's length basis and the investments held by the Company are acquired on the best terms reasonably obtainable having regard to the interests of the Company. An interested party may deal with the Company as principal or as agent, provided that any such dealings are carried out as if effected on normal commercial terms negotiated on an arm's length basis, *i.e.*, if:-

(a)     a certified valuation of a transaction by a person approved by the Custodian as independent and competent is obtained; or

(b)     the transaction is executed on best terms on an organised investment exchange in accordance with the rules of such exchange; or

(c)     the transaction is executed on terms which the Custodian is satisfied are normal commercial terms negotiated at arm's length or in a manner which the Custodian considers will give rise to such normal commercial terms.

In the event that a conflict of interest does arise, the Directors and the Investment Manager will endeavour to ensure that it is resolved fairly and that investment opportunities are allocated on a fair and equitable basis.

## Meetings

Shareholders in the Company will be entitled to attend and vote at general meetings of the Company. The Annual General Meeting of the Company will normally be held in Ireland within six months of the end of each financial year.

## Reporting

The Company's accounting period will end on 31 December in each year.

The Company will prepare an annual report and audited financial statements which will be available within four months of the end of the financial period to which they relate. Copies of the unaudited half yearly reports will also be available within two months of the end of the half year period to which they relate. Such reports and accounts will contain a statement of the value of the net assets of each Fund and of the investments comprised therein as at the year end or the end of such semi-annual period.

Copies of this Prospectus, Memorandum and Articles of Association, annual and half-yearly reports of the Company may be obtained free of charge upon request from the Administrator and the Distributor at the address given under the Directory.

## SUBSCRIPTIONS AND REDEMPTIONS

### Subscription for Shares

Under the Articles the Directors are given authority to effect the issue of Shares of any class and, in accordance with the requirements of the Financial Regulator, to create new classes of Shares and have absolute discretion to accept or reject in whole or in part any application for Shares. In the event of the Directors rejecting an application, the application monies (or relevant part thereof) will be returned where permitted by Irish anti-money laundering legislation, as soon as practicable after such rejection, by wire or in such other manner as the Directors may decide without interest and at his risk and expense. Shares shall be issued at the Net Asset Value per class per Share plus any subscription charges as specified in the relevant Supplement.

Failure to provide the original Application Form by such time as specified in the relevant Supplement may, at the discretion of the Directors, result in the cancellation of any allotment of Participating Shares in respect of such application. Under the Articles, the Directors are given authority to effect the issue of Participating Shares and have absolute discretion to accept or reject in whole or in part any application for Participating Shares without assigning any reason therefor. The Directors have power to impose such restrictions as they think necessary to ensure that no Participating Shares are acquired by any person which might result in the legal and beneficial ownership of Participating Shares by persons who are not Qualified Holders or expose the Company to adverse tax or regulatory consequences.

All new Participating Shares will rank pari passu with existing Participating Shares in the relevant Fund.

Subscription monies are payable in the relevant currency for a Fund at the time specified in the relevant Supplement. However, the Company may accept payment in such other currencies as the Company may agree and such currencies will be converted by the Administrator at the prevailing exchange rate available to the Administrator.

Contract notes will generally be sent to applicants within five Business Days of the Dealing Day, (provided that approved prices are available to the Administrator) setting out details of the Participating Shares which have been provisionally allotted.

Confirmation of ownership will be sent to all applicants upon payment of subscription monies in cleared funds and receipt of the original application together with any documentation required by the Administrator.

Share certificates will only be issued at the specific request of an applicant for Participating Shares in a Fund and will be sent at the Shareholder's risk by ordinary post to the address of the Shareholder or first named shareholder where there are joint Shareholders. The Administrator may charge an administrative fee of €50 to an applicant for each share certificate issued.

Details in relation to the Minimum Holding and minimum subscription amounts for each Fund is set out in the relevant Supplement for that Fund.

### Money Laundering

Applicants subscribing for Shares in the Company are advised that the Shares are issued subject to the provisions of the Company's Memorandum and Articles of Association, a summary of which are contained in the section headed "General Information".

Measures aimed towards prevention of money laundering within Ireland will require a subscriber to verify his identity, address and source of funds to the Company and to the Administrator. This

obligation is absolute in respect to source of funds except where the application is made through a recognised intermediary. This exception will only apply if the intermediary concerned is within a country recognised by Ireland as having equivalent anti-money laundering regulations to Ireland and has itself carried out the relevant identification and given the required assurance to the Company and to the Administrator.

The Administrator will notify applicants, as set out in the application form, what proof of identity is required. By way of example, an individual will be required to produce a copy of a passport or identification card duly certified by a notary public together with two original or certified copies of utility bills or bank statements. In the case of corporate applicants this will require production of certified copies of the certificate of incorporation (and any change of name) and of the memorandum and articles of association (or equivalent) and a copy of the authorised signatories list, and of the names and residential and business addresses of all directors and beneficial owners. Directors and substantial beneficial owners will also be required to verify their identity, address and date of birth.

The details given above are by way of example only and the Administrator will request such information and documentation as it considers is necessary to verify the identity of an applicant. In addition, pursuant to the Savings Directive (as defined under the heading "European Union Taxation of Savings Income Directive" below) the Administrator will require applicants who are individuals or "residual entities" (as that term is used in the Savings Directive) to provide documentary evidence of their tax residency including details of their tax identification number. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator may refuse to accept the application and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided. The redemption proceeds will not be paid to a third party account.

Each applicant for Shares acknowledges that the Administrator shall be held harmless against any loss arising as a result of failure to process his application for, or request for the redemption of, Shares if such information and documentation as has been properly requested by the Administrator has not been provided by the applicant.

The details given above are by way of example only, and the Administrator reserves the right to request such documentation as is necessary to verify the identity, address and source of funds of the applicant.

## European Union Taxation of Savings Income Directive

On 3 June 2003, the European Commission published a new directive (EC Directive 2003/48/EC) regarding the taxation of savings income (the "Savings Directive"). As a result, Members States are required to provide to the tax authorities of another EU member state details of payments of interest (which may include distributions by collective investment funds) or other similar income paid by a person within its jurisdiction to an individual resident in that other EU member state, subject to the right of certain EU member states to opt instead for a withholding system in relation to such payments. Ireland has opted for exchange of information rather than a withholding tax system.

Accordingly, the Custodian, Administrator or such other entity considered a "paying agent" for the purposes of the Savings Directive may be required to disclose details of payments of interest or other similar income to investors in the Company to the Irish Revenue Commissioners. In that regard, the Custodian, Administrator or such other entity considered a "paying agent" will require proof of identity, residence and relevant tax documentation from individual investors. Failure to provide the above information may result in the refusal of an application for a subscription or a request for a redemption.

## Redemption of Shares

Shareholders may, in accordance with the procedures set out in the relevant Supplement redeem their Shares on any Dealing Day. The Redemption Price will be denominated in the relevant base currency for the Fund and will be calculated by reference to the Net Asset Value per Share per class on the Dealing Day.

If total requests for redemption on any Dealing Day for any Fund exceed 10% of the total number of Shares in that Fund outstanding, each redemption request in respect of Shares in such Fund may, if in their sole discretion the Directors acting in good faith believe it shall be necessary or desirable in order not to prejudice the interests of the Shareholders not requesting redemption or on grounds of liquidity or other like reason, be reduced "pro rata." Any redemption request so reduced shall be effected in priority to subsequent redemption requests on the following Dealing Day, subject always to the foregoing provisions. If redemption requests are so carried forward, the Directors shall ensure that the Shareholders affected thereby are promptly informed.

## Total Redemption

All of the Shares of any Fund may be redeemed if:-

(a)     the holders of 75% in value of the issued Participating Shares of the Fund approve of the redemption at a meeting of the Fund of which not more than twelve and not less than four weeks notice has been given; or

(b)     On any Dealing Day falling after the first anniversary of the issue of Shares in any Fund, where the Net Asset Value of that Fund falls below the equivalent of €1,000,000 for a period of more than 90 days.

All of the Shares of the Company shall be redeemed and authorisation by the Financial Regulator will be revoked if the Custodian has served notice of its intention to retire under the terms of the Custodian Agreement (and has not revoked such notice) and no new custodian has been formally approved and appointed within three months of the date of service of such notice.

## Transfers

Shares are (save as hereinafter specified) freely transferable and may be transferred by instrument in writing in a form approved by the Directors provided always that the transferee completes an Application Form to the satisfaction of the Administrator and furnishes the Administrator with any documents required by the Administrator. In addition, the Directors may decline to register any transfer of a Share where they are aware or believe that such transfer would or might result in the beneficial ownership of such Share by a person who is not a Qualified Holder or expose the Company or the Shareholders as a whole to adverse tax or regulatory consequences or where the transfer would result in either the transferor or transferee holding Shares with a value of less than the Minimum Holding.

## Temporary Suspensions

The Company may temporarily suspend the determination of the Net Asset Value of any Fund and the issue and repurchase of Shares of any Fund:-

(a)     during the whole or any part of any period when any market on which a significant portion of the Investments of the relevant Fund from time to time are ordinarily quoted, listed, traded or dealt in is closed (other than for customary weekend or ordinary holidays) or during which dealings therein are restricted or suspended or trading is restricted;

(b) during the whole or any part of any period when, as a result of political, economic, military or monetary events or other circumstances outside the control, responsibility or power of the Directors during which, in the opinion of the Directors, any disposal or valuation of Investments of the relevant Fund is not reasonably practicable without being seriously detrimental to the interests of the owners of Shares in general or the owners of Shares of the relevant Fund;

(c) when for any reason, including a breakdown in the means of communication normally employed in determining the value of the Investments of the relevant Fund, such value cannot be properly and fairly ascertained; or

(d) during any period when the Company is unable to repatriate funds for the purposes of making redemption payments or when such payments cannot in the opinion of the Directors be effected at normal prices or rates of exchange, or during which any transfer of funds involved in the realisation or acquisition of investments or when payments due on redemption cannot, in the opinion of the Directors, be effected at normal rates of exchange or where the Directors envisage that there will be difficulties in the transfer of monies or assets required for subscriptions, redemptions or lending; or

(e) when the Company has issued a notice of general meeting to the Shareholders at which a resolution to wind up any Fund of the Company is to be considered, provided that such suspension shall be in the best interest of Shareholders.

The Company will immediately notify the Financial Regulator and The Irish Stock Exchange of any event of suspension set out above and, if in the opinion of the Directors any such suspension is likely to exceed fourteen days, notification of the suspension shall be published in the Financial Times (and, in Switzerland, Le Temps, and FOSC, and in Germany, Handelsblatt, and such other publications as the Directors shall determine from time to time) for the information of Shareholders.

## Conversion

Shareholders may convert between Funds to maximise the potential of different market conditions relating to the different Funds. This will be effected by way of conversion of the holding of Shares in one Fund to the Shares of another Fund. Shareholders will be able to apply to convert on any Dealing Day such minimum amount in value of their holding of Shares in any Fund (the "Original Fund") as may be specified by the Directors to Shares of another Fund which are being offered at that time (the "New Fund"). Such conversion may be effected by giving notice in proper form to the Administrator. The conversion will take place at the next Valuation Point following the receipt of such notice in proper form by the Administrator. The minimum amount (if any) in value of Shares which may be converted from the Funds will be such amount as may be set in relation to the Fund into which the Shareholder wishes to convert. The Articles permit the Company (or the Administrator on its behalf) to refuse to accept such application in any situation where the Company could refuse an application for Shares or a redemption request. If the application is refused, such refusal shall be without prejudice to the rights of the Shareholder to have his Shares redeemed. No exchanges will be made during any period when the rights of Shareholders to require the redemption of their Shares is suspended. The general provisions on procedures relating to subscription and redemption will apply equally to conversion.

The number of Shares in any New Fund to be issued on an exchange will be calculated in accordance with the following formula:-

$$A = B \times \frac{(C \times D)}{E}$$

where:

A =    the number of Shares of the New Fund to be allotted;

B =    the number of Shares of the Original Fund to be converted;

C =    the Net Asset Value per Share of the Original Fund as at the relevant Dealing Day;

D =    the currency conversion factor determined by the Administrator as representing the effective rate of exchange of settlement on the relevant Dealing day applicable to the transfer of assets between the relevant Funds where the base currencies of the relevant Funds are different or, where the base currencies of the relevant Funds are the same, D = 1; and

E =    the Net Asset Value per Share for the New Fund on the relevant Dealing Day plus the conversion charges details of which are set out below.

Where there is a conversion of Shares, Shares of the New Fund will be allotted and issued in respect of and in proportion to the Shares of the Original Fund in the proportion A to B.

The conversion charge shall not at any time exceed 0.5% of the Net Asset Value of the converted Shares.

## FEES AND EXPENSES

### General

All fees and expenses relating to the establishment of the Company, the listing of the Shares on The Irish Stock Exchange, the cost of printing this Prospectus and other promotional expenses and the fees of the legal advisers to the Company, have been borne by the Company.

The Company shall be responsible for all Value Added Tax payable on all fees and expenses payable by it to third parties.

The Company will pay out of the assets of each Fund:-

(a) the fees and expenses payable to the Administrator and the Custodian appointed in respect of such Fund;

(b) the fees and expenses payable to the Investment Manager and advisers appointed in respect of such Fund;

(c) the fees and expenses payable to the Directors;

(d) fees in respect of publication and circulation of details of the Net Asset Value;

(e) stamp duties, taxes, company secretarial fees, brokerage or other expenses incurred on transactions involving the acquiring and disposing of Investments;

(f) the fees and expenses of the auditors, tax and legal advisers and the fees connected with the listing on The Irish Stock Exchange;

(g) the Financial Regulator's industry funding levy;

(h) fees and expenses in connection with the distribution of Shares, translation of documents and/or costs of registration of the Company in jurisdictions outside Ireland;

(i) the fees of any paying agent;

(j) the costs of printing and distributing reports, accounts and any explanatory memoranda, publishing prices and any costs incurred as a result of periodic updates of the Prospectus will also be paid by the Company.

(k) Any other fees and expenses relating to the management (including managing the Company's currency hedging policy) and administration of the Company or attributable to the Company's investments.

Where an expense is not considered by the Directors to be attributable to any one Fund, the expense will normally be allocated to all Funds pro rata to the value of the net assets of the relevant Funds. In the case of any fees or expenses of a regular or recurring nature, such as audit fees, the Directors may calculate such fees and expenses on an estimated figure for yearly or other periods in advance and accrue the same in equal proportions over any such period.

### Custodian's Fees

The Custodian is entitled to such fees, at such rates and such terms as may be agreed with the Company and set out in the relevant Supplement. The Custodian is also entitled to such out-of-pocket expenses properly incurred by it in carrying out its duties.

### Administrator's Fees

The Administrator is entitled to such fees, at such rates and such terms as may be agreed with the Company and set out in the relevant Supplement. The Administrator is also entitled to such out-of-pocket expenses properly incurred by it in carrying out such duties.

### Investment Manager's Fees

Fees payable to the Investment Manager in respect of any Fund, shall be set out in the relevant Supplement for that Fund.

The various Funds may also incur advisory fees charged by the respective investment advisers or managed accounts in which they may invest which fees shall be charged by the Investment Manager to the relevant Fund. Such fees will be the best the Investment Manager is able to negotiate with the investment advisers, any rebates or refunds being applied for the exclusive benefit of the relevant Fund and its shareholders.

The Investment Manager is entitled to be reimbursed out of the assets of the relevant Fund for any fees and expenses paid to investment advisers to the Funds. The fees payable by the Investment Manager to any investment adviser shall be set out in the relevant supplement for a Fund.

If the Investment Manager acquires units of UCITS and other collective investment schemes that are managed directly or indirectly by the Investment Manager itself or a company with which it is linked by way of common management or control or by way of a direct or indirect stake of more than 10% of the capital or votes, no management fee may be charged to the Company's assets in respect of such investments. In addition, the Investment Manager may not charge to the Company any subscription or redemption commissions received from the relevant underlying collective investment scheme.

### Distributor's Fees

The Distributor is entitled to such fees, at such rates and such terms as may be agreed with the Company and set out in the relevant Supplement. The Distributor is also entitled to such out-of-pocket expenses properly incurred by it in carrying out such duties.

### Directors' Fees

The Directors shall be entitled to a fee and remuneration for their services at a rate to be determined from time to time by the Directors provided that such fee will not exceed the sum of €50,000 per annum per Director without the approval of the Board. All Directors will be entitled to reimbursement by the Company of expenses directly incurred in attendance at Board Meetings. Directors' fees and expenses will be charged to the Funds pro rata to their Net Asset Values.

### Initial Charge

The Articles authorise the Directors to impose an initial charge on the issue of Participating Shares in any Fund up to a maximum of 5% of the Subscription Price, such fee being payable by applicants to defray sales and marketing costs. The initial charge in respect of any Fund will be outlined in the relevant Supplement.

### Redemption Fee

The Articles authorise the Directors to charge a fee on the redemption of Participating Shares in any Fund up to a maximum of 1% of the Redemption Price, such fee being payable to the Company. The Directors will give one month's written notice to Shareholders of its intention to

charge redemption fees. Any redemption fee to be charged will be set out in the relevant Supplement.

### Conversion Charge

The Articles authorise the Directors to charge a fee on the conversion of Participating Shares in one Fund to Participating Shares in another Fund of up to 0.5% of the Net Asset Value of the Shares converted.

### Shareholder Servicing

The Company may appoint further agents to assist with Shareholder servicing, who may be paid at normal commercial rates out of the assets of the relevant Fund.

# TAXATION

## General

*The information given is not exhaustive and does not constitute legal or tax advice. Prospective investors should consult their own professional advisers as to the implications of their subscribing for, purchasing, holding, conversion or disposing of Shares under the laws of the jurisdictions in which they may be subject to tax.*

The following is a brief summary of certain aspects of Irish taxation law and practice relevant to the transactions contemplated in this Prospectus. It is based on the law and practice and official interpretation currently in effect, all of which are subject to change.

Dividends, interest and capital gains (if any) which the Company may receive with respect to its Investments (other than securities of Irish issuers) may be subject to taxes, including withholding taxes, in the countries in which the issuers of Investments are located. It is anticipated that the Company may not be able to benefit from reduced rates of withholding tax in double taxation agreements between Ireland and such countries. If this position changes in the future and the application of a lower rate results in a repayment to the Company, the Net Asset Value will not be re-stated and the benefit will be allocated to the existing Shareholders rateably at the time of the repayment.

## Irish Taxation

The Directors have been advised that on the basis that the Company is resident in Ireland for taxation purposes, the taxation position of the Company and the Shareholders is as set out below.

### Definitions

For the purposes of this section, the following definitions shall apply.

### "Irish Resident"

- in the case of an individual, means an individual who is resident in Ireland for tax purposes.
- in the case of a trust, means a trust that is resident in Ireland for tax purposes.
- in the case of a company, means a company that is resident in Ireland for tax purposes.

### Residence – Individual

An individual will be regarded as being resident in Ireland for a twelve month tax year if s/he:

- spends 183 days or more in Ireland in that twelve month tax year; or

- has a combined presence of 280 days in Ireland, taking into account the number of days spent in Ireland in that twelve month tax year together with the number of days spent in Ireland in the preceding twelve month tax year. Presence in a twelve month tax year by an individual of not more than 30 days in Ireland will not be reckoned for the purpose of applying the two year test. Presence in Ireland for a day means the personal presence of an individual at the end of the day (midnight).

Residence – Company

Irish tax legislation provides that a company incorporated in Ireland will be regarded for all tax purposes as being resident in Ireland. Irrespective of where a company is incorporated a company which has its central management and control in Ireland is resident in Ireland. A company which does not have its central management and control in Ireland but which is incorporated in Ireland is resident in Ireland except where:-

- the company or a related company carries on a trade in Ireland, and either the company is ultimately controlled by persons resident in EU member states or in countries with which Ireland has a double taxation treaty, or the company or a related company are quoted companies on a recognised Stock Exchange in the EU or in a taxation treaty country;

or

- the company is regarded as not resident in Ireland under a double taxation treaty between Ireland and another country.

It should be noted that the determination of a company's residence for tax purposes can be complex in certain cases and declarants are referred to the specific legislative provisions that are contained in Section 23A of the Taxes Act.

**"Irish Ordinary Resident"**

- in the case of an individual, means an individual who is ordinarily resident in Ireland for tax purposes.
- in the case of a trust, means a trust that is ordinarily resident in Ireland for tax purposes.

An individual who has been resident in Ireland for three consecutive tax years becomes ordinarily resident with effect from the commencement of the fourth tax year.

An individual who has been ordinarily resident in Ireland ceases to be ordinarily resident at the end of the third consecutive tax year in which s/he is not resident.

**"Exempted Irish Investor"**

means:

- a pension scheme which is an exempt approved scheme within the meaning of Section 774 of the Taxes Act or a retirement annuity contract or a trust scheme to which Section 784 or 785 of the Taxes Act applies;
- a company carrying on life business within the meaning of Section 706 of the Taxes Act;
- an investment undertaking within the meaning of Section 739(B)(1) of the Taxes Act;
- a special investment scheme within the meaning of Section 737 of the Taxes Act;
- a unit trust to which Section 731(5)(a) of the Taxes Act applies;
- a charity being a person referred to in Section 739D(6)(f)(i) of the Taxes Act;
- a qualifying management company within the meaning of Section 734(1) of the Taxes Act;
- a specified company within the meaning of Section 734(1) of the Taxes Act;
- a person who is entitled to exemption from income tax and capital gains tax under Section 784A(2) of the Taxes Act where the Shares held are assets of an approved retirement fund or an approved minimum retirement fund;
- a qualifying savings manager within the meaning of Section 848B of the Taxes Act in respect of Shares, which are assets of a special savings incentive account within the meaning of Section 848C of the Taxes Act;

- a person who is entitled to exemption from income tax and capital gains tax by virtue of Section 787I of the Taxes Act and the Shares are assets of a PRSA;
- a credit union within the meaning of Section 2 of the Credit Union Act, 1997;
- an Irish Resident company investing in a money market fund being a person referred to in Section 739D(6)(k)(I) of the Taxes Act; or
- any other Irish Resident or Irish Ordinary Resident who may be permitted to own Shares under taxation legislation or by written practice or concession of the Revenue Commissioners without giving rise to a charge to tax in the Company or jeopardising tax exemptions associated with the Company,

provided that they have completed the Relevant Declaration.

**"Intermediary"**

means a person who:-

- carries on a business which consists of, or includes, the receipt of payments from an investment undertaking on behalf of other persons; or

- holds shares in an investment undertaking on behalf of other persons.

**"Ireland"** means the "Republic of Ireland"/the State.

**"Relevant Declaration"**

means the declaration relevant to the Shareholder as set out in Schedule 2B of the Taxes Act. The Relevant Declaration for investors who are neither Irish Resident nor Irish Ordinary Resident (or Intermediaries acting for such investors) is set out in the application form accompanying this Prospectus.

**"Taxes Act"** The Taxes Consolidation Act, 1997 (of Ireland) as amended.

## The Company

The Company will be regarded as resident in Ireland for tax purposes if the central management and control of its business is exercised in Ireland and the Company is not regarded as resident elsewhere. It is the intention of the Directors that the business of the Company will be conducted in such a manner as to ensure that it is Irish Resident for tax purposes.

The Directors have been advised that the Company qualifies as an investment undertaking as defined in Section 739B of the Taxes Act. Under current Irish law and practice, on that basis, it is not chargeable to Irish tax on its income and gains.

However, tax can arise on the happening of a "chargeable event" in the Company. A chargeable event includes any distribution payments to Shareholders or any encashment, redemption, cancellation or transfer of Shares or appropriation or cancellation of Shares of a Shareholder by the Company for the purposes of meeting the amount of the tax payable on a gain arising on a transfer of an entitlement to a Share. It also includes the end of an eight year period following the acquisition of the shares regardless of whether the Shares have been encashed, redeemed, cancelled or transferred. No tax will arise on the Company in respect of chargeable events in respect of a Shareholder who is neither Irish Resident nor Irish Ordinary Resident at the time of the chargeable event provided that a Relevant Declaration is in place and the Company is not in possession of any information which would reasonably suggest that the information contained therein is not or, is no longer materially correct. In

the absence of a Relevant Declaration there is a presumption that the investor is Irish Resident or Irish Ordinary Resident. A chargeable event does not include:

- an exchange by a Shareholder, effected by way of an arm's length bargain of Shares in the Company for other Shares in the Company;

- any transactions (which might otherwise be a chargeable event) in relation to Shares held in a recognised clearing system as designated by order of the Irish Revenue Commissioners;

- a transfer by a Shareholder of the entitlement to a Share where the transfer is between spouses and former spouses, subject to certain conditions;

- an exchange of Shares arising on a qualifying amalgamation or reconstruction of the Company with another investment undertaking (within the meaning of Section 739H of the Taxes Act);

- any transaction in relation to, or in respect of, relevant Shares in an investment undertaking which transaction only arises by virtue of a change of court funds manager for that undertaking.

If the Company becomes liable to account for tax if a chargeable event occurs, the Company shall be entitled to deduct from the payment arising on a chargeable event an amount equal to the appropriate tax and/or where applicable, to appropriate or cancel such number of Shares held by the Shareholder or such beneficial owner as are required to meet the amount of tax. The relevant Shareholder shall indemnify and keep the Company indemnified against loss arising to the Company by reason of the Company becoming liable to account for tax on the happening of a chargeable event if no such deduction, appropriation or cancellation has been made.

Please see the "Shareholders" section below dealing with the tax consequences for the Company and the Shareholders of chargeable events in respect of: -

Shareholders who are neither Irish Resident nor Irish Ordinary Resident; and
Shareholders who are either Irish Resident or Irish Ordinary Resident.

Dividends received by the Company from investment in Irish equities may be subject to Irish dividend withholding tax at the standard rate of income tax (currently 20%). However, the Company can make a declaration to the payer that it is an investment undertaking within the meaning of Section 739B of the Taxes Act beneficially entitled to the dividends which will entitle the Company to receive such dividends without deduction of Irish dividend withholding tax.

## Shareholders

**(i)      Shareholders who are neither Irish Resident nor Irish Ordinary Resident**

The Company will not have to deduct tax on the occasion of a chargeable event in respect of a Shareholder if (a) the Shareholder is neither Irish Resident nor Irish Ordinary Resident, (b) the Shareholder has made a Relevant Declaration and (c) the Company is not in possession of any information which would reasonably suggest that the information contained therein is not, or is no longer materially correct. In the absence of a Relevant Declaration, tax will arise on the happening of a chargeable event in the Company regardless of the fact that a Shareholder is neither Irish Resident nor Irish Ordinary Resident. The appropriate tax that will be deducted is as described in paragraph (ii) below.

To the extent that a Shareholder is acting as an Intermediary on behalf of persons who are neither Irish Residents nor Irish Ordinary Residents, no tax will have to be deducted by the Company on the occasion of a chargeable event provided that the Intermediary has made a

Relevant Declaration that they are acting on behalf of such persons and the Company is not in possession of any information which would reasonably suggest that the information contained therein is not, or is no longer materially correct.

Shareholders who are neither Irish Residents nor Irish Ordinary Residents and who have made Relevant Declarations in respect of which the Company is not in possession of any information which would reasonably suggest that the information contained therein is not, or is no longer materially correct will not be liable to Irish tax in respect of income from their Shares and gains made on the disposal of their Shares. However, any corporate Shareholder which is not Irish Resident and which holds Shares directly or indirectly by or for a trading branch or agency in Ireland will be liable to Irish tax on income from the Shares or gains made on disposal of its Shares.

Where tax is withheld by the Company on the basis that no Relevant Declaration has been filed with the Company by the Shareholder, Irish legislation provides for a refund of tax only to companies within the charge to Irish corporation tax, to certain incapacitated persons and in certain other limited circumstances.

**(ii)    Shareholders who are Irish Resident or Irish Ordinary Resident**

Unless a Shareholder is an Exempted Irish Investor (as defined above), makes a Relevant Declaration to that effect and the Company is not in possession of any information which would reasonably suggest that the information contained therein is not, or is no longer materially correct, tax at the standard rate of income tax (currently 20%) will be required to be deducted by the Company from a distribution made annually or at more frequent intervals to a Shareholder who is Irish Resident or Irish Ordinary Resident. Similarly, tax at the standard rate plus 3% (i.e. currently 23%) will have to be deducted by the Company on any other distribution or gain arising to the Shareholder (other than an Exempted Irish Investor who has made a Relevant Declaration) on an encashment, redemption, cancellation or transfer of Shares by a Shareholder who is Irish Resident or Irish Ordinary Resident.

There are a number of Irish Residents and Irish Ordinary Residents who are exempted from the provisions of the above regime once Relevant Declarations are in place. These are Exempted Irish Investors. Additionally, where Shares are held by the Courts Service no tax is deducted by the Company on payments made to the Courts Service. The Courts Service will be required to operate tax on payments to it by the Company when they allocate those payments to the beneficial owners.

Irish Resident corporate Shareholders who receive distributions (where payments are made annually or at more frequent intervals) from which tax has been deducted will be treated as having received an annual payment chargeable to tax under Case IV of Schedule D of the Taxes Act from which tax at the standard rate has been deducted. In general, such Shareholders will not be subject to further Irish tax on any other payments received in respect of their shareholding from which tax has been deducted. An Irish Resident corporate Shareholder whose Shares are held in connection with a trade will be taxable on any income or gains as part of that trade with a set-off against corporation tax payable for any tax deducted by the Company. In general, non-corporate Shareholders who are Irish Resident or Irish Ordinary Resident will not be subject to further Irish tax on income from their Shares or gains made on disposal of the Shares where tax has been deducted by the Company on payments received. Where a currency gain is made by the Shareholder on the disposal of his/her Shares, such Shareholder may be liable to capital gains tax in the year of assessment in which the Shares are disposed of.

Any Shareholder who is Irish Resident or Irish Ordinary Resident and receives a distribution (where payments are made annually or at more frequent intervals) or receives a gain on an encashment, redemption, cancellation or transfer of Shares from which tax has not been deducted by the Company, may be liable to income tax or corporation tax on the amount of such distribution or gain. Any other Shareholder who is Irish Resident or Irish Ordinary Resident and receives any other distribution or a gain on an encashment, redemption, cancellation or transfer from which tax has not been deducted by the Company may be liable to income tax or corporation tax on the amount of the gain. Whether any further tax is payable by such non-corporate Shareholders will depend on whether their tax returns are correctly filed before the specified return date.

## Stamp Duty

Generally, no stamp duty is payable in Ireland on the issue, transfer, repurchase or redemption of Shares in the Company. Where any subscription for or redemption of Shares is satisfied by the in specie transfer of Irish securities or other Irish property, Irish stamp duty may arise on the transfer of such securities or property.

No Irish stamp duty will be payable by the Company on the conveyance or transfer of stock or marketable securities provided that the stock or marketable securities in question have not been issued by a company registered in Ireland and provided that the conveyance or transfer does not relate to any immovable property situated in Ireland or any right over or interest in such property or to any stocks or marketable securities of a company (other than a company which is an investment undertaking within the meaning of Section 739B of the Taxes Act) which is registered in Ireland.

## Capital Acquisitions Tax

The disposal of Shares will not be subject to Irish gift or inheritance tax (Capital Acquisitions Tax), provided that the Company falls within the definition of an investment undertaking (within the meaning of Section 739B of the Taxes Act) and that: (a) at the date of the gift or inheritance, the donee or successor is neither domiciled nor ordinarily resident in Ireland; (b) at the date of the disposition, either the Shareholder disposing of the Shares is neither domiciled nor ordinarily resident in Ireland or the disposition is not subject to Irish law; and (c) the Shares are comprised in the gift or inheritance at the date of such gift or inheritance and at the valuation date.

## STATUTORY AND GENERAL INFORMATION

1.  Incorporation, Registered Office and Share Capital.

    (a)  The Company was incorporated in Ireland on 9 May, 1996 as an investment company with variable capital with limited liability and having segregated liability between its Funds under registration number 248741, under the name of "Thema International Fund plc".

    (b)  The registered office of the Company is presently at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland.

    (c)  On incorporation the authorised share capital of the Company was US $60,000 divided into 60,000 Subscriber Shares of a par value of US $1.00 each and 500,000,000,000 shares of no par value. The number of shares in issue shall not be less than the number which is currently required by law (currently two) nor more than 60,000 Subscriber Shares of a par value of US$1.00 each and 500,000,000,000 shares of no par value.

    (d)  No capital of the Company is proposed to be issued or is under option or agreed conditionally or unconditionally to be put under option.

    (e)  Neither the Subscriber Shares nor the unclassified shares carry pre-emption rights.

2.  Share Rights

    Save as set out in this Prospectus all Shares shall rank pari passu.

    **Subscriber Shares**

    The holders of the Subscriber Shares shall:-

    (a)  on a poll be entitled to one vote per Subscriber Share;

    (b)  not be entitled to any dividends whatsoever in respect of their holding of Subscriber Shares;

    (c)  in the event of a winding up or dissolution of the Company, be entitled, (after payment to the holders of the Participating Shares of a sum equal to the Net Asset Value of the Participating Shares as at the date of commencement to wind up), to payment in respect of the nominal amount paid up thereon out of the assets of the Company, but shall not be entitled to any further or other amount.

    (d)  Participating Shares

        The holders of Participating Shares shall:-

        (a)  on a poll be entitled to one vote per Participating Share;

        (b)  be entitled to such dividends as the Directors may from time to time declare;

        (c)  in the event of a winding up or dissolution of the Company, be entitled, in priority to the holders of the Subscriber Shares, firstly to an amount equal to the Net Asset Value of the Participating Shares of each class or series held at the date of winding up and, after payment to the holders of the Subscriber