**<u>Exhibit 5</u>**





# Managing Risk across Global Markets: Changing Perceptions and Priorities

As the first line of risk management between their organisations and the global markets in which these are active, network managers play a primary role in identifying potential risks to clients' assets and ensuring that these risks are minimised. *FSR* asked five heads of global network management to reflect on how they are adapting their risk management procedures in response to shifts in cross-border investment patterns and changes to the structural environment, at global and market level, in which they operate



Andrew Rand, Global Head of Network Management,

# Brown Brothers Harriman



Andrew Rand

Brown Brothers Harriman (BBH) has seen strong pick up in the non-US investment flows passing through its global network over the last 12 months. This has translated into concrete growth in asset flows into a number of markets that have been dormant for some time, or in which BBH has not previously supported client investment. This has included requests for Bosnia, Serbia, Kuwait, United Arab Emirates, Uganda, Georgia, Armenia and Belarus.

Specifically, annualised cross-border investment flows channelled through BBH's global network (ex-US) have grown by more than 30-35 per cent during 2006 and increased by a similar amount during 2005. The greatest growth can be found in emerging and pre-emerging markets, where 100-200 per cent growth has been seen. Investment into Asia is particularly strong and remains the fastest growing region.

To support this investment growth, BBH has expanded both the headcount within its network management team and the resources committed to information gathering and market reporting. As its standard, BBH aims to be the 'go-to' global custodian for institutional clients wishing to appoint a partner organisation to support their cross-border investment activity.

Key to meeting this goal is the ability to deliver high quality market information and early warning of potential risk events. We regularly take calls from clients that are not our direct customers who seek information on market developments or other specific areas of concern. Although we would inevitably prefer that they

were our direct clients, it provides an endorsement of the quality of our information flows and technical knowledge that investors approach us to seek clarification or a second opinion, even when they do not directly employ BBH as their global custodian.

## Early Warning of Risk Events

In meeting our commitment to delivering accurate early warning of risk events, we keep the AWACS plane circling on a round-the-clock basis over markets in which we support client assets. The bank embraces a structured approach to risk management that has been refined and road tested over many years. This multi-level risk framework is characteristic of the risk-averse worldview that typically prevails across BBH as an organisation and that is in keeping with the bank's partnership structure.

Looking more closely at this risk management framework, BBH maintains a team of market analysts within its network group that bears responsibility for compiling the bank's global risk information products. These provide detailed review of developments within local market infrastructure, legal and regulatory issues, and operational and risk management performance within the bank's community of appointed sub-custodians.

To reinforce this process, Brown Brothers Harriman's network management team has established an extensive folio of global risk information documents. This includes a comprehensive Market Practice Report for each market in the network and a central depository handbook that consoli-



dates in one place much of the research activity that the bank has conducted to support Reg 17f-7 reporting requirements. BBH also offers online *Life of a Trade® Charts*, which enable clients to track the lifecycle of a trade downstream from the point of execution through to settlement and to monitor key risk elements encountered at each stage in the operational cycle.

To optimise the protection afforded by this research, BBH maintains close dialogue between its market analysts and its sub-custodians to ensure that any potential threat to clients' assets are clearly identified and mitigated at an early stage. We like to be confident that our sub-custodians perceive areas of potential risk from the same standpoint as we do and that they are proactive in taking appropriate precautions to minimise this risk on behalf of Brown Brothers Harriman and its clients.

At the bank level, BBH maintains an international risk and credit group, located in New York, that is responsible for monitoring the sovereign rating of the markets in which it holds clients' assets and the credit rating of banks that it employs as agents within these markets. Through this structure, BBH maintains a clear and detailed picture of the macroeconomic conditions prevailing across its global network of markets. This also provides a financial health check on its sub-custodians, based on the quarterly financial results for each bank within its sub-custodian community.

To provide a consolidated view across these multiple tiers of risk management, BBH maintains a risk management committee that has created a risk profiling system designed to identify, classify, prioritise and mitigate the diverse areas of risk encountered by different business lines within the company. Meeting every Tuesday, this committee is attended by each of the bank's senior partners, the Chief Risk Officer, legal and compliance, and representatives from the network management team.

## Simplifying entry to new locations

A priority for the network group is to maximise the speed of registration and account opening when clients seek to invest in a new market. Given the exacting documentation requirements demanded by financial regulators in some emerging markets, it is important that our clients'

experience remains positive throughout the account opening process – and to avoid situations, where, after months of trying to open an account, the customer becomes exhausted by the process and decides against doing so. This represents a worst-case scenario for us. It provides a disincentive to investors with an interest in emerging markets.

With this in mind, we are doing more work than ever before with local regulators and infrastructure providers to streamline operational procedures and to reinforce standards of risk protection. Key to this process is our desire to help regulators and market infrastructure providers better understand the needs of our clients and the constraints that these clients face when investing in an overseas market.

## Planning ahead

Looking forwards, Brown Brothers Harriman's network group is currently in growth mode. Our development plan for the next 12 months is to expand the number of markets that we offer to clients. We are currently supporting approximately 95 markets within our network and have investment activity in approximately 70-75 of these locations – so we are roughly 20-25 markets ahead of our investor clients at the present time. Our priority is to have established structures in place such that we never represent a drag on the pace that our clients, and prospect clients, can initiate activity in new jurisdictions and instrument types.

In meeting this commitment, we are constrained in some locations by the lack of an established sub-custodian that meets BBH's exacting selection criteria in terms of service delivery standards and credit rating. We have had recent requests from clients to support investment activity in several Central Asian markets, including Georgia and Armenia, for example.

More generally, we continue to monitor regulatory changes and risk events at global and market level to identify possible implications for our customers. At the top of our watch list currently are possible implications emerging from stock exchange consolidation in Western Europe, including transatlantic mergers; the progress of Euroclear's single settlement engine and single platform projects; and the potential impact of Target2-Securities and what this would mean for the future of Europe's clearing and settlement infrastructure.



**Brian Pettitt,** Head of HSS Network Management,
**Mick Underwood,** Head of Custody Network Management,

# HSBC Securities Services (HSS) EMEA




Brian Pettitt          Mick Underwood

HSS EMEA's network management group has been working over an 18-month period to develop a Basel II operational risk assessment framework to supplement its sub-custodian appointment process. "Rather than ignoring Basel II or hoping that it would not happen, HSS EMEA took the decision that we should embrace this regulatory requirement and build it as fully as possible into our day-to-day procedures," says Brian Pettitt, Head of HSS Network Management at HSS EMEA. "Although there has been a defensive response to Basel II in some parts of the securities industry, we viewed this regulatory initiative as an opportunity to deepen our understanding of the risks that we face across our global network and to reinforce the structures we have in place for quantifying and managing these risks."

Since launching this project in May 2005, HSS EMEA's network group has substantially redesigned the evaluation proforma that it employs for measuring how effectively its sub-custodians identify, and offer protection against, operational risk. This evaluation framework embraces the agents' procedures and controls, staff expertise, technology and resource allocation. From this questionnaire-driven assessment, the network group then works closely with HSS's Credit and Risk Management teams to evaluate the responses and to build up a risk rating for each sub-custodian. "From the end of December 2006, we will have a risk rating in place for each of our agents and this will help us optimise the risk/reward equation," says Mick Underwood, Head of Custody Network Management at HSS EMEA, who

co-ordinated development of the Basel II Operational Risk assessment framework.

Having piloted the process, Brian Pettitt is candid about the fact that the depth and quality of information that some agents have delivered to the Basel II Operational Risk questionnaire will need to rise in some cases. "Although agents may have robust risk mitigation procedures in place, some have not been as full and thorough as we might expect in detailing this information in their responses," he explains. "This may force us to give them a higher operational risk rating – which could have an impact in our selection process and on pricing considerations. Given that this is likely to result in higher overall cost for HSS EMEA, we are going to considerable lengths to make sub-custodians aware of their responsibilities under this risk reporting framework."

To support this process, Christine Coe, Chief Credit Officer at HSS, works with the HSBC Group's regulatory reporting team to ensure that the group's methodology is in keeping with regulatory guidelines for collecting risk data, computing operational risk assessments, and, where appropriate, reporting to the financial authorities.

## Evolving role of network management within the parent organisation

As the HSBC Group has acquired new business entities, and streamlined the correspondent networks that these employ for managing activities across their global markets, the network manage-

ment group has been called upon to embrace a range of new business lines under its umbrella, including investment banking, commodities and alternative fund services.

Since the HSBC Group's acquisition of the Bank of Bermuda was completed in February 2004, HSS EMEA's network management group has encountered the new challenge of conducting risk assessments on prime brokers whose hedge fund clients use HSS's Alternative Fund Services as their hedge fund administrator. "Given that the prime broker is typically appointed by the hedge fund, many prime brokers struggle to understand why they should be subject to due diligence by a global custodian," notes Mick Underwood. "However, in practice the prime broker acts a sub-custodian to the hedge fund client's assets. Thus, they fall under the CASS rules of the FSA

hedge fund is launched in Ireland, it is a legal requirement that the custodian, following a satisfactory due diligence, confirms to the Irish Regulator that the fund's prime broker is suitably qualified to serve as a sub-custodian for the client's assets. Without this the Irish Regulator will not provide their approval to allow new funds to launch or existing funds to continue operating as an Irish-regulated fund.

As the HSBC Group has expanded its private banking functions, HSS EMEA's network management has also been working to integrate the requirements of its private banking business units into its sub-custodian selection process. Within the Private Banking arm, the organisation has absorbed its array of traditional Private Banking divisions, including the Bank of Bermuda Private Bank, Republic Bank, Guyerzeller and

> Rather than ignoring Basel II or hoping that it would not happen, HSS EMEA took the decision that we should embrace this regulatory requirement and build it as fully as possible into our day-to-day procedures.

and, consequently, we are required to conduct risk assessment on the prime broker to ensure clients' assets are fully protected."

In Ireland, these fiduciary duties have been codified under Irish regulations. Firstly, the Irish Regulator insists that the prime broker must also be sub-custodian of the assets. The Irish Regulator has specified that the fund must appoint a custodian/trustee to handle the assets that are maintained with the prime broker as sub-custodian. Thus, we are the owner of the assets and the investor would have recourse to HSS EMEA rather than the prime broker directly, explains Brian Pettitt. "Given this responsibility, it is absolutely vital that we work with the prime broker as an agent of ours, even though we may be restricted in our direct power to appoint or replace them, given their additional investment responsibilities for the client."

Moreover, under these provisions, when a new

Trinkaus und Burkardt, along with a number of other smaller acquisitions. To ensure the diverse requirements of these entities are incorporated into the buying criteria, HSS EMEA's network group has worked closely with Private Banking teams, thereby ensuring that customer needs and regulatory requirements are met at local level, while minimising duplication of function across the organisation. Moving forward, HSS EMEA aims to bring in certain parts of the Private Bank business into its 'Hub and Spoke' model, but only where this adds value to the Private Bank and its customers and where it makes commercial sense to do so.

## Market developments

Drilling down within the network, HSS EMEA has seen significant increase in assets under custody in its Middle East locations – driven particularly by a number of active Middle East-based clients that are interested to invest within the region. To support this upturn in demand, the network



management group has appointed a new network manager to cover this set of markets.

A number of African states are attracting growing interest from customers. HSS EMEA has recently launched Requests For Proposals (RFPs) in Namibia and Uganda and is in the process of appointing sub-custodians to support these markets. It has seen customer interest in the Côte d'Ivoire, which serves as gateway for Senegal, Togo, Dahomey, Niger, Burkina Faso and Mali – stocks from these six countries can all be traded on the Ivorian exchange. Mozambique and Tanzania have also attracted some client interest.

Nigeria is currently undergoing an unprecedented level of structural reorganisation and seems destined to attract rising investment flows during the next 12-24 months. The Central Bank of Nigeria has installed new capital requirements, requiring that each bank active in the Nigerian market meets a US$ 185 million minimum capital threshold. This has driven consolidation in the banking sector: the number of active banks has contracted from more than 180 down to approximately 25. The creation of these banking organisations has increased the level and quality of stock available on the local stock exchange and this has provided an effective stimulus to growth in investment activity.

Although in its infancy, the Nigerian pension funds industry is starting to take shape. The State regulator has established registered categories of pension fund advisors and pension fund custodians to support this expansion. Delegates from several larger Nigerian pension funds have made visits to London during the fourth quarter 2006 to draw on the best practice and expertise held within established UK pension funds and investor services companies.

Looking beyond Africa, HSS EMEA has experienced client interest in Azerbaijan, Georgia, Iran, Krygystan, Uzbekistan and Syria – but has struggled in these frontier markets to identify agent banks that offer a credit rating and service quality suitable to service client assets in the local market.

In the Chinese A-share market, HSS is still waiting for the introduction of Delivery versus Payment (DvP) for Qualified Foreign Institutional Investors (QFIIs). Currently, there is almost a one-day lag between exchange of securities and exchange of cash. The introduction of DvP facilities has been postponed from its planned launch in 2006 to first quarter 2007 in order to support simultaneous roll out in Shanghai and Shenzhen.

To provide HSS EMEA clients with comprehensive and timely risk information across its global markets, the network management group produces a network risk profile for customers in each market in which they are active via HSBC.net, the HSBC Group's proprietary web-interface for market information.

HSS EMEA continues to expand its involvement in industry groups. It became a member of the Association of Global Custodians (AGC) during 2005 and, among other things, is actively involved in the AGC's Depository Information Gathering Process (DIGP). To supplement the market risk information extended to customers, HSS EMEA has subscribed to Thomas Murray's depository risk assessment service.

In addition to HSS EMEA's network involvement with the above, they are an active participant in a wide range of industry working groups and consultation committees. Henry Raschen, Head of UK Market Strategy, plays an active role in ISITC (Institutional Trade Communication) and ISSA (International Securities Services Association) Working Groups to reduce operational and credit risk in mutual funds settlement and asset servicing. Henry is also a representative in the Omgeo and Reference Data User Group initiatives and in the Shareholder Voting Working Group, the G30 Monitoring Committee, and in the British Banking Association Recovery Planning Committee.

Stephenie Brock, IFS' Technical & Business Solutions Manager for Corporate Actions (CA), is involved in industry bodies designed to mitigate operational risk in corporate actions, including the European Banking Federation Corporate Actions Task Force, the UK Securities Market Practice Group, and CA Forum, an informal group that addresses corporate action risk threats to the custodian community.

*HSBC Securities Services (HSS) is a division within Global Transaction Banking, part of the HSBC Group. HSS EMEA is a geographic definition within HSS. Institutional Fund Services (IFS) is one of four product areas within HSS.*



Bob Gallagher, Senior Director of Global Network Management,

# Investors Bank & Trust



**Bob Gallagher**

Bob Gallagher highlights two key developments that his team has introduced to its strategy for monitoring and mitigating risk across its network of global markets. First, it has progressively reinforced the analysis that it conducts on counterparties that it interacts with in the local markets. Second, it has dedicated time to better understanding, and protecting against, risks associated with corporate actions – particularly in emerging markets, where legal structures surrounding corporate events may be in nascent form and where there may be only a short history of handling corporate actions activity within those markets. Given that legal precedent may be weakly established within these markets, clients are relying more and more on Investors Bank as their global custodian, and the expertise supplied by their local agents, to help them negotiate this challenge.

Pressed on what are the principal landmarks that have prompted this increasing depth of focus, Gallagher identifies several factors. A first is inevitably the introduction of Regulation 17f-7 in the US in 2001. This prompted US-based custodians to provide detailed risk assessment on depositories in which they hold client assets.

The group's strategy has also been refined and stress tested in the wake of risk events that it has witnessed over a 10-15 year period. Trading anomalies associated with Barings Bank in Singapore in 1994 – and market instabilities that accompanied the onset of financial crisis in the Asia-Pacific from 1997 and in Russia from 1998 provide obvious examples. When a number of Japanese and Korean banks were teetering on the edge of bankruptcy in the aftermath of the Asian financial crisis, this provided clear evidence of the value of conducting

rigorous credit risk assessments on the banks that we use as agents.

Testament to the progress that that industry has made in immunising threat to client assets during market shocks of this sort is apparent from experience during the Argentine financial crisis of 2000-2. Although the country experienced severe financial and political instability, and the market value of securities fell dramatically, all securities investments held on behalf of clients by Investors Bank in the market remained fully protected. There were no tangible losses between the global custodians, their sub-custodians and the CSD holding those assets. Indeed, even though banks were closed, free of payment transactions were still taking place. This points to the success of the business continuity planning arrangements that had been set in place by the regulatory authorities and local banking community, in consultation with foreign intermediaries, in the Argentine market.

In the corporate actions arena, Investors Bank continues to work with market regulators and infrastructure providers to ensure that market practice is consistent with international standards. As such, Investors Bank can demonstrate a long history of instances where regulators have adopted our recommendations. One such example occurred in Greece, where lobbying efforts led directly to the introduction of the concept of 'de-omnibusing'. This allowed investors to break out shares held in an omnibus account and to complete a free of payment transfer without paying the extremely high registration costs.

## Reinforcing Investors Bank's Risk Management framework

In situating the position of the network management team in the broader risk management structure of the organisation, we are finding that the risk group at Investors Bank & Trust is now pushing itself more proactively into what we do in network management and now has more oversight over our activities than was the case previously. This combination of expertise has been invaluable in reinforcing the structures that we have in place across our global markets, enabling the professional risk group to dovetail their detailed understanding of risk measurement methodology with the specialist skills that we have as business experts in managing



cross-border investments on behalf of Investors Bank's clients. This combined expertise has been invaluable, for example, in helping us to analyse the implications of the Markets in Financial Instruments Directive (MiFID) for our clients and their counterparties. We have also dedicated time to evaluating the business implications of Basel II, the recommendations of the Bank Secrecy Advisory Group and a range of other initiatives launched from regulatory bodies or industry committees that may impact our global network.

In Europe, we are monitoring closely the progress of stock exchange consolidation – and potential implications that this may hold for regulatory reporting requirements and, more broadly, for the future development of Europe's post-trade infrastructure. It is still unclear which path this harmonisation process will follow – and the announcement of the Target2-Securities project by the European Central Bank in July 2006 has introduced a sizeable body of new questions and potential ramifications. We anticipate that a minimum of four possible scenarios may develop. It is possible that Euroclear will capitalise on the launch of its single settlement engine and single platform to become the dominant settlement location in Europe. Alternatively, Target2-Securities may become the primary structure for euro settlement. A third option is that Europe's clearing, settlement and asset servicing space will be harmonised with global custodians and investment banks continuing to use Europe's community of sub-custodians to link to the infrastructure. A fourth scenario is that Europe may harmonise according to an entirely different model to the above – and perhaps one where the future development trajectory is not yet obvious.

On balance, Investors Bank & Trust remains agnostic regarding which model ultimately prevails. However, we are ensuring a state of readiness such that, when a transition does begin, we are best placed to help our clients link to the infrastructure. It is possible that this transition may not commence for several years, but, when this does progress, we anticipate that it may move forward relatively quickly. We must ensure that we have worked carefully through the implications of each of these possible models in advance, such that, whether we like the model or not, we can adapt quickly to the challenges it presents and extract maximum efficiency from the new structure on behalf of our clients.

## Changing patterns of investment flow

In reflecting on shifts in the reach and composition

of business activity that Investors Bank & Trust supports on behalf of its clients, we have noted a significant upturn in investor flows through frontier markets within Investors Bank's network.

The Middle East and African regions have been receiving renewed attention, with Kuwait, Lebanon and Nigeria providing examples of this trend. We have opened Kuwait within the last few months to support client interest. We added Lebanon to our network of global markets approximately three years ago, but only now are we starting to see a genuine pick up in client activity. We supported Nigeria within our network for a number of years, but subsequently let this lapse owing to the limited client investment flows into this market. We have now reopened Nigeria and we are also in the process of appointing an agent in Uganda.

When appointing any agent, our process is to apply the 17f-5 standard, regardless of whether our clients may fall under the US regulatory umbrella. We have noted recent interest in Georgia, Albania, Macedonia and a number of other 'pre-emerging' markets, where our principal challenge is to identify an agent that will fulfil our selection criteria. At present, no suitably qualified candidate is available to serve as our sub-custodian in any of these three markets.

At the time of writing, Investors Bank & Trust has over 90 markets in its network and has client investment in approximately 70. We therefore have a 20 market lead on our clients – and this is by design. We hope that the day never arrives when a client wishes to invest in a market and is unable to do so because my team has not yet done the preparatory work necessary to support this location within our network.

With this factor in mind, we maintain a close dialogue with our clients regarding where they expect to be with their investment strategies in 2-3 years' time. We recognise that there is a cost to opening a market in which there is limited client activity – but often it is better to have monitored the market for several years before the client invests. This time lag offers opportunity to become familiar with market practice, to develop a working relationship with regulatory authorities and infrastructure providers, and to fine-tune one's working relationship with the agent. Although we prefer our client investment flows to build up relatively quickly after we open any new market, we recognise the value of having any new market open comfortably in advance of any major surge in cross-border investment.



Andrew Osborne, Head of Worldwide Network Management,

# Northern Trust



Andrew Osborne

The fundamental vision driving risk management strategy within Northern Trust's Worldwide Network Management group has changed little over the last 10 years. Network management remains a risk-driven function and changes to network strategy have involved fine tuning structures that Northern Trust has had in place for more than 10 years.

The bank's current arrangements were established as a result of a comprehensive review of its global network management arrangements that was conducted in 1996, resulting in the consolidation of its practices under one strategic manager. Supervisory structures were also refined and all network activities were, and still are, reviewed and validated by a Sub-custodian Oversight Committee. Subsequent to the review, the London-office became the nerve centre for the bank's network activities and decision-making was centralised through this location under Osborne's leadership.

The Sub-custodian Oversight Committee sits within the bank's Risk Management chain and ultimately reports to the Chief Risk Officer. "All that we do in network management is overseen by this Sub-custodian Oversight Committee," explains Osborne. "This is key to ensure that network strategy is aligned with the bank's risk parameters and that the implications of this strategy are evaluated across all areas of the organisation. The role of this Oversight Committee is not to provide a rubber stamp to Network Management's recommendations. Rather, it serves as check and balance on our decision making, forcing the management group to justify the thinking that has

shaped our decisions and the risk analysis that we have conducted to support this. A record of proceedings is maintained for all these meetings to ensure total transparency, enabling us to demonstrate that we are, at all times, meeting our fiduciary obligations."

The take-home message, notes Osborne, is that Northern Trust has a management structure and oversight committee structure in place that has functioned well for more than a decade. Building on these foundations, subsequent reform has been incremental and designed largely to keep pace with the growing complexity of investment instruments and the wider geographical distribution of clients' investment flows during the subsequent period.

## Network expansion

The bullish outlook for international equities motivated global custodians to extend their market coverage significantly during the second half of the 1990s. However, this expansion has slowed to a standstill over the last three years. In light of this trend, Osborne underlines the point that Northern Trust has never closed markets within its network owing simply to fluctuations in the business cycle. "We have never taken a decision to shrink our network in response to a decline in customer interest in a market," he says. "The decision to take a market out of our network has always been driven by the three fundamental selection criteria that we employ for appointing our sub-custodians, namely credit quality, service capability and value for money. If a sub-custodian does not satisfy these pre-requisites, then we do not have freedom to retain them in our network. In several instances during the last three years we have been forced to close a market, either because a bank with suitable credit rating has ceased to provide sub-custody services, a bank's credit quality has declined to unacceptable levels, or a parent bank has withdrawn its credit backing from a subsidiary that we employed as agent."

While there may be prestige attached to maintaining a network of 120 markets, there is also significant cost attached to managing a network of this size. "With this in mind, we plan our extension activities carefully," notes Osborne. A central



focus for Northern Trust in the last four years, for example, has been to support its customers' expanding investment activities in the Chinese market. This has presented exciting opportunities for Northern Trust to work with banking organisations in China that have excellent technical skills and business prowess, but still have limited exposure to working in international securities markets. By sharing its longstanding expertise in this area, Northern Trust has made an effective contribution to establishing a market infrastructure that is in keeping with global standards and fits with the best interests of the foreign and domestic investor. In expediting this process, Northern Trust has entered into a successful strategic partnership arrangement with the Bank of Communication and this is helping Northern Trust to gain traction in this market.

As well as extending the geographical reach of their investment activities during the last 10 years, investor clients are investing in new asset classes and employing complex derivatives-based investment vehicles in order to optimise returns and to offset risk across their portfolios. However, transaction processing for some complex instruments remains highly manual and recreates some of the operational risks and processing inefficiencies witnessed in the securities processing world 15-20 years – and which were the initial drivers behind the creation of the Network Management industry.

## International outlook

Northern Trust's network group continues to engage in policy analysis and formation at international level through its participation in the Association of Global Custodians and a host of other industry organisations. "We continue to watch the restructuring of Europe's trading, clearing and settlement infrastructure closely from the sidelines," says Osborne. "At this stage, this has not motivated any tangible shift in our long-term strategy. It is still too early to commit to a single pan-European provider, or any other type of multi-market arrangement, and we will continue, until the picture becomes clearer, to appoint on a best-in-market basis." At this point, Northern Trust will then conduct a fundamental review of how it wishes to position itself for the future. "While projects are in place to drive harmonisation within the clearing and settlement layers in Europe, all global custodians remain firmly aware of the key risks that reside in the asset servicing space. Until we are confident that

a single platform can manage our asset servicing needs efficiently across multiple markets, we will be unwilling to put clients' assets under potential threat by making a premature commitment to any new business model."

More broadly, the ongoing trend of consolidation with the sub-custodian community – illustrated most recently by HSBC's August 2006 purchase of Westpac's sub-custody and clearing business in Australia and New Zealand, for example – continues to present challenges for network managers in managing risk across their network of global markets. Looking back 10 years, it was possible to conduct an RFP in a market and to receive a response from 5-10 local providers. Now many markets are dominated by international sub-custody and clearing providers and a declining number of local providers are still offering a sub-custody service.

As a network manager, Andrew Osborne has seen pressure to rationalise at both ends of the value chain. "There has been enormous pressure on global custodians to raise their game from their investor clients – and Northern Trust has responded accordingly," he says. "In turn, we are placing comparable demands on our sub-custodians. As we drive growing volumes through their shops, we expect to see corresponding improvements in pricing and levels of service. Inevitably, these pressures are forcing some sub-custodians to review whether they wish to invest in the technology and development needed to stay at the cutting edge. Some have decided that this is a high volume, low margin business and not what they wish to be doing."

In some locations, this presents new opportunities. As the globals extend their footprint into new markets, some have sought partnerships with local providers to help them support their local business activities – the relationship that Northern Trust established in 2004 with Svenska Handelsbanken to develop its funds servicing capability in the Nordic region exemplifies this process. For this to be successful, there is a need for a good match between partners' business models, their service expectations and their operational culture. If this is in place, Osborne believes that there are still openings for high quality local providers to demonstrate their competitive edge, and to sustain healthy levels of business expansion, in the future.


Keri Smith, Director of Network Management,

# RBC Dexia Investor Services



**Keri Smith**

These are exciting but breathless times for RBC Dexia Investor Services' network management group. Subsequent to the joint venture established between Dexia Banque Internationale à Luxembourg (Dexia BIL) and RBC Global Services, restructuring activities have been underway since January 2006 designed to meld together the network management teams from the two parent companies and to ensure that they work as one.

While this restructuring activity has been in motion, RBC Dexia has seen healthy growth in business activity through a range of locations across its network. "The fund services component of our business continues to expand rapidly, particularly in Asia," says Keri Smith, Director of Network Management at RBC Dexia Investor Services. "Our Australian, Singapore and Hong Kong offices have witnessed strong growth over the past 12 months and we continue to leverage expertise that we have established in Europe and North America to reach out to new customers globally. Also, we have seen a surge in demand from investor clients wishing to build their activities in the Middle East, Vietnam and the Balkans. This has involved extending our network support into 10-12 new markets."

These twin challenges have combined to make it an exhilarating but demanding 2006 for network staff. Given the complementary nature of Dexia BIL's expertise in the global fund services area, and RBC Global Service's international presence as an agile and innovative global custodian, the two parent organisations had only limited business overlap on stepping into the joint venture. However, network management was one area where

both parents did have strong existing capability and, consequently, this will be one of the largest groups within the joint venture to merge directly (see also *FSR, July 2006*, pp 8-9).

On pulling the two together, the combined network will span in excess of 90 markets worldwide. Given the differing business cultures prevailing within the RBC Global Services and Dexia Fund Services network teams prior to the joint venture, it is perhaps unsurprising that the group finds itself with multiple agents in a sizeable number of markets within this network. The objective now is to rationalise this down to one primary provider per market wherever this is in keeping with the goal of delivering service excellence and value for money to customers. "In doing so, an essential starting point is to identify who our core clients are at the current time; and to anticipate who our core clients will be in the future," says Smith. "This forward planning is vital in order to position ourselves for future business expansion and to pre-empt the style of investment strategy that we may be asked to support in times ahead."

## Building an integrated risk management framework

Indeed, as clients expand their activities into new locations and across new financial instruments, RBC Dexia is under constant pressure to revise and upgrade the risk monitoring procedures that it applies across its network of global markets. "As our client base broadens, the network group has been required to extend its risk management focus to futures and options, repo contracts and, more broadly, to a range of strategies designed to help immunise the investor against market risk," says Smith. "These present new challenges in terms of managing collateral and related cash movements, pricing complex instruments held in our administration, overseeing settlement of derivatives-based contracts, and identifying procedures through which the associated risk can be quantified and represented on our books."

Within this environment, the risk management responsibilities of the network team have expanded well beyond the functions traditionally associated with network management. "The dividing line between investment risk and custody risk is be-



coming increasingly blurred," explains Smith. "This is particularly apparent when we are called upon to help clients hedge their currency exposures, for example." In managing a tri-party currency hedge, investors may pass sizeable currency flows through their cash accounts at the agent bank and they need to be aware of the potential risk implications of doing so. Under typical custody agreements, funds held in a client's cash account at the agent bank, that are not directly linked to corresponding securities processing activities, will be held at the client's own risk. Moreover, clients must be aware of the potential for moving the market when large foreign currency flows are moved across their accounts at the agent bank to cover currency hedging activity. "We work closely with clients to familiarise them with these potential risks and to ensure that we can monitor risk exposure effectively over the course of a currency forward contract," she says.

## Strategic outlook

More broadly, as clients extend their interest into frontier and emerging markets, the challenge is to optimise the protection afforded to client assets held in market and to ensure that the investor is properly educated about the primary risks involved. This comes back to fundamental questions that have long underpinned the network management function. What levels of investor protection are available within the market? What level of political and economic stability does it offer? Does the market support a securities infrastructure and regulatory framework that meets with international standards? And, given these risks, what percentage of investment can be held by a foreign investor? "In some cases the percentage of issued securities that can be held by a foreign institutional investor is tightly controlled –and if the client can purchase no more than a one per cent holding in an investment that has a US$3 million ceiling, for example, we need to work through the business case carefully to weigh up whether the potential returns may warrant the costs of setting up a custody structure," says Smith.

Inevitably, the network management team also needs to be clear about whether an agent bank is available within market that meets its required standards of creditworthiness and service quality. If not, the client may be required to assume full responsibility for any investment that it subsequently chooses to hold with its broker (or other preferred intermediary) in the market. "In the face of these challenges, the overarching message that

must be driven home within the network management group is that all decisions must be driven by our long-term strategic thinking – and not by short-term tactical moves that are designed just to cover us for today," says Smith. When investors express interest in a new market, it is important to work carefully through the potential risk and cost implications from the top downwards to ensure that they are equipped to make a considered decision about whether to proceed.

## Legal accuracy

Alongside the above, a key responsibility for the network management team lies in seeking clarification in areas where local securities laws are vague or undefined. The application of nominee account structures in Thailand provides one example, where the nominee concept is recognised but is not codified within the domestic legal framework governing securities investments. As a result, proxy voting and tax reporting must be filed at beneficial owner, rather than at nominee, level. "The overarching message is that we need to be constantly vigilant to ensure that our actions align with the precise obligations that are specified by law, rather than with informal parameters that have been negotiated within the market," says Smith. "We cannot base our decisions on what we assume that the law states. We need to return to the documentation and to build our actions on what formally exists in codified form. The question must be, 'Is there a clearly-defined law permitting nominee accounting? And, if so, in what form does the local market support these nominee account structures?'"

As the compliance and reporting obligations incumbent on global custodians expand, the need for clarity assumes special importance. "We now receive between 300-500 requests per month in our office in Luxembourg to provide shareholder reporting to companies that require details of beneficial owner holdings, whereas two years ago we would not expect to receive this number of requests over a 12 month period," says Smith. In delivering this information, we must be precise in each instance to ensure this is delivered in a format compliant with local law governing nominee and beneficial owner accounting. "In some instances, internationally-accepted corporate governance norms do not align precisely with local company law – and it can be an exacting process to match these imbalances across the multiple jurisdictions in which we manage clients' assets."