# **Exhibit 8**

Dockets.Justia.com

April 2007

# Auditing
# Alternative
# Investments*

A Practical Guide for Investor Entities,
Investee Fund Managers and Auditors

*connectedthinking

PRICEWATERHOUSE(COPERS

# About PricewaterhouseCoopers

PricewaterhouseCoopers is a leading provider of professional services for alternative investment funds and for colleges and universities. Our goal is to help our clients turn their complex business issues into opportunities and measurably enhance their ability to build value, manage risk and improve performance.

For more information about our alternative investment funds services, call us in the US at 646.471.2500 or visit our Web site at http://www.pwc.com/alternatives. For more information about our higher education services, call us in the US at 1.888.272.3236 or visit our Web site at http://www.pwc.com/education.

PricewaterhouseCoopers (www.pwc.com) provides industry-focused assurance, tax and advisory services to build public trust and enhance value for our clients and their stakeholders. More than 130,000 people in 148 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

"PricewaterhouseCoopers" refers to the network of member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

# Our perspective

We are pleased to provide you with this publication, entitled *Auditing Alternative Investments, A Practical Guide for Investor Entities, Investee Fund Managers and Auditors*, on an important topic that has been the focus of the various entities that invest in alternative investment funds, as well as to management of the investee funds.

As you are aware, many types of investors have been investing an increasing percentage of their investment portfolios in alternative investments and other non-traditional types of financial instruments. Recently, outside organizations, regulators and the accounting and auditing rule makers, such as the American Institute of Certified Public Accountants ("AICPA"), have begun to scrutinize the inherent risks associated with alternative investments, with a particular focus on the issues associated with due diligence, oversight and transparency.

In 2005, the AICPA issued an auditing interpretation (the "Interpretation") and, in 2006, a practice aid (the "AICPA Practice Aid"), which required auditors and management to respond quickly to new guidance with respect to the existence and valuation assertions associated with alternative investments. The main focus of the new guidance is as follows:

- With respect to existence, the question is: Do the investor entity's alternative investments exist at the financial statement date, and have the related transactions occurred during the period? While confirming the existence of assets that are held by third parties generally provides adequate audit evidence, the Interpretation and AICPA Practice Aid say that, by itself, a confirmation in the aggregate does not constitute adequate audit evidence.

- With respect to valuation, the question is: Are the alternative investments stated in the investor entity's financial statements at fair value? Confirming the value of the alternative investments from an investee fund manager provides one piece of evidence. Based on the guidance in the AICPA Practice Aid, additional audit evidence could be obtained.

More recently, on February 22, 2007, the President's Working Group on Financial Markets (the "PWG") publicly released its "Agreement among PWG and US Agency Principals on Principles and Guidelines regarding Private Pools of Capital" (the "PWG Principles and Guidelines"). These PWG Principles and Guidelines acknowledge the "significant benefits" that "private pools of capital," including hedge funds, bring to the financial markets and the challenges they pose. It encourages all relevant market participants (i.e., investors, creditors, counterparties, fund managers and regulators) to address them. It also acknowledges that "these pools can involve complex, illiquid or opaque investments and investment strategies that are not fully disclosed," and that such risks are "most appropriately borne by investors with the sophistication to identify, analyze and bear these risks." Interestingly, several of the principles and guidelines set forth by the PWG focus on transparency and due diligence, which are two of the main underlying themes addressed in the AICPA Practice Aid and discussed in this paper. For example, the PWG Principles and Guidelines state the following:

- Investors in private pools of capital should obtain accurate and timely historical and ongoing material information necessary to perform due diligence regarding the pool's strategies, terms, conditions and risk management, thereby enabling such investors to make informed investment decisions. (No. 4)

- Managers of private pools of capital should have information, valuation and, risk management systems that meet sound industry practices and enable them to provide accurate information to creditors, counterparties and investors with appropriate frequency, breadth, and detail. (No. 9)

The PWG Principles and Guidelines also acknowledge the balance that is necessary with respect to transparency. For example, No. 7.4 states that the "information that creditors and counterparties should seek to obtain from a private pool includes both quantitative and qualitative indicators of a private pool's net asset value, performance, market and credit risk exposure, and liquidity. The level of detail expected should respect the *legitimate interest of the private pool in protecting its proprietary trading strategies*" [emphasis added]. In No. 9.3, the PWG Principles and Guidelines further state that the "information provided by managers of private pools to their creditors, counterparties and investors should adhere to the sound practices articulated in industry guidelines. Managers of private pools of capital should provide information frequently enough and with sufficient detail that creditors, counterparties and investors stay informed of strategies, and the amount of risk being taken by the pool, and any material changes."

PricewaterhouseCoopers is uniquely positioned to provide leadership in the areas identified as concerns by regulators, the AICPA and others. We maintain a leadership position as auditors for both investee funds and investor entities – serving many of the largest and most complex alternative investment funds, and many of the most well-endowed higher education and not-for-profit organizations across the country. Our leadership position in both industries gives us a unique perspective and ability to converse with investors and investees, and to understand the implications and challenges for each. We have devoted considerable time and energy to studying these important issues, speaking about the new requirements and – most importantly – listening to the concerns of investors, investees and other industry participants. It is from this position of leadership that we have authored the enclosed publication.

The objective of this PricewaterhouseCoopers' publication is to summarize and highlight the AICPA's interpretative guidance on alternative investments. In addition, this publication is designed to address, from a practical perspective, the issues of most importance to officers, senior management, general partners, fund managers, board members and auditors of many diverse entities (e.g., hedge funds, private equity funds, fund-of-funds, colleges, universities and other highly endowed institutions). These issues include:

- What are the internal controls and leading practices that investor entities should consider implementing?

- How should transparency be viewed at the investor and investee level? Can transparency also be viewed broadly to encompass all forms of information and/or access requested by, or provided to, investors by management of investee funds?

- What is the importance of a management-developed risk assessment of the alternative investment portfolio? How does management view the risks compared to how the auditor views the risks?

- What are some practical suggestions for improving an investor entity's documentation of their internal controls?

- What lessons have we learned from the last two years of audits? How can we all be better prepared for the year-end audits of investor entities such as fund-of-funds, colleges, universities and other highly endowed institutions?

We are pleased to provide this publication to you and hope that it will serve as an informative and thought-provoking document that highlights existing guidance and provides a common message to both investors and investees as to how policies, procedures and controls might be enhanced.

Sincerely,

Mark J. Casella, Assurance Partner
National Alternative Investment Funds
Practice Leader

John A. Mattie, Assurance Partner
National Education and Not-for-Profit
Practice Leader

---

Note: This paper is not intended to drive asset allocation decisions. It is meant to summarize and highlight key issues associated with the AICPA's interpretative guidance on alternative investments.

# Contents

1 | Executive summary

2 | Implications for investor entities
    A.  Management's procedures and controls
    B.  Management's risk assessment

3 | Implications for investee fund managers

4 | Implications for the auditor
    A.  Auditor's risk assessment
    B.  Addressing the existence and valuation assertions

Appendix A | Illustrative AU332 risk assessment and AU332 risk assessment considerations

Appendix B | Liquidity terms

Appendix C | Other key terms

# 1 | Executive summary

Recently, there has been considerable discussion regarding the audit requirements related to investor entities that invest in alternative investments. This discussion resulted from the issuance of the following guidance by the American Institute of Certified Public Accountants ("AICPA"):

- Interpretation No. 1 to AU332 (the "Interpretation"), also referred to as AU9332 (issued July 2005)
- A non-authoritative practice aid entitled *Alternative Investments – Audit Considerations* (the "AICPA Practice Aid") based on input from the AICPA's Alternative Investments Task Force and certain AICPA member firms (issued July 2006)

The Interpretation and the AICPA Practice Aid provide guidance to help auditors address the existence and valuation assertions associated with alternative investments because a readily determinable fair value does not exist and, generally, investee fund managers provide limited investment information. These requirements are currently in effect and will impact the way auditors interact with clients and client investee funds. These requirements will also likely impact the relationships between investor entities and investee funds, as well as affect the nature, timing and extent of information shared between these two parties relating to the investee fund's investment portfolio and the investee fund's valuation policies and procedures.

Alternative investments include private investment funds meeting the definition of an "investment company" under the provisions of the *AICPA Audit and Accounting Guide: Investment Companies*, such as hedge funds, private equity funds, real estate funds, venture capital funds, commodity funds, offshore fund vehicles, and fund-of-funds, as well as bank common/collective trust funds. Collectively, these types of investment funds are referred to in the AICPA Practice Aid and herein as "alternative investments." Alternative investments may be structured as limited partnerships, limited liability corporations, trusts or corporations.

The Interpretation was issued in July 2005 to help auditors apply the provisions of AU332 to alternative investments. Since the Interpretation clarified existing guidance, it was effective upon issuance. It provided guidance on the confirmation of an investor entity's interest in an investee fund by the investor entity's auditor. The Interpretation was controversial because it stated that simply confirming investments in the aggregate does not constitute adequate audit evidence with respect to the existence assertion. It stated that, in certain circumstances, it would be necessary to confirm the investee fund holdings on a security-by-security basis. Uncertainty existed over concerns whether auditors would be required to disclaim opinions on investor entities because of scope limitations resulting from the likely unwillingness of investee fund managers to confirm all requested information. Additionally, even if investee fund managers provided portfolio listings, it was unclear what investor entities and their auditors would be expected to do, or even could do, with the information.

The AICPA Practice Aid was issued in July 2006 to clarify certain key points from the Interpretation. The AICPA Practice Aid should be of interest to management of investor entities, including, but not limited to, other investment companies (e.g., fund-of-funds or funds that hold alternative investments), colleges and universities, hospitals and pension plans, as well as to management of the investee funds. Some of these entities invest a small percentage of their investment portfolios in alternative investments, while others invest a substantial percentage. In addition, the underlying investment portfolios held by alternative investments can range from marketable securities to complex derivatives and/or illiquid investments.

# Key points

The following paragraphs summarize the key points from the AICPA Practice Aid and the Interpretation.

## Management's responsibility

The existence and valuation of an alternative investment is the responsibility of the investor entity's management. Management of the investor entity that uses audited financial statements or other information as support for the valuation of an alternative investment must be prepared to take responsibility, in its own right, for the valuation. Therefore, if management of the investor entity ultimately determines that it is comfortable with the valuation provided by the investee fund, management of the investor entity then takes responsibility for that valuation.

This is particularly reinforced in the AICPA Practice Aid, which states that "management of the investor entity is responsible for the valuation of alternative investment amounts as presented in the investor entity's financial statements" and that "this responsibility cannot, under any circumstances, be outsourced or assigned to a party outside of the investor entity's management." Therefore, although the investor entity's management may look to the investee fund manager for the mechanics of the valuation or to certain third parties to assist with the due diligence and ongoing monitoring efforts, management of the investor entity must have sufficient understanding and supporting information to evaluate and either accept or independently challenge the investee fund's valuation.

To take such responsibility, management of the investor entity must have an effective process and related internal controls in place to ensure a sufficient understanding of their alternative investments. This includes a sufficient understanding of:

- The investment strategies and the manner in which they are employed
- The underlying investment portfolios and the reasonableness and reliability of the inputs and methodologies used for their valuation

The nature, timing and extent of management's process will depend on management's risk assessment of the alternative investments.

## Auditor's responsibility

An important element in determining the nature, timing and extent of the audit procedures is the auditor's understanding of the reliability of the process the investor entity's management uses to determine estimated fair value.

The auditor's approach is based on an assessment of the risk of material misstatement of the financial statements. As stated in AU section 312.11, *Audit Risk and Materiality in Conducting an Audit* (AICPA Professional Standards, vol. 1), the auditor's consideration of materiality is a matter of professional judgment, and materiality judgments involve both quantitative and qualitative considerations. The risk of material misstatement includes inherent risk and control risk. Accordingly, the auditor's risk assessment, after considering management's process, will determine the quantity and quality of audit evidence necessary to support the existence and valuation assertions.

The auditor's risk assessment should consider various factors, including, but not limited to:

- The materiality of the alternative investments
- The nature and extent of management's process and related controls associated with the alternative investments
- The degree of transparency available to the investor entity to support its valuation process and related conclusions (including portfolio detail and/or audit reports)
- The nature, complexity and liquidity of the investee funds and their underlying investments

A subtext to the AICPA Practice Aid is that, because the investments presented in an investor entity's financial statements represent the investor entity's assertion, the auditor should not rely exclusively on information obtained from the investee fund manager while ignoring the investor entity's controls, including its monitoring process.

# Confirmation process

The AICPA Practice Aid reinforces the Interpretation, which states that simply confirming investments in the aggregate does not constitute adequate audit evidence with respect to the existence assertion. The AICPA Practice Aid clarifies that, while confirmation of the holdings of the investee fund on a security-by-security basis (or contemporaneous audited financial statements) typically would constitute adequate audit evidence with respect to the existence assertion, the auditor for the investor entity should consider alternative or additional procedures directed at the existence of the alternative investments. In addition, Appendix 1 to the AICPA Practice Aid provides an illustrative confirmation for use by auditors.

Despite the guidance included in the AICPA Practice Aid, it is still unclear to many industry participants how the confirmation of the investee fund's holdings on a security-by-security basis adequately addresses the existence assertion. Without information on other assets or liabilities of the investee fund and the investor entity's percentage ownership in the net assets of the investee fund, a security-by-security listing of the underlying investments would not generally provide adequate information for the investor entity or its auditor as to the existence or appropriateness of the recorded value of the alternative investment. Further, without other assurance (which may include management's monitoring controls), the auditor may not have sufficient evidence that the listed investments are genuine.

So, why then is it necessary for the auditor to request confirmation of the investee fund's holdings on a security-by-security basis?

- First, the confirmation request is necessary because confirmation of the investee fund's holdings on a security-by-security basis is required by the Interpretation. In fact, the AICPA Practice Aid reinforces that uncertainty about whether the investee fund manager will provide the requested information does not obviate the auditor's requirement to obtain sufficient appropriate audit evidence – either through confirmation or otherwise. If the confirmation request is not returned to the auditor or the details of the underlying investments are not otherwise provided by the investee fund manager, the auditor should perform alternative procedures. The AICPA Practice Aid is helpful in this respect because it acknowledges that alternative procedures can be performed – the Interpretation was silent on this issue. Even if all the requested information is provided, additional procedures may also be necessary in certain circumstances.

- Second, the confirmation request is necessary because confirmation of the investee fund's holdings on a security-by-security basis, or other adequate information about the investee fund and its investment portfolio, may be helpful or necessary with respect to the existence and valuation assertions. This is because such information should serve to corroborate information the investor entity has represented or directly provided to the auditor with respect to the nature, complexity and liquidity of an investee fund.

## Impact to audit report

An auditor cannot audit what management has not done. Therefore, auditors need to evaluate both (i) the adequacy of management's process and related documentation to support the amounts in management's financial statements, and (ii) the quantity and quality of audit evidence available to support the auditor's opinion on those financial statements. In evaluating the quantity and quality of audit evidence to support specific audit objectives, the auditor should consider factors including, but not limited to:

- The significance of the alternative investments for which neither the underlying security-by-security detail nor audited financial statements was available as of the balance sheet date

- The sufficiency of alternative procedures performed and supporting documentation obtained in situations where the security-by-security detail was not provided to the auditor

- The adequacy of management's process and related internal controls, including those related to the extent of its understanding of the complexity and liquidity of the underlying investment portfolio and related valuation process, and the degree of transparency provided by the investee fund manager

If the auditor concludes that management's valuation procedures are adequate or reasonable and that the underlying documentation supports the valuation, the auditor would generally issue an unqualified audit opinion. In certain circumstances, an auditor might include a so-called "fair value paragraph" (i.e., as an emphasis of matter paragraph) in the audit report because of inherent uncertainty in management's estimated fair value for a significant portion of the investment portfolio. If the auditor concludes that management's valuation procedures are inadequate or unreasonable, or that the underlying documentation does not support the valuation, an auditor could issue a qualified opinion or an adverse opinion. For further discussion of such reporting option, see the *AICPA Audit and Accounting Guide: Investment Companies*, paragraph 11.06.

If an auditor cannot obtain sufficient and appropriate audit evidence to support their audit objectives, the auditor may qualify or disclaim an opinion on the financial statements because of a scope limitation.

## Moving forward

With respect to the new guidance in the AICPA Practice Aid, management of both investor entities and investee entities should carefully consider these requirements and evaluate the following:

### Degree of transparency

The demands of a growing and more institutional investor base, along with other pressures, have combined to force management of investor entities and investee fund managers to grapple with the issue of transparency. This means that hedge fund managers, in particular, are increasingly being asked to divulge more information on their strategies, portfolios and performance, whereas traditionally they have not been required to provide such information. In addition, private equity fund managers are being asked to provide more transparency around their portfolio company investments at a time when concerns around this information already exist as a result of the recent Freedom of Information Act requests.

The issue of transparency should be considered broadly to incorporate all forms of information and/or access requested by, or provided to, current and potential investors, consultants and others. The focus on the monitoring controls utilized by management of the investor entity is likely to increase their contact with funds, as well as requests for various types of information throughout the year – not just on investor entities' annual reporting dates. As a result, at both the investee and investor levels, portfolio managers, risk management, legal/compliance and finance/accounting personnel need to collectively prepare for and assess these requirements.

### Due diligence programs

Management of the investor entity must establish controls over its alternative investments to support the existence and valuation assertions. These controls include:

- Initial due diligence (procedures performed before the initial investment)

- Ongoing monitoring (procedures performed after the initial investment)

- Financial reporting controls (procedures related to the accounting for and reporting of the investment)

The design and effectiveness of these controls are particularly important because they can affect the nature, timing and extent of audit procedures performed by the investor entity's auditor over alternative investments. In light of the guidance provided in the AICPA Practice Aid, management of investor entities should examine their due diligence programs, related controls and documentation over alternative investments.

# 2 | Implications for investor entities

## A. Management's procedures and controls

This section addresses an investor entity's procedures and controls over alternative investments and how those procedures and controls can be designed or enhanced to meet the requirements of the audit guidance issued during the past few years.

Directly or through third parties acting on its behalf, management of the investor entity must establish strong procedural controls over the initial due diligence and ongoing monitoring of their alternative investments. These controls may include those listed in Appendix 2 to the AICPA Practice Aid. That list, however, is not intended to be all-inclusive or to be used as a checklist by management or the auditor. Management must design controls appropriate to its organization and the nature and extent of its alternative investments.

To take appropriate responsibility for its portfolio of alternative investments, management of the investor entity must have an effective process and related internal controls in place to ensure a sufficient understanding of their alternative investments. These controls include:

- Initial due diligence (procedures performed before the initial investment)
- Ongoing monitoring (procedures performed after the initial investment)
- Financial reporting controls (procedures related to the accounting for and reporting of the investment)

The design and effectiveness of these controls are particularly important because they can affect the nature, timing and extent of audit procedures performed by the investor entity's auditor over alternative investments. In light of the guidance provided in the AICPA Practice Aid, management of the investor entity should examine its due diligence programs and related controls over alternative investments. In particular, management of the investor entity should evaluate the following, each of which is discussed further below:

1. Design and effectiveness of its due diligence programs
2. Documentation and other evidence available to support its due diligence programs
3. Knowledge, experience and training of the personnel responsible for its due diligence programs and adequacy of related systems
4. Coordination and communication between all parties
5. Financial reporting controls, including valuation

# 1. Design and effectiveness of due diligence programs

### Initial due diligence

It is critical that appropriate controls begin with initial due diligence before choosing to invest in a particular alternative investment. Initial due diligence often incorporates both top-down and bottom-up analysis to evaluate whether a prospective investee fund manager meets the investor entity's risk/return objectives. This would typically involve quantitative and qualitative analysis of a fund manager's investment style and process and an assessment of the effect the investment would have on the investor entity's overall portfolio. Initial due diligence also involves assessing the investee fund manager's personnel, operations, controls, systems, policies and procedures. This is often accomplished through on-site front office and back office reviews, as well as a review of the key legal, tax and compliance issues.

There are a variety of approaches and procedures used by investor entities in their investment decision-making process. Many investor entities have very sophisticated and well-established policies and procedures to identify, select and approve alternative investments, which incorporate quantitative and qualitative analysis, dedicated teams, comprehensive due diligence questionnaires, and formal review and approval processes. Some colleges, universities and other highly endowed institutions rely on third parties to perform pre-investment due diligence, while fund-of-funds typically have their own dedicated personnel. Regardless of which approach is followed, the investor entity is still ultimately responsible for performing sufficient due diligence, making an informed choice, and documenting the

process. The degree to which this process is effectively documented has historically varied depending on the sophistication and resources available to the investor entity. The AICPA Practice Aid reinforces the need for management to <u>document</u> their initial due diligence process.

## Ongoing monitoring

Due diligence should continue after an investment is made. In addition to an ongoing analysis of investment results and risk/return objectives, post-investment monitoring involves ensuring that the investee fund manager – and the investor entity in its role as a prudent investor and fiduciary – continues to have adequate controls, systems, policies and procedures in place.

An effective ongoing monitoring process requires that the investor entity's management (directly or through agents acting on its behalf) has sufficient information on the underlying investee fund and its investments. The investor entity's management may not be able to obtain full transparency into the underlying investments, including a detailed listing of the underlying investment portfolio held by the alternative investments. This is particularly true for hedge funds, which have historically been reluctant to provide such information, and for certain types of investor entities, where the receipt of such information may fall under the Freedom of Information Act. Nevertheless, management should apply a broader view of transparency to incorporate all forms of information and/or access provided by investee fund managers. Therefore, management must find other information or conduct other activities

that will provide valuable information on the alternative investments and the investee fund managers. For example, management of the investor entity can:

- Conduct periodic interviews, including on-site front office reviews, with the investee fund manager to update their understanding of the investee fund's strategy, positions, exposures, key performance drivers, etc.

- Ask about changes in the investee fund manager's detailed valuation policies and procedures, and obtain updated copies or summaries, as applicable. (Note: An excerpt from the investee fund's offering document does not constitute adequate valuation policies and procedures for this purpose.)

- Compare the fund's performance to benchmark returns, peer groups and/or historical returns, to the extent applicable, to see if the return is reasonable

- Review periodic investor reports and letters, including performance and risk statistics, summary or detailed portfolio information, and other information related to leverage, exposure levels, large positions, etc.

- Attend the investee fund manager's annual investor conference, if applicable. (Note: This is common for private equity funds.)

- Obtain and review annual audited financial statements and interim (i.e., quarterly or semi-annual) unaudited financial statements, to the extent available. For audited financial statements, note whether the opinion is qualified and, if so, why. Also note whether there was a change of auditors, or a change in valuation policies (or a change in the amount of "fair valued" investments[1] ) or other unusual disclosures associated with related party transactions or otherwise.

- Review SAS 70 reports[2], if available, and ensure that identified user controls are in place.

- Review press reports for significant management, structure, or personnel developments. Inquire about staffing level changes. When key personnel changes occur, consider making background checks, asking for and checking references, and searching the NASD and SEC websites, as applicable.

- Review the Schedule K-1 for each investee fund taxed as a pass-through entity (e.g., limited partnership, limited liability company), as applicable, to determine if it has resulted in any tax considerations.

- Review information on the investee fund's and investee fund manager's assets under management and inquire as to any significant capital changes (up or down).

The activities described above should be documented and maintained in management's files.

As they do with the initial due diligence, some colleges, universities and other highly endowed institutions may outsource ongoing monitoring activities to a third party. If this is the case, the investor entity must develop appropriate monitoring controls and related documentation over its third-party service provider to make sure that its monitoring activities are complete and effective.

---

1 When effective (fiscal years beginning after November 15, 2007), the new disclosure requirements of Statement of Financial Accounting Standard No. 157, *Fair Value Measurements* ("FAS 157"), will likely provide the investor entity with additional transparency and information relating to the investee fund's fair valuation policies and exposures.

2 Some investee fund managers or fund administrators may have a SAS 70 report on their internal controls. SAS 70 is a standard issued by the AICPA, titled "Reports on the Processing of Transactions by Service Organizations." SAS 70 sets forth the professional standards used by an auditor to assess the internal controls of a service organization and issue a report.

# 2. Documentation and other evidence to support due diligence programs

It would be prudent for management to expect – and prepare for in advance – the external auditor's request for supporting documentation related to the investor entity's due diligence and valuation practices. Good internal controls include strong documentation related to initial due diligence, ongoing monitoring and financial reporting controls. The following table summarizes some examples of the documentation that may be maintained to provide evidence of certain management controls. To the extent that management does not have sufficient information on its underlying investments, and/or sufficient evidence of such information, the auditor needs to consider the reporting implications.

| Area | Illustrative documentation |
| --- | --- |
| Selection, evaluation and approval of investee fund managers | • Written due diligence memos, with appropriate review and approvals indicated<br>• Formal due diligence checklists/questionnaires, with appropriate review and approvals indicated<br>• Written minutes (or summaries) of meetings where investment decisions were made |
| Periodic visits or phone calls to investee fund managers | • Written documentation of visits to or discussions with investee fund managers |
| Investment policy for asset allocations and valuations | • Written policy that has been adopted/approved by the Investment Committee<br>• Written evidence that policy exceptions were presented to the committee for acknowledgement |
| Review of audited financial statements | • Written checklist that may address: (a) reconciliation of audited financial statements to recorded balance, (b) roll-forward of audited balance from investee fund's year end to investor entity's year end, and (c) comparison of actual returns to benchmarks, and explanations of significant variances |
| Review of valuations prepared by investee fund managers, including review of portfolio holdings, key methodologies, inputs and assumptions used | • Written notes on valuations or separate memo documenting understanding of the investee fund manager's process and conclusions<br>• Memo explaining rationale for acceptance of investee fund manager's valuations or adjustments deemed appropriate |

## 3. Knowledge, experience and training of personnel, and adequacy of systems

An important consideration – especially for colleges, universities and other highly endowed institutions – is the required resources to select, monitor, value and report alternative investments, along with the related governance structures in place to oversee these efforts on behalf of the investor entity. As mentioned above, many investor entities have very experienced, dedicated teams, while others (primarily colleges, universities and other highly endowed institutions) may rely on third parties to perform initial and ongoing due diligence. Regardless of which approach is used, the investor entity should maintain a sufficient complement of investment, accounting and finance personnel with an appropriate level of knowledge, experience and training commensurate with the nature, extent and complexity of the investor entity's alternative investment portfolio. The team dedicated to alternative investments should have deep investment experience and extensive experience evaluating and monitoring alternative investments, including the unique tax, legal and regulatory issues.

Equally important are the systems used in the monitoring, oversight, and reporting of alternative investments. Also, given the complexity and risks associated with alternative investments, adequate communication and training are essential.

## 4. Coordination and communication between parties

To ensure an efficient and effective process, all parties should open the lines of communication and take the time to understand the roles and responsibilities of the other parties, including:

- Independent auditors: What audit procedures will they perform and how does the complexity, liquidity and volatility of the alternative investments impact the nature, timing and extent of those procedures?

- Investee fund managers: What controls and processes have they established, documented and shared with their investors?

- Internal constituents: Is there proper coordination and communication between the personnel within an investor entity who perform and document the due diligence and those who perform accounting and financial reporting for such investments? Do the members of the Audit Committee (if applicable), Investment Committee, front/investment office and back/controller's office fully understand how their roles and responsibilities align?

- Other external parties (e.g., valuation specialists, investment consultants), if applicable: What are their responsibilities and how do they satisfy them? What information is shared with the investor entity, in what form and how often?

# 5. Financial reporting controls, including valuation

Valuation is one of the two key issues discussed in the Interpretation and AICPA Practice Aid. The AICPA Practice Aid notes that a readily determinable fair value does not exist for many alternative investments. Despite the difficulty of estimating a fair value for alternative investments, they must generally be stated at their fair value, and management is responsible for determining such fair value. The AICPA Practice Aid states that "management of the investor entity is responsible for the valuation of alternative investment amounts as presented in the investor entity's financial statements" and "this responsibility cannot, under any circumstances, be outsourced or assigned to a party outside of the investor entity's management." This means that although management may look to the investee fund manager for the mechanics of the valuation, management of the investor entity must be able to independently evaluate and either accept or challenge the investee fund manager's valuation. In order to take responsibility at this level, management must have an effective process and controls in place, as well as a sufficient understanding of the investee fund's investment strategies, operations, underlying investments, and valuation policies and procedures.

The timing and extent of the investor entity management's understanding is based on its assessment of risk of material misstatement of the financial statements. The extent of management's fair valuation process and related controls should reflect the significance of the alternative investments to the investor entity's financial statements as a whole, the nature of the underlying investments and their risk assessment. In lower-risk situations, such as for alternative investments invested in readily marketable securities (e.g., bank common/commingled trust funds), an effective valuation process ordinarily requires a less sophisticated process and related controls than a higher-risk portfolio of illiquid and complex alternative investments.

An investor entity with an effective valuation process would obtain and review the investee fund's financial reports (e.g., independently audited financial statements, monthly statements). Ideally, the investee fund's reports would include a detailed list of the underlying investments and their fair values, along with other risk metrics. In the absence of detailed data, the investor entity can request other summarized data, such as condensed portfolio data, sector data, etc., that the investee fund may be willing to provide.

Management of the investor entity must do more than simply obtain the detail of the underlying investments to support its assertion regarding the valuation of the alternative investments. However, the investor entity's valuation process need **not** include recalculation of estimated fair values for the alternative investments. Management of the investor entity should understand the characteristics of the underlying investments and the valuation process used by the investee fund manager for the investments held at the balance sheet date. Management of the investor entity should perform an independent, separate valuation only if it becomes aware of erroneous or incomplete assumptions or methodology.

The following points summarize some sound practices related to the financial reporting and valuation for all types of alternative investments, including fund-of-funds:

- Compare the unaudited net asset values (NAV) received by the investor entity at the investee fund's year-end date (often December) to the information included within the investee fund's audited financial statements. Identify and investigate any significant differences.

- Track the timeliness of NAV statements provided by the investee fund manager during the year.

- For hedge funds, consider whether the fund's estimated NAVs received are consistent with the final NAVs received from the investee fund manager or administrator. Identify and investigate any significant differences.

- Obtain the investee fund's Schedule K-1 (for investee funds structured as partnerships, or taxed as such) and review for any federal and state tax liability. Also, compare the capital account information reflected on the Schedule K-1 with the capital account information provided by the investee fund manager and recorded by the investor entity. Identify and investigate any significant differences.

- Compare the investee fund's NAV statements with the value included on the statement provided by the investor entity's custodian, to the extent applicable. Identify and investigate any significant differences.

- On a regular basis, ask the investee fund manager, via phone calls or on-site visits, about any changes in the fund's valuation polices and procedures, including the valuation methodologies, key inputs and assumptions.

- Request and review changes to valuation policies and procedures. Ask whether the investee fund manager employs a consistent valuation process throughout the year.

- Compare the investee fund manager's valuation policies and procedures across different funds in the fund's peer group to identify potential differences in methodologies or key inputs. Ask the investee fund manager to explain any differences in methodologies or inputs.

- When valuations change significantly, find out what caused the change and consider the reasonableness of the explanation. This can be particularly relevant for private equity funds with a discrete number of private investments whose values do not tend to fluctuate period to period.

- Compare cash distributions to previously reported values throughout the year.

- Inquire periodically as to the composition of the investment portfolio and obtain exposure levels, portfolio attribution, large positions, degree of leverage, etc. (primarily for hedge funds).

- For hedge funds, inquire and understand movements to/from "side pocket accounts" maintained by the fund and any related valuation changes for "side pocket investments." (Note: See Appendix B for further discussion of side pockets.)

Valuation may present the single biggest challenge of alternative investments. Therefore, a robust financial reporting and valuation monitoring process that is well documented is essential, and becomes increasingly important as the size and complexity of the portfolio of alternative investments increases. Investor entities should expect their independent auditors to focus on valuation issues. It would be a good idea to discuss with the auditor – sooner rather than later – what audit evidence the investor entity will expect from the investor entity to support the adequacy and reasonableness of the portfolio's valuation.

## Other financial reporting controls

In addition to exercising its responsibility for determining the fair value of alternative investments, management should take other actions to coordinate the financial statement preparation and prepare for its annual audit. These actions include, but are not limited to, the following:

- Coordinate financial reporting responsibilities between the front and back offices. For colleges, universities and other highly endowed institution, coordinate between the "investment office" and the "controller's office."

- Consider financial reporting controls and related accounting policies over key investment transactions, including investment income, realized gains and losses, and unrealized gains and losses.

- Understand and assess the implications associated with the investee fund's basis of accounting and significant accounting policies and procedures pertaining to the valuation of alternative investments.

- Monitor the level of ownership in each investee fund to determine the proper accounting method (for certain types of investor entities).

- Ensure disclosures related to alternative investments not only meet GAAP standards, but also enhance the transparency of an entity's financial statements given the increasingly high expectations about transparency that exist in the current environment.

# B. Management's risk assessment

The AICPA Practice Aid focuses on the existence and valuation assertions associated with alternative investments. Management of the investor entity is responsible for the existence and valuation of the alternative investments presented in the investor entity's financial statements. To exercise this responsibility, the investor entity's management must have a sufficient understanding of the underlying investments in order to design and maintain an effective process and related controls over its alternative investments.

An auditor's approach is based on an assessment of the risk of material misstatement of the financial statements. While management's risk assessment is based on its assessment of the inherent risk of material misstatement in its financial statements, it encompasses other factors as well. One of the challenges that investor entities and their auditors have experienced in addressing the new auditing guidance set forth in the AICPA Practice Aid has been understanding each other's assessment of risk for their respective purposes. Clearly this is an essential element to an efficient and effective audit process.

To design an efficient and effective risk assessment process that addresses the unique risks associated with alternative investments, management must consider all relevant factors. It is clear that several types of alternative investments with varying structures and strategies, each with their own attributes and characteristics, present unique risks. Accordingly, a "one-size-fits-all" approach to assigning risk attributes to alternative investments may not be appropriate.

So, how does management consider all of these factors? In many cases, management has developed its own assessment of risk across its alternative investment portfolio to facilitate its due diligence and ongoing monitoring of its investee funds. There are several quantitative and qualitative approaches that have been used in practice to address this issue. For example, the investor entity may categorize or stratify its portfolio of alternative investments into different risk categories (e.g., "low," "moderate" and "high" risk categories) and/or assign each investee fund a risk rating, score or grade based on specified criteria. Management would then design procedures and controls appropriate for each risk category to provide adequate comfort given the relative risk rating (e.g., more robust procedures and controls for the "high" risk category). This approach involves considerable judgment and requires extensive experience with alternative investments in order to balance all relevant factors for each investment.

Appendix A provides an illustrative AU332 risk assessment and related considerations that capture certain risk factors being considered in practice, including considerations related to the following areas:

Management, governance and service providers
- Quality and experience of fund management
- Role and effectiveness of fund governance
- Quality of service providers

Strategy, structure and key terms
- Nature, complexity and liquidity of strategy
- Nature of the fund's liquidity terms
- Complexity of structure and key terms

Transparency and reporting
- Nature and quality of transparency
- Quality of financial reporting

Internal controls
- Adequacy of infrastructure, personnel and general internal controls
- Design and effectiveness of valuation policies and procedures
- Quality of risk monitoring
- Impact of regulatory compliance matters
- Impact of legal and tax matters

This information is presented for illustrative purposes only, and is not intended to be an all-inclusive list of risk factors that management should consider.

Given the focus in the AICPA Practice Aid on transparency and the nature, complexity and liquidity of the investee funds and their underlying investments, these factors are discussed in more detail below.

## Nature and quality of transparency provided by the investee fund manager

Among the factors management should consider in performing its risk assessment is the nature and quality of transparency provided by the investee fund manager. An effective process for supporting fair value estimates of its alternative investments requires the investor entity's management (directly or through agents acting on its behalf) to gather sufficient information on the investment strategy and the underlying investments and to understand the policies and procedures used by the investee fund manager and/or an outside service provider, such as a fund administrator, to value the underlying investment portfolio. In many instances, the investor entity's management may not be able to obtain full transparency into the underlying investment portfolio, including a detailed list of the underlying investment portfolio held by the alternative investments. However, the issue of transparency can also be viewed broadly to encompass all forms of information or access provided by the investee fund manager, including the information and activities described earlier.

## Nature, complexity and liquidity of underlying investments of the investee funds

In assessing the risks associated with an investor entity's alternative investments, management should consider the nature of the underlying investments held by the investee funds. Generally, more actively traded, liquid securities held by an investee fund generate the highest level of confidence regarding the valuation and existence assertions at both the investor and investee levels. This is consistent with FAS 157. Conversely, the more complex, illiquid or esoteric the investee fund's investments are, the more effort the investor entity may need to put forth to gain comfort over the investee fund's valuation and existence assertions. The auditor's efforts operate in the same manner as that of the

investor entity. The audit effort needed to support the valuation and existence assertions is greater for a more complex or illiquid investee fund than for a less complex and more liquid fund. Therefore, management's risk assessment should consider the complexity of the underlying investments and the policies relating to valuation for each major asset class.

Management may also consider how the ultimate investments are held by the investee fund. The complexity of the structures used by investee funds may affect the degree of transparency provided to or available for the auditor and the investor entity's management with respect to the underlying investment portfolio. For example, information on the underlying investments may be more limited for investments held through multi-tiered fund structures, like master-feeder or fund-of-funds structures, or through various special-purpose vehicles. Such structures may result in further challenges in assessing the existence or valuation assertions.

Typically, there should be a general correlation between the liquidity of an investee fund's investment portfolio and the liquidity terms of the investee fund itself (i.e., redemption provisions). Investor entity management, as part of its initial due diligence in evaluating potential investee funds and ongoing due diligence in monitoring existing investee funds, should consider risks associated with a potential mismatch of liquidity terms between an investee fund's investments and the liquidity terms of the investee fund. Due diligence procedures should also consider the potential for "style drift" for each investee fund and the effect it may have on the matching or mismatching of liquidity.

If we are to assume correlation of liquidity, as described above, management should give special consideration to the investee funds that hold non-public, illiquid investments, such as private equity funds, special opportunity funds, real estate funds and other real asset or natural resource funds. Since these funds hold assets that are generally illiquid and for which no ready market exists, such assets are generally carried at the investee fund manager's estimate of fair value. This yields a higher level of judgment relating to the valuation assertions.

## Nature, complexity and liquidity of the investee funds themselves

In performing its risk assessment, management should consider the liquidity of the investee fund itself, and assess the risks associated with any potential mismatch of liquidity between the investee fund's investment portfolio and the liquidity terms of the fund itself.

As noted earlier, the AICPA Practice Aid defines alternative investments to include hedge funds, private equity funds, real estate funds, venture capital funds, commodity funds, offshore fund vehicles, fund-of-funds, as well as bank common/collective trust funds. Some alternative investments, such as bank common/collective trust funds and certain offshore funds, may be highly liquid (e.g., daily liquidity) with underlying investment portfolios consisting mostly of marketable securities. Accordingly, these types of alternative investments may not require significant judgment by the investor entity's management in the assessment of fair value and provide a lower risk of material misstatement to the overall financial statements, on a relative basis. As noted in the AICPA Practice Aid, alternative investments that are themselves invested in marketable securities require a less sophisticated fair value process. Therefore, this publication focuses primarily on hedge funds and private equity/venture capital funds because they are more likely to hold complex and/or illiquid investments and may provide limited, if any, liquidity.

## Hedge funds

In general, key structural and operational issues associated with hedge funds complicate their capital structures and related liquidity terms, which may affect fair value considerations of the investor entity. Such issues include, but are not limited to:

- Legal structures
- Liquidity of the underlying investment portfolio
- Timing of cash flows and net asset value determinations
- Prevalence and mechanisms associated with performance-based fee arrangements (e.g., incentive allocations)

For example, the use of a corporate form for most offshore funds (as opposed to a limited partnership form for most domestic funds) imposes certain complexities on the capital structure. In addition, multiple classes of shares or partnership interests with varied terms, as well as master-feeder or other multi-tiered structures, also contribute to the complexity of the fund and issues related to liquidity and fair value.

Investors in domestic and offshore hedge funds can generally withdraw amounts from, or redeem interests in, hedge funds on a monthly, quarterly, semi-annual or annual basis, as the case may be for each fund, subject to certain notice and timing requirements. Such terms (commonly referred to as the "liquidity terms") are governed by the respective investee fund's governing documents (e.g., limited partnership agreement, confidential offering memorandum and articles of association). In particular, the use of "side pocket accounts" may affect the risk assessment. Other liquidity terms include initial lock-ups, the ability to withdraw with penalties (i.e., redemption fees), notice periods, holdbacks and gates. Each of these liquidity terms are described in more detail in Appendix B. Other key terms that may affect the determination of fair value for an investor entity's interest in an investee fund are summarized in Appendix C. Management of an investor entity should be familiar with the various fund terms that may affect the risk assessment with respect to an investee fund, with a particular focus on the investee fund's liquidity terms.

# Private equity funds

Redemption upon liquidation or termination of the entity is generally the case for investment fund structures traditionally used for private equity funds (comprising buyout, venture capital, mezzanine and other similar strategies). These entities are referred to as "limited-life funds" pursuant to the AICPA's Statement of Position 03-4, *Reporting Financial Highlights and Schedule of Investments by Nonregistered Investment Partnerships: An Amendment to the Audit and Accounting Guide Audits of Investment Companies* and AICPA Statement of Position 95-2, *Financial Reporting by Nonpublic Investment Partnerships*. Some closed-end hedge funds employing certain investment strategies (e.g., special opportunities, distressed debt, and so-called "PIPEs," or private investments in public equities) may also be structured in a similar way. These funds typically do not provide for limited partner-initiated redemptions. Rather, by the terms of their offering documents, these funds have limited lives, often 8 to10 years, with the ability for the general partner to extend the life for a specified period of time (e.g., 2 years). Therefore, unless an investor entity's interest is sold in the "secondary market," such funds have limited opportunities, if any, for investor entities to withdraw before the fund is terminated. As a result, interests in private equity funds are less liquid than interests in hedge funds because investors in hedge funds generally have the ability to redeem their interests at their discretion, subject to applicable liquidity terms.

Also, unlike hedge funds, which are generally open to the acceptance of new capital, private equity funds do not continuously raise capital. Rather, investor entities "commit" a specified amount of capital upon inception of the fund (i.e., committed capital), which is then generally "drawn down" over a specified period of the fund's life (i.e., the investment period) either on a "just-in-time basis" (i.e., as needed by the general partner to make investments or fund the payment of fees and expenses) or at specified intervals. Both the investor entity and its auditor should be aware of the amount of future commitments, not only for disclosure, but also for understanding the projected liquidity of the overall investments in the portfolio.

Private equity funds have, as a predominant operating strategy, the return of the proceeds from the disposition of investments to investor entities. Therefore, upon the disposition of an investment, the proceeds will generally be distributed to the investor entities (including both the limited and general partners), subject to a limited ability of the general partner to "recycle" (i.e., reinvest) the capital under certain circumstances. Distributions can be in the form of cash or securities.

Finally, unlike hedge funds, private equity funds do not routinely acquire (directly or indirectly) market-traded securities or derivatives as part of their investment strategy. Rather, they generally invest in the equity and/or debt securities of private companies.

Funds that specialize in purchasing the existing interests of an investor entity in a closed private equity fund are referred to as "secondary funds." This type of fund may aim to exploit an existing investor entity's need for liquidity or desire to avoid future draws on unfunded commitment balances by purchasing these interests, often at a price that is different than the capital balance attributable to the interest. The divergence between the purchase price of the interest and the purchased capital balance (which is often a discount to the investee fund's NAV but may also be a premium) creates unique valuation considerations for these secondary funds. Because many of these transactions purchased at a discount have a "fire sale" attribute to them, the purchase price actually may not be fair value. Conversely, if the purchase price was derived from negotiations between the buyer and seller after robust due diligence by the buyer, and there is no "fire sale" element to the transaction, the purchase price may be indicative of fair value. Therefore, the investor entity's management must carefully consider the nature of each transaction and the specific facts and circumstances of each transaction when determining fair value. In each case, the investor entity should document the nature and circumstances surrounding the transaction to support the fair value assertion.

# 3 | Implications for investee fund managers

The challenges of increased investor due diligence, new auditing requirements, a growing interest in demonstrating operational soundness and stability, and other factors have all combined to force management of investor entities and investee fund managers to grapple with the issues of transparency and more intensive due diligence. As a result, investee fund managers should expect an increase in the nature and extent of due diligence by investors and requests for greater transparency. As described in this document, the request for greater transparency will not come just from management of the investor entity – it will also come from the investor entity's auditor. With respect to such requests for greater transparency, investee fund managers should consider the following:

## Anticipate requests and plan response

Investee fund managers should anticipate and prepare for confirmation requests from investor entities' auditors. As described earlier, such requests should include a request for portfolio-level detail. Formulating a policy and approach to such requests will likely require investee fund managers to make an evaluation between:

- Providing certain information they generally consider proprietary
- Meeting investors' expectations by fulfilling these requests
- Addressing legal and compliance considerations relating to providing information to some but not all investors

## Carefully consider response

As discussed earlier, the auditor's request for confirmation of the investee fund's holdings on a security-by-security basis is required by the Interpretation, and uncertainty about whether the investee fund manager will provide the requested information does not obviate the auditor's requirement to obtain sufficient appropriate audit evidence. As a result, by and large, it should be expected that auditors will send confirmation requests that include requests for portfolio-level detail similar to those set forth in the AICPA Practice Aid.

To help satisfy the accounting and reporting needs and expectations of their investors, we encourage investee fund managers to carefully consider their responses to these new confirmation requests. Other than the request for portfolio-level detail, the other information requested in the confirmation should not be too controversial or difficult for an investee fund manager to provide. To facilitate the audit of the investor entity, we encourage investee fund managers to respond to these requests for such information in a timely fashion, even if a response to the request for portfolio-level detail is sent separately.

We also encourage investee fund managers to carefully consider these confirmation requests and respond in a manner that balances the needs of their investors and their own policies and obligations with respect to transparency and confidentiality. Many investee fund managers have formulated responses that appear to have met this balance by providing the requested portfolio-level detail and/or providing other adequate information about the investee fund and its investment portfolio. Based on our experience to date, such other information has taken a variety of forms, including, but not limited to, one or more of the following:

- Condensed portfolio detail
- Performance and/or risk reports
- Exposure levels at the asset class, geography, industry and/or position level
- Liquidity analysis of the investment portfolio
- Valuation procedures, in general or by asset class

Some investee fund managers have responded with a standard reporting package, while others address each request separately. Some have even considered scheduling conference calls or hosting web-casts for investors during which they discuss valuation policies and procedures and other matters.

While the portfolio-level detail remains the requirement pursuant to the AICPA Practice Aid, the type of information described above may also be helpful or necessary for the auditor to address the valuation and existence assertions and to corroborate information the investor entity has represented or directly provided to the auditor with respect to the nature, complexity and liquidity of an investee fund.

## "One size does not fit all"

It is important for investee fund managers to recognize that requests for greater transparency from their investor entities and from their investor entities' auditors will likely not be consistent, at least for some time. Such inconsistency could result from continued uncertainty about applying the requirements set forth in the AICPA Practice Aid (which this document hopes to alleviate), and some could result from other reasons relating to the application of the considerable judgment required in this process. For example, different investor entities investing the same amount in the same investee fund may approach their due diligence responsibilities differently because of various factors, including different views about risk, different levels of sophistication with respect to their due diligence, different resources, etc. Also, auditors auditing an investment held by different investor entities in the same investee fund may also have different approaches and expectations with respect to the nature and level of transparency needed to satisfy their respective audit requirements. These different expectations and approaches could be driven by various factors, including:

- Different risk assessments by the investor entity and/or their auditor for various reasons, including the significance of the alternative investment to a given investor entity
- The design and effectiveness of the investor entity's procedures and controls
- Different audit approaches

Fund-of-funds, in particular, may face significant challenges with respect to the requirements of the Interpretation and the AICPA Practice Aid because they are both an investor entity (investing in investee funds) and an investee fund for their own investor entities.

# 4 | Implications for the auditor

## A. Auditor's risk assessment

The AICPA Practice Aid focuses on the existence and valuation assertions associated with alternative investments. The auditor's approach is based on an assessment of the risk of material misstatement of the financial statements. As stated in AU Section 312.11, the auditor's consideration of materiality is a matter of professional judgment – and materiality judgments involve both quantitative and qualitative considerations. The risk of material misstatement includes assessing inherent risk and control risk.

With respect to investments in alternative investments, an auditor's risk assessment depends on the particular facts and circumstances, including, but not limited to, the following risk factors, each of which is discussed in more detail below[1]:

1. Significance of alternative investments to the investor entity's financial statements
2. Nature and extent of the investor entity's process and related internal controls associated with the alternative investments
3. Nature and extent of information available to the investor entity to support its valuation process and valuation conclusions (including the availability of portfolio detail and audit reports)
4. Nature, complexity and liquidity of the underlying investments of the investee funds
5. Nature, complexity and liquidity of the investee funds themselves

### 1. Significance of alternative investments to the investor entity's financial statements

In assessing the risks to the investor entity's financial statements related to alternative investments, auditors need to consider the size of the portfolio devoted to alternative investments and the assessment of materiality at the overall financial statement level or in relation to financial statement assertions for classes of transactions, account balances and disclosures. However, with respect to an investor entity's interests in alternative investments, the relative size is not the only factor used to determine the audit strategy. Auditors also should consider the complexity of the strategies of these investments, the complexity of the entities or legal structures that hold the investments, the level of transparency into the underlying investments, the level of oversight by management and the Investment Committee, and other factors. These other risk considerations are addressed in more detail below.

---

1 The AICPA Practice Aid includes items (1) through (4), although we have re-sequenced them to reflect the order in which we believe they should be considered. The above list also includes item (5) which was not explicitly included in the AICPA Practice Aid. While we believe there is often an implicit correlation between the nature, complexity and liquidity of the underlying investments (item (4) above) and that of the funds themselves, we have included item (5) to ensure that auditors appropriately focus on this issue as well.

## 2. Nature and extent of the investor entity's process and related internal controls

In performing the risk assessment of the investor entity's valuation assertion, the auditor should consider the process used by the investor entity's management in developing its fair value estimates and the controls established relative to those estimates. See Section 2 for further discussion of investor entity management's controls and procedures.

In many cases, other parties play a role in the valuation and/or due diligence process. For example, the investor entity's management will often look to the investee fund manager for the mechanics of the valuation. In addition, depending on the extent of the investor entity's investment activities and the relative sophistication of its internal investment process and resources, the investor entity may use the services of a third-party investment consultant to initially select alternative investments (often within the context of its overall investment portfolio) and/or monitor such investments. As stated in the AICPA Practice Aid, management's "responsibility cannot, under any circumstances, be outsourced or assigned to a party outside of the investor entity's management." Therefore, while management of the investor entity may initially rely on the investee fund manager for the valuation of the underlying investments and the determination of its interest in the investee fund, management is not bound by such valuations. Management must have sufficient information to evaluate the investee fund's valuation and either accept or independently challenge it, as appropriate. Also, while management of the investor entity may engage a third-party consultant to select and monitor its alternative investments, it needs to design controls, including monitoring controls, to ensure that its outsourced investment monitoring and due diligence are effective.

As discussed above, regardless of whether other parties are involved in the valuation and/or due diligence process, management must have a sufficient understanding of the nature of the underlying investments, the portfolio strategies of the alternative investments, and the methods and significant assumptions used by the investee fund managers to value the underlying investments. To do this, management must maintain a sufficient complement of personnel with an appropriate level of knowledge, experience and training commensurate with the risks associated with its alternative investments. In addition, management should document its understanding of the nature of the underlying investments and the associated assumptions and methodologies used by the investee fund managers to value underlying investments.

As part of the overall risk assessment, the auditor uses professional judgment in assessing control risk (i.e., the risk that a potential material misstatement will not be prevented or detected on a timely basis by the entity's internal control). The auditor's assessment of control risk is based on an evaluation of the effectiveness of an entity's internal control to prevent or detect material misstatements in the financial statements. Since this assessment should generally be applied in the context of a particular process, it should be applied when obtaining an understanding of processes and controls, and when evaluating and validating internal controls around alternative investments. This may require that the auditor understand, evaluate and, if appropriate, validate varying controls over different classes or types of alternative investments held by the investor entity. As stated above, the controls to be tested may include those listed in Appendix 2 to the AICPA Practice Aid. As previously noted, however, that list is not intended to be all-inclusive or to be used as a checklist by the investor entity's management or the auditor. Management must design controls appropriate to its organization and the nature and extent of its alternative investments.

The assessment of control risk determines the nature and extent of controls comfort, if any, from the effective operation of internal controls. The nature of controls testing relates to the purpose and type of audit procedures. The extent of controls testing relates to the quantity and quality of audit evidence needed to demonstrate that controls operated effectively throughout the period of reliance. The level of comfort obtained from testing the controls drives an auditor to determine the nature and extent of substantive procedures to be performed.

If the auditor believes that controls are unlikely to be effective as they relate to existence or valuation of alternative investments, or believes that evaluating their effectiveness would be inefficient, the auditor would assess control risk for those assertions at the maximum, resulting in obtaining little or no controls comfort from the effective operation of internal control. Conversely, if the auditor assesses control risk at a low level, then significant controls comfort can be obtained by evaluating and validating the effectiveness of the design and operation of internal controls. Assessing control risk below the maximum level requires that the auditor:

- Identify specific controls relevant to specific assertions
- Test controls
- Conclude on the assessed level of control risk

In order to rely on controls around alternative investments, an auditor must also validate, through testing, the design and operating effectiveness of the related internal controls, including those in the information technology environment.

## 3. Nature and extent of information available to the investor entity

Management of the investor entity is responsible for the valuation of the alternative investments presented in the investor entity's financial statements. To exercise this responsibility, the investor entity's management must have a sufficient understanding of the underlying investments in order to design and maintain an effective process to support fair value estimates of its alternative investments. The timing and extent of management's procedures is based on its assessment of the inherent risk of material misstatement in its financial statements. In higher risk situations, management should have a better understanding of the underlying investments and the process used to value such investments. Management must also have sufficient information to understand, evaluate and either accept or independently challenge the investee fund's valuation policies and application thereof.

Management of the investor entity must also have a sufficient understanding of the nature of the investee fund's underlying investments, the portfolio strategy employed and the policies and procedures used by the investee fund manager and/or an outside service provider, such as a fund administrator, to value the underlying investment portfolio, including the inputs, methods and key assumptions used. Such understanding should be documented in the investor entity's files.

An effective process for supporting fair value estimates of its alternative investments requires the investor entity's management (directly or through agents acting on its behalf) to have sufficient information on the underlying investments. Therefore, an auditor needs to assess the nature and extent of information available to management and the documentation and support of such information in management's files. Good internal controls include strong documentation related to both initial and periodic ongoing due diligence. To the extent that management does not have sufficient information on its underlying investments, and/or sufficient evidence of such information, the auditor needs to consider the internal control and financial statement reporting implications.

## 4. Nature, complexity and liquidity of underlying investments of the investee funds

In assessing the risks associated with an investor entity's alternative investments, the auditor should consider factors including, but not limited to, the nature of the underlying investments held by the investee funds, the policies relating to valuation for each major asset class, and the manner in which investments are held by the investee fund.

As discussed in Section 2, the auditor's efforts operate in the same manner as that of the investor entity. Generally, more actively traded, liquid securities held by an investee fund generate the highest level of confidence regarding the valuation and existence assertions. This is consistent with FAS 157. The audit effort needed to support the valuation and existence assertions is greater for a more complex or illiquid investee fund than for a less complex and more liquid fund.

The investor entity's auditor should also consider management's policies relating to obtaining an understanding and evidence of the composition of the investee fund's investment portfolio and the valuation policies relating thereto (e.g., what are the valuation inputs and methodologies, how much of the portfolio is fair valued, how often is the portfolio priced). The auditor, in developing a risk assessment, must also consider how the ultimate investments are held by the investee fund. The complexity of the structures used by investee funds may affect the degree of transparency provided to or available for the auditor and the investor entity's management, with respect to the underlying investment portfolio. For example, information on the underlying investments may be more limited for investments held through multi-tiered fund structures like master-feeder or fund-of-funds structures, or through various special-purpose vehicles. Such structures may result in further challenges in assessing the existence or valuation assertions.

As discussed in Section 2, there should be a general correlation between the liquidity of an investee fund's investment portfolio and the liquidity terms of the fund itself (i.e., redemption provisions). As part of its risk assessment, the auditor should consider the potential for liquidity mismatch between an investee fund's investments and the liquidity terms of the investee fund itself, as well as the potential for "style drift" for each investee fund and the effect it may have on liquidity.

# 5. Nature, complexity and liquidity of the investee funds themselves

In performing its risk assessment over an investor entity's portfolio of alternative investments, the auditor should consider the liquidity of the investee funds themselves, with a particular focus on hedge funds and private equity funds. When assessing the risk of the investment, management of the investor entity and the auditor should understand the nature and extent of the investee fund's liquidity terms. For the following reasons, funds that provide less liquidity (i.e., less frequent redemption rights) may be considered higher risk than funds with greater liquidity:

- Investor entities are not as readily able to redeem their interests in the fund.
- There is an expected correlation between the liquidity terms of the fund itself and the liquidity of the investee fund's underlying investment portfolio.

Therefore, investee funds with longer lock-up periods and/or notice periods may suggest that the investee fund is less liquid – and therefore higher risk – than funds with shorter or no lock-up periods. This is because investors in funds with shorter or no lock-up periods generally have the ability to redeem their interests more frequently. Also, since investor entities lose any redemption rights with respect to the portion of the underlying investments designated in "side pocket accounts" (as explained in Appendix B), the use of such mechanisms may create inherent difficulties in assessing fair value. Therefore, it is important to determine if investments held in the side pocket accounts are material to the investor entity's overall capital balance, and for management to understand the nature of the fair value policies and procedures over the related side pocket investments. Further, the imposition of the "gate" could indicate significant redemptions from the fund. Depending on the liquidity of the underlying investments in the fund, this could affect the amount and timing of the investor entity's redemptions from an investee fund and, therefore, affect the investor entity's assertion related to fair value (i.e., consider whether the net asset value of the investment should be discounted).

Some of these terms could affect the investor entity's net realizable value with respect to an investee fund. For example, the investor entity and the auditor should be aware of situations where the holdback period (described in Appendix B) has ended and proceeds have either not been received from the investee fund or have been received but not for the full amount. This could indicate an issue associated with the net realizable value of the receivable from the investee fund with respect to such holdback amount.

When assessing the risk of the investment, the auditor (and management of the investor entity) should ensure they understand the nature and extent of the investee fund's liquidity terms in combination with other factors. For example, since private equity funds have limited opportunities, if any, for investor entities to withdraw before the fund terminates (other than through a sale in the "secondary market"), interests in private equity funds may be considered less liquid than interests in hedge funds. Therefore, simply from a liquidity perspective, private equity funds may be considered higher risk. Other factors, however, such as the possibility of a sale in the "secondary market" and/or the higher level of transparency often provided by private equity fund managers to their investors may serve to mitigate the higher risk. Private equity fund managers tend to provide significant transparency to investors because their portfolios consist of positions that were "privately negotiated" with little access to the transactions through the public market.

# Summary of auditor's risk assessment

As noted throughout this section, with respect to investments in alternative investments, the auditor's risk assessment depends on the particular facts and circumstances, including, but not limited to, the following risk factors:

- Significance of alternative investments to the investor entity's financial statements
- Nature and extent of management's process and related internal controls associated with alternative investments
- Nature and extent of information available to management to support its valuation process and valuation conclusions
- Nature, complexity and liquidity of the underlying investments of the investee funds
- Nature, complexity and liquidity of the investee funds themselves

In determining the nature, timing and extent of audit procedures, the auditor must consider all of these factors. It is clear that several types of alternative investments with varying structures and strategies, each with their own attributes and characteristics, present unique audit risks. Accordingly, a "one-size-fits-all" approach to auditing an investor entity's interests in various alternative investments may not be appropriate. To design efficient and effective audit procedures that address the unique risks associated with each investment, all relevant factors must be considered. As with management's risk assessment, there are several approaches to addressing this issue. One approach would be to categorize or stratify the investor entity's portfolio of alternative investments by the auditor's perceived risk assessment into "low," "moderate" and "high" risk categories. The auditor would then design procedures for each category to provide adequate comfort given the relative risk rating (e.g., more robust audit procedures for the "high" risk category). For example, based on the risk assessment, the auditor may categorize the portfolio of alternative investments as follows:

| Low risk | Moderate risk | High risk |
|---|---|---|
| • Lower relative risk than other categories | • Moderate relative risk compared with other categories | • High relative risk compared with other categories |
| • Heavier reliance on management's process and controls | • Moderate reliance on management's process and controls | • Low reliance on management's process and controls |
| • Some substantive testing of valuation and existence assertions | • More substantive testing of valuation and existence assertions | • Heavy substantive testing of valuation and existence assertions |

This approach, which involves considerable judgment by the auditor, should consider all relevant factors for each alternative investment. For example, if the auditor considered the liquidity of the alternative investment as the only relevant factor in categorizing risk, all closed-ended private equity funds would default to a "high" risk rating. If the auditor considered other factors, such as the transparency of portfolio holdings and quality of quarterly investment summary disclosures, the risk assessment for those private equity funds may change to "moderate" or "low."

Also, given the varying terms, structures and strategies within different types of alternative investments, it is likely that the alternative investments within a general category (e.g., hedge funds, private equity funds) may be placed into different risk categories. For example, a hedge fund that holds highly liquid, marketable securities and provides monthly liquidity may be categorized as "low" risk, while another hedge fund that holds liquid and illiquid investments and has a longer lock-up period may be considered "moderate" or "high" risk. The same could apply for funds that employ a similar investment strategy but are structured differently.

In addition, a fund-of-funds investment might be categorized initially as "high" risk given the inherent liquidity issues and transparency constraints with respect to the ultimate underlying investments. If, however, the fund-of-funds manager has effective procedures and strong internal controls and periodically provides detailed or summary information on portfolio funds, the risk assessment might change to "moderate" or "low" risk.

As discussed in Section 2, in many cases, management may have developed its own stratification of risk across its alternative investment portfolio to facilitate its due diligence and ongoing monitoring of the investee fund managers. Though the factors management considered in their stratification effort may vary from those of an auditor, the auditor should understand management's approach and any significant differences that could influence their ultimate risk categorization of the investments. An efficient approach may be for the auditor to obtain and assess management's risk assessments, corroborate the information, and then design appropriate audit procedures around each category.

# B. Addressing the existence and valuation assertions

As with any audit area, an auditor's approach is based on an assessment of the risk of material misstatement of the financial statements. Accordingly, the auditor needs to consider the quantity and quality of audit evidence to be obtained when assessing risks and designing audit procedures. There is a direct relationship between the risk of misstatement and the quantity of audit evidence needed – the greater the risk, the more audit evidence is required. Also, the quantity and quality of audit evidence are interrelated because the higher the quality of audit evidence, the less quantity of audit evidence may be required.

The evaluation of the quality of such evidence is subject to the auditor's professional judgment. The AICPA Practice Aid highlights that the quantity and quality of the audit evidence necessary generally increases as:

• The percentage of alternative investments to total assets and the total investment portfolio increases

• The nature, complexity and volatility of the underlying investments increases

Refer to Exhibit I and related discussion in the AICPA Practice Aid for further information.

In general, a direct relationship also exists between the quality of the audit evidence and the nature and extent of the information provided by the investor entity and/or the investee fund manager as of a date closest to the investor entity's balance sheet date. As the quality and extent of information as of the investor entity's year end increases, so does the quality of the audit evidence available. Because of certain inherent issues associated with alternative investments, auditors may face challenges in obtaining the same quality and quantity of audit evidence across an investor entity's portfolio of alternative investments. The evaluation of the quality and quantity of audit evidence is subject to the auditor's professional judgment. Table 4A is a non-all-inclusive list of the various types of audit evidence an auditor may receive and an illustrative assessment as to its quality.

Table 4A

| Information available | Quality |
| --- | --- |
| US GAAS/GAAP audited financial statements of the investee fund, including detailed schedule of investments, as of the investor entity's balance sheet date | Highest |
| US GAAS/GAAP audited financial statements of the investee fund, including condensed schedule of investments, as of the investor entity's balance sheet date | High |
| Unaudited detailed list of the investee fund's underlying investments as of the date of the investor entity's balance sheet date, particularly to the extent the investments are highly liquid | High |
| Non-US GAAP audited financial statements of the investee fund, including detailed schedule of investments, as of the investor entity's balance sheet date, along with reconciliation to US GAAP | Moderate/High |
| Unaudited investee fund's condensed schedule of investments as of the date of the investor entity's balance sheet date | Moderate |
| Unaudited detailed listing of the investee fund's underlying investments as of a date other than the investor entity's balance sheet date | Moderate |
| Audited financial statements of the investee fund, including a detailed or condensed schedule of investments as of a date other than the investor entity's balance sheet date | Moderate |
| Confirmation with the investee fund manager or with a third-party administrator of the investor entity's interest in the investee fund (e.g., number of units held or percentage ownership, and value of the investor entity's proportionate share of net assets/partners' capital) as of the investor entity's balance sheet date | Moderate/Low |
| Limited visibility into the underlying investments | Low |

# Existence assertion

The existence assertion addresses whether the alternative investments exist at a given date. The occurrence assertion addresses whether the alternative investment transactions reported in the financial statements actually occurred.

### Confirmation process

The AICPA Practice Aid provides guidance on the confirmation process that auditors should incorporate into their audit approach. According to the AICPA Practice Aid, simply confirming investments in the aggregate does not constitute adequate evidence with respect to the existence assertion. Rather, the AICPA Practice Aid states that, if the auditor concludes that the nature and extent of audit procedures should include confirming the existence of the entity's investments, confirmation of the holdings of the alternative investments on a security-by-security basis typically would constitute adequate audit evidence with respect to the existence assertion. Appendix 1 to the AICPA Practice Aid includes an illustrative confirmation for alternative investments. This confirmation is illustrative only and may be enhanced or modified if appropriate. For example, for private equity funds, it may be appropriate to also confirm the investor entity's share of committed capital and the unfunded capital commitment as of the reporting date. It may also be appropriate to create different confirmations for an investee hedge fund (domestic and offshore funds) or an investee private equity fund.

If the confirmation request is not returned to the auditor or the details of the underlying investments are not otherwise provided, the AICPA Practice Aid states that the auditor should perform alternative procedures to assess the existence of the alternative investments. Even if the auditor obtains a detailed confirmation of the investee fund's holdings, the AICPA Practice Aid states that the auditor may need to perform additional procedures, depending on the significance of the alternative investments to the investor entity's financial statements. Considerable auditor judgment is required to determine whether the auditor has sufficient evidence to satisfy the existence assertion.



The confirmation process is summarized as follows:

---

1 It would be unusual for the nature and extent of audit procedures to not include confirming evidence of the investor entity's alternative investments.