## Illustrative alternative or additional procedures

Alternative or additional auditing procedures include, but are not limited to, the following:

1. Observe management site visits or listen to telephone calls to investee funds (or review documentation of such calls or visits).

Observation: Depending on the timing of management's site visits or telephone calls to investee funds and the willingness of the investee fund manager to allow participation by the auditor, auditors may or may not be able to actually observe such visits or calls. However, management of the investor entity, as part of its due diligence process, should maintain adequate records of such visits or calls, which auditors can review.

2. Review executed partnership, trust, limited liability corporation or similar arrangements.

Observation: The ability and extent to which executed documents help satisfy the existence assertion depends on factors such as the nature of the investee fund and the aging of the investment. For example, the limited partnership agreement for a private equity fund may include a list of each limited partner and their corresponding capital commitment. Reviewing executed copies of such documents may provide evidence as to the existence assertion, especially when the investment is relatively new. However, if an investment in a private equity fund is aged (i.e., greater than one year), reviewing the partnership agreement would give the auditor less evidence of the ownership of that alternative investment as of a current reporting date.

The limited partnership agreement for a hedge fund does not typically provide an investor list. Rather, each limited partner separately executes a limited partnership agreement and related subscription document upon admission to the hedge fund. Limited partners may execute additional subscription documents or other documents upon subsequent subscriptions to the fund. Limited partners may also execute redemption requests upon providing notice of their intention to redeem from an investee fund.

The auditor might obtain adequate audit evidence by reviewing executed documents, along with confirmation of related capital activity, with the investee fund manager or with a third-party fund administrator, and vouching the related cash.

3. Inspect other documentation supporting the investor entity's interest in the fund (e.g., confirmation of subscription, periodic statements, tax forms).

Observation: Upon subscription to a fund, the investee fund manager or fund administrator may provide a "confirmation" of the investment made. Typically, the investee fund manager or fund administrator also provides periodic statements reflecting an investor entity's interest in the fund, related capital account or number of shares/units held. Such information may be useful audit evidence for the existence assertion, especially when it is supplied to the investor entity directly by a third-party fund administrator. Alternative investments structured as domestic partnerships (or taxed as such) would also be required to provide limited partners with a Schedule K-1, which reports the components of taxable income, the capital account balance and related activity, as well as the percentage of interest of such investor entity in the fund. Auditors need to keep in mind that, like most alternative investments, funds structured as domestic partnerships predominantly have a December 31 year end. For such information to be most useful to the auditor of the investor entity, management of the investor entity with a different year end should reconcile such calendar year tax information to the audit period and year end of the investor entity.

4. Review periodic investor/partner statements from the investee fund or administrator/custodian reflecting investment activity and compare such activity with the investor entity's records.

Observation: As noted above, the investee fund manager or fund administrator typically provides periodic statements reflecting an investor entity's interest in the fund, related capital account or number of shares/units held. Comparing such documentation reflecting investment activity to the records of the investor entity may provide the auditor with valuable audit evidence, especially when such information is supplied directly to the investor entity by a third-party fund administrator.

Dockets.Justia.com

5. Review annual audited financial statements.

Observation: In most cases, alternative investments are required to have an annual audit. The timing of the audit depends on factors primarily driven by the investee fund's fiscal year end and the nature of its underlying investment portfolio. The vast majority of alternative investments have a December 31 year end. Some offshore hedge funds, however, may have a different year end, often June 30. Reviewing annual audited financial statements (or, to a lesser extent, quarterly or semi-annual unaudited financial statements) may be useful in satisfying the existence assertion, especially when the financial statements include additional information detailing an investor entity's interest in the fund. Considerations related to the use of such financial statements are discussed in further detail later in this section.

6. Vouch relevant cash receipts and disbursements.

Observation: Comparing cash activity reflected in the records of the investor entity with the corresponding cash movements reflected in bank or brokerage statements generally provides the auditor with valuable audit evidence.

## Valuation assertion

The valuation assertion addresses whether alternative investments have been included in the financial statements at the appropriate values. This guidance addresses alternative investments required to be carried at fair value.

### Illustrative procedures

The auditor's consideration of the valuation assertion typically begins with understanding the process used by the investor entity's management to develop its fair value estimates and the controls established relative to those estimates.

As discussed earlier, management of the investor entity is responsible for the valuation of the alternative investment amounts presented in the investor entity's financial statements. The AICPA Practice Aid states that this responsibility **cannot be outsourced or assigned** to a party outside of the investor entity's management. While management can look to other parties for the mechanics, review, accounting or oversight of the valuation – such as the investee fund manager, administrator/custodian or a third-party investment consultant – management must have sufficient information to evaluate the investee fund's valuation, and either independently challenge it or accept it, as appropriate. In certain circumstances, challenging the investee fund's valuation may cause the investor entity to modify it in some way.

The investor entity's auditor needs to develop a solid understanding of the investor management's process and controls to determine the estimated fair value of its alternative investments in order to assess how they affect the nature, timing and extent of the auditing procedures. The AICPA Practice Aid suggests that the auditor test management's fair value estimates using one or more of the following approaches as of the balance sheet date:

a. Confirm the alternative investment

b. Review and test the investor entity's process and related data

c. Use audited financial statements

d. Review recent transactions

These approaches are described in more detail below. To the extent that the investor entity's management estimates the fair value of a significant portion of its alternative investments as of an interim date, management of the investor entity needs to obtain sufficient information to record such investments at fair value as of its balance sheet date. In those cases, the auditor must test both the investor entity's estimation process as of the interim date and the investor entity's roll-forward process to the reporting date.

The auditor must also consider how much management of the investor entity relies on the information reported to it by the investee funds. If management of the investor entity relies significantly on the investee fund manager's valuations and valuation process, management must first ascertain whether it is appropriate to do so by gathering as much information about each of the investee fund managers as possible. Much of this information is obtained and analyzed as part of management's initial and ongoing due diligence procedures described in the AICPA Practice Aid and discussed in Section 2.

The auditor should ensure that it understands where within the investor entity's organization the due diligence and monitoring process takes place. The auditor should not only review the procedures performed by operational and accounting personnel, but also focus on the functions performed by areas such as portfolio management, risk management and the legal department. In some cases, the responsibility for the due diligence programs and related documentation is dispersed within an investor entity's organization. It is also helpful for the auditor to understand the type of data that is presented to management, Valuation Committees and/or the board of directors at the investor entity with respect to alternative investments.

Where management of the investor entity has determined that they are NOT comfortable relying on an investee fund's reported value, management must arrive at its own estimate of fair value. This is typically done with the help of the underlying investee fund manager because the information about the portfolio investments that would facilitate the valuation process is often not totally transparent or available to the investor entity. For example, if the investee fund reports on a tax basis (rather than US GAAP), the investor entity should contact the investee fund manager to obtain the necessary information to arrive at fair values in accordance with US GAAP for the investee fund's investment portfolio.

The approaches described in the AICPA Practice Aid for the auditor to test management's fair value estimates are each stated below, with additional guidance provided on the use of financial statements and the review of recent transactions.

a. Confirm the alternative investment

The AICPA Practice Aid states that if the auditor determines that the nature and extent of auditing procedures should include testing the measurement of the investor entity's investment, simply receiving a confirmation from the investee fund of its underlying investments, either in the aggregate or on a security-by-security basis, does not, in and of itself, constitute adequate audit evidence with respect to the valuation assertion. The extent of additional procedures is directly related to the assessed risk of material misstatement of the financial statements.

b. Review and test investor entity's process and related data

A confirmation on a security-by-security basis may provide the auditor with corroborating evidence to support the data used or considered by the investor entity's management in its valuation process. However, if detailed information, such as a description of each investment, ownership percentage, shares owned and estimated value is not available, then the auditor should look to other information that management of the investor entity used in its valuation.

Such other information may include detailed descriptions of the investee fund process to determine fair value and the investor entity's assessment of that process. It may also include a review of Valuation or Investment Committee minutes or other memoranda or summaries that document key valuation assessments and judgments made in the process.

Often, management uses a wide variety of information to assess valuation. This includes management's understanding and supporting documentation related to the valuation controls at the investee fund manager, as well as information it receives on a periodic basis. As part of its ongoing due diligence, the investor entity may receive full transparency to the investee fund's underlying portfolio or something less, such as material positions. Alternatively, they may receive other information, such as exposure reports or benchmarking data, which they may use to assess the reasonableness of the returns provided by investee fund managers. For instance, a fixed-income hedge fund may not provide an investor with full transparency to the fund, but may give the investor key data with respect to the portfolio that the investor may in turn use to track the fund against observable benchmarks. Such data includes the duration of the portfolio, weighted average maturity, weighted average coupon, portion of the portfolio that is hedged, etc. The investor entity may then use this information to derive expectations related to the investee fund, which are then compared to actual returns.

Another example would be an investee fund invested in over-the-counter derivatives. The investee fund may provide enough information related to the portfolio, such as its sensitivity relative to the benchmark (e.g., the delta of the portfolio) that it could be tracked against an observable market. In the absence of sufficient audit evidence, especially when the year end of the investee fund does not coincide with that of the investor entity, auditors may consider testing these analytical procedures by performing independent analytical procedures using publicly available information or testing the assumptions used.

## c. Use audited financial statements

The investor entity should provide the auditor with the most recent financial statements of each investee fund and the accompanying audit report. The investor entity should also provide the auditor with the reconciliation of such financial statements with the investment balance recorded by the investor entity. In reviewing these financial statements and related reconciliations, the auditor should consider the factors discussed below.

## Obtain and review available financial statements

In general, coterminous financial statements of the investee fund that are reported on the same basis of accounting as those of the investor entity and which have been audited by an auditor whose report is satisfactory to the investor entity's auditor, for this purpose, may constitute sufficient evidential matter.

Upon reviewing the investee fund's financial statements, however, the auditor may conclude that additional evidence is needed because of factors such as:

- Unfamiliarity with, or questions surrounding, the professional reputation and standing of the investee fund's auditor
- Significant differences in fiscal year ends between the investor entity and the investee fund
- Significant differences in the basis of accounting between the investor entity and the investee fund resulting in significant differences in the accounting principles applied
- Questions regarding the audit opinion for the investee fund and/or its accounting policies
- Timing of the investor entity's audit that precludes receipt of the audited financial statements of the investee fund
- Other factors that cause management of the investor entity discomfort with relying on an investee fund manager's estimate of value

The following decision tree is a tool to help the auditors of investor entities as they consider the use of financial statements of investee funds.



As reflected above, if the investor entity and the investee fund have the same year end and basis of accounting, then the audited financial statements of the investee fund and the accompanying auditor's report may provide significant audit evidence regarding the valuation of the investment. To the extent that the investor entity and the investee fund have different year ends and/or a different basis of accounting, the auditor may need to perform additional procedures.

---

1 It would be unusual for the audit strategy to not include obtaining and reviewing the most recent audited financial statements of the investee funds.

If, because of the issues listed above (or others), the auditor needs more evidential matter, the auditor should perform additional procedures to gather the additional evidence. The nature, timing and extent of these additional procedures is a matter of professional judgment after considering factors such as the materiality of the investment in relation to the financial statements of the investor entity. These procedures may include those listed in Table 4B below.

Table 4B

| Factors impacting use of audited financial statements | Illustrative additional procedures |
|---|---|
| Professional reputation and standing of the investee fund's auditor | • Investigate the professional reputation and standing of the investee fund's auditor. <br><br> • Request that the investor entity apply, or have the auditor apply, appropriate procedures to the financial statements and/or the underlying records. <br><br> • Request that the investor entity call or visit the other auditor to discuss audit procedures followed and the results thereof. Review the audit program and/or working papers of the other auditor, to the extent permissible.[1] While it may be appropriate for auditors to observe such visits (or to review documentation of the calls or visits), the investor entity retains primary responsibility. |
| Significant differences in fiscal year ends | • Obtain and review interim financial information supplied by the investor entity related to the investee fund and test their tracking analyses. <br><br> • Obtain from the investor entity any roll-forward or analytical procedures over the investment balance from the date of the investee fund's year end to the date of the investor entity's year end. |
| Significant differences in basis of accounting | • Obtain a reconciliation of the reported amounts to US GAAP. Such reconciliation should be prepared by the investor entity or obtained by the investor entity from the investee fund manager and reviewed by the investor entity. <br><br> • Obtain documentation from the investor entity assessing differences in the basis of accounting and the effect on the investment balance. For investments not held by the investee fund at fair value, review the independent assessment of fair value provided by the investor entity's management.[2] |
| Qualified opinion and/or unusual accounting policies | • Review financial statements of the investee fund to assess the potential effect of a qualified opinion or unusual accounting policies. <br><br> • Obtain documentation from the investor entity assessing the potential effect of a qualified opinion or unusual accounting policies. |

---

1 To the extent that the investee fund's auditors have policies that prevent an investor from contacting them directly, investor entity auditors need to consider alternative procedures.

2 This is typically done with the help of the investee fund manager whenever possible. For example, if the investee fund reports on a tax basis (rather than US GAAP), management of the investor entity should contact the investee fund manager to obtain the necessary information to arrive at fair values for the investments held by the investee fund. For real estate funds, for instance, the investee fund manager may have independent appraisals. Management of the investor entity may obtain and review the appraisals to support its fair value assertions.

## Reconcile financial statements to investment balance

In addition to assessing the adequacy of the audited financial statements of the investee funds based on the factors set forth above, the auditor should obtain management's reconciliation of the investee fund's financial statements with the investor entity's recorded investment balance.

Management's ability to reconcile the investee fund's audited financial statements to the investor entity's recorded investment balance depends on various factors, such as the nature of the information provided in the financial statements and the investee fund's capital structure. In certain situations, it may be easy for the investor entity to reconcile the recorded investment balance with information in the investee fund's audited financial statements. In other situations, it may be difficult. Consider the following examples:

- Supplemental information: In some cases, the audited financial statements include supplemental information containing individual investor capital balances and related activity. In such situations, the investor entity should compare the recorded investment balance with the corresponding capital balance presented as supplemental information to the investee fund's audited financial statements and reconcile any differences.

- Unitized capital structures: In the case of hedge funds that maintain unitized capital structures (e.g., most offshore funds structured as corporations), the audited financial statements should present the net asset value (NAV) per share for the various classes or series outstanding at year end. The investor entity may decide to compare such NAVs reflected in the audited financial statements with those used by the investor entity to record its investment balance.

- Analytical procedures: In other cases, it may be more difficult for management to reconcile the audited financial statements for the investee fund as a whole with the investor entity's recorded investment balance. In those cases, the investor entity may decide to perform analytical procedures over the investment balance for reasonableness. For example, it may be possible for the investor entity to reconcile its investment balance to the product of the total capital/net assets of the investee fund reflected in the audited financial statements and the investor entity's percentage interest. Such percentage interest can be obtained from information provided by the investee fund manager and/or the percentage interest reflected for the investor entity on the Schedule K-1 it receives from an investee fund structured as a limited partnership (i.e., most domestic funds).

- Private equity funds: With respect to investments in private equity funds, management's reconciliation of the audited financial statement to the recorded investment balance may be more difficult because the economics of private equity funds may be unique. For instance, partnership agreements may require priority returns be made to limited partners before the general partner receives distributions of capital, after which the general partner may receive amounts in excess of its capital commitments (commonly known as carried interest). The investor entity's management must have a very good understanding of the partnership agreement and its effect on fair value as of the balance sheet date. The investor entity's analysis should generally incorporate a hypothetical liquidation approach (i.e., what amount would the investor entity be entitled to under the distribution terms of the investee fund agreement if the investee fund were to liquidate all of its investments at the balance sheet date). The investor entity must also be cognizant that some financial statements of private equity funds may not allocate unrealized gain/loss to the capital accounts of the limited partners. Lack of allocation of such amounts may result in large differences associated with capital balances for the partners. The investor entity must ensure that its analysis incorporates unrealized gain/loss amounts. Finally, it is always important for the auditor to read investor letters that accompany the annual financial statements because they may identify anticipated transactions or other information that may be relevant to the determination of fair value.

### d. Review recent transactions

Under Statement of Auditing Standard No. 101, the auditor's substantive tests of fair value measurements involve examining subsequent events and transactions that confirm or disconfirm the estimate. The investor entity may liquidate a portion of its alternative investment as of a date close to the investor entity's fiscal year end to support the valuation of its investment. The auditor needs to consider how often these settlements occur and the procedures used to value them, including whether there are holdbacks or whether the transactions are between willing buyers and sellers.

## Recent transactions not indicative of fair value

Sometimes a recent transaction should not be considered in the valuation considerations because it may not indicate fair value. Such an example often arises in the secondary private equity market where an investor purchases a limited partner's existing interest and remaining commitment in a private equity fund. This often results from the seller's need for liquidity, inability to fund future commitments or desire

to reduce exposure to private equity. The seller may sell its interest in a private equity fund to the buyer at a deep discount or at a premium to the fund's NAV. Consequently, the sale or transfer price between the buyer and the seller may not indicate a true fair value.

Another example is a "run on the fund," where funds have been forced to liquidate because of various circumstances, such as poor performance combined with expired lock-up periods or lack of "gates." This could become a situation of duress for the investee fund. In an effort to meet its redemption requests, the fund may be forced to liquidate securities in a "fire sale" situation. Such a forced liquidation or sale could result in values lower than those recorded on the books and records of the investee fund. Alternatively, the fund may sell its highly liquid investments first, leaving very illiquid investments in the portfolio. The auditor must consider those remaining investments if the investor entity remains in the fund. The investor entity must be aware of the activities occurring at the investee fund to ensure no circumstances can create a situation of duress that may affect the valuation of its investment. If indicators of duress arise, the investor entity requires additional effort to determine fair value.

### Full and partial redemptions

On or close to the investor entity's fiscal year end, there may be full or partial redemptions of interests in investee funds. For a full redemption, as noted in Appendix B, the investee fund may hold back a portion of the investor entity's balance pending the issuance of the independent auditor's report of the investee fund. These amounts are generally recorded as receivables on the investor entity's books, and may range from 5 percent to 10 percent of the full redemption amount. After the auditor's report is released, the investee fund will then remit the remaining balance, with the ultimate balance perhaps being more or less than the balance recorded at year end. The investor entity's auditor's procedures should include vouching such amounts received and comparing adjustments to the amounts recorded at the balance sheet date.

Full redemptions can be indicative of value near the balance sheet date. For instance, close to year end, an investor entity may request a full redemption from an investee fund. The balance related to its investment may be materially consistent with the balance recorded at year end. Through its monitoring controls and other documentation, the investor entity should be able to assert the reasons for the difference between the year-end balance and the redemption amount. The combination of the cash received from the redemption and other documentation supporting the investor entity's assertion, with respect to the difference between the balance sheet value and redeemed value, may constitute sufficient audit evidence for the valuation assertion.

It is more difficult in a non-unitized fund environment (i.e., investment partnership) to gain significant comfort with respect to the valuation assertion from a partial redemption because there is no point of measurement for the investor entity. For example, if an investee fund reported an investor account balance of $5,000,000 and the investor entity requested $3,000,000 in redemption proceeds, the redemption provides less support for the valuation assertion with respect to the remaining $2,000,000. Accordingly, the auditor for the investor entity would have to gain additional audit evidence for both the existence and valuation assertions. With respect to unitized funds (i.e., most offshore funds), some audit comfort may be achieved because the number of units and dollar value per unit are known. But this depends on the circumstances associated with the transaction.

## Summary of addressing the existence and valuation assertions

As discussed above, the auditor's approach is based on an assessment of the risk of material misstatement of the financial statements and must consider the quantity and quality of audit evidence to be obtained when assessing risks and designing further audit procedures.

Because alternative investments use varying structures and strategies, each with their own attributes and characteristics, they present unique audit risks. Accordingly, a "one-size-fits-all" approach to auditing an entity's interests in various alternative investments may not be appropriate or possible.

An effective and efficient process may involve the following:

1. Obtain management's risk assessment over its portfolio of alternative investments.

2. Review and assess such risk assessment and corroborate/test the information reflected.

3. Design efficient and effective procedures that address the unique risks associated with each investment, either individually or by assigned risk category, after considering all relevant factors.

Because of certain inherent issues associated with alternative investments, either individually or by assigned risk category, auditors may face challenges in obtaining the same quality and quantity of audit evidence across an investor entity's portfolio of alternative investments. The evaluation of the quality and quantity of audit evidence necessary to satisfy existence and valuation assertions is subject to the auditor's professional judgment.

# Appendix A | Illustrative AU332 risk assessment and AU332 risk assessment considerations

The following illustrative AU332 risk assessment is provided as an example only. It depicts one approach management of investor entities might use to assess and summarize risk to determine the nature and extent of due diligence pursuant to the requirements of the AICPA Practice Aid. This example is not intended to be all-inclusive of every risk factor that management should consider.

| | Risk rating[1] | | |
|---|---|---|---|
| | Fund A | Fund B | Fund C |
| General information | | | |
| Fund type (e.g., hedge, private equity, real estate, fund-of-funds) | | | |
| Investment strategy | | | |
| Investor's original investment date | | | |
| Investor's investment balance at [date] | | | |
| Fund's net assets/partners' capital | | | |
|     Amount | | | |
|     As of date | | | |
| Fund manager's assets under management | | | |
|     Amount | | | |
|     As of date | | | |
| Fund's fiscal year end date | | | |

---

1 Investor entities can use different approaches to assess the risk associated with their portfolio of alternative investments. Such approaches can be quantitatively driven based on the assignment of a risk score (i.e., 1 = lowest risk, 5 = highest risk) or more qualitatively driven.

| | Risk rating[1] | | |
|---|---|---|---|
| | Fund A | Fund B | Fund C |
| **Management, governance and service providers** | | | |
| Quality and experience of fund management | | | |
| Role and effectiveness of fund governance | | | |
| Quality of service providers | | | |
| **Strategy, structure and key terms** | | | |
| Nature, complexity and liquidity of strategy | | | |
| Nature of fund's liquidity terms | | | |
| Complexity of structure and key terms | | | |
| **Transparency and reporting** | | | |
| Nature and quality of transparency | | | |
| Quality of financial reporting | | | |
| **Internal controls** | | | |
| Adequacy of infrastructure, personnel and general internal controls | | | |
| Design and effectiveness of valuation policies and procedures | | | |
| Quality of risk monitoring | | | |
| Impact of regulatory compliance matters | | | |
| Impact of legal and tax matters | | | |
| **Other factors** | | | |
| Composite Risk Rating/Score/Grade | | | |

*(Left vertical label: Risk assessment areas[2])*

Prepared by: _____   Date: _____

Reviewed by: _____   Date: _____

---

1 Investor entities can use different approaches to assess the risk associated with their portfolio of alternative investments. Such approaches can be quantitatively driven based on the assignment of a risk score (i.e., 1 = lowest risk, 5 = highest risk) or more qualitatively driven.

2 See accompanying pages for items to consider when assessing the risk associated with an investee fund.

PricewaterhouseCoopers | Auditing Alternative Investments

# AU332 risk assessment considerations

The following summarizes various considerations that management can use when addressing the risk areas in the AU332 risk assessment. These risk assessment considerations are for illustrative purposes only and are not intended to be all-inclusive of every risk factor that management should consider.

## Management, governance and service providers

### Quality and experience of fund management

- Is this a new or established investment manager?
- What is the quality and experience of management?
- Does the investment manager demonstrate that he or she is specifically qualified to execute the strategy in the market in which the investee fund invests?
- Is there evidence from similar endeavors of the ability of the principals to work together?

### Role and effectiveness of fund governance

- Is there an Advisory Committee composed of certain limited partners or others? Is it effective?
- Is there a Board of Directors? If so, are there independent members? Is it effective?

### Quality of service providers

- Are the auditors a reputable firm with the requisite knowledge and experience given the nature and complexity of the fund?
- Who is the prime broker? Will they use multiple prime brokers?
- Are the attorneys a well-established firm with appropriate industry experience?
- Is the administrator/accounting agent (if outsourced) experienced and well-established?

# Strategy, structure and key terms

## Nature, complexity and liquidity of strategy

- What is the nature, complexity and liquidity of the investment portfolio?
- Consider the following:
  - Investment strategy
  - Performance history
  - Concentrations and exposures
  - Asset classes (e.g., equities, fixed income, derivatives, private equity)
  - Volatility
  - Volume of transactions
  - Leverage and use of derivatives
- What is the risk and complexity of the financial instruments in the portfolio?
- Consider the following:
  - Market prices are readily available from active markets with significant transparency and reliability (e.g., stocks, bonds, options, futures).
  - Prices can be obtained from multiple sources such as dealers, brokers and intermediaries based on active markets with reasonable transparency, reliability and objectivity (e.g., certain high-yield bonds, forward contracts, matrix pricing of municipal bonds).
  - Prices can be obtained but the prices are not completely transparent, and the quality and reliability vary. The information is generally obtainable from dealers, although there may be wide spreads in prices (e.g., asset-backed securities, mortgage-backed securities, CDOs).
  - Prices are not observable in the market but can be derived from observable market data or estimated from historical performance or comparable data. The derivation or estimation requires a level of judgment (e.g., structured products, private equity).

## Nature of fund's liquidity terms

- What is the liquidity of the investee fund?
- Consider the following:
  - Subscription frequency (e.g., monthly, quarterly, annually, commitments)
  - Redemption frequency (e.g., monthly, quarterly, annually, closed end)
    - Gates
    - Early redemption charges
    - Side pockets
    - Holdbacks
    - Lock-ups
- To what extent is the liquidity of the investee fund's portfolio consistent with the liquidity provisions of the investee fund itself?

## Complexity of structure and key terms

- What is the complexity of the investee fund structure and key terms?
- Consider the following:
  - Management fee
  - Incentive fee/allocations
  - Carried interest
  - Hurdle rate/preferred return
  - High-water mark
  - Clawback provisions
  - Loss carryforward
  - Master-feeder
  - Multi-tiered
  - Side-by-side
  - Fund-of-funds
  - Side letters
  - Special-purpose vehicles
  - Opt-out provisions

# Transparency and reporting

## Nature and quality of transparency

- What is the nature, extent and timeliness of the investee fund manager's reporting (e.g., monthly, quarterly, annual statements; written correspondence in the form of newsletters, discussion of holdings and performance)?

- What level and quality of transparency is provided by the investee fund manager (e.g., full access to portfolio positions, access to books and records, access to portfolio managers and key accounting and operational personnel)?

## Quality of financial reporting

- Are the accounting policies and procedures consistent with industry practice? Under what basis of accounting are the financial statements of the investee fund prepared (e.g., US GAAP, International Financial Reporting Standards, Tax)? Is it the same basis as the investor entity?

- Is the investee fund's year end coterminous with the investor entity's reporting year end?

- Has the investee fund received anything other than an unqualified audit opinion in the past three years?

- Do the financial statements contain a portfolio of investments? Is it condensed or detailed? Does it contain enough information to assess geographical or industry concentrations?

- Are there unusual accounting policies or disclosures, including related-party disclosures?

# Internal controls

## Adequacy of infrastructure, personnel and general internal controls

- What is the quality of the fund accounting and operational personnel? Does the investee fund manager have a sufficient complement of accounting and finance personnel with the requisite skills, experience and training to provide for the investee fund's needs?
- What is the financial condition of the investment management firm?
- Is there a good relationship between management, the board of directors and the investors?
- Are there written policies and procedures commensurate with the size, nature and complexity of the funds trading strategies? If yes, how frequently are such policies reviewed and approved by senior management?
- Does the investment manager have the necessary infrastructure to execute, process and account for the transactions?
- Does the fund manager maintain adequate oversight over outside service providers such as prime brokers, custodians, administrators, investment consultants, sub-advisors, etc.? Are such firms reputable and experienced?
- Is the fund's strategy a core or ancillary strategy of the manager? Is this a new strategy?
- Are all trading strategies determined, approved and reviewed by senior management?
- Is there a SAS 70 or other attest engagement performed over the control environment by external auditors? If service providers are used (e.g., fund administrator), is there a SAS 70 over their control environment? If applicable, what is the nature of the SAS 70 report?
- Is there an internal audit function within the complex and, if so, does that internal audit department include the investee fund operations within the scope of its review each year?

## Design and effectiveness of valuation policies and procedures

- Does the firm have comprehensive written valuation policies and procedures that address the key methodologies and related inputs, by asset class, and the roles and responsibilities of the key parties in the valuation process?
- What is the degree of independence in the valuation process?
  - Role of front office
  - Role of back office
  - Role of service providers (e.g., third-party valuation experts)
  - Role of Valuation Committee
- Does a Valuation Committee exist and is it effective? Does it consist of any independent members?
- If valuation models are utilized, are:
  - They standard?
  - They consistently applied?
  - The key assumptions reasonable and reliable?
  - Third-party experts involved?
- Are there adequate information technology controls, including a disaster recovery plan?

## Quality of risk monitoring

- Are there risk limitation policies?
- What types of monitoring, reporting, escalation and resolution processes exist?
- Are "stress tests" performed on a regular basis?
- Are the concentrations of risk in the portfolio routinely measured against the trading covenants/restrictions outlined in the fund's governing documents (asset class, industry, geography, etc.)?
- What is the nature of the policies and procedures around the cash management function?
- What are the sources of liquidity available to the fund?
- What policies and procedures exist around measuring the fund's exposure to potential defaults by the fund's counterparties?
- Do policies and procedures exist to measure the fund's exposure to leverage? Are they operating as prescribed?
- What policies and procedures exist to measure the fund's exposure to operational risk (data entry errors, system failures, valuation errors, fraud)?

## Impact of regulatory compliance matters

- Is the advisor or the investee fund subject to SEC, CFTC, DOL, FSA or other regulations?
- If so, have there been any examinations by the regulatory bodies?
- What were the results?
  - Any investigations, sanctions or enforcement proceedings?
  - Any threatened or pending litigation?
- Does the investee fund manager maintain procedures for tracking and meeting large position reporting requirements?
- Is the investee fund manager's compliance with regulatory requirements independently reviewed? How often?
- Is there an effective chief compliance officer? Have his/her reviews resulted in any material findings that would affect the investee fund?
- Has senior management instituted a training program for all employees with respect to ethics and compliance procedures?
- Does management of the investee fund have a robust anti-money laundering program in place?

## Impact of legal and tax matters

- Does the complex have an effective in-house legal function that is recognized as part of senior management?
- Are all agreements with all relevant counterparties formally documented with legally binding agreements?
- Has management established formal, written document retention policies?
- Are there any lawsuits or litigation involving the general partner, its principals, employees or prior funds that would impact the investment manager or the fund?
- Are there any conflicts of interest with regard to the investee fund, as well as activities of the principals?
- Has the fund broken any covenants relating to any credit facilities or other counterparty arrangements? If yes, has the fund obtained appropriate waivers from the counterparty/credit provider?
- Is there an effective tax function and related internal controls?
- Are there significant uncertain tax positions?

# Appendix B | Liquidity terms

## Lock-up Period

A lock-up period refers to the initial amount of time a limited partner or shareholder is required to keep his or her money in a hedge fund before redeeming it. When the lock-up period is over, the limited partner or shareholder is free to redeem his or her interests in the fund on any liquidity date, subject to the other liquidity terms described in the fund documents. Whether a hedge fund demands a long lock-up period depends a great deal on the quality and reputation of the hedge fund as well as the liquidity of the underlying investment portfolio. Investors may be able to redeem during a lock-up period after they pay a "redemption fee," often 3 percent to 5 percent of the amount requested to be redeemed.

## Notice Requirement

Following the expiration of any applicable lock-up period, a limited partner or shareholder may, upon specified prior written notice (generally 45 days to 120 days) to the general partner or manager (a "Redemption Notice"), elect to redeem all or a portion of his or her interest in a hedge fund as of the last day of a calendar quarter or month (the "Redemption Date"). Redemption requests are generally irrevocable once delivered and are unconditional. Redemption requests that purport to be revocable or conditional can generally be ignored or treated as irrevocable and unconditional, at the discretion of the general partner or investment manager.

## Payment and Holdback

When the general partner or investment manager receives a Redemption Notice, the hedge fund will redeem the interests of a limited partner or shareholder as specified in the Redemption Notice, at the redemption price as of the applicable Redemption Date. The fund will distribute all or a substantial portion (i.e., 90 percent) of the redemption price with respect to the interests being redeemed within a specified number of business days (e.g., 30) following the applicable Redemption Date. Any balance (i.e., the remaining 10 percent) is distributed within a specific timeframe, often following the release of the fund's audited financial statements for the year in which the Redemption Date falls. Sometimes (but not always) the redeeming limited partner or shareholder is entitled to interest on the unremitted balance. Holdback amounts protect the general partner or investment manager from adjustments made to the net asset value of the fund as a result of an audit of the financial statements.

## Side Pockets

Some hedge funds have an investment strategy that allows the fund to invest in illiquid securities, yet investors are still allowed periodic redemption. In such cases, a common mechanism used is a "side pocket," whereby, at the time an investment is made in such an illiquid security, a proportionate share of a limited partner's capital account, relative to the entire capital balance of the fund, is assigned to a separate memorandum capital account or "side pocket account" for that limited partner. This side pocket account generally does not incur a performance fee until the illiquid security is sold or otherwise deemed liquid. Typically, limited partners lose redemption rights to their side pocket accounts, and even a full redemption request is fulfilled only with that capital ascribed to his or her "basic" capital account (i.e., the non-side pocket capital account). Only after the security is sold (or otherwise deemed liquid) by the fund is the amount moved back to each applicable limited partner's basic capital account. Side pocket accounts are often referred to as "designated accounts" or as "special investment accounts."

## Suspension or Postponement of Redemption

Pursuant to the hedge fund's governing documents, the general partner or investment manager can suspend or restrict the determination of net asset value and/or the right of any limited partner or shareholder to redeem his or her interests (whether in whole or in part). The general partner or investment manager can implement this restriction for certain reasons, including the aggregate amount of redemption requests, certain adverse regulatory and tax consequences and other reasons that may cause the inability to promptly and accurately calculate the fund's net asset value. The most common example is the use of a "gate," whereby redemption requests are deferred because the aggregate amount of redemption requests as of a particular Redemption Date exceeds a specified level, generally ranging from 15 percent to 25 percent of the fund's net asset value.

# Appendix C | Other key terms

## Hedge funds

| Key terms | Potential implications |
|---|---|

### Classes of Shares or Partnership Interests

Offshore hedge funds may issue interests in the form of a single class of shares or multiple classes of shares. Partnerships may also have different ownership classes or interests. Multiple-class funds have unique operational and accounting issues. The terms of the fund documents dictate how income, expenses, gains and losses are to be allocated to determine the net asset value for each class or interest. In addition, specific classes may have class-specific expenses or be entitled to specific items of income (e.g., "new issue" income). Finally, fee waivers may exist for certain classes of shares.

The investor entity should understand the terms of its ownership interest and ensure that the class of shares or partnership interest that is reported by the investee fund manager on its investor statement is consistent with the subscription documents maintained in its files.

### High-Water Mark

A high-water mark ensures that an incentive fee/allocation (see below) is made only to the extent that the net asset value of an investor's interest exceeds the highest net asset value as of any previous incentive fee/allocation period. In general, a high-water mark is the capital balance of an individual partner/shareholder after the last incentive fee/allocation was charged. This balance is then adjusted for any contributions or withdrawals during the period to establish a new high-water mark. The agreement or offering memorandum defines the high-water mark and dictates how the incentive fee/allocation is calculated.

The investor entity should be aware of the high-water mark provision in the fund documents and if its investment exceeds the high-water mark for a given period. If the investment balance exceeds the high-water mark, the investor entity should ensure that its net asset value is calculated net of the incentive fee/allocation.

### Incentive Fee/Allocation

Incentive fee/allocation is performance-based compensation in which the investment manager or general partner receives a specified percentage (often 20 percent) of net income. These amounts are accounted for in accordance with the offering memorandum/partnership agreement, sometimes as an expense (income statement) as in the case of a corporate structure or as a special allocation of partnership profits (statement of changes in partners' capital) to the general partner in the case of a partnership. The amount of the allocation should be shown in the statement of operations or in the statement of changes in partners' capital, and the method of computing such allocations should be disclosed.

When determining fair value, the investor entity should ensure that its capital balance is reported net of the incentive fee/allocation.

| Key terms | Potential implications |
|---|---|

## Loss Carryforward

A loss carryforward is a technique or provision in the partnership agreement or offering document that applies the current year's net operating losses to future period profits when calculating the incentive fee/allocations. These provisions protect the investor entity by ensuring the general partner or investment manager makes up the shortfall of losses before he or she is entitled to any incentive fee based on profits. Accordingly, if the investee fund has earned profits in the current period, the general partner or investment manager may not be entitled to an incentive fee/allocation because there may be pre-existing loss carryforwards from prior periods. Typically, unused carryforwards are reduced pro rata for redemptions made while they are outstanding.

The investor entity must be aware of loss carryforward provisions that exist in investee fund partnership agreements and the impact, if any, to the fair value of its investment.

## Master-Feeder Funds

Certain funds will have structures under which they invest in other affiliated funds. A feeder fund is a fund that conducts virtually all of its investing through another fund (called the master fund). The master fund conducts all investing activities. Each feeder fund's statement of assets and liabilities shows an investment in the master fund, which is usually the sole or principal investment of the feeder fund.

A schedule of portfolio investments is generally not presented at the feeder level. Accordingly, the investor entity should obtain the feeder fund's and the master fund's financial statements to ascertain the capital structure and associated net asset value of its investment and understand the nature, complexity and liquidity of the underlying portfolio investments.

## New Issue Eligibility

New issue securities are defined by the National Association of Securities Dealers Inc. (NASD) as equity securities being sold through an initial public offering. Resulting profits or losses from new issue securities are not allocated to the capital accounts of those investor entities considered to be restricted persons. In many cases, separate share classes will be created for shareholders who are eligible and ineligible to participate in new issue income.

The investor entity should be aware of its eligibility and whether it has subscribed to the appropriate class of shares. Accordingly, when analyzing the fair value of its investment, the investor entity should ensure that new issue income has been properly included or excluded from its capital account balance.

| Key terms | Potential implications |
|---|---|

## Open-End Fund

An open-end fund is an investment company that is ready to offer or redeem its shares or partnership interests periodically. Open-end funds provide for liquidity to investor entities. The frequency of contributions or redemptions is dictated by the fund's documents. Contributions and redemptions can be monthly, quarterly, semi-annually, annually, etc. The amount of liquidity provided to investor entities in a particular fund is usually consistent with the liquidity and risk associated with the underlying portfolio (i.e., the more liquid the investments in the portfolio, the greater the liquidity generally provided to the investors).

The investor entity should be aware of the liquidity provisions associated with the fund in which it invests. If the investee fund is less liquid, the investor should have a better understanding of the nature, complexity and risks associated with the underlying investments.

## Side Letters

In general, a side letter is a private agreement between a general partner and a limited partner, relating to the limited partner's investment in a partnership, which provides the limited partner with rights that are not otherwise available to the limited partners under the fund agreements. A side letter typically appears as a unilateral letter agreement delivered by the general partner to the limited partner, although it can be drafted as a traditional, two-party agreement. Side letters may provide for certain agreements outside of the partnership agreement, such as management fee waivers, co-invest or opt-out provisions.

Side letters are not part of the fund agreements; therefore, those within the investor entity responsible for monitoring of and accounting for the investment must know if side letters exist between the investor entity and the fund because the side letter may have a direct impact on the calculation of the investor entity's investment in the investee fund.

## Special-Purpose Vehicle (SPV)

Special-purpose vehicles (SPV) are usually created for a single, well-defined and narrow purpose. The SPV can take any number of legal forms: corporation, partnership, trust, unincorporated entity or a multi-user structure (such as a protected cell company). In certain cases, SPVs are referred to as a "bankruptcy-remote entity," with operations limited to the acquisition and financing of specific assets. Sometimes, funds will own interests in SPVs, which will in turn own interests in specific investments.

Just as the investor entity must understand the terms and conditions associated with an investee fund, it must also understand the terms and conditions associated with the SPV and its effect on the liquidity and fair value of the investee fund.

# Private equity funds

## Key terms

## Potential implications

### Capital Commitments

A capital commitment is a general or limited partner's obligation to provide a certain amount of capital to a fund. Commitments are usually made up front at the time capital is raised. Profits and losses may be allocated in accordance with capital commitments or unfunded capital commitments rather than capital contributed to the fund.

The investor entity should consider its ability to meet its obligations under its capital commitment. Disclosure should be made in the financial statements with respect to the investor entity's obligation.

### Carried Interest

This term denotes the split of profits to the general partner. This is the general partner's compensation for carrying the management responsibility plus all the liability for serving as general partner, as well as providing the needed expertise to successfully manage the investments in the fund. Carried interest is somewhat analogous to incentive fee/allocation for a hedge fund. There are many variations of this profit split, both in its size and how it is calculated and accrued. The carried interest terms will affect the balance of the capital account for both the general partner and limited partners, depending on the terms of the agreement.

Carried interest incorporates a "waterfall" calculation based on the terms of the agreement. The investor entity should be aware that in certain cases the carried interest is considered more of a distribution concept than an allocation concept. The investor entity must ensure that the investee fund considered a hypothetical liquidation model when calculating its capital account (i.e., if the fund were completely liquidated on the reporting date, how would the proceeds be distributed to the general partner and the limited partners?). In most cases, but not all, this allocation is reflected in the capital statement already – on a hypothetical liquidation basis – and disclosed as such.

### Clawback

A clawback obligation represents the general partner's promise that, over the life of the fund, the managers will not receive a greater share of the fund's distributions than they are entitled to. Generally, this means that the general partner cannot keep distributions representing more than a specified percentage (e.g., 20 percent) of the fund's cumulative profits. When triggered, the clawback requires that the general partner return to the fund an amount equal to what is determined to be "excess" distributions. Clawbacks can present issues with respect to valuation when the value of the portfolio falls below a specific threshold. Issues arise because carried interest distributions have often already been made to the general partner, thus requiring that amounts be returned to the fund by the general partner. The calculation of the amount of clawback obligation is dictated by a number of technical, often highly negotiated, provisions in the fund's limited partnership agreement. These provisions look at the aggregate amount of distributions received by the general partner over the life of the fund, but typically exclude both amounts received in respect of the general partner's capital contribution (usually 1 percent) and the taxes payable by the general partner on all carried interest distributions. More complex provisions exist as well. When applying the waterfall calculation concept, clawback provisions must be taken into consideration. Also see *Carried Interest* above.

When a clawback is triggered, it may affect the investor entity's interest in the investee fund. Certain clawback provisions may result in a negative general partner balance or a receivable from the general partner. The investor entity must assess the impact of the clawback on its own investment balance and consider the credit risk associated with the general partner's obligation to refund the clawback to the partnership. Also see *Carried Interest* above.

| Key terms | Potential implications |
|---|---|

## Closed-End Fund

A closed-end fund is an investment company that has a
fixed number of shares outstanding or a fixed amount of
capital commitments from investors, which it does not
stand ready to redeem. This structure is very common to
private equity funds because the underlying investments are
illiquid. As such, the fund has no liquidity to provide for
redemptions to investors. Accordingly, investors are
"locked in" and must wait until the fund can sell its
investments in order to convert the fair value of the
investment into cash that can then be distributed under the
terms of the agreement.

The investor entity should be aware of the liquidity
provisions associated with the fund in which it invests.
If the investee fund is less liquid, the investor entity should
have a better understanding of the nature, complexity and
risks associated with the underlying investment portfolio.

## In-Kind Contributions and Distributions

Certain agreements may provide for capital contributions or
distributions in the form of securities or investments in other
funds. The valuation of these transactions, for purposes of
allocations/distributions under the agreement, may be non-
GAAP. For instance, for a private equity fund, a distribution
may be based on a value determined using a 10-day
average, unlike GAAP, which would require the securities to
be fair valued on the date of distribution.

The investor entity should be aware of the accounting
policies used by the investee fund and ensure that its
accounting policy conforms with GAAP.

## Opt-out Provisions

Certain investment partnership agreements will allow
partners to "opt out" of a particular investment by providing
a written notice or written opinion to the effect that a limited
partner's participation in such investment would have a
detrimental effect due to legal, regulatory, or other
requirements. Accordingly, the limited partner would be
excluded from participation in that type of investment within
the fund's portfolio.

Gains and losses associated from the restricted investment
should not be reflected as part of the fair value of the
investor entity's interest in the investee fund.

## Key terms

## Potential implications

### Preferred Return and Catch-Up Amount

The preferred return is the internal rate of return that a fund must achieve before its general partner can receive a carried interest. When the fund achieves the preferred return as defined in the fund documents, the general partner is usually entitled to receive a carried interest (see definition above). In many cases, the general partner is entitled to a "catch-up amount" whereby all or a specified large percentage of profit is allocated to the general partner after the preferred return is achieved until the general partner has received cumulative profits equal to the carried interest percentage (e.g., 20 percent).

See *Carried Interest* discussed earlier.

### Priority Allocation

Certain funds may incorporate priority returns to the general partner or other partner that result in economics for a partner or shareholder that are other than a pro rata share of income or loss. For example, this could take the form of management fees waived by the general partner in exchange for a priority allocation of a gain associated with a particular investment.

Priority allocations must be taken into consideration when applying the waterfall provisions of a private equity partnership agreement in determining the fair value of an interest in that partnership.

# Practice leaders

Mark Casella
Assurance Partner
National Alternative Investment Funds
Practice Leader
646.471.2500
mark.j.casella@us.pwc.com

John A. Mattie
Assurance Partner
National Education and Not-for-Profit
Practice Leader
617.530.4251
john.a.mattie@us.pwc.com

# Principal authors

Michele Godvin
Assurance Partner
Alternative Investment Funds
206.398.3801
michele.l.godvin@us.pwc.com

Mike Greenstein
Assurance Partner
Alternative Investment Funds
646.471.3070
michael.s.greenstein@us.pwc.com

Tim Grady
Assurance Partner
Alternative Investment Funds
617.530.7162
timothy.grady@us.pwc.com

Lee Ann Leahy
Assurance Partner
National Education and Not-for-Profit
617.530.4554
leeann.c.leahy@us.pwc.com

© 2007 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a Delaware limited liability partnership) or, as the context requires, the PricewaterhouseCoopers global network or other member firms of the network, each of which is a separate and independent legal entity. *connectedthinking is a trademark of PricewaterhouseCoopers LLP (US).

www.pwc.com